# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **EILEEN A. MCNAMARA, as Administrator of the ESTATE OF JONATHAN GLEAVES, JR.,** | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 2:20-cv-04570-RBS** |
| | : | |
| **CITY OF PHILADELPHIA; CORIZON HEALTH; GERALD SLORY; ELIZABETH BRADLEY; LALITHA TRIVIKRAM; MATU GAYE; JOHN DOE(S),** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF REQUEST TO PRODUCE MORTALITY REVIEW DOCUMENTS

As directed in the Court's Order of April 8, 2022 (Doc. 25), plaintiff Eileen A. McNamara submits this Memorandum of Law in further support of a request that defendant Corizon Health produce in discovery all documents prepared in connection with a mortality review relating to the death of plaintiff's decedent, Jonathan Gleaves, Jr. For the reasons outlined in this Memorandum, which supplements a letter request of March 11, 2022, *see* Ex. A., Ms. McNamara respectfully requests that the Court order the production of the mortality review materials.

## I.    Factual and Procedural Background

The claims in this matter concern Mr. Gleaves's death on September 21, 2018, one day after his admission to Curran-Fromhold Correctional Facility in the Philadelphia Department of Prisons. In relevant part, the complaint alleges that the Corizon defendants failed to schedule necessary and required medical assessments to monitor Mr. Gleaves's dangerous withdrawal

from his self-reported use of opiates and benzodiazepines, and, because of that failure, were unable to intervene when Mr. Gleaves developed symptoms of the condition that caused his death.[1]

Based on discovery conducted to date, it is undisputed that Mr. Gleaves was not seen for any medical assessment between his initial admission to the facility at approximately 7:00 pm on September 20, 2018, and 7:00 am on September 21, 2018, when he was found unresponsive in his cell. Two physicians employed by Corizon have testified in their depositions that Mr. Gleaves *should* have had an assessment in this period. As defendant Dr. Lalitha Trivikram explained, a known, but unresolved, glitch in Corizon's electronic medical record system required nurses to take extra steps to schedule a "same day assessment"—that is, an assessment in the nursing shift immediately following the shift during which an initial intake evaluation was completed. Accordingly, when Mr. Gleaves was seen by the medical unit on his admission to the facility at 7:00 pm on September 20 (a time that fell within the 3 pm—11 pm nursing shift), a nurse was required to manually create an appointment in the electronic record system to ensure that Mr. Gleaves would be assessed again during the next nursing shift, between 11:00 pm on September 20 and 7:00 am on September 21. *See* Trivikram Dep. (Ex. B) at 35-41. The nurse who saw Mr. Gleaves at 7:00 pm on September 20, defendant Nurse Gaye, failed to manually create this appointment, and, as a result, there was no assessment scheduled.

Following Mr. Gleaves's death, defendant Corizon took two actions regarding the failure to create a same day assessment. First, it initiated an "employee education" process for Nurse

---

[1] The complaint also asserts claims against the City of Philadelphia and a correctional officer regarding the failure to conduct necessary monitoring of Mr. Gleaves while he was locked in a cell. To Ms. McNamara's understanding, the mortality review process did not touch on any conduct on the part of the City or City employees. Accordingly, these separate claims are not implicated by the instant discovery dispute.

Gaye. A report arising out of that process stated that Gaye "failed to create the same day withdrawal encounters for an inmate on 9-20-18" and instructed that withdrawal encounters for all persons who require assessments "will be manually created for the same day." Ex. C.

Second, it addressed this failure in its mortality review. According to Dr. Trivikram, as a matter of course, a mortality review meeting involves officials in multiple positions within the prison, including the site medical director (that is, Dr. Trivikram), quality assurance specialists from Corizon, correctional officials employed by the City of Philadelphia, and Philadelphia police detectives. Ex. B at 26-27. During the mortality review, Dr. Trivikram reported on the details of the events leading to the death, the cause of death, and any improvements in practices to remedy observed shortcomings or errors. *Id.* at 27-28. Dr. Trivikram explained that multiple documents would have been created in connection with the mortality review, including Dr. Trivikram's written review of the case. *Id.* at 28. Although Dr. Trivikram could not recall whether other documents were created regarding Mr. Gleaves, she anticipated that quality assurance staff members should have produced reports and that, if discipline or remedial measures were recommended as a result of the mortality review, then additional documents would have been prepared to communicate those recommendations. *Id.* at 28-29.

During her deposition, Dr. Trivikram informed counsel that, to prepare for her deposition testimony, she reviewed the report she wrote in advance of the mortality review meeting. *Id.* at 29. Following that testimony, counsel for Ms. McNamara requested that Corizon produce a copy of the report reviewed by Dr. Trivikram. *Id.* at 30. Counsel for Corizon objected, citing a "patient safety" privilege. *Id.* Additionally, when counsel for Ms. McNamara asked Dr. Trivikram to describe any conclusions made in the mortality review process regarding errors or

the need for discipline, counsel for Corizon directed Dr. Trivikram not to answer on the same grounds. *Id.* at 31-32.

Thereafter, on March 11, 2022, counsel for Ms. McNamara submitted a letter to the Court requesting that the Court direct Corizon to produce *all* materials related and referring to the mortality review (i.e., not just the document prepared by Dr. Trivikram that she later reviewed to prepare for her deposition testimony). *See* Ex. A at 1. After Corizon's submission of a letter outlining its position, on April 8, 2022, the Court entered an Order directing the parties to submit further briefing.

Since that Order, on April 27, 2022, counsel for Ms. McNamara conducted the deposition of defendant Nurse Gaye—the Corizon employee, who, as established in previous depositions of other defendants, had failed to follow mandatory protocols for the scheduling of an assessment for Mr. Gleaves. Gaye denied that she had done anything improper in her encounter with Mr. Gleaves. In the first instance, she stated that she did not recall any discussion of the employee education report regarding her failure to schedule an assessment. Ex. B. Although she acknowledged that her signature was at the bottom of the document, she claimed not to recall ever receiving it. Further, and significantly, Gaye stated that the explanation of required protocols for the scheduling of assessments provided in the employee education report was *wrong*. In Gaye's view, she was permitted to use her judgment as to whether Mr. Gleaves required an assessment on the 11 pm – 7 am nursing shift, and she specifically recalled that she had made the judgment that he did not require such an assessment. When confronted with Dr. Trivikram's testimony that such an assessment was, in fact, required, Nurse Gaye testified that, in her opinion, Dr. Trivikram, the facility medical director, had an inaccurate understanding of

the facility's protocols.  Finally, Nurse Gaye denied having learned of any conclusions in a mortality review proceeding that she had acted improperly in her encounter.[2]

## II.      Argument

Any documents related to Corizon's mortality review are very likely of significant relevance to Ms. McNamara's claims.  Dr. Trivikram's testimony that Corizon was aware of an issue in its recordkeeping system requiring nurses to take an extra step to schedule critical appointments and the result in this case where an appointment was not scheduled suggests that Corizon failed to establish necessary policies to ensure adequate medical treatment.  *See Natale v. Camden Cty. Corr. Facility,* 318 F.3d 575, 585 (3d Cir. 2003) (reversing summary judgment for County defendant on grounds that jury could conclude that County failed to establish a policy to sufficiently address prisoners' medication needs).  Additionally, Nurse Gaye's testimony insisting that both the supervisor who wrote her employee education report and Dr. Trivikram had an incorrect understanding of relevant protocols and that she had done nothing wrong in failing to schedule an assessment for Mr. Gleaves supports a claim that Corizon failed to properly train, supervise, and/or discipline its employees.  *See Whitehurst v. Lackawanna Cty.,* No. 3:17-CV-00903, 2020 WL 6106616, at *18 (M.D. Pa. Mar. 5, 2020), *report and recommendation adopted*, 2020 WL 6083409 (M.D. Pa. Oct. 15, 2020) (denying summary judgment to county based on evidence that county had failed to train medical and correctional staff to observe and report on prisoners' medical status).  Given Dr. Trivikram's testimony that the mortality review process focuses on practices that may have led to bad medical outcomes and

---

[2] The transcript of Nurse Gaye's deposition has not yet been produced.  Ms. McNamara will provide relevant portions of the transcript to the Court when it is prepared.

results in the development of remedial measures to address any faulty practices, the findings of the mortality review process in Mr. Gleaves's case are highly probative to these claims.

Corizon has asserted in its letter submission and its memorandum (Doc. 27) that the instant discovery dispute concerns a single document: the report written by Dr. Trivikram that she reviewed in preparation for her deposition testimony. Ms. McNamara, however, seeks *all* documents prepared in connection with the mortality review, as, based on Dr. Trivikram's testimony, it appears that multiple such documents may have been created. To the extent any such other documents exist, Corizon has proffered no objection to the production of those materials, and Ms. McNamara requests that the Court direct Corizon to produce those materials.

As to the single document discussed in Corizon's submissions—the report prepared by Dr. Trivikram—the Court's Order directs the parties to address (a) whether the document was prepared for the purpose of reporting to a patient safety organization and (b) whether accreditation standards or prison policies require the preparation of the document. As outlined below, on the first issue, Corizon has failed to meet its burden of demonstrating applicability of the patient safety privilege, and, on the second issue, given nationwide standards and Corizon's contractual obligations mandating preparation of the document in question, it must be produced. Further, even if the Court were to find that any privilege applied, Dr. Trivikram's use of the document to refresh her recollection prior to her deposition testimony waives any privilege, and the document is discoverable.

### A. Corizon has not established that Dr. Trivikram's report was prepared for submission to a patient safety organization.

Corizon asserts that Dr. Trivikram's report is protected from disclosure under the Patient Safety and Quality Improvement Act because it meets the definition of a document prepared for

submission to a "patient safety organization" as defined in 42 U.S.C. § 299b-21(7)(A).  Corizon is incorrect.

While Corizon asserts that the statutory framework provides "broad" protection against disclosure, Doc. 27 at 3, the case law is to the contrary.  The statute is "not intended to provide a blanket protection for all information and communications generated for quality control purposes."  *Johnson v. Cook Cty.*, No. 15-741, 2015 WL 5144365, at \*6 (N.D. Ill. Aug. 31, 2015).  Only information that is *specifically made or gathered for* a patient safety organization is subject to protection.  *Id.* (citing 42 U.S.C. § 299b-21(7)(A)).  Thus, any information that is gathered for some other purpose is not protected from disclosure just because it was also reported to a patient safety organization.  *Id.* (citing 42 U.S.C. § 299b-21(7)(B)).

A party asserting privilege under the PSQIA has the burden of establishing that the privilege applies.  Thus, in *Johnson* for example, the court rejected the defendant medical provider's claim of privilege on the ground that the provider had "offered no actual proof to support its assertion that the Report was ever reported—functionally or otherwise—to a PSO." *Id*.  The defendant had not submitted an affidavit from anyone connected with the purported patient safety organization or any other proof to support that conclusion.  *Id*.

Corizon's assertion of privilege in this case suffers from the same flaw.  It has offered no proof that Dr. Trivikram's report was prepared for submission to a patient safety organization. Instead, its argument rests on the conclusory assertion in its brief that the document was, in fact, submitted to Corizon's patient safety organization.  Just as in *Johnson*, this assertion, without more, "is not enough."  *Id.*; *see also Tanner v. McMurray*, 405 F. Supp. 3d 1115, 1224 (D.N.M. 2019) (citing *Dunn v. Dunn*, 163 F. Supp. 3d 1196, 1210 (M.D. Ala. 2016)) (concluding that

medical provider had "not met…its burden of demonstrating that the information at issue was in fact assembled or developed for reporting to the PSO").

Corizon relies on the ruling in *Abran v. City of Philadelphia*, No. 18-1107, ECF 97 (E.D Pa. Nov. 8, 2019), to support its assertion of privilege in this case. In *Abran*, Corizon made similar bald assertions that the document in question was produced to a patient safety organization. *Abran*, ECF 78-1 at 2-3. At no time, however, did the plaintiff in that matter assert that Corizon had failed to meet its evidentiary burden in supporting the assertion of the privilege—indeed, the plaintiff filed no brief responding to Corizon's brief on the issue. The court, therefore, was left to decide the privilege question without any challenge to Corizon's claim that the privilege applied. *Abran* does not, therefore, stand for any broad proposition that Corizon's mortality review documents are presumptively protected from disclosure.[3]

**B.     Preparation of mortality review documents is required under national accreditation standards and Corizon's contract with the City of Philadelphia.**

The failure of Corizon to provide proof that the document in question was prepared for the purpose of submission to a patient safety organization is not a mere technical or formal requirement. Courts have insisted on such proof because the PSQIA's statutory framework envisions that many materials submitted to a patient safety organization are prepared for *other*

---

[3] Contrary to Corizon's characterization, the Third Circuit's affirmance of a grant of summary judgment for the defendants in *Abran* provides no support for its position in this case. The Third Circuit's ruling addressed the district court's ruling on the *merits* of plaintiff's claims. *Abran v. City of Philadelphia*, No. 20-3503, 2021 WL 5401542, at \*3-4 (3d Cir. Nov. 8, 2021). Though the Court made passing reference to discovery issues, it did so only to respond to the plaintiff's assertion that the district court had failed to resolve outstanding discovery disputes. *Id.* at \*5. That assertion was, the Court pointed out, false—a conclusion that led the Court to admonish plaintiff's counsel to be mindful of the duty of candor to the court. *Id.* In these circumstances, the Court's conclusion that there was no abuse of discretion in the district court's "management of discovery" addressed only the fact that the district court had provided the parties with definitive rulings on all discovery issues. *Id.* That conclusion says nothing about the merits of the district court's ruling on the PSQIA privilege issue.

purposes. Such documents are not protected from disclosure. *See Johnson*, 2015 WL 5144365, at *7 ("Information generated or assembled for some other purpose, even if the information relates to quality improvement measures, is not considered patient safety work product."); *Tanner*, 405 F. Supp. 3d at 1223 ("[B]ecause Correct Care does not specify when it provided the documents in question to the PSO, it is not possible to determine whether the documents were produced for reporting to the PSO, or for some other purpose, such as contract compliance, and later provided to the PSO.").

Corizon acknowledges that its contract with the City of Philadelphia requires it to conduct a mortality review in the event of a prisoner death. Doc. 27 at 4-5. It also acknowledges that National Commission on Correctional Health Care standards require implementation of a mortality review process in order to maintain accreditation as a correctional health care provider. *Id.* at 5. Indeed, Corizon's policies for operations in the Philadelphia Department of Prisons are synced with NCCHC accreditation guidelines. *Compare* Ex. D (Corizon Policy No. "J-A-10.00" regarding procedures in the event of an inmate death) *with* Inmate Death, National Commission on Correctional Health Care, *available at*, https://www.ncchc.org/inmate-death (referring to "Standard A-10" as requiring a clinical mortality review).[4] Under the relevant standard, as articulated in its facility policy, Corizon is *required* to conduct a death review regarding "[a]ll deaths," with that review consisting of an administrative review, a clinical mortality review, and a psychological autopsy. Ex. D.

These arrangements are dispositive of the privilege issue. Corizon's contract requires it to maintain accreditation and comply with NCCHC standards. Those standards require a

---

[4] NCCHC does not make its standards available to the public; the referenced web posting provides commentary on relevant standards and is cited here to confirm the identification of the specific NCCHC standard regarding mortality reviews: A-10.

mortality review. Corizon's policies effectuate that requirement. This framework creates a process that is entirely separate from whatever actions Corizon elects to take regarding a patient safety organization under the terms of the PSQIA. Accordingly, even if Corizon had proven that it submitted Dr. Trivikram's mortality report to a patient safety organization (it has not), the fact that the report was prepared for another purpose precludes application of the patient safety privilege. *See Johnson*, 2015 WL 5144365, at *7 (noting in rejection of privilege assertion that "the Report is an internal document prepared in accordance with Jail Policy A–10 and focused on the issue of system failures"); *see also Lopez v. Bucks Cty.*, No. 15-cv-5059, ECF 26 at 3 (E.D. Pa. April 15, 2016) (noting in ordering production of full mortality report that redacted report produced by defendants showed that "such reviews are required by the National Commission on Correctional Health Care standards").

      **C.     Claims of privilege are waived for any document Dr. Trivikram reviewed to prepare for deposition testimony.**

Even if Corizon were able to properly assert a privilege to preclude production of Dr. Trivikram's report, the privilege is waived because Dr. Trivikram reviewed the report to prepare for deposition testimony. *See Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, No. 17-3166, 2018 WL 704686, at *6 (N.D. Ill. Feb. 5, 2018) ("[I]f a deponent or a trial witness uses a document to refresh recollection, even the claim of privilege will not protect against disclosure."); *Napolitano v. Omaha Airport Auth.*, No. 8:08-cv-299, 2009 WL 1393392, at *5 (D. Neb. May 11, 2009) (concluding that where attorneys did not prepare the disputed documents the fact that the plaintiff used the documents to prepare for a deposition so that he could recall the events at issue in the litigation required disclosure). Dr. Trivikram made clear in her testimony that she reviewed her mortality report to refresh her recollection of events

concerning Mr. Gleaves.  The report is, therefore, subject to disclosure regardless of any privilege.

**III.    Conclusion**

For the foregoing reasons, Ms. McNamara respectfully requests that the Court direct defendant Corizon to produce all documents in its possession relating or referring to the mortality review conducted following the death of Mr. Gleaves.

Respectfully submitted,


/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
jfeinberg@krlawphila.com

*Counsel for Plaintiff Eileen A. McNamara*