# EXHIBIT A

**KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN LLP**          Law Offices

The Cast Iron Building
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

David Rudovsky                                    Phone  (215) 925-4400
Paul Messing                                      Fax     (215) 925-5365
Jonathan H. Feinberg                              jfeinberg@krlawphila.com
Susan M. Lin
Grace Harris
Ilene Kalman (1985-1996)                          www.krlawphila.com
David Kairys
   Of Counsel
Tanya Alexander
   Office Manager

March 11, 2022

***Via Email***
The Honorable R. Barclay Surrick
United States District Court
601 Market Street
Philadelphia, PA 19106

Re:    *McNamara v. City of Philadelphia et al.*, No. 20-cv-4570

Dear Judge Surrick:

I write to request the Court's intervention in a discrete discovery dispute: plaintiff's request that defendant Corizon Health produce materials related and referring to the mortality review conducted following the death at issue in this civil rights matter. Corizon has declined to produce the requested materials, and, after good faith discussions, the parties are at an impasse. The parties, therefore, request a conference with the Court, or, if the Court prefers, a schedule to more fully brief the issue.

For purposes of background, the claims in this matter concern the death of Jonathan Gleaves, Jr., one day after his admission to the Philadelphia Department of Prisons in September 2018. In relevant part, the complaint alleges that the Corizon defendants failed to schedule necessary medical assessments to monitor Mr. Gleaves's dangerous withdrawal from his self-reported use of opiates and benzodiazepines. Discovery conducted to date has provided substantial support for this allegation. In depositions conducted this week of defendants Dr. Elizabeth Bradley and Dr. Lalitha Trivikram, the testimony established that a third defendant, Nurse Matu Gaye, failed to schedule a necessary appointment for Mr. Gleaves. As a result, Mr. Gleaves was, in violation of Corizon practices, not seen for any medical evaluation after his admission to the prison on the evening of September 20, 2018. Indeed, the only reason he was ever seen by Corizon staff after his admission is because correctional staff found him unresponsive and summoned assistance for a medical emergency. Additionally, the testimony established that Nurse Gaye's failure to schedule the appointment may have been due to a known, but unresolved, glitch in Corizon's electronic medical record system that requires nurses to take extra steps to schedule drug withdrawal assessments like that required for Mr. Gleaves.

The mortality review that is the subject of the parties' discovery dispute was addressed in Dr. Trivikram's deposition in two respects. First, Dr. Trivikram reported that Nurse Gaye's failure to schedule the necessary appointment for Mr. Gleaves was discussed in documents prepared for the mortality review process. Second, Dr. Trivikram explained that in preparation for her deposition she reviewed the memorandum that she wrote as part of the mortality review. Given this testimony, plaintiff requested that Corizon produce the mortality review documents, but counsel for Corizon declined to do so, citing various privileges.

Your Honor has addressed this precise issue in an analogous situation. In *Williams v. City of Philadelphia*, No. 08-cv-1979, 2014 WL 5697204 (E.D. Pa. Nov. 4, 2014), a suit concerning conditions in the Philadelphia Department of Prisons, the Court held that no federal peer-review privilege precluded the production of mortality and sentinel event reviews, and it ordered Corizon to produce those materials. As the Court noted in echoing the lead Circuit decision on the issue, "'in the prison context[,] the safety and efficiency of the prison' render it 'peculiarly important that the public have access to the assessment by peers of the care provided.'" *Id.* at *4 (quoting *Agster v. Maricopa Cty*, 422 F.3d 836, 839 (9th Cir. 2005)). Other Judges of this Court have reached the same conclusion. *See Lopez v. Bucks Cty.*, No. 15-cv-5059, ECF 26 at 1-3 n.1 (April 15, 2016) (citing *Williams*, 2014 WL 5697204, at *4) (declining to recognize medical peer review privilege given "the greater need for public scrutiny of medical care in the prison context than in the ordinary hospital setting"); *Weiss v. Cty. of Chester*, 231 F.R.D. 202, 205-07 (E.D. Pa. 2005) (compelling production of mortality review report in prisoner suicide case).

Counsel for Corizon has made specific reference in discussions on plaintiff's request to a "patient safety" privilege under the Patient Safety and Quality Improvement Act, 42 U.S.C. § 299b-21. But that privilege is a uniquely narrow one that applies only to materials meeting a statutory definition of "patient safety work product." *See Johnson v. Cook Cty.*, No. 15-cv-741, 2015 WL 5144365, at *5-6 (N.D. Ill. Aug. 31, 2015) (ordering production of mortality report based on finding that report did not constitute patient safety work product); *see also Tanner v. McMurray*, 405 F. Supp. 3d 1115, 1197-98, 1200-03 (D.N.M. May 7, 2019) (citing *Williams*, 2014 WL 5697204, at *1) (rejecting assertions of self-critical analysis privilege and statutory patient safety privilege and directing production of quality improvement materials in prison death case).

Counsel for Corizon has identified an Order entered in *Abran v. City of Philadelphia*, No. 18-cv-1107, ECF 97 (Nov. 8, 2019), as supporting its position that it may withhold the mortality review materials in this case as "patient safety" materials. While the Court in *Abran* declined to order production of the materials based on the assertion of a patient safety privilege, the ruling appears to be an outlier that does not address decisions emphasizing narrow application of that privilege. Nor does the Order cite the multiple decisions, including Your Honor's, directing the production of materials like the mortality review documents plaintiff now requests. Indeed, on the facts, the single "patient safety" document referenced in *Abran* appears to be materially different from mortality review materials which are mandatorily produced under national accreditation standards. *See Lopez*, No. 15-5059, ECF 26 at 3 (noting in ordering production of full mortality report that redacted report produced by defendants showed that "such reviews are required by the National Commission on Correctional Health Care standards").

Given these authorities, plaintiff respectfully requests that the Court direct the Corizon defendants to produce the requested materials. Alternatively, plaintiff respectfully requests an opportunity to more fully brief the issues raised by this dispute.

Thank you for your attention to this request.

Respectfully,

Jonathan H. Feinberg

cc:    Thomas Gregory, Esq. (via email)
       Anne Taylor, Esq. (via email)

3

# EXHIBIT B

Dr. Lalitha Trivikram

Page 1

IN THE UNITED DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
- - -
EILEEN A. MCNAMARA,    :
as Administrator of    :
the ESTATE OF JONATHAN:
GLEAVES, JR.           :
                       :
   Plaintiff (s)   :
                       :
   vs.              :
                       :
CITY OF PHILADELPHIA; :
CORIZON HEALTH; GERALD:
SLORY; ELIZABETH      :
BRADLEY; LALITHA      :
TRIVIKRAM; MATU GAYE; :
JOHN DOES (S)        :
                       :
   Defendant (s)   :
                       - - -

     Zoom deposition of LALITHA TRIVIKRAM,
M.D., was taken pursuant to notice, held on March 9,
2022, beginning at or about 12:33 p.m. before Michelle
Palys, Court Reporter and Notary Public, there being
present.
     - - -
     Any reproduction of this transcript is
prohibited without authorization by the certifying
agency.
     - - -

Page 2

APPEARANCES:
KAIRYS, RUDOVSKY, MESSING & FEINBERG
VIA ZOOM:
BY:  JONATHAN H. FEINBERG, ESQUIRE
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19106
Phone: (215) 925-4400
Representing the Plaintiff
jfeinberg@krlawphila.com
O'CONNOR KIMBALL
VIA ZOOM:
BY:  THOMAS J. GREGORY, ESQUIRE
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1100
Philadelphia, Pennsylvania 19102
Phone: (215) 564-0400
Representing the Defendant, Corizon
tgregory@okllp.com
CITY OF PHILADELPHIA LAW DEPARTMENT
VIA ZOOM:
BY:  ANNE TAYLOR, ESQUIRE
1515 Arch Street, Suite 15
Philadelphia, Pennsylvania 19102
Phone: (215) 683-5381
Representing the City of Philadelphia
anne.taylor@phila.gov

Page 3

- - -
I N D E X
- - -
LALITHA TRIVIKRAM, M.D.          PAGE
BY MR. FEINBERG:          5

- - -
E X H I B I T S
- - -
NUMBER     DESCRIPTION     PAGE
P-12     Medical Chart     10
P-14     Education Report     34

Page 4

- - -
     Before I swear in the witness, I will
ask Counsel to stipulate on the record that due to the
current national emergency pandemic, the court
reporter, myself, may swear in the deponent even though
I am not in the physical presence of the deponent, and
that there is no objection to that at this time, nor
will there be an objection to it at a future date.
     - - -
     MR. GREGORY:  No objection.
     MR. FEINBERG:  That's agreed for
Plaintiff.
     MS. TAYLOR:  And no objection from the
City defendants.
     - - -
     LALITHA TRIVIKRAM, M.D., after having
been first duly sworn, was examined and testified as
follows:
     - - -
     THE COURT REPORTER:  Any stipulations?
     MR. GREGORY:  Usual is fine with me.
     MR. FEINBERG:  That's fine for me as
well.
     MS. TAYLOR:  That's fine.

1 (Pages 1 to 4)

Dr. Lalitha Trivikram

Page 21

Q.    Do you know who made the call to Emergency Medical Services?

A.    Usually one of the nurses would. I think in the note it said Ms. McGettigan had called.

Q.    Okay.

Do you know how long it took for the Emergency Medical Services to get there?

A.    I do not.

Q.    While you were waiting for Emergency Medical Services what, if anything, were you doing with Mr. Gleaves?

A.    We would have been monitoring him again just making sure his vital signs remain stable and that there wasn't any change in his condition.

Q.    Okay.

Did you draw any conclusions about what his specific medical condition was at that time other than what we've already discussed?

A.    I couldn't draw any specific conclusions. It seemed less likely to be opiate related since the Narcan didn't reverse him like I would have expected. It's hard to say if there was any seizure component because he never really came through for us to see a postictal phase to assess him in that way. And as I

Page 22

said, and his blood pressure and pulse were fine. He was breathing. There was concern that he may have aspirated. There might be some pneumonia that's starting but there's no way to know that for sure. That would be suspected but I wouldn't conclude that that's what happened.

Q.    Okay.

Now, you just explained to me that you reviewed the autopsy report. Before I ask you more questions about that, did you look at any documents from either of the two hospitals that Mr. Gleaves was taken to Nazareth and Hahnemann?

A.    I did not.

Q.    Do you recall now sitting here today -- well, first, just as a first principle. My understanding is that when a patient is taken from the Philadelphia Department of Prisons to an outside hospital there are regular communications that occur between the medical unit and the hospital; is that true?

A.    Regular communications as in?

Q.    Periodic updates from the hospital if someone is going to be admitted or a report back from the hospital about what happened in the emergency department, anything like that?

Page 23

A.    There can be, yes.

Q.    Do you recall participating or having any phone conversations or any other communications for that matter with anyone at either Nazareth Hospital or Hahnemann Hospital?

A.    I don't recall having any conversation with anybody at the hospital.

Q.    Do you recall hearing from any of your colleagues in the medical unit whether they be doctors, nurses, what have you, about their communications with anyone in the hospital?

A.    Not that I can recall.

Q.    Do you recall -- well, obviously, sitting here today you're aware that Mr. Gleaves died after going to the hospital; is that correct?

A.    Correct.

Q.    All right.

Let's go back into September of 2018, when did you learn about his death?

A.    I probably would have learned about it the same day likely, yeah.

Q.    Do you remember what you learned at that point about the cause of death?

A.    I don't know that I knew anything specific

Page 24

about the cause of death at that point.

Q.    Okay.

So obviously you've been more educated on that now given what you've seen in the autopsy report; is that right?

A.    That's correct.

Q.    Okay.

Now, that everyone involved in this case has seen the autopsy report but let me just ask you what's your understanding as to the cause of death based on what you saw in the autopsy?

A.    So what I saw and what I understand is that it was acute drug intoxication. The substances that were found in his system were cocaine, Fentanyl and Xylidine. There was also evidence of acute cerebellar infarction and pulmonary congestion that was found.

Q.    Okay.

When you say -- let's focus specifically on acute cerebellar infarction. That's essentially a stroke that takes place in the cerebellum; is that correct?

A.    Correct.

Q.    Have you -- we don't need to go into more discussion of this but have you seen or heard reporting

6 (Pages 21 to 24)

Dr. Lalitha Trivikram

Page 25

on how that type of event can be sometimes related to drug intoxication?

A.    Yes.

Q.    Okay.

At any point do you recall reading -- or strike that.

You've already told me that you prepared a note on September 21st concerning your encounter with Mr. Gleaves; is that correct?

A.    Correct.

Q.    At any point back in September of 2018, or now for that matter, did you go back and look at the rest of the medical chart to see what happened in the encounters leading up to the morning of the 21st?

A.    Yes.

Q.    Okay.

So any my question then is did you see any evidence from this prior encounter that he was experiencing that cerebellar infarction at that point any time prior to the morning of the 121st?

A.    No.

Q.    Okay.

You mentioned that you expect that you would have heard about the death at some point on the

Page 26

21st after it happened.  After that death did you participate in any conversations, any discussions of Mr. Gleaves of his care or anything like that in the days and weeks that followed?

A.    There would have been a discussion as far as a mortality review but that would have been the extent of it.

Q.    Okay.

At that point were you the site medical director at CFCF?

A.    I was.

Q.    Is that still your title today?

A.    It is.

Q.    Okay.

My understanding from a previous deposition is that the site medical director will as a matter of course participate in the mortality review; is that a correct understanding?

A.    Yes.

Q.    Who else tends to participate in the mortality review?

A.    It will be the quality assurance people for Corizon.  PDP is involved.  Detectives that investigate the case are involved.  Behavioral Health is involved.

Page 27

And the administrator for CFCF will be involved.

Q.    How long after the death does the mortality review typically occur?

A.    I would say probably two to three weeks.

Q.    Okay.

And do you recall -- sitting here today do you recall participating in that mortality review for Mr. Gleaves; is that correct?

A.    I don't specifically remember but I would have been, yes.

Q.    Okay.

As a matter of course you would have participated; is that correct?

A.    Correct.

Q.    And that's not because you had an encounter but because of your title as the site medical director you would have; is that correct?

A.    That's correct.

Q.    All right.

Forget Mr. Gleaves for a moment, in a mortality review in just a typical case, walk me through the process of what happens during those reviews?

A.    So I generally will report on the details of

Page 28

the case and I will provide any information I have from AED or from the autopsy report.  And then I'll generally in hindsight seen what the cause of death may have been and discuss areas of improvement that we might need to address.  After I finish my section people ask questions, clarifications will be made. Then Behavioral Health will be asked to weigh in on whatever their review of the chart revealed.  Then PDP there's a nurse who reviews the chart as well and looks for areas of improvement and we discuss those and then finally the detectives will provide any information they have so that we can get a whole picture of the case.

Q.    As a result of that process are there documents prepared?

A.    Yes, there are documents prepared.

Q.    What types of documents are prepared as a result of that review process?

A.    It's my review.  I suppose there are other documents that QI makes.  I don't necessarily see those.  I'm not exactly sure what the nature of those are.

Q.    And if there are any remedial measures that -- or let me ask that a different way.

7 (Pages 25 to 28)

Dr. Lalitha Trivikram

Page 29

If as a result of this process you determine that there should be some remedial measures in place whether it's training for an employee or a change in practice or discipline for an employee, I take it that would be reported somewhere in the process; is that correct?

A.   Correct.

Q.   All right.

And just to confirm, leading up to this deposition have you gone back and looked at any of the documents produced for or as a result of the mortality review in this case?

A.   Other than my review, nothing else.

Q.   Okay.

Well, so your review -- did you go back and look at notes that you made for purposes of the mortality review?

A.   The review itself, yes.

Q.   Okay.

And that was different from the document that we looked at earlier today?

A.   Correct.

Q.   Okay.

Do you have that document with you

Page 30

today?

A.   I don't have it in front of me right now, no.

Q.   Okay, all right.

MR. FEINBERG:  Tom, in light of the fact that our witness reviewed this document in preparation for the deposition I think I'm entitled to see it.  And I'd ask that it be produced before we go on with the deposition.

MR. GREGORY:  My position is that this is a document prepared --

- - -

(Whereupon, a brief discussion was held off the record.)

- - -

(Whereupon, a brief break was taken at this time.)

- - -

MR. GREGORY:  Well, we disagree.  I think the documents are protected by the Act.  They were prepared in conjunction with the requisites of the Act or the purposes behind the Act.  And if the Judge says we have to turn them over we'll turn them over but until that happens we respectfully decline.

MR. FEINBERG:  Okay, fair enough,

Page 31

understood.  We'll continue with the deposition but let me just note that if those documents are produced I'll reserve the right to reopen the deposition for the purpose of furthering questioning on this document.

MR. GREGORY:  If the Judge says she has to come back, she'll come back.

MR. FEINBERG:  Okay.

BY MR. FEINBERG:

Q.   All right, Doctor, let me ask --

MR. FEINBERG:  Well, Tom, I know you're going to object from the previous discussion but let me note the question for the record.

BY MR. FEINBERG:

Q.   Were there any conclusions reached in the mortality review process whether it was the meeting or any documents produced that there were errors made or violations of any procedure in the care provided to Mr. Gleaves?

MR. GREGORY:  Objection, do not answer.

BY MR. FEINBERG:

Q.   All right, to your knowledge, Doctor, similar question, was there any directive for the institution of discipline in connection with the care regarding Mr. Gleaves?

Page 32

MR. GREGORY:  Objection, do not answer.

BY MR. FEINBERG:

Q.   Doctor, did you ever hear -- forget the mortality review process for a moment.  Did you ever hear anyone say that Mr. Gleaves' death could have been prevented?

A.   No.

Q.   Did you ever reach that conclusion yourself that Mr. Gleaves' death could have been prevented?

A.   It could not have been prevented.  My conclusion was that it could not have been prevented.

Q.   All right.

Let me show you -- and actually, as I ask that, let me ask you to explain.  Why is it that you reached the conclusion that Mr. Gleaves' death was not preventable?

A.   Because based on what the medical examiner found it seemed like it was an acute event.  And he received the attention to try to stabilize him when he was found.  He was sent to the hospital in a timely manner.  And you know, we weren't able to reverse the course.  So I don't feel like there is something that we could have done differently.  He was given the emergency care that he needed.  I do not feel like

WWW.KLWREPORTERS.COM

Dr. Lalitha Trivikram

Page 33

there is something we could have done differently.

Q.     Did you ever hear any indication that Mr. Gleaves' cellmate had sought assistance from a correctional officer at some point during the early morning hours of September 21st before you saw Mr. Gleaves?

A.     I did not.

Q.     Okay.

Did you ever hear or see any documents concerning whether -- actually, I'm sorry.

Do you have any understanding given the position about what correctional officers responsibilities are for conducting tours in the housing areas where they're assigned?

A.     I'm sorry, can you repeat that question, please.

Q.     Sure, and let me state I know you work for Corizon and you're not a correctional officer and literally I'm just asking you for what you've heard. But have you ever heard what a correctional officer's responsibility is in terms of frequency for conducting a tour of the unit where they're assigned?

A.     I don't think I can really comment on that since my role is medical.

Page 34

Q.     Understood.

Have you -- do you know a nurse by the name of Matu Gaye?

A.     I do.

Q.     And did I pronounce that name correctly?

A.     Yes.

Q.     Is Nurse Gaye still employed by Corizon?

A.     She is.

Q.     Working at CFCF?

A.     Correct.

Q.     Okay.

I'm going to show you a document which I had previously marked as Exhibit P-14.  It's a document called Employee Education Report.  And it appears -- I can't interpret the signature of the supervisor.  Do you have any idea whose signature that is?

A.     I'm not for sure whose that might be.  It might be Ms. Jeobohan just looking at the letters.

Q.     Could you spell that name for me?

A.     Yes, J-E-O-B-O-H-A-N.

Q.     Thank you.

The Employee Education Report notes as follows under the supervisor's statement.  Mrs. Gaye

Page 35

failed to create the same day withdrawal encounters for an inmate on 9/20/18.  First off, have you seen this document before?

A.     I have not, no.

Q.     Do you have any idea what this means under the supervisor's statement?

A.     Yes, I do.

Q.     Can you tell me or explain it to me, please?

A.     Yes, so the system that we have when a patient comes in through intake and reports a history of drug use the system -- the computer system triggers assessments to be scheduled each shift for I believe seven days so that they can be monitored for their withdrawal symptoms and treated accordingly.  The system for whatever reason doesn't generate appointments starting on the same as the intake encounter occurs and this is what that is referring to.  Those appointments need to be generated manually.

Q.     Okay.

And how -- tell me what you mean by a manual appointment or manual creation of an appointment?

A.     That means that somebody would have to go in and specifically create the appointment for the same

Page 36

day -- withdrawal appointment for the same day as the intake encounter occurs.

Q.     Understood.  And then if -- and by the way, you don't have to repeat -- well, I know you weren't present for Doctor Bradley's deposition but with Doctor Bradley we went through at length when withdrawal assessments are supposed to take place.  And she informed me -- I'm just giving you my recollection. That typically there's one withdrawal assessment per shift; is that correct to your understanding?

A.     That is correct.

Q.     So if Mr. Gleaves came in and was seen in the intake area sometime between 3:00 p.m. and 11:00 p.m. on September 20th, 2018 you would expect that he would have another withdrawal assessment between 11:00 p.m. on the 20th and 7:00 a.m. on the 21st; is that correct?

A.     Correct.

Q.     And in order for that appointment to be created you would have to go through this manual process as opposed to the system which automatically creates it; is that correct?

A.     Correct.

Q.     All right.

How long has the -- and by the way, the

9 (Pages 33 to 36)

Dr. Lalitha Trivikram

Page 37

system we're talking about that's the electronic medical record; is that correct?

A.   Correct.

Q.   And how do you at the prison like what do you call that record just EMR?

A.   Technically, the name is ECW Eclinicalworks.

Q.   How long has ECW been in place at the Philadelphia Department of Prisons?

A.   For as long as I've been here but I think it was instated earlier than that so I'm not sure.

Q.   I haven't asked you your background questions yet which I'll do in just a moment but when did you start with the Philadelphia Department of Prisons?

A.   February of 2018.

Q.   Okay.

And to your knowledge has this situation been in place throughout that time where you have to manually schedule an appointment on the same day?

A.   I believe so.

Q.   And by the way, we're using the phrase same day.  We're talking about the next shift 11:00 p.m. to 7:00 p.m. as the next shift after the 3:00 p.m. to 11:00 p.m. shift.  Is that timeframe 11:00 p.m. to

Page 38

7:00 a.m. after a 3:00 p.m. to 11:00 p.m. encounter considered the same day?

A.   Yes, it would.

Q.   Okay.

And since that issue has been in place -- well, strike that.

Do you have any understanding as to what training nurses receive regarding the scheduling of these same day assessments?

A.   I don't think I can speak to the training the nurses receive.

Q.   Okay.

But from your perspective and your understanding this is a known issue EWC does not automatically create that appointment so you have to manually create them; is that correct?

A.   Yes.

Q.   And you, yourself, Doctor Trivikram have known that since you started working for the Philadelphia Department of Prisons; is that correct?

A.   At some point I would have learned that, yes.

Q.   Okay.

At any point since your encounter with Mr. Gleaves on September 21st did you ever learn

Page 39

anything about the failure to schedule a same day assessment for Mr. Gleaves?

A.   Could you repeat the question?

Q.   Sure, now, I just showed you a document which reported that there was a failure to manually create that same day assessment.  My question is before I showed you that document at any time from September 21st of 2018 through today were you involved in any conversation where this topic was discussed in connection with Mr. Gleaves?

A.   It would have been related to identifying -- the -- yes, if Ms. Gaye received the education that it would have been triggered by discussion or review of the case.

Q.   In the mortality review?

A.   Yes.

Q.   Do you remember participating in any discussions with other Corizon professionals about what Nurse Gaye did or didn't do in this case?

A.   No, not specifically, no.

Q.   Okay.

Outside of the context of this case do you recall seeing other instances where there had been failures on the part of nurses to manually schedule

Page 40

same day assessments?

A.   I have not, no.

Q.   And by the way, I neglected to ask you this before, the phrase same day does that mean within 24 hours?

A.   I guess, yes -- no, not -- 24 hours of when?

Q.   Yeah, let me do this.  I think it would be easier to answer the question this way.  The records that we have show that Mr. Gleaves saw Nurse Gaye and that Doctor Bradley reviewed those notes between 7:00 p.m. and 10:00 p.m. on September 20th of 2018, understood?

A.   Yes.

Q.   All right.

And as part of that process there was on order issued by Nurse Gaye and signed off on by Doctor Bradley for one withdrawal assessment per shift, understood?

A.   Yes.

Q.   Okay.

Now, for what appointments given that timeframe would Nurse Gaye have needed to manually schedule as we discussed?

A.   It would have been the 11:00 to 7:00 shift

10 (Pages 37 to 40)

# EXHIBIT C



## Employee Education Report

Name: _____ Matu Gaye _____        Site: ___ CFCF ___

Date: _____ 10/5/18 _____

Subject of Education: Not creating manual withdrawal encounters

| Supervisor's Statement: | Employee's Statement |
|---|---|
| _____ Mrs. Gaye failed to create the same day withdrawal encounters for an inmate on 9-20-18. | ☒ I concur with the supervisor's statement<br>_____ I disagree with the supervisor's statement for the following reasons: |

### Education Decision/Plan of Action

_____ Withdrawal encounters for all inmates that need COWs, CIWA, and or BW-S assessments will be manually created for the same day.

I have read this education report and I understand it.

Signature of Employee: _Matu Gaye_ Date: 10/9/18

Signature of Supervisor: _[signature]_ Date: 10/9/18

*A copy is to be provided to the employee, and a copy is to be placed in the employee's personnel file.*

# EXHIBIT D

| General Health Services Policy & Procedure | **CORIZON** HEALTH™ |
|---|---|
| **Site Name:** Curran-Fromhold Correctional Facility | **Reviewed:** 09/2014, 11/2015, 07/2016, 05/2017 |
| **Title:** Procedure in the Event of an Inmate Death | **Revised:** 09/2014 |
| **NCCHC: Important**    **ACA: Mandatory** | **No:** J-A-10.00 |

**POLICY:**

All deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures or practices are warranted; and to identify issues that require further study. Mortalities are considered sentinel events. Specific details are outlined in the Corizon Sentinel Event Process.

**PROCEDURE STATEMENTS:**

**NCCHC**

1. All deaths are reviewed within 30 days.

2. Deaths are reviewed in accordance with the Corizon Sentinel Event Policy. A Sentinel Event Review Site Checklist is to be completed for each death. If a psychological autopsy is conducted a Psychological Autopsy Checklist must also be completed.

3. A death review consists of:
   a. An administrative review
   b. A clinical mortality review
   c. A psychological autopsy if the death is by suicide

4. Treating staff are informed of the clinical mortality review and administrative review findings.

5. Corrective actions identified through the mortality review processes are implemented and monitored through the CQI program for systemic issues, and through the Corizon Patient Safety Program.

6. There is a defined process for timely notification of the responsible health authority, the responsible physician, and the responsible facility administrator in the event of an inmate death.

**REFERENCES**

**NCCHC:** Standards for Health Services in Jails, 2014, J-A-10
**NCCHC:** Standards for Mental Health Services in Correctional Facilities 2008, MH-A-10
**ACA:** Standards for Adult Local Detention Facilities, 4th Edition, 4-ALDF-4D-12, -4D-23, -4D-24
**ACA:** 2014 Standards Supplement – no revisions
**PPS:** 4.E.14, 4.E.25

| Site Name: Curran-Fromhold Correctional Facility | Reviewed: 09/2014, 11/2015, 07/2016, 05/2017 Revised: 09/2014 |
|---|---|
| Title: Procedure in the Event of an Inmate Death | No: J-A-10.00 |

PROCEDURE DETAILS:

1. In the event of an inmate death, the on-site healthcare staff is required to notify the on-call administrator. Upon notification, the on-site administrator is responsible to alert the Vice President of Operations, Regional Medical Director, Directors of Operation, and Regional Director of Nursing, Regional Medical Records Director, QI Coordinator and the facility Site Medical Director immediately.

2. Within 24 hours, a written summary will be submitted to the Vice President of Operations, Regional Medical Director, Directors of Operation, and Regional Director of Nursing, which includes the following:

   a. Demographics: name, PP#, date of birth, date of incident, time of death

   b. Location of incident and preliminary cause of death

   c. CPR start and AED usage details

   d. History, including mental health diagnoses/history, InterMedHx hits, all ordered medications, medication compliance

   e. Appointment summary and any outstanding appointments

   f. Time of EMS call, time of EMS location, dispatch unit number

   g. Chart copy status and location (including MARs and treatment records)

   h. Status of Sentinel Event Notification Form (faxed to 877-729-7053)

   i. Location of AED (if used, secure security's AED until print out of history obtained)

3. Upon notification by the on-call administrator, the Regional Medical Records Director will make arrangements to secure and copy the medical record for all applicable parties.

4. Diagnostic and therapeutic interventions pertaining to the event will be documented in a timely manner.

5. A clinical mortality review for each death is completed within 30 days. An administrative review will be performed within 30 days.

6. A psychological autopsy will be conducted within 30 days by the mental health provider if the death was a suicide. A physical autopsy will be scheduled the next day, and will be attended by the clinical administrator and a PPS representative.

7. Corrective actions identified through the mortality review process are implemented and monitored through the facility's CQI program.

8. The Medical Examiner will be notified and a post-mortem examination requested as appropriate. Autopsy results will be obtained by the HSA for the health record. A copy will be forwarded to the Corizon Patient Safety Committee. The mortality review will be appended upon receipt of autopsy findings.

9. The Corizon Mortality Review Policy (QI-06A) is located in the Corizon CQI Manual and reflects the necessary requirements, forms and timelines to be used in the event of an inmate death.

REFERENCES

NCCHC: Standards for Health Services in Jails, 2014, J-A-10
NCCHC: Standards for Mental Health Services in Correctional Facilities 2008, MH-A-10
ACA: Standards for Adult Local Detention Facilities, 4th Edition, 4-ALDF-4D-12, -4D-23, -4D-24
ACA: 2014 Standards Supplement – no revisions
PPS: 4.E.14, 4.E.25