**EXHIBIT E**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - -

EILEEN A. McNAMARA, as      : CIVIL ACTION
Administrator of the        : Docket No.
ESTATE OF JONATHAN          : 2:20-cv-0457-RBS
GLEAVES, JR.,               :
                  Plaintiff,:
          -V-               :
                            :
CITY OF PHILADELPHIA;       :
CORIZON HEALTH; GERALD      :
SLORY; ELIZABETH BRADLEY;   :
LALITHA TRIVIKRAM;          :
MATU GAYE; JOHN DOE(S),     :
                  Defendants.:

- - - - - - - - - - - - - - -

- - -

Tuesday, January 10, 2023

- - -

ORAL DEPOSITION of JOSEPH CALEB

McCALL, M.D., taken pursuant to Subpoena,

held via Zoom video conferencing from

Philadelphia, Pennsylvania, commencing at

3:03 p.m., stenographically reported by ANITA

B. KERRIGAN, Court Reporter - Notary Public.

A P P E A R A N C E S: (All via Zoom video)


KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP.

BY:          JONATHAN H. FEINBERG, ESQUIRE
             The Cast Iron Building
             718 Arch Street
             Suite 501 South
             Philadelphia, PA  19106
             (215) 925-4400
             jfeinberg@krlawphila.com

             Representing the Plaintiff


CITY OF PHILADELPHIA LAW DEPARTMENT

BY:          KATELYN MAYS,
             Assistant City Solicitor
             One Parkway Building
             1515 Arch Street, 14th Floor
             Philadelphia, Pennsylvania  19102
             (215) 683-5434
             katelyn.mays@phila.gov

             Representing Defendants
             City of Philadelphia and
             Gerald Slory


O'CONNOR KIMBALL, LLP.

BY:          THOMAS J. GREGORY, ESQUIRE
             1500 Market Street, Suite 1100
             Philadelphia, Pennsylvania  19102
             (215) 564-0400
             tgregory@okllp.com

             Representing Defendants Corizon,
             Dr. Bradley and Nurse Gaye

ALSO PRESENT:

             ANGELINE ETIENNE, Paralegal

Joseph Caleb McCall, M.D.
1/10/2023

Page 3

I N D E X

WITNESS                                    PAGE

JOSEPH CALEB McCALL, M.D.

(Witness sworn.)                             6

EXAMINATION BY:

  Ms. Mays                                   6

  Mr. Gregory                               43

             - - -

         E X H I B I T S

NUMBER        DESCRIPTION           PAGE

         (No exhibits marked.)

             - - -

Page 4

P R O C E E D I N G S

             - - -

COURT REPORTER:  The attorneys participating in this proceeding acknowledge that I am not physically present in the deposition room and that I will be reporting this proceeding remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his/her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MR. FEINBERG:  Agreed for the Plaintiff.  And this is Jonathan Feinberg, Counsel for the Plaintiff.

MS. MAYS:  And agreed for

Page 5

Defendant City of Philadelphia and CO Slory.  And this is Katelyn Mays for Defendants.

Tom, I think you're muted.

MR. GREGORY:  I do.  I consent.

COURT REPORTER:  Counsel, are we proceeding with the usual stipulations today?

MS. MAYS:  That's fine with me.

MR. FEINBERG:  Yep.  Same.

(By agreement of counsel, the signing, sealing, certification and filing are waived; and all objections, except as to the form of the question, are reserved until the time of trial.)

COURT REPORTER:  Dr. McCall, will you state and spell your full, legal name for the record.

THE WITNESS:  Yes.  It's Joseph Caleb McCall.  First name J-O-S-E-P-H, middle name C-A-L-E-B, last name M-C-C-A-L-L.

Page 6

             - - -

JOSEPH CALEB McCALL, M.D., after having been duly sworn, was examined and testified as follows.

             - - -

BY MS. MAYS:

Q     Good afternoon, Dr. McCall.

A     Good afternoon.

Q     My name is Katelyn Mays, and I represent the Defendants in this case, City of Philadelphia and Correction Officer Slory, and I'm gonna be taking your deposition today.  Okay?

A     Okay.

Q     Have you ever had your deposition taken before?

A     I have not.

Q     Okay.  So I'm just gonna go through a couple instructions.  Some of them might be self-explanatory, but just to make sure we're on the same page.  Okay?

A     Okay.

Q     Do you understand that you're testifying under oath today, and that you are

Page 7

legally obligated to tell the truth under penalty of perjury?

A    Yes.

Q    And you must provide verbal responses to my questions so that the court reporter can take it all down.  That means no shaking of the head or no uh-huh or nuh-uh.

Do you understand that?

A    I understand.

Q    If you don't hear a question or you don't understand a question, please feel free to tell me, and I'll either repeat or rephrase the question.  Okay?

A    Okay.

Q    And if you -- I don't expect this to be very long, but if you need a break at any time, please feel free to say so.  Okay?

A    Okay.

Q    Okay.  I'm gonna just share my screen really quick.

(Document displayed via screen sharing.)

BY MS. MAYS:

Q    And do you see the subpoena that's on

Page 8

my screen?

A    I do.

Q    Okay.  And have you ever seen this before?

A    Yes.

Q    Okay.  And I'm gonna scroll down to Schedule A.

Did you get a chance to take a look at this?

A    I did.

Q    Okay.  And did you have anything responsive to this?

A    Nope.

Q    Okay.  So you did not take any notes while you were creating your report?

A    I -- I took notes in longhand which have since been disposed of.

Q    Okay.  You don't have any notes anymore?

A    No.

Q    Okay.  You don't have any -- so for Number 4 -- communications between yourself and Mr. Feinberg related to compensation?

A    I -- I did forward him a copy of a fee

Page 9

schedule for my services.

Q    Okay.

A    Which I believe he said a copy was also forwarded to your office.

Q    Okay.  And that's the only communications you've had concerning fees?

A    Yes.

Q    Okay.  What about any invoices for any work done so far?

A    I've not submitted any invoices for work so far.

Q    Okay.

(Screen sharing stopped.)

BY MS. MAYS:

Q    And do you recall on what date you were first contacted about this case?

A    I don't -- I don't recall off the top of my head, no.

Q    Do you recall the month?

A    I don't, no.

Q    Okay.  Was it within the past year?

A    It may have been about a year ago.

Q    Okay.  And do you recall who contacted you?

Page 10

A    I believe I was referred to Mr. Feinberg's office by a colleague.

Q    Do you know your colleague's name that referred you?

A    Yes.  It was David Oxman.

Q    Okay.  And do you know how he came to know about the case?

A    I believe he -- he may have also served as an expert witness.

Q    For Mr. Feinberg?

A    Yes.

Q    Okay.  Had you ever talked to Mr. Feinberg before this case?

A    No.

Q    Okay.  Do you market yourself as an expert?

A    I have not, no.

Q    Okay.  So is this your first time working in this capacity as an expert?

A    I have worked in one other case as an expert, but I have not marketed myself.  That was also through a referral through a colleague.

Q    Okay.  Do you recall the caption name

Page 11

of that case, or the parties?

A       I -- I don't recall it.  I could find that information for you, but I don't recall it.

Q       Okay.  Did you prepare a report in that case?

A       I did not, no.

Q       Okay.  Were you ever -- I guess you were never deposed in that case, right?

A       I wasn't.

Q       Okay.  And do you know whether that case went to trial or not?

A       It did not.

Q       Okay.  Do you recall what you were initially told about the facts of this case when you first spoke to Mr. Feinberg?

          MR. FEINBERG:  Before you answer that, Dr. McCall, I'm gonna object to the question as phrased, Katelyn.  I think conversations between counsel and an expert are subject to the work product privilege, and I'm gonna instruct Dr. McCall not to answer.

Page 12

          MS. MAYS:  It's not -- I'm asking about conversations about the facts of the case, nothing about draft reports or assumptions relied on.

          MR. FEINBERG:  All right.  With the qualification that your question is limited to discussions regarding the facts of the case --

          MS. MAYS:  Yes.  Nothing about his draft report.

          MR. FEINBERG:  -- that's fine.  Okay.

          MS. MAYS:  Any report or draft.

          MR. FEINBERG:  Yeah.  Dr. McCall, you can answer the question regarding any communications about the specific facts of this case.

          THE WITNESS:  Okay.  Prior to receiving any of the medical records or any other materials regarding the case, Mr. Feinberg and I discussed that this case involved a man who -- who while in custody in the City of

Page 13

Philadelphia suffered from a stroke, and there was some question as to whether there had been a delay in identification of symptoms of a stroke and -- and therefore, also appropriate treatment of the stroke.

BY MS. MAYS:

Q       Okay.  Did you render any preliminary opinions when you were first told those facts?

A       I did not render any opinions until I began reviewing documentation.

Q       Okay.  And you said you hadn't prepared any invoices yet.  Do you know approximately how much time you've spent on this case so far?

A       In total, including preparation in the past few days, I've probably spent ten or so hours.  I have the exact number, you know, in a -- in a notepad elsewhere, but not with me.

Q       Okay.  But you would estimate around ten hours?

A       Yes.

Q       Okay.  And how would you describe your

Page 14

assignment for this case as an expert?

A       My task was to review the medical records both from the correctional facility where the -- you know, where the patient was being cared for initially and in custody, and then the records from the hospitals where he was cared for once it was identified that he may be having some sort of medical issue.  I also reviewed his autopsy, and I reviewed depositions from other people in the case.

          And my task was to try to establish whether there may have been -- whether the stroke, you know, could have been identified earlier and could have been treated earlier, and if earlier treatment might have increased the chance that the -- that Mr. Gleaves would have survived.

Q       Okay.  So I think you mentioned in the report that you were looking for a potential deviation from the standard of care.

          Does that sound right?

A       Yes.

Q       And with regard to the deviation of the standard of care, do you mean within the

Page 15

medical field?

A    Yes.

Q    Okay.  So, you were not taking a look at the deviation of the standard of care at, for example, the correction officers.

A    No.

Q    Okay.  You mentioned you reviewed some depositions.  Do you recall offhand whose depositions you reviewed?

A    I -- if I can refer to my notes, I can tell you.

Q    Sure.  I can also -- let me show you.

(Document displayed via screen sharing.)

BY MS. MAYS:

Q    This is a copy of your report, correct?

A    Yes.

Q    Okay.  And it looks like on page 1239 you have a list of materials reviewed, right?

A    Yes.

Q    Okay.  So you have a couple depositions here.  Deposition of Matu Gaye, deposition of -- I'm gonna butcher that

Page 16

name -- Nurse Jeoboham, Terrelle Jones, and deposition of I think it's Dr. Trivikram.  And you did -- it doesn't look like you have the deposition of Officer Slory on here, right?

A    No.

Q    So you didn't take a look at Officer Slory's deposition; is that right?

A    No.

Q    Okay.  Do you think it would have been helpful to take a look at his deposition?

MR. FEINBERG:  Objection to the form of the question.

Dr. McCall, you can answer if you're able.

THE WITNESS:  It -- I wouldn't be able to answer that without knowing what the content was.

BY MS. MAYS:

Q    Okay.  Approximately, how much time did you spend drafting the report?

A    Again, I do -- I do have that in my notes that I've been keeping for billing purposes.  If I were to estimate, it was

Page 17

probably about two and a half to three and a half hours.

Q    Okay.

MR. FEINBERG:  Kate, can I interrupt for just one second --

MS. MAYS:  Sure.

MR. FEINBERG:  -- and note that with regard to invoicing, as Dr. McCall pointed out, he has not sent us an invoice yet.  Once he does, I'll be happy to disclose that, if that will help short-circuit some of the questions you've got.

And also, and perhaps we can discuss this off the record.  We should discuss arranging payment from the City for purposes of today's deposition.

MS. MAYS:  Right.  Yeah.  I was gonna wait until the deposition was done, since I don't think it's gonna go over four hours, but just in case.

MR. FEINBERG:  Yeah.  Okay.

Page 18

MS. MAYS:  I know he has a flat rate of within four hours.

MR. FEINBERG:  Certainly.  Okay.

BY MS. MAYS:

Q    Dr. McCall, did you -- were you asked for your opinion on any topic that you didn't include in your final report?

A    I don't believe so, no.

Q    Okay.  Did anyone else help you in preparing the report?

A    No.

Q    And can you take me through a little bit of your process in preparing the report; meaning what did you review, what did you feel was most important when you reviewed, and how that helps you come to your final opinion?

MR. FEINBERG:  I'm gonna object to the form of the question.

But Dr. McCall, you can answer.

THE WITNESS:  Yes.  I reviewed his medical records and tried to

Page 19

summarize what I thought were the facts most relevant to what it ultimately appeared to be the medical conditions that led to his deterioration and hospitalization and ultimately death.  Namely, as a neurologist, I tried to focus on the development of what appeared to be a stroke and some of the factors that might have surrounded development of the stroke.

BY MS. MAYS:

Q     And can you tell me what are some of those factors?

A     Well, you know, it appeared that Mr. Gleaves was suffering from drug withdrawal.  That withdrawal syndrome likely led to instability of vital signs, particularly elevations of his blood pressure, which were documented.  And a stroke did occur.

It's likely, based on the testing that was performed when he arrived at the hospital, I believe Nazareth Hospital is

Page 20

where he first arrived, that the stroke had not -- had not likely occurred in just the minutes or hours before his arrival there.  It had likely been at least several hours in the making.  And the delay in him receiving appropriate evaluation and care likely led to an avoidable poor outcome for him.

Q     You noted the delay in care.  Do you have a time frame in which you think would not have constituted a delay in care?

A     Well, a tenet of stroke care is, you know, time is brain.  So even minutes can be precious in diagnosing and seeking appropriate care for a stroke.

In his case, he had a significant amount of cerebral edema in the brain as a result of his stroke that was already present when he was first evaluated in the emergency room, which likely means that his stroke was at least several hours old.  Because of the description of the size of his stroke, it's likely that he would have had symptoms of that stroke from the onset; and so anytime during that symptomatic period would have

Page 21

been an opportunity for him to -- for the stroke to have been recognized and for him to be referred for a higher level of care.

Q     So do you have an estimate on what time the stroke began?

A     It would be difficult to say.  As I mention I believe in my expert report, cerebral edema that is clinically significant often occurs over several days following a stroke.

The cerebral edema present in Mr. Gleaves is a little bit of an exception because he was relatively young and because it was -- because of the anatomic location of his stroke in a relatively confined area within the cranium.  So it would be hard for me to give a precise time on the clock when the stroke likely occurred.  It clearly occurred between -- in my opinion, between when he was evaluated, because no stroke symptoms were identified during the intake process, and when he was found the next morning.  And if I were to estimate, because of the amount of cerebral edema, I would

Page 22

estimate that it occurred sooner in the evening after his medical evaluation than closer to the recognition the following morning that something had -- something bad had happened.

Q     Okay.  And you mention that there were no signs of a stroke during intake; is that right?  During his intake at the prison.  I think it was on the 20th.

A     None -- none were recognized.

Q     Okay.  Does it necessarily mean he was not having any symptoms of a stroke?

A     The -- likely, yes.

Q     Is it possible that someone could be experiencing a stroke with no noticeable symptoms?

MR. FEINBERG:  I'll object to the form of the question.

But you can answer, Dr. McCall.

THE WITNESS:  It is possible, but in this anatomic location in this part of the brain, strokes are almost always symptomatic.  Significantly

Page 23

symptomatic.

BY MS. MAYS:

Q    And what would be some of the symptoms of an early signs of a stroke?

A    Incoordination of movements of the extremities, difficulty walking, difficulty speaking without some sort of abnormality of the voice, nausea and vomiting.

Q    And is it your opinion that the stroke was caused by drug withdrawal?  Do I have that right?

A    It's -- it's difficult for me to pinpoint the exact cause of the stroke.  I think that is the most likely explanation.

Q    And could you go through what the other explanations could be?

A    Well, I did -- and I believe I mentioned this in my report.  Drug intoxication and withdrawal can also lead to arrhythmias, abnormal rhythms of the heart that could create blood clots, and those blood clots can then travel to different parts of the body, including the brain.

Q    Is it possible to have a stroke due to

Page 24

a drug overdose?

A    I suppose so, yes.

Q    So could that be a possible cause of the stroke in this case?

A    I -- I suppose so.  I suppose so, yes.

Q    Is there a reason you didn't include that in your report?

A    From the medical records that I obtained, there was no evidence that Mr. Gleaves continued to -- to consume any substances after his medical evaluation.  And as it was already identified that he was suffering from withdrawal syndromes, it seemed more likely that drug withdrawal was a relevant factor.

Q    Withdrawal symptoms were noted during intake, correct?

A    Yes.

Q    And Mr. Gleaves did have drugs in his system, per the autopsy report, right?

A    So, I would -- I would have to refer to the -- to some of the specific testing that was done in the records.  Sometimes testing that's done, particularly in

Page 25

emergency rooms, like urine drug screening tests, test for the substances themselves. Sometimes -- sometimes these tests test for metabolites, kind of breakdown products of substance.  So to be precise, I'd have to review those specific tests to determine if he still had drugs in his system, as you phrased it.

Q    Okay.  And I think Mr. Gleaves stated that he had last used drugs on September 19th, 2018.

Does that sound right?

A    I believe -- I believe that's correct, yes.

Q    Okay.  And then you -- in your opinion, his stroke began on the -- at night on September 20th or in the early morning of the 21st?

MR. FEINBERG:  Objection to the extent it's asked and answered.

But you can answer, Dr. McCall.

THE WITNESS:  Yeah.  It would -- it would be difficult to

Page 26

answer.  I think the most precise answer I can give is that there was no evidence he was having a stroke at the time of his medical evaluation, and it seems, of course, likely then that the stroke occurred sometime after that.

BY MS. MAYS:

Q    For someone who used the amount of drugs as frequently as Mr. Gleaves did, which I think were in the medical -- were in the prison records, I think he reported using heroin, Fentanyl and Xanax for six years, ten bags daily of heroine, two-milligram bars, four to six tablets.

How long would you estimate that a person would begin going through withdrawal symptoms?

MR. FEINBERG:  Objection to the form of the question.

You can answer.

THE WITNESS:  It's really hard to say.  Unless an individual gives a specific metered dose of how much of a substance they're using, terms like

Page 27

bags I find very unreliable as a measurement of what's actually being consumed. But depending on -- the other reason that might be a little bit difficult to answer is depending on where these substances were obtained, they may not actually be what he thinks they were.

But generally speaking, people can begin to withdrawal from benzodiazepines like alprazolam or Xanax, one of the substances that he mentioned, within a -- within a few hours. And -- and that withdrawal syndrome can continue for hours or days.

Opiates have a whole range of different half lives, as do benzodiazepines; and so depending on which ones he was actually using, his withdrawal syndrome likewise could have started within hours or progressed and continued over days.

BY MS. MAYS:

Page 28

Q    Okay. And then if such withdrawal symptoms were to cause a stroke, how long would that typically take?

A    I think it would be hard for anyone to answer that with precision. I think it would be hard for anyone to answer that with precision.

Q    If it were a week, would that be -- would that sound right?

A    Well, I think what I would say is these withdrawal syndromes, there's steps in between the withdrawal from the substance and something like a stroke occurring. So instability of vital signs, for example, highly elevated blood pressures is one of the things that would connect those two events. And highly elevated blood pressures could -- could develop or persist over hours and last for several days.

Q    And you mentioned on materials reviewed that you took a look at Dr. Trivikram's deposition. I'm butchering her last name.

Is that right?

Page 29

A    Yes.

Q    And so on page 24 of her deposition -- I can pull it up if you need a refresh -- but she testified that it was her understanding that the cause of death was acute drugs and drug intoxication.

Do you disagree with that opinion?

MR. FEINBERG:  Let me note an objection, and just give Dr. McCall an instruction that if you feel like you need to see the testimony to answer that question, you can certainly ask to have that shown to you.

THE WITNESS:  Would it be possible to produce that?

MS. MAYS:  Yep.

(Document displayed via screen sharing.)

BY MS. MAYS:

Q    And I can scroll up and down or whatever may be helpful.

A    Yes, I see that.

And can you repeat the question?

Q    Sure.

Page 30

So her conclusion that she understood the cause of death to be acute drug intoxication, do you disagree with that?

A    I don't disagree, but can I explain why?

Q    Sure.

A    So oftentimes when we're identifying the cause of death we are not identifying the mechanism of death. We're identifying the event that eventually started a cascade of events. And so drug intoxication and then drug withdrawal likely led to a lot of the medical complications that Mr. Gleaves ultimately suffered from.

Q    Okay. Is there any discernible way to tell whether it was a drug overdose as compared to drug withdrawal that caused the stroke?

A    I mean, I think evaluation at that time, as took place when he was being admitted and evaluated, would have been one of the most reliable ways. There are cases, in my experience, where people are actually suffering from drug withdrawal while the

Page 31

tests that we use to detect presence of a drug or its metabolites are still positive.

So I don't think that there -- I don't think that there's a way retrospectively to say he had transitioned, other than to look at a variety of factors, as was done when he was being screened and admitted.

Q    And I'm gonna scroll down to page 32.

And if you look at what is highlighted, the doctor's opinion when asked, "Did you ever reach that conclusion yourself, that Mr. Grieves' death could have been prevented;" the doctor answered, "It could not have been prevented.  My conclusion was that it could not have been prevented."

Do you disagree with that conclusion?

A    Yes.

Q    And can you tell me a little bit about why?

(Screen sharing stopped.)

A    Well, Mr. Gleaves, most imminently the mechanism of his death was the stroke and what appeared to be pulmonary complications of the stroke.  When he was found at Corizon

Page 32

the morning that he was transferred to the hospital, the staff there identified and documented that he appeared to have vomited and aspirated some of the contents of his vomitus.  This was consistent with what was found when he arrived at the hospital.  The extensive abnormalities on the scans done of his brain, the stroke, and abnormalities of the chest x-ray, what appeared to be development of some sort of Acute Respiratory Distress Syndrome or ARDS.  And these were the things that were managed over the ensuing hours.  These things are treatable and could have been treated likely with much better success had they been identified earlier in their development.

(Document displayed via screen sharing.)

BY MS. MAYS:

Q    And I'm just gonna go back to your report for a little bit.

So you talk here -- I'll highlight it -- about why Mr. Gleaves' case was exceptional because his stroke -- his stroke

Page 33

occurred in the cerebellum.

Can you just tell me a little bit more about that in layman's terms, as best as possible?

A    Sure.

MR. FEINBERG:  Can we just note the Bates stamp of the document you highlighted?

MS. MAYS:  Sure.  It's McNamara 1243.

MR. FEINBERG:  Thanks.

Go ahead, Dr. McCall.

THE WITNESS:  Sure.

So, sorry.  Can you -- can you clarify the question a little bit?

BY MS. MAYS:

Q    Sure.

You note that Mr. Gleaves' case was also exceptional.  Can you tell me a little bit more about that, and potentially in layman's terms as best as possible?

A    Sure.  I think the context here I was talking about the cerebral edema that was noted on the scan of his brain.  Cerebral

Page 34

edema is essentially swelling of the brain.  That's a sign that we see take place usually in the one to two-day period after a stroke occurs, and then worsen and reach sort of its peak intensity several days after a stroke occurs.  Three, four, five days after a stroke occurs.

The reason that we look for that and worry about that is that swelling of the brain can be very clinically significant and harmful to patients.  It can press on other areas of the brain that were not injured by the stroke and cause further injury.  And in some cases, depending on where it is and what it's pressing on, it can even be deadly.

In his case, you know, the edema truly begins within hours after a stroke develops.  It's usually not clinically apparent.  I think when I say that his case was exceptional is it became very clinically apparent and clinically significant in his case because he was relatively young.  And over the course of our lives we have some degree of atrophy of the brain that takes

Page 35

place, meaning the brain decreases in volume slightly and fills the skull less fully. So swelling, there's more space for that -- that brain to expand into.

Because he was young, he did not enjoy that extra space. But also because of the compartment within the skull in which it took place -- and I believe I mention this -- there is -- the cerebellum is enclosed by the bottom of the skull beneath it, and then on top a thick layer of connective tissue called the -- the tentorium. And this -- this results in a situation where cerebral edema of this relatively small part of the brain that is in this relatively fixed space quickly causes it to push on the only other structures in that space, which are the bottom of the brain, the brainstem, and then a channel of fluid called the cerebral aqueduct, that becomes very clinically consequential for patients. It can result in death by dysregulating breathing, dysregulating swallowing, dysregulating heart rate. And obstruction to passage of the

Page 36

spinal fluid can result in a condition called hydrocephalus, which can be dangerous and deadly.

Q     So you mention that the -- you mention -- I'm gonna go back to the edema. You said that because Mr. Gleaves was younger, the edema, it sounds like -- tell me if I'm wrong -- grew more rapidly or appeared more rapidly?

A     I'm not sure that I would say it grew more rapidly, but it became more clinically consequential because an older patient might have had some degree of atrophy. And so again, there might have been more space in which that swelling, that increased fluid content of the brain could have expanded in to without pushing on brain structures.

Q     Okay. So say it were an older patient; when would you expect the edema to become clinically apparent during a stroke?

A     Well, I mean age is only sort of a proxy for the amount of atrophy that takes place. Some young people can have advanced atrophy and some older people can have very

Page 37

little. So I think it depends a lot on the particular patient beyond just their age.

Q     Is it possible that drug use can cause brain atrophy over time?

A     Yes.

Q     Okay. So is it possible that Mr. Gleaves had brain atrophy because of drug use?

A     It's possible.

Q     In which case, it's potentially -- the edema potentially could have taken longer to have become clinically apparent; is that right?

A     You know, I don't have enough information about his particular case to say that -- that that -- that was actually what happened, but given how quickly his course with this stroke progressed, that seems less likely.

Q     How are you sure how quickly his course of stroke occurred?

A     Well, again, he did not seem to be having any symptoms of a stroke identified by the medical team during his intake assessment

Page 38

and, you know, by the next morning was having significant cerebral edema.

So, you know, I -- going back to your question, can -- maybe can you repeat that question?

Q     I think I forget my question now.

MS. MAYS: Can we have the court reporter read back, please?

(At this time the record was read back as requested.)

THE WITNESS: And sorry, would you like me to answer that?

BY MS. MAYS:

Q     I think you did in the last one. And I think, you know, you mentioned that there was no signs or evidence that he was experiencing a stroke at intake, right?

A     Yes.

Q     But for that whole statement we're relying on the notes and information taken down by the medical providers during intake, right?

A     Well, I think not just on their observations, but also on his reporting that

Joseph Caleb McCall, M.D.
1/10/2023

Page 39

he was denying any of the complaints I would have expected. He was observed to be walking and talking without any difficulties.

Q     I think you mentioned before that it is possible to have symptoms of a stroke that are not apparent, right?

MR. FEINBERG: Objection. Asked and answered. And an objection to the extent it mischaracterizes previous testimony.

THE WITNESS: Yeah. If someone is having symptoms, that is by definition, apparent.

What I said earlier was someone could have a stroke without having symptoms, but that that would be unlikely in this particular part of the brain.

BY MS. MAYS:

Q     Is it possible that symptoms of withdrawal are ever very similar to symptoms of a stroke, early signs of a stroke?

A     You know, symptoms of withdrawal, there's a lot of different substances from

Page 40

which someone can have a clinical withdrawal syndrome.

Is there a specific substance you're questioning?

Q     Not that I can think of.

A     You know, the -- the one thing I can think of is something like nausea. But again, a stroke in the cerebellum that would cause nausea would almost always cause severe vomiting, vertigo, and difficulty with walking and movement of the extremities as well.

Q     Okay. And would withdrawal ever cause vomiting, vertigo, or difficulties with walking?

MR. FEINBERG: Objection to the form of the question. But you can answer.

THE WITNESS: Yeah. So, you know, when I refer to difficulty with movement of the extremities and difficult walking, I'm referring to kind of a clinical entity called ataxia. I think it would be -- I

Page 41

think most clinicians would not confuse ataxia with a symptom of a withdrawal syndrome, at least ataxia that would occur from a stroke.

BY MS. MAYS:

Q     Does ataxia occur in every case of a stroke?

A     No.

Q     And I'm gonna scroll down to page -- this is Bates stamped 1245. The last sentence you note, "It is again my opinion that he would have been a better candidate for potentially life-saving stroke care and could have had an improved outcome had his symptoms been assessed and appropriately triaged during the time in which he and his cellmate were requesting help and were not monitored by nursing or guard staff members."

Do you know whether Mr. Gleaves was ever monitored by guard staff members on -- between the night of the 20th going into the 21st of September?

MR. FEINBERG: Object to the question -- form of the question.

Page 42

But you can answer, if you know, Dr. McCall.

THE WITNESS: The only information that I have regarding this were reports from a deposition of Ms. Jones. This is with regards to the guard staff in which his cellmate reported to Ms. Jones that no one had been patrolling and no one had answered their calls for help both verbally and with use of the -- the alert buttons that were placed in the cells of that particular part of the correctional facility.

With regards to the nursing staff, you know, deposition of multiple of the medical staff members indicated that a medical assessment should have been done each shift, which would have included sometime between the period of 11:00 and 7:00, the morning that he was found to have suffered some medical deterioration.

BY MS. MAYS:

Page 43

Q      Okay.  And do you know in what way Mr. Gleaves called out for help from guard staff members?

A      I don't know.

MR. FEINBERG:  Object to the form of the question.

I'm sorry, Dr. McCall.  Go ahead.  You can answer.

THE WITNESS:  I don't know specifically how he or his cellmate were calling for help, except what was already mentioned, that they were verbally calling and using the button in the cell.

MS. MAYS:  Okay.  I don't think I have any other questions.

Tom, I'm not sure if you have any.

MR. GREGORY:  Yeah, I have a couple.

BY MR. GREGORY:

Q      Good afternoon, Doctor.

My name is Thomas Gregory.  I represent Corizon and its employees.

Page 44

I noticed that at the top of your report you indicate behind the letters M.D. the abbreviation HEC-C.

What does that stand for?

A      That is Hospital Ethics Consultation Certification.

Q      And did you undergo special training or education in order to get that?

A      I did.

Q      And what was that training?

A      So that -- that training was accumulation of about four -- over 400 hours of experience in managing complex ethical cases in the clinical setting in the hospital both through direct observation, direct preparation and independent study, and then passing a certification exam administered by the -- the American Society for Bioethics and the Humanities.

Q      What is your experience with correctional healthcare?

A      I take care of patients that are in custody in correctional facilities in the hospital when their care is so complex that

Page 45

they require admission, but otherwise, I have none.

Q      When you say you take care of patients who are in custody, you take care of them when they're brought to the community hospital by way of a short-term release from the -- from their incarceration, correct?

A      Correct.

Q      So you're not on the prison grounds. You are in the private hospital or the community hospital taking care of the patient who's been brought to you.

A      That's correct.

Q      Correct?

So in that instance, there's really no difference between that patient and any other patient that you would treat on a normal day, correct?

A      As far as how I treat them, no.

Q      Right.

Are you familiar with the NCCHC?

A      I'm not.

Q      The National Commission on Correctional Health?  Okay.

Page 46

So, in preparation for your role as an expert in this case, have you reviewed any standards, any correctional healthcare standards promulgated by the NCCHC or any other accrediting agency?

A      I have not, no.

Well, I mean, accrediting agency within that context, is that what you mean?

Q      Accrediting agency for correctional healthcare, yes.

A      No, I have not.

Q      So, you don't have any opinions as you sit here today as to whether any conduct on the part of Corizon Health and/or any of its employees deviated in any way from any standard set by any correctional accrediting agency.

A      For accreditations with regard specifically to correctional facilities, I don't.  That's not how I judged the standard of care in this case.

Q      Got it.

In discussing Mr. Gleaves earlier, I think on -- on a couple of -- in a couple of

Page 47

your answers you mentioned that -- or emphasized that he was relatively young. He was 33 years old. And I agree that that's relatively young. But he was not relatively healthy, was he?

A    Can you clarify what you mean by that?

Q    Well, were you aware, for example, that at the time of his admission he was infected with Hepatitis C?

A    I was aware of that, yes.

Q    And were you aware that upon his admission he tested positive for HIV?

A    I did see documentation of that, yes.

Q    And were you familiar that upon his admission he also suffered from long-term chronic asthma?

A    I saw -- I saw a report that he had asthma, but the -- the clinical significance of that seemed to be de-emphasized by the team admitting him. It sounds like he had not required treatment for asthma in -- I believe in many years is what they noted.

Q    But did you see that among the treatment that he had previously engaged in

Page 48

was the use of an inhaler?

A    I did. It seemed -- I think it was reported as many years prior. I think specifically the -- Mr. Gleaves said he couldn't remember the last time he used it, it had been so long. But yes, I did see that.

Q    And you were aware that despite his asthmatic condition, he also smoked more than a pack of cigarettes a day?

A    I did see a report that he smoked cigarettes, yes.

Q    And you are aware and you indicate in your report that he reported taking significant dosages of heroin, Xanax, and Fentanyl everyday.

A    Yes.

Q    At the time of his admission it was also noted that he was 71 inches tall, and if my math is correct -- and I was an English major -- I think that makes him 5 foot 11, right?

A    Yes.

Q    And he weighed only 139 pounds,

Page 49

correct?

A    I would have to look at the documentation to confirm that, but I --

Q    At the time -- at the time of his autopsy -- I'll pull it up so I can make sure I'm saying the right thing.

The physician conducting the autopsy, Dr. Emory, reported that Mr. Gleaves' brain revealed a dusky discoloration.

Where does that come from?

A    I'm not sure why that would have been observed.

Q    Is dusky discoloration not a sign of ongoing chronic drug abuse?

A    I'm not an expert in, you know, pathological examination in this context, so I don't think I can answer that.

Q    So if a toxicologist were to tell us that the first sign of chronic opiate abuse is a dusky discoloration of the brain, you would have no reason to disagree with that, right?

MR. FEINBERG: Object to the form of the question, but he can

Page 50

answer.

THE WITNESS: I don't have any expertise that allows me to agree or disagree with that.

BY MR. GREGORY:

Q    What is the weight of the average adult human brain?

A    The weight -- the weight of the average adult human brain is probably somewhere between 6 and 10 pounds.

Q    Can you tell me what that equates to in grams?

A    Not without a conversion chart, no.

Q    The autopsy report indicated that Mr. Gleaves' brain was 1460 grams. That's enlarged, is it not?

A    I -- as I said, I'm not -- not an expert in pathological examination of any tissue.

Q    What is cardiomeglopathy -- megla -- cardiomegaly?

A    Cardiomegaly refers to enlargement of the heart.

Q    And you're aware that the autopsy

Page 51

findings were positive for cardiomegaly in Mr. Gleaves?

A      I did see that in the autopsy report, yes.

Q      And that the autopsy report was also positive for splenomegaly, an enlargement of his spleen.

A      I saw that as well, yes.

Q      Are all of these organ anomalies the result of a stroke that was suffered within hours of death, or were they the result of long-term deficiencies with his organs?

MR. FEINBERG:  Object to the form of the question.

But you can answer if you're able.

THE WITNESS:  My expertise only allows me to say that stroke does not cause cardiomegaly or splenomegaly.

BY MR. GREGORY:

Q      In your report you mentioned that in the -- in the very first narrative paragraph on the first page of your report you indicate

Page 52

that, under the heading of medical course at CFCF, that on September 20th, 2018, Mr. Gleaves was seen by Dr. Elizabeth Bradley.

What did Dr. Bradley do for Mr. Gleaves, if you remember?

A      Is it okay --

MR. FEINBERG:  Object to the form of the --

I'm sorry, before you answer, Dr. McCall, let me just note I have an objection to the form of the question.

And Dr. McCall, if it would help for you to look at your report on the screen while you answer that question, just let us know.

THE WITNESS:  Yes.  If I could review that, that would be great.

(Document displayed via screen sharing.)

BY MR. GREGORY:

Q      Okay.  There it is right there at the top of the first page.

MR. GREGORY:  Whoever's got

Page 53

control of the screen, right there.

BY MR. GREGORY:

Q      Medical course at CFCF.  Right there in the center of that paragraph, Dr. McCall, you say, "On 9/20/2018 Mr. Gleaves was seen by Dr. Elizabeth Bradley, M.D., and Matu Gaye, R.N., during his intake and screening assessment while being admitted to CFCF."

My specific question is, what can you tell me Dr. Bradley did during that screening intake?

MR. FEINBERG:  I object to the form of the question to the extent you're asking Dr. McCall to repeat what's already reflected in the records.  But Dr. McCall can answer the question.

THE WITNESS:  Generally, Dr. Bradley and Nurse Gaye performed a -- you know, an initial intake assessment which included gathering a history, a physical exam, and then use of some of the screening tools both -- both of which featured questions as

Page 54

well as, you know, checking for signs on a physical exam.

BY MR. GREGORY:

Q      Do you have a recollection of seeing any reports or progress notes authored by Dr. Bradley?

A      I would have to review the -- I would have to review the records.  I can do that, if you would like.

Q      Well, let me ask you this:  If you look at the paragraph above or the section in your report above this section we were just looking at, materials reviewed, you would agree with me that you do not indicate reviewing the deposition of Elizabeth Bradley, M.D., correct?

A      I did not review a deposition from Dr. Bradley.  Her inclusion in the report I believe reflects that her name was indicated in the initial documentation within the Corizon health records for Mr. Gleaves.  But specifically with regards to what exactly she did and what Nurse Gaye did, I would have to review the notes to try to answer that.

Page 55

Q    Did you think it was important to review what Dr. Bradley may have said under oath in a deposition?

MR. FEINBERG:  Objection to the form of the question.

You can answer.

THE WITNESS:  It could be important, yes, depending on what -- what she was deposed about.

BY MR. GREGORY:

Q    I think your report concurs with the progress notes on Mr. Gleaves that he was evaluated and administered COWS protocol sometime around 7:00 to 7:30 p.m. on the evening of September 20th.

Is that your recollection?

A    I don't know what you mean by protocol.  COWS --

Q    He was tested.

A    Okay.

Q    He was COWS tested, right?

A    Yeah.  So it seems like --

Q    And it's right there -- it's right there on the page.  At the time of his

Page 56

assessment, approximately 1900, that would be 7:00 p.m., correct?

MR. FEINBERG:  Wait.  Tom, I think Dr. McCall was about -- was not finished with his answer to your previous question.  Can we just let him respond to that question?

MR. GREGORY:  Sure.

THE WITNESS:  So, COWS stands for Clinical Opiate Withdrawal Scale. So that is a scoring system.

You used the word protocol, and in many healthcare contexts there is a protocol that goes along with that testing scale.  Usually that scale is used on a serial basis.

So I -- the documentation indicated that the scale was used at a single point in time.  I was only questioning your use of the word protocol.

BY MR. GREGORY:

Q    Oh, okay.

But right there on the page that

Page 57

appears on our screen where the cursor has paused, that last sentence was -- is "At the time of his assessment, approximately 1900, his score was the highest possible score, 15, consistent with normal eye, motor and verbal responses."

And where it says -- I take that back. That's the Glasgow Coma Scale, correct?

A    Yes.  That's referring to the Glasgow Coma Scale.

Q    Right.  But it's your recollection, is it not, that at the same time he was -- or at the same assessment that he was administered the Glasgow Coma Scale, he also was administered the COWS test, correct?

A    Yes.  And I do refer to that in my report.

Q    Right.  It's up above.  And it's -- it now appears on the page.

And that's -- that paragraph at the top of the page he scored 6 and 10 respectively.  The assessments completed were completed at -- September 20th at 1900.  That would be 7:00 p.m.  Right?

Page 58

A    Yes.

Q    Okay.  So we know that at 7:00 p.m. he was experiencing would you call that mild withdrawal symptoms?

A    I believe that was how it was characterized by Dr. Bradley and Nurse Gaye.

Q    Okay.  Do you routinely conduct COWS testing on your patients?

A    Not -- when there is reason to believe they are withdrawing from a substance like opiates or benzodiazepines, we do use these tools, yes.

Q    Okay.  So you were familiar with the use of these tools in your everyday practice, correct?

A    Yes.

Q    Okay.  So if a patient were to score a 10, would you deem that mild, moderate or intense -- I don't know what they -- what they -- the appropriate terminology would be -- withdrawal?

MR. FEINBERG:  Objection to the form of the question, but you can answer.

Page 59

THE WITNESS:  A score of 10 is by most protocols at the upper limit of what we would -- and sorry.  This is specifically with regards to COWS, is at the upper limit of what we consider to be mild withdrawal symptoms nearly becoming, you know, moderate.

BY MR. GREGORY:

Q    Okay.  And we know that Mr. Gleaves was discovered in distress about 12 hours later.

Do I understand your testimony to be that you cannot pinpoint with any degree of medical certainty the time at which Mr. Gleaves' stroke event occurred?

MR. FEINBERG:  Objection.  Asked and answered.

But you can answer.

THE WITNESS:  I cannot pinpoint the time at which his stroke occurred.

(Screen sharing stopped.)

BY MR. GREGORY:

Page 60

Q    Can you pinpoint -- well, one of the things that you said is that there should have been an assessment during the next shift, and I think you said the shift that would have begun at 2300 or 11:00 p.m., correct?

A    Can you repeat that?

Q    If I ask you to assume that the medical staff operated on the same shift schedule as corrections officers, which was three shifts throughout a 24-hour period: 7:00 a.m. to 3:00 p.m., 3:00 p.m. to 11:00 p.m., and 11:00 p.m. to 7:00 a.m., is it your testimony that Mr. Gleaves having been assessed at 7:00 p.m., therefore during the second shift, should have been -- should have been assessed again after the 11:00 p.m. shift began?

MR. FEINBERG:  Objection to the form of the question.

But you can answer.

THE WITNESS:  That seems to be the suggestion of the staff at Corizon in their depositions.

Page 61

BY MR. GREGORY:

Q    And are you able to state with any degree of medical certainty how better Mr. Gleaves would have made out if he had been assessed between 11:00 p.m. and 12:00 midnight, 12:00 midnight and 1:00 a.m., 1:00 a.m. to 2:00 a.m., so forth and so on?

A    Well, it seems clear that his symptoms of withdrawal continued and possibly worsened.  The instructions that he was given at the end of his assessment and the plan that was documented was not just for repeated assessments.  He was actually given instructions to notify staff if his symptoms worsened so that he could be reassessed outside of whatever protocol they would have scheduled without his involvement.

So I can't say with pinpoint accuracy during any single hour period on the clock how his condition might have been progressing.  But as I've -- as I've said before, it does seem that his withdrawal symptoms likely continued and likely progressed.  And again, a stroke developed at

Page 62

some point after his medical assessment before he was found the next morning.

Q    And do you have any knowledge or indication that Mr. Gleaves did what he was instructed to do in terms of asking for more help or asking for help if his symptoms advanced?

A    As I -- as I mentioned earlier, some of the materials I reviewed, including depositions from Ms. Jones, indicate that his cellmate reported to Ms. Jones that the patient and the cellmate had both been calling for help verbally and using the alert button that was available to them and that he had been instructed to use during his medical assessment, if he needed assistance.

Q    Is that the only information that you have that's responsive to that question?

A    Yes.

MR. FEINBERG:  I'm late.  Let me note an objection to the form of that question, but the answer stands.

MR. GREGORY:  I'm just checking my notes, Dr. McCall.  I

Page 63

think those are all the questions I have.

Yes, they are.  Thank you.

MR. FEINBERG:  I don't have any questions for Dr. McCall.

Kate, do you have any more?

MS. MAYS:  Nope.  I am all set.

Thank you, Dr. McCall.

MR. GREGORY:  Thank you, sir.

COURT REPORTER:  Counsel, can you state on the record if you have a copy order?

MS. MAYS:  Yes, please.

MR. FEINBERG:  Yes, please. Electronic only for me.

MR. GREGORY:  Same for me.

MR. FEINBERG:  And I just need the mini is fine for me.

MR. GREGORY:  Yeah, me too.

- - -

(Deposition concluded at 4:09 p.m.)

- - -

Page 64

C E R T I F I C A T I O N

I hereby certify that the proceedings and evidence noted are contained fully and accurately in the stenographic notes taken by me in the foregoing matter, and that this is a correct transcript of the same.

_____

Court Reporter - Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**WORD INDEX**

**< 1 >**
**1:00** 61:6
**10** 1:1 50:10 57:21 58:18 59:1
**11** 48:21
**11:00** 42:21 60:5, 12, 13, 17 61:5
**1100** 2:19
**12** 59:11
**12:00** 61:5, 6
**1239** 15:19
**1243** 33:10
**1245** 41:10
**139** 48:24
**1460** 50:15
**14th** 2:12
**15** 57:4
**1500** 2:19
**1515** 2:12
**1900** 56:1 57:3, 23
**19102** 2:13, 19
**19106** 2:6
**19th** 25:11

**< 2 >**
**2:00** 61:7
**2:20-cv-0457-RBS** 1:1
**2018** 25:11 52:2
**2023** 1:1
**20th** 22:9 25:17 41:21 52:2 55:15 57:23
**215** 2:7, 13, 20
**21st** 25:18 41:22
**2300** 60:5
**24** 29:2
**24-hour** 60:11

**< 3 >**
**3:00** 60:12
**3:03** 1:1
**32** 31:8
**33** 47:3

**< 4 >**
**4** 8:22
**4:09** 63:22
**400** 44:12

**43** 3:9

**< 5 >**
**5** 48:21
**501** 2:6
**564-0400** 2:20

**< 6 >**
**6** 3:5, 8 50:10 57:21
**683-5434** 2:13

**< 7 >**
**7:00** 42:21 55:14 56:2 57:24 58:2 60:12, 13, 15
**7:30** 55:14
**71** 48:19
**718** 2:5

**< 9 >**
**9/20/2018** 53:5
**925-4400** 2:7

**< A >**
**a.m** 60:12, 13 61:6, 7
**abbreviation** 44:3
**able** 16:15, 17 51:16 61:2
**abnormal** 23:20
**abnormalities** 32:7, 8
**abnormality** 23:7
**abuse** 49:14, 19
**accreditations** 46:18
**accrediting** 46:5, 7, 9, 16
**accumulation** 44:12
**accuracy** 61:18
**accurately** 64:6
**acknowledge** 4:5, 9
**ACTION** 1:1
**acute** 29:5 30:2 32:10
**administered** 4:10 44:17 55:13 57:13, 15

**Administrator** 1:1
**admission** 45:1 47:8, 12, 15 48:18
**admitted** 30:21 31:7 53:8
**admitting** 47:20
**adult** 50:7, 9
**advanced** 36:23 62:7
**afternoon** 6:7, 8 43:22
**age** 36:21 37:2
**agency** 46:5, 7, 9, 17
**ago** 9:22
**agree** 47:3 50:3 54:14
**Agreed** 4:21, 24
**agreement** 4:18, 20 5:13
**ahead** 33:12 43:8
**alert** 42:12 62:13
**allows** 50:3 51:18
**alprazolam** 27:11
**American** 44:18
**amount** 20:16 21:24 26:8 36:22
**anatomic** 21:14 22:22
**and/or** 46:14 64:23
**ANGELINE** 2:24
**ANITA** 1:1
**anomalies** 51:9
**answer** 11:18, 24 12:16 16:14, 17 18:22 22:19 25:21 26:1, 2, 20 27:5 28:5, 6 29:11 38:12 40:18 42:1 43:8 49:17 50:1 51:15 52:10, 15 53:16 54:24

**55:6 56:5 58:24 59:19 60:21 62:22
**answered** 25:20 31:13 39:8 42:10 59:18
**answers** 47:1
**anymore** 8:19
**anytime** 20:23
**apparent** 34:18, 21 36:20 37:12 39:6, 13
**appeared** 19:3, 8, 15 31:23 32:3, 9 36:8
**appears** 57:1, 19
**apply** 64:21
**appropriate** 13:5 20:6, 14 58:20
**appropriately** 41:15
**approximately** 13:15 16:20 56:1 57:3
**aqueduct** 35:20
**Arch** 2:5, 12
**ARDS** 32:11
**area** 21:15
**areas** 34:12
**arrangement** 4:15
**arranging** 17:16
**arrhythmias** 23:20
**arrival** 20:3
**arrived** 19:23 20:1 32:6
**asked** 18:6 25:20 31:10 39:8 59:18
**asking** 12:2 53:14 62:5, 6
**aspirated** 32:4
**assessed** 41:15 60:15, 17 61:5
**assessment** 37:24 42:18 53:8, 21 56:1 57:3, 13 60:3 61:11 62:1, 16
**assessments** 57:22 61:13

**assignment** 14:1
**assistance** 62:16
**Assistant** 2:11
**assume** 60:8
**assumptions** 12:4
**asthma** 47:16, 18, 21
**asthmatic** 48:9
**ataxia** 40:24 41:2, 3, 6
**atrophy** 34:24 36:13, 22, 24 37:4, 7
**attorneys** 4:3
**authored** 54:5
**autopsy** 14:9 24:20 49:5, 7 50:14, 24 51:3, 5
**available** 62:14
**average** 50:6, 9
**avoidable** 20:7
**aware** 47:7, 10, 11 48:8, 13 50:24

**< B >**
**back** 32:20 36:5 38:3, 8, 10 57:7
**bad** 22:4
**bags** 26:13 27:1
**bars** 26:13
**based** 19:22
**basis** 56:16
**Bates** 33:7 41:10
**becoming** 59:7
**began** 13:12 21:5 25:16 60:18
**begins** 34:17
**begun** 60:5
**believe** 9:3 10:1, 8 18:9 19:24 21:7 23:17 25:13 35:8 47:22 54:19 58:5, 9
**beneath** 35:10
**benzodiazepines** 27:11, 19 58:11
**best** 33:3, 21

**better** 32:14 41:12 61:3
**beyond** 37:2
**billing** 16:23
**Bioethics** 44:18
**bit** 18:14 21:12 27:5 31:18 32:21 33:2, 15, 20
**blood** 19:19 23:21, 22 28:15, 17
**body** 23:23
**bottom** 35:10, 18
**BRADLEY** 1:1 2:22 52:4, 5 53:6, 10, 19 54:6, 16, 18 55:2 58:6
**brain** 20:12, 16 22:23 23:23 32:8 33:24 34:1, 10, 12, 24 35:1, 4, 14, 18 36:16, 17 37:4, 7 39:18 49:8, 20 50:7, 9, 15
**brainstem** 35:18
**break** 7:16
**breakdown** 25:4
**breathing** 35:22
**brought** 45:5, 12
**Building** 2:5, 12
**butcher** 15:24
**butchering** 28:22
**button** 43:13 62:14
**buttons** 42:12

**< C >**
**CALEB** 1:1 3:4 5:22 6:2
**C-A-L-E-B** 5:23
**call** 58:3
**called** 35:11, 19 36:1 40:23 43:2
**calling** 43:11, 13 62:13
**calls** 42:10

Joseph Caleb McCall, M.D.
1/10/2023

2

candidate 41:*12*
capacity 10:*19*
caption 10:*24*
cardiomegaly 50:*21, 22* 51:*1, 19*
cardiomeglopathy 50:*20*
care 14:*20, 24* 15:*4* 20:*6, 8, 10, 11, 14* 21:*3* 41:*13* 44:*22, 24* 45:*3, 4, 11* 46:*21*
cared 14:*5, 7*
cascade 30:*10*
case 6:*10* 9:*16* 10:*7, 13, 20* 11:*1, 6, 9, 12, 15* 12:*3, 8, 18, 22, 23* 13:*16* 14:*1, 10* 17:*23* 20:*15* 24:*4* 32:*23* 33:*18* 34:*16, 19, 22* 37:*10, 15* 41:*6* 46:*2, 21*
cases 30:*22* 34:*14* 44:*14*
Cast 2:*5*
cause 23:*13* 24:*3* 28:*2* 29:*5* 30:*2, 8* 34:*13* 37:*3* 40:*9, 13* 51:*19*
caused 23:*10* 30:*17*
causes 35:*16*
cell 43:*14*
cellmate 41:*17* 42:*7* 43:*10* 62:*11, 12*
cells 42:*13*
center 53:*4*
cerebellum 33:*1* 35:*9* 40:*8*
cerebral 20:*16* 21:*8, 11, 24* 33:*23, 24* 35:*13, 19* 38:*2*
Certainly 18:*3* 29:*12*
certainty 59:*15* 61:*3*

certification 5:*14* 44:*6, 17* 64:*20*
certify 64:*4*
certifying 64:*24*
CFCF 52:*2* 53:*3, 8*
chance 8:*8* 14:*16*
channel 35:*19*
characterized 58:*6*
chart 50:*13*
checking 54:*1* 62:*24*
chest 32:*9*
chronic 47:*16* 49:*14, 19*
cigarettes 48:*10, 12*
CITY 1:*1* 2:*10, 11, 15* 5:*1* 6:*10* 12:*24* 17:*17*
CIVIL 1:*1*
clarify 33:*15* 47:*6*
clear 61:*8*
clearly 21:*18*
clinical 40:*1, 23* 44:*14* 47:*18* 56:*10*
clinically 21:*8* 34:*10, 18, 20, 21* 35:*20* 36:*11, 20* 37:*12*
clinicians 41:*1*
clock 21:*17* 61:*19*
closer 22:*3*
clots 23:*21, 22*
colleague 10:*2, 23*
colleague's 10:*3*
Coma 57:*8, 10, 14*
come 18:*17* 49:*10*
commencing 1:*1*
Commission 45:*23*
communications 8:*22* 9:*6* 12:*17*

community 45:*5, 11*
compared 30:*17*
compartment 35:*7*
compensation 8:*23*
complaints 39:*1*
completed 57:*22, 23*
complex 44:*13, 24*
complications 30:*13* 31:*23*
concerning 9:*6*
concluded 63:*22*
conclusion 30:*1* 31:*11, 14, 16*
concurs 55:*11*
condition 36:*1* 48:*9* 61:*20*
conditions 19:*4*
conduct 46:*13* 58:*7*
conducting 49:*7*
conferencing 1:*1*
confined 21:*15*
confirm 49:*3*
confuse 41:*2*
connect 28:*16*
connective 35:*11*
consent 4:*15* 5:*6*
consequential 35:*21* 36:*12*
consider 59:*6*
consistent 32:*5* 57:*5*
constituted 20:*10*
Consultation 44:*5*
consume 24:*10*
consumed 27:*3*
contacted 9:*16, 23*
contained 64:*5*
content 16:*18* 36:*16*
contents 32:*4*
context 33:*22*

46:*8* 49:*16*
contexts 56:*13*
continue 27:*15*
continued 24:*10* 27:*23* 61:*9, 23*
control 53:*1* 64:*23*
conversations 11:*20* 12:*2*
conversion 50:*13*
copy 8:*24* 9:*3* 15:*16* 63:*13*
CORIZON 1:*1* 2:*20* 31:*24* 43:*24* 46:*14* 54:*21* 60:*23*
correct 15:*17* 24:*17* 25:*13* 45:*7, 8, 13, 14, 18* 48:*20* 49:*1* 54:*16* 56:*2* 57:*8, 15* 58:*15* 60:*6* 64:*8*
Correction 6:*11* 15:*5*
correctional 14:*3* 42:*14* 44:*21, 23* 45:*24* 46:*3, 9, 16, 19*
corrections 60:*10*
counsel 4:*14, 23* 5:*7, 13* 11:*21* 63:*11*
couple 6:*19* 15:*22* 43:*20* 46:*24*
course 26:*5* 34:*23* 37:*17, 21* 52:*1* 53:*3*
COURT 1:*1* 4:*3* 5:*7, 18* 7:*5* 38:*8* 63:*11* 64:*14*
COWS 55:*13, 18, 21* 56:*9* 57:*15* 58:*7* 59:*4*
cranium 21:*16*
create 23:*21*
creating 8:*15*
cursor 57:*1*
custody 12:*24* 14:*5* 44:*23*

45:*4*

**< D >**
daily 26:*13*
dangerous 36:*2*
date 9:*15*
David 10:*5*
day 45:*17* 48:*10*
days 13:*18* 21:*9* 27:*16, 23* 28:*19* 34:*5, 6*
deadly 34:*15* 36:*3*
death 19:*6* 29:*5* 30:*2, 8, 9* 31:*12, 22* 35:*22* 51:*11*
declare 4:*12*
decreases 35:*1*
deem 58:*18*
de-emphasized 47:*19*
Defendant 5:*1*
Defendants 1:*1* 2:*15, 20* 5:*3* 6:*10*
deficiencies 51:*12*
definition 39:*13*
degree 34:*24* 36:*13* 59:*14* 61:*3*
delay 13:*3* 20:*5, 8, 10*
denying 39:*1*
DEPARTMENT 2:*10*
depending 27:*3, 5, 19* 34:*14* 55:*8*
depends 37:*1*
deposed 11:*9* 55:*9*
DEPOSITION 1:*1* 4:*6* 6:*12, 15* 15:*23, 24* 16:*2, 4, 8, 11* 17:*18, 20* 28:*22* 29:*2* 42:*5, 16* 54:*15, 17* 55:*3* 63:*22*
depositions 14:*10* 15:*8, 9, 23* 60:*24* 62:*10*
describe 13:*24*

DESCRIPTION 3:*13* 20:*21*
despite 48:*8*
detect 31:*1*
deterioration 19:*5* 42:*23*
determine 25:*6*
develop 28:*18*
developed 61:*24*
development 19:*8, 10* 32:*10, 16*
develops 34:*17*
deviated 46:*15*
deviation 14:*20, 23* 15:*4*
diagnosing 20:*13*
difference 45:*16*
different 23:*22* 27:*18* 39:*24*
difficult 21:*6* 23:*12* 25:*24* 27:*5* 40:*22*
difficulties 39:*3* 40:*14*
difficulty 23:*6* 40:*10, 20*
direct 44:*15* 64:*23*
disagree 29:*7* 30:*3, 4* 31:*16* 49:*21* 50:*4*
discernible 30:*15*
disclose 17:*11*
discoloration 49:*9, 13, 20*
discovered 59:*11*
discuss 17:*15, 16*
discussed 12:*22*
discussing 46:*23*
discussions 12:*7*
displayed 7:*21* 15:*13* 29:*17* 32:*17* 52:*19*
disposed 8:*17*
Distress 32:*11* 59:*11*
DISTRICT 1:*1*
Docket 1:*1*

doctor 31:*13* 43:*22*
doctor's 31:*10*
Document 7:*21* 15:*13* 29:*17* 32:*17* 33:*7* 52:*19*
documentation 13:*12* 47:*13* 49:*3* 54:*20* 56:*17*
documented 19:*20* 32:*3* 61:*12*
DOE(S 1:*1*
dosages 48:*15*
dose 26:*23*
Dr 2:*22* 5:*18* 6:*7* 11:*18, 23* 12:*16* 16:*2, 14* 17:*9* 18:*6, 21* 22:*20* 25:*22* 28:*22* 29:*9* 33:*12* 42:*2* 43:*7* 49:*8* 52:*3, 5, 11, 13* 53:*4, 6, 10, 14, 16, 19* 54:*6, 18* 55:*2* 56:*4* 58:*6* 62:*24* 63:*5, 9*
draft 12:*3, 10, 14*
drafting 16:*21*
drug 19:*16* 23:*10, 18* 24:*1, 14* 25:*1* 29:*6* 30:*2, 11, 12, 16, 17, 24* 31:*2* 37:*3, 7* 49:*14*
drugs 24:*19* 25:*7, 10* 26:*9* 29:*5*
due 23:*24*
duly 6:*3*
dusky 49:*9, 13, 20*
dysregulating 35:*22, 23*

< E >
earlier 14:*14, 15* 32:*15* 39:*14* 46:*23* 62:*8*
early 23:*4* 25:*17* 39:*22*
EASTERN 1:*1*

edema 20:*16* 21:*8, 11, 24* 33:*23* 34:*1, 16* 35:*13* 36:*5, 7, 19* 37:*11* 38:*2*
education 44:*8*
EILEEN 1:*1*
either 7:*12*
Electronic 63:*16*
elevated 28:*15, 17*
elevations 19:*19*
ELIZABETH 1:*1* 52:*3* 53:*6* 54:*15*
emergency 20:*18* 25:*1*
Emory 49:*8*
emphasized 47:*2*
employees 43:*24* 46:*15*
enclosed 35:*9*
engaged 47:*24*
English 48:*20*
enjoy 35:*5*
enlarged 50:*16*
enlargement 50:*22* 51:*6*
ensuing 32:*12*
entity 40:*23*
equates 50:*11*
ESQUIRE 2:*3, 16*
essentially 34:*1*
establish 14:*11*
ESTATE 1:*1*
estimate 13:*21* 16:*24* 21:*4, 23* 22:*1* 26:*15*
ethical 44:*13*
Ethics 44:*5*
ETIENNE 2:*24*
evaluated 20:*18* 21:*20* 30:*21* 55:*13*
evaluation 20:*6* 22:*2* 24:*11* 26:*4* 30:*19*
evening 22:*2* 55:*15*
event 30:*10* 59:*16*
events 28:*16* 30:*11*

eventually 30:*10*
everyday 48:*16* 58:*14*
evidence 24:*9* 26:*3* 38:*16* 64:*5*
exact 13:*19* 23:*13*
exactly 54:*22*
exam 44:*17* 53:*22* 54:*2*
EXAMINATION 3:*7* 49:*16* 50:*18*
examined 6:*4*
example 15:*5* 28:*14* 47:*7*
exception 21:*12*
exceptional 32:*24* 33:*19* 34:*20*
exhibits 3:*15*
expand 35:*4*
expanded 36:*16*
expect 7:*15* 36:*19*
expected 39:*2*
experience 30:*23* 44:*13, 20*
experiencing 22:*15* 38:*17* 58:*3*
expert 10:*9, 16, 19, 21* 11:*21* 14:*1* 21:*7* 46:*2* 49:*15* 50:*18*
expertise 50:*3* 51:*17*
explain 30:*4*
explanation 23:*14*
explanations 23:*16*
extensive 32:*7*
extent 25:*20* 39:*9* 53:*13*
extra 35:*6*
extremities 23:*6* 40:*11, 21*
eye 57:*5*

< F >
facilities 44:*23* 46:*19*

facility 14:*3* 42:*14*
factor 24:*15*
factors 19:*9, 14* 31:*6*
facts 11:*15* 12:*3, 8, 18* 13:*10* 19:*2*
familiar 45:*21* 47:*14* 58:*13*
far 9:*9, 11* 13:*16* 45:*19*
featured 53:*24*
fee 8:*24*
feel 7:*11, 17* 18:*16* 29:*10*
fees 9:*6*
FEINBERG 2:*3* 4:*21, 23* 5:*12* 8:*23* 10:*10, 13* 11:*16, 17* 12:*5, 11, 15, 22* 16:*12* 17:*4, 7, 24* 18:*3, 19* 22:*17* 25:*19* 26:*18* 29:*8* 33:*6, 11* 39:*7* 40:*16* 41:*23* 43:*5* 49:*23* 51:*13* 52:*8* 53:*12* 55:*4* 56:*3* 58:*22* 59:*17* 60:*19* 62:*20* 63:*4, 15, 18*
Feinberg's 10:*2*
Fentanyl 26:*12* 48:*16*
field 15:*1*
filing 5:*15*
fills 35:*2*
final 18:*8, 17*
find 11:*2* 27:*1*
findings 51:*1*
fine 5:*10* 12:*11* 63:*19*
finished 56:*5*
First 5:*22* 9:*16* 10:*18* 11:*16* 13:*9* 20:*1, 18* 49:*19* 51:*23, 24* 52:*23*
five 34:*6*
fixed 35:*15*
flat 18:*2*
Floor 2:*12*

fluid 35:*19* 36:*1, 15*
focus 19:*7*
following 21:*9* 22:*3*
follows 6:*4*
foot 48:*21*
foregoing 64:*7, 20*
forget 38:*6*
form 5:*16* 16:*13* 18:*20* 22:*18* 26:*19* 40:*17* 41:*24* 43:*6* 49:*24* 51:*14* 52:*9, 12* 53:*13* 55:*5* 58:*23* 60:*20* 62:*21*
forth 61:*7*
forward 8:*24*
forwarded 9:*4*
found 21:*22* 31:*24* 32:*6* 42:*22* 62:*2*
four 17:*22* 18:*2* 26:*14* 34:*6* 44:*12*
frame 20:*9*
free 7:*11, 17*
frequently 26:*9*
full 5:*19*
fully 35:*2* 64:*6*
further 4:*9* 34:*13*

< G >
gathering 53:*21*
GAYE 1:*1* 2:*22* 15:*23* 53:*7, 19* 54:*23* 58:*6*
generally 27:*9* 53:*18*
GERALD 1:*1* 2:*16*
give 21:*17* 26:*2* 29:*9*
given 37:*17* 61:*10, 13*
gives 26:*22*
Glasgow 57:*8, 9, 14*
GLEAVES 1:*1* 14:*16* 19:*16* 21:*12*

24:*10, 19* 25:*9* 26:*9* 30:*13* 31:*21* 32:*23* 33:*18* 36:*6* 37:*7* 41:*19* 43:*2* 46:*23* 48:*4* 49:*8* 50:*15* 51:*2* 52:*3, 6* 53:*5* 54:*21* 55:*12* 59:*10, 16* 60:*14* 61:*4* 62:*4*
go 6:*18* 17:*22* 23:*15* 32:*20* 33:*12* 36:*5* 43:*7*
goes 56:*14*
going 26:*16* 38:*3* 41:*21*
gonna 6:*12, 18* 7:*19* 8:*6* 11:*18, 23* 15:*24* 17:*20, 22* 18:*19* 31:*8* 32:*20* 36:*5* 41:*9*
Good 6:*7, 8* 43:*22*
grams 50:*12, 15*
great 52:*18*
GREGORY 2:*16* 3:*9* 5:*5* 43:*19, 21, 23* 50:*5* 51:*21* 52:*21, 24* 53:*2* 54:*3* 55:*10* 56:*8, 22* 59:*9, 24* 61:*1* 62:*23* 63:*10, 17, 20*
grew 36:*8, 10*
Grieves 31:*12*
grounds 45:*9*
guard 41:*18, 20* 42:*7* 43:*2*
guess 11:*8*

< H >
half 17:*1, 2* 27:*18*
happened 22:*5* 37:*17*
happy 17:*11*
hard 21:*16* 26:*21* 28:*4, 6*
harmful 34:*11*
head 7:*7* 9:*18*
heading 52:*1*

Joseph Caleb McCall, M.D.
1/10/2023

4

| | | | | | |
|---|---|---|---|---|---|
| **HEALTH** 1:*1* 45:*24* 46:*14* 54:*21* | **identified** 14:*7, 13* 21:*21* 24:*12* 32:*2, 15* 37:*23* | **instructions** 6:*19* 61:*10, 14* | **know** 10:*3, 6, 7* 11:*11* 13:*14, 19* 14:*4, 13* | 34:*8* 49:*2* 52:*14* 54:*11* | **M-C-C-A-L-L** 5:*24* |
| **healthcare** 44:*21* 46:*3, 10* 56:*13* | **identifying** 30:*7, 8, 9* | **intake** 21:*21* 22:*7, 8* 24:*17* 37:*24* 38:*17, 21* 53:*7, 11, 20* | 18:*1* 19:*15* 20:*12* 34:*16* | **looking** 14:*19* 54:*13* | **McNAMARA** 1:*1* 33:*10* |
| **healthy** 47:*5* | **imminently** 31:*21* | **intense** 58:*19* | 37:*14* 38:*1, 3, 15* 39:*23* 40:*6, 20* 41:*19* 42:*2, 16* 43:*1, 4, 9* | **looks** 15:*19* | **mean** 14:*24* 22:*11* 30:*19* 36:*21* 46:*7, 8* 47:*6* 55:*17* |
| **hear** 7:*10* | **important** 18:*16* 55:*1, 8* | **intensity** 34:*5* | 49:*15* 52:*16* 53:*20* 54:*1* 55:*17* 58:*2, 19* 59:*7, 10* | **lot** 30:*12* 37:*1* 39:*24* | |
| **heart** 23:*20* 35:*23* 50:*23* | **improved** 41:*14* | **interrupt** 17:*5* | | | **meaning** 18:*15* 35:*1* |
| **HEC-C** 44:*3* | **incarceration** 45:*7* | **intoxication** 23:*19* 29:*6* 30:*3, 11* | **knowing** 16:*17* | < M > | **means** 7:*6* 20:*19* 64:*22* |
| **held** 1:*1* | **inches** 48:*19* | **invoice** 17:*10* | **knowledge** 62:*3* | **M.D** 1:*1* 3:*4* 6:*2* 44:*2* 53:*6* 54:*16* | **measurement** 27:*2* |
| **help** 17:*12* 18:*10* 41:*17* 42:*10* 43:*2, 11* 52:*14* 62:*6, 13* | **include** 18:*8* 24:*6* | **invoices** 9:*8, 10* 13:*14* | | **major** 48:*21* | **mechanism** 30:*9* 31:*22* |
| **helpful** 16:*11* 29:*21* | **included** 42:*20* 53:*21* | **invoicing** 17:*8* | < L > | **making** 20:*5* | **medical** 12:*20* 14:*2, 8* 15:*1* 18:*24* 19:*3* 22:*2* 24:*8, 11* 26:*4, 10* 30:*13* 37:*24* 38:*21* 42:*17, 18, 23* 52:*1* 53:*3* 59:*15* 60:*9* 61:*3* 62:*1, 15* |
| **helps** 18:*17* | **including** 13:*17* 23:*23* 62:*9* | **involved** 12:*23* | **LALITHA** 1:*1* | **man** 12:*23* | |
| **Hepatitis** 47:*9* | **inclusion** 54:*18* | **involvement** 61:*17* | **late** 62:*20* | **managed** 32:*12* | |
| **heroin** 26:*12* 48:*15* | **Incoordination** 23:*5* | **Iron** 2:*5* | **LAW** 2:*10* | **managing** 44:*13* | |
| **heroine** 26:*13* | **increased** 14:*15* 36:*15* | **issue** 14:*8* | **layer** 35:*11* | **manner** 4:*16* | |
| **higher** 21:*3* | **independent** 44:*16* | **its** 31:*2* 34:*4* 43:*24* 46:*14* | **layman's** 33:*3, 21* | **marked** 3:*15* | **megla** 50:*20* |
| **highest** 57:*4* | **indicate** 4:*18* 44:*2* 48:*13* 51:*24* 54:*14* 62:*10* | | **lead** 23:*19* | **Market** 2:*19* 10:*15* | **members** 41:*18, 20* 42:*17* 43:*3* |
| **highlight** 32:*22* | **indicated** 42:*18* 50:*14* 54:*19* 56:*18* | < J > | **led** 19:*4, 18* 20:*6* 30:*12* | **marketed** 10:*21* | |
| **highlighted** 31:*10* 33:*8* | | **January** 1:*1* | **legal** 5:*20* | **materials** 12:*21* 15:*20* 28:*20* 54:*13* 62:*9* | **mention** 21:*7* 22:*6* 35:*8* 36:*4, 5* |
| **highly** 28:*15, 17* | **indication** 62:*4* | **Jeoboham** 16:*1* | **legally** 7:*1* | | |
| **his/her** 4:*12* | **individual** 26:*22* | **jfeinberg@krlawphila.com** 2:*7* | **letters** 44:*2* | **math** 48:*20* | **mentioned** 14:*18* 15:*7* 23:*18* 27:*13* 28:*20* 38:*15* 39:*4* 43:*12* 47:*1* 51:*22* 62:*8* |
| **history** 53:*22* | **infected** 47:*9* | **JOHN** 1:*1* | **level** 21:*3* | **matter** 4:*13* 64:*7* | |
| **HIV** 47:*12* | **information** 11:*3* 37:*15* 38:*20* 42:*4* 62:*17* | **JONATHAN** 1:*1* 2:*3* 4:*22* | **lieu** 4:*10* | **MATU** 1:*1* 15:*23* 53:*6* | |
| **hospital** 19:*24* 32:*2, 6* 44:*5, 14, 24* 45:*6, 10, 11* | | **Jones** 16:*1* 42:*6, 8* 62:*10, 11* | **life-saving** 41:*13* | **MAYS** 2:*11* 3:*8* 4:*24* 5:*2, 10* 6:*6, 9* 7:*23* 9:*14* 12:*1, 9, 13* 13:*7* 15:*15* 16:*19* 17:*6, 19* 18:*1, 5* 19:*12* 23:*2* 26:*7* 27:*24* 29:*16, 19* 32:*19* 33:*9, 16* 38:*7, 13* 39:*19* 41:*5* 42:*24* 43:*15* 63:*7, 14* | |
| **hospitalization** 19:*5* | **inhaler** 48:*1* | **JOSEPH** 1:*1* 3:*4* 5:*22* 6:*2* | **likewise** 27:*21* | | **MESSING** 2:*3* |
| **hospitals** 14:*6* | **initial** 53:*20* 54:*20* | **J-O-S-E-P-H** 5:*23* | **limit** 59:*2, 5* | | **metabolites** 25:*4* 31:*2* |
| **hour** 61:*19* | **initially** 11:*15* 14:*5* | **JR** 1:*1* | **limited** 12:*7* | | **metered** 26:*23* |
| **hours** 13:*19, 22* 17:*2, 22* 18:*2* 20:*3, 4, 20* 27:*14, 15, 22* 28:*18* 32:*13* 34:*17* 44:*12* 51:*11* 59:*11* | **injured** 34:*12* | **judged** 46:*20* | **LIN** 2:*3* | | **middle** 5:*23* |
| | **injury** 34:*13* | | **list** 15:*20* | | **midnight** 61:*6* |
| | **instability** 19:*18* 28:*14* | < K > | **little** 18:*13* 21:*12* 27:*4* 31:*18* 32:*21* 33:*2, 15, 19* 37:*1* | **McCALL** 1:*1* 3:*4* 5:*18, 22* 6:*2, 7* 11:*18, 23* 12:*16* 16:*14* 17:*9* 18:*6, 21* 22:*20* 25:*22* 29:*9* 33:*12* 42:*2* 43:*7* 52:*11, 13* 53:*4, 14, 16* 56:*4* 62:*24* 63:*5, 9* | **mild** 58:*3, 18* 59:*6* |
| | **instance** 45:*15* | **KAIRYS** 2:*3* | | | **mini** 63:*19* |
| **human** 50:*7, 9* | **instruct** 11:*23* | **Kate** 17:*4* 63:*6* | | | **minutes** 20:*3, 12* |
| **Humanities** 44:*19* | **instructed** 62:*5, 15* | **KATELYN** 2:*11* 5:*2* 6:*9* 11:*20* | **lives** 27:*18* 34:*23* | | **mischaracterizes** 39:*9* |
| **hydrocephalus** 36:*2* | **instruction** 29:*10* | **katelyn.mays@phila.gov** 2:*14* | **LLP** 2:*3, 16* | | **moderate** 58:*18* 59:*8* |
| | | **keeping** 16:*23* | **location** 21:*14* 22:*22* | | **monitored** 41:*18, 20* |
| < I > | | **KERRIGAN** 1:*1* | **long** 7:*16* 26:*15* 28:*2* 48:*6* | | **month** 9:*19* |
| **identification** 13:*4* | | **KIMBALL** 2:*16* | **longer** 37:*11* | | |
| | | **kind** 25:*4* 40:*23* | **longhand** 8:*16* | | |
| | | | **long-term** 47:*15* 51:*12* | | |
| | | | **look** 8:*8* 15:*3* 16:*3, 7, 11* 28:*21* 31:*5, 9* | | |

morning 21:23 22:4 25:17 32:1 38:1 42:22 62:2
motor 57:5
movement 40:11, 21
movements 23:5
multiple 42:17
muted 5:4

< N >
name 4:19 5:20, 22, 23, 24 6:9 10:3, 24 16:1 28:23 43:23 54:19
narrative 51:23
National 45:23
nausea 23:8 40:7, 9
Nazareth 19:24
NCCHC 45:21 46:4
nearly 59:7
necessarily 22:11
need 7:16 29:3, 11 63:18
needed 62:16
neurologist 19:7
never 11:9
night 25:16 41:21
Nope 8:13 63:7
normal 45:17 57:5
Notary 1:1 64:14
note 17:7 29:8 33:7, 18 41:11 52:11 62:21
noted 20:8 24:16 33:24 47:22 48:19 64:5
notepad 13:20
notes 8:14, 16, 18 15:10 16:23 38:20 54:5, 24 55:12 62:24 64:7

noticeable 22:15
noticed 44:1
notify 61:14
nuh-uh 7:7
NUMBER 3:13 8:22 13:19
Nurse 2:22 16:1 53:19 54:23 58:6
nursing 41:18 42:15

< O >
oath 4:10 6:24 55:3
object 11:19 18:20 22:17 41:23 43:5 49:23 51:13 52:8 53:12
Objection 16:12 25:19 26:18 29:9 39:7, 8 40:16 52:12 55:4 58:22 59:17 60:19 62:21
objections 4:16 5:15
obligated 7:1
observation 44:15
observations 38:24
observed 39:2 49:12
obstruction 35:24
obtained 24:9 27:7
occur 19:21 41:4, 6
occurred 20:2 21:18, 19 22:1 26:6 33:1 37:21 59:16, 22
occurring 28:13
occurs 21:9 34:4, 6, 7
O'CONNOR 2:16
offhand 15:8
office 9:4 10:2
Officer 6:11 16:4, 7

officers 15:5 60:10
oftentimes 30:7
Oh 56:23
Okay 6:13, 14, 18, 21, 22 7:13, 14, 17, 18, 19 8:3, 6, 11, 14, 18, 21 9:2, 5, 8, 12, 21, 23 10:6, 12, 15, 18, 24 11:5, 8, 11, 14 12:12, 19 13:8, 13, 21, 24 14:18 15:3, 7, 19, 22 16:10, 20 17:3, 24 18:4, 10 22:6, 11 25:9, 15 28:1 30:15 36:18 37:6 40:13 43:1, 15 45:24 52:7, 22 55:20 56:23 58:2, 7, 13, 17 59:10
old 20:20 47:3
older 36:12, 18, 24
once 14:7 17:10
ones 27:20
ongoing 49:14
onset 20:23
operated 60:9
opiate 49:19 56:10
Opiates 27:17 58:11
opinion 18:7, 18 21:19 23:9 25:16 29:7 31:10 41:11
opinions 13:9, 11 46:12
opportunity 21:1
ORAL 1:1
order 44:8 63:13
organ 51:9
organs 51:12
outcome 20:7 41:14
outside 61:16
overdose 24:1 30:16

Oxman 10:5

< P >
p.m 1:1 55:14 56:2 57:24 58:2 60:5, 12, 13, 15, 17 61:5 63:23
PA 2:6
pack 48:10
PAGE 3:3, 13 6:21 15:19 29:2 31:8 41:9 51:24 52:23 55:24 56:24 57:19, 21
paragraph 51:23 53:4 54:11 57:20
Paralegal 2:24
Parkway 2:12
part 22:23 35:14 39:17 42:13 46:14
participating 4:4
particular 37:2, 15 39:17 42:13
particularly 19:19 24:24
parties 4:14 11:1
parts 23:23
passage 35:24
passing 44:17
pathological 49:16 50:18
patient 14:4 36:12, 19 37:2 45:11, 16, 17 58:17 62:12
patients 34:11 35:21 44:22 45:3 58:8
patrolling 42:9
paused 57:2
payment 17:16
peak 34:5
penalty 4:13 7:2
PENNSYLVAN IA 1:1 2:13, 19
people 14:10 27:9 30:23 36:23, 24

performed 19:23 53:19
period 20:24 34:3 42:21 60:11 61:19
perjury 4:13 7:2
persist 28:18
person 4:11 26:16
PHILADELPH IA 1:1 2:6, 10, 13, 15, 19 5:1 6:11 13:1
phrased 11:19 25:8
physical 53:22 54:2
physically 4:5
physician 49:7
pinpoint 23:13 59:14, 21 60:1 61:18
place 30:20 34:2 35:1, 8 36:23
placed 42:12
Plaintiff 1:1 2:7 4:22, 23
plan 61:11
Please 4:18 7:11, 17 38:8 63:14, 15
point 56:19 62:1
pointed 17:9
poor 20:7
positive 31:2 47:12 51:1, 6
possible 22:14, 21 23:24 24:3 29:15 33:4, 21 37:3, 6, 9 39:5, 20 57:4
possibly 61:9
potential 14:19
potentially 33:20 37:10, 11 41:13
pounds 48:24 50:10
practice 58:14
precious 20:13
precise 21:17 25:5 26:1
precision 28:5, 7
preliminary 13:8

preparation 13:17 44:16 46:1
prepare 11:5
prepared 13:14
preparing 18:11, 14
presence 31:1
PRESENT 2:23 4:6 20:17 21:11
press 34:11
pressing 34:15
pressure 19:20
pressures 28:15, 17
prevented 31:13, 14, 15
previous 39:10 56:6
previously 47:24
Prior 12:19 48:3
prison 22:8 26:11 45:9
private 45:10
privilege 11:22
probably 13:18 17:1 50:9
proceeding 4:4, 8 5:8
proceedings 64:5
process 18:14 21:22
produce 29:15
product 11:22
products 25:4
progress 54:5 55:12
progressed 27:23 37:18 61:24
progressing 61:21
promulgated 46:4
protocol 55:13, 18 56:12, 14, 21 61:16
protocols 59:2
provide 7:4
providers 38:21
proxy 36:22

**Public** 1:*1* 64:*14*
**pull** 29:*3* 49:*5*
**pulmonary** 31:*23*
**purposes** 16:*24* 17:*17*
**pursuant** 1:*1*
**push** 35:*16*
**pushing** 36:*17*

**< Q >**
**qualification** 12:*6*
**question** 5:*16* 7:*10, 11, 13* 11:*19* 12:*7, 17* 13:*2* 16:*13* 18:*20* 22:*18* 26:*19* 29:*12, 23* 33:*15* 38:*4, 5, 6* 40:*17* 41:*24* 43:*6* 49:*24* 51:*14* 52:*12, 16* 53:*9, 13, 17* 55:*5* 56:*6, 7* 58:*23* 60:*20* 62:*18, 22*
**questioning** 40:*4* 56:*20*
**questions** 7:*5* 17:*13* 43:*16* 53:*24* 63:*1, 5*
**quick** 7:*20*
**quickly** 35:*16* 37:*17, 20*

**< R >**
**R.N** 53:*7*
**range** 27:*17*
**rapidly** 36:*8, 9, 11*
**rate** 18:*2* 35:*24*
**reach** 31:*11* 34:*4*
**read** 38:*8, 10*
**really** 7:*20* 26:*21* 45:*15*
**reason** 24:*6* 27:*4* 34:*8* 49:*21* 58:*9*
**reassessed** 61:*15*
**recall** 9:*15, 17, 19, 23* 10:*24* 11:*2, 3, 14* 15:*8*

**receiving** 12:*20* 20:*5*
**recognition** 22:*3*
**recognized** 21:*2* 22:*10*
**recollection** 54:*4* 55:*16* 57:*11*
**record** 4:*20* 5:*20* 17:*15* 38:*9* 63:*12*
**records** 12:*20* 14:*3, 6* 18:*24* 24:*8, 23* 26:*11* 53:*16* 54:*8, 21*
**refer** 15:*10* 24:*21* 40:*20* 57:*16*
**referral** 10:*22*
**referred** 10:*1, 4* 21:*3*
**referring** 40:*22* 57:*9*
**refers** 50:*22*
**reflected** 53:*15*
**reflects** 54:*19*
**refresh** 29:*3*
**regard** 14:*23* 17:*8* 46:*18*
**regarding** 12:*8, 17, 21* 42:*4*
**regards** 42:*6, 15* 54:*22* 59:*4*
**related** 8:*23*
**relatively** 21:*13, 15* 34:*22* 35:*14, 15* 47:*2, 4*
**release** 45:*6*
**relevant** 19:*2* 24:*15*
**reliable** 30:*22*
**relied** 12:*4*
**relying** 38:*20*
**remember** 48:*5* 52:*6*
**remotely** 4:*8*
**render** 13:*8, 11*
**repeat** 7:*12* 29:*23* 38:*4* 53:*14* 60:*7*
**repeated** 61:*12*
**rephrase** 7:*13*
**report** 8:*15* 11:*5* 12:*10, 13* 14:*19* 15:*16* 16:*21* 18:*8, 11,*

*14* 21:*7* 23:*18* 24:*7, 20* 32:*21* 44:*2* 47:*17* 48:*11, 14* 50:*14* 51:*3, 5, 22, 24* 52:*14* 54:*12, 18* 55:*11* 57:*17*
**reported** 1:*1* 26:*11* 42:*8* 48:*3, 14* 49:*8* 62:*11*
**Reporter** 1:*1* 4:*3* 5:*7, 18* 7:*5* 38:*8* 63:*11* 64:*14, 24*
**reporting** 4:*7, 17* 38:*24*
**reports** 12:*4* 42:*5* 54:*5*
**represent** 6:*10* 43:*24*
**Representing** 2:*7, 15, 20*
**reproduction** 64:*22*
**requested** 38:*10*
**requesting** 41:*17*
**require** 45:*1*
**required** 47:*21*
**reserved** 5:*17*
**respectively** 57:*22*
**Respiratory** 32:*10*
**respond** 56:*7*
**responses** 7:*4* 57:*6*
**responsive** 8:*12* 62:*18*
**result** 20:*17* 35:*21* 36:*1* 51:*10, 11*
**results** 35:*13*
**retrospectively** 31:*4*
**revealed** 49:*9*
**review** 14:*2* 18:*15* 25:*6* 52:*18* 54:*7, 8, 17, 24* 55:*2*
**reviewed** 14:*9* 15:*7, 9, 20* 18:*16, 23* 28:*21* 46:*2* 54:*13* 62:*9*

**reviewing** 13:*12* 54:*15*
**rhythms** 23:*20*
**right** 11:*9* 12:*5* 14:*21* 15:*20* 16:*5, 8* 17:*19* 22:*8* 23:*11* 24:*20* 25:*12* 28:*9, 24* 37:*13* 38:*17, 22* 39:*6* 45:*20* 48:*22* 49:*6, 22* 52:*22* 53:*1, 3* 55:*21, 23* 56:*24* 57:*11, 18, 24*
**role** 46:*1*
**room** 4:*6* 20:*19*
**rooms** 25:*1*
**routinely** 58:*7*
**RUDOVSKY** 2:*3*

**< S >**
**saw** 47:*17* 51:*8*
**saying** 49:*6*
**says** 57:*7*
**Scale** 56:*10, 15, 16, 18* 57:*8, 10, 14*
**scan** 33:*24*
**scans** 32:*7*
**Schedule** 8:*7* 9:*1* 60:*10*
**scheduled** 61:*17*
**score** 57:*4* 58:*17* 59:*1*
**scored** 57:*21*
**scoring** 56:*11*
**screen** 7:*19, 21* 8:*1* 9:*13* 15:*13* 29:*17* 31:*20* 32:*17* 52:*15, 19* 53:*1* 57:*1* 59:*23*
**screened** 31:*7*
**screening** 25:*1* 53:*7, 10, 23*
**scroll** 8:*6* 29:*20* 31:*8* 41:*9*
**sealing** 5:*14*
**second** 17:*5* 60:*16*
**section** 54:*11, 12*

**see** 7:*24* 29:*11, 22* 34:*2* 47:*13, 23* 48:*6, 11* 51:*3*
**seeing** 54:*4*
**seeking** 20:*13*
**seen** 8:*3* 52:*3* 53:*5*
**self-explanatory** 6:*20*
**sent** 17:*10*
**sentence** 41:*11* 57:*2*
**September** 25:*10, 17* 41:*22* 52:*2* 55:*15* 57:*23*
**serial** 56:*16*
**served** 10:*9*
**services** 9:*1*
**set** 46:*16* 63:*8*
**setting** 44:*14*
**severe** 40:*9*
**shaking** 7:*6*
**share** 7:*19*
**sharing** 7:*22* 9:*13* 15:*14* 29:*18* 31:*20* 32:*18* 52:*20* 59:*23*
**shift** 42:*19* 60:*4, 9, 16, 18*
**shifts** 60:*11*
**short-circuit** 17:*12*
**short-term** 45:*6*
**show** 15:*12*
**shown** 29:*13*
**sign** 34:*2* 49:*13, 19*
**significance** 47:*18*
**significant** 20:*15* 21:*8* 34:*10, 21* 38:*2* 48:*15*
**Significantly** 22:*24*
**signing** 5:*14*
**signs** 19:*18* 22:*7* 23:*4* 28:*14* 38:*16* 39:*22* 54:*1*
**similar** 39:*21*
**single** 56:*19* 61:*19*

**sir** 63:*10*
**sit** 46:*13*
**situation** 35:*13*
**six** 26:*12, 14*
**size** 20:*21*
**skull** 35:*2, 7, 10*
**slightly** 35:*2*
**SLORY** 1:*1* 2:*16* 5:*2* 6:*11* 16:*4*
**Slory's** 16:*8*
**small** 35:*14*
**smoked** 48:*9, 11*
**Society** 44:*18*
**Solicitor** 2:*11*
**sooner** 22:*1*
**sorry** 33:*14* 38:*11* 43:*7* 52:*10* 59:*3*
**sort** 14:*8* 23:*7* 32:*10* 34:*4* 36:*21*
**sound** 14:*21* 25:*12* 28:*9*
**sounds** 36:*7* 47:*20*
**South** 2:*6*
**space** 35:*3, 6, 15, 17* 36:*14*
**speaking** 23:*7* 27:*9*
**special** 44:*7*
**specific** 12:*18* 24:*22* 25:*6* 26:*23* 40:*3* 53:*9*
**specifically** 43:*10* 46:*19* 48:*4* 54:*22* 59:*4*
**spell** 5:*19*
**spend** 16:*21*
**spent** 13:*15, 18*
**spinal** 36:*1*
**spleen** 51:*7*
**splenomegaly** 51:*6, 20*
**spoke** 11:*16*
**staff** 32:*2* 41:*18, 20* 42:*7, 16, 17* 43:*3* 60:*9, 23* 61:*14*
**stamp** 33:*7*
**stamped** 41:*10*
**stand** 44:*4*

standard
14:*20*, *24*  15:*4*
46:*16*, *20*
standards
46:*3*, *4*
stands  56:*9*
62:*22*
started  27:*22*
30:*10*
state  5:*19*
61:*2*  63:*12*
stated  25:*9*
statement
38:*19*
STATES  1:*1*
stating  4:*19*
stenographic
64:*6*
stenographicall
y  1:*1*
steps  28:*11*
stipulations
5:*9*
stopped  9:*13*
31:*20*  59:*23*
Street  2:*5*, *12*,
*19*
stroke  13:*1*, *4*,
*6*  14:*13*  19:*9*,
*11*, *21*  20:*1*, *11*,
*14*, *17*, *19*, *21*,
*23*  21:*2*, *5*, *10*,
*15*, *18*, *20*  22:*7*,
*12*, *15*  23:*4*, *9*,
*13*, *24*  24:*4*
25:*16*  26:*3*, *6*
28:*2*, *13*  30:*18*
31:*22*, *24*  32:*8*,
*24*  34:*3*, *5*, *7*,
*13*, *17*  36:*20*
37:*18*, *21*, *23*
38:*17*  39:*5*, *15*,
*22*  40:*8*  41:*4*,
*7*, *13*  51:*10*, *18*
59:*16*, *21*
61:*24*
strokes  22:*23*
structures
35:*17*  36:*17*
study  44:*16*
subject  11:*22*
submitted  9:*10*
Subpoena  1:*1*
7:*24*
substance
25:*5*  26:*24*
28:*12*  40:*3*
58:*10*

substances
24:*11*  25:*2*
27:*6*, *12*  39:*24*
success  32:*15*
suffered  13:*1*
30:*14*  42:*23*
47:*15*  51:*10*
suffering
19:*16*  24:*13*
30:*24*
suggestion
60:*23*
Suite  2:*6*, *19*
summarize
19:*1*
supervision
64:*23*
suppose  24:*2*, *5*
sure  6:*20*
15:*12*  17:*6*
29:*24*  30:*6*
33:*5*, *9*, *13*, *17*,
*22*  36:*10*
37:*20*  43:*17*
49:*5*, *11*  56:*8*
surrounded
19:*10*
survived  14:*17*
swallowing
35:*23*
swelling  34:*1*,
*9*  35:*3*  36:*15*
sworn  3:*5*  6:*3*
symptom  41:*2*
symptomatic
20:*24*  22:*24*
23:*1*
symptoms
13:*4*  20:*22*
21:*21*  22:*12*,
*16*  23:*3*  24:*16*
26:*17*  28:*2*
37:*23*  39:*5*, *12*,
*16*, *20*, *21*, *23*
41:*15*  58:*4*
59:*7*  61:*8*, *14*,
*23*  62:*6*
syndrome
19:*17*  27:*15*,
*21*  32:*11*  40:*2*
41:*3*
syndromes
24:*13*  28:*11*
system  24:*20*
25:*7*  56:*11*


< T >
tablets  26:*14*

take  7:*6*  8:*8*,
*14*  16:*7*, *11*
18:*13*  28:*3*
34:*2*  44:*22*
45:*3*, *4*  57:*7*
taken  1:*1*
6:*16*  37:*11*
38:*20*  64:*7*
takes  34:*24*
36:*22*
talk  32:*22*
talked  10:*12*
talking  33:*23*
39:*3*
tall  48:*19*
task  14:*2*, *11*
team  37:*24*
47:*20*
tell  7:*1*, *12*
15:*11*  19:*13*
30:*16*  31:*18*
33:*2*, *19*  36:*7*
49:*18*  50:*11*
53:*10*
ten  13:*18*, *22*
26:*12*
tenet  20:*11*
tentorium
35:*12*
terminology
58:*20*
terms  26:*24*
33:*3*, *21*  62:*5*
Terrelle  16:*1*
test  25:*2*, *3*
57:*15*
tested  47:*12*
55:*19*, *21*
testified  6:*4*
29:*4*
testifying  6:*24*
testimony
4:*12*  29:*11*
39:*10*  59:*13*
60:*14*
testing  19:*22*
24:*22*, *24*
56:*15*  58:*8*
tests  25:*2*, *3*, *6*
31:*1*
tgregory@okllp
.com  2:*20*
Thank  63:*3*, *9*,
*10*
Thanks  33:*11*
thick  35:*11*
thing  40:*6*
49:*6*

things  28:*16*
32:*12*, *13*  60:*2*
think  5:*4*
11:*20*  14:*18*
16:*2*, *10*  17:*21*
20:*9*  22:*9*
23:*14*  25:*9*
26:*1*, *10*, *11*
28:*4*, *5*, *10*
30:*19*  31:*3*, *4*
33:*22*  34:*19*
37:*1*  38:*6*, *14*,
*15*, *23*  39:*4*
40:*5*, *7*, *24*
41:*1*  43:*16*
46:*24*  48:*2*, *3*,
*21*  49:*17*  55:*1*,
*11*  56:*4*  60:*4*
63:*1*
thinks  27:*8*
THOMAS
2:*16*  43:*23*
thought  19:*1*
three  17:*1*
34:*6*  60:*11*
time  5:*17*
7:*17*  10:*18*
13:*15*  16:*20*
20:*9*, *12*  21:*5*,
*17*  26:*4*  30:*20*
37:*4*  38:*9*
41:*16*  47:*8*
48:*5*, *18*  49:*4*
55:*24*  56:*19*
57:*3*, *12*  59:*15*,
*21*
tissue  35:*11*
50:*19*
today  5:*9*
6:*13*, *24*  46:*13*
today's  17:*17*
told  11:*15*
13:*9*
Tom  5:*4*
43:*17*  56:*3*
tools  53:*23*
58:*12*, *14*
top  9:*17*
35:*11*  44:*1*
52:*23*  57:*21*
topic  18:*7*
total  13:*17*
toxicologist
49:*18*
training  44:*7*,
*10*, *11*
transcript
64:*8*, *21*

transferred
32:*1*
transitioned
31:*5*
travel  23:*22*
treat  45:*17*, *19*
treatable  32:*13*
treated  14:*14*
32:*14*
treatment
13:*6*  14:*15*
47:*21*, *24*
triaged  41:*16*
trial  5:*17*
11:*12*
tried  18:*24*
19:*7*
TRIVIKRAM
1:*1*  16:*2*
Trivikram's
28:*22*
truly  34:*16*
truth  7:*1*
try  14:*11*
54:*24*
Tuesday  1:*1*
two  17:*1*
28:*16*
two-day  34:*3*
two-milligram
26:*13*
typically  28:*3*


< U >
uh-huh  7:*7*
ultimately
19:*3*, *6*  30:*14*
undergo  44:*7*
understand
6:*23*  7:*8*, *9*, *11*
59:*13*
understanding
29:*4*
understood
30:*1*
UNITED  1:*1*
unreliable  27:*1*
upper  59:*2*, *5*
urine  25:*1*
use  31:*1*  37:*3*,
*8*  42:*11*  48:*1*
53:*22*  56:*20*
58:*11*, *14*
62:*15*
usual  5:*8*
usually  34:*2*,
*18*  56:*15*

< V >
variety  31:*6*
verbal  7:*4*
57:*5*
verbally  4:*11*
42:*11*  43:*13*
62:*13*
vertigo  40:*10*,
*14*
video  1:*1*  2:*1*
vital  19:*18*
28:*14*
voice  23:*8*
volume  35:*1*
vomited  32:*3*
vomiting  23:*8*
40:*10*, *14*
vomitus  32:*5*


< W >
wait  17:*20*
56:*3*
waive  4:*15*
waived  5:*15*
walking  23:*6*
39:*2*  40:*11*, *15*,
*22*
way  30:*15*
31:*4*  43:*1*
45:*6*  46:*15*
ways  30:*22*
week  28:*8*
weighed  48:*24*
weight  50:*6*, *8*
Well  19:*15*
20:*11*  23:*17*
28:*10*  31:*21*
36:*21*  37:*22*
38:*23*  40:*12*
46:*7*  47:*7*
51:*8*  54:*1*, *10*
60:*1*  61:*8*
went  11:*12*
we're  6:*20*
30:*7*, *9*  38:*19*
Whoever's
52:*24*
withdrawal
19:*17*  23:*10*,
*19*  24:*13*, *14*,
*16*  26:*16*
27:*10*, *14*, *21*
28:*1*, *11*, *12*
30:*12*, *17*, *24*
39:*21*, *23*  40:*1*,
*13*  41:*3*  56:*10*
58:*4*, *21*  59:*6*
61:*9*, *22*

withdrawing 58:*10*
**WITNESS** 3:*3, 5* 4:*11* 5:*21* 10:*9* 12:*19* 16:*16* 18:*23* 22:*21* 25:*23* 26:*21* 29:*14* 33:*13* 38:*11* 39:*11* 40:*19* 42:*3* 43:*9* 50:*2* 51:*17* 52:*17* 53:*18* 55:*7* 56:*9* 59:*1, 20* 60:*22*
**word** 56:*12, 20*
**work** 9:*9, 11* 11:*22*
**worked** 10:*20*
**working** 10:*19*
**worry** 34:*9*
**worsen** 34:*4*
**worsened** 61:*10, 15*
**wrong** 36:*8*

**< X >**
**Xanax** 26:*12* 27:*12* 48:*15*
**x-ray** 32:*9*

**< Y >**
**Yeah** 12:*15* 17:*19, 24* 25:*23* 39:*11* 40:*19* 43:*19* 55:*22* 63:*20*
**year** 9:*21, 22*
**years** 26:*12* 47:*3, 22* 48:*3*
**Yep** 5:*12* 29:*16*
**young** 21:*13* 34:*22* 35:*5* 36:*23* 47:*2, 4*
**younger** 36:*7*

**< Z >**
**Zoom** 1:*1* 2:*1*