**EXHIBIT F**

Page 1

In the United States District Court
For the Eastern District of Pennsylvania

----------------------------x
Eileen A. McNamara, as
Administrator of the Estate
of Jonathan Gleaves, Jr.,
          Plaintiff
     vs          No. 2:20-cv-04570-RBS
City of Philadelphia;
Corizon Health; Gerald Slory;
Elizabeth Bradley;
Lalitha Trivikram; Matu Gaye;
John Does,
          Defendants
----------------------------x

JUNE 9, 2022
DEPOSITION OF:      KUNGCHIHA JEOBOHAM
called for oral examination by counsel for the
Plaintiff, pursuant to Notice on a Zoom Deposition
before Hillary Hazlett Walsh of KLW Court Reporters
& Litigation Support, a Notary Public in and for the
Commonwealth of Pennsylvania, beginning at 10:02
a.m., when were present on behalf of the respective
parties.

Page 2

A P P E A R A N C E S
On behalf of the Plaintiff:
  Kairys, Rudovsky, Messing, Feinberg, Lin
  By:  Jonathan H. Feinberg, Esquire
  The Cast Iron Building
  718 Arch Street, Suite 501 South
  Philadelphia, PA  19106
  (215) 925-4400
  jfeinberg@krlawphila.com
On behalf of the Defendants:
  O'Connor Kimball
  By:  Thomas Gregory, Esquire
  1500 John F Kennedy Blvd
  Philadelphia, PA 19012
  (215) 564-0400
  gkimball@okllp.com

  City of Philadelphia
  By:  Katelyn Mays, Esquire
  1515 Arch Street, Suite 15
  Philadelphia, PA 19102
  (215) 683-5235
  katelyn.mays@phila.gov
ALSO PRESENT:
  Gila Glattstein
  Caroline Anapol

Page 3

                I N D E X
                EXAMINATION
DEPOSITION OF                      PAGE
Kungchiha Jeoboham
  By Mr. Feinberg              4

                EXHIBITS
        (No exhibits were marked.)

Page 4

          THE REPORTER:  The attorneys
participating in this deposition acknowledge
that I am not physically present in the
deposition room and that I will be reporting
this deposition remotely.
          They further acknowledge that, in lieu
of an oath administered in person, I will
administer the oath remotely.
          The parties and their counsel consent to
this arrangement and waive any objections to
this manner of reporting.
          Please indicate your consent by stating
your name and agreement on the record.
          MR. FEINBERG:  That is agreed for the
Plaintiff, and this is Jon Feinberg.
          MR. GREGORY:  Thomas Gregory.  Agreed
for the defense.
          KUNGCHIHA JEOBOHAM, called as a witness,
being duly sworn, testified as follows:
EXAMINATION BY
MR. FEINBERG:
     Q  Okay.  Miss Jeoboham, good morning.
     A  Good morning.
     Q  We met just a minute ago before we went
on the record.  And as I told you, my name is

Kungchiha Jeoboham

Page 5

Jon Feinberg.

Let me formally introduce myself since we are on the record and tell you what my role in this case is and why we are here for the deposition.

I'm an attorney for a woman named Eileen McNamara. Miss McNamara is the grandmother of the children of Jonathan Gleaves, Jr.

And Miss McNamara has been appointed by the Court to be the administrator of Jonathan Gleaves's estate, giving her authority to bring a lawsuit on behalf of his estate.

As you are likely aware, Mr. Gleaves died on September 21st, 2018, a few hours after he was found unresponsive in his cell at the Curran-Fromhold Correctional Facility in the Philadelphia Department of Prisons.

Miss McNamara has brought a lawsuit against Corizon, three Corizon medical employees, the City of Philadelphia, and a correctional officer employed at the Philadelphia Department of Prisons.

In the lawsuit, Miss McNamara claims that the Defendants were deliberately indifferent to Mr. Gleaves's serious medical

Page 6

needs and as a result caused his death.

Q Do you understand everything that I have outlined, ma'am?

A Yes, I do.

Q All right. You have not been named as a Defendant in this case but your name has come up in prior testimony as someone who may have information related to the case.

So for that reason, we brought you in to testify for a deposition. Do you understand that?

A I do.

Q All right. You are represented for purposes of this deposition by Mr. Gregory. And do I -- is that correct?

A Yes.

Q Have you had a chance to consult with Mr. Gregory before I ask you questions about this case?

A Yes, I have.

Q Do you need anymore time to speak with Mr. Gregory before we go forward?

A No.

Q Have you ever testified in a deposition before?

Page 7

A Yes. This is my second time.

Q When was the first one?

A Oh, I have no idea. I don't remember.

Q And I'm -- I don't mean to be specific. You can give me an estimate.

Was it a year or two ago? Five years ago? Ten years ago?

A I would say maybe within the past five years.

Q Okay. Beyond testifying in a deposition, have you ever testified in any court proceeding under oath?

A No.

Q Let me give you a few instructions then related to this deposition. You may have heard all of these, but it is probably important to make sure we are on the same page.

First things first. As you know, there is a court reporter, Hillary, is recording everything that is said while we are on the record in this deposition.

So for that reason, I will ask you to keep two things in mind. First, make sure you speak loudly enough and give verbal answers to all of my questions so that your answers can be

Page 8

recorded in the transcript.

Understood?

A Understood.

Q All right. Second, even if you anticipate exactly what I'm going to say with my question, I'm going to ask you to resist the temptation to interrupt me. Let me finish my question before you give an answer. Okay?

A Got you.

Q And if at any point I inadvertently interrupt you while you're in the middle of an answer, I want you to tell me right away so that we will let you finish your answer before I go on and ask another question. Okay?

A Okay.

Q All right. Now, since we are conducting this deposition by Zoom, just a couple of points.

First, if you experience any delays with the technology, my voice lags, or the video goes out or anything, just make sure you let us know so we make sure that you are hearing and seeing everything you need to hear and see. Okay?

A Okay.

Q All right. And since we are not in the

2 (Pages 5 to 8)

Page 9

same room, I need to ask you, where are you at this moment?

A I'm in my office currently at Mod --

Q I'm sorry.

A -- 2.

Q Mod 2 at the Philadelphia Department of Prisons; is that correct?

A Yes.

Q Is there anybody in the room with you?

A No.

Q Do you have any documents with you?

A No.

Q Okay. If at any point someone comes into the room, could you just tell us so we know who might be listening into the deposition?

A Okay.

Q All right. Do you understand, Miss Jeoboham, that you are testifying under oath today?

A I do understand.

Q Do you understand that this means that you are swearing that all of your answers are true and correct?

A Correct. Yeah.

Q All right. If at any point you don't

Page 10

understand the question that I have asked, will you let me know that?

A Will do.

Q If you realize that an answer that you have given earlier in the deposition was incorrect or incomplete, will you let me know that so you can have an opportunity to correct it?

A Yes.

Q I don't think we are going to take very long today; but if we get to a point where you need a break, just let me know with the one qualifier that if there is a question pending at the time, you should answer the question and then we can take the break. Agreed?

A Agreed.

Q Is there any reason why you cannot give full and complete testimony today?

A No.

Q Did you do anything to prepare for today's deposition?

A The only thing I did was review Miss Gaye's file but that was it.

Q When you say Miss Gaye's file, it has a couple of meanings to me. So could you be more

Page 11

specific?

A I just went over her employee record just to see if there was anything, I guess, outstanding; but there was nothing that I needed to really do. I just reviewed it, and that was it.

Q All right. Did you review any medical records -- and by the way, did you have a conversation whether it was by phone or Zoom with Mr. Gregory?

A I did.

Q I'm not going to ask you what was discussed. Can you just tell me how many times you met with Mr. Gregory?

A We met twice.

Q For how long did you meet with him in total, if you can estimate?

A Maybe 30 minutes total if you add both conversations. It wasn't long.

Q Okay. When was the last conversation?

A Yesterday.

Q In addition to the -- let me reask that a different way.

Would it be correct to say the file you looked at was the personnel file for Miss Gaye?

Page 12

A Yes.

Q Okay. In addition to that personnel file, did you look at any other documents?

A No, I did not.

Q To be specific, did you look at any documents concerning Mr. Gleaves, Mr. Gleaves's medical care or anything like that?

A No, I did not.

Q All right. There have been a number of depositions conducted previously in this case. There have been transcripts made of those depositions.

Did you happen to review at any point transcripts of those depositions?

A No, I have not.

Q In particular -- I understand your answer but let me just note. I took the deposition of Nurse Gaye, which is what led us to be -- in the interest of full disclosure to seek your deposition testimony because Nurse Gaye discussed some interactions with you.

That is a long lead up for me to ask you this question: Did you review the transcript of Miss Gaye's testimony?

A No, I did not.

3 (Pages 9 to 12)

Page 13

Q   When you reviewed Miss Gaye's personnel file, was there anything that stood out and caught your attention?
A   No.
Q   One of the documents that was discussed in Miss Gaye's deposition was an employee education report that we believe has your signature on it.
First things first, did you see that employee education document?
A   I did.
Q   And when you saw that document, did you recall having -- actually, I'm sorry. A more foundational question.
Did you, in fact, prepare that document?
A   I did.
Q   And when you saw that document as you were preparing for today's deposition, did you remember the circumstances which led to the preparation of that document?
A   I did not, no.
Q   Okay. All right. Well, that is helpful. Thank you. I will show you that document in a little bit to try to refresh your recollection on some things.

Page 14

Before we get there though, let me ask you, I gave you the background regarding Mr. Gleaves that he was in the prison September 20th to 21st of 2018 and that he died on the 21st.
Did you at any point in that timeframe have any encounters with Mr. Gleaves?
A   I can't recall that. This was years ago. I don't know.
Q   What were your normal working hours back in 2018?
A   2018, it was -- 9:00 -- approximately 9:00 to 9:30 until maybe 6:00. Sometimes later if I had to work as a nurse.
Q   Did you work at CFCF?
A   I did. Yep.
Q   All right. Do you remember being involved in any response to a medical emergency in that timeframe in September of 2018 regarding Mr. Gleaves?
A   I can't remember that.
Q   Okay. And just for further background, what we know from the previous documents and testimony is that Dr. Trivikram was involved and was in the medical unit when Mr. Gleaves was

Page 15

brought in.
Do you recall having any interactions with Dr. Trivikram while Mr. Gleaves was being worked on after he was found unresponsive in his cell?
A   No, I don't. I don't remember anything about the incident. This was in 2018.
Q   My understanding is that there was some type of mortality review proceeding. Do you recall participating in any mortality review regarding Mr. Gleaves?
A   Regarding him specifically, no. But for the most part, if CFCF had a mortality, if I was scheduled to work that day, I would have been a part of it unless I was on vacation or something.
Q   We will come back to that one.
Do you remember whether there were any remedial actions in terms of discipline for employees or anything else that arose in that timeframe regarding Mr. Gleaves that you were involved in?
A   From the mortality review, no.
Q   Slightly different topic. You may have already answered this, but I will ask it in a

Page 16

slightly different way.
Do you remember any interactions with Nurse Gaye back in 2018 concerning her job performance?
A   No.
Q   All right. Some background questions about you then, Miss Jeoboham.
For how long have you worked at Corizon?
A   Since 2009.
Q   All right. Are you trained as a nurse?
A   I am.
Q   What is your degree in -- I'm sorry. Different question. Are you an RN, LPN, what have you?
A   I am an RN with an MSN degree as well.
Q   Where did you get your education?
A   My bachelor's or master's?
Q   Start with your bachelor's.
A   SUNY Brockport, State University of New York College of Brockport.
Q   When did you graduate?
A   2008.
Q   And did you -- then you went and got your master's, right?
A   Yes.

4 (Pages 13 to 16)

Kungchiha Jeoboham

Page 17

Q  Where did you go for that?
A  LaSalle University.
Q  In Philly, right?
A  Yes.
Q  Did you finish that in 2009?
A  No.  I finished that in either 2014 or 2015.  One of those two years.
Q  All right.  So while you were working, you were able to continue your master's coursework; is that right?
A  Correct.  Yep.
Q  Did you have any nursing employment before you started working with Corizon in 2009?
A  Corizon, no.
Q  Let me make sure -- given the way you answered I'm not sure I asked the question the right way.
     So let me be more specific.  Was there anywhere else that you worked as a nurse before you went to Corizon?
A  No.  This was my first nursing job.
Q  Thank you.  Could you describe for me then the various assignments you have had while working for Corizon?
A  While working for Corizon, I worked as

Page 18

an intake nurse.  I worked as a nurse in triage.  I have completed nursing sick call.  I have had to pass medications as well.  Those are the nursing stuff.  And then I was Assistant HSA, then HSA, and now I am Regional Vice President.
Q  When did you become the HSA?  You could estimate.
A  2017.
Q  And when did you become the Regional Vice President?
A  2021 or 2020.  The same year as COVID.  I believe it was 2020.
Q  All right.  Let me just ask you some quick questions about your current responsibilities and then we will go back and talk about what you did as an HSA.
A  Okay.
Q  Can you just describe what your responsibilities are in your current position?
A  Currently, I oversee the clinical care for the patients here at PDP.
Q  Do you have any clinical work responsibilities now or is it mostly administrative?
A  Mostly administrative unless I'm coming

Page 19

in to fill a shift to help out.
Q  What are your work hours now?
A  Generally, 9:00 to whenever I get done.  I would say 9:00 to 6:00, 9:00 to 5:00; but it can go over.
Q  Okay.  Who reports to you in your current position?
A  Currently, the only person who reports to me is Linda Wacowski.
Q  And what is Linda's job?
A  Now, she is the director of clinical services.
Q  Who reports to Linda?
A  Currently, the folks who report to Linda are those assigned to the utilization management department, UM.  She has three individuals who report to her.
Q  And the utilization management concerns decision-making for all facility care; is that correct?
A  Decision-making, no.  They are the ones who are the responsible for scheduling appointments for patients to go to offsite appointments once it is approved, once the referral is approved.

Page 20

Q  Understood.
     Do you have any responsibility for supervising HSAs in your current position?
A  In my current position, no.  That is my partner Dejauan Edwards.
Q  How do you spell the first and last -- well, Edwards, traditional spelling; but how do you spell Dejauan?
A  D-e-j-a-u-a-n.  And it is Edwards with an S.
Q  Okay.  Let's go back to your time at HSA.  That is the health services administrator?
A  Correct.  Yep.
Q  My understanding, please tell me if I'm correct, the HSA is essentially the administrative supervisor over all nurses working within the facility; is that correct?
A  Correct.  Yep.
Q  Each facility has its own HSA?
A  Yes.
Q  All right.  Can you describe what your day-to-day work looked like as the HSA and walk me through a day in the life?
A  As the HSA, it depends if I was on call or not.  If you was on call, if I received

5 (Pages 17 to 20)

Kungchiha Jeoboham

Page 21

callouts earlier in the morning, I would have to move people around just to make sure that the facility is able to still function.

But then I would get in in the morning and then I would do my rounds. And my rounds would typically going to the LPN room, clocking in, and then going over to medical intake to see what is going on there, how many patients we have waiting, do we have any issues, going back to triage, which is our triage area and just checking the books to see if anyone has any missed signatures, and talking to the staff for a little bit and then go back to my office and start looking at e-mails, ECW, which is our Electronic Medical Records system, and then anything else that happens for that day but that is typically how my morning starts.

And then throughout the day is just answering the e-mails, still going through ECW, giving people assignments, if we have something pending, making sure that is addressed, printing things out of ECW and handing things out to folks so they know how to do it for that shift. And that is pretty much all I did all day.

Q   Okay.  I take it as we already

Page 22

established, the nurses who work at -- and before I even get there, you were HSA at CFCF; is that correct?

A   Correct.  Yes.

Q   In general, in that time period, how many employees were employed at CFCF?

A   Nurses?

Q   Let me ask you a different question.

Yeah.  How many people were you responsible for supervising is what I was getting at?

A   I would say approximately 100 and like 10 including PRN per diem.

Q   Okay.  I asked you at the beginning of the deposition about an employee education report.

Is that -- employee education, is that one of your job responsibilities?

A   Correct.  Myself as well as the Assistant HSA, we would both do that.

Q   Who was the Assistant HSA back in 2018, by the way?

A   I don't remember.  It has been several. I don't remember.  2018.  I don't remember who was the Assistant HSA under me.

Page 23

Q   If you think of it -- if you think of it as while we are moving on, you can feel free to jump in and let me know.

Moving forward, let's talk more about employee education, which is an issue that I raised just a moment ago.

Could you describe to me what that phrase means employee education in connection with your responsibilities?

A   Employee education, if I identified something that was done maybe incorrectly or not done correctly, something that was missed instead of just having a verbal communication about it, we would do like a nonpunitive employee education.

And that is just pretty much putting it on paper that this is not disciplinary but this is just a conversation we are having.

And I'm documenting it so that if it happens again, we move forward with the progressive discipline.

Q   Okay.  And that was my next question. Am I understanding correctly that employee education is sometimes the first step of what could be a disciplinary process?

Page 24

A   Correct.

Q   So if you see an issue that is not resolved then it moves into, to use your phrase, progressive discipline?

A   Yes.  If it is something we already discussed and on paper via the employee education form, then we would move forward with actual disciplinary action.

Q   Walk me through the process then if you identified an issue, just a general hypothetical case where you see a nurse has not done something the nurse was supposed to do and you have decided you are going to initiate this employee education process, what steps do you take?

A   I would do my research just to make sure that there weren't anything -- well, I would go through my research and make sure that the employee, in fact, didn't have the miss or didn't do whatever they didn't do.

And then I would write up the employee education; and then at the time, I would flip it to my supervisor at the time Brandon De Julius and he would review it before we actually handed it to the employees.

6 (Pages 21 to 24)

Page 25

So he would review it, approve it, if anything was off or he didn't like the verbiage, he would let us know that it should be X, Y, and Z.

And then we would make the changes as needed and then give the employee education to the employee, if he agreed with it.

Q   What was Mr. De Julius's title?

A   At the time -- his title changed several times.  At the time, I believe it was Area Vice President.

Q   So you would then not do anything with the employee education until you got the sign off from Mr. De Julius; is that correct?

A   Yes, correct.

Q   Okay.  Once you had that sign off, let's go through a little bit more precisely about what you would do.

Really what I have in mind is this, would you hand the document to the employee at issue or would you sit down and have a meeting about it?

A   Well, we would get -- the employee would get called to my office or the Assistant HSA's office.  It doesn't really matter.

Page 26

And then we would talk about what led to it.  So it could be that you did this -- you did nursing sick call and we noticed that you missed this step.

So this is just a nonpunitive education to let you know that you did not do X, Y, and Z and I'm putting it on paper but it is just a nonpunitive education.  It is not disciplinary.

But if it were to happen again, it could lead to progressive discipline.  But I just want you to know this is what you did not do.

And I just need you to either agree or disagree because you could disagree but you still get the nonpunitive education and I need you to sign.

Sometimes they refuse to sign.  Sometimes we document refuse to sign with a witness there or they just sign it and then we file it away in their file.

Q   It sounds like from your testimony then that there will be a meeting to discuss it no matter what; is that correct?

A   Correct.

Q   Would there ever be a circumstance where you would just hand the document off to the

Page 27

employee or put it in an employee mailbox or something like that and not talk to the employee about it?

A   No.  We always talked to the employees.

Q   All right.  And then you always give the -- sounds like you always give the employee the opportunity to sign off saying they agree or disagree or not even sign; is that correct?

A   Correct.  Because there are times -- I mean, I may see something and I wrote it up and I noticed after the employee while they are sitting in front of me tells me something, I'm like, oh, okay, maybe this wasn't you.  And then I have to take it back because it, in fact, wasn't them.

Q   Let me ask you specifically then about Nurse Gaye.

You did mention that you saw one employee education form in her file; is that correct?

A   I think I saw two.

Q   Okay.  And that --

A   I believe it was --

Q   That is possible.  As you will learn in just a couple of minutes, I'm focused on one

Page 28

because of this relationship to this case.

So I'll ask a broader question.  For how long did you supervise Nurse Gaye?

A   I can't remember when she started, but I have been an administrator at CFCF since 2017.  So it would be from either 2017 or from whenever she actually started as a nurse at CFCF.

Q   Have you had any contact with Nurse Gaye since you took on your new possession -- position as the Regional Vice President?

A   Yes, I have.  I reached out to her several times to try to get her to pick up some shifts.

Q   Okay.  So that is some connection with asking her to come to work, right?

A   Right.

Q   Or to take on shifts.  I see.

Different question.  Have you had any further interactions with Miss Gaye concerning her performance as an employee?

A   Since I took this new position?

Q   Yes.

A   No.

Q   Okay.  Have you -- going back to the time that you were a direct supervisor --

Page 29

supervisor for Nurse Gaye while you were working at CFCF, did you have any issue with Nurse Gaye's work as a nurse?

A  No.  She was a very great nurse -- well, she is a very great nurse.  So no issues.

Q  So no issues in terms of discipline or anything like that?

A  No.

Q  I want to ask you about -- I want to ask you about withdrawal protocols because that has been the subject of some prior testimony in the case.

Can I assume that in your position as the HSA back in 2018 you were familiar with what was supposed to happen when a person was admitted to the facility and reported substance abuse?

A  I was.

Q  Let's do that then.  Let's say a hypothetical person gets admitted to CFCF, they are interviewed by a nurse in the intake portion or in the intake area and the person says I abuse whatever substances and there is a determination that the person is likely to go through withdrawal, what happens next?

Page 30

A  So depending -- so when they come in and they report anything, drugs that they are taking that can cause withdrawal or maybe medications that they are taking that can cause withdraw, we have to sort the SAWS assessment, which is a Corizon form that we have to fill out for the patient and it asks about withdrawal issues.

Then we do a COWS score.  If they are on opioids, a benz score or tool assessment if they are on benzodiazapines.

Or if they are reporting that they drink and we are starting CIWA for withdrawal, then I would ask them questions or do an assessment on the alcohol-related questions and then score them on that.

Depending on what the score is, I would let the -- if the score is a -- if it is above ten for opioid, I would let the provider know and get them orders for medication for -- for comfort meds right there while I'm in intake.

And then from there -- well, back in 2018, the system was not able to create appointments the same day, so you would have to manually create the appointment for withdrawal for the same day, same shift -- not same shift

Page 31

but say if I was doing COWS on day shift, I would have to create the appointment for evening shift, as well as night shift.

If I was on evening shift, I would do the COWS assessment at that time and then I would have to manually create the appointment for night shift.

And then the system would automatically create the future withdrawal assessments for the next day and prior.

Q  So let me see if I can summarize my understanding to make sure that I got it correct.

First things first, do I understand correctly that the typical procedure would be the withdraw assessments would be conducted once per shift for five days?

A  Yes.

Q  Okay.  And that is assuming a determination has been made that a withdraw assessment -- that the person is at risk of withdrawal, then that is what will happen five days out; is that correct?

A  Correct.

Q  Now, you referred to shifts in a couple

Page 32

of different ways.  First, you mentioned day shift.

Is that 7:00 a.m. to 3:00 p.m.?

A  Yes.  Um-hum.

Q  Evening shift is 3:00 p.m. to 8:00 p.m. -- 11 p.m.; is that correct?

A  Yes.

Q  And the night shift is 11:00 p.m. to 7:00 a.m.; is that correct?

A  Correct.  Yep.

Q  So let's focus, just using that terminology, let me -- let me just review.  If you are the intake nurse and you are meeting with someone between 7:00 a.m. and 3:00 p.m. and you -- they need to be placed on withdrawal assessments, you got to create an appointment for a 3:00 to 11:00 shift; is that correct?

A  Yes.

Q  And you have got to create an appointment for the 11:00 p.m. to 7:00 a.m. shift; is that correct?

A  Yes.

Q  All right.  One more example, if someone comes in on the 3:00 to 11:00 shift, then you have to create the appointment for the 11:00

Page 33

p.m. to the 7:00 a.m. shift; is that correct?

A   Correct.

Q   But in that circumstance, your expectation is that the system would automatically create an appointment for the next day, meaning the 7:00 a.m. to 3:00 p.m. shift; is that correct?

A   Um-hum.  For the next five days for all three shifts.

Q   Why is it that the -- that you would have to create that manual assessment?

A   It was the system, ECW, yeah.  That is what we have here to use, and it wasn't able to at that time.

Now, in 2022, it is different.  It does do it.  So it all depends on -- an ECW, there are different versions and one version may not be able to do something else until you move to the higher version.

So I don't know what we were back in 20 -- what version we used back in 2018, but I know we are in Version 10 now.

And we are -- I think in a few months, we will be moving to Version 11.  It is just the system that we are using.

Page 34

Q   Did that system and the need to create the manual assessments create any -- any problems in ensuring treatment and evaluations for people when they came into the facility?

A   Not really because all of the nurses, the new nurses, nurses who are here, they have all been trained and we have meetings and discuss it that it has to be created manually.

I mean, the only thing is, that is what, you know, when you have a manual process, there could be some misses.

That is why the goal was to shoot for automatic creation, which is what it is doing now.

But the nurses were informed, they were trained.  We talked about it.  It is just what we had to do, but you could miss it.

Q   Are there any misses that you recall that resulted in any kind of significant complications for a patient?

A   No.  Well, just from, I guess, Mr. Gleaves from when I reviewed Miss -- Miss Gaye's file.

Q   Okay.

A   And I think the education didn't state

Page 35

him specifically.  It just stated that an appointment wasn't generated manually.

Q   And we will get into that in just a moment then.

So other than Mr. Gleaves, do you recall any other instances in which similar to the question I asked before but are there any others that stand out in your mind where there was a miss, as you have described it, and someone wasn't seen when they needed to be?

A   Not from what I remember.  That is not to say it didn't happen, but I can't remember that right now.

Q   Would you agree -- before I ask that, let me just -- I assume based on your experience that working in a prison environment for, gosh, the past 13 years, you are familiar with what withdrawal looks like from various substances?

A   I am very aware, yes.

Q   All right.  And would you agree with me based on your experience as a nurse working with people who are withdrawing, that withdrawal can be particularly dangerous right at the beginning of the process?

A   I agree.

Page 36

Q   So for that reason, would you agree that it is very important that people are assessed with some degree of regularity especially at the beginning of the withdrawal process?

A   I agree.

Q   So is it for that reason that as you have described, Corizon makes sure that nurses are aware of their responsibilities to enter these manual assessments; is that correct?

A   Correct.

Q   And the point of making nurses aware of that is so nurses will schedule assessments so people can be seen at that dangerous time at the beginning of their withdrawal; is that correct?

A   Correct.  And throughout those five days.

Q   And I don't mean to suggest one way or the other.

My question for you is to focus on that early period, and correct me if I am wrong, but it sounds like you certainly appreciate that that early period could be very critical while a person goes through withdrawal; is that right?

A   Yes.  Yep.

Q   When did the fix happen -- happen to the

9 (Pages 33 to 36)

Page 37

system that would allow the appointments to be created automatically?

A  I don't remember when.  I would say -- I believe I was still an HSA.  So it had to be prior to April of 2020.

Q  Was there any event that led to that change in the system that you are aware of?

A  Not that I'm aware of.  All I know is that it is something that we -- I think at the time the EHR team was trying to do; it just could not happen until we moved onto a later version of ECW.

Q  The EHR team, what does that stand for?

A  Electronic health record team.

Q  I was going to guess that, but thank you.

Who -- do you know who was involved in the EHR team or who was involved on the EHR team at the time this change was made?

A  At the time it was Robert McCulley, I think Joseph Marsella.  He is not with us anymore, but I think he was still here at that time.

Those are the only two.  I don't know that their current supervisor was the supervisor

Page 38

at the time.

Q  Okay.  I want to show you now, Miss Jeoboham, the document that we have been talking about a little bit already.

This has been previously marked as Exhibit P-14.

Do you see that in front of your -- on your screen now?

A  Yes.

Q  Is this the employee education -- pardon me.  Is this the employee education document that you saw when you looked through the file when you were preparing for this deposition?

A  Yes.

Q  Okay.  The date here on the top of the form -- first let me ask you this.  There is -- there is text that is typed onto the form.

Are you the person who typed that text?

A  Yes.

Q  Same with down at the bottom, the text that is in bold, did you type that?

A  Yes.

Q  And down at the -- all the way at the bottom of the form, there are two signatures.  The signature of employee that appears to be

Page 39

Nurse Gaye's dated 10/9/18.

Does that sound correct to you?

A  Yes.

Q  And is this your signature next to the signature of supervisor?

A  Yes, it is.

Q  Also dated October 9th of 2018; is that correct?

A  Correct.

Q  At the top of the form where it says 10/5/18, I assume that is the date that you created the form; is that correct?

A  Correct.

Q  And then do I understand correctly from the date 10/9/18 and also your previous testimony about previous meetings, that 10/9 is when you would have had the meeting with Miss Gaye?

A  Correct.

Q  Sitting here today, do you remember having the meeting with Miss Gaye?

A  I do not.

Q  But it sounds like it is a fair assumption -- well, is it a fair assumption that if you signed and dated this form on October

Page 40

9th, that would have been in the context of a meeting with Miss Gaye in your office?

A  That is correct.  Correct.

Q  Now, the subject of education states not creating manual withdrawal encounters and then the supervisor's statement says Mrs. Gaye failed to create the same-day withdrawal encounters for the inmate on 9/20/18.

First things first, did I read that correctly?

A  That is correct.

Q  How did that come to your attention?

A  I don't know.  It could have been -- so whenever someone -- it had to be something that happened for us to know that the withdrawal encounter didn't occur.

It could be that for Mr. Gleaves he went to the hospital and he passed away and now we are reviewing the chart and then it was identified.

Or could be something that came up at one of the mortality meetings and then that is part of the corrective -- one of the Corrective Action Plans that were decided.

But she was -- chances are -- I was

Page 41

going to say chances are if -- if the patient passed away and I identified that before, like when right he passed away because we do, like, a -- you know, we do a review of the chart, chances are I probably would have did an education once I identified that.

Q   Okay.  So, Miss Jeoboham, your previous testimony when you were outlining the possibilities of how this would have come in -- come to your attention, do I understand you correctly in that you don't know for sure but you are hypothesizing that these are the different things that could have happened and led to you reviewing this information; is that correct?

A   Yes.  Correct.

Q   So I'm going to save everybody the time and not go through Mr. Gleaves's medical records with you unless a question comes up about them.

But if we assume that Mr. Gleaves came into the facility between 3:00 and 11:00 p.m. on September 20th and there was no assessment scheduled for him between 11:00 p.m. and 7:00 a.m., that is something you would have noticed in your chart review; is that correct?

Page 42

A   Correct.  Yep.

Q   And then once that would have been noticed whether it was by you or someone else, that is what would have led to this employee education meeting with Miss Gaye; is that correct?

A   That is correct.

Q   All right.  Now, down continuing on the bottom of the form, there is a statement withdrawal encounters for all inmates that need COWS, CIWA or/and BWS assessments will be manually created for the same 6day.

Is that consistent with everything you have told me a short while ago about how nurses have to go into the system to manually create the appointments.

A   Yes.  That is consistent with what I said earlier.

Q   All right.  Now, there is an X or a checkoff here under employee's statement that says I concur with the supervisor's statement.

Do you see that?

A   Um-hum.  Yes.

Q   That indicates to you that Ms. Gaye agreed with everything that you discussed with

Page 43

her; is that correct?

A   Correct.

Q   All right.  And then following that discussion when Miss Gaye signed it, it sounds like she is signing off on the fact that she has educated them about this and that she agrees; is that correct?

A   That is correct.

Q   And do you -- I asked you before, you did not review, just to confirm, Miss Gaye's deposition testimony; is that correct?

A   That is correct.

Q   All right.  I want to show you some portions of her deposition testimony where we discussed exactly these issues.

First things first, I'm going to try to expedite this for you, ma'am, so you don't have to read a lot of text.

First of all, do you see the transcript on the screen?

A   Yes, I do.

Q   All right.  And both -- I'll make this easy for you in just a moment.  First, I just want to show you that -- I'll increase the size of the text here that I took Miss Gaye's

Page 44

testimony on Wednesday, April 27th of 2022.

Do you see that highlighted there?

A   Yes, I do.

Q   All right.  And throughout the deposition, I asked her a number of questions about the same-day withdrawal assessment.

And I'm going to ask you to read the testimony that is highlighted.  I'm enlarging it.  There is some highlighted text here on Page 43 of the deposition.  I have enlarged it so it will be easier for you to read.

Are you able to read what is on the screen now?

A   Yes.

Q   All right.  So please take a moment just to read to yourself the text that is highlighted here, Line 5 through Line 19.

Let me know when you are done, and then I'll move the screen over so you can read another page.

A   Okay.  Okay.  I'm good.

Q   I'm moving on to Page 44.  Could you read the highlighted text there on Page -- Lines 1 through 14?

A   I'm done.

Kungchiha Jeoboham

Page 45

Q   In summary, Ms. Gaye's testimony, I'm summarizing the text that you have read, appears to be that she could exercise her nursing judgment to determine whether Mr. Gleaves needed to be seen on the next shift.

Would you agree that that is a summary of what her testimony is here?

A   I would agree, yes.

Q   Is that wrong or right?

A   That is wrong.

Q   So consistent with what we reviewed on the employee education form, Miss Gaye had to create the manual assessment; is that correct?

A   That is correct.

Q   I'm going to show you another portion of her deposition testimony is at Page 45 on Lines 10 through 20.

Please just read that to yourself and let me know when you are done.

A   Okay.

I'm done.

Q   All right. I'll just go through the three questions that I asked you to read.

Would you agree that Ms. Gaye is incorrect when she says that she is permitted to

Page 46

make a nursing judgment about the need for a same-day assessment?

A   Yes.  She is incorrect.

Q   Is it also the case that someone did tell Ms. Gaye that she got it wrong?

A   Yes.  Somebody would have told her.

Q   And in fact, that person given the employee education report was likely you; is that correct?

A   That is correct.

Q   And, in fact, what you did tell her is that nurses were required to schedule same-day assessment; is that correct?

A   That is correct.

Q   All right.  One more portion of testimony here.

I have got highlighted text Pages 55 and 56.  First read Page 55, Lines 4 through 21 and let me know when you are finished.

A   Okay.

Q   By the way, ma'am, before you read, in this portion of the deposition, I had shown Miss Gaye the employee education form that you and I were just reviewing and then I was asking her questions about it.

Page 47

So that is when you are reading this testimony, that is what is going on.  So please read it and let me know when you finish.

A   Okay.

I'm done.

Q   Let's go over to Page 56, Lines 14 through 20.  You can read that now.

A   I'm done.

Q   All right.  Once again, just to confirm, Miss Gaye is wrong when she says that she was allowed to use nursing judgment; is that correct?

A   That is correct.  She was wrong.

Q   And there was, in fact, a failure when she did not schedule the manual test then; is that correct?

A   That is correct.

Q   Did -- over here on Page 56, there is a notation for summary -- testimony from Miss Gaye that she disagreed with your assessment and that you got it wrong.

Did you get it wrong?

A   I did not get it wrong.

Q   And when Miss Gaye wrote that -- or checked off the box that she concurred and then

Page 48

signed, did she ever say that she disagreed with your assessment?

A   No, not at that time because if you disagree, I believe -- I can't remember off the top of my head; but if you go back, I think there is an area where she can document -- I can't remember but she would have -- could have said it then.

Even if she did disagree, it is not to say that that education would have went away because that is what we do.

You have to create same-day appointments for patients who had -- who need withdrawing encounters.

Q   One other thing.  I'm not going to show you testimony on this.  I'm just going to summarize.

When Miss Gaye told me that she was permitted to make a nursing judgment about whether the withdrawal assessment was needed, she then also told me -- that there was no requirement that she record her nursing assessment in the records anywhere.

Would that ever be the case that you could make that a nurse would be permitted to

12 (Pages 45 to 48)

Kungchiha Jeoboham

Page 49

make a nursing assessment and then not record it in her record?

A  No.  That is not the case.  And a nurse -- whatever you do, if you deal -- if you are giving patient care, you have to document it in the record.

Q  And same thing, if you -- with putting aside care, if you are making an assessment as a nurse, it has got to be documented in the record; is that correct?

A  That is correct.

Q  All right.  I asked you before whether you recalled participating in any meetings, mortality review, what have you about Miss Gaye's actions and you said no at that point.

Let me ask you the question again now with the benefit of having reviewed the employee education report, some testimony from Miss Gaye.  Does that refresh your recollection in any way about any of the work you did on this case?

A  No, it doesn't.  I still don't recall attending the mortality review.

Q  All right.  Do you know given the way that Miss Gaye testified in response to

Page 50

questions that I asked of her concerning her conduct in this case, does that refresh your recollection about any further discussions with Miss Gaye where she later told you that she disagreed or that she said she did nothing wrong or anything like that?

A  No.  It doesn't change anything.  I don't remember having a conversation about anything like that.

Q  Okay.  I know you don't recall much about anything at all about Mr. Gleaves; but with the benefit now of having gone through documents and additional testimony, do you recall overhearing anyone say that Mr. Gleaves's death could have been prevented in any way?

A  I do not recall hearing anything like that.

Q  One of the other topics that we have talked -- that we have taken testimony on in this case is correctional officer practices for conducting tours in the housing areas at CFCF.

Do you have any familiarity with what the rules are for correctional officers in terms of how they conduct their tours?

A  A little.

Page 51

Q  Okay.  Tell me what your understanding is.

A  My understanding is tours, I believe, have to be conducted every 30 minutes on the unit.

Q  Have you heard during your -- I understand you are not at CFCF now -- strike that.  Let me just ask you more broadly.

Have you heard at any point discussions about problems with the frequency in which officers were actually conducting tours?

A  In my tenure here, I have heard.

Q  Okay.  What kind of complaints have you heard or issues?

A  Maybe something like the tour wasn't done at the scheduled time.  If it was every 30 minutes, it didn't happen every 30 minutes as it should have.

Q  Do you recall hearing anything about that in connection with Mr. Gleaves back in that timeframe of September of 2018?

A  No, I do not.

Q  Now, I believe that concludes my questions.  Let me take just 20 seconds here to review my notes to make sure I covered

Page 52

everything.  So just bear with me for just a moment.

A  Okay.

MR. FEINBERG:  Okay.  Confirmed.  I don't have any further questions for you, ma'am.  Anything, other counsel?

MR. GREGORY:  Katelyn, any questions?

MS. MAYS:  No.  No questions from me.

MR. GREGORY:  Okay.  Great.

Thank you, Kungchiha.  You can log off.

(The deposition concluded at 10:52 a.m.)

THE REPORTER:  Mr. Gregory, do you need a copy of today's transcript?

MR. GREGORY:  Yes.

THE REPORTER:  Ms. Mays, do you need a copy of today's transcript?

MS. MAYS:  Yes.

13 (Pages 49 to 52)

Kungchiha Jeoboham

Page 53

I hereby certify that the proceedings and evidence are contained fully and accurately in the notes taken by me on the within proceedings and that this is a correct transcript of the same.

Hillary Hazlett Walsh, Reporter
Notary Public

14 (Page 53)

| A | allow 37:1 | 50:1 | 18:15 20:11 | C |
|---|---|---|---|---|
| **a.m** 1:20 32:3,9 32:14,20 33:1 33:6 41:24 52:11 | **allowed** 47:11 | **asking** 28:15 46:24 | 21:9,13 22:21 27:14 28:24 29:14 30:21 33:20,21 48:5 51:20 | **C** 2:1 |
| | **Anapol** 2:16 | **asks** 30:7 | | **call** 18:2 20:24 20:25 26:3 |
| | **answer** 8:8,12 8:13 10:4,14 12:17 | **assessed** 36:2 | | **called** 1:15 4:18 25:24 |
| | | **assessment** 30:5 30:9,13 31:5 31:21 33:11 41:22 44:6 45:13 46:2,13 47:20 48:2,20 48:23 49:1,8 | **background** 14:2,22 16:6 | **callouts** 21:1 |
| **able** 17:9 21:3 30:22 33:13,18 44:12 | **answered** 15:25 17:16 | | **based** 35:15,21 | **care** 12:7 18:20 19:19 49:5,8 |
| | **answering** 21:19 | | **bear** 52:1 | **Caroline** 2:16 |
| **abuse** 29:17,23 | **answers** 7:24,25 9:22 | | **beginning** 1:19 22:14 35:23 36:4,14 | **case** 5:4 6:6,8,19 12:10 24:11 28:1 29:12 46:4 48:24 49:3,21 50:2 50:20 |
| **accurately** 53:2 | | | | |
| **acknowledge** 4:2,6 | **anticipate** 8:5 | **assessments** 31:9,16 32:16 34:2 36:9,12 42:11 | **behalf** 1:20 2:2 2:7 5:12 | |
| **action** 24:8 40:24 | **anybody** 9:9 | | **believe** 13:7 18:12 25:10 27:23 37:4 48:4 51:3,23 | |
| | **anymore** 6:21 37:22 | **assigned** 19:15 | | **Cast** 2:4 |
| **actions** 15:19 49:15 | **appears** 38:25 45:2 | **assignments** 17:23 21:20 | | **caught** 13:3 |
| | | | **benefit** 49:18 50:12 | **cause** 30:3,4 |
| **actual** 24:8 | **appointed** 5:9 | **Assistant** 18:4 22:20,21,25 25:24 | | **caused** 6:1 |
| **add** 11:18 | **appointment** 30:24 31:2,6 32:16,20,25 33:5 35:2 | | **benz** 30:9 | **cell** 5:15 15:5 |
| **addition** 11:22 12:2 | | | **benzodiazapi...** 30:10 | **certainly** 36:21 |
| **additional** 50:13 | | **assume** 29:13 35:15 39:11 41:20 | **Beyond** 7:10 | **certify** 53:1 |
| **addressed** 21:21 | **appointments** 19:23,24 30:23 37:1 42:16 48:12 | | **bit** 13:24 21:13 25:17 38:4 | **CFCF** 14:15 15:13 22:2,6 28:5,7 29:2,20 50:21 51:7 |
| **administer** 4:8 | | **assuming** 31:19 | | |
| **administered** 4:7 | | **assumption** 39:24,24 | **Blvd** 2:9 | |
| **administrative** 18:24,25 20:16 | **appreciate** 36:21 | **attending** 49:23 | **bold** 38:21 | **chance** 6:17 |
| | **approve** 25:1 | **attention** 13:3 40:12 41:10 | **books** 21:11 | **chances** 40:25 41:1,5 |
| **administrator** 1:3 5:10 20:12 28:5 | **approved** 19:24 19:25 | | **bottom** 38:20,24 42:9 | **change** 37:7,19 50:7 |
| | | **attorney** 5:6 | **box** 47:25 | |
| **admitted** 29:16 29:20 | **approximately** 14:12 22:12 | **attorneys** 4:1 | | **changed** 25:9 |
| | | **authority** 5:11 | **Bradley** 1:8 | **changes** 25:5 |
| **ago** 4:24 7:6,7,7 14:9 23:6 42:14 | **April** 37:5 44:1 | **automatic** 34:13 | **Brandon** 24:23 | **chart** 40:19 41:4 41:25 |
| | **Arch** 2:4,12 | **automatically** 31:8 33:5 37:2 | **break** 10:12,15 | |
| | **area** 21:10 25:10 29:22 48:6 | | **bring** 5:11 | **checked** 47:25 |
| **agree** 26:12 27:7 35:14,20,25 36:1,5 45:6,8 45:24 | | **aware** 5:13 35:19 36:8,11 37:7,8 | **broader** 28:2 | **checking** 21:11 |
| | **areas** 50:21 | | **broadly** 51:8 | **checkoff** 42:20 |
| | **arose** 15:20 | | **Brockport** 16:19 16:20 | **children** 5:8 |
| **agreed** 4:14,16 10:15,16 25:7 42:25 | **arrangement** 4:10 | | | **circumstance** 26:24 33:3 |
| | | **B** | **brought** 5:18 6:9 15:1 | |
| | **aside** 49:8 | **bachelor's** 16:17 16:18 | | **circumstances** 13:19 |
| **agreement** 4:13 | **asked** 10:1 17:16 22:14 35:7 43:9 44:5 45:23 49:12 | | **Building** 2:4 | |
| **agrees** 43:6 | | **back** 14:10 15:17 16:3 | **BWS** 42:11 | **City** 1:7 2:11 5:20 |
| **alcohol-related** 30:14 | | | | |

CIWA 30:12
42:11
claims 5:23
clinical 18:20,22
19:11
clocking 21:6
College 16:20
come 6:6 15:17
28:15 30:1
40:12 41:9,10
comes 9:13
32:24 41:19
comfort 30:20
coming 18:25
Commonwealth
1:19
communication
23:13
complaints
51:13
complete 10:18
completed 18:2
complications
34:20
concerning 12:6
16:3 28:19
50:1
concerns 19:18
concluded 52:11
concludes 51:23
concur 42:21
concurred 47:25
conduct 50:2,24
conducted 12:10
31:16 51:4
conducting 8:16
50:21 51:11
confirm 43:10
47:9
Confirmed 52:4
connection 23:8
28:14 51:20
consent 4:9,12
consistent 42:13
42:17 45:11
consult 6:17

contact 28:8
contained 53:2
context 40:1
continue 17:9
continuing 42:8
conversation
11:9,20 23:18
50:8
conversations
11:19
copy 52:13,16
Corizon 1:7
5:19,19 16:8
17:13,14,20,24
17:25 30:6
36:7
correct 6:15 9:7
9:23,24 10:7
11:24 17:11
19:20 20:13,15
20:17,18 22:3
22:4,19 24:1
25:14,15 26:22
26:23 27:8,9
27:20 31:13,23
31:24 32:6,9
32:10,17,21
33:1,2,7 36:9
36:10,14,15,20
39:2,8,9,12,13
39:19 40:3,3
40:11 41:15,16
41:25 42:1,6,7
43:1,2,7,8,11
43:12 45:13,14
46:9,10,13,14
47:12,13,16,17
49:10,11 53:4
correctional
5:16,21 50:20
50:23
corrective 40:23
40:23
correctly 23:12
23:23 31:15
39:14 40:10

41:11
counsel 1:15 4:9
52:6
couple 8:17
10:25 27:25
31:25
coursework
17:10
court 1:1,17
5:10 7:11,19
covered 51:25
COVID 18:11
COWS 30:8
31:1,5 42:11
create 30:22,24
31:2,6,9 32:16
32:19,25 33:5
33:11 34:1,2
40:7 42:15
45:13 48:12
created 34:8
37:2 39:12
42:12
creating 40:5
creation 34:13
critical 36:22
Curran-From...
5:16
current 18:14
18:19 19:7
20:3,4 37:25
currently 9:3
18:20 19:8,14

_____

**D**

D 3:1
D-e-j-a-u-a-n
20:9
dangerous 35:23
36:13
date 38:15 39:11
39:15
dated 39:1,7,25
day 15:14 20:23
21:16,18,24
30:23,25 31:1

31:10 32:1
33:6
day-to-day
20:22
days 31:17,23
33:8 36:16
De 24:23 25:8,14
deal 49:4
death 6:1 50:15
decided 24:13
40:24
decision-maki...
19:19,21
Defendant 6:6
Defendants 1:10
2:7 5:24
defense 4:17
degree 16:12,15
36:3
Dejauan 20:5,8
delays 8:19
deliberately
5:24
department
5:17,22 9:6
19:16
depending 30:1
30:16
depends 20:24
33:16
deposition 1:14
1:16 3:3 4:2,4
4:5 5:5 6:10,14
6:24 7:11,15
7:21 8:17 9:15
10:5,21 12:18
12:20 13:6,18
22:15 38:13
43:11,14 44:5
44:10 45:16
46:22 52:11
depositions
12:10,12,14
describe 17:22
18:18 20:21
23:7

described 35:9
36:7
determination
29:24 31:20
determine 45:4
died 5:14 14:4
diem 22:13
different 11:23
15:24 16:1,13
22:8 28:18
32:1 33:15,17
41:13
direct 28:25
director 19:11
disagree 26:13
26:13 27:8
48:4,9
disagreed 47:20
48:1 50:5
disciplinary
23:17,25 24:8
26:8
discipline 15:19
23:21 24:4
26:10 29:6
disclosure 12:19
discuss 26:21
34:8
discussed 11:13
12:21 13:5
24:6 42:25
43:15
discussion 43:4
discussions 50:3
51:9
District 1:1,1
document 13:10
13:12,15,17,20
13:24 25:20
26:17,25 38:3
38:11 48:6
49:5
documented
49:9
documenting
23:19

documents 9:11
  12:3,6 13:5
  14:23 50:13
doing 31:1 34:13
Dr 14:24 15:3
drink 30:11
drugs 30:2
duly 4:19

**E**

E 2:1,1 3:1
e-mails 21:14,19
earlier 10:5 21:1
  42:18
early 36:20,22
easier 44:11
Eastern 1:1
easy 43:23
ECW 21:14,19
  21:22 33:12,16
  37:12
educated 43:6
education 13:7
  13:10 16:16
  22:15,17 23:5
  23:8,10,15,24
  24:7,14,22
  25:6,13 26:5,8
  26:14 27:19
  34:25 38:10,11
  40:4 41:6 42:5
  45:12 46:8,23
  48:10 49:19
Edwards 20:5,7
  20:9
EHR 37:10,13
  37:18,18
Eileen 1:3 5:6
either 17:6
  26:12 28:6
Electronic 21:15
  37:14
Elizabeth 1:8
emergency
  14:18
employed 5:21

22:6
employee 11:2
  13:6,10 22:15
  22:17 23:5,8
  23:10,15,23
  24:6,14,19,21
  25:6,7,13,20
  25:23 27:1,1,2
  27:6,11,19
  28:20 38:10,11
  38:25 42:4
  45:12 46:8,23
  49:18
employee's
  42:20
employees 5:20
  15:20 22:6
  24:25 27:4
employment
  17:12
encounter 40:16
encounters 14:7
  40:5,7 42:10
  48:14
enlarged 44:10
enlarging 44:8
ensuring 34:3
enter 36:8
environment
  35:16
especially 36:3
Esquire 2:3,8,12
essentially 20:15
established 22:1
estate 1:3 5:11
  5:12
estimate 7:5
  11:17 18:7
evaluations 34:3
evening 31:2,4
  32:5
event 37:6
everybody 41:17
evidence 53:2
exactly 8:5
  43:15

examination
  1:15 3:2 4:20
example 32:23
exercise 45:3
Exhibit 38:6
exhibits 3:7,8
expectation 33:4
expedite 43:17
experience 8:19
  35:15,21

**F**

F 2:9
facility 5:16
  19:19 20:17,19
  21:3 29:16
  34:4 41:21
fact 13:15 24:19
  27:14 43:5
  46:7,11 47:14
failed 40:6
failure 47:14
fair 39:23,24
familiar 29:14
  35:17
familiarity
  50:22
feel 23:2
Feinberg 2:3,3
  3:5 4:14,15,21
  5:1 52:4
file 10:23,24
  11:24,25 12:3
  13:2 26:19,19
  27:19 34:23
  38:12
fill 19:1 30:6
finish 8:7,13
  17:5 47:3
finished 17:6
  46:19
first 7:2,18,18
  7:23 8:19 13:9
  13:9 17:21
  20:6 23:24
  31:14,14 32:1

38:16 40:9,9
  43:16,16,19,23
  46:18
five 7:6,8 31:17
  31:22 33:8
  36:15
fix 36:25
flip 24:22
focus 32:11
  36:19
focused 27:25
folks 19:14
  21:23
following 43:3
follows 4:19
form 24:7 27:19
  30:6 38:16,17
  38:24 39:10,12
  39:25 42:9
  45:12 46:23
formally 5:2
forward 6:22
  23:4,20 24:7
found 5:15 15:4
foundational
  13:14
free 23:2
frequency 51:10
front 27:12 38:7
full 10:18 12:19
fully 53:2
function 21:3
further 4:6
  14:22 28:19
  50:3 52:5
future 31:9

**G**

Gaye 1:8 11:25
  12:18,21 16:3
  27:17 28:3,8
  28:19 29:1
  39:18,21 40:2
  40:6 42:5,24
  43:4 45:12,24
  46:5,23 47:10

47:19,24 48:18
  49:19,25 50:4
Gaye's 10:23,24
  12:24 13:1,6
  29:3 34:23
  39:1 43:10,25
  45:1 49:15
general 22:5
  24:10
Generally 19:3
generated 35:2
Gerald 1:7
getting 22:11
Gila 2:16
give 7:5,14,24
  8:8 10:17 25:6
  27:5,6
given 10:5 17:15
  46:7 49:24
giving 5:11
  21:20 49:5
gkimball@okl...
  2:10
Glattstein 2:16
Gleaves 1:4 5:8
  5:13 12:6 14:3
  14:7,20,25
  15:3,11,21
  34:22 35:5
  40:17 41:20
  45:4 50:11
  51:20
Gleaves's 5:11
  5:25 12:6
  41:18 50:14
go 6:22 8:13
  17:1 18:15
  19:5,23 20:11
  21:13 24:17
  25:17 29:24
  41:18 42:15
  45:22 47:6
  48:5
goal 34:12
goes 8:20 36:23
going 8:5,6

Kungchiha Jeoboham

Page 57

10:10 11:12
21:6,7,8,9,19
24:13 28:24
37:15 41:1,17
43:16 44:7
45:15 47:2
48:15,16
**good** 4:22,23
44:21
**gosh** 35:16
**graduate** 16:21
**grandmother**
5:7
**great** 29:4,5
52:9
**Gregory** 2:8
4:16,16 6:14
6:18,22 11:10
11:14 52:7,9
52:12,14
**guess** 11:3 34:21
37:15

**H**

**H** 2:3
**hand** 25:20
26:25
**handed** 24:24
**handing** 21:22
**happen** 12:13
26:9 29:15
31:22 35:12
36:25,25 37:11
51:17
**happened** 40:15
41:13
**happens** 21:16
23:20 29:25
**Hazlett** 1:17
53:8
**head** 48:5
**health** 1:7 20:12
37:14
**hear** 8:23
**heard** 7:15 51:6
51:9,12,14

**hearing** 8:22
50:16 51:19
**help** 19:1
**helpful** 13:23
**higher** 33:19
**highlighted** 44:2
44:8,9,16,23
46:17
**Hillary** 1:17
7:19 53:8
**hospital** 40:18
**hours** 5:14
14:10 19:2
**housing** 50:21
**HSA** 18:4,5,6,16
20:12,15,19,22
20:24 22:2,20
22:21,25 29:14
37:4
**HSA's** 25:24
**HSAs** 20:3
**hypothesizing**
41:12
**hypothetical**
24:10 29:20

**I**

**idea** 7:3
**identified** 23:10
24:10 40:20
41:2,6
**important** 7:16
36:2
**inadvertently**
8:10
**incident** 15:7
**including** 22:13
**incomplete** 10:6
**incorrect** 10:6
45:25 46:3
**incorrectly**
23:11
**increase** 43:24
**indicate** 4:12
**indicates** 42:24
**indifferent** 5:25

**individuals**
19:16
**information** 6:8
41:14
**informed** 34:15
**initiate** 24:13
**inmate** 40:8
**inmates** 42:10
**instances** 35:6
**instructions**
7:14
**intake** 18:1 21:7
29:21,22 30:20
32:13
**interactions**
12:21 15:2
16:2 28:19
**interest** 12:19
**interrupt** 8:7,11
**interviewed**
29:21
**introduce** 5:2
**involved** 14:18
14:24 15:22
37:17,18
**Iron** 2:4
**issue** 23:5 24:2
24:10 25:21
29:2
**issues** 21:9 29:5
29:6 30:7
43:15 51:14

**J**

**Jeoboham** 1:14
3:4 4:18,22
9:18 16:7 38:3
41:7
**jfeinberg@krl...**
2:6
**job** 16:3 17:21
19:10 22:18
**John** 1:9 2:9
**Jon** 4:15 5:1
**Jonathan** 1:4
2:3 5:8,10

**Joseph** 37:21
**Jr** 1:4 5:8
**judgment** 45:4
46:1 47:11
48:19
**Julius** 24:23
25:14
**Julius's** 25:8
**jump** 23:3
**JUNE** 1:13

**K**

**Kairys** 2:3
**Katelyn** 2:12
52:7
**katelyn.mays...**
2:14
**keep** 7:23
**Kennedy** 2:9
**Kimball** 2:8
**kind** 34:19
51:13
**KLW** 1:17
**know** 7:18 8:21
9:14 10:2,6,12
14:9,23 21:23
23:3 25:3 26:6
26:11 30:18
33:20,22 34:10
37:8,17,24
40:13,15 41:4
41:11 44:18
45:19 46:19
47:3 49:24
50:10
**Kungchiha** 1:14
3:4 4:18 52:10

**L**

**lags** 8:20
**Lalitha** 1:8
**LaSalle** 17:2
**lawsuit** 5:12,18
5:23
**lead** 12:22 26:10
**learn** 27:24

**led** 12:18 13:19
26:1 37:6
41:14 42:4
**let's** 20:11 23:4
25:16 29:19,19
32:11 47:6
**lieu** 4:6
**life** 20:23
**Lin** 2:3
**Linda** 19:9,13
19:14
**Linda's** 19:10
**Line** 44:17,17
**Lines** 44:23
45:16 46:18
47:6
**listening** 9:15
**Litigation** 1:18
**little** 13:24
21:13 25:17
38:4 50:25
**log** 52:10
**long** 10:11 11:16
11:19 12:22
16:8 28:3
**look** 12:3,5
**looked** 11:25
20:22 38:12
**looking** 21:14
**looks** 35:18
**lot** 43:18
**loudly** 7:24
**LPN** 16:13 21:6

**M**

**ma'am** 6:3 43:17
46:21 52:5
**mailbox** 27:1
**making** 21:21
36:11 49:8
**management**
19:15,18
**manner** 4:11
**manual** 33:11
34:2,10 36:9
40:5 45:13

47:15
**manually** 30:24
  31:6 34:8 35:2
  42:12,15
**marked** 3:8 38:5
**Marsella** 37:21
**master's** 16:17
  16:24 17:9
**matter** 25:25
  26:22
**Matu** 1:8
**Mays** 2:12 52:8
  52:15,17
**McCulley** 37:20
**McNamara** 1:3
  5:7,7,9,18,23
**mean** 7:4 27:10
  34:9 36:17
**meaning** 33:6
**meanings** 10:25
**means** 9:21 23:8
**medical** 5:19,25
  11:7 12:7
  14:18,25 21:7
  21:15 41:18
**medication**
  30:19
**medications**
  18:3 30:3
**meds** 30:20
**meet** 11:16
**meeting** 25:21
  26:21 32:13
  39:17,21 40:2
  42:5
**meetings** 34:7
  39:16 40:22
  49:13
**mention** 27:18
**mentioned** 32:1
**Messing** 2:3
**met** 4:24 11:14
  11:15
**middle** 8:11
**mind** 7:23 25:19
  35:8

**minute** 4:24
**minutes** 11:18
  27:25 51:4,17
  51:17
**missed** 21:12
  23:12 26:3
**misses** 34:11,18
**Mod** 9:3,6
**moment** 9:2
  23:6 35:4
  43:23 44:15
  52:2
**months** 33:23
**morning** 4:22,23
  21:1,4,17
**mortality** 15:9
  15:10,13,23
  40:22 49:14,23
**move** 21:2 23:20
  24:7 33:18
  44:19
**moved** 37:11
**moves** 24:3
**moving** 23:2,4
  33:24 44:22
**MSN** 16:15

─────── **N** ───────

**N** 2:1 3:1
**name** 4:13,25
  6:6
**named** 5:6 6:5
**need** 6:21 8:23
  9:1 10:12
  26:12,14 32:15
  34:1 42:10
  46:1 48:13
  52:12,15
**needed** 11:4
  25:6 35:10
  45:4 48:20
**needs** 6:1
**new** 16:19 28:9
  28:21 34:6
**night** 31:3,7
  32:8

**nonpunitive**
  23:14 26:5,8
  26:14
**normal** 14:10
**Notary** 1:18
  53:9
**notation** 47:19
**note** 12:17
**notes** 51:25 53:3
**Notice** 1:16
**noticed** 26:3
  27:11 41:24
  42:3
**number** 12:9
  44:5
**nurse** 12:18,20
  14:14 16:3,10
  17:19 18:1,1
  24:11,12 27:17
  28:3,7,8 29:1,2
  29:3,4,5,21
  32:13 35:21
  39:1 48:25
  49:4,9
**nurses** 20:16
  22:1,7 34:5,6,6
  34:15 36:7,11
  36:12 42:14
  46:12
**nursing** 17:12
  17:21 18:2,4
  26:3 45:3 46:1
  47:11 48:19,22
  49:1

─────── **O** ───────

**O'Connor** 2:8
**oath** 4:7,8 7:12
  9:19
**objections** 4:10
**occur** 40:16
**October** 39:7,25
**office** 9:3 21:13
  25:24,25 40:2
**officer** 5:21
  50:20

**officers** 50:23
  51:11
**offsite** 19:23
**oh** 7:3 27:13
**okay** 4:22 7:10
  8:8,14,15,23
  8:24 9:13,16
  11:20 12:2
  13:22 14:22
  18:17 19:6
  20:11 21:25
  22:14 23:22
  25:16 27:13,22
  28:14,24 31:19
  34:24 38:2,15
  41:7 44:21,21
  45:20 46:20
  47:4 50:10
  51:1,13 52:3,4
  52:9
**once** 19:24,24
  25:16 31:16
  41:6 42:2 47:9
**ones** 19:21
**opioid** 30:18
**opioids** 30:9
**opportunity**
  10:7 27:7
**or/and** 42:11
**oral** 1:15
**orders** 30:19
**outlined** 6:3
**outlining** 41:8
**outstanding**
  11:4
**overhearing**
  50:14
**oversee** 18:20

─────── **P** ───────

**P** 2:1,1
**P-14** 38:6
**p.m** 32:3,5,6,6,8
  32:14,20 33:1
  33:6 41:21,23
**PA** 2:5,9,13

**page** 3:3 7:17
  44:9,20,22,23
  45:16 46:18
  47:6,18
**Pages** 46:17
**paper** 23:17
  24:6 26:7
**pardon** 38:10
**part** 15:13,15
  40:23
**participating**
  4:2 15:10
  49:13
**particular** 12:16
**particularly**
  35:23
**parties** 1:21 4:9
**partner** 20:5
**pass** 18:3
**passed** 40:18
  41:2,3
**patient** 30:7
  34:20 41:1
  49:5
**patients** 18:21
  19:23 21:8
  48:13
**PDP** 18:21
**pending** 10:13
  21:21
**Pennsylvania**
  1:1,19
**people** 21:2,20
  22:9 34:4
  35:22 36:2,13
**performance**
  16:4 28:20
**period** 22:5
  36:20,22
**permitted** 45:25
  48:19,25
**person** 4:7 19:8
  29:15,20,22,24
  31:21 36:23
  38:18 46:7
**personnel** 11:25

12:2 13:1
**Philadelphia** 1:7
  2:5,9,11,13
  5:17,20,22 9:6
**Philly** 17:3
**phone** 11:9
**phrase** 23:8 24:3
**physically** 4:3
**pick** 28:12
**placed** 32:15
**Plaintiff** 1:5,16
  2:2 4:15
**Plans** 40:24
**please** 4:12
  20:14 44:15
  45:18 47:2
**point** 8:10 9:13
  9:25 10:11
  12:13 14:6
  36:11 49:16
  51:9
**points** 8:18
**portion** 29:21
  45:15 46:15,22
**portions** 43:14
**position** 18:19
  19:7 20:3,4
  28:10,21 29:13
**possession** 28:9
**possibilities**
  41:9
**possible** 27:24
**practices** 50:20
**precisely** 25:17
**preparation**
  13:20
**prepare** 10:20
  13:15
**preparing** 13:18
  38:13
**present** 1:20
  2:15 4:3
**President** 18:5
  18:10 25:11
  28:10
**pretty** 21:24

23:16
**prevented** 50:15
**previous** 14:23
  39:15,16 41:7
**previously** 12:10
  38:5
**printing** 21:21
**prior** 6:7 29:11
  31:10 37:5
**prison** 14:3
  35:16
**Prisons** 5:17,22
  9:7
**PRN** 22:13
**probably** 7:16
  41:5
**problems** 34:3
  51:10
**procedure** 31:15
**proceeding** 7:12
  15:9
**proceedings**
  53:1,4
**process** 23:25
  24:9,14 34:10
  35:24 36:4
**progressive**
  23:21 24:4
  26:10
**protocols** 29:10
**provider** 30:18
**Public** 1:18 53:9
**purposes** 6:14
**pursuant** 1:16
**put** 27:1
**putting** 23:16
  26:7 49:7

_____

**Q**

**qualifier** 10:13
**question** 8:6,8
  8:14 10:1,13
  10:14 12:23
  13:14 16:13
  17:16 22:8
  23:22 28:2,18

35:7 36:19
  41:19 49:17
**questions** 6:18
  7:25 16:6
  18:14 30:13,14
  44:5 45:23
  46:25 50:1
  51:24 52:5,7,8
**quick** 18:14

_____

**R**

**R** 2:1
**raised** 23:6
**reached** 28:11
**read** 40:9 43:18
  44:7,11,12,16
  44:19,23 45:2
  45:18,23 46:18
  46:21 47:3,7
**reading** 47:1
**realize** 10:4
**really** 11:5
  25:19,25 34:5
**reask** 11:22
**reason** 6:9 7:22
  10:17 36:1,6
**recall** 13:13 14:8
  15:2,10 34:18
  35:5 49:22
  50:10,14,16
  51:19
**recalled** 49:13
**received** 20:25
**recollection**
  13:25 49:20
  50:3
**record** 4:13,25
  5:3 7:21 11:2
  37:14 48:22
  49:1,2,6,10
**recorded** 8:1
**recording** 7:19
**records** 11:8
  21:15 41:18
  48:23
**referral** 19:25

**referred** 31:25
**refresh** 13:24
  49:20 50:2
**refuse** 26:16,17
**regarding** 14:2
  14:19 15:11,12
  15:21
**Regional** 18:5,9
  28:10
**regularity** 36:3
**related** 6:8 7:15
**relationship**
  28:1
**remedial** 15:19
**remember** 7:3
  13:19 14:17,21
  15:6,18 16:2
  22:23,24,24
  28:4 35:11,12
  37:3 39:20
  48:4,7 50:8
**remotely** 4:5,8
**report** 13:7
  19:14,17 22:16
  30:2 46:8
  49:19
**reported** 29:16
**reporter** 4:1
  7:19 52:12,15
  53:8
**Reporters** 1:17
**reporting** 4:4,11
  30:11
**reports** 19:6,8
  19:13
**represented**
  6:13
**required** 46:12
**requirement**
  48:22
**research** 24:16
  24:18
**resist** 8:6
**resolved** 24:3
**respective** 1:20
**response** 14:18

49:25
**responsibilities**
  18:15,19,23
  22:18 23:9
  36:8
**responsibility**
  20:2
**responsible**
  19:22 22:10
**result** 6:1
**resulted** 34:19
**review** 10:22
  11:7 12:13,23
  15:9,10,23
  24:24 25:1
  32:12 41:4,25
  43:10 49:14,23
  51:25
**reviewed** 11:5
  13:1 34:22
  45:11 49:18
**reviewing** 40:19
  41:14 46:24
**right** 6:5,13 8:4
  8:12,16,25
  9:17,25 11:7
  12:9 13:22
  14:17 16:6,10
  16:24 17:3,8
  17:10,17 18:13
  20:21 27:5
  28:15,16 30:20
  32:23 35:13,20
  35:23 36:23
  41:3 42:8,19
  43:3,13,22
  44:4,15 45:9
  45:22 46:15
  47:9 49:12,24
**risk** 31:21
**RN** 16:13,15
**Robert** 37:20
**role** 5:3
**room** 4:4 9:1,9
  9:14 21:6
**rounds** 21:5,5

**Rudovsky** 2:3
**rules** 50:23

**S**

**S** 2:1 20:10
**same-day** 40:7
  44:6 46:2,12
  48:12
**save** 41:17
**saw** 13:12,17
  27:18,21 38:12
**SAWS** 30:5
**saying** 27:7
**says** 29:22 39:10
  40:6 42:21
  45:25 47:10
**schedule** 36:12
  46:12 47:15
**scheduled** 15:14
  41:23 51:16
**scheduling**
  19:22
**score** 30:8,9,14
  30:16,17
**screen** 38:8
  43:20 44:13,19
**second** 7:1 8:4
**seconds** 51:24
**see** 8:23 11:3
  13:9 21:7,11
  24:2,11 27:10
  28:17 31:11
  38:7 42:22
  43:19 44:2
**seeing** 8:22
**seek** 12:20
**seen** 35:10 36:13
  45:5
**September** 5:14
  14:3,19 41:22
  51:21
**serious** 5:25
**services** 19:12
  20:12
**shift** 19:1 21:23
  30:25,25 31:1

31:3,3,4,7,17
32:2,5,8,17,21
32:24 33:1,6
45:5
**shifts** 28:13,17
  31:25 33:9
**shoot** 34:12
**short** 42:14
**show** 13:23 38:2
  43:13,24 45:15
  48:15
**shown** 46:22
**sick** 18:2 26:3
**sign** 25:13,16
  26:15,16,17,18
  27:7,8
**signature** 13:8
  38:25 39:4,5
**signatures** 21:12
  38:24
**signed** 39:25
  43:4 48:1
**significant**
  34:19
**signing** 43:5
**similar** 35:6
**sit** 25:21
**sitting** 27:12
  39:20
**size** 43:24
**slightly** 15:24
  16:1
**Slory** 1:7
**Somebody** 46:6
**sorry** 9:4 13:13
  16:12
**sort** 30:5
**sound** 39:2
**sounds** 26:20
  27:6 36:21
  39:23 43:4
**South** 2:4
**speak** 6:21 7:24
**specific** 7:4 11:1
  12:5 17:18
**specifically**

15:12 27:16
35:1
**spell** 20:6,8
**spelling** 20:7
**staff** 21:12
**stand** 35:8 37:13
**start** 16:18
  21:14
**started** 17:13
  28:4,7
**starting** 30:12
**starts** 21:17
**state** 16:19
  34:25
**stated** 35:1
**statement** 40:6
  42:9,20,21
**states** 1:1 40:4
**stating** 4:12
**step** 23:24 26:4
**steps** 24:14
**stood** 13:2
**Street** 2:4,12
**strike** 51:7
**stuff** 18:4
**subject** 29:11
  40:4
**substance** 29:16
**substances**
  29:23 35:18
**suggest** 36:17
**Suite** 2:4,12
**summarize**
  31:11 48:17
**summarizing**
  45:2
**summary** 45:1,6
  47:19
**SUNY** 16:19
**supervise** 28:3
**supervising** 20:3
  22:10
**supervisor**
  20:16 24:23
  28:25 29:1
  37:25,25 39:5

**supervisor's**
  40:6 42:21
**Support** 1:18
**supposed** 24:12
  29:15
**sure** 7:17,23
  8:21,22 17:15
  17:16 21:2,21
  24:16,18 31:12
  36:7 41:11
  51:25
**swearing** 9:22
**sworn** 4:19
**system** 21:15
  30:22 31:8
  33:4,12,25
  34:1 37:1,7
  42:15

**T**

**take** 10:10,15
  21:25 24:15
  27:14 28:17
  44:15 51:24
**taken** 50:19 53:3
**talk** 18:16 23:4
  26:1 27:2
**talked** 27:4
  34:16 50:19
**talking** 21:12
  38:4
**team** 37:10,13
  37:14,18,18
**technology** 8:20
**tell** 5:3 8:12 9:14
  11:13 20:14
  46:5,11 51:1
**tells** 27:12
**temptation** 8:7
**ten** 7:7 30:18
**tenure** 51:12
**terminology**
  32:12
**terms** 15:19 29:6
  50:23
**test** 47:15

**testified** 4:19
  6:24 7:11
  49:25
**testify** 6:10
**testifying** 7:10
  9:18
**testimony** 6:7
  10:18 12:20,24
  14:24 26:20
  29:11 39:16
  41:8 43:11,14
  44:1,8 45:1,7
  45:16 46:16
  47:2,19 48:16
  49:19 50:13,19
**text** 38:17,18,20
  43:18,25 44:9
  44:16,23 45:2
  46:17
**thank** 13:23
  17:22 37:15
  52:10
**thing** 10:22 34:9
  48:15 49:7
**things** 7:18,23
  13:9,25 21:22
  21:22 31:14
  40:9 41:13
  43:16
**think** 10:10 23:1
  23:1 27:21
  33:23 34:25
  37:9,21,22
  48:5
**Thomas** 2:8
  4:16
**three** 5:19 19:16
  33:9 45:23
**time** 6:21 7:1
  10:14 20:11
  22:5 24:22,23
  25:9,10 28:25
  31:5 33:14
  36:13 37:10,19
  37:20,23 38:1
  41:17 48:3

51:16
**timeframe** 14:6
  14:19 15:21
  51:21
**times** 11:13
  25:10 27:9
  28:12
**title** 25:8,9
**today** 9:19 10:11
  10:18 39:20
**today's** 10:21
  13:18 52:13,16
**told** 4:25 42:14
  46:6 48:18,21
  50:4
**tool** 30:9
**top** 38:15 39:10
  48:5
**topic** 15:24
**topics** 50:18
**total** 11:17,18
**tour** 51:15
**tours** 50:21,24
  51:3,11
**traditional** 20:7
**trained** 16:10
  34:7,16
**transcript** 8:1
  12:23 43:19
  52:13,16 53:5
**transcripts**
  12:11,14
**treatment** 34:3
**triage** 18:1
  21:10,10
**Trivikram** 1:8
  14:24 15:3
**true** 9:23
**try** 13:24 28:12
  43:16
**trying** 37:10
**twice** 11:15
**two** 7:6,23 17:7
  27:21 37:24
  38:24
**type** 15:9 38:21

**typed** 38:17,18
**typical** 31:15
**typically** 21:6,17

**U**

**UM** 19:16
**Um-hum** 32:4
  33:8 42:23
**understand** 6:2
  6:10 9:17,20
  9:21 10:1
  12:16 31:14
  39:14 41:10
  51:7
**understanding**
  15:8 20:14
  23:23 31:12
  51:1,3
**Understood** 8:2
  8:3 20:1
**unit** 14:25 51:5
**United** 1:1
**University** 16:19
  17:2
**unresponsive**
  5:15 15:4
**use** 24:3 33:13
  47:11
**utilization** 19:15
  19:18

**V**

**vacation** 15:15
**various** 17:23
  35:18
**verbal** 7:24
  23:13
**verbiage** 25:2
**version** 33:17,19
  33:21,22,24
  37:12
**versions** 33:17
**Vice** 18:5,10
  25:10 28:10
**video** 8:20
**voice** 8:20

**vs** 1:6

**W**

**Wacowski** 19:9
**waiting** 21:9
**waive** 4:10
**walk** 20:22 24:9
**Walsh** 1:17 53:8
**want** 8:12 26:10
  29:9,9 38:2
  43:13,24
**wasn't** 11:19
  27:13,15 33:13
  35:2,10 51:15
**way** 11:8,23
  16:1 17:15,17
  22:22 36:17
  38:23 46:21
  49:20,24 50:15
**ways** 32:1
**Wednesday** 44:1
**went** 4:24 11:2
  16:23 17:20
  40:17 48:10
**weren't** 24:17
**withdraw** 30:4
  31:16,20
**withdrawal**
  29:10,25 30:3
  30:7,12,24
  31:9,22 32:15
  35:18,22 36:4
  36:14,23 40:5
  40:7,15 42:10
  44:6 48:20
**withdrawing**
  35:22 48:13
**witness** 4:18
  26:18
**woman** 5:6
**work** 14:14,15
  15:14 18:22
  19:2 20:22
  22:1 28:15
  29:3 49:21
**worked** 15:4

16:8 17:19,25
  18:1
**working** 14:10
  17:8,13,24,25
  20:17 29:1
  35:16,21
**write** 24:21
**wrong** 36:20
  45:9,10 46:5
  47:10,13,21,22
  47:23 50:5
**wrote** 27:10
  47:24

**X**

**x** 1:2,10 3:1 25:3
  26:6 42:19

**Y**

**Y** 25:3 26:6
**yeah** 9:24 22:9
  33:12
**year** 7:6 18:11
**years** 7:6,7,9
  14:8 17:7
  35:17
**Yep** 14:16 17:11
  20:13,18 32:10
  36:24 42:1
**Yesterday** 11:21
**York** 16:20

**Z**

**Z** 25:4 26:6
**Zoom** 1:16 8:17
  11:9

**0**

**1**

**1** 44:24
**10** 22:13 33:22
  45:17
**10/5/18** 39:11
**10/9** 39:16
**10/9/18** 39:1,15
**10:02** 1:19

**10:52** 52:11
**100** 22:12
**11** 32:6 33:24
**11:00** 32:8,17,20
  32:24,25 41:21
  41:23
**13** 35:17
**14** 44:24 47:6
**15** 2:12
**1500** 2:9
**1515** 2:12
**19** 44:17
**19012** 2:9
**19102** 2:13
**19106** 2:5

**2**

**2** 9:5,6
**2:20-cv-04570...**
  1:6
**20** 33:21 45:17
  47:7 51:24
**2008** 16:22
**2009** 16:9 17:5
  17:13
**2014** 17:6
**2015** 17:7
**2017** 18:8 28:5,6
**2018** 5:14 14:4
  14:11,12,19
  15:7 16:3
  22:21,24 29:14
  30:22 33:21
  39:7 51:21
**2020** 18:11,12
  37:5
**2021** 18:11
**2022** 1:13 33:15
  44:1
**20th** 14:4 41:22
**21** 46:18
**215** 2:5,10,13
**21st** 5:14 14:4,5
**27th** 44:1

**3**

**3:00** 32:3,5,14 32:17,24 33:6 41:21
**30** 11:18 51:4,16 51:17

**4**
**4** 3:5 46:18
**43** 44:10
**44** 44:22
**45** 45:16

**5**
**5** 44:17
**5:00** 19:4
**501** 2:4
**55** 46:17,18
**56** 46:18 47:6,18
**564-0400** 2:10

**6**
**6:00** 14:13 19:4
**683-5235** 2:13
**6day** 42:12

**7**
**7:00** 32:3,9,14 32:20 33:1,6 41:23
**718** 2:4

**8**
**8:00** 32:5

**9**
**9** 1:13
**9/20/18** 40:8
**9:00** 14:12,13 19:3,4,4
**9:30** 14:13
**925-4400** 2:5
**9th** 39:7 40:1