**EXHIBIT G**

Gerald Slory

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EILEEN A. McNAMARA, as    :
Administrator of the      :
ESTATE OF JONATHAN        :
GLEAVES, JR.,             :
    Plaintiff   :
               :
   vs.      :  NO. 2:20-cv-04570-RBS
               :
CITY OF PHILADELPHIA,     :
CORIZON HEALTH, GERALD    :
SLORY, ELIZABETH          :
BRADLEY, LALITHA          :
TRIVIKRAM, MATU GAYE,     :
JOHN DOE(s),              :
    Defendants   :
_____

ZOOM DEPOSITION OF GERALD SLORY

DATE AND TIME:  Wednesday, September 29, 2021
at 10:10 a.m.

_____

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112  1-877-KLW-DEPO
www.klwreporters.com

Page 2

APPEARANCES:
  KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
  By:  Jonathan H. Feinberg, Esquire
  Cast Iron Building, Suite 501 South
  718 Arch Street
  Philadelphia, PA  19106
    Representing the Plaintiff

  Anne B. Taylor, Esquire
  Chief Deputy City Solicitor
  1515 Arch Street
  14th Floor
  Philadelphia, PA  19102
    Representing the City of Philadelphia Defendants

  O'CONNOR KIMBALL, LLP
  By:  Thomas J. Gregory, Esquire
  Two Penn Center Plaza
  15th and JFK Blvd.
  Suite 1100
  Philadelphia, PA  19102

    Representing Corizon Health Defendants

ALSO PRESENT:

  Gila Glattstein

_____

STIPULATION:  It has been stipulated by and between counsel that they waive the reading, signing and sealing of the transcribed testimony by the witness and the filing of the original with the Court, and all objections, except as to form, until the time of trial.

Page 3

INDEX

WITNESS         EXAMINED BY      PAGE

Gerald Slory      Mr. Feinberg     4

EXHIBITS

NUMBER      DESCRIPTION      PAGE
P-1     Housing Log      81
P-4     Statement of Terrelle Jones    106
P-10    Statement of Tyrone Thomas   119
P-11    Gerald Slory Interview    31

Page 4

P R O C E E D I N G S

GERALD SLORY

was called as a witness and, having been first duly sworn by the Reporter-Notary Public through Zoom, was examined and testified as follows:

BY MR. FEINBERG:

    Q.  Mr. Slory, am I pronouncing your name correctly, sir?

    A.  That's right.

    Q.  Are you still employed at the Philadelphia Department of Prisons as a Correctional Officer?

    A.  Yes, sir.

    Q.  All right.  So I'll refer to you as Officer Slory.  And first, Officer, let me introduce myself.  I did not have an opportunity to do so before we went on the record, so now I'll tell you that my name is Jon Feinberg.

    I'll also introduce, so you see who else is here on the Zoom, Gila Glattstein is a Paralegal with my law firm.  The other person that you see on the Zoom besides Lori, the Court Reporter, is Tom Gregory, who represents the Corizon Defendants in this case.

    And by way of further introduction,

1 (Pages 1 to 4)

Gerald Slory

Page 5

sir, my purpose for being here and for asking you to come in for your deposition is that I represent a woman named Eileen McNamara. Ms. McNamara is the grandmother of the children of Jonathan Gleaves, Jr., and Ms. McNamara has been appointed by the Court as the Administrator of the Estate for Jonathan Gleaves, Jr.

What that means, in simple terms, is that she has the authority to bring legal action on behalf of a deceased person.

Now, as you are likely aware, sir, Mr. Gleaves, the person I just mentioned a moment ago, died on September 21st of 2018, a few hours after he was found unresponsive in his cell at the Curran-Fromhold Correctional Facility in the Philadelphia Department of Prisons.

Ms. McNamara has brought a lawsuit against you, the City of Philadelphia, the company called Corizon and some of Corizon's employees, who are medical providers in that facility.

In the lawsuit Ms. McNamara claims that the Defendants, including you, were deliberately indifferent to Mr. Gleaves' serious medical needs and, as a result, caused his death.

Do you understand everything that I've just outlined, sir?

Page 6

A. Yes, sir.

Q. You are represented, for purposes of today's deposition and in this case, by Ms. Taylor, who is seated to your left in the same room with you.

Have you had an opportunity to speak with Ms. Taylor before we begin today's deposition?

A. Yes, sir.

Q. Do you need any more time to speak with Ms. Taylor before I ask you questions about this case?

A. No, sir.

Q. Have you ever testified in a deposition before?

A. No, until today.

(Court Reporter clarification.)

No, until today.

Q. Today would be your first time sitting for a deposition. Is that correct?

A. Yes, sir.

Q. Have you ever testified under oath in any court proceeding before?

A. Yes, sir.

Q. How many times have you testified in court?

A. This is the second time.

Q. Okay. So what it sounds like then is

Page 7

that just once before today you testified under oath in a court proceeding. Is that correct?

A. Yes, sir.

Q. How long ago was that court proceeding where you testified?

A. Like years ago.

Q. Okay. Do you remember what was the -- what the purpose of that court proceeding was?

A. It was like immigration related when I came in this country.

Q. I see. So you testified as part of an immigration proceeding related to your own immigration status. Is that correct?

A. Right.

Q. Got it, okay. And how long ago did you enter the United States?

A. 30 years.

Q. Okay. So we're talking about a court proceeding that took place a very long time ago. Is that accurate?

A. Yes, sir.

Q. All right. All of those questions, sir, were really just a preview for me to make sure that you understand what it means to testify under oath in today's proceeding.

Page 8

So in light of that fact, that you haven't testified for many, many years, let me give you a few instructions to make sure that we're all on -- on the same page.

The first thing I want you to note -- and it may be obvious, but let's confirm -- Lori, our Court Reporter, is making a transcript of everything that is said while we are on the record today. That gives rise to two important instructions for you.

First, I want to make -- I want you to make sure that you give verbal answers to all of my questions, and that you give those answers loudly so that they can be heard and recorded in the transcript. Understood, sir?

A. Yes, sir.

Q. Okay. Second, we may get into a rhythm where you can anticipate any question that I'm going to ask, and you might be tempted to cut me off. And I'm not suggesting that's rude, but you may be doing it just because you know exactly what I'm going to say; that's how normal conversation works.

I'll ask you to try to resist that temptation, wait till I finish my question, give your answer, so that we have a transcript that is easy to read with questions followed by answers. Understood?

2 (Pages 5 to 8)

Gerald Slory

Page 9

A. Yes, sir.

Q. Okay. Relatedly, if at any point I interrupt your answer, I want you to tell me that you haven't finished your answer so that you can give a complete -- a full and complete answer for purposes of making the transcript. Understood, sir?

A. Okay.

Q. All right. One other preliminary thing to note, we are conducting this deposition by way of Zoom. We are making a video and audio recording of this deposition. You may see in the top left corner of your screen a red blinking light. That recording will only be used for purposes of this case. Do you understand that, sir?

A. Okay.

Q. All right. If there are any technical issues that come up, you can't see, you can't hear, the sound is garbled, please make sure to let us know. We want to make sure that you only answer a question after you've heard the question. Is that acceptable, sir?

A. Yes.

Q. All right. Let's confirm your understanding of what's happening. Do you understand that you are testifying under oath?

A. Yes, sir.

Page 10

Q. Do you understand that this means that you're swearing that all of your answers are true and correct?

A. Yes, sir.

Q. If you don't understand a question that I've asked, will you let me know that?

A. Yes, sir.

Q. If you realize an answer that you've given earlier was not correct or complete, will you let me know that as well?

A. Yes, sir.

Q. We may take a little while today, not too terribly long, but if we get to a point where you need a break, please let me know and we'll be happy to accommodate that. Understood?

A. Okay.

Q. One exception to that rule, though, sir, is that if you do ask for a break while there is a question pending, I'll ask you to answer the question and then we'll take the break. Okay?

A. Okay.

Q. All right. Is there any reason why you cannot give full and complete testimony today?

A. No, sir.

Q. I want to start by asking you about

Page 11

your preparation for this deposition. I -- you mentioned just a moment ago that you had an opportunity to speak with your counsel, Ms. Taylor.

I'm not going to ask you what you discussed with Ms. Taylor, but I would like to know how many times did you meet with Ms. Taylor or talk with her about this deposition.

A. At least three or four times.

(Court Reporter clarification.)

Three, four times, three to four times.

Q. Okay. And when was the -- when were those meetings, if you can just give us a rough estimate?

A. Right here in this building, 1515 Arch Street.

Q. Okay. Either I misspoke or you misheard me. What I intended to ask was, when did those meetings occur?

A. I can't remember those days. Today was one of them days.

Q. Okay. When was the last time before today that you met with your attorney?

A. Like approximately two weeks ago.

Q. Okay. Before then can you estimate, when was the last time you met with your attorney?

Page 12

A. No, I can't remember.

Q. How long was the meeting that you had about two weeks ago?

A. Like roughly an hour, approximately.

Q. Okay. And how long was the meeting that you had today, before today's -- before we began the deposition?

A. Like maybe a half an hour, 45 minutes.

Q. Have you spoken with anyone else besides your attorney about this deposition?

A. No, sir.

Q. And just by way of example -- I understand your answer but, by way of example, I'm referring to any co-workers at the -- at the prison, any family members, anything like that. Have you spoken to anybody about the deposition?

A. No, sir.

Q. Did you review any documents to prepare for this deposition?

A. No.

Q. Have you looked at a single -- and when I say documents, I don't mean pieces of paper like this (indicting). I mean digital documents, things on a screen. Have you looked at anything to prepare for the deposition?

3 (Pages 9 to 12)

Gerald Slory

Page 13

A. Yes.

Q. Okay. What did you look at?

A. Maybe I was introduced by the Lock and Track log by my attorney.

(Court Reporter clarification.)

Lock and Track.

BY MR. FEINBERG:

Q. Lock and Track?

A. Right.

Q. Two different words; right?

A. I was introduced by it by my attorney.

Q. Okay. So -- and to confirm, sir, Lock and Track is a -- that's a computerized database that is used in the Philadelphia prisons. Is that correct?

A. Yes, sir.

Q. And is what you're saying that you reviewed some of the Lock and Track documents concerning Mr. Gleaves?

A. Yes, sir.

Q. Now, I've seen a number of documents or a number of Lock and Track databases over the course of the time I've been handling cases in Philadelphia. I know Lock and Track has many different things that it records about a prisoner.

Is there any specific portion of Mr.

Page 14

Gleaves' Lock and Track data that you looked at?

A. Nothing specific. It's the work that I did through that -- throughout the night.

Q. Okay. One of the things that has been reviewed in previous depositions is something called the -- which I referred to as the Housing Log. Is that something that you've looked at, sir?

A. Yes.

Q. Were there any other documents for Mr. Gleaves that you reviewed?

A. No.

Q. Did you watch any of the -- strike -- I'm sorry, let me ask -- let me ask that question a different way.

We have been provided by your Counsel with video footage from the unit where Mr. Gleaves was housed. Have you viewed any of that video footage?

A. Yes, sir.

Q. Okay. Which portions of the video footage did you review?

A. While I was doing a tour. Yeah, while I was doing a tour.

Q. Okay. How many portions of the video -- and I'm sorry, that's a bad question. I know that throughout the course of your shift -- and we'll get

Page 15

into these details later -- but throughout the course of your shift there may have been maybe many occasions when you toured the location -- or toured that unit. How many different tours did you watch on the video?

A. It was one particular one.

Q. Do you remember what time was shown on the video screen from that tour that you watched?

A. It was my last tour of the shift, if I can remember. Yeah, it was my last tour of the shift.

Q. Okay. Now, my understanding is that that happened sometime shortly before 7 o'clock a.m. on the morning of September 21st of 2018. Is that correct?

A. Yes, sir.

Q. Okay. Were there any other tours that you reviewed in the video footage?

A. No, I haven't.

Q. So in terms of materials that you've reviewed, you told me that there was some information from Lock and Track, the video footage. What else did you look at to prepare for the deposition?

A. I think that's it.

Q. Let me give you other examples of things that have been shared by the attorneys in this case. One example is, there's something called a Complaint. That's a legal document that my client

Page 16

prepared and was filed in court to start this case. Did you review that?

A. No.

Q. Did you review any other information about Mr. Gleaves, the person who was deceased in this case?

A. No.

Q. Prior to -- or before today there was a deposition taken of Officer Charlene Wilson. First, do you know Officer Wilson?

A. No, I don't know her.

Q. Okay. Did you happen to review a transcript -- which I'm holding here, this is something called a transcript (indicating) -- a written record of what happened in that deposition? Did you happen to read that?

A. No.

Q. Yesterday we took the deposition testimony of Officer Christopher Jones. Do you know Christopher Jones?

A. No.

Q. Okay. So maybe the answer to my next question is obvious then. Can I assume that you did not speak with Christopher Jones about what happened in his deposition yesterday?

**4 (Pages 13 to 16)**

Gerald Slory

Page 17

A.  No.

Q.  Do you, sir, have any personal notes, any diaries that reference this case at all?

A.  No, I have not.

Q.  Do you ever post on social media?

A.  No, I'm not on social media.

Q.  So you don't use anything like Facebook, Instagram, Twitter, nothing like that?

A.  No.

Q.  Okay.  All right.  Sir, let me just ask you before I ask -- I ask you some background questions about yourself, do you remember any encounters with Jonathan Gleaves from the night of September 20th to 21st of 2018?

A.  Yes, sir.

Q.  It's -- am I correct in saying that you were working the night shift that night from 11:00 p.m. to 7:00 a.m.?

A.  Yes, sir.

Q.  And you left the block before Mr. Gleaves was found unresponsive.  Is that correct?

A.  Yes, sir.

Q.  Had you -- when did you first find out about the fact that Mr. Gleaves was found unresponsive in his cell?

Page 18

A.  When I came back to work for my -- my 3:00-11:00 shift.

(Court Reporter clarification.)

When I came back to work for my 3:00-11:00 shift.

Q.  So your 3:00-11:00 shift?

A.  Yeah, I'm working 3:00-11:00.

Q.  Was 3:00 to 11:00 your typical shift, sir?

A.  Yes, sir, 3:00 p.m. till 11:00 p.m.

Q.  All right.  And you were working -- the shift that we were just talking about concerning Mr. Gleaves, was that an overtime shift for you?

A.  I was doing overtime that night.

Q.  So then you would have come back to work that same day, the September -- that September -- I'm sorry -- on September 21st at 3:00 p.m.  Is that correct?

A.  At 3:00 p.m.

Q.  What did you hear when you got back to work at 3:00 p.m. on the 21st about Mr. Gleaves?

A.  A Sergeant -- a Sergeant told me that I gotta go to the Shift Commander's office.  And I went to the Shift Commander's office, and he asked me -- he told me what happened, and he told me I gotta make a memo for

Page 19

what happened, and I made a memo.

I was saddened for what happened.  I still didn't have a chance to give my condolences to the family, so I want to take this opportunity to do it right away, to give my condolences to the family, but I was really saddened what happened.

Q.  All right.  I thank you for saying that, Mr. Slory.  I appreciate that.  Let me -- on behalf of the family.

Let me ask you a few questions about what was discussed with the Shift Commander.  Who was the Shift Commander?

A.  It's a Captain.  I forgot his name.

Q.  Okay.  Let me note, sir -- I did not tell you at the beginning -- if you don't remember specifically names, dates, it's fine for you to tell me that.  This is not a quiz where we're asking you to try to get the right answer.  I just want to ask what you remember.  Okay?

A.  Right.

Q.  You remember that it was a Captain you spoke to?

A.  Captain Harris.

Q.  Okay.  Is that Melvin Harris?

A.  Captain Harris.  I don't know his first

Page 20

name.

Q.  All right.  When -- so Captain Harris asked you to write a memo.  He obviously would have given you some information which -- which kind of told you why you needed to write a memo.

What information did he give you?  And I'm not asking you what he -- the exact words that he used.  Just tell me, in summary, what he explained to you.

A.  He asked me -- he told me that there was somebody who was transported to the -- had an emergency, and he was transported to the hospital.  And I gotta write a memo for what I did that night during the night shift, what happened throughout the night shift.  And I did the memo, what happened throughout the night shift.

Q.  Have -- by the way, sir, that's -- I asked you a while ago about documents you looked at prior to today's deposition.  Did you see that memo in preparing for this deposition?

A.  No, I haven't seen that memo anymore.  It is in my, my, my storage, but I haven't -- for some reason I didn't look at it 'cause I -- I got it in my head, I guess.

MR. FEINBERG:  Okay.  Well, let me note, Anne, it's entirely possible that I missed

5 (Pages 17 to 20)

Gerald Slory

Page 21

something, but I don't remember seeing a contemporaneous memo from Officer Slory.

MS. TAYLOR: I will check the production. I think I was --

(Court Reporter clarification.)

I'll double check the production and see if I can find it.

MR. FEINBERG: Okay. Yeah, and that's -- when we get to a break let's -- I'll go back and look at the production, too.

And, Gila, I'll ask if you can just please remind me once we get to a break and we'll take a look for that.

BY MR. FEINBERG:

Q. Okay, but back to my questioning. Officer Slory, you have a specific memory of completing a memorandum that day, meaning on the 3:00 to 11:00 shift on September 21st; correct?

A. Yes, sir.

Q. Who did you hand the memo to after you finished it?

A. When I wrote the -- I can't understand you. What is the question again?

Q. Sure. Once -- first of all -- and I'll withdraw that question and ask you a different one.

Page 22

When you prepared a memo, did you handwrite it or did you type it?

A. I typed it.

Q. Did you print out a hard copy?

A. I print it, yeah. I print it, then I give it to the Captain 'cause I had to give it to him.

Q. And that was Captain Harris you gave it to. Is that correct?

A. Yes, sir.

Q. Did you ever -- now, you mentioned that you may have it in storage. It sounds like you kept a copy for yourself. Is that right?

A. I probably do have a copy for myself.

Q. Okay. But you don't recall seeing it anytime recently. Is that correct?

A. No, I haven't. I haven't seen it 'cause I'm doing a lot of -- I'm working.

Q. All right. Tell me, sir, what did you write in the memorandum, as far as you remember?

A. I wrote, to the best of my ability, how my job performance were that day, that particular day.

Q. Okay.

A. I had a busy night. My computer was running slow. I did tours to the best of my ability.

And when Mr. Gleaves -- that group came

Page 23

in, I asked them how they feel. They told me they feel good.

To what I observed from them, I saw that they -- they were a little tired, and they told me, too, that -- I asked them, What's up, you guys all right? They say, Yeah, we just a little tired. I say, Okay, I'm gonna make you guys comfortable. I'm gonna make a place available for y'all, and I give them somewhere to go and to rest.

Q. All right. You used the word they a couple times, sir, in referring to Mr. Gleaves. I'm aware that a number of different men were admitted to the unit that night. When you say they, are you indicating that you were speaking to a group of people all at the same time?

A. Yes.

Q. At any point in that --

A. To five people.

(Court Reporter clarification.)

To five people, five inmates, (indicating).

Q. In that time period did you have any one-on-one conversation with Mr. Gleaves?

A. No.

Q. So anything that you just described

Page 24

about the things that you said was said to the group of five men. Is that correct?

A. To the group of five men.

Q. All right. Do you remember Mr. Gleaves saying anything to you?

A. No.

Q. When Mr. Gleaves -- you said that -- and the transcript will speak for itself, but my recollection from just a moment ago is that you said that they said, We're tired. Was -- are you telling me that that's generally what the guys said to you, that they were tired?

A. Yeah.

Q. Do you remember --

A. They all said, All we want, man, is -- is to go -- you know, to lay down, you know. And I got them the place to be comfortable. I made him comfortable with a nice place for them to rest, what the process is, giving them soap. I did that for them.

Q. When you say make them comfortable, were you -- does that mean putting them into a cell?

A. I housed them in a cell.

Q. Okay. So I just want to make sure -- and look, sir, I've never worked in the Philadelphia Department of Prisons, so when you say I made them

6 (Pages 21 to 24)

Gerald Slory

Page 25

comfortable, what you're really saying is that you gave them a cell assignment in the unit where you were working. Is that correct?

A. Yes, sir.

Q. All right. So that's the first encounter that you recall with Mr. Gleaves when he came onto the unit.

And from the timing -- well, first of all, is that correct, that that's the first encounter you recall?

A. Yes.

Q. Okay. Now, from the records I've seen, it sounds like that happened probably sometime around 1:00 o'clock in the morning. Does that sound right to you?

A. Yes, sir.

Q. Do you remember any other encounters with Mr. Gleaves from that shift?

A. No.

Q. Okay. You mentioned that you did tours to the best of your ability. What did you mean by that?

A. I did tour at the circumstances from the job 'cause I had a busy day. I was most of the time in the day room area with other people that were doing their job, too. So that's how my day went. That's how

Page 26

my night, actually, went.

Q. All right. We'll come back to tours in a little while. You said that your computer was slow. What did you mean by that?

A. It was running really slow. I -- I couldn't do my job the way I -- I had to that night.

Q. How is it that you remember that your computer was slow? Why does that stand out in your -- in your memory?

A. Because when I gotta house people I didn't have, you know, the time to house them right away that's done. I had to wait --

(Court Reporter clarification.)

Yeah, at the same time when they came on the unit, I didn't have time to house them right away. The process was really slow that night. The computer was running slow.

Q. Do you remember asking anyone for assistance?

A. No.

Q. Were you working the block by yourself?

A. Yes, sir.

Q. Did any supervising officers come on to the block at any point?

A. No.

Page 27

Q. At any point did you call a supervisor and ask for assistance because of the computer trouble that you were having?

A. No.

Q. At any time did you call for assistance for a supervisor to come assist you in doing tours?

A. No.

Q. By the way, when I say calling a -- call a supervisor, I want to be clear about what I mean. I mean to ask to have another officer come to the block to assist you, to ask the supervisor to assist you, anything like that. Did that -- any of that happen?

A. I asked for an officer to come assist me.

Q. So you asked for -- and which officer did you ask?

A. I don't know the officer's name.

Q. Where was that officer stationed?

A. He's a officer just like -- like I do.

Q. No, I understand that.

A. He was roving.

Q. Okay. Now, on that shift -- in fact, Officer Christopher Jones, whose testimony we took yesterday, described himself as the B-1 rover. Does that title sound familiar to you?

Page 28

A. Yeah.

Q. Is that the -- is the person who was filling that role the person who you asked to come assist you?

A. Yeah, if it's that -- the person -- if he's the one who came and assisted me that night, yeah.

Q. So did someone actually come and assist you?

A. Yeah. That's what I just said.

Q. I misheard you then. At what time of the night did that person come assist you?

A. It was in the early morning, approximately 4:30, I should say.

Q. What kind of assistance did that person offer?

A. Because an inmate was giving me a problem on that pod, so I called for assistance to assist me.

Q. Oh. And did that person remove the -- did that person -- the inmate from the block?

A. No. He just assisted me to let him abide by what I was asking him because he was on the list to get transferred to another jail.

Q. Okay, I want to make sure -- so the officer who you called in to assist you, was it a male

7 (Pages 25 to 28)

Gerald Slory

Page 29

or female officer?

A. It was a male.

Q. All right. And the person who was giving you a problem was gonna be transferred to another jail?

A. Yes, sir.

Q. And when the -- when you called for assistance, was that assistance to escort this man off the block so he could be transferred?

A. Yeah. When the time came on to -- to have him going out, we got him out.

Q. I know, sir -- and we may talk about this -- I'm sorry, strike that. We'll -- I'll -- I'll come back to that later.

Okay. Did you ever ask for any assistance in conducting a tour of the housing area?

A. No, sir.

Q. All right. Let's go back to the conversation that you had with Captain Harris when you came back to the prison at 3:00 p.m. on the 21st.

Do you remember anything else that he told you about Mr. Gleaves?

A. No. He didn't tell me anything about Mr. Gleaves.

Q. Did he tell you that Mr. Gleaves had

Page 30

died?

A. Yeah. That was the purpose of when he called me.

Q. Okay. Did he tell you anything about the circumstances of his death, how he died --

A. No, sir.

Q. -- where he died? Let me finish the question, sir. Were there -- did he give you any details about the hospitalization, what happened in the hospital, the cause of death, anything like that?

A. No, sir.

Q. After you prepared that memorandum on the afternoon or evening of the 21st, did anyone from the prison come ask you questions about what happened with Mr. Gleaves?

A. I think I spoke to my Union representation.

Q. When was that?

A. That was a long time ago. It's three years --

Q. No, I --

A. -- so probably after that incident took place.

Q. And let me do this, sir. I'm going to introduce an exhibit, which means I'm going to put it on

Page 31

your screen. This will be marked as Exhibit P-11.

Lori, this will be newly marked. If you can stamp it after we finish the deposition, I'll e-mail it to you.

Sir, in just a moment you'll have this in front of you.

(Exhibit P-11 shown.)

Can you see in front of you a typed document that has your name at the top left corner?

A. (Witness reviewed document.)

Oh, yes.

Q. All right. Have you seen this document before, sir?

A. Yeah, I've seen this document.

Q. When did you last look at this document?

A. (Witness reviewed document.)

Q. And let's --

A. Oh, when I came to see Mr. -- Ms. Taylor the last time.

Q. Got it, okay. So let's just confirm. It's a two-page document, and is that your signature down on the bottom of the first page?

A. Yes, sir.

Q. And on the bottom of the second page,

Page 32

is that your signature?

A. Yes, sir.

Q. All right. The date of this document is January 29th of 2019. Do you see that?

A. Yes, sir.

Q. And this appears to be an interview that you conducted with Sergeant Marshall from the OPC Unit. Is that correct?

A. Yes, sir.

Q. All right. I'm not gonna ask you about the specifics of this now, so I'll take it down.

My question for you is, knowing that this interview with Sergeant Marshall took place in January of 2019 and the incident with Mr. Gleaves took place in September, 2018, that's about a four-month period between the incident and this statement. Would you agree?

A. Yes, sir.

Q. All right. In that four-month period can you tell me when you spoke to your Union representative? Was it closer to when Mr. Gleaves died, or was it closer to when you had that interview with Sergeant Marshall?

A. I think closer to when Mr. -- Mr. Gleaves passed away.

Gerald Slory

Page 33

Q.  All right.  Do you remember anything about your conversation with the Union representative?

A.  I just told him what happened, and he told me to just follow through with Captain -- what Captain Harris told me, to prepare a memo.

Q.  Oh, okay.  Well, it's -- I think you told me a little earlier today that you prepared that memo the same day.  Is that correct?

A.  That's right.

Q.  So it sounds like -- and you tell me if I'm wrong -- it sounds like then that you would have spoken to your Union representative that very same day.  Is that correct?

A.  That's right.

Q.  All right.  So Captain Harris -- so let's get the order down.  Captain Harris says, I need you to prepare a memo.  You speak to your Union representative.  Union representative says to you, do what Captain Harris asks.  You prepare that memorandum and give it to Captain Harris.  Is that correct?

A.  That's right.

Q.  All right.  And that all happens the afternoon or evening of September 21st.  Is that correct?

A.  Yes, the day after.  Yep.

Page 34

Q.  After September 21st and before January 29th when you did the interview with Sergeant Marshall, some four months later, did anybody else come asking you questions, ask you to provide information, sit you down for an interview, anything like that?

A.  No.  No, sir.

Q.  Did you speak to anyone in that time period -- and I'm sorry, let me withdraw that.

And my previous question suggested kind of like a formal interview.  I'm want to ask a different question now.

Did you talk to anybody informally, conversation, chitchat with colleagues, about what happened with Mr. Gleaves?

A.  No.

Q.  All right.  Is -- am I understanding correctly then that from the afternoon of September 21st of 2018, when you prepared that memorandum for Captain Harris, all the way through January 29th of 2019, you never spoke to a single person about Mr. Gleaves.  Is that accurate?

A.  No, I didn't spoke [sic] to anybody.

Q.  All right.  So what I said is accurate.  Is that correct?

A.  That's right.

Page 35

Q.  All right.  After January 29th of 2019 through when you got notice of this lawsuit, did you speak to anybody about Mr. Gleaves?

A.  No, sir.

Q.  Do you remember when you first learned about this lawsuit?

A.  When my supervisor called me, and he told me that I gotta come to court -- I gotta go to court.

Q.  And that would have been sometime in the past couple of months?

A.  Maybe, yes.

Q.  Okay.  All right.  Aside from the memorandum that you recall preparing -- which neither Anne nor I remember seeing, but we'll look into -- and the document that I just showed you from the interview with Sergeant Marshall, do you remember preparing any other documents concerning Mr. Gleaves?

A.  No, I haven't.

Q.  Did anyone at any point, Mr. Slory, ever tell you that you did anything wrong in connection with Mr. Gleaves' death?

A.  No, sir.

Q.  Did anyone ever tell you that your actions that night were in violation of a prison policy

Page 36

or rule?

A.  No, sir.

Q.  Did you ever think to yourself, between September 21st of 2018 and today, that you could have done something different to help Mr. Gleaves?

A.  If I had the opportunity I would do something different for Mr. Gleaves, to keep him alive like anybody else I save life throughout my career.

Q.  Well, my question is -- and I appreciate that answer, but my question is slightly different.

At any point between September of 2018 and today have you ever said to yourself, oh, you know what, I missed an opportunity or there was something different I could have done and that might have protected Mr. Gleaves?

A.  I don't know.

Q.  Okay.  Well, my question -- I tried my best to ask a yes or no question.  Which was have you ever thought.  It sounds like you're saying that, no, you have never thought about the fact -- or you've never real- -- or never come to the belief that there was something different you could have done.  Is that correct?

A.  Yes.

9 (Pages 33 to 36)

Gerald Slory

Page 37

Q. I'm going to ask you some background questions now, sir. How long have you been working for the Philadelphia Department of Prisons?

A. Approximately five years.

Q. So that means you started in 2016. Is that correct?

A. Yes, sir.

Q. How old are you, sir, by the way?

A. I'm 55 years.

Q. You mentioned immigration proceeding. When did you first come to the United States?

A. In 1993.

Q. What's your highest level of education?

A. I have Associate degree in criminal justice, and I'm going to school for my Bachelor degree in criminal justice at this time.

Q. When did you complete the Associates degree?

A. I think in 2010.

Q. What institution did you obtain -- from what institution did you obtain the Associates degree?

A. Northampton Community College.

Q. Before you started that Associates degree, when is the last time that you had participated in any formal education?

Page 38

A. It's from back home.

Q. Okay. Where is back home, by the way?

A. In South America.

Q. I'm sorry, say that again.

A. South America.

Q. Okay. So at some point before you immigrated to the United States you -- that was the last point that you were in any formal education. Is that correct?

A. Yes, sir.

Q. Did you -- do you have a -- did you graduate from a high school?

A. Yes, sir.

Q. What kind of work did you do before you became an employee of the Philadelphia Department of Prisons?

A. I was a -- I was working at a car wash when I first got in United States, and I worked my way up. From being a worker, I became a manager at a car wash.

And I went and I got my Associate degree in criminal justice, and I start working in a casino as a correct- -- as a security guard.

Q. When did you start that casino job?

A. In 2012, '13.

Page 39

Q. How long did you work -- and which casino did you work for, by the way?

A. Pocono Down.

Q. Pocono Down?

A. Mohegan and Suns, yeah.

Q. Mohegan --

(Court Reporter clarification.)

A. Mohegan and Suns --

Q. So -- okay.

A. -- in Wilkes-Barre.

Q. In Wilkes-Barre, Pennsylvania?

A. Yes, sir.

Q. How long did you work there?

A. For approximately a year. I just wanted something on my resume.

Q. And why did you leave that job?

A. I just wanted something on my resume to go further in my career.

Q. Yeah -- no, I heard you say that, but what -- what was your next job after Mohegan Sun?

A. I was a security guard.

Q. No, no. I think maybe -- either I'm misspeaking or you may have misheard me, sir. What was your next job after Mohegan Sun?

A. I became a Correction Officer.

Page 40

Q. Okay. And that was -- was that at some other facility or at the Philadelphia Department of Prisons?

A. The Philadelphia Department of Prison.

Q. Okay. Now, the Philadelphia Department of Prisons, you told me you started in 2016. Is that correct?

A. Yes, sir.

Q. How much time passed between when you left Mohegan Sun and when you started at the prison?

A. Like maybe a year, a year and a half.

Q. Were you working during that time?

A. No, I wasn't.

Q. Okay. How were you supporting yourself, sir?

A. Work.

Q. What kind of work were you doing?

A. I mean, if -- how I'm supporting myself. I got a wife. I'm a married man.

Q. I understand that. What I'm trying to figure out, sir, is your work history. It's relevant to the question, so I'm going to ask you about your work in the Philadelphia Department of Prisons.

A. Yes, sir.

Q. So I'm trying to figure out where you

Gerald Slory

Page 41

worked.  You told me that you left as a casino security guard in 2013, and then you started in the prison in 2016.  So I just wanna understand, what kind of work were you doing in that time period after you left the casino and before you started with the prison?

A.  I wasn't working.  I think I was injured, my leg.  I had something going on with my health around that time, which took me off from working, and it gave the right time to start with my academy.  Something like that was going on.

Q.  Okay.

A.  I can't remember it.  Yeah.

Q.  I neglected to ask you about some of the details concerning your job at the car wash.

A.  Yes, sir.

Q.  Were you at the same car wash the entire time, or did you go from different places?

A.  No, I was at the same place.

Q.  What was the name of the car wash?

A.  I can't remember.

Q.  Where was it located?

A.  (No response.)

Q.  Do you have an answer to that question, sir, where it was located?

A.  No, I don't -- where is it located?

Page 42

Q.  Yeah.

A.  In Chestnut Street in Union.

Q.  Union, New Jersey?

A.  Union, New Jersey, Chestnut Street.

Q.  Okay.  And you were there from the early 1990's all the way through 2010?

A.  2007, 2007.

Q.  Okay.  And you worked your way up from a worker to the position of a manager.  Is that correct?

A.  Yes, sir.

Q.  All right.  Why did you leave that job once you -- yeah -- why did you leave the car wash?

A.  Yeah, I had some health problems after that, so I had to take care of my health.  I was off the workforce for like years, and I came back, made my way up -- back, and I came back in the workforce.

Q.  Okay.

A.  I entered the workforce when I went to school.

Q.  That was when you started your Associates degree at the --

A.  Right, yeah.

(Court Reporter clarification.)

Q.  -- Northampton.  I may have interrupted you, sir.  Did you complete your answer?

Page 43

A.  I completed my answer.

Q.  Did -- so if I understand you correctly, you started in your Associates degree position once you got over the health problems that you just mentioned.  Is that correct?

A.  Yes, sir.

Q.  All right.  Sir, have you ever been fired from a job, terminated, asked to leave, anything like that in any of your previous employment?

A.  No, sir.

Q.  Why did you decide to apply to the Philadelphia Department of Prisons?

A.  Because it's my background.  I was a military policeman overseas back home.  So from my background, I thought it was a good opportunity for me to apply with the Philadelphia of Prison [sic].

Q.  So before you immigrated to the United States, you were in the military.  Is that right?

A.  Yes.  I was a military policeman.

Q.  What branch of the -- well, first -- I'm sorry -- what country did you reside in, sir?

A.  I'm from Suriname.

Q.  Okay.  And so you were in the military in Suriname.  Is that correct?

A.  Yes, sir.

Page 44

Q.  And you worked as a military policeman?

A.  I was a military policeman.

Q.  And you decided -- based on that previous experience, you decided you wanted to get back into law enforcement.  Is that right?

A.  Yes, sir.

Q.  All right.  You entered the academy in -- was it 2015 or 2016?

A.  2016, sir.

Q.  All right.  And have you been with the Philadelphia Department of Prisons consistently from that time all the way through today?

A.  Yes, sir.

Q.  In your time at the Philadelphia Department of Prisons, have you ever been disciplined for any misconduct on the job?

A.  I have -- I haven't been disciplined.

Q.  Now, I know the Philadelphia Department of Prisons has something called an Internal Affairs process where they investigate allegations of misconduct, wrongdoing and so on.

To your knowledge, have you ever been the subject of an Internal Affairs investigation?

A.  Yes, once.

Q.  When was that?

Gerald Slory

Page 45

A. Maybe 2018.

Q. What was the allegation, or what was the subject of the investigation?

A. Maybe an inmate -- an inmate said that I cursed at him.

(Court Reporter clarification.)

That I cursed him out.

Q. Sir, I see --

A. Something like that.

Q. All right. Did you receive any discipline as a result of that investigation?

A. No, I haven't received any discipline.

Q. Are there any other instances that you can remember where you've been the subject of an investigation about misconduct?

A. Yes, sir.

Q. What are the others?

A. During the same night, the night of Mr. Gleaves, that particular inmate that I was asking help for...

Q. Yeah. What happened?

A. He was rude against me, he disrespected me, and I was unprofessional.

Q. Okay. You gave him the middle finger; right?

Page 46

A. Yes, sir.

Q. Were you disciplined as a result of your -- of having done that?

A. No, I wasn't disciplined.

Q. Were there -- did anyone talk to you about that and tell you that --

A. Yes.

Q. -- you had to -- okay.

(Discussion between Attorney Taylor and the witness.)

BY MR. FEINBERG:

Q. Describe that. What were you told as a result of -- in that -- in any conversation you had about that?

A. I was told -- I was given like a probation, a probation time. For one year you don't get any -- you don't get in trouble for approximately one year.

Q. Okay. So you were not docked any pay or you didn't lose any pay, you weren't suspended, but you were told that you needed to avoid any discipline for a period of a year. Is that correct?

A. Yes, sir.

Q. All right. Were there -- and that's a separate incident from the other time where a person

Page 47

said that you -- that you cursed him out. Is that correct?

A. Yes, sir.

Q. Now, the incident involving the -- giving the middle finger where you were put on probation, as you've described, that took place in September of 2018. Is that -- it's the same night as Mr. Gleaves was on your unit. Is that correct?

A. Yes, sir.

Q. The other incident that you mentioned where you were accused of cursing someone out, did that take place before the incident with Mr. Gleaves or after?

A. Before.

Q. And you don't recall receiving any discipline or any probationary period in that incident. Is that correct?

A. No, sir.

Q. Other than those two that we've been talking about, what other instances are there, that you can remember, where you've been investigated for any allegation of misconduct?

A. Nothing.

Q. Aside from this case, sir, have you ever been sued in any other lawsuit?

Page 48

A. No, sir.

Q. Have you ever brought a lawsuit yourself?

A. No, sir.

Q. All right. I wanna ask you about your -- more specifically about your employment at the Philadelphia Department of Prisons. You remained under the title Correctional Officer. Is that correct?

A. Yes, sir.

Q. When you started you went through the academy. Is that correct?

A. Yes, sir.

Q. How long is your period -- is your time in the academy?

A. Approximately six months.

Q. So that -- and then from that point on you start working as a Correctional Officer in one of the facilities. Is that correct?

A. Yes, sir.

Q. Which facilities have you worked in and which shifts have you worked? Can you walk me through from when you started through today?

A. I first started at Curran-Fromhold Correctional Facility, CFCF, and I'm still working there.

12 (Pages 45 to 48)

Gerald Slory

Page 49

Q.   Have you always been on the 3:00 to 11:00 shift?

A.   I have always been on the 3:00-11:00 shift.

Q.   So your entire time you've been at CFCF 3:00 to 11:00; correct?

A.   Yes, sir.

Q.   Now, my understanding --

MR. GREGORY: May I interrupt? May I interrupt? Can we go off the record for a second?

MR. FEINBERG: Sure.

(Discussion was held off the record.)

(Attorney Gregory left the deposition.)

MR. FEINBERG: Lori, back on the record. Why don't we note while we're still on the record that Mr. Gregory had another obligation to attend to, so he's left the deposition, but he gave us his consent to proceed.

BY MR. FEINBERG:

Q.   Mr. Slory, let's go back on -- back to the topic of your work in the Philadelphia Department of Prisons. What are the various assignments that you have worked at CFCF?

A.   The 3:00-11:00 shift to house inmates.

Q.   Let me -- let me explain my question a

Page 50

little bit better. At this point in the case I've taken testimony from Officer Wilson, who described herself as a housing officer. She's someone who works on a unit, conducts tours and so on.

Officer Christopher Jones, who we deposed yesterday, described himself as the rover, which means he goes around to the different housing units and escorts prisoners back and forth between the units.

Using those two examples of different assignments, what has your assignment been?

A.   I'm a pod officer.

Q.   A pod -- all right, pod officer, which is another way of saying housing officer. Is that correct?

A.   Yes, sir.

Q.   Has there been one specific pod that you have tended to work on as opposed to others?

A.   No.

Q.   The night of this incident you were working on B-1 Pod 3. Was that your usual pod?

A.   No, I don't work at B-1 -- in B Building usually.

Q.   All right. Which building do you usually work in?

Page 51

A.   D Building and C Building.

Q.   I know that B Building is the Quarantine Unit. Is that correct?

A.   Yes, sir.

Q.   Before September 18th -- I'm sorry -- before September 21st of 2018, had you worked in a -- on a pod in the B Building before -- at any other time?

A.   Yes, sir.

Q.   All right. So you were familiar with the responsibilities of working as a pod officer in the Quarantine Unit. Is that correct?

A.   Yes, sir.

Q.   All right. And are there differences between working in the B Building versus the C or D Buildings?

A.   As far as inmates, there aren't any differences. As far as -- as far as the medical problems, that is different.

Q.   How would you describe it? And explain that. What do you mean, the differences in terms of medical issues?

A.   When you enter Quarantine, you just came off from the street, and you go in quarantine before you get in, in the population.

Q.   And do you see different medical issues

Page 52

in the population in the Quarantine Unit?

A.   Yes.

Q.   So by way -- just one example, for guys who were just coming off the street, they may have substance abuse issues and might be withdrawing. Is that correct?

A.   Withdrawing, yes, sir.

Q.   And I take it -- so that's something -- that's an added responsibility for you in order to be on the lookout for issues that may arise from people who are withdrawing from substances. Is that correct?

A.   Yes, sir.

Q.   And by September of 2018 you were fully familiar with your responsibilities to assess those issues. Is that correct?

A.   Can you repeat the question, please?

Q.   Sure. You were -- by September of 2018 you were aware of the fact that there might be more -- more urgent medical issues in the Quarantine Unit than in other units. Is that correct?

MS. TAYLOR: Objection. You can answer.

BY MR. FEINBERG:

Q.   You can -- sir, when your attorney objects to a question, she's just noting on the record

13 (Pages 49 to 52)

Gerald Slory

Page 53

that will be made of this proceeding that there was something that she thought was inappropriate about my question, but you can still answer my question. So can you answer?

A. Yes, sir.

MR. FEINBERG: I don't remember what the question was. Lori, would you read it back, please?

COURT REPORTER: Yes.

(Whereupon, the Reporter read back the referred-to question.)

BY MR. FEINBERG:

Q. Let me ask a better question. You've reminded me of the line of thinking that I was on and now I can rephrase the question.

All right, so -- all right, Mr. Slory, by September of 2018 you were familiar with the idea that there might be more urgent medical issues on the Quarantine Unit. Is that correct?

A. Yes, sir.

Q. And you were aware, when working on the Quarantine Unit, that you had a responsibility to be alert to those medical issues. Is that correct?

A. Yes, sir.

Q. All right. Can you -- I wanna ask you

Page 54

about what a typical day on the -- in the B Building would look like. And it sounds like by September of 2018 you had had enough experience to work in the B Building. Is that correct?

A. Yes, sir.

Q. All right. Walk me through then. From the moment that you start -- I'm sorry. Let me withdraw that for a second.

When you are on the 11:00 --

MS. TAYLOR: I'm sorry to interrupt. It looks like we're getting the other computer online. Would you mind doing the break now so we can reconstitute, or do you wanna dial up this question and then keep going?

MR. FEINBERG: That's -- let me ask this one question and then -- and then let's take a break.

MS. TAYLOR: Okay.

BY MR. FEINBERG:

Q. So, Mr. Slory, is there any difference between your responsibilities on the 11:00 p.m. to 7:00 a.m. shift versus the 3:00 to 11:00 shift?

A. No. It's the same responsibilities.

Q. So, in other words, your standard workday is 3:00 to 11:00. When you work 11:00 to 7:00,

Page 55

it's not like you have to do something different; you're just doing the same thing at a different time of day. Is that correct?

A. Yes, sir.

MR. FEINBERG: Okay. All right. With that why don't we go off the record. Let's take a break.

(Short recess was taken.)

BY MR. FEINBERG:

Q. Mr. Slory, we're back on the record. We've now rearranged the Zoom so you and Ms. Taylor are in separate rooms. First things first, can you see and hear me?

A. Yes, sir.

MR. FEINBERG: Okay, very good. Before I begin questioning you again, sir, let me just note on the record that previously the Officer discussed or mentioned to us a memorandum that he had written on September 21st of 2018.

I've reviewed my materials that I've received from the City. I have not been able to locate it. I know Ms. Taylor has done the same thing and has not, on a quick search, been able to locate it, so we will follow up with a discovery request seeking a copy of that contemporaneous or close to contemporaneous

Page 56

memorandum prepared by Officer Slory. Anne, anything else to add to that?

MS. TAYLOR: No. Thank you.

BY MR. FEINBERG:

Q. Mr. Slory, let's continue with our discussion of the case concerning Mr. Gleaves. We took a break for about 10 to 12 minutes there. During the course of that break did you realize that any of your previous testimony was incorrect or incomplete?

A. No, sir.

Q. All right. We left off with -- I had started to ask you a question about whether -- or if you could describe for me a typical day in the life of a pod officer in the B Building, so let's pick that up again.

Could you just walk me through, when you arrive in the facility, what's the first thing you do and take us -- take us forward from there.

A. The first thing you do when you go on a pod is you sign in. You take any info- -- valuable information from the previous officer, what the officer have to say to you.

So then you sign in, you do your initial tour. You log it in, and you're ready to do your next tour.

Q. Okay. Am I understanding correctly,

14 (Pages 53 to 56)

Gerald Slory

Page 57

sir, that the primary function of a housing officer is to tour the unit?

A. That's right, yes.

Q. All right. Are there any other responsibilities that you have besides touring the unit?

A. To maintain order.

Q. All right. Do you typically work with a partner as a housing officer when you're in the B Building?

A. No. You work alone.

Q. Is that on the 3:00 to 11:00 shift and the 11:00 to 7:00 shift, you typically are alone?

A. Yes, sir.

Q. Now, I'm aware, from just taking testimony from Officer Wilson, that Officer Wilson and Officer Terrelle Jones were partnered on the 7:00 to 3:00 shift. Are you aware of what the staffing is on the 7:00 to 3:00 shift in the B Building?

A. They used to be -- they used to have two persons on a pod working, but --

Q. Is that -- has that changed recently?

A. It has changed.

MR. FEINBERG: Okay. And, Anne, for your benefit, I'm not going to get into staffing issues at the --

Page 58

MS. TAYLOR: Thank you.

MR. FEINBERG: -- at the Curran-Fromhold Correctional Facility.

BY MR. FEINBERG:

Q. My purpose in questioning Officer Slory on this -- and, Officer, let me explain that to you -- is to find out whether there was anything unusual about you working solo the night -- 11:00 p.m. to 7:00 a.m., and it sounds like there wasn't. Is that correct?

A. No, it wasn't unusual.

Q. All right. Sir, I want to ask you about some of the basic rules and principles that are at work in your job. Okay?

Would you agree that your most important responsibility as a Correctional Officer is to ensure the health, safety and well-being of prisoners in your custody?

A. Yes, sir.

Q. And that's your No. 1 priority. Is that correct?

A. It's one of the priorities.

Q. All right. Is there any priority that you would place higher than that one?

A. Maintain order, security and safety for the officer and the inmates.

Page 59

Q. And that's -- maintaining safety and security is all about preserving the well-being of prisoners in your custody. Is that correct?

A. Yes, sir.

Q. All right. And I take it, the way you've described it, you feel pretty strongly about that responsibility. Is that correct?

A. Yes, sir.

(Court Reporter clarification.)

Q. My question was, I take it that you feel pretty strongly about that responsibility, and I believe the answer was yes, sir. Is that correct?

A. Yes, sir.

Q. And can I assume then, Officer, that when you go to work each day that's the -- at the top of your mind; you want to make sure that you preserve the health and safety of prisoners in your custody. Is that correct?

A. Yes, sir.

Q. Would you agree that you also, as part of that responsibility, have a responsibility to treat people in your custody with respect and dignity?

A. Yes, sir.

Q. Do you have a -- can I assume that, given your time in the -- working with a prison

Page 60

population that you often are dealing with people who have mental health disorders?

A. Yes, sir.

Q. And you're often dealing with people who have substance abuse issues?

A. Yes, sir.

Q. And are you familiar, based on your experience working with people who are dealing with such issues, that those issues may cause them to act out?

A. Yes, sir.

Q. All right. And I assume that you've been trained that when someone acts out your responsibility is to remain calm and treat that person with respect. Is that correct?

A. Yes, sir.

Q. And I take it you try to do that in every interaction you have. Is that correct?

A. Yes, sir.

Q. All right. Let's talk more specifically about tours. And just as a transition to what we've -- or from what we've just been talking about, would you agree that your responsibility to conduct tours is a significant -- or is the most important part of keeping prisoners healthy and safe?

MS. TAYLOR: Objection. You can

15 (Pages 57 to 60)

Gerald Slory

Page 61

answer.

THE WITNESS: Yes, sir.

BY MR. FEINBERG:

Q. All right. In other words -- and maybe I'm stating the obvious -- if your job is to keep prisoners healthy and safe and they're in their cells, you have to see whether they are, in fact, healthy and safe while you're working. Is that correct?

A. Yes, sir.

Q. And that's why you conduct the tour; correct?

A. Yes, sir.

Q. All right. Now, I'm gonna ask you some questions about how tours work. And -- well, first let me ask you this. Are the rules about when you are supposed to conduct a tour and how you are supposed to conduct the tour the same for every shift?

A. Yes, sir, the same.

Q. So when you work -- and this is similar to what I asked you before our break. When you conduct tours on the 3:00 to 11:00 shift, you do the same thing when you're working the 11:00 to 7:00 shift. Is that correct?

A. Yes, sir.

Q. So the fact that it's overnight doesn't

Page 62

change the way you do anything. Is that correct?

A. No.

Q. No, it doesn't change anything, which means that I'm correct; right?

A. Yes, sir.

Q. So, Mr. Slory, tell me, when you conduct a tour how do you do it? Describe it for me. What do you do?

A. Any officer is supposed to have a flashlight when you work as a Correction Officer. You do your tour by walking at each cell. You start at 1, 17, 16 or 32, whatever cell you want to start.

You're gonna follow the halls, spin your flashlight, check to see if there is any light, and you keep it moving.

If somebody is up where you can communicate with, you communicate with that person; how are you doing, how are you feeling, everything good? Yes. You keep it moving. Then you finish your tour and you document.

Q. Okay. How often are you supposed to conduct a tour?

A. Like half an hour, approximately, half an hour.

Q. You're saying approximately. I wanna

Page 63

-- I wanna try to be as specific as possible here. Other officers who've testified have told me that that's a hard and fast rule, that you have to conduct a tour at least every 30 minutes. Is that correct?

A. At least --

MS. TAYLOR: Objection.

THE WITNESS: -- 30 minutes.

(Court Reporter clarification.)

BY MR. FEINBERG:

Q. Sir, can you -- well, let me ask the question again, sir. Would you agree, Officer Slory -- and, yeah, let me take out the previous testimony. That -- that may have made things confusing.

Would you agree, Officer Slory, that you are required, as a Correctional Officer in the Philadelphia Department of Prisons, to conduct a tour of the unit at least once every 30 minutes?

A. Every 30 minutes.

Q. Okay. That rule, is that written down somewhere in a post order, a policy, or anything like that, to your knowledge?

A. It's probably a policy.

Q. Now, you're saying probably. I don't want you to guess, sir. I'm asking your knowledge. Do you recall -- well, let me ask it this way.

Page 64

Am I -- do I understand correctly that after you complete the training at the academy, your first position is always going to be as a housing officer?

A. Yes, sir.

Q. All right. So from the very beginning, when you worked at the -- when you were in the academy, were you instructed by training officers that you have to conduct a tour at least once every 30 minutes?

A. Yes, sir.

Q. So that's something that you've known literally from the time that you started working as a Correction Officer. Is that correct?

A. Yes, sir.

Q. All right. Are you allowed to deviate from that rule?

A. No.

Q. All right. So, in other words, that's -- it's not like you just do your best and tour as much as you possibly can; it's a hard and fast rule that you have to follow. Is that correct?

A. Yes. You gotta do it every 30 minutes.

Q. All right. And would you -- and I understand that you're not the person who writes the policies or sets the rules, but would you agree that at

16 (Pages 61 to 64)

Gerald Slory

Page 65

least someone in the prison has made a determination that, in order to protect the health and safety of prisoners, an officer has to do the tour every 30 minutes?

MS. TAYLOR: Objection.

THE WITNESS: Yes, sir.

BY MR. FEINBERG:

Q. One of the other things you said when you described the tour, sir, is -- you kind of described, as an example, that you have to have proof of life. Is that correct?

A. Yes, sir.

Q. What do you mean by that?

A. See if somebody is breathing, moving, (indicating).

Q. Okay. So can I assume that if someone is obviously awake, walking around or sitting up in their bed or reading, that that's obvious that that person is living and okay. Is that correct?

A. Yes, sir.

Q. But if the person is laying in bed and does not appear to be moving, how do you determine whether that person is, in fact, alive?

A. You check, see if he's breathing and you move.

Page 66

Q. So is it fair to say then that you need to spend enough time looking in the cell to determine that there is, in fact, the chest rising. Is that correct?

A. No, you don't have to spend a lot of time. You just see if the person is breathing, and you move;see if the person is in the cell, that the person is accounted for, then you move.

Q. Let me -- let me take away what I said about spend a lot of time and say it a different way. Would you agree that you need to spend enough time to see that the person is actually breathing?

A. Yes.

Q. So, in other words, you can't just run by, right, and if the person is there that's good enough. You need to actually make sure that you see a breath. Is that correct?

A. Yes, with your flashlight up you look (indicating).

MR. FEINBERG: Now, bear with me for one second, sir.

(Short pause.)

I apologize. There's some background noise here. Is that disturbing?

Page 67

(Discussion was held off the record.)

BY MR. FEINBERG:

Q. Now, Officer Slory, I'm reviewing the transcript of Officer Wilson's deposition, and I asked her some of these same questions about what you're required to do on a tour.

And one of the phrases that Officer Wilson used -- and for reference, I'm looking at Pages 31 to 34 of her deposition. She told me that if you can't tell whether there is a sign of life, you have to try to get the prisoner's attention, ask them to shake a leg or shake an arm to -- so you can be -- so you can confirm that they are, in fact, alive. Is that your practice as well?

A. No, I haven't practiced that that particular day.

(Court Reporter clarification.)

Day -- night. I mean the night that I worked.

Q. Well, no, I'm asking whether, sir, that is your typical practice. Do you -- do you make sure that you can see someone move an arm or a leg?

A. Yeah, especially when we do count. When we do head count, you want to see if the persons are there.

Page 68

Q. Well, I'm talking -- the purpose of the tours that you're conducting every half hour is to look for proof of life; right?

A. Yeah, for proof of life and to make sure that the person is accounted for.

Q. All right. I'm going to read you a question and answer from my deposition questioning of Officer Wilson, and I'll ask you to pay attention and see whether you do the same thing in the way you conduct yourself on a tour. Okay? I'm reading from Page 31, Line 16 through Line 25.

I asked Officer Wilson this question, sir: How do you do that, confirm that you have -- that a prisoner is alive and breathing? And that may sound like an obvious question but tell me, when you conduct a tour, what do you look for as you do it?

The answer that Officer Wilson gave was as follows: Okay. So like -- like, for instance, when we first come in for count -- like when we first come in from roll call so we can count we gotta shake a leg, move an arm, only because that's the intake and a lot of those guys are withdrawing, so you have to get some type of body motion to say that, okay, he's alive.

All right. Would you agree with what Officer Wilson described there?

17 (Pages 65 to 68)

Gerald Slory

Page 69

A. Yes, sir.

Q. All right. Now, Officer Wilson then went to -- proceeded to describe that every 20 to 30 minutes she would conduct a tour and do the same thing. Would you agree with that assessment, sir?

A. Yes, sir.

Q. All right. So you've gotta make sure every time you do your tour, once every 30 minutes, you've got proof of life. Is that correct?

A. Yes, sir.

Q. All right. You also mentioned, when you described what you're supposed to do on a tour, that you have to log it, you've got to record it. Is that correct?

A. Yes, sir.

Q. And is that in the -- using the Lock and Track system?

A. Yes, sir.

Q. All right. So you make a note that the tour was completed so everyone knows that it actually happened. Is that correct?

A. Yes, sir.

Q. Can I assume -- and this may be completely obvious -- but can I assume that you have to report truthfully that the tour happened?

Page 70

A. Yes, sir.

Q. In other words, if you did not conduct a tour you can't write on the log, I conducted the tour and everything's fine. Is that correct?

A. Yes, sir.

Q. That would be lying. Is that correct?

A. Yes, sir.

Q. And, also, if you're lying about whether you conducted a tour you will not -- well, strike that. That's something that would be completely impermissible. Is that correct?

A. Yes, sir.

Q. And you were aware of that back in 2018. Is that right?

A. Yes, sir.

Q. Now, these -- we talked a little bit before about what goes on, on the Quarantine Unit in the B Building. And I think you confirmed for me your understanding that people in that area may have more emergent medical issues than in other locations in the prison. Is that correct?

A. Yes, sir.

Q. All right. Which -- can I assume that that means that when you're working as a pod officer in the B Building, you are doubly cautious about conducting

Page 71

your tours with regularity. Is that correct?

A. Yes, sir.

Q. All right. Sir, on the topic of medical issues in the Quarantine Unit, it sounds like you're familiar with the concept of withdrawal from substance abuse. Is that correct?

A. Yes, sir.

Q. And, in particular, are you familiar with withdrawals from -- pardon me -- with withdrawal from opiate use?

A. Yes, sir.

Q. What's your understanding of some of the symptoms that you see when someone is withdrawing from opiate usage?

A. They'll usually be sick, throwing up, stomach pain, cramps, be sleeping all day, be cold.

Q. So you see people who are experiencing a lot of discomfort. Is that correct?

A. Right, yes.

Q. And that's -- I take it you see it pretty frequently in -- especially in the Quarantine Unit. Is that correct?

A. Yes, sir.

Q. And, by the way, I'm using two phrases. I wanna just make sure that we're on the same page.

Page 72

When I say Quarantine, that's the B Building; correct?

A. Yes, sir.

Q. All right. While working in the -- actually, while working anywhere, have you had or seen any prisoner experience an overdose from drug usage?

A. No.

Q. And pardon me if this is an obvious question, but do you know the difference between an overdose and withdrawal?

A. That should be a different --

Q. Right. Well --

A. -- but I don't know the difference.

Q. Well, can -- when I say overdose, what I'm talking about is someone who has ingested or taken a drug and that that drug usage has caused them to experience a medical issue, which is different from withdrawing, right, when you have stopped using a drug and you're suffering. Do you understand what I'm saying there?

A. Yeah, I -- yes, sir.

Q. All right. To your knowledge, have you ever been -- now that I've explained that, have you ever been present when someone has overdosed on a drug?

A. No.

Q. Do you have any understanding as to why

18 (Pages 69 to 72)

Gerald Slory

Page 73

or how Mr. Gleaves died?

A.  No.

Q.  Sir, there's been testimony from other witnesses in this case about call buttons that are in the cells at CFCF.  Are you familiar with those call buttons?

A.  Yes, sir.

Q.  How do those work?

A.  If an inmate needs anything, they press the call button, and they call the officer so the officer can respond to the inmate's need.

Q.  You say when they call.  Is there -- is there a phone usage, or is it just yelling?

A.  No.  It's the button.

Q.  All right.

A.  The button is the calling on the officer for the inmate's need.

Q.  How are you alerted to the fact that a -- when you're working as a pod officer, how are you alerted to the fact that someone has placed -- has pressed the call button?

A.  You're gonna hear the buzz, and you're gonna see the flashing lights.

Q.  So there's a flashing light in the cell high up on the ceiling.  Is that correct?

Page 74

A.  Yes, sir.

Q.  And you said hear the buzz.  Is that a buzzer that goes off on the console by the desk where the officer is stationed?

A.  It goes -- you can -- you can put it off.  The officer can put it off.

Q.  When you say put it off, what do you mean?

A.  Like cut the sound off.

Q.  Got it.  All right.  So you have the ability to cut that sound off.  How do you know what cell the call button has been pressed in?

A.  The sound is gonna come from the button where the cell is.

Q.  All right.  So there's a -- so there's a panel which indicates which cell?

A.  Yes, sir.

Q.  All right.  Have you experienced any problems where the call button doesn't work in a cell in one of those units?

A.  All call buttons all work.

Q.  When you come in at the beginning of your shift -- I asked you before about your day-to-day responsibilities -- do you have any responsibility to check to make sure the call buttons are working?

Page 75

A.  Yes, sir.

Q.  All right.  How do you do that? Describe that for me.

A.  You clear the whole panel (indicating).

Q.  Okay.  When you say clear -- and let me note, sir, I've never worked as an officer in the Department of Prisons, so I'm going to ask you to try to break that down for me.  What does it mean to clear the panel?

A.  Previous calls that were made by inmates that were turned blue when the particular officer shut them down and responds to them.  You gotta clear everything, the blues.  You take all that and clear everything so your shift can have like the responsibility to communicate with inmates when they call you to responds [sic] to their needs.

Q.  All right.  Is there like a switch that you flip to clear the panel?

A.  No.  You just press on it (indicating).

Q.  So if you -- so if there's a button that is lit up, which -- indicating that a call came from a cell, if you press that button then it'll clear and the light will go off.  Is that correct?

A.  Yes, sir.

Q.  All right.  So that's one thing that

Page 76

you do when you get there.  Is there any other responsibility that you have to make sure that the call buttons are working?

A.  No.  That's the only way you would clear to make sure that you got a clear communication with the inmates.

Q.  Do you have to document anywhere on any paper or in any log that you have checked on the call buttons when you start your shift?

A.  Yes.

Q.  Where do you document that?

A.  You document it in the Lock and Track.

Q.  Now, Mr. -- Officer Jones testified yesterday about this and referred to some type of sanitation log.  And I may be misremembering, but does that sound familiar to you?

A.  Yeah, a sanitation log.

Q.  Is that where you -- is that where you record the fact that you've checked the call buttons?

A.  Yeah, that everything was -- checked everything out that the cell is operable.

Q.  Do you remember from the night of September 20th into 21st of 2018 whether the call buttons were working?

A.  They were working because I answered

Gerald Slory

Page 77

other calls, so they were working.

Q. Are you ever permitted to ignore a call button?

A. You're not permitted to ignore a call button.

Q. All right. So if a prisoner is in a cell, presses the call button, you've gotta go find out what's wrong. Is that correct?

A. Yeah. It's your duty to do that.

Q. Okay. When you're working as a pod officer, do you ever -- are you ever permitted to leave the block?

A. If there is a response.

(Court Reporter clarification.)

If there is a response.

Q. If there is a response. And what do you mean -- I think I know what you mean, sir, but let me ask you. What do you mean by that?

A. If there is an emergency in another pod, a fight, and they call for a response, then you get a response and help out.

Q. Okay. Are there any -- is there any other reason why you're permitted to leave the pod?

A. When you go to lunch.

Q. Do you have to ensure, when you're

Page 78

working by yourself, that someone takes your place before you leave?

A. No.

Q. Well, for an emergency I understand that you wouldn't do that, but if you are -- when you take your lunch, which I -- you know, 11:00 p.m. to 7:00 a.m. you get a break to eat halfway through that shift; right?

A. Yes, sir.

Q. When you take that break, do you have to wait to be relieved by another officer?

A. No, you don't have to wait to be relieved by another officer.

Q. All right. So it's permissible for you to leave the cell with no officer monitoring. Is that correct?

A. You just tell the booth officer that you're going on lunch break.

(Court Reporter clarification.)

The booth officer, right, that you're going on lunch break.

Q. So there's an officer in the booth, which is in the central area in the building. Is that correct?

A. Yes, sir.

Page 79

Q. Okay. If you are not in the unit and a prisoner presses the call button, will someone in the booth be alerted to that, if you know?

A. They -- they'd be alerted to that, yes.

Q. How are they alerted?

A. They can see the flashing light (indicating).

Q. The flashing light that goes off when the call button is pressed. Is that correct?

A. Yes, sir.

Q. All right. When you come -- if you've left the pod and you come back, I assume the same thing would happen to you, right, you would see the flashing light and you would be able to tell from the console who pressed the button. Is that correct?

A. Yes, sir.

Q. All right. Back to a point which may be kind of basic, but let's confirm. If you obtain information that a prisoner has what appears to be a medical emergency, can I assume that you have to act on that right away?

A. You act at it right away.

Q. You call for medical attention. Is that correct?

A. You call for medical attention.

Page 80

Q. Okay. All right. Let's transition, sir, to talk more about Mr. Gleaves. We talked a little bit about him at the beginning of the deposition, and you told me -- or we agreed that he came onto the unit sometime around 1 o'clock in the morning. Do you recall that testimony, sir?

A. Yes, sir.

Q. How many other times do you remember seeing Mr. Gleaves between 1:00 a.m. and when you finished your shift around 7:00 a.m. that morning?

A. I saw Mr. Gleaves once when they first came on the pod while I was in the process of housing him. Then I saw Mr. Gleaves. He was with five other men. They were with five men together.

Q. Did you see him on any tours?

A. I saw him at the tour. They were laying and resting.

Q. Well, so what I'm trying to get at, sir, is that, you know, we've reviewed at length, just a little while ago, that you were supposed to conduct tours every half hour. That's a hard and fast rule. You can't vary.

So that -- when I say see Mr. Gleaves, how many times did you actually lay eyes on him between when he arrived at 1:00 a.m. and when you left at 7:00

Gerald Slory

Page 81

a.m.?

A. Like throughout the whole -- through all my duties. When I was doing tour, I saw them; they were resting. Do other tours, and I saw them; they were resting.

Q. Can you estimate for me how many times you saw him?

A. I don't know. I can't remember.

Q. At any point do you remember coming to the conclusion that Mr. Gleaves appeared to be having a medical issue?

A. No.

Q. Okay. Sir, I want to review the log that you prepared that night. First, I'm going to put it on your screen.

(Exhibit P-1 shown.)

Do you see that now, sir?

A. Yes, sir.

Q. Let's see. Let me -- I'm going to see if I can make this larger. Well, I've actually made it smaller but now we see the whole page. Are you able to read the text as it stands now, sir?

A. Yes, I see it.

Q. Okay. If you have trouble let me know, and I can zoom in. This, by the way, is marked as

Page 82

Exhibit P-1.

And let me just represent to you, sir, that this document was provided to us by your Counsel in connection with this case.

What I'm gonna do is scroll down through this and ask you a few questions about what appears on the log. First, do you see where my cursor is on the screen, sir?

A. Yes, sir.

Q. All right. September 20th, 2018, 23:43, there's a sign-on, Slory_G, which that refers to you. Is that correct?

A. Yes, sir.

Q. So you're signing on to duty on B-1 Pod 3 at that time. Is that correct?

A. Yes, sir.

Q. And it looks like the previous officer who was there was Fulga. Is that how it's pronounced?

A. Fulga, yeah, Fulga.

Q. Fulga, F-U-L-G-A. Do you know, what's Officer Fulga's first name, if you know?

A. No, I don't know her first name.

Q. Okay. Is it a male or female officer?

A. It's a female.

Q. All right. So then you document here,

Page 83

sir, at 23:44, 11:44 p.m., that you conducted an initial tour and all appeared normal. Is that correct?

A. Yes, sir.

Q. All right. There are a few more entries, and then at -- a little later in the shift at 12:07 and 28 seconds, there's an equipment check. You write down, All equipment are operable and accounted for. Then there's reference to a radio, a cut-down kit and fire extinguishers. Do you see that, sir?

A. Yes, sir.

Q. When you note, All equipments are operable, does that refer to the call button and the panel that we were talking about a short while ago?

A. Yes, sir.

Q. So if you made that notation here that means, from your perspective, the call buttons appeared to be working. Is that correct?

A. Yes, sir.

Q. All right. Is there a way, by the way -- well, I'll withdraw that question.

And, by the way, I'm kind of making an assumption as I ask you these questions. When your name appears next to an entry, does that indicate that you were, in fact, the person who typed in whatever appears on this log?

Page 84

A. Yes, sir.

Q. And when -- if you made this entry here at 0 hours 7 minutes 28 seconds, does that mean that -- would you have made that entry right after you did the equipment check?

A. Yes, sir.

Q. So, in other words, it's not like you did the equipment check at 11 o'clock and then came and made an entry about it at 12:00; right?

A. No, sir.

Q. So your log entries are all -- I'll use the word contemporaneous. Do you know what I mean by that?

A. Yeah. At the same time.

Q. So all of your log entries are contemporaneous. Is that correct?

A. Yeah, some of it, some of it --

Q. Okay.

A. -- 'cause I had a slow computer that night.

Q. I got it. So if there's -- sometimes you might be delayed by a couple of minutes. Is that correct?

A. Yeah.

Q. All right. Let's scroll down a little

21 (Pages 81 to 84)

Gerald Slory

Page 85

bit more and talk about what happened after Mr. Gleaves arrived. We see entry -- an entry here -- and by the way, for the record, I'm -- everything I've read so far has been from the first page of Exhibit 1, which is Bates stamped City 19.

There's a reference here to 0 hours and 58 minutes, at 12:58 a.m., when Mr. Gleaves arrives in the unit. Is that correct?

A. Yes, sir.

Q. And if it says, Inmate housed in unit, does that mean that Mr. Gleaves was placed -- here we see Cell No. 1 -- as of around that time?

A. Yes, sir.

Q. Let's look at your first couple of tours that are noted. The next one I see -- I'm sorry, the first -- the first tour I see after Mr. Gleaves appears in the unit is at 1:11 a.m. There's a note here that says, Toured unit: Exceptions noted. What does that mean?

A. (Witness reviewed document.)
You -- you note what the exceptions are after you did your tour.

Q. Well, what -- what is -- what is an exception?

A. If there are any things that you --

Page 86

unusual that you saw on your tour.

Q. Okay. So if there's something unusual then is there a place on the screen where you can type in what the unusual thing is?

A. Yes, sir.

Q. All right. Now, what I see here, though, is that -- Toured unit, Exceptions noted, and the note that appears immediately below that is, All appears in order at this time. Is that an exception?

A. Yes, sir.

Q. Okay. Why -- why is that an exception?

A. It was the particular officer's experience when he -- she did this tour.

Q. Well, this is you who conducted this tour; right?

A. Yes, sir.

Q. All right. And let me -- there were other tours -- here, I'll just -- I'm gonna scroll down. I'm skipping ahead. Do you see where I am here at 1:42 a.m.?

A. Yes, sir.

Q. And there's a note that says Toured unit: Appears in order. What's the difference between Toured unit: Appears in order -- noted at 1:42 a.m. -- and Toured unit: Exceptions noted, All appears in order

Page 87

at this time, at 1:11?

A. Both of them are tours. It's just like this one right here, the second one, it's like a quick tour you do.

Q. Well, I guess the -- is there a difference between a quick tour and a tour?

A. Well, they're both the same. It's just like different logs, entry.

Q. All right. Is there -- well, why I'm asking that is, do those different log entries signify that you did something different in the way you conducted the tour?

A. No, that's the same thing. It's just a tour. A tour is a tour.

Q. So is it fair to say then that the log entry that we looked at, at 1:11 a.m. and 1:42 a.m., it says different things, but you're communicating the same message, that everything was fine on the tour. Is that correct?

A. Yes. One is a okay tour and one is a tour.

Q. Now, we know here that 1:11 a.m. is your tour, the first one we talked about, then the next one's at 1:42, which that's 31 minutes that passed by, but does that seem like it's a tour that complies with

Page 88

the requirement for 30 -- for 30 minutes?

A. Yes, sir.

Q. All right. Your next tour is noted here at 2:24 a.m., which is -- let's see -- about 40 minutes between tours. Is that in compliance with what you're required to do?

A. It is compliance with what I -- I -- I'm doing during the night 'cause next tours I was housing a lot of inmate --

(Court Reporter clarification.)
I had other responsibilities to do throughout the night before I get to that particular tour.

Q. Okay. Now, sir, you told me awhile ago that, it's a hard and fast rule, you gotta conduct tours every 30 minutes. Do you remember that testimony?

A. Yes, sir.

Q. You told me then that there are no exceptions to that rule. Is that correct?

A. Yes, sir.

Q. And you certainly knew that if you were having trouble complying with your responsibilities to conduct a tour every 30 minutes, that you could have asked someone -- one of the rovers to come in. Is that correct?

Gerald Slory

Page 89

A.    I didn't know that.

Q.    But didn't you tell me you could do that earlier today?  You told me you contacted a rover who came in to assist you with an unruly inmate.  Is that right?

A.    Yes, sir.

Q.    All right.  Is there any reason why you didn't call another officer in to assist you by conducting tours in a timely fashion?

MS. TAYLOR:  Objection.  You can answer.

THE WITNESS:  Because I didn't need any help or someone to come help me with a tour.

BY MR. FEINBERG:

Q.    Okay.  Even though you weren't conducting them every 30 minutes?

A.    Yes, sir.

Q.    All right. So as of September 21st of 2018 you were aware that your primary responsibility as a housing officer was to conduct a tour every 30 minutes.  Is that correct?

A.    Every --

MS. TAYLOR:  Objection.  You can answer.

BY MR. FEINBERG:

Page 90

Q.    So the objection is noted.  You can answer.

A.    Yes, to answer, to do my tour every 30 minutes.

Q.    Okay.  And you made a choice not to seek assistance when you felt that you were unable to do it.  Is that correct?

A.    Well, I didn't make a choice to do it.

Q.    Well, why didn't it happen?

A.    I was doing other work on the pod, but I was available on the pod.

Q.    Okay.  And because -- so, in other words, you chose to do other work as opposed to conduct the tour.  Is that correct?

A.    Yes.  I was physically available on the pod housing inmates.  I was associates -- I was associating myself in the pod --

Q.    All right.

A.    -- so I was there physically on the pod.

Q.    Okay.  Now, sir, I think we discussed before that there's a difference between being present on the pod and conducting a tour.  Would you agree?

A.    Yeah, that is different.

Q.    If you're present on the pod and someone has a heart attack and dies in his sleep, you

Page 91

have no way to know that; right?

A.    Yes, sir.

Q.    You can only assess proof of life, to ensure the health and safety of the prisoners under your custody, if you walk around and look inside the doors that are locked.  Is that right?

A.    Yes, sir.

Q.    And, by the way, on the nighttime shift inmates are locked in their cells; they can't get out.  Is that correct?

A.    Inmates are locked in all the time in their cell except when they gotta come out for recreation.

Q.    Which is certainly not between 11:00 p.m. and 7:00 a.m.  Is that correct?

A.    Yes, sir.

Q.    All right.  So would you agree then, sir, that being present on the pod does not live up to your responsibility to ensure the health and safety as we've discussed at length so far?

MS. TAYLOR:  Objection.

THE WITNESS:  It does at times.  When an inmate needs help from an officer, we have a call bell for inmates to notify us that they're in some distressed situation at times.

Page 92

BY MR. FEINBERG:

Q.    Well, just to stick with the example that I gave.  If there are two guys in a cell, one of them is asleep, the other has a heart attack and dies, you're not gonna know that unless you go tour -- tour the unit.  Is that correct?

MS. TAYLOR:  Objection.

THE WITNESS:  You ain't gonna know that.

BY MR. FEINBERG:

Q.    Okay.  And that's why you conduct the tour; right?

A.    Yes, sir.

Q.    All right.  We were talking -- before we got onto that tangent, we talked about the tour that took place at 2:24.  There's another one at 2:58.  You note, Toured unit, Appears in order.

And then the next tour -- do you see where I am on the screen, by the way, sir?

A.    Yes, sir.

Q.    So we just reviewed the one at 2:58.  And then the next one occurs at 3:49, so 50 minutes, give or take, between tours.  Obviously, that is not in compliance with the rule that we discussed about a tour every 30 minutes.  Agreed?

Gerald Slory

Page 93

A. Yes, sir.

Q. Why was there not a tour within 30 minutes of the 2:58 tour?

A. I have other inmates that I was preparing to get on the pod around that time.

Q. So, in other words, at that time you chose to do the work with the other inmates instead of doing the tour every 30 minutes. Is that correct?

A. Yeah. I was associating myself the same -- the same thing, walk around the pod, house inmates. I was working on the pod.

Q. All right. And you did not choose to contact an officer in another unit to seek assistance conducting a tour. Is that correct?

A. Yeah, 'cause I could handle it.

Q. Well, did you conduct the tour every half hour?

A. I didn't conduct the tour every half an hour.

Q. Okay. Which, as we've discussed, is in violation of the rules that govern your duty as a pod officer; correct?

A. Yes, sir.

Q. All right. The next tour after 3:49 that's listed here is at 4:29, so about 40 minutes.

Page 94

Once again, not within 30 minutes; correct?

A. Yes, sir.

Q. Is that the same explanation there, that you were busy housing other officers -- or other inmates?

A. Yeah, we were busy with the other activity. Medication was in progress, insulin and Accu-Chek was in progress --

(Court Reporter clarification.)

Insulin and Accu-Chek was in progress, medication was in progress, so I was getting inmates out of their cell to get ready to get transferred to another jail.

So I was associating myself, again, with everything that is in the pod, that is happening on the pod.

Q. And the tour, once again, did not take place within 30 minutes as required by prison rules. Is that correct?

A. Yes, sir.

Q. The next tour after 4:29 occurs at 5:19 so, again, about a 50-minute period. Agreed?

A. Yes, sir.

Q. Same explanation as before; you were doing other things. That timing violates prison rules.

Page 95

Is that correct?

A. Yes, sir.

Q. The next tour after 5:19 appears to be at 6:12, so just shy of an hour. Agree, sir?

A. Yes, sir.

Q. Once again, you were doing other things, didn't conduct the tour within the half an hour as required by prison rules. Is that correct?

A. Yes, sir.

Q. The next tour after 6:12 is 6:50 -- I'm sorry -- 6:43, so about 30 minutes. Is that correct?

A. Yes, sir.

Q. This tour notes: Exceptions noted; conduct final tour of shift; all appeared normal and secure.

What does that reference mean, sir? I know it's obvious, but could you please tell me?

A. All was normal when I did my last tour. All the cells were secure.

Q. I think you told me before that you recall seeing Mr. Gleaves on each one of the tours that we've just reviewed. Is that correct?

A. Yes, sir.

Q. All right. And in each of those situations he appeared to be sleeping and in perfectly

Page 96

fine health, so far as you could tell. Is that correct?

A. Yeah, so far as I could tell.

Q. In other words, if your responsibility was to ensure proof of life, you felt like you had proof of life for Mr. Gleaves in each and every one of the tours that you conducted. Is that correct?

A. Yes, sir.

MR. FEINBERG: Okay. Gila, I'd like to show the 3:22 tour. Are you in a position to do that now, or should we break to -- okay.

First, let me stop sharing this and we'll bring that screen up.

BY MR. FEINBERG:

Q. Sir, while Gila is going to put some video on the screen, let me explain to you that we're going to show you some of the video surveillance from B-1 Pod 3 that night. Okay?

A. Yes.

MR. FEINBERG: Gila, show that screen whenever you're ready. Can you see that?

(Video shown.)

BY MR. FEINBERG:

Q. Sir, do you see -- first of all, do you see the surveillance footage in front of you?

A. Yes, I see it.

24 (Pages 93 to 96)

Gerald Slory

Page 97

Q.   All right.  If we look down on the bottom left, do you see my cursor that's moving around here?

A.   Yeah, I see it.

Q.   So that's -- and I assume you're familiar with B-1 Pod 3.  My cursor now is on a yellow door.  Does that look like Cell 1?

A.   No.  That is the multi-purpose room.

(Court Reporter clarification.)

Multi-purpose room.

Q.   Okay.  Are you talking about -- so this is you right here that my cursor is over.  Is that correct?

A.   Yes.

MS. TAYLOR:  I'm not seeing your cursor in the location you're talking about.

MR. FEINBERG:  Oh, I see.  You know why?  Because I'm not sharing my screen.

MS. TAYLOR:  Yeah.

MR. FEINBERG:  Right, okay.  All right.  So then -- yeah, Gila, would you please put your cursor over what appears to be Officer Slory?

(Ms. Glattstein complies.)

MR. FEINBERG:  Thank you, Anne.  Once again, you get full credit for your technical skills.

Page 98

MS. TAYLOR:  Thanks.

BY MR. FEINBERG:

Q.   All right.  So, Officer Slory, the white cursor now, that is pointing to you.  Is that correct?

A.   Yes, sir.

MR. FEINBERG:  All right.  Gila, would you please move to the left, the yellow door.

(Ms. Glattstein complies.)

BY MR. FEINBERG:

Yeah.  Where the cursor is now, is that Cell 1, sir?

A.   Yes, sir.

Q.   Okay.  What I'd like you to do -- now, this is 3:22 a.m. -- I'd like you to watch for the next several seconds.

MR. FEINBERG:  Gila, you can hit play and then I'll tell you when to stop.

(Video shown.)

MR. FEINBERG:  Okay, you can pause, Gila.

(Ms. Glattstein complies.)

BY MR. FEINBERG:

Q.   Sir, what you just watched, was that your tour in which you were checking on Cell 1 at

Page 99

3:22 a.m. on September 21st of 2018?

A.   Yes, sir.

Q.   Would you agree with me that when you looked into Cell 1 you were, what appeared to be, let's say, 8 to 10 feet away from the door?

A.   I don't know how far I was from the door.

Q.   Could you see into that cell?

A.   Yes, sir, with my flashlight.

Q.   Could you tell whether Mr. Gleaves was alive and well at that time?

A.   I saw that they -- they were laying down in the cell.

Q.   Who's they?

A.   I don't know if he was alive or not.

Q.   Who's they?

A.   Those two inmates.

Q.   All right.  Let's -- to put names on this, the two people who were in the cell were Jonathan Gleaves and Tyrone Thomasl.  That's the cellmate.  Do you remember Mr. Thomas?

A.   No.

Q.   Okay.  I'll represent to you that that's what the information shows.  What you have just said, though, is that Mr. Gleaves and Mr. Thomas were

Page 100

lying down in the cell.  Is that correct?

A.   Yes, sir.

Q.   You don't know whether they were alive.  Is that correct?

A.   I don't know if they were alive or not.

Q.   No idea whatsoever.  Is that correct?

A.   Yes, sir.

MR. FEINBERG:  Okay.  Gila, you can take that screen down.

(Video removed.)

BY MR. FEINBERG:

Q.   Let me put Exhibit 1 back.

(P-1 shown.)

All right.  Sir, do you see the Housing Log in front of you again?

A.   Yes, sir.

Q.   What we just looked at took place at 3:22 a.m., and I believe that covered a tour -- either the 2:58 tour or the -- well, yeah, I think that -- that probably covers the 2:58 tour.  Would you agree, sir?

A.   Yes.

Q.   There are other tours that you report, 3:49, 4:29, 5:19 and 6:12.  Do you agree?  I've just quickly gone through the log, but do you agree that --

A.   Yes, sir.

25 (Pages 97 to 100)

Gerald Slory

Page 101

Q. -- that you reported those tours happening? Is that correct?

A. Yes, sir.

Q. I'll represent to you, sir, that I've watched -- I and my -- and others in my office have watched video from those time periods and did not see you conduct a tour where you looked into Cell 1 at any time in those time periods, between 3:22 a.m. and after 6:00 a.m.

Do you know, sitting here today, whether you did, in fact, look in Mr. Gleaves' cell?

A. Yeah, I did look in Mr. Gleaves' cell when I did my tours.

Q. Would you agree that in order to look into the cell you would actually have to be at the cell side in order to see in?

A. Yes, sir.

MR. FEINBERG: All right. So -- I'm sorry, Gila, would you just bring up that screen one more time? Let me stop the share here.

(Video shown.)

MR. FEINBERG: Thanks, Gila.

BY MR. FEINBERG:

Q. So would you agree, sir, that if you conducted a tour -- that's fine right there, Gila -- in

Page 102

order to look in that cell, we would see you on this screen; right? Do you understand --

MS. TAYLOR: Jon, I'm sorry. What are you --

MR. FEINBERG: Yeah, yeah. Okay, that's a bad question.

BY MR. FEINBERG:

Q. In order for you to actually look in the cell, you would have to be close enough to the cell that we would expect to see you on the surveillance footage. Is that correct?

A. Yes, sir.

Q. In other words, now I know this -- it's a little challenging with this video screen, but if you look at the top left screen, sir, that's the day room area. Is that correct?

A. Yes, sir.

Q. And we can just see you, your left foot, it looks like -- Gila, if can move the cursor over to there -- that's showing you outside of Cell 1. Is that correct?

A. Yes, sir.

Q. All right. Would you agree that if you were standing in the middle of the day room, you would not be able to look into Cell 1 to do a check on the

Page 103

health and well-being of Mr. Gleaves?

A. Oh, no.

Q. Okay. So, in other words, you've gotta be close enough to the cell so that we would actually see you looking into the cell. Is that correct?

A. Yes, sir.

Q. All right. Have you looked at any -- and, Gila, you can take this down now.

(Video removed.)

Have you looked at any video footage to see whether you did conduct a tour at 4:29, 5:19 or 6:12?

A. Yeah, I did -- I -- I -- yeah, I believe so.

Q. Okay. You're saying you believe so.

A. Yes.

Q. What I'm asking you is, have you gone back and actually looked at the video yourself to see whether you, in fact, conducted the tour?

A. No, I did -- I didn't. I didn't see any video footage of -- since I was working there.

Q. So I'm gonna represent to you, sir, that we've looked; that is, the people in my office, and we haven't seen you appear to conduct any cell checks in that time period. And that's my representation. I'm

Page 104

not asking you to accept it.

Rather than showing you three hours of video footage right now, what I'm gonna ask you to do -- and I'll communicate this to your lawyer after the deposition -- I'm gonna ask you to work with your lawyer to review that video footage and tell me, by providing a time stamp, when you actually saw Mr. Gleaves during that time period. Do you understand what I've just said, sir?

A. Yes, sir.

Q. In other words, you say you conducted the tour. I'm saying I don't see it. I want you to tell me when you actually did, according to the video. Do you understand?

A. Yes, sir.

MR. FEINBERG: All right. Let's change tracks a little bit. Gila, the next video I'd like to look at is from 7:10 a.m.

(Video shown.)

BY MR. FEINBERG:

Q. And, sir, as Gila is bringing up that video footage, we've already established you were not working at 7:10 a.m. Is that correct?

A. No, I was -- I was off-duty.

Q. All right. So, sir, I'm gonna ask you

26 (Pages 101 to 104)

Gerald Slory

Page 105

to keep your eye on the top right screen, which says 7:10 and 38 seconds. Do you see -- do you see at the very bottom of that top right portion of the screen an officer in a black uniform?

A.  Yes, sir.

Q.  I'll represent to you that, at least based on my understanding, that that's Officer Terrelle Jones. Do you know Officer Jones?

A.  I don't know him.

Q.  I'm sorry. Terrelle -- Terrelle -- this is actually -- that's a female officer. T-E double R-E double L-E. I'll ask you to watch Officer Jones as Gila plays the video.

And, Gila, I'll ask you to stop after -- when we get to the relevant point.

So keep your eye on Officer Jones, sir.

(Video shown.)

All right, Gila, you can pause. Thank you.

(Video paused.)

BY MR. FEINBERG:

Q.  Officer, did you see with me how Officer Jones went, looked in Cell 1, paused for a moment, and then kicked the door?

A.  Yes, sir.

Page 106

MR. FEINBERG: Okay. Let's -- actually, Gila, let's take that down, please.

(Video removed.)

BY MR. FEINBERG:

Q.  I'm gonna ask you to bear with me for one second, sir. I'm going to put in front of you, sir, an exhibit which I believe we have not marked yet. This will be Exhibit P-4 (indicating).

Once again, Lori, I'll ask you to stamp it once I e-mail you these documents.

(P-4 shown.)

Sir, this is -- first of all, do you see an exhibit that's stamped P-4?

A.  Yes, sir.

Q.  This is a statement from Terrelle Jones, the same officer that I referenced. Do you see that, sir?

A.  Yes, sir.

Q.  All right. Do me a favor, please. I'm scrolling down to the bottom of the first page. There's a question -- follow along with me -- it says, Please explain the sequence of events as you started your initial tour.

What I'd like for you to do is read the answer that Officer Jones gives that's typed here.

Page 107

When you get to the bottom of the page, tell me and I'm gonna scroll down and show you more. All right? So go ahead, read to yourself and let me know when you're finished.

A.  When I got to Cell No. 11 --

Q.  Sir, just read it to yourself. I want you to become familiar with what Officer Jones said.

A.  Oh.

Q.  Tell me when you're finished reading to yourself.

A.  (Witness reviewed document.)

Yeah, I read it.

Q.  Okay. Let's read -- just read to yourself -- let's see. Bear with me for one second. Actually, just read the first two questions and answers to yourself, and let me know when you're done.

A.  (Witness reviewed document.)

Q.  Sir, have you gotten to the point here -- have you read, Yes, I turned the cell lights on from the console?

A.  Yeah, I read that.

Q.  Okay. All right, let's take this down. Would you agree, sir, that, based on what you've read from Officer Jones' statement and what you saw on the video, that Officer Jones immediately observed an issue

Page 108

with Mr. Gleaves when she went to the cell?

A.  Yes.

MS. TAYLOR: Objection.

BY MR. FEINBERG:

Q.  She looked into the cell, according to her statement, she saw Mr. Gleaves completely naked and foaming at the mouth. Agreed?

A.  Yes, sir.

Q.  And she made those observations at 7:10 a.m., and that was her first tour when she started for the day. Is that correct?

A.  Yes, sir.

Q.  All right. Now, the records appear to show that your last tour took place sometime between 6:50 and 7:00 a.m. Does that sound right to you, sir?

A.  Yes, sir.

MR. FEINBERG: Gila, could you please bring up the video from 6:56 a.m.?

(Video shown.)

BY MR. FEINBERG:

Q.  Okay, sir. Do you see -- let's look at the bottom left screen. Do you see the time stamp that says 6:56 and 14 seconds?

A.  Yes, sir.

Q.  And do you see an officer that's in

**27 (Pages 105 to 108)**

Gerald Slory

Page 109

black?

A. Yeah.

Q. All right. Now, as we watch the video I think this will -- it'll become clear that this is you. What I'd ask you to do, once we start to play the video, is watch yourself as you go by Cell 1, and then I'll ask you some questions.

So, Gila, please play from there and I'll let you know when to pause.

(Video shown.)

All right, you can pause.

(Video paused.)

BY MR. FEINBERG:

Q. All right. Officer Slory, the video that we just showed you, have you looked at that video anytime recently?

A. Yes, sir.

Q. All right. Do you have any idea whether Mr. Gleaves was experiencing any medical emergency at that time?

A. I haven't seen him, that he was experiencing any medical emergency.

Q. Did you actually see Mr. Gleaves?

A. I haven't seen that he was in some distress.

Page 110

Q. No, that's -- I'm asking a different question. Did you see Mr. Gleaves?

A. I see Mr. Gleaves.

Q. What was he doing?

A. They were laying down. Both inmates was laying down, comfortable in their cell.

Q. Was he breathing?

A. I don't know if he was breathing, but they were laying down comfortably in their cell.

Q. Okay. Now, you're saying they.

A. Both are they.

Q. So you're talking about Mr. Thomas and Mr. Gleaves. Is that right?

(Court Reporter clarification.)

Officer Slory, can you hear me?

A. Yes, sir.

Q. You're talking -- when you say they, you're referring to both those inmates. Is that correct?

A. Yes, sir.

Q. All right. Do you -- since we got a little sidetracked let me ask, do you know whether Mr. Gleaves was breathing?

A. I assume so.

Q. Why do you assume?

Page 111

A. 'Cause when I spinned my flashlight I didn't see any sign that was showing that he was in any distressed situation.

Q. We reviewed, maybe within the past hour, about the way that you conduct a tour, and you confirmed for me that your fundamental responsibility when you conduct a tour is to determine whether there's proof of life. Is that correct?

A. Yes, sir.

Q. Would you agree, just basic human experience, that when someone is sleeping and they're breathing their breathing tends to be pretty slow?

MS. TAYLOR: Objection. You can answer.

THE WITNESS: Yes, sir.

BY MR. FEINBERG:

Q. In order to determine whether someone is breathing while they're sleeping, it may take some time to actually see a chest rise and fall. Is that correct?

MS. TAYLOR: Objection.

THE WITNESS: Yes, sir.

BY MR. FEINBERG:

Q. Did you spend enough time in front of that cell, in what looks like about half a second from

Page 112

what we saw on the video, to see whether or not Mr. Gleaves was breathing?

A. I spinned my flashlight. I looked --

(Court Reporter clarification.)

I splashed my flashlight in the cell, I look. It was all right for me to move forward, and I did move forward.

Q. What did you see that convinced you that it was all right to move forward?

A. Because they were comfortably sleeping in the cell.

Q. How do you know that?

A. I didn't see any sign that would mention that he was having foam coming out of his mouth and those other significants [sic] that he was experiencing.

Q. Was he clothed or naked?

A. I haven't seen that he was -- was naked.

Q. Okay. Now, you realize that Officer Jones, less than 15 minutes after your observations, immediately observed that Mr. Gleaves was naked and foaming at the mouth. Is that correct?

A. Yes, sir.

Q. Is it your understanding that that all happened in less than 15 minutes?

A. I don't know when it happened.

**28 (Pages 109 to 112)**

Gerald Slory

Page 113

Q.   Okay.  Is it possible that Mr. Gleaves was, in fact, naked when you walked by the cell?

A.   I don't know.

Q.   All right.  Isn't it possible that Mr. Gleaves was foaming at the mouth when you walked by the cell?

A.   I don't know, sir.

Q.   Is it fair to say, sir, that you did not spend enough time looking through Mr. Gleaves' cell, looking into Cell 1, in order to know whether he was naked, in order to know whether he was foaming at the mouth?

A.   If I had saw Mr. Gleaves was in a distressed situation for the time I was passing through his cell -- I splashed my flashlight in -- I would have, at the same time, response [sic] and call for medical assistance for Mr. Gleaves.

Q.   I understand that, sir.

A.   That's my responsibility.

Q.   I understand that, sir, and I mean no disrespect with -- with -- with what I'm about to say now, which is that's not an answer to my question.

My question is as follows:  Did you spend enough time to know whether Mr. -- looking into the -- and, I'm sorry, let me try that again.

Page 114

Did you spend enough time looking into the cell to know whether Mr. Gleaves was foaming at the mouth?

A.   Yes, sir.

Q.   Did you spend enough time looking in the cell to know whether Mr. Gleaves was completely naked?

A.   Yes, sir.

Q.   So your testimony then and your expectation is that Mr. Gleaves became fully naked and Mr. Gleaves began foaming at the mouth all within the less than 15 minutes between your observation and when Officer Jones appeared on the block.  Is that correct?

A.   Yes, sir.

Q.   Are you certain about that?

MS. TAYLOR:  Objection.  You can answer.

THE WITNESS:  Can you repeat the question, please?

BY MR. FEINBERG:

Q.   Are you certain that you spent enough time to make those observations?

A.   Yes, sir.

Q.   Are you certain that you conducted a tour at 4:29 a.m.?

Page 115

A.   I gotta get my recollection of the tours that I did.

Q.   Well, if the log -- if the tour -- sorry, pardon me.  If the log said 4:29, 5:19 and 6:12 that you conducted tours, are you certain that you did, in fact, conduct those tours?

A.   I should do them.

Q.   Because if the log said that you conducted those tours and you didn't, that means you would have been lying on your log; correct?

MS. TAYLOR:  Objection.  This is argumentative, and it's already been covered.

(Court Reporter clarification.)

MS. TAYLOR:  Been covered.

BY MR. FEINBERG:

Q.   You can answer, sir.

A.   Well, I would've been lying 'cause sometimes when an officer is in the area he's conducting his work, interacting with inmates in the area where -- where the day room on the top bunk, on the top -- on the top tier.  I -- I put it as a tour 'cause I was interacting with other inmates on the pod.

Q.   A tour means that you look in every single cell on the block.  Is that right?

A.   Yes, sir.

Page 116

Q.   All right.  So would it count as a tour if you did not look inside Cell 1?

A.   Yes, sir.

Q.   Yes, it would count as a tour?

A.   (No response.)

Q.   If you -- and let me -- let me ask that again.  If you happened to be just walking around in the day room and you don't actually look into Cell 1 to obtain proof of life in Cell 1, is that a tour?

A.   No.

Q.   So if you indicate that it was a tour and you didn't actually look into Cell 1, that would not be accurate reporting.  Is that correct?

A.   Yes, sir.

MR. FEINBERG:  Let's see.  Gila, I'm sorry, I didn't ask you, on this same video can you fast forward to 7:14 when Mr. Thomas comes out of the cell?

(Video fast forwarded.)

MR. FEINBERG:  Oh, is that the next video?

MS. GRATTSTEIN:  Yeah, I think it is different.

MR. FEINBERG:  Yeah.  Let's -- actually, let's do this 'cause I think we're pretty

29 (Pages 113 to 116)

Gerald Slory

Page 117

close to finished. Let's go off the record.

(Short recess taken.)

BY MR. FEINBERG:

Q. Officer Slory, we're now back on the record. Did you realize during the break that we just took, for about ten minutes, that any of your previous testimony was incorrect or incomplete?

A. No, sir.

Q. Let's start by pulling up the video that I referenced before we went off the record. Gila, if you can bring that up, please.

(Video shown.)

Sir, we're looking at a video now from B-1 Pod 3 at 7:13 and 55 seconds. If you look on the top right portion of the screen, you see Officer Wilson and Officer Jones. I understand that you don't know them, but I'll represent that to you, that that's who we have there, standing outside Cell 1 with the door open. Do you see that, sir?

A. Yes, sir.

Q. What we're going to watch is the -- is Mr. Gleaves' cellmate, who I've identified as Tyrone Thomas, walk out, and then I'll ask you some questions.

So I'll ask you to keep your eye on what happens in the top right corner of the screen as

Page 118

Gila plays it. And, Gila, I'll let you know when to pause from here.

(Video shown.)

Okay, you can pause there, Gila.

Sir, did you see the man in the orange jumpsuit come out of the cell?

A. Yes, sir.

Q. My understanding is that that is Officer Thomas -- I'm sorry -- Mr. Thomas. And did you see that Mr. Thomas appeared to be saying something to the two officers standing outside the cell?

A. Yeah, I see the way he came out that he was saying something.

MR. FEINBERG: Okay. All right. Gila, you can take the video down now. Thank you.

(Video removed.)

BY MR. FEINBERG:

Q. Officer Slory, did you ever hear from anybody at the prison about what Mr. Thomas said when he came out of the cell?

A. No, sir, I haven't hear [sic] anything.

Q. So do you have -- you have no idea what Mr. Thomas said about any of these events concerning Mr. Gleaves?

A. I just read the papers from Mr. -- Ms.

Page 119

Jones or Mr. Jones that you just showed me.

Q. Got it. Oh, yes, got it, the things that Terrelle Jones said about Mr. Thomas coming out of his cell.

Let me show you another statement that was prepared by Mr. -- or that was given by Mr. Thomas to Philadelphia police. This is a document that's been previously marked as Exhibit P-10.

(P-10 shown.)

Do you see a Philadelphia Police Department document in front of you, sir, now with the name Tyrone Thomas?

A. Yes, sir.

Q. All right. I'm scrolling forward to the fourth page of that document. And since the writing is a little tough to read here, I'm gonna read out loud to you, and I'll ask you to pay attention.

A. Yeah.

Q. The question that is asked by a Philadelphia police detective to Mr. Thomas is as follows: Did you make any attempts to notify the guards prior to 6:00 a.m.? And that's, from context, that's notify the guards about Mr. Gleaves.

The answer is, from Mr. Thomas: I pressed the button around 5:00 a.m., and it didn't

Page 120

beep, so I don't know if it was working. Then I told the guard at 6:00 a.m. when she was making a tour.

All right. Did you see that text and hear me read that, sir?

A. Yes, sir.

Q. Let me stop sharing that now.

(Document removed.) And I'll ask you, do you remember at any point that night seeing an alert or hearing an alert from the call button in Cell 1?

A. No, sir.

Q. Do you remember Mr. Thomas saying to you at any point, Get Mr. Gleaves out of my cell?

A. No, sir.

Q. And I'll ask that question in a slightly different way because I know you don't remember him as Mr. Thomas. Do you remember anyone, over the course of that night, asking you to remove Mr. Gleaves from the cell because he appeared to be in bad health?

A. Absolutely not.

Q. Okay. Sir, I just want to review what we've talked about so far to make sure we're on the same page.

You've told me you have a responsibility, as a Correctional Officer, to check on the welfare of every person who's assigned to your

30 (Pages 117 to 120)

Gerald Slory

Page 121

block. Is that correct?

A.   Yes, sir.

Q.   And you agree that you've got an enhanced responsibility to do that on the Quarantine block because people might be having emergent health issues just coming into the facility.  Agreed?

MS. TAYLOR:  Objection.

THE WITNESS:  Yes.

BY MR. FEINBERG:

Q.   You were aware of that as of September, 2018.  Is that correct?

MS. TAYLOR:  Objection.

THE WITNESS:  Yes.

BY MR. FEINBERG:

Q.   You looked in the cell of Mr. Gleaves around 3:22 a.m.  Is that correct?

A.   Yes, sir.

Q.   And your previous testimony was that you really can't say one way or the other what his condition was at that point.  Is that correct?

MS. TAYLOR:  Objection.

BY MR. FEINBERG:

Q.   That's what you told me before.  Is that correct?

A.   Yes, sir.

Page 122

Q.   Now, the document that you filled out, the Housing Log -- or the log that we reviewed, Exhibit P-1, suggests that you did at least three tours between 3:22 a.m. and 7:00 a.m.  Is that correct?

A.   Yes, sir.

Q.   Now, I've told you I haven't seen those tours taking place, and we're gonna address that issue later.

I'll represent to you that the next tour I see takes place three and a half hours later. Do you understand that representation?

A.   Yes, sir.

Q.   What we've reviewed on the video is when you looked in the cell at that time period, you were there for about half a second.  Is that right?

MS. TAYLOR:  Objection.

THE WITNESS:  Yes, sir.

BY MR. FEINBERG:

Q.   What you've told me is that in that half a second you were able to determine that Mr. Gleaves appeared to be just fine.  Is that correct?

A.   Yes, sir.

Q.   And you agree that 15 minutes later Mr. Gleaves -- or less than 15 minutes later Mr. Gleaves was fully naked and foaming at the mouth.  Is that correct?

Page 123

A.   Yes, sir.

Q.   And you're telling me that, from your perspective, that all happened -- Mr. Gleaves becoming fully naked and foaming at the mouth, that all happened in the less than 15 minutes between 6:56 and 7:10 a.m. Is that correct?

A.   Yes, sir.

Q.   We reviewed before, sir, your Internal Affairs statement which took place in January of 2019. After you gave that statement you received no discipline about anything in connection with Mr. Gleaves.  Is that correct?

A.   No, sir.

Q.   The discipline that -- that was imposed -- or not discipline, but any consequences that came were as a result of you engaging in a disrespectful gesture.  Is that correct?

A.   Yes, sir.

Q.   And, by the way, at the beginning of this deposition you confirmed for me that one of your responsibilities as a Correctional Officer is to treat people with respect and dignity no matter how they act. Is that right?

A.   Yes, sir.

Q.   We don't have to mark this as an

Page 124

exhibit, but I'm showing you a document that is Bates stamped City 502.

(Document shown.)

Do you see that document, sir?  It's a photograph of you.

A.   Yes, sir.

Q.   Raising your middle finger.  Is that correct?

A.   Yes, sir.

Q.   And my understanding is that that photograph was taken as a screenshot from surveillance footage.  Is that your understanding as well?

A.   Yes, sir.

Q.   All right.  And this is the gesture that led to you being placed on some type of probation where you were instructed not to engage in any other misconduct for at least a year.  Is that correct?

A.   Yes, sir.

Q.   All right.  And you agree, seeing that, that that is a violation of your responsibility to treat people with respect and dignity.  Is that right?

A.   Mutual respect.

Q.   Okay.  You agree that that -- that you violated the rules that apply to officers.  Is that correct?

31 (Pages 121 to 124)

Gerald Slory

Page 125

A.  I did violated [sic] the rules.

Q.  And that's why you were told that you would be on probation for about a year.  Is that right?

A.  Yes, sir.

Q.  Okay.  Sir, I asked you at the beginning of the deposition whether anyone had told you that you could or should have done something different regarding Mr. Gleaves, and I believe your answer was no.  Is that correct?

A.  If I could have done anything different for Mr. Gleave [sic]?

Q.  Yes.

A.  I would have done so.

MS. TAYLOR:  I just want to make sure you understood the question.

BY MR. FEINBERG:

Q.  Yeah.  That was a complicated question.  I'll -- let me -- I'll withdraw it and let me ask you a different one.

At the beginning of the deposition, sir, you told me that you did not -- you were not aware of any other opportunity that existed for you to assist Mr. Gleaves; correct?

A.  Yes, sir.

Q.  After what we've reviewed over the past

Page 126

couple of hours, I just want to ask whether that's changed.  Do you believe that there is anything that you could have done to protect Mr. Gleaves?

A.  Yes, I would have done so if I had any opportunity.  If I was in the position to see Mr. Gleaves in any distressed situation, I would've respond and give Mr. Gleave [sic] the nelp [sic] -- the help he deserve [sic].

Q.  Did you see anything, based on what we reviewed in terms of video and documents, which showed you that you did, in fact, have an opportunity to assist Mr. Gleaves?

A.  Yes.

Q.  What was that opportunity?

A.  When I did my last tour to see if he was in a distressed situation.

Q.  All right.  What you're saying then is that if you spent more time looking through that window you might have seen that Mr. Gleaves was experiencing medical distress.  Is that correct?

MS. TAYLOR:  Objection.

THE WITNESS:  I don't know if my timing is playing a role in this, but I had a good vision to see that there wasn't anything coming out of his mouth and that he wasn't naked, sir.

Page 127

BY MR. FEINBERG:

Q.  And you're -- and we've already talked about that you're -- you're certain that that's what happened.  Is that correct?

A.  Yeah, I am certain thatm if I had saw him in a distressed situation, God knows I would have helped this man.  I would've helped him.

Q.  Sir, my final point would be this, just to remind you that I'm going to ask you to review the video footage to determine for us how many times you looked in Mr. Gleaves' cell.

But I'll ask you as a final question, other than the two times that we've reviewed, the observation at 3:22 a.m., which is the first one we looked at --

A.  Yes.

Q.  -- and the observation at 6:56 a.m., which we just talked about a moment ago, do you remember, sitting here today, any other times that you looked in Mr. Gleaves' cell?

A.  I don't know.

MR. FEINBERG:  Okay.  With that, sir, I don't have any further questions for you.

MS. TAYLOR:  I have no questions.

MR. FEINBERG:  Okay.  Officer Slory,

Page 128

your deposition is concluded.  I thank you for your time.

Lori, do you need anything from us on the record?

COURT REPORTER:  Just a second, yeah, I do.  Counsel, could I have your orders on the record, please.

MR. FEINBERG:  A PDF mini is fine for me.

COURT REPORTER:  And Anne?

MS. TAYLOR:  And I'll also take a PDF mini, please.

COURT REPORTER:  Thank you.

(Whereupon, the deposition concluded at 2:55 o'clock p.m.)

32 (Pages 125 to 128)

Page 129

CERTIFICATE

I, Lori A. Dilks, the officer before whom the deposition of GERALD SLORY was taken, do hereby certify that GERALD SLORY, the witness whose testimony appears in the foregoing deposition, was duly sworn by me through Zoom on September 29, 2021, and that the transcribed deposition of said witness is a true record of the testimony given by him; that the proceedings are herein recorded fully and accurately to the best of my ability; that I am neither attorney nor counsel for, nor related to any of the parties to the action in which this deposition was taken; and, further, that I am not a relative of any attorney or counsel employed by the parties hereto or financially interested in this action.

Lori Dilks_____
Lori A. Dilks

PA Court Reporter
Notary Public in and for the
Commonwealth of Pennsylvania

My Commission expires
November 29, 2023

Gerald Slory

**A**

**a.m** 1:16 15:11 17:18 54:22 58:8 78:7 80:9 80:10,25 81:1 85:7,17 86:20 86:24 87:16,16 87:22 88:4 91:15 98:15 99:1 100:18 101:8,9 104:18 104:23 108:10 108:15,18 114:25 119:22 119:25 120:2 121:16 122:4,4 123:5 127:14 127:17

**abide** 28:22

**ability** 22:20,24 25:21 74:11 129:11

**able** 55:21,23 79:14 81:21 102:25 122:20

**Absolutely** 120:19

**abuse** 52:5 60:5 71:6

**academy** 41:9 44:7 48:11,14 64:2,7

**accept** 104:1

**acceptable** 9:20

**accommodate** 10:15

**accounted** 66:8 68:5 83:7

**Accu-Chek** 94:8 94:10

**accurate** 7:20 34:21,23 116:13

**accurately** 129:10

**accused** 47:11

**act** 60:9 79:20 79:22 123:22

**action** 5:8 129:12,15

**actions** 35:25

**activity** 94:7

**acts** 60:12

**add** 56:2

**added** 52:9

**address** 122:7

**Administrator** 1:3 5:6

**admitted** 23:12

**Affairs** 44:19,23 123:9

**afternoon** 30:13 33:23 34:17

**ago** 5:11 7:4,6 7:15,19 11:2 11:23 12:3 20:17 24:9 30:19 80:20 83:13 88:14 127:18

**agree** 32:17 58:14 59:20 60:22 63:11,14 64:25 66:11 68:24 69:5 90:22 91:17 95:4 99:3 100:20,23,24 101:14,24 102:23 107:23 111:10 121:3 122:23 124:19 124:23

**agreed** 80:4 92:25 94:22 108:7 121:6

**ahead** 86:19 107:3

**ain't** 92:8

**alert** 53:23 120:8,9

**alerted** 73:18,20

79:3,4,5

**alive** 36:7 65:23 67:13 68:14,23 99:11,15 100:3 100:5

**allegation** 45:2 47:22

**allegations** 44:20

**allowed** 64:15

**America** 38:3,5

**Anne** 2:7 20:25 35:15 56:1 57:23 97:24 128:10

**answer** 8:24 9:3 9:4,5,19 10:8 10:19 12:13 16:22 19:18 36:10 41:23 42:25 43:1 52:22 53:3,4 59:12 61:1 68:7,17 89:11 89:24 90:2,3 106:25 111:14 113:22 114:17 115:16 119:24 125:8

**answered** 76:25

**answers** 8:11,12 8:25 10:2 107:15

**anticipate** 8:17

**anybody** 12:16 34:3,12,22 35:3 36:8 118:19

**anymore** 20:20

**anytime** 22:15 109:16

**apologize** 66:24

**appear** 65:22 103:24 108:13

**APPEARAN...** 2:1

**appeared** 81:10 83:2,16 95:14 95:25 99:4 114:13 118:10 120:18 122:21

**appears** 32:6 79:19 82:7 83:23,25 85:17 86:8,9,23,24 86:25 92:17 95:3 97:22 129:6

**apply** 43:11,16 124:24

**appointed** 5:5

**appreciate** 19:8 36:10

**approximately** 11:23 12:4 28:13 37:4 39:14 46:17 48:15 62:23,25

**Arch** 2:3,8 11:14

**area** 25:24 29:16 70:19 78:23 102:16 115:18 115:19

**argumentative** 115:12

**arm** 67:12,22 68:21

**arrive** 56:16

**arrived** 80:25 85:2

**arrives** 85:7

**Aside** 35:13 47:24

**asked** 10:6 18:24 20:3,10,17 23:1,5 27:13 27:15 28:3 43:8 61:20 67:4 68:12 74:23 88:24 119:19 125:5

**asking** 5:1 10:25

19:17 20:7 26:18 28:22 34:4 45:19 63:24 67:20 87:10 103:17 104:1 110:1 120:17

**asks** 33:19

**asleep** 92:4

**assess** 52:14 91:3

**assessment** 69:5

**assigned** 120:25

**assignment** 25:2 50:11

**assignments** 49:22 50:11

**assist** 27:6,11,11 27:13 28:4,7 28:11,18,25 89:4,8 125:22 126:11

**assistance** 26:19 27:2,5 28:14 28:17 29:8,8 29:16 90:6 93:13 113:17

**assisted** 28:6,21

**Associate** 37:14 38:21

**associates** 37:17 37:21,23 42:21 43:3 90:16

**associating** 90:17 93:9 94:14

**assume** 16:23 59:14,24 60:11 65:16 69:23,24 70:23 79:12,20 97:5 110:24,25

**assumption** 83:22

**attack** 90:25 92:4

**attempts** 119:21

Gerald Slory

**attend** 49:17
**attention** 67:11
  68:8 79:23,25
  119:17
**attorney** 11:22
  11:25 12:10
  13:4,11 46:9
  49:13 52:24
  129:11,14
**attorneys** 15:23
**audio** 9:10
**authority** 5:8
**available** 23:8
  90:11,15
**avoid** 46:21
**awake** 65:17
**aware** 5:10
  23:12 52:18
  53:21 57:14,17
  70:13 89:19
  121:10 125:21
**awhile** 88:14

**B**

**B** 2:7 50:22 51:2
  51:7,14 54:1,3
  56:14 57:8,18
  70:18,25 72:1
**B-1** 27:24 50:21
  50:22 82:14
  96:17 97:6
  117:14
**Bachelor** 37:15
**back** 18:1,4,15
  18:20 21:9,15
  26:2 29:14,18
  29:20 38:1,2
  42:15,16,16
  43:14 44:4
  49:14,20,20
  50:8 53:7,10
  55:10 70:13
  79:12,17
  100:12 103:18
  117:4
**background**

17:11 37:1
  43:13,15 66:24
**bad** 14:24 102:6
  120:18
**based** 44:3 60:7
  105:7 107:23
  126:9
**basic** 58:12
  79:18 111:10
**Bates** 85:5 124:1
**bear** 66:21 106:5
  107:14
**becoming** 123:3
**bed** 65:18,21
**beep** 120:1
**began** 12:6
  114:11
**beginning** 19:15
  64:6 74:22
  80:3 123:19
  125:6,20
**behalf** 5:9 19:9
**belief** 36:22
**believe** 59:12
  100:18 103:13
  103:15 106:7
  125:8 126:2
**bell** 91:24
**benefit** 57:24
**best** 22:20,24
  25:21 36:19
  64:19 129:10
**better** 50:1
  53:13
**bit** 50:1 70:16
  80:3 85:1
  104:17
**black** 105:4
  109:1
**blinking** 9:12
**block** 17:20
  26:21,24 27:10
  28:20 29:9
  77:12 114:13
  115:24 121:1,5
**blue** 75:11

**blues** 75:13
**Blvd** 2:13
**body** 68:23
**booth** 78:17,20
  78:22 79:3
**bottom** 31:23,25
  97:2 105:3
  106:20 107:1
  108:22
**BRADLEY** 1:8
**branch** 43:20
**break** 10:14,18
  10:20 21:9,12
  54:12,17 55:7
  56:7,8 61:20
  75:8 78:7,10
  78:18,21 96:10
  117:5
**breath** 66:18
**breathing** 65:14
  65:24 66:6,13
  68:14 110:7,8
  110:23 111:12
  111:12,18
  112:2
**bring** 5:8 96:12
  101:19 108:18
  117:11
**bringing** 104:21
**BROAD** 1:23
**brought** 5:16
  48:2
**building** 2:3
  11:14 50:22,24
  51:1,1,2,7,14
  54:1,4 56:14
  57:9,18 70:18
  70:25 72:1
  78:23
**Buildings** 51:15
**bunk** 115:20
**busy** 22:23
  25:23 94:4,6
**button** 73:10,14
  73:16,21 74:12
  74:13,19 75:20

75:22 77:3,5,7
  79:2,9,15
  83:12 119:25
  120:9
**buttons** 73:4,6
  74:21,25 76:3
  76:9,19,24
  83:16
**buzz** 73:22 74:2
**buzzer** 74:3

**C**

**C** 4:1 51:1,14
**call** 27:1,5,9
  68:20 73:4,5
  73:10,10,12,21
  74:12,19,21,25
  75:16,21 76:2
  76:8,19,23
  77:2,4,7,20
  79:2,9,23,25
  83:12,16 89:8
  91:23 113:16
  120:9
**called** 4:3 5:18
  14:5 15:24
  16:14 28:17,25
  29:7 30:3 35:7
  44:19
**calling** 27:8
  73:16
**calls** 75:10 77:1
**calm** 60:13
**Captain** 19:13
  19:21,23,25
  20:2 22:6,7
  29:19 33:4,5
  33:15,16,19,20
  34:18
**car** 38:17,19
  41:14,16,19
  42:12
**care** 42:14
**career** 36:8
  39:18
**case** 4:24 6:3,9

9:13 15:24
  16:1,6 17:3
  47:24 50:1
  56:6 73:4 82:4
**cases** 13:22
**casino** 38:23,24
  39:2 41:1,5
**Cast** 2:3
**cause** 20:22 22:6
  22:16 25:23
  30:10 60:9
  84:19 88:8
  93:15 111:1
  115:17,21
  116:25
**caused** 5:23
  72:15
**cautious** 70:25
**ceiling** 73:25
**cell** 5:13 17:25
  24:21,22 25:2
  62:11,12 66:2
  66:7 73:24
  74:12,14,16,19
  75:22 76:21
  77:7 78:15
  85:12 91:12
  92:3 94:12
  97:7 98:12,25
  99:4,8,13,19
  100:1 101:7,11
  101:12,15,15
  102:1,9,9,20
  102:25 103:4,5
  103:24 105:23
  107:5,19 108:1
  108:5 109:6
  110:6,9 111:25
  112:5,11 113:2
  113:6,9,10,15
  114:2,6 115:24
  116:2,8,9,12
  116:18 117:18
  118:6,11,20
  119:4 120:9,12
  120:18 121:15

122:14 127:11 127:20
**cellmate** 99:20 117:22
**cells** 61:6 73:5 91:9 95:19
**Center** 2:13
**central** 78:23
**certain** 114:15 114:21,24 115:5 127:3,5
**certainly** 88:21 91:14
**CERTIFICATE** 129:1
**certify** 129:5
**CFCF** 48:24 49:5,23 73:5
**challenging** 102:14
**chance** 19:3
**change** 62:1,3 104:16
**changed** 57:21 57:22 126:2
**Charlene** 16:9
**check** 21:3,6 62:14 65:24 74:25 83:6 84:5,8 102:25 120:24
**checked** 76:8,19 76:20
**checking** 98:25
**checks** 103:24
**chest** 66:3 111:19
**Chestnut** 42:2,4
**Chief** 2:7
**children** 5:4
**chitchat** 34:13
**choice** 90:5,8
**choose** 93:12
**chose** 90:13 93:7
**Christopher** 16:19,20,24

27:23 50:5
**circumstances** 25:22 30:5
**City** 1:7 2:7,10 5:17 55:21 85:5 124:2
**claims** 5:20
**clarification** 6:14 11:9 13:5 18:3 21:5 23:19 26:13 39:7 42:23 45:6 59:9 63:8 67:17 77:14 78:19 88:10 94:9 97:9 110:14 112:4 115:13
**clear** 27:9 75:4,5 75:8,12,13,18 75:22 76:4,5 109:4
**client** 15:25
**close** 55:25 102:9 103:4 117:1
**closer** 32:21,22 32:24
**clothed** 112:16
**co-workers** 12:14
**cold** 71:16
**colleagues** 34:13
**College** 37:22
**come** 5:2 9:17 18:15 26:2,23 27:6,10,13 28:3,7,11 29:14 30:14 34:3 35:8 36:22 37:11 68:19,19 74:13 74:22 79:11,12 88:24 89:13 91:12 118:6
**comes** 116:17

**comfortable** 23:7 24:17,18 24:20 25:1 110:6
**comfortably** 110:9 112:10
**coming** 52:4 81:9 112:14 119:3 121:6 126:24
**Commander** 19:11,12
**Commander's** 18:23,24
**Commission** 129:23
**Commonwealth** 129:21
**communicate** 62:17,17 75:15 104:4
**communicating** 87:17
**communication** 76:5
**Community** 37:22
**company** 5:17
**Complaint** 15:25
**complete** 9:5,5 10:9,23 37:17 42:25 64:2
**completed** 43:1 69:20
**completely** 69:24 70:10 108:6 114:6
**completing** 21:16
**compliance** 88:5 88:7 92:24
**complicated** 125:17
**complies** 87:25 97:23 98:9,22

**complying** 88:22
**computer** 22:23 26:3,8,17 27:2 54:11 84:19
**computerized** 13:13
**concept** 71:5
**concerning** 13:17 18:12 35:18 41:14 56:6 118:23
**concluded** 128:1 128:14
**conclusion** 81:10
**condition** 121:20
**condolences** 19:3,5
**conduct** 60:23 61:10,16,17,20 62:7,22 63:3 63:16 64:9 68:9,15 69:4 70:2 80:20 88:15,23 89:20 90:13 92:11 93:16,18 95:7 95:14 101:7 103:11,24 111:5,7 115:6
**conducted** 32:7 70:3,9 83:1 86:14 87:12 96:6 101:25 103:19 104:11 114:24 115:5,9
**conducting** 9:9 29:16 68:2 70:25 89:9,16 90:22 93:14 115:18
**conducts** 50:4
**confirm** 8:6 9:22 13:12 31:21 67:13 68:13

79:18
**confirmed** 70:18 111:6 123:20
**confusing** 63:13
**connection** 35:21 82:4 123:11
**consent** 49:18
**consequences** 123:15
**consistently** 44:11
**console** 74:3 79:14 107:20
**contact** 93:13
**contacted** 89:3
**contemporane...** 21:2 55:25,25 84:12,16
**context** 119:22
**continue** 56:5
**conversation** 8:21 23:23 29:19 33:2 34:13 46:13
**convinced** 112:8
**copy** 22:4,12,13 55:24
**Corizon** 1:7 2:15 4:23 5:18
**Corizon's** 5:18
**corner** 9:11 31:9 117:25
**correct** 6:17 7:2 7:13 10:3,9 13:14 15:12 17:16,21 18:18 21:18 22:8,15 24:2 25:3,9 32:8 33:8,13 33:20,24 34:24 36:24 37:6 38:9 40:7 42:9 43:5,24 46:22 47:2,8,17 48:8 48:11,18 49:6

Gerald Slory

50:15 51:3,11 52:6,11,15,20 53:19,23 54:4 55:3 58:9,20 59:3,7,12,18 60:14,17 61:8 61:11,23 62:1 62:4 63:4 64:13,21 65:11 65:19 66:4,18 69:9,14,21 70:4,6,11,21 71:1,6,18,22 72:1 73:25 75:23 77:8 78:16,24 79:9 79:15,24 82:12 82:15 83:2,17 84:16,23 85:8 87:19 88:19,25 89:21 90:7,14 91:10,15 92:6 93:8,14,22 94:1,19 95:1,8 95:11,22 96:1 96:6 97:13 98:5 100:1,4,6 101:2 102:11 102:16,21 103:5 104:23 108:11 110:19 111:8,20 112:21 114:13 115:10 116:13 121:1,11,16,20 121:24 122:4 122:21,25 123:6,12,17 124:8,17,25 125:9,23 126:20 127:4
**correct-** 38:23
**Correction** 39:25 62:10 64:13
**Correctional**

4:11 5:14 48:8 48:17,24 58:3 58:15 63:15 120:24 123:21
**correctly** 4:8 34:17 43:3 56:25 64:1
**counsel** 2:23 11:3 14:15 82:3 128:6 129:11,14
**count** 67:23,24 68:19,20 116:1 116:4
**country** 7:10 43:21
**couple** 23:11 35:11 84:22 85:14 126:1
**course** 13:21 14:25 15:1 56:8 120:17
**court** 1:1,22 2:24 4:22 5:5 6:14,20,23 7:2 7:4,8,18 8:7 11:9 13:5 16:1 18:3 21:5 23:19 26:13 35:8,9 39:7 42:23 45:6 53:9 59:9 63:8 67:17 77:14 78:19 88:10 94:9 97:9 110:14 112:4 115:13 128:5 128:10,13 129:20
**covered** 100:18 115:12,14
**covers** 100:20
**cramps** 71:16
**credit** 97:25
**criminal** 37:14 37:16 38:22

**Curran-From...** 5:13 48:23 58:3
**cursed** 45:5,7 47:1
**cursing** 47:11
**cursor** 82:7 97:2 97:6,12,15,21 98:4,11 102:19
**custody** 58:17 59:3,17,22 91:5
**cut** 8:18 74:9,11
**cut-down** 83:8

─────────
**D**
─────────

**D** 3:1 4:1 51:1 51:14
**data** 14:1
**database** 13:13
**databases** 13:21
**date** 1:15 32:3
**dates** 19:16
**day** 18:16 21:17 22:21,21 25:23 25:24,25 33:8 33:12,25 54:1 55:2 56:13 59:15 67:16,18 71:16 102:15 102:24 108:11 115:20 116:8
**day-to-day** 74:23
**days** 11:19,20
**dealing** 60:1,4,8
**death** 5:23 30:5 30:10 35:22
**deceased** 5:9 16:5
**decide** 43:11
**decided** 44:3,4
**Defendants** 1:10 2:10,15 4:23 5:21
**degree** 37:14,15

37:18,21,24 38:22 42:21 43:3
**delayed** 84:22
**deliberately** 5:21
**Department** 4:11 5:14 24:25 37:3 38:15 40:2,4,5 40:23 43:12 44:11,15,18 48:7 49:21 63:16 75:7 119:11
**deposed** 50:6
**deposition** 1:14 5:2 6:3,6,11,17 9:9,11 11:1,7 12:7,10,16,19 12:25 15:20 16:9,15,18,25 20:18,19 31:3 49:13,17 67:4 67:9 68:7 80:3 104:5 123:20 125:6,20 128:1 128:14 129:4,6 129:8,13
**depositions** 14:5
**Deputy** 2:7
**describe** 46:12 51:19 56:13 62:7 69:3 75:3
**described** 23:25 27:24 47:6 50:2,6 59:6 65:9,10 68:25 69:12
**DESCRIPTION** 3:8
**deserve** 126:8
**desk** 74:3
**details** 15:1 30:9 41:14
**detective** 119:20

**determination** 65:1
**determine** 65:22 66:2 111:7,17 122:20 127:10
**deviate** 64:15
**dial** 54:13
**diaries** 17:3
**died** 5:11 30:1,5 30:7 32:21 73:1
**dies** 90:25 92:4
**difference** 54:20 72:8,12 86:23 87:6 90:21
**differences** 51:13,17,20
**different** 13:10 13:23 14:14 15:4 21:25 23:12 34:11 36:5,7,11,15 36:23 41:17 50:7,10 51:18 51:25 55:1,2 66:10 72:10,16 87:8,10,11,17 90:23 110:1 116:23 120:15 125:7,10,19
**digital** 12:23
**dignity** 59:22 123:22 124:21
**Dilks** 129:3,18 129:19
**discipline** 45:11 45:12 46:21 47:16 123:10 123:14,15
**disciplined** 44:15,17 46:2 46:4
**discomfort** 71:18
**discovery** 55:24
**discussed** 11:5

Gerald Slory

Page 134

19:11 55:17
90:20 91:20
92:24 93:20
**discussion** 46:9
49:12 56:6
67:1
**disorders** 60:2
**disrespect**
113:21
**disrespected**
45:22
**disrespectful**
123:16
**distress** 109:25
126:20
**distressed** 91:25
111:3 113:14
126:6,16 127:6
**DISTRICT** 1:1
1:1
**disturbing** 66:25
**docked** 46:19
**document** 15:25
31:9,10,12,14
31:16,17,22
32:3 35:16
62:20 76:7,11
76:12 82:3,25
85:20 107:11
107:17 119:7
119:11,15
120:7 122:1
124:1,3,4
**documents**
12:18,22,23
13:17,20 14:9
20:17 35:18
106:10 126:10
**DOE(s)** 1:9
**doing** 8:19 14:21
14:22 18:14
22:17 25:24
27:6 40:17
41:4 54:12
55:2 62:18
81:3 88:8

90:10 93:8
94:25 95:6
110:4
**door** 97:7 98:8
99:5,7 105:24
117:18
**doors** 91:5
**double** 21:6
105:11,12
**doubly** 70:25
**drug** 72:5,15,15
72:17,23
**duly** 4:3 129:6
**duties** 81:3
**duty** 77:9 82:14
93:21

**E**

**E** 3:1 4:1,1
**e-mail** 31:4
106:10
**earlier** 10:9 33:7
89:3
**early** 28:12 42:6
**EASTERN** 1:1
**easy** 8:24
**eat** 78:7
**education** 37:13
37:25 38:8
**Eileen** 1:3 5:3
**either** 11:16
39:22 100:18
**ELIZABETH**
1:8
**emergency**
20:11 77:19
78:4 79:20
109:20,22
**emergent** 70:20
121:5
**employed** 4:10
129:14
**employee** 38:15
**employees** 5:18
**employment**
43:9 48:6

**encounter** 25:6
25:9
**encounters**
17:12 25:17
**enforcement**
44:5
**engage** 124:16
**engaging** 123:16
**enhanced** 121:4
**ensure** 58:16
77:25 91:4,19
96:4
**enter** 7:16 51:22
**entered** 42:18
44:7
**entire** 41:17
49:5
**entirely** 20:25
**entries** 83:5
84:11,15 87:10
**entry** 83:23 84:2
84:4,9 85:2,2
87:8,16
**equipment** 83:6
83:7 84:5,8
**equipments**
83:11
**escort** 29:8
**escorts** 50:8
**especially** 67:23
71:21
**Esquire** 2:2,7,12
**established**
104:22
**Estate** 1:4 5:6
**estimate** 11:13
11:24 81:6
**evening** 30:13
33:23
**events** 106:22
118:23
**everything's**
70:4
**exact** 20:7
**exactly** 8:20
**examined** 3:2

4:4
**example** 12:12
12:13 15:24
52:3 65:10
92:2
**examples** 15:22
50:10
**exception** 10:17
85:24 86:9,11
**exceptions** 85:18
85:21 86:7,25
88:19 95:13
**exhibit** 30:25
31:1,7 81:16
82:1 85:4
100:12 106:7,8
106:13 119:8
122:2 124:1
**EXHIBITS** 3:6
**existed** 125:22
**expect** 102:10
**expectation**
114:10
**experience** 44:4
54:3 60:8 72:5
72:16 86:13
111:11
**experienced**
74:18
**experiencing**
71:17 109:19
109:22 112:15
126:19
**expires** 129:23
**explain** 49:25
51:19 58:6
96:15 106:22
**explained** 20:8
72:22
**explanation**
94:3,24
**extinguishers**
83:9
**eye** 105:1,16
117:24
**eyes** 80:24

**F**

**F-U-L-G-A**
82:20
**Facebook** 17:8
**facilities** 48:18
48:20
**facility** 5:14,19
40:2 48:24
56:16 58:3
121:6
**fact** 8:1 17:24
27:22 36:21
52:18 61:7,25
65:23 66:3
67:13 73:18,20
76:19 83:24
101:11 103:19
113:2 115:6
126:11
**fair** 66:1 87:15
113:8
**fall** 111:19
**familiar** 27:25
51:9 52:14
53:17 60:7
71:5,8 73:5
76:16 97:6
107:7
**family** 12:15
19:4,5,9
**far** 22:19 51:16
51:17,17 85:3
91:20 96:1,2
99:6 120:21
**fashion** 89:9
**fast** 63:3 64:20
80:21 88:15
116:17,19
**favor** 106:19
**feel** 23:1,1 59:6
59:11
**feeling** 62:18
**feet** 99:5
**Feinberg** 2:2,2
3:3 4:6,18 13:7
20:24 21:8,14

Gerald Slory

46:11 49:11,14 49:19 52:23 53:6,12 54:15 54:19 55:5,9 55:15 56:4 57:23 58:2,4 61:3 63:9 65:7 66:21 67:2 89:14,25 92:1 92:10 96:8,13 96:19,22 97:17 97:20,24 98:2 98:7,10,17,20 98:23 100:8,11 101:18,22,23 102:5,7 104:16 104:20 105:21 106:1,4 108:4 108:17,20 109:13 111:16 111:23 114:20 115:15 116:15 116:20,24 117:3 118:14 118:17 121:9 121:14,22 122:18 125:16 127:1,22,25 128:8
**felt** 90:6 96:4
**female** 29:1 82:23,24 105:11
**fight** 77:20
**figure** 40:21,25
**filed** 16:1
**filing** 2:24
**filled** 122:1
**filling** 28:3
**final** 95:14 127:8 127:12
**financially** 129:15
**find** 17:23 21:7 58:7 77:7
**fine** 19:16 70:4

87:18 96:1 101:25 122:21 128:8
**finger** 45:24 47:5 124:7
**finish** 8:23 30:7 31:3 62:19
**finished** 9:4 21:21 80:10 107:4,9 117:1
**fire** 83:9
**fired** 43:8
**firm** 4:21
**first** 4:3,15 6:16 8:5,10 16:9 17:23 19:25 21:24 25:5,8,9 31:23 35:5 37:11 38:18 43:20 48:23 55:12,12 56:16 56:18 61:14 64:3 68:19,19 80:11 81:14 82:7,21,22 85:4,14,16,16 87:23 96:11,23 106:12,20 107:15 108:10 127:14
**five** 23:18,20,20 24:2,3 37:4 80:13,14
**flashing** 73:23 73:24 79:6,8 79:13
**flashlight** 62:10 62:14 66:19 99:9 111:1 112:3,5 113:15
**flip** 75:18
**Floor** 2:8
**foam** 112:14
**foaming** 108:7 112:21 113:5 113:11 114:2

114:11 122:25 123:4
**follow** 33:4 55:24 62:13 64:21 106:21
**followed** 8:25
**follows** 4:5 68:18 113:23 119:21
**foot** 102:19
**footage** 14:16,17 14:20 15:15,19 96:24 102:11 103:10,21 104:3,6,22 124:12 127:10
**foregoing** 129:6
**forgot** 19:13
**form** 2:24
**formal** 34:10 37:25 38:8
**forth** 50:8
**forward** 56:17 112:6,7,9 116:17 119:14
**forwarded** 116:19
**found** 5:13 17:21,24
**four** 11:8,10,10 34:3
**four-month** 32:15,19
**fourth** 119:15
**frequently** 71:21
**front** 31:6,8 96:24 100:15 106:6 111:24 119:11
**Fulga** 82:18,19 82:19,20
**Fulga's** 82:21
**full** 9:5 10:23 97:25
**fully** 52:13 114:10 122:25

123:4 129:10
**function** 57:1
**fundamental** 111:6
**further** 4:25 39:18 127:23 129:13

---
### G

**G** 4:1
**garbled** 9:18
**GAYE** 1:9
**generally** 24:11
**Gerald** 1:7,14 3:3,12 4:2 129:4,5
**gesture** 123:17 124:14
**getting** 54:11 94:11
**Gila** 2:18 4:20 21:11 96:8,14 96:19 97:21 98:7,17,21 100:8 101:19 101:22,25 102:19 103:8 104:17,21 105:13,14,18 106:2 108:17 109:8 116:15 117:10 118:1,1 118:4,14
**give** 8:2,11,12 8:23 9:4 10:23 11:12 15:22 19:3,5 20:6 22:6,6 23:8 30:8 33:20 92:23 126:7
**given** 10:9 20:4 46:15 59:25 119:6 129:9
**gives** 8:9 106:25
**giving** 24:19 28:16 29:4

47:5
**Glattstein** 2:18 4:20 97:23 98:9,22
**Gleave** 125:11 126:7
**Gleaves** 1:4 5:4 5:6,11 13:18 14:10,16 16:5 17:13,21,24 18:13,21 22:25 23:11,23 24:4 24:7 25:6,18 29:22,24,25 30:15 32:14,21 32:25 34:14,20 35:3,18 36:5,7 36:16 45:19 47:8,12 56:6 73:1 80:2,9,11 80:13,23 81:10 85:1,7,11,16 95:21 96:5 99:10,20,25 103:1 104:8 108:1,6 109:19 109:23 110:2,3 110:13,23 112:2,20 113:1 113:5,13,17 114:2,6,10,11 118:24 119:23 120:12,17 121:15 122:21 122:24,24 123:3,11 125:8 125:23 126:3,6 126:12,19
**Gleaves'** 5:22 14:1 35:22 101:11,12 113:9 117:22 127:11,20
**go** 18:23 21:9 23:9 24:16 29:18 35:8

Gerald Slory

39:18 41:17
49:10,20 51:23
55:6 56:18
59:15 75:23
77:7,24 92:5
107:2 109:6
117:1
**God** 127:6
**goes** 50:7 70:17
74:3,5 79:8
**going** 8:17,20
11:4 29:11
30:24,25 37:1
37:15 40:22
41:7,10 54:14
57:24 64:3
68:6 75:7
78:18,21 81:14
81:19 96:14,16
106:6 117:21
127:9
**gonna** 23:7,7
29:4 32:10
61:13 62:13
73:22,23 74:13
82:5 86:18
92:5,8 103:22
104:3,5,25
106:5 107:2
119:16 122:7
**good** 23:2 43:15
55:15 62:18
66:16 126:23
**gotta** 18:23,25
20:12 26:10
35:8,8 64:22
68:20 69:7
75:12 77:7
88:15 91:12
103:3 115:1
**gotten** 107:18
**govern** 93:21
**graduate** 38:12
**grandmother**
5:3
**GRATTSTEIN**

116:22
**Gregory** 2:12
4:23 49:9,13
49:16
**group** 22:25
23:14 24:1,3
**guard** 38:23
39:21 41:2
120:2
**guards** 119:21
119:23
**guess** 20:23
63:24 87:5
**guys** 23:5,7
24:11 52:3
68:22 92:3

———————
**H**
———————
**H** 2:2
**half** 12:8 40:11
62:23,23 68:2
80:21 93:17,18
95:7 111:25
122:10,15,20
**halfway** 78:7
**halls** 62:13
**hand** 21:20
**handle** 93:15
**handling** 13:22
**handwrite** 22:2
**happen** 16:12,15
27:12 79:13
90:9
**happened** 15:11
16:15,24 18:25
19:1,2,6 20:14
20:15 25:13
30:9,14 33:3
34:14 45:21
69:21,25 85:1
112:24,25
116:7 123:3,4
127:4
**happening** 9:23
94:15 101:2
**happens** 33:22

117:25
**happy** 10:14
**hard** 22:4 63:3
64:20 80:21
88:15
**Harris** 19:23,24
19:25 20:2
22:7 29:19
33:5,15,16,19
33:20 34:19
**head** 20:23
67:24
**health** 1:7 2:15
41:8 42:13,14
43:4 58:16
59:17 60:2
65:2 91:4,19
96:1 103:1
120:18 121:5
**healthy** 60:24
61:6,7
**hear** 9:17 18:20
55:13 73:22
74:2 110:15
118:18,21
120:4
**heard** 8:13 9:20
39:19
**hearing** 120:9
**heart** 90:25 92:4
**held** 49:12 67:1
**help** 36:5 45:19
77:21 89:13,13
91:23 126:7
**helped** 127:7,7
**hereto** 129:15
**high** 38:12 73:25
**higher** 58:23
**highest** 37:13
**history** 40:21
**hit** 98:17
**holding** 16:13
**home** 38:1,2
43:14
**hospital** 20:12
30:10

**hospitalization**
30:9
**hour** 12:4,8
62:23,24 68:2
80:21 93:17,19
95:4,7 111:5
**hours** 5:12 84:3
85:6 104:2
122:10 126:1
**house** 26:10,11
26:15 49:24
93:10
**housed** 14:17
24:22 85:10
**housing** 3:9 14:6
29:16 50:3,7
50:14 57:1,8
64:3 80:12
88:8 89:20
90:16 94:4
100:14 122:2
**human** 111:10

———————
**I**
———————
**idea** 53:17 100:6
109:18 118:22
**identified**
117:22
**ignore** 77:2,4
**immediately**
86:8 107:25
112:20
**immigrated** 38:7
43:17
**immigration** 7:9
7:12,12 37:10
**impermissible**
70:11
**important** 8:9
58:15 60:24
**imposed** 123:14
**inappropriate**
53:2
**incident** 30:22
32:14,16 46:25
47:4,10,12,16

50:20
**including** 5:21
**incomplete** 56:9
117:7
**incorrect** 56:9
117:7
**indicate** 83:23
116:11
**indicates** 74:16
**indicating** 16:14
23:14,21 65:15
66:20 75:4,19
75:21 79:7
106:8
**indicting** 12:23
**indifferent** 5:22
**info-** 56:19
**informally** 34:12
**information**
15:18 16:4
20:4,6 34:4
56:20 79:19
99:24
**ingested** 72:14
**initial** 56:23
83:1 106:23
**injured** 41:7
**inmate** 28:16,20
45:4,4,19 73:9
85:10 88:9
89:4 91:23
**inmate's** 73:11
73:17
**inmates** 23:20
49:24 51:16
58:25 75:10,15
76:6 90:16
91:9,11,24
93:4,7,10 94:5
94:11 99:17
110:5,18
115:19,22
**inside** 91:5
116:2
**Instagram** 17:8
**instance** 68:18

Gerald Slory

**instances** 45:13
  47:20
**institution** 37:20
  37:21
**instructed** 64:8
  124:16
**instructions** 8:3
  8:9
**insulin** 94:7,10
**intake** 68:21
**intended** 11:17
**interacting**
  115:19,22
**interaction**
  60:17
**interested**
  129:15
**Internal** 44:19
  44:23 123:8
**interrupt** 9:3
  49:9,10 54:10
**interrupted**
  42:24
**interview** 3:12
  32:6,13,22
  34:2,5,10
  35:16
**introduce** 4:15
  4:19 30:25
**introduced** 13:3
  13:11
**introduction**
  4:25
**investigate**
  44:20
**investigated**
  47:21
**investigation**
  44:23 45:3,11
  45:15
**involving** 47:4
**Iron** 2:3
**issue** 72:16
  81:11 107:25
  122:7
**issues** 9:17 51:21

51:25 52:5,10
52:15,19 53:18
53:23 57:24
60:5,9,9 70:20
71:4 121:6
**it'll** 75:22 109:4

**J**

**J** 2:12
**jail** 28:23 29:5
  94:13
**January** 32:4,14
  34:2,19 35:1
  123:9
**Jersey** 42:3,4
**JFK** 2:13
**job** 22:21 25:23
  25:25 26:6
  38:24 39:16,20
  39:24 41:14
  42:11 43:8
  44:16 58:13
  61:5
**JOHN** 1:9
**Jon** 4:18 102:3
**Jonathan** 1:4
  2:2 5:4,6 17:13
  99:19
**Jones** 3:10 16:19
  16:20,24 27:23
  50:5 57:16
  76:13 105:8,8
  105:12,16,23
  106:16,25
  107:7,25
  112:19 114:13
  117:16 119:1,1
  119:3
**Jones'** 107:24
**Jr** 1:4 5:4,6
**jumpsuit** 118:6
**justice** 37:15,16
  38:22

**K**

**KAIRYS** 2:2

**KAPLAN** 1:22
**keep** 36:7 54:14
  61:5 62:15,19
  105:1,16
  117:24
**keeping** 60:24
**kept** 22:11
**kicked** 105:24
**KIMBALL** 2:12
**kind** 20:4 28:14
  34:9 38:14
  40:17 41:3
  65:9 79:18
  83:21
**kit** 83:8
**knew** 88:21
**know** 8:20 9:18
  10:6,10,14
  11:5 13:23
  14:24 16:10,11
  16:19 19:25
  24:16,16 26:11
  27:17 29:12
  36:13,17 44:18
  51:2 55:22
  72:8,12 74:11
  77:17 78:6
  79:3 80:19
  81:8,24 82:20
  82:21,22 84:12
  87:22 89:1
  91:1 92:5,8
  95:17 97:17
  99:6,15 100:3
  100:5 101:10
  102:13 105:8,9
  107:3,16 109:9
  110:8,22
  112:12,25
  113:3,7,10,11
  113:24 114:2,6
  117:16 118:1
  120:1,15
  126:22 127:21
**knowing** 32:12
**knowledge**

44:22 63:21,24
72:21
**known** 64:11
**knows** 69:20
  127:6

**L**

**L-E** 105:12
**LALITHA** 1:8
**larger** 81:20
**law** 4:21 44:5
**lawsuit** 5:16,20
  35:2,6 47:25
  48:2
**lawyer** 104:4,6
**lay** 24:16 80:24
**laying** 65:21
  80:16 99:12
  110:5,6,9
**LEAMAN** 1:22
**learned** 35:5
**leave** 39:16
  42:11,12 43:8
  77:11,23 78:2
  78:15
**led** 124:15
**left** 6:4 9:11
  17:20 31:9
  40:10 41:1,4
  49:13,17 56:11
  79:12 80:25
  97:2 98:8
  102:15,18
  108:22
**leg** 41:7 67:12
  67:22 68:20
**legal** 5:8 15:25
**length** 80:19
  91:20
**let's** 8:6 9:22
  21:9 29:18
  31:18,21 33:16
  49:20 54:16
  55:6 56:5,14
  60:19 79:18
  80:1 81:19

84:25 85:14
88:4 99:4,18
104:16 106:1,2
107:13,14,22
108:21 116:15
116:24,25
117:1,9
**level** 37:13
**life** 36:8 56:13
  65:11 67:10
  68:3,4 69:9
  91:3 96:4,5
  111:8 116:9
**light** 8:1 9:12
  62:14 73:24
  75:23 79:6,8
  79:14
**lights** 73:23
  107:19
**LIN** 2:2
**line** 53:14 68:11
  68:11
**list** 28:23
**listed** 93:25
**lit** 75:21
**literally** 64:12
**LITIGATION**
  1:22
**little** 10:12 23:4
  23:6 26:3 33:7
  50:1 70:16
  80:2,20 83:5
  84:25 102:14
  104:17 110:22
  119:16
**live** 91:18
**living** 65:19
**LLP** 2:2,12
**locate** 55:21,23
**located** 41:21,24
  41:25
**location** 15:3
  97:16
**locations** 70:20
**Lock** 13:3,6,8,12
  13:17,21,23

Gerald Slory

14:1 15:19 69:16 76:12
**locked** 91:6,9,11
**log** 3:9 13:4 14:6 56:23 69:13 70:3 76:8,15 76:17 81:13 82:7 83:25 84:11,15 87:10 87:15 100:15 100:24 115:3,4 115:8,10 122:2 122:2
**logs** 87:8
**long** 7:4,15,19 10:13 12:2,5 30:19 37:2 39:1,13 48:13
**look** 13:2 15:20 20:22 21:10,13 24:24 31:15 35:15 54:2 66:19 68:2,16 85:14 91:5 97:1,7 101:11 101:12,14 102:1,8,15,25 104:18 108:21 112:6 115:23 116:2,8,12 117:14
**looked** 12:21,24 14:1,7 20:17 87:16 99:4 100:17 101:7 103:7,10,18,23 105:23 108:5 109:15 112:3 121:15 122:14 127:11,15,20
**looking** 66:2 67:8 103:5 113:9,10,24 114:1,5 117:13 126:18
**lookout** 52:10

**looks** 54:11 82:17 102:19 111:25
**Lori** 4:22 8:6 31:2 49:14 53:7 106:9 128:3 129:3,18 129:19
**lose** 46:20
**lot** 22:17 66:5,10 68:21 71:18 88:9
**loud** 119:16
**loudly** 8:12
**lunch** 77:24 78:6 78:18,21
**lying** 70:6,8 100:1 115:10 115:17

_____
**M**
**maintain** 57:6 58:24
**maintaining** 59:1
**making** 8:7 9:6 9:10 83:21 120:2
**male** 28:25 29:2 82:23
**man** 24:15 29:8 40:19 118:5 127:7
**manager** 38:19 42:9
**mark** 123:25
**marked** 31:1,2 81:25 106:7 119:8
**married** 40:19
**Marshall** 32:7 32:13,23 34:3 35:17
**materials** 15:17 55:20
**matter** 123:22

**MATU** 1:9
**McNAMARA** 1:3 5:3,3,5,16 5:20
**mean** 12:22,23 24:21 25:21 26:4 27:9,10 40:18 51:20 65:13 67:18 74:8 75:8 77:17,17,18 84:3,12 85:11 85:19 95:16 113:20
**meaning** 21:17
**means** 5:7 7:24 10:1 30:25 37:5 50:7 62:4 70:24 83:16 115:9,23
**media** 17:5,6
**medical** 5:19,22 51:17,21,25 52:19 53:18,23 70:20 71:4 72:16 79:20,23 79:25 81:11 109:19,22 113:16 126:20
**medication** 94:7 94:11
**meet** 11:6
**meeting** 12:2,5
**meetings** 11:12 11:18
**Melvin** 19:24
**members** 12:15
**memo** 18:25 19:1 20:3,5,13 20:15,18,20 21:2,20 22:1 33:5,8,17
**memorandum** 21:17 22:19 30:12 33:19 34:18 35:14

55:18 56:1
**memory** 21:16 26:9
**men** 23:12 24:2 24:3 80:14,14
**mental** 60:2
**mention** 112:13
**mentioned** 5:11 11:2 22:10 25:20 37:10 43:5 47:10 55:18 69:11
**message** 87:18
**MESSING** 2:2
**met** 11:22,25
**middle** 45:24 47:5 102:24 124:7
**military** 43:14 43:18,19,23 44:1,2
**mind** 54:12 59:16
**mini** 128:8,12
**minutes** 12:8 56:7 63:4,7,17 63:18 64:9,22 65:4 69:4,8 84:3,22 85:7 87:24 88:1,5 88:16,23 89:16 89:21 90:4 92:22,25 93:3 93:8,25 94:1 94:18 95:11 112:19,24 114:12 117:6 122:23,24 123:5
**misconduct** 44:16,21 45:15 47:22 124:17
**misheard** 11:17 28:10 39:23
**misrememberi...** 76:15

**missed** 20:25 36:14
**misspeaking** 39:23
**misspoke** 11:16
**Mohegan** 39:5,6 39:8,20,24 40:10
**moment** 5:11 11:2 24:9 31:5 54:7 105:24 127:18
**monitoring** 78:15
**months** 34:3 35:11 48:15
**morning** 15:12 25:14 28:12 80:5,10
**motion** 68:23
**mouth** 108:7 112:14,21 113:5,12 114:3 114:11 122:25 123:4 126:24
**move** 65:25 66:8 67:22 68:21 98:8 102:19 112:6,7,9
**move;see** 66:7
**moving** 62:15,19 65:14,22 97:2
**multi-purpose** 97:8,10
**Mutual** 124:22

_____
**N**
**N** 3:1 4:1
**naked** 108:6 112:16,17,20 113:2,11 114:7 114:10 122:25 123:4 126:25
**name** 4:7,17 19:13 20:1 27:17 31:9

Gerald Slory

41:19 82:21,22
83:23 119:12
**named** 5:3
**names** 19:16
99:18
**need** 6:8 10:14
33:16 66:1,11
66:17 73:11,17
89:12 128:3
**needed** 20:5
46:21
**needs** 5:22 73:9
75:16 91:23
**neglected** 41:13
**neither** 35:14
129:11
**nelp** 126:7
**never** 24:24
34:20 36:21,21
36:22 75:6
**New** 42:3,4
**newly** 31:2
**nice** 24:18
**night** 14:3 17:13
17:17,17 18:14
20:13,13,14,15
22:23 23:13
26:1,6,16 28:6
28:11 35:25
45:18,18 47:7
50:20 58:8
67:18,18 76:22
81:14 84:20
88:8,12 96:17
120:8,17
**nighttime** 91:8
**noise** 66:25
**normal** 8:21
83:2 95:14,18
**Northampton**
37:22 42:24
**Notary** 129:21
**notation** 83:15
**note** 8:5 9:9
19:14 20:25
49:15 55:16

69:19 75:6
83:11 85:17,21
86:8,22 92:17
**noted** 85:15,18
86:7,24,25
88:3 90:1
95:13
**notes** 17:2 95:13
**notice** 35:2
**notify** 91:24
119:21,23
**noting** 52:25
**November**
129:23
**number** 3:8
13:20,21 23:12

——————
**O**
——————
**O** 4:1
**o'clock** 15:11
25:14 80:5
84:8 128:15
**O'CONNOR**
2:12
**oath** 6:19 7:1,24
9:24
**objection** 52:21
60:25 63:6
65:5 89:10,23
90:1 91:21
92:7 108:3
111:13,21
114:16 115:11
121:7,12,21
122:16 126:21
**objections** 2:24
**objects** 52:25
**obligation** 49:16
**observation**
114:12 127:14
127:17
**observations**
108:9 112:19
114:22
**observed** 23:3
107:25 112:20

**obtain** 37:20,21
79:18 116:9
**obvious** 8:6
16:23 61:5
65:18 68:15
69:24 72:7
95:17
**obviously** 20:3
65:17 92:23
**occasions** 15:2
**occur** 11:18
**occurs** 92:22
94:21
**off-duty** 104:24
**offer** 28:15
**office** 18:23,24
101:5 103:23
**officer** 4:12,15
4:15 16:9,10
16:19 21:2,16
27:10,13,15,18
27:19,23 28:25
29:1 39:25
48:8,17 50:2,3
50:5,12,13,14
51:10 55:17
56:1,14,20,20
57:1,8,15,15
57:16 58:5,6
58:15,25 59:14
62:9,10 63:11
63:14,15 64:4
64:13 65:3
67:3,4,7 68:8
68:12,17,25
69:2 70:24
73:10,11,16,19
74:4,6 75:6,11
76:13 77:11
78:11,13,15,17
78:20,22 82:17
82:21,23 89:8
89:20 91:23
93:13,22 97:22
98:3 105:4,7,8
105:11,12,16

105:22,23
106:16,25
107:7,24,25
108:25 109:14
110:15 112:18
114:13 115:18
117:4,15,16
118:9,18
120:24 123:21
127:25 129:3
**officer's** 27:17
86:12
**officers** 26:23
63:2 64:8 94:4
118:11 124:24
**oh** 28:19 31:11
31:19 33:6
36:13 97:17
103:2 107:8
116:20 119:2
**okay** 6:25 7:7,15
7:18 8:16 9:2,7
9:15 10:16,20
10:21 11:11,16
11:21,24 12:5
13:2,12 14:4
14:19,23 15:10
15:14 16:12,22
17:10 19:14,19
19:24 20:24
21:8,15 22:14
22:22 23:7
24:23 25:12,20
27:22 28:24
29:15 30:4
31:21 33:6
35:13 36:18
38:2,6 39:9
40:1,5,14
41:11 42:5,8
42:17 43:23
45:24 46:8,19
54:18 55:5,15
56:25 57:23
58:13 62:21
63:19 65:16,19

68:10,18,23
75:5 77:10,22
79:1 80:1
81:13,24 82:23
84:18 86:2,11
87:20 88:14
89:15 90:5,12
90:20 92:11
93:20 96:8,10
96:17 97:11,20
98:14,20 99:23
100:8 102:5
103:3,15 106:1
107:13,22
108:21 110:10
112:18 113:1
118:4,14
120:20 124:23
125:5 127:22
127:25
**old** 37:8
**once** 7:1 21:12
21:24 42:12
43:4 44:24
63:17 64:9
69:8 80:11
94:1,17 95:6
97:24 106:9,10
109:5
**one's** 87:24
**one-on-one**
23:23
**online** 54:11
**OPC** 32:7
**open** 117:19
**operable** 76:21
83:7,12
**opiate** 71:10,14
**opportunity**
4:16 6:5 11:2
19:4 36:6,14
43:15 125:22
126:5,11,14
**opposed** 50:18
90:13
**orange** 118:5

order 33:16 52:9
  57:6 58:24
  63:20 65:2
  86:9,23,24,25
  92:17 101:14
  101:16 102:1,8
  111:17 113:10
  113:11
orders 128:6
original 2:24
outlined 5:25
outside 102:20
  117:18 118:11
overdose 72:5,9
  72:13
overdosed 72:23
overnight 61:25
overseas 43:14
overtime 18:13
  18:14

**P**

P 4:1
P-1 3:9 81:16
  82:1 100:13
  122:3
P-10 3:11 119:8
  119:9
P-11 3:12 31:1,7
P-4 3:10 106:8
  106:11,13
p.m 17:17 18:10
  18:10,17,19,21
  29:20 54:21
  58:8 78:6 83:1
  91:15 128:15
PA 2:4,9,14
  129:20
page 3:2,8 8:4
  31:23,25 68:10
  71:25 81:21
  85:4 106:20
  107:1 119:15
  120:22
Pages 67:8
pain 71:16

panel 74:16 75:4
  75:9,18 83:13
paper 12:22
  76:8
papers 118:25
Paralegal 4:21
pardon 71:9
  72:7 115:4
part 7:11 59:20
  60:24
participated
  37:24
particular 15:5
  22:21 45:19
  67:16 71:8
  75:11 86:12
  88:12
parties 129:12
  129:15
partner 57:8
partnered 57:16
passed 32:25
  40:9 87:24
passing 113:14
pause 66:23
  98:20 105:18
  109:9,11 118:2
  118:4
paused 105:20
  105:23 109:12
pay 46:19,20
  68:8 119:17
PDF 128:8,11
pending 10:19
Penn 2:13
Pennsylvania
  1:1,23 39:11
  129:21
people 23:14,18
  23:20 25:24
  26:10 52:10
  59:22 60:1,4,8
  70:19 71:17
  99:19 103:23
  121:5 123:22
  124:21

perfectly 95:25
performance
  22:21
period 23:22
  32:16,19 34:8
  41:4 46:22
  47:16 48:13
  94:22 103:25
  104:8 122:14
periods 101:6,8
permissible
  78:14
permitted 77:2,4
  77:11,23
person 4:21 5:9
  5:11 16:5 28:2
  28:3,5,11,14
  28:19,20 29:3
  34:20 46:25
  60:13 62:17
  64:24 65:19,21
  65:23 66:6,7,7
  66:12,16 68:5
  83:24 120:25
personal 17:2
persons 57:20
  67:24
perspective
  83:16 123:3
Philadelphia 1:7
  1:23 2:4,9,10
  2:14 4:11 5:14
  5:17 13:14,22
  24:24 37:3
  38:15 40:2,4,5
  40:23 43:12,16
  44:11,14,18
  48:7 49:21
  63:16 119:7,10
  119:20
phone 73:13
photograph
  124:5,11
phrases 67:7
  71:24
physically 90:15

90:19
pick 56:14
pieces 12:22
place 7:19 23:8
  24:17,18 30:23
  32:13,15 41:18
  47:6,12 58:23
  78:1 86:3
  92:16 94:18
  100:17 108:14
  122:7,10 123:9
placed 73:20
  85:11 124:15
places 41:17
Plaintiff 1:5 2:5
play 98:17 109:5
  109:8
playing 126:23
plays 105:13
  118:1
Plaza 2:13
please 9:18
  10:14 21:12
  52:16 53:8
  95:17 97:21
  98:8 106:2,19
  106:21 108:17
  109:8 114:19
  117:11 128:7
  128:12
Pocono 39:3,4
pod 28:17 50:12
  50:13,13,17,21
  50:21 51:7,10
  56:13,19 57:20
  70:24 73:19
  77:10,19,23
  79:12 80:12
  82:14 90:10,11
  90:16,17,19,22
  90:24 91:18
  93:5,10,11,21
  94:15,16 96:17
  97:6 115:22
  117:14
point 9:2 10:13

23:17 26:24
  27:1 35:20
  36:12 38:6,8
  48:16 50:1
  79:17 81:9
  105:15 107:18
  120:8,12
  121:20 127:8
pointing 98:4
police 119:7,10
  119:20
policeman 43:14
  43:19 44:1,2
policies 64:25
policy 35:25
  63:20,22
population
  51:24 52:1
  60:1
portion 13:25
  105:3 117:15
portions 14:19
  14:23
position 42:9
  43:4 64:3 96:9
  126:5
possible 20:25
  63:1 113:1,4
possibly 64:20
post 17:5 63:20
practice 67:14
  67:21
practiced 67:15
preliminary 9:8
preparation
  11:1
prepare 12:18
  12:24 15:20
  33:5,17,19
prepared 16:1
  22:1 30:12
  33:7 34:18
  56:1 81:14
  119:6
preparing 20:19
  35:14,17 93:5

Gerald Slory

present 2:17 72:23 90:21,24 91:18
preserve 59:16
preserving 59:2
press 73:9 75:19 75:22
pressed 73:21 74:12 79:9,15 119:25
presses 77:7 79:2
pretty 59:6,11 71:21 111:12 116:25
preview 7:23
previous 14:5 34:9 43:9 44:4 56:9,20 63:12 75:10 82:17 117:6 121:18
previously 55:17 119:8
primary 57:1 89:19
principles 58:12
print 22:4,5,5
prior 16:8 20:18 119:22
priorities 58:21
priority 58:19 58:22
prison 12:14 29:20 30:14 35:25 40:4,10 41:2,5 43:16 59:25 65:1 70:21 94:18,25 95:8 118:19
prisoner 13:24 68:14 72:5 77:6 79:2,19
prisoner's 67:11
prisoners 50:8 58:17 59:3,17 60:24 61:6

65:3 91:4
prisons 4:11 5:15 13:14 24:25 37:3 38:16 40:3,6 40:23 43:12 44:11,15,19 48:7 49:22 63:16 75:7
probably 22:13 25:13 30:22 63:22,23 100:20
probation 46:16 46:16 47:6 124:15 125:3
probationary 47:16
problem 28:17 29:4
problems 42:13 43:4 51:18 74:19
proceed 49:18
proceeded 69:3
proceeding 6:20 7:2,4,8,12,19 7:25 37:10 53:1
proceedings 129:9
process 24:19 26:16 44:20 80:12
production 21:4 21:6,10
progress 94:7,8 94:10,11
pronounced 82:18
pronouncing 4:7
proof 65:10 68:3 68:4 69:9 91:3 96:4,4 111:8 116:9
protect 65:2

126:3
protected 36:16
provide 34:4
provided 14:15 82:3
providers 5:19
providing 104:7
Public 4:4 129:21
pulling 117:9
purpose 5:1 7:8 30:2 58:5 68:1
purposes 6:2 9:5 9:13
put 30:25 47:5 74:5,6,7 81:14 96:14 97:21 99:18 100:12 106:6 115:21
putting 24:21

___

**Q**

quarantine 51:3 51:11,22,23 52:1,19 53:19 53:22 70:17 71:4,21 72:1 121:4
question 8:17,23 9:19,20 10:5 10:19,19 14:13 14:24 16:23 21:23,25 30:8 32:12 34:9,11 36:9,10,18,19 40:22 41:23 49:25 52:16,25 53:3,3,7,11,13 53:15 54:13,16 56:12 59:10 63:11 68:7,12 68:15 72:8 83:20 102:6 106:21 110:2 113:22,23 114:19 119:19

120:14 125:15 125:17 127:12
questioning 21:15 55:16 58:5 68:7
questions 6:9 7:22 8:12,25 17:11 19:10 30:14 34:4 37:2 61:14 67:5 82:6 83:22 107:15 109:7 117:23 127:23,24
quick 55:23 87:3 87:6
quickly 100:24
quiz 19:17

___

**R**

R 4:1
R-E 105:12
radio 83:8
Raising 124:7
read 8:25 16:16 53:7,10 68:6 81:22 85:3 106:24 107:3,6 107:12,13,13 107:15,19,21 107:23 118:25 119:16,16 120:4
reading 2:23 65:18 68:10 107:9
ready 56:23 94:12 96:20
real- 36:22
realize 10:8 56:8 112:18 117:5
really 7:23 19:6 25:1 26:5,16 121:19
rearranged 55:11

reason 10:22 20:22 77:23 89:7
recall 22:14 25:6 25:10 35:14 47:15 63:25 80:5 95:21
receive 45:10
received 45:12 55:21 123:10
receiving 47:15
recess 55:8 117:2
recollection 24:9 115:1
reconstitute 54:13
record 4:17 8:8 16:14 49:10,12 49:15,16 52:25 55:6,10,17 67:1 69:13 76:19 85:3 117:1,5,10 128:4,6 129:8
recorded 8:13 129:10
recording 9:10 9:12
records 13:24 25:12 108:13
recreation 91:13
red 9:12
refer 4:14 83:12
reference 17:3 67:8 83:8 85:6 95:16
referenced 106:16 117:10
referred 14:6 76:14
referred-to 53:11
referring 12:14 23:11 110:18
refers 82:11

Gerald Slory

regarding 125:8
regularity 71:1
related 7:9,12
  129:12
Relatedly 9:2
relative 129:14
relevant 40:21
  105:15
relieved 78:11
  78:13
remain 60:13
remained 48:7
remember 7:7
  11:19 12:1
  15:6,9 17:12
  19:15,19,21
  21:1 22:19
  24:4,14 25:17
  26:7,18 29:21
  33:1 35:5,15
  35:17 41:12,20
  45:14 47:21
  53:6 76:22
  80:8 81:8,9
  88:16 99:21
  120:8,11,15,16
  127:19
remind 21:12
  127:9
reminded 53:14
remove 28:19
  120:17
removed 100:10
  103:9 106:3
  118:16 120:7
repeat 52:16
  114:18
rephrase 53:15
report 69:25
  100:22
reported 101:1
Reporter 4:22
  6:14 8:7 11:9
  13:5 18:3 21:5
  23:19 26:13
  39:7 42:23

45:6 53:9,10
59:9 63:8
67:17 77:14
78:19 88:10
94:9 97:9
110:14 112:4
115:13 128:5
128:10,13
129:20
Reporter-Not...
  4:4
reporting 1:22
  116:13
represent 5:2
  82:2 99:23
  101:4 103:22
  105:6 117:17
  122:9
representation
  30:17 103:25
  122:11
representative
  32:21 33:2,12
  33:18,18
represented 6:2
Representing
  2:5,10,15
represents 4:23
request 55:24
required 63:15
  67:6 88:6
  94:18 95:8
requirement
  88:1
reside 43:21
resist 8:22
respect 59:22
  60:14 123:22
  124:21,22
respond 73:11
  126:6
responds 75:12
  75:16
response 41:22
  77:13,15,16,20
  77:21 113:16

116:5
responsibilities
  51:10 52:14
  54:21,23 57:5
  74:24 88:11,22
  123:21
responsibility
  52:9 53:22
  58:15 59:7,11
  59:21,21 60:13
  60:22 74:24
  75:15 76:2
  89:19 91:19
  96:3 111:6
  113:19 120:24
  121:4 124:20
rest 23:9 24:18
resting 80:17
  81:4,5
result 5:23 45:11
  46:2,13 123:16
resume 39:15,17
review 12:18
  14:20 16:2,4
  16:12 81:13
  104:6 120:20
  127:9
reviewed 13:17
  14:5,10 15:15
  15:18 31:10,17
  55:20 80:19
  85:20 92:21
  95:22 107:11
  107:17 111:4
  122:2,13 123:8
  125:25 126:10
  127:13
reviewing 67:3
rhythm 8:16
right 4:9,14 7:14
  7:22 9:8,16,22
  10:22 11:14
  13:9,10 17:10
  18:11 19:5,7
  19:18,20 20:2
  22:12,18 23:6

23:10 24:4
25:5,14 26:2
26:11,15 29:3
29:18 31:12
32:3,10,19
33:1,9,14,15
33:21,22 34:16
34:23,25 35:1
35:13 41:9
42:11,22 43:7
43:18 44:5,7
44:10 45:10,25
46:24 48:5
50:13,24 51:9
51:13 53:16,16
53:25 54:6
55:5 56:11
57:3,4,7 58:11
58:22 59:5
60:11,19 61:4
61:13 62:4
64:6,15,18,23
66:16 68:3,6
68:24 69:2,7
69:11,19 70:14
70:23 71:3,19
72:3,11,17,21
73:15 74:10,15
74:18 75:2,17
75:25 77:6
78:8,14,20
79:11,13,17,21
79:22 80:1
82:10,25 83:4
83:19 84:4,9
84:25 86:6,15
86:17 87:3,9
88:3 89:5,7,18
90:18 91:1,6
91:17 92:12,14
93:12,24 95:24
97:1,12,20,20
98:3,7 99:18
100:14 101:18
101:25 102:2
102:23 103:7

104:3,16,25
105:1,3,18
106:19 107:2
107:22 108:13
108:15 109:3
109:11,14,18
110:13,21
112:6,9 113:4
115:24 116:1
117:15,25
118:14 119:14
120:3 122:15
123:23 124:14
124:19,21
125:3 126:17
rise 8:9 111:19
rising 66:3
role 28:3 126:23
roll 68:20
room 6:4 25:24
  97:8,10 102:15
  102:24 115:20
  116:8
rooms 55:12
rough 11:12
roughly 12:4
rover 27:24 50:6
  89:3
rovers 88:24
roving 27:21
rude 8:19 45:22
RUDOVSKY
  2:2
rule 10:17 36:1
  63:3,19 64:16
  64:20 80:21
  88:15,19 92:24
rules 58:12
  61:15 64:25
  93:21 94:18,25
  95:8 124:24
  125:1
run 66:15
running 22:24
  26:5,17

Gerald Slory

**S**

**S** 4:1
**saddened** 19:2,6
**safe** 60:24 61:6,8
**safety** 58:16,24
  59:1,17 65:2
  91:4,19
**sanitation** 76:15
  76:17
**save** 36:8
**saw** 23:3 80:11
  80:13,16 81:3
  81:4,7 86:1
  99:12 104:7
  107:24 108:6
  112:1 113:13
  127:5
**saying** 13:16
  17:16 19:7
  24:5 25:1
  36:20 50:14
  62:25 63:23
  72:18 103:15
  104:12 110:10
  118:10,13
  120:11 126:17
**says** 33:16,18
  85:10,18 86:22
  87:17 105:1
  106:21 108:23
**school** 37:15
  38:12 42:19
**screen** 9:12
  12:24 15:7
  31:1 81:15
  82:8 86:3
  92:19 96:12,15
  96:19 97:18
  100:9 101:19
  102:2,14,15
  105:1,3 108:22
  117:15,25
**screenshot**
  124:11
**scroll** 82:5 84:25
  86:18 107:2

**scrolling** 106:20
  119:14
**sealing** 2:23
**search** 55:23
**seated** 6:4
**second** 6:24 8:16
  31:25 49:10
  54:8 66:22
  87:3 106:6
  107:14 111:25
  122:15,20
  128:5
**seconds** 83:6
  84:3 98:16
  105:2 108:23
  117:14
**secure** 95:15,19
**security** 38:23
  39:21 41:1
  58:24 59:2
**see** 4:19,22 7:11
  9:11,17 20:18
  21:7 31:8,19
  32:4 45:8
  51:25 55:12
  61:7 62:14
  65:14,24 66:6
  66:12,17 67:22
  67:24 68:9
  71:13,17,20
  73:23 79:6,13
  80:15,23 81:17
  81:19,19,21,23
  82:7 83:9 85:2
  85:12,15,16
  86:6,19 88:4
  92:18 96:20,23
  96:24,25 97:2
  97:4,17 99:8
  100:14 101:6
  101:16 102:1
  102:10,18
  103:5,11,18,20
  104:12 105:2,2
  105:22 106:13
  106:16 107:14

108:21,22,25
  109:23 110:2,3
  111:2,19 112:1
  112:8,13
  116:15 117:15
  117:19 118:5
  118:10,12
  119:10 120:3
  122:10 124:4
  126:5,9,15,24
**seeing** 21:1
  22:14 35:15
  80:9 95:21
  97:15 120:8
  124:19
**seek** 90:6 93:13
**seeking** 55:24
**seen** 13:20 20:20
  22:16 25:12
  31:12,14 72:4
  103:24 109:21
  109:24 112:17
  122:6 126:19
**separate** 46:25
  55:12
**September** 1:15
  5:12 15:12
  17:13 18:16,16
  18:17 21:18
  32:15 33:23
  34:1,17 36:4
  36:12 47:7
  51:5,6 52:13
  52:17 53:17
  54:2 55:19
  76:23 82:10
  89:18 99:1
  121:10 129:7
**sequence** 106:22
**Sergeant** 18:22
  18:22 32:7,13
  32:23 34:2
  35:17
**serious** 5:22
**sets** 64:25
**shake** 67:11,12

68:20
**share** 101:20
**shared** 15:23
**sharing** 96:11
  97:18 120:6
**shift** 14:25 15:2
  15:8,9 17:17
  18:2,5,6,8,12
  18:13,23,24
  19:11,12 20:14
  20:14,15 21:18
  25:18 27:22
  49:2,4,24
  54:22,22 57:11
  57:12,17,18
  61:17,21,22
  74:23 75:14
  76:9 78:7
  80:10 83:5
  91:8 95:14
**shifts** 48:21
**short** 55:8 66:23
  83:13 117:2
**shortly** 15:11
**show** 96:9,16,19
  107:2 108:14
  119:5
**showed** 35:16
  109:15 119:1
  126:10
**showing** 102:20
  104:2 111:2
  124:1
**shown** 15:6 31:7
  81:16 96:21
  98:19 100:13
  101:21 104:19
  105:17 106:11
  108:19 109:10
  117:12 118:3
  119:9 124:3
**shows** 99:24
**shut** 75:11
**shy** 95:4
**sic** 34:22 43:16
  75:16 112:15

113:16 118:21
  125:1,11 126:7
  126:7,8
**sick** 71:15
**side** 101:16
**sidetracked**
  110:22
**sign** 56:19,22
  67:10 111:2
  112:13
**sign-on** 82:11
**signature** 31:22
  32:1
**significant** 60:23
**significants**
  112:15
**signify** 87:10
**signing** 2:23
  82:14
**similar** 61:19
**simple** 5:7
**single** 12:21
  34:20 115:24
**sir** 4:8,13 5:1,10
  5:25 6:1,7,10
  6:18,21 7:3,21
  7:23 8:14,15
  9:1,6,14,20,25
  10:4,7,11,18
  10:24 12:11,17
  13:12,15,19
  14:7,18 15:13
  17:2,10,15,19
  17:22 18:9,10
  19:14 20:16
  21:19 22:9,18
  23:11 24:24
  25:4,16 26:22
  29:6,12,17
  30:6,8,11,24
  31:5,13,24
  32:2,5,9,18
  34:6 35:4,23
  36:2 37:2,7,8
  38:10,13 39:12
  39:23 40:8,15

Gerald Slory

40:21,24 41:15
41:24 42:10,25
43:6,7,10,21
43:25 44:6,9
44:13 45:8,16
46:1,23 47:3,9
47:18,24 48:1
48:4,9,12,19
49:7 50:16
51:4,8,12 52:7
52:12,24 53:5
53:20,24 54:5
55:4,14,16
56:10 57:1,13
58:11,18 59:4
59:8,12,13,19
59:23 60:3,6
60:10,15,18
61:2,9,12,18
61:24 62:5
63:10,11,24
64:5,10,14
65:6,9,12,20
66:22 67:20
68:13 69:1,5,6
69:10,15,18,22
70:1,5,7,12,15
70:22 71:2,3,7
71:11,23 72:2
72:20 73:3,7
74:1,17 75:1,6
75:24 77:17
78:9,25 79:10
79:16 80:2,6,7
80:19 81:13,17
81:18,22 82:2
82:8,9,13,16
83:1,3,9,10,14
83:18 84:1,6
84:10 85:9,13
86:5,10,16,21
88:2,14,17,20
89:6,17 90:20
91:2,7,16,18
92:13,19,20
93:1,23 94:2

94:20,23 95:2
95:4,5,9,12,16
95:23 96:7,14
96:23 98:6,12
98:13,24 99:2
99:9 100:2,7
100:14,16,20
100:25 101:3,4
101:17,24
102:12,15,17
102:22 103:6
103:22 104:9
104:10,15,21
104:25 105:5
105:16,25
106:6,6,12,14
106:17,18
107:6,18,23
108:8,12,15,16
108:21,24
109:17 110:16
110:20 111:9
111:15,22
112:22 113:7,8
113:18,20
114:4,8,14,23
115:16,25
116:3,14 117:8
117:13,19,20
118:5,7,21
119:11,13
120:4,5,10,13
120:20 121:2
121:17,25
122:5,12,17,22
123:1,7,8,13
123:18,24
124:4,6,9,13
124:18 125:4,5
125:21,24
126:25 127:8
127:22
**sit** 34:5
**sitting** 6:16
  65:17 101:10
  127:19

**situation** 91:25
  111:3 113:14
  126:6,16 127:6
**situations** 95:25
**six** 48:15
**skills** 97:25
**skipping** 86:19
**sleep** 90:25
**sleeping** 71:16
  95:25 111:11
  111:18 112:10
**slightly** 36:10
  120:15
**Slory** 1:8,14 3:3
  3:12 4:2,7,15
  19:8 21:2,16
  35:20 49:20
  53:16 54:20
  55:10 56:1,5
  58:5 62:6
  63:11,14 67:3
  97:22 98:3
  109:14 110:15
  117:4 118:18
  127:25 129:4,5
**Slory_G** 82:11
**slow** 22:24 26:3
  26:5,8,16,17
  84:19 111:12
**smaller** 81:21
**soap** 24:19
**social** 17:5,6
**Solicitor** 2:7
**solo** 58:8
**somebody** 20:11
  62:16 65:14
**sorry** 14:13,24
  18:17 29:13
  34:8 38:4
  43:21 51:5
  54:7,10 85:15
  95:11 101:19
  102:3 105:10
  113:25 115:4
  116:16 118:9
**sound** 9:18

25:14 27:25
  68:14 74:9,11
  74:13 76:16
  108:15
**sounds** 6:25
  22:11 25:13
  33:10,11 36:20
  54:2 58:9 71:4
**South** 1:23 2:3
  38:3,5
**speak** 6:5,8 11:3
  16:24 24:8
  33:17 34:7
  35:3
**speaking** 23:14
**specific** 13:25
  14:2 21:16
  50:17 63:1
**specifically**
  19:16 48:6
  60:20
**specifics** 32:11
**spend** 66:2,5,10
  66:11 111:24
  113:9,24 114:1
  114:5
**spent** 114:21
  126:18
**spin** 62:13
**spinned** 111:1
  112:3
**splashed** 112:5
  113:15
**spoke** 19:22
  30:16 32:20
  34:20,22
**spoken** 12:9,15
  33:12
**staffing** 57:17,24
**stamp** 31:3
  104:7 106:9
  108:22
**stamped** 85:5
  106:13 124:2
**stand** 26:8
**standard** 54:24

**standing** 102:24
  117:18 118:11
**stands** 81:22
**start** 10:25 16:1
  38:22,24 41:9
  48:17 54:7
  62:11,12 76:9
  109:5 117:9
**started** 37:5,23
  40:6,10 41:2,5
  42:20 43:3
  48:10,22,23
  56:12 64:12
  106:22 108:10
**statement** 3:10
  3:11 32:16
  106:15 107:24
  108:6 119:5
  123:9,10
**States** 1:1 7:16
  37:11 38:7,18
  43:18
**stating** 61:5
**stationed** 27:18
  74:4
**status** 7:13
**stick** 92:2
**stipulated** 2:22
**STIPULATION**
  2:22
**stomach** 71:16
**stop** 96:11 98:18
  101:20 105:14
  120:6
**stopped** 72:17
**storage** 20:21
  22:11
**street** 1:23 2:3,8
  11:15 42:2,4
  51:23 52:4
**strike** 14:12
  29:13 70:10
**strongly** 59:6,11
**subject** 44:23
  45:3,14
**substance** 52:5

Gerald Slory

60:5 71:6
**substances**
  52:11
**sued** 47:25
**suffering** 72:18
**suggested** 34:9
**suggesting** 8:19
**suggests** 122:3
**Suite** 1:23 2:3
  2:14
**summary** 20:8
**Sun** 39:20,24
  40:10
**Suns** 39:5,8
**supervising**
  26:23
**supervisor** 27:1
  27:6,9,11 35:7
**SUPPORT** 1:22
**supporting**
  40:14,18
**supposed** 61:16
  61:16 62:9,21
  69:12 80:20
**sure** 7:23 8:3,11
  9:18,19 21:24
  24:23 28:24
  49:11 52:17
  59:16 66:17
  67:21 68:4
  69:7 71:25
  74:25 76:2,5
  120:21 125:14
**Suriname** 43:22
  43:24
**surveillance**
  96:16,24
  102:10 124:11
**suspended** 46:20
**swearing** 10:2
**switch** 75:17
**sworn** 4:3 129:6
**symptoms** 71:13
**system** 69:17

————————
          **T**
————————

**T-E** 105:11
**take** 10:12,20
  19:4 21:12
  32:11 42:14
  47:12 52:8
  54:16 55:6
  56:17,17,19
  59:5,10 60:16
  63:12 66:9
  71:20 75:13
  78:6,10 92:23
  94:17 100:9
  103:8 106:2
  107:22 111:18
  118:15 128:11
**taken** 16:9 50:1
  55:8 72:14
  117:2 124:11
  129:4,13
**takes** 78:1
  122:10
**talk** 11:6 29:12
  34:12 46:5
  60:19 80:2
  85:1
**talked** 70:16
  80:2 87:23
  92:15 120:21
  127:2,18
**talking** 7:18
  18:12 47:20
  60:21 68:1
  72:14 83:13
  92:14 97:11,16
  110:12,17
**tangent** 92:15
**Taylor** 2:7 6:3,6
  6:9 11:3,5,6
  21:3 31:20
  46:9 52:21
  54:10,18 55:11
  55:22 56:3
  58:1 60:25
  63:6 65:5
  89:10,23 91:21
  92:7 97:15,19

98:1 102:3
  108:3 111:13
  111:21 114:16
  115:11,14
  121:7,12,21
  122:16 125:14
  126:21 127:24
  128:11
**technical** 9:16
  97:25
**tell** 4:17 9:3
  19:15,16 20:8
  22:18 29:23,25
  30:4 32:20
  33:10 35:21,24
  46:6 62:6
  67:10 68:15
  78:17 79:14
  89:2 95:17
  96:1,2 98:18
  99:10 104:6,13
  107:1,9
**telling** 24:10
  123:2
**temptation** 8:23
**tempted** 8:18
**ten** 117:6
**tended** 50:18
**tends** 111:12
**terminated** 43:8
**terms** 5:7 15:17
  51:20 126:10
**Terrelle** 3:10
  57:16 105:7,10
  105:10 106:15
  119:3
**terribly** 10:13
**testified** 4:5 6:11
  6:19,22 7:1,5
  7:11 8:2 63:2
  76:13
**testify** 7:24
**testifying** 9:24
**testimony** 2:23
  10:23 16:19
  27:23 50:2

56:9 57:15
  63:12 73:3
  80:6 88:16
  114:9 117:7
  121:18 129:5,9
**text** 81:22 120:3
**thank** 19:7 56:3
  58:1 97:24
  105:18 118:15
  128:1,13
**Thanks** 98:1
  101:22
**thatm** 127:5
**they'd** 79:4
**thing** 8:5 9:8
  55:2,22 56:16
  56:18 61:21
  68:9 69:4
  75:25 79:12
  86:4 87:13
  93:10
**things** 12:23
  13:23 14:4
  15:23 24:1
  55:12 63:13
  65:8 85:25
  87:17 94:25
  95:7 119:2
**think** 15:21 21:4
  30:16 32:24
  33:6 36:3
  37:19 39:22
  41:6 70:18
  77:17 90:20
  95:20 100:19
  109:4 116:22
  116:25
**thinking** 53:14
**Thomas** 2:12
  3:11 99:21,25
  110:12 116:17
  117:23 118:9,9
  118:10,19,23
  119:3,6,12,20
  119:24 120:11
  120:16

**Thomasl** 99:20
**thought** 36:20
  36:21 43:15
  53:2
**three** 11:8,10,10
  30:19 104:2
  122:3,10
**throwing** 71:15
**tier** 115:21
**till** 8:23 18:10
**time** 1:15 2:24
  6:8,16,24 7:19
  11:21,25 13:22
  15:6 23:15,22
  25:23 26:11,14
  26:15 27:5
  28:10 29:10
  30:19 31:20
  34:7 37:16,24
  40:9,12 41:4,8
  41:9,17 44:12
  44:14 46:16,25
  48:13 49:5
  51:7 55:2
  59:25 64:12
  66:2,6,10,12
  69:8 82:15
  84:14 85:12
  86:9 87:1
  91:11 93:5,6
  99:11 101:6,8
  101:8,20
  103:25 104:7,8
  108:22 109:20
  111:19,24
  113:9,14,16,24
  114:1,5,22
  122:14 126:18
  128:2
**timely** 89:9
**times** 6:22 11:6
  11:8,10,10
  23:11 80:8,24
  81:6 91:22,25
  127:10,13,19
**timing** 25:8

94:25 126:22
**tired** 23:4,6
  24:10,12
**title** 27:25 48:8
**today** 6:13,15,16
  7:1 8:8 10:12
  10:23 11:19,22
  12:6 16:8 33:7
  36:4,13 44:12
  48:22 89:3
  101:10 127:19
**today's** 6:3,6
  7:25 12:6
  20:18
**told** 15:18 18:22
  18:24,25 20:4
  20:10 23:1,4
  29:22 33:3,4,5
  33:7 35:8 40:6
  41:1 46:12,15
  46:21 63:2
  67:9 80:4
  88:14,18 89:3
  95:20 120:1,23
  121:23 122:6
  122:19 125:2,6
  125:21
**Tom** 4:23
**top** 9:11 31:9
  59:15 102:15
  105:1,3 115:20
  115:20,21
  117:15,25
**topic** 49:21 71:3
**tough** 119:16
**tour** 14:21,22
  15:7,8,9 25:22
  29:16 56:23,24
  57:2 61:10,16
  61:17 62:7,11
  62:19,22 63:3
  63:16 64:9,19
  65:3,9 67:6
  68:10,16 69:4
  69:8,12,20,25
  70:3,3,9 80:16

81:3 83:2
85:16,22 86:1
86:13,15 87:4
87:6,6,12,14
87:14,14,18,20
87:21,23,25
88:3,13,23
89:13,20 90:3
90:14,22 92:5
92:5,12,15,18
92:24 93:2,3,8
93:14,16,18,24
94:17,21 95:3
95:7,10,13,14
95:18 96:9
98:25 100:18
100:19,20
101:7,25
103:11,19
104:12 106:23
108:10,14
111:5,7 114:25
115:3,21,23
116:1,4,9,11
120:2 122:10
126:15
**toured** 15:3,3
  85:18 86:7,22
  86:24,25 92:17
**touring** 57:5
**tours** 15:4,14
  22:24 25:20
  26:2 27:6 50:4
  60:20,23 61:14
  61:21 68:2
  71:1 80:15,21
  81:4 85:15
  86:18 87:2
  88:5,8,15 89:9
  92:23 95:21
  96:6 100:22
  101:1,13 115:1
  115:5,6,9
  122:3,7
**Track** 13:4,6,8
  13:13,17,21,23

14:1 15:19
69:17 76:12
**tracks** 104:17
**trained** 60:12
**training** 64:2,8
**transcribed** 2:23
  129:8
**transcript** 8:7
  8:13,24 9:6
  16:13,14 24:8
  67:4
**transferred**
  28:23 29:4,9
  94:12
**transition** 60:20
  80:1
**transported**
  20:11,12
**treat** 59:21
  60:13 123:21
  124:20
**trial** 2:24
**tried** 36:18
**TRIVIKRAM**
  1:9
**trouble** 27:2
  46:17 81:24
  88:22
**true** 10:2 129:8
**truthfully** 69:25
**try** 8:22 19:17
  60:16 63:1
  67:11 75:7
  113:25
**trying** 40:20,25
  80:18
**turned** 75:11
  107:19
**Twitter** 17:8
**two** 2:13 8:9
  11:23 12:3
  13:10 47:19
  50:10 57:19
  71:24 92:3
  99:17,19
  107:15 118:11

127:13
**two-page** 31:22
**type** 22:2 68:23
  76:14 86:3
  124:15
**typed** 22:3 31:8
  83:24 106:25
**typical** 18:8 54:1
  56:13 67:21
**typically** 57:7,12
**Tyrone** 3:11
  99:20 117:22
  119:12

———————
### U
**unable** 90:6
**understand** 5:24
  7:24 9:13,23
  10:1,5 12:13
  21:22 27:20
  40:20 41:3
  43:2 64:1,24
  72:18 78:4
  102:2 104:8,14
  113:18,20
  117:16 122:11
**understanding**
  9:23 15:10
  34:16 49:8
  56:25 70:19
  71:12 72:25
  105:7 112:23
  118:8 124:10
  124:12
**understood** 8:14
  8:25 9:6 10:15
  125:15
**uniform** 105:4
**Union** 30:16
  32:20 33:2,12
  33:17,18 42:2
  42:3,4
**unit** 14:16 15:3
  23:13 25:2,7
  26:15 32:8
  47:8 50:3 51:3

51:11 52:1,19
53:19,22 57:2
57:5 63:17
70:17 71:4,22
79:1 80:4 85:8
85:10,17,18
86:7,23,24,25
92:6,17 93:13
**United** 1:1 7:16
  37:11 38:7,18
  43:17
**units** 50:8,9
  52:20 74:20
**unprofessional**
  45:23
**unresponsive**
  5:13 17:21,24
**unruly** 89:4
**unusual** 58:7,10
  86:1,2,4
**urgent** 52:19
  53:18
**usage** 71:14 72:5
  72:15 73:13
**use** 17:7 71:10
  84:11
**usual** 50:21
**usually** 50:23,25
  71:15

———————
### V
**valuable** 56:19
**various** 49:22
**vary** 80:22
**verbal** 8:11
**versus** 51:14
  54:22
**video** 9:10 14:16
  14:17,19,23
  15:4,7,15,19
  96:15,16,21
  98:19 100:10
  101:6,21
  102:14 103:9
  103:10,18,21
  104:3,6,13,17

Gerald Slory

104:19,22
105:13,17,20
106:3 107:25
108:18,19
109:3,6,10,12
109:14,15
112:1 116:16
116:19,21
117:9,12,13
118:3,15,16
122:13 126:10
127:10
**viewed** 14:17
**violated** 124:24
  125:1
**violates** 94:25
**violation** 35:25
  93:21 124:20
**vision** 126:23
**vs** 1:6

**W**

**wait** 8:23 26:12
  78:11,12
**waive** 2:23
**walk** 48:21 54:6
  56:15 91:5
  93:10 117:23
**walked** 113:2,5
**walking** 62:11
  65:17 116:7
**wanna** 41:3 48:5
  53:25 54:13
  62:25 63:1
  71:25
**want** 8:5,10,10
  9:3,19 10:25
  19:4,18 24:15
  24:23 27:9
  28:24 34:10
  58:11 59:16
  62:12 63:24
  67:24 81:13
  104:12 107:6
  120:20 125:14
  126:1

**wanted** 39:14,17
  44:4
**wash** 38:17,20
  41:14,16,19
  42:12
**wasn't** 40:13
  41:6 46:4 58:9
  58:10 126:24
  126:25
**watch** 14:12
  15:4 98:15
  105:12 109:3,6
  117:21
**watched** 15:7
  98:24 101:5,6
**way** 4:25 9:9
  12:12,13 14:14
  20:16 26:6
  27:8 34:19
  37:8 38:2,18
  39:2 42:6,8,15
  44:12 50:14
  52:3 59:5 62:1
  63:25 66:10
  68:9 71:24
  76:4 81:25
  83:19,19,21
  85:3 87:11
  91:1,8 92:19
  111:5 118:12
  120:15 121:19
  123:19
**we'll** 10:14,20
  14:25 21:12
  26:2 29:13
  35:15 96:12
**we're** 7:18 8:3
  19:17 24:10
  49:15 54:11
  55:10 71:25
  96:15 116:25
  117:4,13,21
  120:21 122:7
**we've** 47:19
  55:11 60:21,21
  80:19 91:20

93:20 95:22
  103:23 104:22
  120:21 122:13
  125:25 127:2
  127:13
**Wednesday** 1:15
**weeks** 11:23
  12:3
**welfare** 120:25
**well-being** 58:16
  59:2 103:1
**went** 4:17 18:23
  25:25 26:1
  38:21 42:18
  48:10 69:3
  105:23 108:1
  117:10
**weren't** 46:20
  89:15
**whatsoever**
  100:6
**white** 98:4
**who've** 63:2
**wife** 40:19
**Wilkes-Barre**
  39:10,11
**Wilson** 16:9,10
  50:2 57:15,15
  67:8 68:8,12
  68:17,25 69:2
  117:15
**Wilson's** 67:4
**window** 126:18
**withdraw** 21:25
  34:8 54:7
  83:20 125:18
**withdrawal** 71:5
  71:9 72:9
**withdrawals**
  71:9
**withdrawing**
  52:5,7,11
  68:22 71:13
  72:17
**witness** 2:23 3:2
  4:3 31:10,17

46:10 61:2
  63:7 65:6
  85:20 89:12
  91:22 92:8
  107:11,17
  111:15,22
  114:18 121:8
  121:13 122:17
  126:22 129:5,8
**witnesses** 73:4
**WOLFE** 1:22
**woman** 5:2
**word** 23:10
  84:12
**words** 13:10
  20:7 54:24
  61:4 64:18
  66:15 70:2
  84:7 90:13
  93:6 96:3
  102:13 103:3
  104:11
**work** 14:2 18:1
  18:4,16,21
  38:14 39:1,2
  39:13 40:16,17
  40:21,22 41:3
  49:21 50:18,22
  50:25 54:3,25
  57:7,10 58:12
  59:15 61:14,19
  62:10 73:8
  74:19,21 90:10
  90:13 93:7
  104:5 115:19
**workday** 54:25
**worked** 24:24
  38:18 41:1
  42:8 44:1
  48:20,21 49:23
  51:6 64:7
  67:19 75:6
**worker** 38:19
  42:9
**workforce** 42:15
  42:16,18

**working** 17:17
  18:7,11 22:17
  25:3 26:21
  37:2 38:17,22
  40:12 41:6,8
  48:17,24 50:21
  51:10,14 53:21
  57:20 58:8
  59:25 60:8
  61:8,22 64:12
  70:24 72:3,4
  73:19 74:25
  76:3,24,25
  77:1,10 78:1
  83:17 93:11
  103:21 104:23
  120:1
**works** 8:21 50:3
**would've** 115:17
  126:6 127:7
**wouldn't** 78:5
**write** 20:3,5,13
  22:19 70:3
  83:7
**writes** 64:24
**writing** 119:15
**written** 16:14
  55:18 63:19
**wrong** 33:11
  35:21 77:8
**wrongdoing**
  44:21
**wrote** 21:22
  22:20
**www.klwrepo...**
  1:24

**X**

**X** 3:1

**Y**

**y'all** 23:8
**yeah** 14:21 15:9
  18:7 21:8 22:5
  23:6 24:13
  26:14 28:1,5,6

Gerald Slory

28:9 29:10 30:2 31:14 39:5,19 41:12 42:1,12,13,22 45:21 63:12 67:23 68:4 72:20 76:17,20 77:9 82:19 84:14,17,24 90:23 93:9,15 94:6 96:2 97:4 97:19,21 98:11 100:19 101:12 102:5,5 103:13 103:13 107:12 107:21 109:2 116:22,24 118:12 119:18 125:17 127:5 128:5

**year** 39:14 40:11 40:11 46:16,18 46:22 124:17 125:3

**years** 7:6,17 8:2 30:20 37:4,9 42:15

**yelling** 73:13

**yellow** 97:6 98:8

**Yep** 33:25

**yesterday** 16:18 16:25 27:24 50:6 76:14

___

**Z**

**zoom** 1:14 4:4 4:20,22 9:10 55:11 81:25 129:7

___

**0**

**0** 84:3 85:6

___

**1**

**1** 58:19 62:11 80:5 85:4,12 97:7 98:12,25

99:4 100:12 101:7 102:20 102:25 105:23 109:6 113:10 116:2,8,9,12 117:18 120:9

**1-877-KLW-...** 1:24

**1:00** 25:14 80:9 80:25

**1:11** 85:17 87:1 87:16,22

**1:42** 86:19,24 87:16,24

**10** 56:7 99:5

**10:10** 1:16

**106** 3:10

**11** 84:8 107:5

**11:00** 17:17 18:8 18:10 21:17 49:2,6 54:9,21 54:22,25,25 57:11,12 58:8 61:21,22 78:6 91:15

**11:44** 83:1

**1100** 2:14

**119** 3:11

**12** 56:7

**12:00** 84:9

**12:07** 83:6

**12:58** 85:7

**13** 38:25

**1303** 1:23

**14** 108:23

**14th** 2:8

**15** 112:19,24 114:12 122:23 122:24 123:5

**1515** 2:8 11:14

**15th** 2:13

**16** 62:12 68:11

**17** 62:12

**18th** 51:5

**19** 85:5

**19102** 1:23 2:9

2:14

**19106** 2:4

**1990's** 42:6

**1993** 37:12

___

**2**

**2:20-cv-04570...** 1:6

**2:24** 88:4 92:16

**2:55** 128:15

**2:58** 92:16,21 93:3 100:19,20

**20** 69:3

**2007** 42:7,7

**2010** 37:19 42:6

**2012** 38:25

**2013** 41:2

**2015** 44:8

**2016** 37:5 40:6 41:3 44:8,9

**2018** 5:12 15:12 17:14 32:15 34:18 36:4,12 45:1 47:7 51:6 52:13,17 53:17 54:3 55:19 70:14 76:23 82:10 89:19 99:1 121:11

**2019** 32:4,14 34:19 35:1 123:9

**2021** 1:15 129:7

**2023** 129:23

**20th** 17:13 76:23 82:10

**215** 1:24

**21st** 5:12 15:12 17:14 18:17,21 21:18 29:20 30:13 33:23 34:1,17 36:4 51:6 55:19 76:23 89:18 99:1

**23:43** 82:11

**23:44** 83:1

**230** 1:23

**25** 68:11

**28** 83:6 84:3

**29** 1:15 129:7,23

**29th** 32:4 34:2 34:19 35:1

___

**3**

**3** 50:21 82:15 96:17 97:6 117:14

**3:00** 18:8,10,17 18:19,21 21:17 29:20 49:1,6 54:22,25 57:11 57:17,18 61:21

**3:00-11:00** 18:2 18:5,6,7 49:3 49:24

**3:22** 96:9 98:15 99:1 100:18 101:8 121:16 122:4 127:14

**3:49** 92:22 93:24 100:23

**30** 7:17 63:4,7 63:17,18 64:9 64:22 65:3 69:3,8 88:1,1 88:16,23 89:16 89:20 90:3 92:25 93:2,8 94:1,18 95:11

**31** 3:12 67:9 68:10 87:24

**32** 62:12

**34** 67:9

**38** 105:2

___

**4**

**4** 3:3

**4:29** 93:25 94:21 100:23 103:11 114:25 115:4

**4:30** 28:13

**40** 88:4 93:25

**45** 12:8

___

**5**

**5:00** 119:25

**5:19** 94:21 95:3 100:23 103:11 115:4

**50** 92:22

**50-minute** 94:22

**501** 2:3

**502** 124:2

**55** 37:9 117:14

**58** 85:7

___

**6**

**6:00** 101:9 119:22 120:2

**6:12** 95:4,10 100:23 103:12 115:4

**6:43** 95:11

**6:50** 95:10 108:15

**6:56** 108:18,23 123:5 127:17

___

**7**

**7** 15:11 84:3

**7:00** 17:18 54:21 54:25 57:12,16 57:18 58:8 61:22 78:6 80:10,25 91:15 108:15 122:4

**7:10** 104:18,23 105:2 108:10 123:5

**7:13** 117:14

**7:14** 116:17

**718** 2:3

___

**8**

**8** 99:5

**81** 3:9

___

**9**

Gerald Slory

Page 149

**922-7112** 1:24