**EXHIBIT H**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EILEEN A. McNAMARA, as :
Administrator of the :
ESTATE OF JONATHAN :
GLEAVES, JR., :
     Plaintiff :
             :
     vs. :
             :
CITY OF PHILADELPHIA, :
CORIZON HEALTH, GERALD : NO. 2:20-cv-04570-RBS
SLORY, ELIZABETH :
BRADLEY, LALITHA :
TRIVIKRAM, MATU GAYE, :
JOHN DOE (s), :
     Defendants :

_____

ZOOM DEPOSITION OF CHARLENE WILSON

DATE AND TIME: Wednesday, June 30, 2021
at 3:10 p.m.

_____

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112  1-877-KLW-DEPO

## Page 2

APPEARANCES:

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
By: Jonathan H. Feinberg, Esquire
Cast Iron Building, Suite 501 South
718 Arch Street
Philadelphia, PA 19106
   Representing the Plaintiff

Anne B. Taylor, Esquire
Chief Deputy City Solicitor
1515 Arch Street
14th Floor
Philadelphia, PA 19102
   Representing the City of Philadelphia Defendants

O'CONNOR KIMBALL, LLP
By: Thomas J. Gregory, Esquire
Two Penn Center Plaza
15th and JFK Blvd.
Suite 1100
Philadelphia, PA 19102
   Representing Corizon Health Defendants

_____

STIPULATION: It has been stipulated by and between counsel that they waive the reading, signing and sealing of the transcribed testimony by the witness and the filing of the original with the Court, and all objections, except as to form, until the time of trial.

## Page 3

I N D E X

WITNESS      EXAMINED BY      PAGE

Charlene Wilson    Mr. Feinberg    4

I N D E X

EXHIBITS USED IN DEPOSITION

NUMBER      DESCRIPTION
P-1      Housing Log
P-2      Charlene Wilson's Statement dated 10/10/18 to the Special Investigations Unit (Internal Affairs)

P-3      Memorandum dated 9/21/18 to Lieutenant Albright from C.O. Charlene Wilson

P-7      Memorandum dated 9/26/18 to Major Beaufort from Lieutenant Medina on behalf of Tyrone Thomas

## Page 4

P R O C E E D I N G S

CHARLENE WILSON

was called as a witness and, having been first duly sworn by the Reporter-Notary Public, was examined and testified as follows:

BY MR. FEINBERG:

Q. Ma'am, can I ask you just to state your name for the record, please?

A. Charlene Wilson.

Q. And I can tell by your uniform you are still employed by the Philadelphia Department of Prisons. Is that correct?

A. Yes.

Q. So I'll refer to you as Officer Wilson as we go forward today. As you know, Officer Wilson, from my introduction just a moment ago before we went on the record, my name is Jon Feinberg. I'm the attorney for a woman named Eileen McNamara. Ms. McNamara is the grandmother of the children of Jonathan Gleaves, Jr.

As you are likely aware, Mr. Gleaves died on September 21st of 2018 a few hours after he was found unresponsive in his cell at the Curran-Fromhold Correctional Facility, known as CFCF within the Philadelphia Department of Prisons. Ms. McNamara has brought a lawsuit against the city of Philadelphia, a

Charlene Wilson

Page 5

Correctional Officer named Gerald Slory, S-L-O-R-Y, Gerald with a G. She has also brought the lawsuit against Corizon and some Corizon medical providers who worked with the Philadelphia Department of Prisons.

In the lawsuit Ms. McNamara claims that the Defendants were deliberately indifferent to Mr. Gleaves' serious medical needs and, as a result, were responsible for causing his death.

You have not been sued as a Defendant in this case. You are not named as a party. No one is bringing any claims saying you did anything wrong. But based on the documents that we have seen in the case, it appears that you may have relevant information about the circumstances that led up to Mr. Gleaves' death. So for that reason we've asked you to come in today to testify in this deposition about what you knew -- about what you know.

Do you understand all that, that I have explained so far, Officer Wilson?

A.   Yes.

Q.   You're represented, for purposes of today's deposition, by Counsel for the city, Anne Taylor. Ms. Taylor is there seated with you in that conference room.

Have you had the opportunity to speak

Page 6

with Ms. Taylor about your testimony today?

A.   Yes.

Q.   Do you need any more time to speak with Ms. Taylor before I ask you questions about this case?

A.   No.

Q.   Have you ever testified in a deposition before?

A.   No.

Q.   Have you ever testified under oath in any court proceeding before?

A.   Yes.

Q.   How many times have you testified in court?

A.   Once.

Q.   How long ago was that?

A.   Almost 11 years ago.

Q.   Was that in connection with your job as Correctional Officer or was it unrelated?

A.   Yeah, job related.

Q.   Was it a criminal matter?

A.   Yes, for an Officer.

Q.   What do you mean by that?

A.   An inmate was sent to church, and they found substance -- illegal substance in the area where the Officer was. So I just had to tell that I sent the

Page 7

inmate to the area.

Q.   Understood. The reason I'm asking these questions is to make sure that you understand what it means to testify under oath. I'm gonna give you a couple of brief instructions. You may have heard these from your attorney before, but I think it's important that we get these on the record.

One thing I wanna mention is that, obviously, we have a Court Reporter, Lori, who is taking a record or making a record of everything that we say during the proceedings today and that leads me to ask you to do two things. One, I'll ask you to please give verbal answers to my questions so we can make a record of what your answer is. Understood?

A.   Yes.

Q.   Second -- and you've been very good about this so far and I appreciate it -- is I'll ask you to wait until I complete my question before you answer it even if you know exactly what I'm gonna say. And the reason I mention that is because if you and I interrupt each other then it makes the transcript of the proceedings difficult to read and understand. Got it?

A.   Yes.

Q.   Obviously, you know, most depositions are conducted in person. We're conducting this one by Zoom

Page 8

while we get through, what is hopefully, the end of the pandemic. But in these circumstances where we're using Zoom what we, as lawyers have all learned, is sometimes there's a lag in the technology and you may start to answer before I finish my question. So I'll ask you to be conscious of any technical issues in terms of the video or audio. Understood?

A.   Yes.

Q.   And second, as Lori mentioned just before we went on the record here, we are recording this proceeding, everything that takes place, the video and the audio. Do you understand that?

A.   Yes.

Q.   And that recording will be made available to your Counsel. You'll be able to see it if you want and it will only be used for purposes of this case. Understood?

A.   Yes.

Q.   Officer Taylor [sic], you understand that you're testifying under oath; correct?

(Discussion was held off the record.)

BY MR. FEINBERG:

Q.   Let me withdraw that question since the roles are reversed here and say, Officer Wilson, you're aware that you're testifying under oath; correct?

WWW.KLWREPORTERS.COM

Charlene Wilson

Page 9

A. Yes.

Q. Do you understand that this means that you're swearing that all of your answers are true and correct?

A. Yes.

Q. If you don't understand a question that I ask, will you let me know that?

A. Yes.

Q. If you realize an answer that you had given earlier was not correct or complete, will you let me know that as well?

A. Yes.

Q. I don't think we're gonna take all that long today. We should be pretty quick. But if you get to a point where you need a break, please tell me and I'll be happy to accommodate that request. Understood?

A. Yes.

Q. The one exception to that rule is that if there's a question pending at the time you ask for a break you'll have to answer the question, then we'll take the break. Understood?

A. Yes.

Q. Any reason why you cannot give full and complete testimony today?

A. No.

Page 10

Q. Officer, what, if anything, did you do to prepare for today's deposition besides talk to your attorney? I don't wanna ask you about what you discussed with Ms. Taylor. Can you just tell me if you did anything else to prepare?

A. I read my notes that I sent -- my memo that I did and when I went to Internal Affairs, the questions that they asked.

Q. There was a statement that you gave in Internal Affairs. Is that correct?

A. Yes.

Q. So you reviewed, it sounds like, two different documents; one was a memo, the other was a statement. Is that correct?

A. Correct.

Q. Did you review any other documents?

A. No.

Q. And to be specific -- I understand your answer -- but to be specific, did you look at any other memos or statements prepared by other people with information about this case?

A. No.

Q. Did you look at any other records from the Philadelphia Department of Prisons, investigation reports, other statements by prisoners, anything like

Page 11

that?

A. No.

Q. Did you watch any of the surveillance video from the day in question, September 21st of 2018?

A. No.

Q. Have you reviewed the Complaint that was filed by my client, Ms. McNamara, making allegations about wrongdoing by the Defendants in this case?

A. No.

Q. Did you conduct any personal investigation about my client, about Mr. Gleaves, or anyone involved in this case outside of the Philadelphia Department of Prisons?

A. No.

Q. Do you have any personal notes, any diaries, anything like that about what happened in this case?

A. No.

Q. Did you ever post on social media about this case?

A. No.

Q. All right. We talked about documents and other things that you've reviewed. Let me ask you whether you spoke to anybody else.

Now, besides your attorney did you talk

Page 12

to anyone, let's say, any time in the past four or five weeks about this case or this deposition?

A. Yes.

Q. Who did you speak with?

A. Officer C. Jones.

Q. C is the first initial?

A. C as in Charlie.

Q. C, is that short for Christopher?

A. Yes.

Q. Did you speak to anybody else besides Officer Jones?

A. Officer TE. Jones.

Q. Anybody else besides those two?

A. No.

Q. When did you speak to Officer C. Jones?

A. When I first got my Notice for -- to call my attorney --

Q. And did --

A. -- when I got subpoenaed, subpoenaed to call her.

Q. And when was that?

A. I can't recall how long ago it was.

Q. What did you discuss with Officer C. Jones?

A. Did he get one as well, did he get a

3 (Pages 9 to 12)

Charlene Wilson

Page 13

Subpoena as well.

Q. Did he?

A. He said he didn't.

Q. Did you discuss anything about the case, about what happened with Mr. Gleaves?

A. Did he remember what -- about the person, the inmate that it was about.

Q. It sounds like these -- what you're describing to me are questions that you asked of Officer Jones. Is that correct?

A. Yeah.

Q. And did he remember anything about Mr. Gleaves?

A. No.

Q. What else was discussed?

A. That was it. Oh, my family but nothing else about the case.

Q. Is Officer C. Jones -- does he still work at the Philadelphia Department of Prisons?

A. Yes.

Q. Now, Officer TE. Jones, T is short for Terrelle. Is that correct?

A. Yes.

Q. T- E- double R, E- double L-E. Is that correct?

Page 14

A. (No response.)

Q. Is that a yes?

A. Yes.

Q. When did you speak to Officer TE. Jones?

A. Probably like three -- I think it was a weekend where we were in line for seafood, and I seen her.

(Court Reporter clarification.)

I asked her, did she get a Subpoena as well probably like three -- two, three weeks ago.

Q. I think what -- Lori, what you may not have heard -- and, Officer Wilson, I'll ask you to confirm this for me. You said you were in line for seafood?

A. Yeah, seafood.

Q. Where was that?

A. 55th and Baltimore Avenue.

Q. So you just happened to see her out and about. Is that right?

A. Yeah.

Q. Is Officer TE. Jones still employed at the Philadelphia Department of Prisons?

A. As of right now I know she's on a leave of absence.

Q. Do you have a way to reach Officer TE.

Page 15

Jones?

A. Yes.

MR. FEINBERG: I'll just make a request -- Anne, you and I have discussed this; I'll do it on the record -- we have been trying to get Officer Jones in for a deposition so, obviously, Anne, I'm not gonna ask her for her personal phone number but if -- my request would be that you speak with Officer Wilson to make arrangements to contact Officer Terrelle Jones so we can bring her in for a deposition.

MS. TAYLOR: Okay.

MR. FEINBERG: And I can confirm that in writing.

BY MR. FEINBERG:

Q. And, Officer Wilson, your recollection is that -- what you've told me is that Officer TE. Jones did not remember -- did not receive a Subpoena. Is that correct?

A. Correct.

Q. Did she remember anything about this case concerning Mr. Gleaves?

A. Yes.

Q. What did she tell you?

MS. TAYLOR: Form.

THE WITNESS: What?

Page 16

MS. TAYLOR: Sorry. That's me just objecting to form, but you can answer.

THE WITNESS: Just about what took place that day when we were at work. But we were both confused on why -- why I was getting a Subpoena, why I was the only one that got a Subpoena for a deposition when I really didn't do much, while I was -- you know, I wasn't a big part of the situation.

BY MR. FEINBERG:

Q. Got it, okay. And I appreciate you saying that at the beginning, Officer Wilson, and I'll tell you that I understand that as well. And I'll just represent to you we're trying to find out some basic facts of what happened and that's why we've brought you here today.

So, Officer Wilson, besides the two Officer Joneses that you mentioned, did you speak to anybody else about this deposition before we brought you here today?

A. No.

Q. Actually, that's a good transition to the next thing I want to ask you. Do you have much recollection about what hap- -- what you saw and observed and heard on the day that Mr. Gleaves was found in his cell?

Charlene Wilson

Page 17

A. Yes.

Q. Tell me what you remember. Let's -- in fact, let me ask it this -- I'll try to ask a better question. What was it that first drew your attention to Mr. Gleaves?

A. My partner told me to come to Cell 1 which -- where he was housed.

Q. Walk me through what happened after that.

A. Well, when I got there he was -- on the top bunk was where he -- his bed was. His celly was -- we're just talking a lot but wasn't really paying him no mind because the top bunk -- he was butt naked and it looked like it was -- he was foaming at the mouth but that's about it.

So -- but we told the celly to get out of the cell so we could, you know, get a better view of what was going on with him --

Q. Okay.

A. -- the inmate.

Q. And at --

A. 'Cause at that moment I don't know who he is. I just no there's an inmate on the top bunk butt naked, but I couldn't tell you what was his name at that time.

Q. Got it. After you noticed that he was --

Page 18

I think you said two things you noticed -- one, he is naked and, two, he's foaming at the mouth. Is that correct?

A. Yes.

Q. After that did someone put in a call for medical assistance?

A. Yes, my partner, Jones, TE. Jones.

Q. Do you remember, did Officer Jones do that before you arrived or after you arrived?

A. I believe it was after.

Q. And --

A. It might have been before. That I'm not really sure, but it might have been after, it might have been before, but I'm not really sure.

Q. Walk me through what happened from that point.

A. Officer C. Jones came, and he went in the cell 'cause he put the blanket over the guy 'cause we're both females. So he put the blanket over the guy, asked him, was he okay? He just was breathing heavy, very heavy.

Q. And what happened next?

A. We wait for Medical to arrive.

Q. And I take it at some point Medical, obviously, did arrive. Is that correct?

Page 19

A. Yes. Yes.

Q. At any point did you get involved in any efforts to -- to evaluate -- like, did -- well, let me ask -- ask it this way. Did you ever check Mr. Gleaves' pulse?

A. No.

Q. Did you ever provide CPR or anything like that?

A. No.

Q. Do I understand correctly that you, at least, did not touch Mr. Gleaves; you waited till the medical staff got there. Is that correct?

A. Correct.

Q. By the way, before this happened, before you were -- or Mr. Gleaves was called to your attention, had you spoken to Officer Slory about Mr. Gleaves at all?

A. No.

Q. Had you spoken to Officer Slory, period?

A. No.

Q. Is there anything else that stands out in your recollection about what happened after Medical got there?

A. After Medical came we went on, you know, with finishing -- 'cause when we first come on it's headcount for us, night shift, 7 to 3. When we come on

Page 20

my shift it's 7 to 3, so as soon as we come from roll call we go to the unit and we automatically start headcount.

So when we first came on we were on our way to count and then that's when my partner, TE. Jones, seen -- well, the celly, his celly, alerted her but that's what we walked into and --

Q. Okay.

A. -- then -- then he started talking.

Q. Sorry, and I interrupted you, so let me stop and let you continue, please.

A. We finished counting after he left and went to Medical. Detectives came. We had to go to Internal Affairs. And that was basically the rest of the day.

Q. So that all happened that same day. Is that correct?

A. Yes.

Q. After September 21st of 2018 did you have any involvement with Mr. Gleaves? In other words, did you have -- did you speak to anybody about him?

A. No.

Q. And do I understand correctly that, between September 21st of 2018 and a few weeks ago when you got Noticed for this deposition, you didn't really

5 (Pages 17 to 20)

Charlene Wilson

Page 21

have any occasion to consider what happened to him?

A. No.

Q. Am I correct in saying that?

A. Oh, yes. Sorry.

Q. Thank you for that, Officer Wilson. That's helpful background. We're going to come back and follow-up on that in a little bit.

Before then I want to ask you some background questions. You told me at the beginning of this deposition your title is Correctional Officer. Is that correct?

A. Yes.

Q. How long have you been employed as a Correctional Officer?

A. July 27th it will be 12 years.

Q. So July 27 of 2009. Is that correct?

A. Yes.

Q. And have you -- so you've worked consistently for the Philadelphia Department of Prisons for that entire time?

A. Yes.

Q. Now, obviously, I know there are several facilities within the Philadelphia Department of Prisons. Back in 2018, in September of 2018, you were working at CFCF. Is that correct?

Page 22

A. Yes.

Q. Where are you working at now?

A. Riverside Correctional Facility.

Q. How many different facilities have you worked in over the course of your employment?

A. Two.

Q. So CFCF and RCF only. Is that correct?

A. Yes. But I work at my three and it's all like one now so, yeah, I don't -- it's all one -- it's all one cell.

Q. Well, let's do -- yeah, let's do this: When did you start at CFCF?

A. Well, with training, so July 27 I started at the academy and then I believe in October we went to CFCF, I believe.

Q. October of 2009?

A. Yes.

Q. And then you were at CFCF until pretty recently. Is that correct?

A. Yes, until 2019.

Q. Back in September of 2018 you were obviously working the 7 to 3 shift. Is that correct?

A. Yes.

Q. Are you still on that shift?

A. Yes.

Page 23

Q. When did you start on that shift?

A. 2014.

Q. So you had been there in that shift -- as of September, 2018 you had been there doing that shift at CFCF for a good four years or so. Is that correct?

A. Yes.

Q. What's your highest level of education?

A. High school.

Q. Did you graduate from high school?

A. Yes.

Q. When did you graduate?

A. 2005.

Q. What kind of work, if any, did you do between your graduation from high school and when you started working at the prison?

A. Retail.

Q. Did you have any other law enforcement work before you worked -- started at the prison?

A. No.

Q. In your position as a Correctional Officer at CFCF, my understanding is that there are a number of different assignments that you can be given on any given day. Is that correct?

A. Yes.

Q. You were -- this incident, by the way,

Page 24

took place on B1Pod3. Is that correct?

A. Yes.

Q. Were you usually assigned to that pod or would you be assigned to different pods on different days?

A. I was assigned there every day.

Q. Before September of 2018 how long had you been assigned to that pod?

A. I'm not really sure.

Q. It sounds like --

A. I'm not sure how long I've been down there --

Q. Okay.

A. -- that situation.

Q. Well, it sounds like you'd been -- before September of 2018 you had been in that assignment for a -- for a couple of years at least. Is that right?

A. Yeah, but I just don't know the exact number.

Q. Is -- and the reason I asked you that, ma'am, is that in a little bit I'm going to ask you about your day-to-day responsibilities --

A. Okay.

Q. -- and I just want to make sure that was a usual assignment, and it sounds like it was. Is that

6 (Pages 21 to 24)

Charlene Wilson

Page 25

correct?

A.  Yes.

Q.  Before we get to what your responsibilities were, though, can -- a couple of other questions.  Your partner on that day was Officer TE. Jones; correct?

A.  Yes.

Q.  Did the two of you usually work as partners?

A.  Yes.

Q.  How long had you worked as partners before September of 2018?

A.  Again, not knowing the time frame, but like every day besides our days off or when one of us called out.

Q.  So same thing, probably a couple of years, can't say for sure?

A.  Yes.

Q.  Had you ever worked with Officer Slory?

A.  No.

Q.  Now, I know Officer Slory would have been on the night shift, the --

A.  11.

Q.  -- the 11 to 7.  That's my understanding. Does that sound right to you?

Page 26

A.  Yes.

Q.  Was there ever any occasion -- and understanding that you were on different shifts, the reason I ask the question is this, did he ever work overtime and work with you on the 7 to 3 or, vice versa, did you ever work overtime on the 11 to 7 where the two of you would have been together?

A.  Not that I recall, no.

Q.  Do you know him at all?  I mean, did you ever have an occasion to talk to him?

A.  Probably, but I'm not really sure.

Q.  When you take over -- when you arrive for the 7 to 3 shift, or at least back in that time frame, September of 2018, would you have a conversation with the person who had been assigned to the pod on the 11 to 7 shift?

A.  Yes.

Q.  Tell me -- can you just walk me through what would happen when you'd show up for work, in terms of that conversation?

A.  They would tell us what the census is, if we had any courts out, how was the night, stuff like that.

Q.  And is that part of a daily routine, that you'll have a conversation with the Officer just to --

Page 27

who gives you an update?

A.  Yes.

Q.  Do they ever put anything in writing for you?

A.  Sometimes, yes, if --

Q.  Do they do that in a -- is the written message communicated Housing Log?

A.  It's probably on a piece of paper.  The census and the headcount or how many courts a day -- I'm sorry.  The census and the headcount would probably be on a piece of paper if they had to leave earlier than us getting there.

MS. TAYLOR:  Jon, can we take a quick break just so the Officer can run to the hallway?

MR. FEINBERG:  Yeah, sure, no problem. Let's, in fact -- well, we'll just wait until you come back.

MS. TAYLOR: Okay.

(Short recess was taken.)

BY MR. FEINBERG:

Q.  Officer, we just took a short break.  In the course of that break did you realize that any of your previous testimony was incorrect or incomplete in any way?

A.  No.

Page 28

Q.  We were talking before we took the break about what happens when you transition from the 11 to 7 shift into the 7 to 3 shift.  Is it -- you mentioned or you described that sometimes the Officer on the 11 to 7 shift might have to leave early and you don't speak.  Is that an exception to the rule?  I guess how often does that happen is my question?

A.  Not that often 'cause it's the intake so -- they have -- they normally have an escort down there to just continue their tours once -- if that Officer has to be there at like 6:30, so for that half an hour a rover will come and do a tour on the unit.

If they left at 6:30 -- I'm not sure. They left between 6 and 6:30.  A rover could go as an escort down there because there's a lot of movement in the intake area.  They have to do tours on the block that is unmanned.

Q.  Let's do this then.  Officer, can you tell me -- and let's think back to September of 2018 -- when you would show up for the 7 to 3 shift, can you just walk me through?  What would your basic assignments be during the course of your day?

A.  Okay.  So when we first get on we do -- straight go into headcount.  Once we go into headcount we turn our count into the Center Control Sergeant or we

Charlene Wilson

Page 29

basically sit there until count clears.

We have TB check in. We have -- on that unit where we worked on Bravo 1-3 we have Med locks so that Medical people come check on them to see if they want to change their mind on getting -- during the intake process before they get to my unit where I was -- worked at.

We have the Mill. We have C.O.W.S., which are for inmates that withdraw. We have a Social Worker. We have a official visits. And we have people that have --

(Court Reporter clarification.)

Q.   C.O.W.S. would be C-O-W-S. It's the Clinical Opiate Withdrawal Scale. Does that sound right?

A.   Yes, so we have that. We have a Social Worker. We had -- if they have to go to Medical. If they have to go to Mental Health. We have the Mill.

We have to do tours every half an hour. I think it got changed to 20 minutes at one point. Yeah, busy.

Q.   By the way, is that a Quarantine Unit?

A.   Yes.

Q.   And I'll be honest, I generally know what a Quarantine Unit is, but let's make sure we're talking about the same thing. What does it mean to you that

Page 30

that's a Quarantine Unit?

A.   Okay. So you have the quarantine now. But then you had -- the quarantine then was, when they first leave the receiving room they have to be there after they -- through the intake process in the receiving room, and then they get their TB. They get a TB shot in the receiver room, and they can't leave my housing area until they're TB cleared. And then they can go to whichever unit that housed their custody level.

Q.   Got it. So is it fair to say then that people who come to that unit are almost always newly admitted to the -- to the facility?

A.   Yes.

Q.   In fact, not almost always, are always newly admitted to the facility. Is that right?

A.   Yes. But we do get some people that -- like were upstate, and they had to come back down so....

Q.   So newly admitted to the Philadelphia Department of Prisons at least in recent time; is that correct?

A.   Yes.

Q.   Let me ask you some more detailed questions about what those responsibilities were.

The first thing I want to cover is

Page 31

tours, and you just mentioned that a moment ago, that you would be required to do tours. When you use that phrase what do you mean by it?

A.   Tours, we have to check, walk around the unit to make sure everybody is alive and breathing.

Q.   That's the purpose, is to make sure that everyone is alive. Is that correct?

A.   Yes.

Q.   And breathing. Is that correct?

A.   Yes.

Q.   And can we agree that, as a Correctional Officer, protecting the health and safety of prisoners who are in your custody is one of, if not the, most important responsibility you have?

A.   Yes.

Q.   How do you do that, confirm that you have -- that a prisoner is alive and breathing? And that may sound like an obvious question but tell me, when you conduct a tour, what do you look for as you do it?

A.   Okay. So like -- like, for instance, when we first come in for count -- like when we first come in from roll call so we can count we gotta shake a leg, move an arm, only because that's the intake and a lot of those guys are withdrawing, so you have to get some type of body motion to say that, okay, he's alive.

Page 32

Q.   Now, Ms. Wilson, let -- Officer Wilson, let me clarify something. You were on the 7 to 3 shift, and I take it the rules that you're describing to me are rules that would apply to you. Is that correct?

A.   Rules that applied to everyone.

Q.   Okay, thank you. And my next question was, do you know whether there are any different practices for the 11 p.m. to 7 a.m. shift?

A.   No.

Q.   So as far as your understanding, everything that you're telling me about what is required on the tour is the same thing that would apply across the board no matter what time of day it is. Is that correct?

A.   Correct.

Q.   How often were you supposed to do the tours?

A.   Every half an hour, but I believe it got changed to every 20 minutes because they're considered special management.

Q.   And did that happen before or after September, 2018?

A.   That I don't recall.

Q.   At a minimum, though, tours were supposed to be once at least every 30 minutes. Is that correct?

A.   Yes.

8 (Pages 29 to 32)

Charlene Wilson

Page 33

Q.   And that means once every 30 minutes you would have to go around and make sure that the prisoner in each cell that you looked in, shake a leg -- shook a leg or shook an arm.  Is that correct?

A.   Yes.

Q.   If someone appeared to be sleeping what would you do?

A.   See if his chest is rising, like if he's breathing.

Q.   So that's proof of -- so that's proof of breathing.  Is that correct?

A.   Yes.

Q.   And can I assume, from the way you're describing things, that when you conduct this tour to assess whether a person can shake a leg, shake an arm or their chest is rising, you've got to look in long enough to make sure that happens.  Is that correct?

A.   Yes.

Q.   In other words, you can't just walk by and glance and then just move on.  Right?

A.   Only way you're glancing is if they're woke and they're sitting up doing something.  You're like, okay.

Q.   So if you walk by and you see someone is walking around the cell, if they're sitting up in bed and

Page 34

they're reading or something, it's going to be obvious; right?

A.   Right.

Q.   But, barring that obvious circumstance, you've gotta at least take the time to make sure that there is either movement or breathing; correct?

A.   Correct.

Q.   Now, everything that we're talking about here, is there specific guidance in a policy or a procedure that you can point to?

A.   On how we conduct a tour?

Q.   Yes.  And, look, let me say, Officer Wilson, I know you've been there a long time and this may be second nature and common sense to you -- and, in fact, I should ask, is what you're describing -- this is something that you've been doing for 12 years now; right?

A.   Correct.

Q.   Do you know, sitting here today, whether there is a specific policy which says that when you conduct a tour you're supposed to do X, Y and Z?

A.   I'm not sure.

Q.   And that's fine.  It sounds like then, Officer -- and tell me if this is right -- that from the point of your training, all the way back in 2009, this is the way you've been taught to do a tour whenever you work

Page 35

in the facility.  Is that correct?

A.   Correct.

Q.   All right, thank you.  And I think -- you started to mention, and then I went in a different topic -- that the rules that you're describing to me apply to B1-3 because it's a Quarantine Unit.  Is that correct?

A.   No.  Those rules apply for wherever you work.

Q.   Then that's a good clarification.  So what -- and let's confirm.  What you're describing, tours every 30 minutes, confirmation of movement or breathing, applies across the board every unit at CFCF.  Is that correct?

A.   Correct.

Q.   Or even, more broadly, every unit across the entire Philadelphia Department of Prisons.  Is that correct?

A.   Correct.

Q.   Regarding the Quarantine Unit, you mentioned that a lot of guys who come into that unit are dealing with opiate withdrawal and that's why you have a familiarity with the C.O.W.S. process.  Is that correct?

A.   Correct.

Q.   Can I assume then that because you're familiar with the concept of opiate withdrawal that

Page 36

you're on the lookout for symptoms of opiate overdose as well?

A.   No.

Q.   Have you -- to your knowledge, have you seen or observed anyone who has overdosed due to opiate usage while in the Philadelphia Department of Prisons?

A.   Yes.  I believe he overdosed.  He -- I mean, he was -- I believe he overdosed.  I can't confirm or deny that it was an overdose because I'm not sure if he was taking something.

But he was -- we have a -- we have a day room and then we have -- on the unit.  When you see the video -- we're gonna still play it; right --

Q.   We --

A.   -- I can describe what I am speaking of right now.

Q.   Let me interrupt, Officer.  When you say he, are you referring to Mr. Gleaves?

A.   No, no, no.

Q.   We're talking about a different --

A.   Another inmate.  He passed out where we served the meal.

We spoke -- again, we just -- we call Medical.  So I'm assuming he overdosed because they put the thing under his nose (indicating), the thing under

9 (Pages 33 to 36)

Charlene Wilson

Page 37

his nose 'cause we saw it.

(Court Reporter clarification.)

The thing under his nose, I don't know what that does. I'm not sure what --

Q.   And --

A.   -- I'm not sure what the thing they put under their nose to bring them back -- a NARCAN, that's what it's called.

Q.   Officer, you've made it clear, although you probably know more about medicine than I do, but you've made it clear that you're not a -- you're obviously not trained to deal with medical issues that are presented by prisoners. Is that correct?

A.   CPR, we are trained for CPR.

Q.   But bottom line, the moment you notice an issue then you call the Medical Unit. Is that correct?

A.   Yes.

Q.   And in connection with what we've been discussing in terms of tours, if you noticed that someone doesn't shake a leg or shake an arm when you ask them to, or when someone does not appear to be breathing, you immediately call the Medical Unit. Is that correct?

A.   Well, we open the cell and sometimes you gotta tap them like, you know, give them a little nudge, are you there, you know. But if they don't you call

Page 38

Medical (indicating).

Q.   Okay.

A.   And hold on.

Q.   The other thing I want to --

A.   Hold on.

Q.   -- ask you --

A.   I'm sorry. I say that because those that are withdrawing, they'll like to act -- they'll act they don't hear us, so they just don't wanna move or they don't wanna be bothered in that case.

Q.   And if -- it sounds like that's something that happens pretty frequently. Is that right?

A.   Correct.

Q.   So if you don't get movement then you go into the cell?

A.   Go inside the cell, yes.

Q.   And it sounds like you -- there's like two steps. First, if you don't see movement you try to call some attention by knocking on the window. Is that right?

A.   Yes.

Q.   And if that doesn't work then the door gets opened, you walk in. Is that right?

A.   Correct.

Q.   Can you -- CFCF, it's not a -- you don't

Page 39

use a key to enter the cells. Is that correct?

A.   You do.

Q.   So can the doors be popped from a central location?

A.   A console, yes.

Q.   So you can enter with either a console or a key?

A.   Yes.

Q.   Another thing I want to ask you about concerning tours is how you record them. In fact, let me show you -- I'm going to put a document on the screen.

MR. FEINBERG: Anne, will you be able to see documents from where you are sitting?

MS. TAYLOR: We may. I think if you get in with the docu- -- or when you share your screen I think it should take up the entirety of this one.

MR. FEINBERG: Okay, perfect. Give me one moment then.

(Short pause.)

BY MR. FEINBERG:

Q.   Can you see that all right?

A.   Yes.

Q.   So what I'm showing you is a document that's been marked as Exhibit P-1. And this, I believe, is a Housing Log from B1-3 on the night -- on

Page 40

September 20th and September 21st of 2018.

And let me just note for you, as I scroll down here, here is one reference from 2:24 -- do you see where my cursor is? I'm moving it around.

A.   Yes.

Q.   And that's from 2:24 a.m. on September 21st. It looks like it's entered by Officer Slory and there's a note there, toured unit. Do you see that?

A.   Yes.

Q.   When you tour the unit are you -- can I assume that you're supposed to record that in the log?

A.   Yes.

Q.   And is that -- that's supposed to happen for every time you conduct a tour. Is that correct?

A.   Yes.

Q.   How soon after you conduct a tour are you supposed to record it in the log?

A.   Once you get back to the desk where the computer is.

Q.   Now, there's some notes here concerning -- where it says, exceptions noted. Can you see where my cursor is now?

A.   Yes.

Q.   Do you have any idea what that means, as

10 (Pages 37 to 40)

Charlene Wilson

Page 41

far as the log entry goes?

A. There's two entries for tours, so it just depends on which one you put it under.

Q. What are the two entries?

A. The first one that says 1:42 and then the second one that says 2:24.

Q. I see. So it's either going to be, as we see here 1:42 a.m., toured unit, appears in order, or toured unit, exceptions noted. Is that correct?

A. Correct.

Q. What does exceptions noted mean?

A. From my knowledge, not that I know of. It just -- when you type in the computer, if you put okay first, the okay tour part, the okay tour will come up. If you just put -- type -- start with the word tour then exception noted tour will come up. That's all.

Q. Got it. If there is -- if you saw something on a tour where something was not in order, is there a place where you can make a record of that?

A. Yes. You type it in the notes. When you type in -- I haven't used the computer in awhile. When you type in -- like when you type in okay tour, it's an area where it say notes. And you could just go down there and you could type in whatever you need to type in, whether it was a stretcher call, whether -- a

Page 42

stretcher call or if something took place, if it was a fight.

It's where you -- it's an area on that same place you typed in, okay tour, where you can click notes and that -- when something happened while you were on tour.

Q. Got it. So if you saw something over the course of your -- over your tour you would make a note of it. Is that correct?

A. If I seen an incident as if -- only time you put something in as a note is if you need to call the stretcher.

Like if somebody is laying in bed but they have a lot -- they have thrown up, again, withdrawal 'cause that's what a lot of them were, withdrawing, and they would throw up, and I needed for Medical to come I would call for Medical assistance.

But I would -- by the time I got back to the computer and once they left the Housing area, I can put who came to the area and what was going on inside that cell.

But if I'm just doing a regular tour and nothing is going on then I'm not putting nothing in besides, okay tour.

Q. Officer, how often would you have a

Page 43

stretcher call? And I know you can't tell me with specificity, but can you estimate over the course of a month --

A. A lot.

Q. -- how many times would you, on average, have occasion to call a stretcher to the -- to the pod?

A. I don't have a number but a lot, a lot of stretcher calls.

Q. And are most of those stretcher calls in connection with people who are going through opiate withdrawal?

A. Yes.

Q. So, obviously, that's -- at least at that time, and sounds like even beyond that time -- that was a common issue that you dealt with. Is that correct?

A. Correct.

Q. Still on the topic of tours -- and I'll take this log down now.

MR. GREGORY: Jon, before you do can we see the Bates number.

MR. FEINBERG: Sure.

MR. GREGORY: Bates numbers.

MR. FEINBERG: And, by the way, what I'll do after we finish the deposition, Tom and Anne, any exhibit that we use I'll email you copies so you've

Page 44

got them. This is City 19 through --

MR. GREGORY: Got it.

MR. FEINBERG: -- City 25.

MR. GREGORY: That's okay, thanks.

MR. FEINBERG: Yep.

BY MR. FEINBERG:

Q. Officer, is there any requirement, to your knowledge, for supervisors, Sergeants, Lieutenants, whatever, to conduct tours during the course of a shift?

A. Yes.

Q. On the 7 to 3 shift how does that work?

A. The same way it works on any shift. The supervisors show up whenever they show up to do a tour. There's no -- there's no set time frame for when they show up as long as they show up between the shift of 7 to 3 or 3 to 11 or 11 to 7.

Q. So it sounds like, to your understanding, at least once per shift a Supervisor ought to come through. Is that correct?

A. Once or twice. I believe it's twice per shift.

Q. And what rank of supervisor?

A. Sergeant, Lieutenant, Captain, whoever decides to show up, but mainly the Sergeants are supposed to do a tour.

11 (Pages 41 to 44)

Charlene Wilson

Page 45

Q. And do those Sergeants -- do they do the same type of tour that you do when they're looking for proof of life in every cell?

A. Yes.

Q. And, to your knowledge, that's the same on every shift. Is that correct?

A. Correct.

Q. Is a Supervisor's tour supposed to be logged on the Housing Log that we were just looking at?

A. Yes.

Q. Who makes that entry? Is it the Officer or the Supervisor?

A. Officer can make it and a Supervisor makes it as well.

Q. Different topic, Officer. If a -- some prisoners have told me that there is supposed to be something called a panic button in the cells at CFCF or a button that you can press to get the attention of a Correctional Officer. Are there such buttons at CFCF in the cells?

A. Yes.

Q. If I'm in a cell and I want an Officer's attention, I take it I can press that button any time; right?

A. Yes.

Page 46

Q. What happens when I press that button?

A. When you press the button the console at the desk where we sit it on the unit, it will flash. There's a light on the console for that cell that will flash.

Also, it's -- you know, if it's a fire and then light flashes, the white light, it will flash in the day room. That will flash as well.

Q. Got it. So if someone hits a button -- I take it that's if you are not at the console then that flashing will catch your attention that someone has asked for your assistance so you can go back to the console and see who it is. Is that correct?

A. Correct.

Q. So is -- at the console there's an indication -- or is there a different light for each cell in the unit?

A. It's a -- it just go by the cell number. So that -- whatever cell is hitting that button, that light will flash for that cell number on the console.

Q. What is your responsibility, as an Officer, when you see that button light up?

A. To ask what's wrong.

Q. Can you -- you can do that and communicate, um ---

Page 47

A. You could communicate that through -- sorry to cut you off, but you could communicate that through being at the console, depending on what cell they in, or, you know, walking to the cell.

Q. So there's a speaker that you can use from the console. Is that correct?

A. No, no. Raising your voice.

Q. So if someone in whatever cell hits the button you can just yell, hey, Cell 4, what do you want?

A. Yes.

Q. Something like that?

A. Yes.

Q. Can you ignore that light if it goes off?

A. Yes.

Q. So that's --

A. You can ignore it if you choose to but --

Q. Okay.

A. -- it's up to you.

Q. Do officers, in your experience, ignore when those lights light up?

A. Yes.

Q. Is there any specific requirement, any policy or directive, telling you that you've got to respond to every notification you get from a prisoner?

Page 48

A. Probably. I'm not sure.

Q. Has any supervisor ever told you, hey, prisoners are complaining that you officers are not responding when they hit the button. Has anyone said that?

A. Not to me.

Q. Have you ever heard about that happening at CFC?

A. Yes.

Q. Tell me about that.

A. Just that somebody pushed the button and the Officer didn't see what was wrong but that's about it. That's just hearsay, though. I can't go off if that actually took place.

Q. Do you know whether every one of those buttons works?

A. No.

Q. Do you know whether anyone checks on that on a regular basis?

A. No.

Q. For example, if I'm in Cell 1 where Mr. Gleaves is and I've got an issue, and I hit the button do you have any -- could you tell me one way or the other whether that button is going to make something light up at your console?

Charlene Wilson

Page 49

A.  No.

Q.  Do you know whether -- and it sounds like you don't know, one way or the other, whether anyone ever goes around and checks to make sure that that works.

A.  Unless they tell us.  Unless the inmate tell us that the button doesn't work.  They'll say -- like if you're on tour they'll say, I've been hitting my buzzon [sic] -- my button but nothing -- it's not -- you're not, you know, coming to me, then we'll go check and then we'll call maintenance.

Q.  So -- and a prisoner won't know it's not working unless an Officer doesn't respond repeatedly.  Is that correct?

A.  Like the light wouldn't flash, that light I was telling you about --

Q.  Oh.

A.  -- so if a button doesn't work and they hit the button, it's not gonna flash.

Q.  Do you know whether the Maintenance Department at the prison keeps a record of checks on those buttons?

A.  Not that I know of.

Q.  Has there ever been a situation where a person has hit that button and you have ignored that?

A.  Yes.

Page 50

Q.  And can you give me an example of a circumstance when you have ignored that button?

A.  If I just did a tour and they're locked in the cell and they hit the button, 'cause they're trying to say they wanna come out, and I just walked around so they gotta wait.

Q.  Has there ever been a situation where a person was having a medical emergency when they hit the button and you ignored it?

A.  No.

Q.  Have you ever heard of an instance where someone was hitting the button because of a medical emergency and an Officer ignored it?

A.  No.

Q.  With regard to medical emergencies --

A.  Can I ask you a question?  Is that for every unit or my unit or ---

Q.  Every unit.

A.  Oh, well, yes -- well, not an emergency situation, no.

Q.  Describe an example of what you heard about before.

A.  Like I just said, just that they was pushing a button and nobody went to see, but nobody like -- not that it was an emergency.

Page 51

Q.  So if they're -- well, what's -- are you thinking about a specific example, Officer Wilson?

A.  I mean, I feel like an emergency is if somebody was having a seizure, somebody was, you know, trying to hang up or, you know, somebody was dying or something; that would be considered an emergency on the Intake Unit.

I mean, I can't -- or somebody was in the cell fighting, that would be an emergency, two cell mates were fighting and the Officer ignored the button, something like that.

Q.  So my question for you, though, Officer is in response to my previous question about whether you heard about this happening before, it sounds like, yeah, you recall some stories about Officers ignoring that button -- and, I'm sorry, let me strike that.

What do you call that button when a prisoner pushes that to try to get an Officer's attention?

A.  The call button.

Q.  The call button, okay.  So it sounds like you've heard of situations where an Officer has ignored that call button when someone was having a medical issue.  Is that correct?

A.  No.

Page 52

Q.  Then maybe you and I are speaking past each other.  So what examples can you think of, if any, where you've heard about an Officer ignoring a call button where a prisoner had some kind of need for assistance?

A.  I haven't.

Q.  Okay.  You haven't heard about that happening ever?

A.  No.

Q.  Let me come back to what happened on September 21st of 2018.  And as I do this -- bear with me for one second, please.

(Short pause.)

I'm gonna put Exhibit 1 back on the screen.  Do you see that log back on the screen there, Officer?

A.  Yes.

Q.  I have -- here I'm pointing -- moving my cursor around at 6:53 a.m., September 21st.  This is an entry by Officer G. Slory, which says: Sign-off duty, Officer G. Slory off duty, waiting for relief.  What does that waiting for relief designation mean?

A.  He just put that he is waiting for the next shift to relieve him.

Q.  The next entry we see looks like it's

13 (Pages 49 to 52)

Charlene Wilson

Page 53

entered by you. Is that -- C.H. Wilson, is that you?

A. Yes.

Q. And you note, sign-on duty, C/0's C. Wilson and TE Jones on duty at 7 a.m. Is that correct?

A. Correct.

Q. Now, that entry wasn't made until 7:33, which is a half hour, give or take, after you showed up. Is that correct?

A. Correct.

Q. Can I assume that you were delayed in making that entry because of what happened with Mr. Gleaves?

A. Correct.

Q. Looking at this log entry, can you -- does that refresh your recollection in any way as to whether you or Officer Jones -- or, to your knowledge, Officer Jones spoke with Officer Slory before you started your shift or as you started your shift?

A. I don't remember talking to him but Jones could have talked to him.

Q. And, by the way, when you start a shift I take it your assumption is, is that Officer Slory would have conducted a final tour before you started. Is that correct?

A. Correct.

Page 54

Q. Is there any rule about how close in time to the end of the shift he should conduct that tour?

A. There should have been one done at 6:30. Between 6:30 and 7.

Q. And that's consistent with that there has to be a tour once every half hour; right?

A. Correct.

Q. So your expectation is there will be a tour sometime between 6:30 and 7, and then you'll conduct your tour at sometime between 7 and 7:30. Is that correct?

A. Correct.

Q. By the way, I neglected to ask -- ask you before, on this log -- and this may sound basic but let's confirm it -- you can't write on the log that you did a tour unless you, in fact, conducted a tour. Is that correct?

A. No.

Q. So if you were just sitting at the desk, didn't actually conduct the tour but you wrote on the computer conducted tour, everything's okay, that would not be proper. Is that correct?

A. Correct.

Q. So, sitting here today, you don't have any recollection of hearing anything or speaking to

Page 55

Officer Slory at all. Is that correct?

A. Correct.

Q. And your first recollection is that once you entered the block Officer Jones saw -- called Mr. Gleaves to your attention. Is that correct?

A. Correct.

Q. Do you remember what she said to you?

A. No.

Q. Was it as soon as you entered the block?

A. Yes.

Q. Let's do this. I think to make it easier I am going to try to show you the video --

A. Okay.

Q. -- and we'll see if that refreshes your recollection in any way.

A. Okay.

Q. And to confirm -- well, in fact, let me get it up on the screen first and then we'll see whether you remember any of it.

(Video shown.)

Q. Do you see on your screen, ma'am, four different video images?

A. Yes.

Q. And am I correct that my cursor is on the top right image pointing to a yellow door. Is that Cell

Page 56

1 in the B1-3 Unit?

A. Yes.

Q. I'm gonna play this forward, and I'll ask you to watch the top right --

MS. TAYLOR: Jon, can you just hold one moment --

MR. FEINBERG: Sure.

MS. TAYLOR: -- and stop playing just because the Zoom is blocking most of that view.

MR. FEINBERG: Oh, got it. Okay, yeah.

(Short pause.)

MS. TAYLOR: All right, there we go.

BY MR. FEINBERG:

Q. So, Officer, do you see there's an Officer who appears to be walking toward Cell 1 there. Is that correct?

A. Yes.

Q. And for the record it's 7:10 and 40 -- 7:10 a.m. and 44 seconds. Does that -- can you see the time? Are you close enough to see that?

A. Yes.

Q. And do we -- do you agree that you see Officer Jones kick the door there?

A. Yes.

Q. And it looks like that's something that

WWW.KLWREPORTERS.COM

Charlene Wilson

Page 57

she did pretty instantaneously as soon as she arrived at that cell. Is that correct?

A. Correct.

Q. Now, if we look at the other screens, we don't see you on the unit. Is that correct?

A. Correct.

Q. I'm gonna play it forward a little bit from here. It looks like Officer Jones is walking back toward the console area. Is that correct?

A. Correct.

Q. And I'm gonna fast forward a little bit until you come into the scene.

(Video fast forwarded.)

Okay. I'm pausing here. Looking at the bottom right screen at 7:12 a.m., I played it fast there but did you see -- was that you who entered the unit at that point?

A. Yes.

Q. And now at 7:12 a.m. and 28 seconds we see you walking past the console area. Is that correct?

A. Correct.

Q. Now, does that -- does it look like you're now entering the block at the beginning of your shift?

A. Yes.

Page 58

Q. So this is -- this is your -- basically the first thing that happens when you start your workday. Is that right?

A. Correct.

Q. Now, as you walk in Officer Jones is walking back towards Cell 1 and it looks like you walked toward the console. Seeing that now does that refresh your recollection about what she said to you or what she reported to you?

A. No.

Q. It looks like, from the video at the top left, as Officer Jones -- first of all, she's opened the door of Cell 1. Is that correct?

A. Correct.

Q. And you're at the console. Is that right?

A. Correct.

Q. Do you know what you were doing?

A. Yes.

Q. What were you doing?

A. It looked like I was getting a pencil -- a pen because the paper I grabbed is the count sheet.

Q. Okay. So you're writing --

A. When I put -- sorry -- when my put my head down and I grabbed the piece of paper, it was so I

Page 59

can count. That's that paper I grabbed.

Q. Okay.

A. I might have been in a drawer looking for a pen. I'm -- I just know I'm in a drawer.

Q. I'm gonna play on from here and I'll ask you to watch yourself, and then my question to you in a moment will be what you were doing.

A. Okay.

Q. I'm now at 7:13 and a few seconds. You start walking towards Cell 1. Is that correct?

A. I started walking and I -- yes.

Q. Now, we see you on the top right screen. You're walking toward Officer Jones at Cell 1. Is that correct?

A. Correct.

Q. Now at 7:13 and 18 seconds the two of you are in front of Cell 1 with the open door. Is that right?

A. Correct.

Q. Seeing that now do you remember what Officer Jones said to you?

A. Probably said, look at the guy. I don't -- I don't remember what she said.

Q. In general -- and understanding that you don't remember the specific words that she said -- did

Page 60

she make it pretty clear to you that this -- that the man she was looking at appeared to have a medical situation?

A. Not that I recall 'cause I am not sure if she was telling me about the celly or if she was telling me about him.

Q. Okay.

A. I told you the celly was -- he was hyperactive.

Q. By the way, from the records we've seen we know that that cellmate's name was Tyrone Thomas. Does that sound familiar to you?

A. If that's in the paperwork, but if you -- I mean, that's about it, 'cause I read it in my papers, but I don't know.

Q. So sitting here today it sounds like you don't remember it, but when you saw it in the papers you have no reason to dispute that. Is that right?

A. Correct.

Q. When you came up to the cell, as we see here in the video, did you notice right away that Mr. Gleaves appeared to be completely naked?

A. Yes.

Q. Did you notice right away that he appeared to be foaming at the mouth?

A. No.

15 (Pages 57 to 60)

Charlene Wilson

Page 61

Q. When did you notice that?

A. When -- I'm not really sure, actually. Now I'm looking at the video.

Q. I'm gonna play forward now -- and I believe in just a moment we'll see the cellmate leave the cell. At 7:13 and 32 seconds you walked back towards the steps and then back toward Officer Jones. Do you have any idea what you were doing there?

A. No.

Q. I'm going to continue to play for a moment until we see Mr. -- the cellmate, Mr. Thomas, walk out.

Actually, as we do that, at 7:13 and 55 seconds a male Officer walked in. Is that Officer C. Jones?

A. Correct.

Q. I'll pause there. The top left we see Officer C. Jones walking toward both you and Officer TE. Jones. Is that correct?

A. Correct.

Q. We see a man in an orange jump suit coming out of Cell 1. Is that correct?

A. Correct.

Q. And is that the cellmate you've been referring to?

Page 62

A. Correct.

Q. By the way, you mentioned a short while ago that he was hyperactive. Is that correct?

A. Correct.

Q. Do you recall -- when you say hyperactive what do you mean by that?

A. Saying a lot. He was talking a lot about his cellmate.

Q. What was he saying?

A. That he was in there digging up his butt, digging up his butt, that he told the Officer before us to come get him outta his cell; if you don't get him outta my cell I'm gonna beat him up, that type of stuff.

Q. That he told the Officer before, meaning Officer Slory?

A. Yes.

Q. Did he say anything about Mr. Gleaves' medical condition?

A. Not that I remember, not to us. He just said I told the Officer before about how his celly was acting.

Q. What else did he say to you?

A. That's about it.

Q. Did you get a sense whether Officer or

Page 63

Mr. Thomas said this to Officer Slory during the course of a tour?

A. I'm assuming. I'm not sure. I wasn't -- I don't know what he said.

Q. And it sounds like all you know is what Mr. Thomas, the cellmate, said to you. Is that correct?

A. Correct.

Q. And what he said to you is that he told the Officer that he was gonna beat up Mr. Gleaves because of the way he was acting. Is that right?

A. Correct.

Q. Did he say anything else about what he was gonna do to Mr. Gleaves?

A. No.

Q. Did you ever talk to Officer Slory about these things that Mr. Thomas said to you?

A. No.

Q. We -- let's go back and play some more. In fact, before I do that let me ask this. Did you get the sense from Officer TE. Jones, when she summoned you over there, that it was immediately apparent to her that there was some issue for Mr. Gleaves?

A. When she summoned me over I knew that it was a problem.

Q. And you obviously -- from the video we

Page 64

know that you were not on the block when Officer TE. Jones decided to -- when she kicked the door and then opened the cell. Is that right?

A. Correct.

Q. But you can obviously tell from watching the video that, as soon as she looked in that window, she decided she needed to take some action. Is that correct?

MS. TAYLOR: Form. You can answer.

THE WITNESS: Correct.

BY MR. FEINBERG:

Q. Did -- do you remember her saying to you right off the bat, as soon as you walked in, we've gotta do something about this guy?

A. Not that I remember.

Q. From context, though, it looks like you were -- you walk in, you're ready to do your tour, you've got your paper and your pen or pencil, but you get completely distracted from that and get brought over to Cell No. 1. Is that correct?

A. Correct.

Q. And, obviously, it was a significant enough issue that it drew your attention away from what your typical responsibilities were. Is that correct?

A. Correct.

Q. And once you go to the cell door and you

WWW.KLWREPORTERS.COM

Charlene Wilson

Page 65

see a guy there completely naked, that's something that you're gonna pay attention to; is that correct?

A. Correct.

Q. When within this process do you remember noticing that his -- he was foaming at the mouth?

A. I don't remember.

Q. Okay.

A. I don't know if -- see, I don't remember if it was after Officer Jones went in his cell, the guy -- the male Jones. I'm not really sure.

Q. Let's keep watching and then let's see if that refreshes your recollection. I'm playing now at 7:14. You see the cellmate walk out and Officer C. Jones walk toward you and Officer TE. Jones, and he's now at the cell front at 7:14 and 15 seconds. Agreed?

A. Correct.

Q. Now, Officer TE. Jones stands there for a few moments. Do you remember what he was saying or doing?

A. He was putting gloves, on and he was -- I believe he was yelling for the inmate to like, you know, say something.

Q. And the inmate, that's obviously Mr. Gleaves. Is that correct?

A. Correct.

Page 66

Q. Did Mr. Gleaves respond at all?

A. No.

Q. In fact, I think you said before that the only thing he was doing was breathing very heavily. Is that -- is that right?

A. Correct.

Q. And was it sometime within this process that you noticed that he was foaming at the mouth?

A. Correct.

Q. How much foam? And, you know, I'm sorry to be -- to -- to really harp on this, but was there -- was it a lot or was it just a little like at the edges of his lips?

A. I would say a lot.

Q. Was it running down the sides of his face?

A. Yes.

Q. So it's something that was pretty noticeable to you as soon as it caught your attention. Is that correct?

A. Correct.

Q. Now, at 7:15 and 33 seconds -- I've been running it play -- letting it play while I asked you that last question -- we see a Medical staff member enter. Is that correct?

Page 67

A. Correct.

Q. I didn't ask you to pay attention about -- to when the call to Medical was made. Did you happen to notice, while I was asking you questions, when in this process Medical was called?

A. No.

Q. Was it you who made the call or Officer TE. Jones who made the call?

A. Jones.

Q. Well, TE. Jones or C. Jones?

A. TE.

Q. Okay, thank you.

A. I can't -- I mean, I'm looking at the screen, but I'm like focused on certain -- the different angles are taking my attention.

Q. That's okay. And, look, Officer Wilson, I didn't call your attention to that. I was just -- my question was just whether you happened to notice anything.

And it's not important enough for me to go back and ask you. Your recollection is, I think, that you did not call Medical. Is that correct?

A. Correct.

Q. Well, we'll have an opportunity to ask Officer TE. Jones and Officer C. Jones that same

Page 68

question. Once the Medical Unit comes onto the staff or onto the -- I'm sorry, let me try that again.

Once the Medical Unit comes into the -- Medical staff comes into the unit did you have any involvement in what they were doing or were you just standing there observing?

A. Just standing and observe. And, you know, we tell them, you know, what they're walking into or what, you know, what we believe is going on.

Q. Okay.

A. We tell them what we -- what we see, basically.

Q. Okay. And it looks like at 7:15 and 59 seconds the staff member who just walked by you -- it looks like you raised your hand and had some kind of -- you said something to her. Is that right?

A. Yes.

Q. Would you like me to go back?

A. Yes.

(Video played.)

Q. Do you see you raised your hand?

A. Yes.

Q. Do you remember anything about what you said?

A. No.

17 (Pages 65 to 68)

Page 69

Q. At any point during this process were you concerned about Mr. Gleaves' health and safety?

A. Yes.

Q. What did you think was going -- understanding that you're not medically trained, what did you think was going on?

A. I had no idea what was going on. I've never -- I've never seen that, someone foaming at the mouth.

Q. And someone foaming at the mouth -- well, let's -- first of all, let's list the things that you observed. One, he was foaming at the mouth. Is that correct?

A. Correct.

Q. Two, he appeared not to be able to speak to you. Is that correct?

A. Correct.

Q. Or at least he wasn't answering any questions. Is that correct?

A. Correct.

Q. Three, he was breathing pretty heavily?

A. Correct.

Q. Could you hear what his breathing -- well, let me ask you, what did his breathing sound like?

A. Just a heavy breathing.

Page 70

Q. Were there any other symp- -- and, obviously -- well, fourth, he was obviously naked. Is that correct?

A. Correct.

Q. So when you saw that, but you didn't know what was going on or didn't have any, kind of, medical diagnoses you at least were concerned enough that -- it was obvious to you that it was a medical situation. Is that correct?

A. Correct.

Q. I'm going to take the video down, and I think we're done with that.

And just a few more questions for you, Officer. You mentioned that after Mr. Gleaves was taken out of the facility or off the unit, you wrote a memo. Is that correct?

A. Well, we continued to -- we had to count. We had to complete count. And then when the memo was asked for I had to do one.

Q. Who asked you for the memo?

A. I believe it was a Lieutenant 'cause normally when people -- when inmates go out via rescue we have to write a memo of what took place.

Q. And who did you give the memo to?

A. I'm not really sure if it was my

Page 71

Lieutenant or my Sergeant. I'm not really sure.

Q. You mentioned that you also went to Internal Affairs and asked -- and answered some questions there. Is that correct?

A. Correct.

Q. Where is the Internal Affairs unit in the prison?

A. It's on Byberry Road.

Q. B-Y-B-E-R-R-Y. And that was that same day. Is that correct?

A. I believe so, yes.

Q. Do you remember hearing about Mr. Gleaves' death?

A. Days later, not that day.

Q. Who told you about it?

A. A Supervisor.

Q. What did they tell you?

A. That he passed away.

Q. Did they tell you anything about the cause of death or what happened at the hospital?

A. No.

Q. Did you ever speak to anybody beyond that conversation days later with the Supervisor?

A. No.

Q. Did you ever speak to anybody who gave

Page 72

you information about what happened at the facility?

A. No.

Q. Or, I'm sorry, at the hospital?

A. No.

Q. So, sitting here today, you don't recall speaking to any of the officers who took him -- who escorted him to the hospital. Is that correct?

A. Correct.

Q. At -- in some prison facilities, Officer, my understanding is that there's something called a critical incident debriefing where mental health professionals talk to Officers after they have been involved in an incident like this. Did anything like that ever happen?

A. To me?

Q. Yes.

A. No.

Q. Did any supervising Officers come ask you how you were doing after discovering Mr. Gleaves this way?

A. No.

Q. Did you ever talk with Officer Slory at any point after this incident about what he observed with Mr. Gleaves?

A. No.

18 (Pages 69 to 72)

Charlene Wilson

Page 73

Q. Did you ever hear that Officer Slory appeared to go by Mr. Gleaves' cell a little less than 15 minutes before Officer TE. Jones discovered him there?

A. No.

Q. If -- based on what you've told me, can I assume that if the evidence shows that Officer Slory did not look in Mr. Gleaves' cell for some three or three and a half hours before 7 a.m. that would be completely impermissible as far as you understand it. Is that correct?

MS. TAYLOR: Form.

THE WITNESS: Correct.

BY MR. FEINBERG:

Q. I want to show you just a couple of the documents we've talked about, Officer. The first is -- I'm gonna -- I'm numbering out of order here -- this will be Exhibit P-3. Officer, do you see your memorandum there?

A. Correct.

Q. And it's dated September 21st of 2018. Is that correct?

A. Correct.

Q. And it's addressed to Lieutenant Albright. Does that refresh your recollection as to who you submitted it to?

Page 74

A. Yes.

Q. Let me ask you just to take a moment, Officer Wilson and read the text that appears there. Read it to yourself. Let me know when you're done?

A. (Witness reviewed document.) I'm done.

Q. Is that memorandum -- sitting here today, does that appear to be accurate -- an accurate reflection of what happened that day?

A. Yes.

Q. Next thing I'm gonna do is show you your statement to Internal Affairs that was exhibit -- it's going to be marked as Exhibit P-2. Do you have Exhibit P-2 in front of you?

A. Yes.

Q. And it looks like the person you spoke to was Sergeant I. Marshall. Is that correct?

A. Yes.

Q. The date here is October 10th of 2018 at 1:00 p.m. so, let's see, about two and a half to three weeks later. Is that correct?

A. Yes.

Q. Have you looked at this document within the past couple of days?

A. Yes.

Q. Let me ask you just to read -- do you see

Page 75

where my cursor is here, which -- it's a longer answer, which responds to the question, please explain the sequence of events involving Inmate Gleaves?

A. Yes.

Q. Just take a moment to read that to yourself right now and let me know when you're done.

A. (Witness reviewed document.) I'm finished.

Q. Is that an accurate account of what you recall from that day?

A. Yes.

Q. Down at the bottom of the -- of this first page you're asked, what was Inmate Thomas, the cellmate, doing at the time you observed Inmate Gleaves? And your answer was, Inmate Thomas was hype, angry, saying get him out my cell, he is dope sick, he wiping his ass with a rag, get him out the cell or I'm going to beat him up.

Is that accur- -- is that consistent with your recollection?

A. Yes.

Q. Now, you told me today that you remember Inmate Thomas telling you that he had said that to the previous Officer. That's not mentioned here. Is that correct?

Page 76

A. Correct.

Q. Is that something that you just neglected to mention to Sergeant Marshall back on October 10th of 2018?

A. I didn't know I had to say that part.

Q. Oh, and, Officer, let me be clear. I'm not -- I'm not accusing you of anything. I'm just asking you whether you neglected to mention that.

A. Correct.

Q. Because it sounds like, to your recollection, Mr. Thomas did, in fact, say that. Is that correct?

A. Correct.

Q. That will conclude that exhibit. Let me show you two more.

The first thing I'm going to do is show you a statement prepared by -- it appears to be prepared by Mr. Thomas. First things first, do you see -- this is marked as Exhibit P-7. Once again, I am going out of order. Do you -- have you seen this document before, Officer?

A. No.

Q. If I shrink this text down are you able to see everything that appears on that page?

A. Yes.

19 (Pages 73 to 76)

Charlene Wilson

Page 77

Q. Please take a moment to read that to yourself and let me know when you're done.

MS. TAYLOR: Jon, can you read that Bates number, please.

MR. FEINBERG: Sure. This is Bates City640 -- pardon me -- City469.

MS. TAYLOR: Thank you.

(Witness reviewed document.) Done.

BY MR. FEINBERG:

Q. There's a second page here. Let me ask you to keep reading the text where my cursor is.

A. (Witness reviewed document.) I'm done.

Q. So you mentioned you've never seen this before. Is that correct?

A. Correct.

Q. Do you have -- did you ever hear -- well, I'm sorry, let me ask it this way. Do you have any idea how it came to be that Lieutenant Medina would write a statement on behalf of Tyrone Thomas?

A. No.

Q. Who is Lieutenant Medina, by the way?

A. Just one of the Lieutenants at CFCF.

Q. Who is Major Beaufort?

A. Beaufort.

Q. Beaufort, pardon me. Is that the Deputy

Page 78

Warden?

A. Yes. Deputy Commissioner now.

Q. Oh, and thank you. I'm aware of that. So he was -- at that point he was the Deputy Warden at CFCF. Is that correct?

A. Correct.

Q. There's a statement here on the first page, with the Bates Stamp City469 that says: Inmate Thomas claims he hit the button to alert staff but no one came. Inmate claims Inmate Gleaves -- I'm sorry. I just want to ask you about that previous sentence which reads: Inmate Thomas claims he hit the button to alert staff but no one came.

Did you ever -- did you ever hear that before, that inmate Thomas claimed to have tried to alert a Correctional Officer that there was an issue with Mr. Gleaves?

A. Yes.

Q. Where did you hear that?

A. From him.

Q. From Mr. Thomas?

A. Yes.

Q. And he -- so he told you that that day. Is that right?

A. He told us that he tried to tell the

Page 79

Officer before that about the cell- -- his celly.

Q. And so I may have misunderstood you. I think you told me -- I understood you as saying that he did tell the Officer.

A. Not that he -- like he told him about -- like he was telling him, like get him -- 'cause of how the celly was acting, not that -- not that I know if anything was wrong with him. I don't know if he told that Officer that.

I know he -- the way he was acting is how the Officer probably -- he was -- like he was acting hype and angry towards his celly. Not -- not that I know if anything was wrong with him.

I don't know if that's what he told him. He was just telling him how -- if you don't like -- how he was acting in the cell, if you don't get him out of my cell I'm gonna beat him up, stuff like that, but not that -- all that. That's it.

BY MR. FEINBERG:

Q. So if I'm understanding you correctly, it sounds like Mr. Thomas told you two different things, and let me ask you to follow along.

A. Okay.

Q. The first thing it sounds like Thomas said to you is, I told the Officer -- meaning Officer

Page 80

Slory -- get him outta my cell; I'm gonna beat him up.

A. Correct.

Q. Did Thomas tell you that?

A. Correct.

Q. It sounds like Thomas also told you a second thing, that he tried to get Slory's attention because of an issue with Gleaves and Slory did not respond. Is that correct?

A. No.

Q. What did I get wrong?

A. Just that he -- about how he was acting in the cell, not that he was an emergency -- like a medical issue, just get him out, like I don't wanna deal with him, how he -- however he was acting in the cell prior to us getting there.

Q. Did Mr. Thomas, yes or no, did he tell you that he had pressed the button to try to get Slory's attention?

A. Yes.

Q. Okay.

A. And he pressed the button. Now, I -- like again, I don't know that Slory was there. I just know he said he hit the button to get the Officer's attention before us.

Q. Got it. And did -- after he pressed the

Charlene Wilson

Page 81

button to get Slory's attention did he tell you or did he give you the indication that Slory failed to respond?

A. Correct.

Q. So your understanding from Thomas at that moment, early morning, September 21st of 2018, is Thomas is saying, I tried to get the previous Officer by hitting the button and no one ever came. Is that correct?

A. Correct.

Q. So when you see that memo from Thomas that's consistent, in large part, with what you were told by Thomas that morning. Is that correct?

A. Correct.

Q. Did you ever tell anybody about that after you learned that fact?

A. No.

Q. Would you agree that that's a -- that's a pretty important statement by Mr. Thomas?

MS. TAYLOR: Form. You can answer.

BY MR. FEINBERG:

Q. You can answer.

A. Yes.

Q. Because what Thomas is saying is this guy is having a medical emergency, I tried to get some attention and no one responded. Is that correct?

MS. TAYLOR: Form.

Page 82

THE WITNESS: No. I mean -- no.

BY MR. FEINBERG:

Q. Well, what did I get wrong there?

A. He never said he was having a medical emergency.

Q. That's fair. Maybe I'm attributing too much then. But bottom line is this, from your perspective, as an Officer with now 12 years of experience, if a prisoner is hitting the button in this type of situation you're gonna want to respond. Is that correct?

A. Beings, though, what was -- okay, so yes and no. You got an inmate, Tom -- the celly, not Gleaves, the other one, that's being hyperactive because he don't want someone in his cell that is dope sick, so you have an inmate that's upset about that.

Q. Okay.

A. That's the type of energy he's giving. You're not -- if he's not saying that anything is wrong with his celly, which was said that he did say that, but if he's giving the angry, I told y'all to come get him outta my cell, he in here dope sick, da da da da, did you not -- what's the problem? You gotta deal with it. You get a celly that you might not want in your cell; that's how it goes.

Page 83

Q. It sounds like Mr. Thomas told you that Officer Slory never responded. Is that correct?

A. Correct.

Q. So Officer Slory, based on that, had no idea what was going on with Mr. Gleaves if what Mr. Thomas says is true. Is that correct?

MS. TAYLOR: Form.

THE WITNESS: Correct.

BY MR. FEINBERG:

Q. And to return to the point that I made before -- and I may be asking you a question you've already answered but just to confirm -- what you read in that memo that I just showed you is consistent with what your understanding was all the way back on September 21st. Is that correct?

A. Correct.

Q. Bear with me for one second.

(Short pause.)

Did you ever see Mr. Thomas at any point after that encounter that you had at the cell side on the morning of September 21st.

A. Yes. When we were in Unit Management the detectives came up.

Q. Was that that same day?

A. Yes. I believe so, yes.

Page 84

Q. A Detective from the Philadelphia Police Department. Is that correct?

A. Correct.

Q. What was Mr. Thomas doing at that time?

A. Giving his statement.

Q. Giving a statement to who?

A. The Detectives.

Q. Do you know -- so that -- so those were -- that was a statement taken by the Philadelphia Police Department. Is that correct?

A. Yes.

MR. FEINBERG: Anne, let me know -- I don't think I've seen any statements prepared by the Philadelphia police. Do you know whether we have them?

MS. TAYLOR: I have not -- I haven't seen that. I will treat this as a follow-up Request for Production and ask.

MR. FEINBERG: Okay. Yeah, thank you.

BY MR. FEINBERG:

Q. And on that same taken, Officer Wilson, let me ask you, have you spoken -- did you give a statement to the Detectives?

A. Not that I recall, no.

Q. Did you observe Mr. Thomas sitting there with a Detective preparing a written statement?

Charlene Wilson

Page 85

A. Yes.

Q. Do you know which Detective that was?

A. No. It was two males.

Q. Do you know whether anyone else gave a statement to those Detectives?

A. No.

Q. Did you talk with Mr. Thomas at any point during that encounter?

A. No.

Q. We got on this topic because I asked you whether you ever saw him again. It sounds like when you -- you said yes because you just happened to see him in connection with this statement he was giving. Is that correct?

A. Correct.

Q. At any time after that did you see Mr. Thomas again?

A. No. He -- I mean, he was back on the unit, I believe, or he went to be -- yeah, I'm not sure.

Q. Did you ever talk with him again?

A. Oh, no. No, sorry.

Q. Do you know whether Officer TE. Jones gave a statement to police?

A. No.

Q. Do you know whether Officer Slory ever

Page 86

gave a statement to police?

A. No.

Q. Now, obviously, Officer Slory was gone for the day after Mr. Gleaves was taken off the unit and to the hospital. Do you know whether Officer Slory was ever brought back into the prison to answer questions at some point that day?

A. No.

Q. Final question for you, Officer, or final topic for you, Officer, is at any point since September 21st did you ever hear anyone from the prison say that an Officer could or should have done something differently in connection with Mr. Gleaves?

A. No.

Q. And I understand your answer but, for example, did anyone ever say that there was an Officer who failed to conduct a proper tour and didn't do what they were supposed to concerning Mr. Gleaves?

A. No.

Q. Did you ever hear anyone say that an Officer failed to respond to a call button that was pressed by Mr. Thomas because of medical concerns about Mr. Gleaves?

A. Not that I recall, no.

Q. And besides the memo that you prepared

Page 87

and the statement that you gave to Internal Affairs, am I understanding correctly that you did not prepare any documents in connection with this case?

A. No. Do I have any statements? No. Or documents? No.

Q. You don't remember anything besides those two. Is that correct?

A. Correct.

MR. FEINBERG: With that, Officer Wilson, I don't have any further questions for you. Tom or Anne?

MR. GREGORY: I have no questions. Thank you.

MS. TAYLOR: I have no questions. Thank you.

MR. FEINBERG: Officer, your deposition is concluded, and I thank you for being available today.

THE WITNESS: You're welcome.

MR. FEINBERG: And for Counsel, let's see, we marked exhibits --

MR. GREGORY: Three.

MR. FEINBERG: Yeah.

MS. TAYLOR: 7 and 1 but did you have an Exhibit No. for the first, the memo to the

Page 88

Lieutenant? I don't think we used an Exhibit No. for that.

MR. FEINBERG: Oh, yeah. So I have, P-1 was the Housing Log. P-2 is Officer Williams -- Wilson's statement to Internal Affairs. Exhibit 3 is the memorandum to the Lieutenant. And then we looked at Exhibit 7, which is Mr. Thomas' statement.

MS. TAYLOR: Yes.

MR. FEINBERG: Lori, why don't I email those to you, copy Counsel. And, Lori, I'll ask you if you can attach those to the transcript and all Counsel will have copies.

THE REPORTER: Sure.

MR. FEINBERG: Sound good?

COURT REPORTER: Yes. Can I just get your orders on the record, please. Jon?

MR. FEINBERG: I just need a mini, electronically.

COURT REPORTER: Okay. And Mr. Gregory?

MR. GREGORY: Mini and electronic.

COURT REPORTER: Okay. And Anne?

MS. TAYLOR: Make that three, please. Electronic for me.

(Whereupon, the deposition concluded at

22 (Pages 85 to 88)

Page 89

4:45 o'clock p.m.)

Page 90

CERTIFICATE

I, Lori A. Dilks, the officer before whom the deposition of CHARLENE WILSON was taken, do hereby certify that CHARLENE WILSON, the witness whose testimony appears in the foregoing deposition, was duly sworn by me on June 30, 2021 and that the transcribed deposition of said witness is a true record of the testimony given by her; that the proceedings are herein recorded fully and accurately to the best of my ability; that I am neither attorney nor counsel for, nor related to any of the parties to the action in which this deposition was taken; and, further, that I am not a relative of any attorney or counsel employed by the parties hereto or financially interested in this action.

Lori Dilks_____
Lori A. Dilks

PA Court Reporter
Notary Public in and for the Commonwealth of
Pennsylvania

My Commission expires
November 29, 2023

**A**

**a.m** 32:8 40:6 41:8 52:19 53:4 56:19 57:15,19 73:8
**ability** 90:10
**able** 8:15 39:12 69:15 76:23
**absence** 14:24
**academy** 22:14
**accommodate** 9:16
**account** 75:9
**accur-** 75:19
**accurate** 74:7,7 75:9
**accurately** 90:10
**accusing** 76:7
**act** 38:8,8
**acting** 62:22 63:10 79:7,10 79:12,16 80:11 80:14
**action** 64:7 90:12,15
**addressed** 73:23
**Administrator** 1:3
**admitted** 30:13 30:16,19
**Affairs** 3:13 10:7,10 20:14 71:3,6 74:11 87:1 88:5
**ago** 4:16 6:15,16 12:22 14:10 20:24 31:1 62:3
**agree** 31:11 56:22 81:16
**Agreed** 65:15
**Albright** 3:15 73:24
**alert** 78:9,12,16
**alerted** 20:6
**alive** 31:5,7,17

31:25
**allegations** 11:7
**angles** 67:15
**angry** 75:15 79:12 82:21
**Anne** 2:7 5:22 15:4,6 39:12 43:24 84:12 87:11 88:22
**answer** 7:14,18 8:5 9:9,20 10:19 16:2 64:8 75:1,15 81:18,20 86:6 86:15
**answered** 71:3 83:12
**answering** 69:18
**answers** 7:13 9:3
**anybody** 11:24 12:10,13 16:18 20:21 71:22,25 81:13
**apparent** 63:21
**appear** 37:21 74:7
**APPEARAN...** 2:1
**appeared** 33:6 60:2,21,24 69:15 73:2
**appears** 5:13 41:8 56:15 74:3 76:17,24 90:6
**applied** 32:5
**applies** 35:12
**apply** 32:4,12 35:5,7
**appreciate** 7:17 16:10
**Arch** 2:3,8
**area** 6:24 7:1 28:16 30:8 41:23 42:3,19 42:20 57:9,20

**arm** 31:23 33:4 33:15 37:20
**arrangements** 15:9
**arrive** 18:23,25 26:12
**arrived** 18:9,9 57:1
**asked** 5:15 10:8 13:9 14:9 18:20 24:20 46:11 66:23 70:19,20 71:3 75:13 85:10
**asking** 7:2 67:4 76:7 83:11
**ass** 75:17
**assess** 33:15
**assigned** 24:3,4 24:6,8 26:15
**assignment** 24:16,25
**assignments** 23:22 28:21
**assistance** 18:6 42:17 46:12 52:5
**assume** 33:13 35:24 40:12 53:10 73:6
**assuming** 36:24 63:3
**assumption** 53:22
**attach** 88:11
**attention** 17:4 19:15 38:19 45:18,23 46:11 51:19 55:5 64:22 65:2 66:19 67:2,15 67:17 80:6,18 80:24 81:1,24
**attorney** 4:17 7:6 10:3 11:25 12:17 90:11,13

**attributing** 82:6
**audio** 8:7,12
**automatically** 20:2
**available** 8:14 87:17
**Avenue** 14:17
**average** 43:5
**aware** 4:20 8:25 78:3
**awhile** 41:21

**B**

**B** 2:7
**B-Y-B-E-R-R...** 71:9
**B1-3** 35:6 39:25 56:1
**B1Pod3** 24:1
**back** 21:6,24 22:21 26:13 27:17 28:19 30:18 34:24 37:7 40:19 42:18 46:12 52:10,14,15 57:8 58:6 61:6 61:7 63:18 67:21 68:18 76:3 83:14 85:18 86:6
**background** 21:6,9
**Baltimore** 14:17
**barring** 34:4
**based** 5:12 73:5 83:4
**basic** 16:13 28:21 54:14
**basically** 20:14 29:1 58:1 68:12
**basis** 48:19
**bat** 64:12
**Bates** 43:20,22 77:4,5 78:8

**bear** 52:11 83:17
**beat** 62:13 63:9 75:18 79:17 80:1
**Beaufort** 3:17 77:23,24,25
**bed** 17:10 33:25 42:13
**beginning** 16:11 21:9 57:23
**behalf** 3:17 77:19
**Beings** 82:12
**believe** 18:10 22:14,15 32:17 36:7,8 39:24 44:20 61:5 65:21 68:9 70:21 71:11 83:25 85:19
**best** 90:10
**better** 17:3,16
**beyond** 43:14 71:22
**big** 16:8
**bit** 21:7 24:21 57:7,11
**blanket** 18:18,19
**block** 28:16 55:4 55:9 57:23 64:1
**blocking** 56:9
**Blvd** 2:13
**board** 32:13 35:12
**body** 31:25
**bothered** 38:10
**bottom** 37:15 57:15 75:12 82:7
**BRADLEY** 1:8
**Bravo** 29:3
**break** 9:15,20 9:21 27:14,21 27:22 28:1
**breathing** 18:20

31:5,9,17 33:9 33:11 34:6 35:11 37:21 66:4 69:21,23 69:24,25
**brief** 7:5
**bring** 15:10 37:7
**bringing** 5:11
**BROAD** 1:24
**broadly** 35:15
**brought** 4:25 5:2 16:14,18 64:18 86:6
**Building** 2:3
**bunk** 17:10,12 17:22
**busy** 29:20
**butt** 17:12,22 62:11,11
**button** 45:17,18 45:23 46:1,2,9 46:19,22 47:9 48:4,11,22,24 49:6,8,17,18 49:24 50:2,4,9 50:12,24 51:10 51:16,17,20,21 51:23 52:4 78:9,12 80:17 80:21,23 81:1 81:7 82:9 86:21
**buttons** 45:19 48:16 49:21
**buzzon** 49:8
**Byberry** 71:8

_____
**C**
_____

**C** 4:1 12:5,6,7,8 12:15,23 13:18 18:17 53:3 61:15,18 65:13 67:10,25
**C-O-W-S** 29:13
**C.H** 53:1
**C.O** 3:15

**C.O.W.S** 29:8 29:13 35:22
**C/0's** 53:3
**call** 12:17,20 18:5 20:2 31:22 36:23 37:16,22,25 38:19 41:25 42:1,11,17 43:1,6 49:10 51:17,20,21,23 52:3 67:3,7,8 67:17,22 86:21
**called** 4:3 19:15 25:15 37:8 45:17 55:4 67:5 72:10
**calls** 43:8,9
**Captain** 44:23
**case** 5:10,12 6:4 8:16 10:21 11:8,12,17,20 12:2 13:4,17 15:20 38:10 87:3
**Cast** 2:3
**catch** 46:11
**caught** 66:19
**cause** 17:21 18:18,18 19:24 28:8 37:1 42:15 50:4 60:3,13 70:21 71:20 79:6
**causing** 5:8
**cell** 4:22 16:25 17:6,16 18:18 22:10 33:3,25 37:23 38:15,16 42:21 45:3,22 46:4,16,18,19 46:20 47:3,4,8 47:9 48:21 50:4 51:9,9 55:25 56:15 57:2 58:6,13

59:10,13,17 60:19 61:6,22 62:12,13 64:3 64:19,25 65:9 65:15 73:2,7 75:16,17 79:16 79:17 80:1,12 80:14 82:15,22 82:24 83:20
**cell-** 79:1
**cellmate** 61:5,11 61:24 62:8 63:6 65:13 75:14
**cellmate's** 60:10
**cells** 39:1 45:17 45:20
**celly** 17:10,15 20:6,6 60:4,7 62:21 79:1,7 79:12 82:13,20 82:24
**census** 26:21 27:9,10
**Center** 2:12 28:25
**central** 39:3
**certain** 67:14
**CERTIFICATE** 90:1
**certify** 90:5
**CFC** 48:8
**CFCF** 4:23 21:25 22:7,12 22:15,18 23:5 23:21 35:12 38:25 45:17,19 77:22 78:5
**change** 29:5
**changed** 29:19 32:18
**Charlene** 1:14 3:3,12,15 4:2,9 90:4,5
**Charlie** 12:7
**check** 19:4 29:2

29:4 31:4 49:9
**checks** 48:18 49:4,20
**chest** 33:8,16
**Chief** 2:7
**children** 4:19
**choose** 47:16
**Christopher** 12:8
**church** 6:23
**circumstance** 34:4 50:2
**circumstances** 5:14 8:2
**city** 1:7 2:7,10 4:25 5:22 44:1 44:3
**City469** 77:6 78:8
**City640** 77:6
**claimed** 78:15
**claims** 5:5,11 78:9,10,12
**clarification** 14:8 29:12 35:9 37:2
**clarify** 32:2
**clear** 37:9,11 60:1 76:6
**cleared** 30:8
**clears** 29:1
**click** 42:4
**client** 11:7,11
**Clinical** 29:14
**close** 54:1 56:20
**come** 5:15 17:6 19:24,25 20:1 21:6 27:16 28:12 29:4 30:12,18 31:21 31:22 35:20 41:14,16 42:17 44:18 50:5 52:10 57:12 62:12 72:18 82:21

**comes** 68:1,3,4
**coming** 49:9 61:22
**Commission** 90:24
**Commissioner** 78:2
**common** 34:14 43:15
**Commonwealth** 90:21
**communicate** 46:25 47:1,2
**communicated** 27:7
**complaining** 48:3
**Complaint** 11:6
**complete** 7:18 9:10,24 70:18
**completely** 60:21 64:18 65:1 73:8
**computer** 40:20 41:13,21 42:19 54:21
**concept** 35:25
**concerned** 69:2 70:7
**concerning** 15:21 39:10 40:21 86:18
**concerns** 86:22
**conclude** 76:14
**concluded** 87:17 88:25
**condition** 62:19
**conduct** 11:10 31:19 33:14 34:11,20 40:15 40:17 44:9 54:2,9,20 86:17
**conducted** 7:25 53:23 54:16,21
**conducting** 7:25

Charlene Wilson

Page 93

conference 5:23
confirm 14:13
  15:12 31:16
  35:10 36:8
  54:15 55:17
  83:12
confirmation
  35:11
confused 16:5
connection 6:17
  37:18 43:10
  85:13 86:13
  87:3
conscious 8:6
consider 21:1
considered
  32:18 51:6
consistent 54:5
  75:19 81:10
  83:13
consistently
  21:19
console 39:5,6
  46:2,4,10,12
  46:15,20 47:3
  47:6 48:25
  57:9,20 58:7
  58:15
contact 15:9
context 64:15
continue 20:11
  28:10 61:10
continued 70:17
Control 28:25
conversation
  26:14,20,25
  71:23
copies 43:25
  88:12
copy 88:10
Corizon 1:7 2:15
  5:3,3
correct 4:12
  8:20,25 9:4,10
  10:10,14,15
  13:10,22,25

15:18,19 18:3
18:25 19:12,13
20:17 21:3,11
21:16,25 22:7
22:19,22 23:5
23:23 24:1
25:1,6 30:21
31:7,9 32:4,13
32:14,24 33:4
33:11,17 34:6
34:7,17 35:1,2
35:6,13,14,17
35:18,22,23
37:13,16,22
38:13,24 39:1
40:15 41:9,10
42:9 43:15,16
44:19 45:6,7
46:13,14 47:6
49:13 51:24
53:4,5,8,9,13
53:24,25 54:7
54:11,12,17,22
54:23 55:1,2,5
55:6,24 56:16
57:2,3,5,6,9,10
57:20,21 58:4
58:13,14,17
59:10,14,15,19
60:18 61:16,19
61:20,22,23
62:1,3,4 63:6,7
63:11 64:4,7,9
64:19,20,23,24
65:2,3,16,24
65:25 66:6,9
66:20,21,25
67:1,22,23
69:13,14,16,17
69:19,20,22
70:3,4,9,10,16
71:4,5,10 72:7
72:8 73:10,12
73:19,21,22
74:16,20 75:25
76:1,9,12,13

77:14,15 78:5
78:6 80:2,4,8
81:3,7,8,11,12
81:24 82:11
83:2,3,6,8,15
83:16 84:2,3
84:10 85:14,15
87:7,8
**Correctional**
  4:23 5:1 6:18
  21:10,14 22:3
  23:20 31:11
  45:19 78:16
correctly 19:10
  20:23 79:20
  87:2
counsel 2:21
  5:22 8:15
  87:20 88:10,11
  90:11,14
count 20:5 28:25
  29:1 31:21,22
  58:22 59:1
  70:18,18
counting 20:12
couple 7:4 24:17
  25:4,16 73:14
  74:23
course 22:5
  27:22 28:22
  42:8 43:2 44:9
  63:1
court 1:1,23
  2:22 6:10,13
  7:9 14:8 29:12
  37:2 88:15,19
  88:22 90:21
courts 26:22
  27:9
cover 30:25
CPR 19:7 37:14
  37:14
criminal 6:20
critical 72:11
**Curran-From...**
  4:22

cursor 40:4,23
  52:19 55:24
  75:1 77:11
custody 30:9
  31:13
cut 47:2

——————
**D**
**D** 3:1,6 4:1
da 82:22,22,22
  82:22
daily 26:24
date 1:16 74:18
dated 3:12,14,16
  73:20
day 11:4 16:4,24
  20:15,16 23:23
  24:6 25:5,14
  27:9 28:22
  32:13 36:12
  46:8 71:10,14
  74:8 75:10
  78:23 83:24
  86:4,7
day-to-day
  24:22
days 24:5 25:14
  71:14,23 74:23
deal 37:12 80:13
  82:23
dealing 35:21
dealt 43:15
death 5:8,14
  71:13,20
debriefing 72:11
decided 64:2,7
decides 44:24
**Defendant** 5:9
**Defendants** 1:10
  2:10,15 5:6
  11:8
delayed 53:10
deliberately 5:6
deny 36:9
**Department**
  4:11,24 5:4

10:24 11:13
13:19 14:22
21:19,23 30:20
35:16 36:6
49:20 84:2,10
depending 47:3
depends 41:3
deposition 1:14
  3:8 5:16,22 6:6
  10:2 12:2 15:6
  15:10 16:6,18
  20:25 21:10
  43:24 87:16
  88:25 90:4,6,7
  90:12
depositions 7:24
**Deputy** 2:7
  77:25 78:2,4
describe 36:15
  50:21
described 28:4
describing 13:9
  32:3 33:14
  34:15 35:5,10
**DESCRIPTION**
  3:10
designation
  52:22
desk 40:19 46:3
  54:19
detailed 30:23
**Detective** 84:1
  84:25 85:2
detectives 20:13
  83:23 84:7,22
  85:5
diagnoses 70:7
diaries 11:16
died 4:21
different 10:13
  22:4 23:22
  24:4,4 26:3
  32:7 35:4
  36:20 45:15
  46:16 55:22
  67:14 79:21

Charlene Wilson

Page 94

**differently** 86:13
**difficult** 7:22
**digging** 62:10,11
**Dilks** 90:3,18,19
**directive** 47:24
**discovered** 73:3
**discovering** 72:19
**discuss** 12:23 13:4
**discussed** 10:3 13:15 15:4
**discussing** 37:19
**Discussion** 8:21
**dispute** 60:17
**distracted** 64:18
**DISTRICT** 1:1 1:1
**docu-** 39:15
**document** 39:11 39:23 74:5,22 75:7 76:21 77:8,12
**documents** 5:12 10:13,16 11:22 39:13 73:15 87:3,5
**DOE** 1:9
**doing** 23:4 33:22 34:16 42:22 58:18,20 59:7 61:8 65:19 66:4 68:5 72:19 75:14 84:4
**door** 38:22 55:25 56:23 58:13 59:17 64:2,25
**doors** 39:3
**dope** 75:16 82:15,22
**double** 13:24,24
**drawer** 59:3,4
**drew** 17:4 64:22
**due** 36:5

**duly** 4:3 90:6
**duty** 52:20,21 53:3,4
**dying** 51:5

**E**

**E** 3:1,6 4:1,1
**E-** 13:24,24
**earlier** 9:10 27:11
**early** 28:5 81:5
**easier** 55:11
**EASTERN** 1:1
**edges** 66:12
**education** 23:7
**efforts** 19:3
**Eileen** 1:3 4:18
**either** 34:6 39:6 41:7
**electronic** 88:21 88:24
**electronically** 88:18
**ELIZABETH** 1:8
**email** 43:25 88:9
**emergencies** 50:15
**emergency** 50:8 50:13,19,25 51:3,6,9 80:12 81:23 82:5
**employed** 4:11 14:21 21:13 90:14
**employment** 22:5
**encounter** 83:20 85:8
**energy** 82:18
**enforcement** 23:17
**enter** 39:1,6 66:24
**entered** 40:7 53:1 55:4,9

57:16
**entering** 57:23
**entire** 21:20 35:16
**entirety** 39:16
**entries** 41:2,4
**entry** 41:1 45:11 52:20,25 53:6 53:11,14
**escort** 28:9,15
**escorted** 72:7
**Esquire** 2:2,7,12
**ESTATE** 1:4
**estimate** 43:2
**evaluate** 19:3
**events** 75:3
**everybody** 31:5
**everything's** 54:21
**evidence** 73:6
**exact** 24:18
**exactly** 7:19
**examined** 3:2 4:4
**example** 48:21 50:1,21 51:2 86:16
**examples** 52:2
**exception** 9:18 28:6 41:16
**exceptions** 40:22 41:9,11
**exhibit** 39:24 43:25 52:14 73:17 74:11,12 74:12 76:14,19 87:25 88:1,5,7
**exhibits** 3:8 87:21
**expectation** 54:8
**experience** 47:20 82:9
**expires** 90:24
**explain** 75:2
**explained** 5:19

**F**

**face** 66:16
**facilities** 21:23 22:4 72:9
**facility** 4:23 22:3 30:13,16 35:1 70:15 72:1
**fact** 17:3 27:16 30:15 34:14 39:10 54:16 55:17 63:19 66:3 76:11 81:14
**facts** 16:14
**failed** 81:2 86:17 86:21
**fair** 30:11 82:6
**familiar** 35:25 60:11
**familiarity** 35:22
**family** 13:16
**far** 5:19 7:17 32:10 41:1 73:9
**fast** 57:11,13,15
**feel** 51:3
**Feinberg** 2:2,2 3:3 4:6,17 8:22 15:3,12,14 16:9 27:15,20 39:12,17,20 43:21,23 44:3 44:5,6 56:7,10 56:13 64:10 73:13 77:5,9 79:19 81:19 82:2 83:9 84:12,18,19 87:9,16,20,23 88:3,9,14,17
**females** 18:19
**fight** 42:2
**fighting** 51:9,10
**filed** 11:7
**filing** 2:22

**final** 53:23 86:9 86:9
**financially** 90:14
**find** 16:13
**fine** 34:22
**finish** 8:5 43:24
**finished** 20:12 75:8
**finishing** 19:24
**fire** 46:6
**first** 4:3 12:6,16 17:4 19:24 20:4 28:23 30:4,25 31:21 31:21 38:18 41:5,14 55:3 55:18 58:2,12 69:11 73:15 75:13 76:16,18 76:18 78:7 79:24 87:25
**five** 12:1
**flash** 46:3,5,7,8 46:20 49:14,18
**flashes** 46:7
**flashing** 46:11
**Floor** 2:8
**foam** 66:10
**foaming** 17:13 18:2 60:24 65:5 66:8 69:8 69:10,12
**focused** 67:14
**follow** 79:22
**follow-up** 21:7 84:16
**follows** 4:5
**foregoing** 90:6
**form** 2:22 15:24 16:2 64:8 73:11 81:18,25 83:7
**forward** 4:15 56:3 57:7,11 61:4
**forwarded** 57:13

found 4:22 6:24 16:24
four 12:1 23:5 55:21
fourth 70:2
frame 25:13 26:13 44:14
frequently 38:12
front 59:17 65:15 74:13
full 9:23
fully 90:9
further 87:10 90:13

**G**

G 4:1 5:2 52:20 52:21
GAYE 1:9
general 59:24
generally 29:23
Gerald 1:7 5:1,2
getting 16:5 27:12 29:5 58:21 80:15
give 7:4,13 9:23 37:24 39:17 50:1 53:7 70:24 81:2 84:21
given 9:10 23:22 23:23 90:8
gives 27:1
giving 82:18,21 84:5,6 85:13
glance 33:20
glancing 33:21
Gleaves 1:4 4:19 4:20 11:11 13:5,13 15:21 16:24 17:5 19:11,15,16 20:20 36:18 48:22 53:12 55:5 60:21 63:9,13,22

65:24 66:1 70:14 72:19,24 75:3,14 78:10 78:17 80:7 82:14 83:5 86:4,13,18,23
Gleaves' 5:7,14 19:4 62:18 69:2 71:13 73:2,7
gloves 65:20
go 4:15 20:2,13 28:14,24,24 29:16,17 30:9 33:2 38:14,16 41:23 46:12,18 48:13 49:9 56:12 63:18 64:25 67:21 68:18 70:22 73:2
goes 41:1 47:13 49:4 82:25
going 17:17 21:6 24:21 34:1 39:11 41:7 42:20,23 43:10 48:24 55:12 61:10 68:9 69:4,6,7 70:6 70:11 74:12 75:17 76:16,20 83:5
gonna 7:4,19 9:13 15:7 36:13 49:18 52:14 56:3 57:7,11 59:5 61:4 62:13 63:9,13 65:2 73:16 74:10 79:17 80:1 82:10
good 7:16 16:21 23:5 35:9 88:14

gotta 31:22 34:5 37:24 50:6 64:12 82:23
grabbed 58:22 58:25 59:1
graduate 23:9 23:11
graduation 23:14
grandmother 4:19
Gregory 2:12 43:19,22 44:2 44:4 87:12,22 88:20,21
guess 28:6
guidance 34:9
guy 18:18,19 59:22 64:13 65:1,9 81:22
guys 31:24 35:20

**H**

H 2:2
half 28:11 29:18 32:17 53:7 54:6 73:8 74:19
hallway 27:14
hand 68:15,21
hang 51:5
hap- 16:23
happen 26:19 28:7 32:20 40:14 67:3 72:14
happened 11:16 13:5 14:18 16:14 17:8 18:15,22 19:14 19:21 20:16 21:1 42:5 52:10 53:11 67:18 71:20 72:1 74:8

85:12
happening 48:7 51:14 52:8
happens 28:2 33:17 38:12 46:1 58:2
happy 9:16
harp 66:11
head 58:25
headcount 19:25 20:3 27:9,10 28:24,24
health 1:7 2:15 29:17 31:12 69:2 72:11
hear 38:9 69:23 73:1 77:16 78:14,19 86:11 86:20
heard 7:5 14:12 16:24 48:7 50:11,21 51:14 51:22 52:3,7
hearing 54:25 71:12
hearsay 48:13
heavily 66:4 69:21
heavy 18:20,21 69:25
held 8:21
helpful 21:6
hereto 90:14
hey 47:9 48:2
high 23:8,9,14
highest 23:7
hit 48:4,22 49:18,24 50:4 50:8 78:9,12 80:23
hits 46:9 47:8
hitting 46:19 49:7 50:12 81:6 82:9
hold 38:3,5 56:5
honest 29:23

hopefully 8:1
hospital 71:20 72:3,7 86:5
hour 28:11 29:18 32:17 53:7 54:6
hours 4:21 73:8
housed 17:7 30:9
housing 3:11 27:7 30:8 39:25 42:19 45:9 88:4
hype 75:15 79:12
hyperactive 60:8 62:3,5 82:14

**I**

idea 40:25 61:8 69:7 77:17 83:5
ignore 47:13,16 47:20
ignored 49:24 50:2,9,13 51:10,22
ignoring 51:15 52:3
illegal 6:24
image 55:25
images 55:22
immediately 37:22 63:21
impermissible 73:9
important 7:6 31:14 67:20 81:17
incident 23:25 42:10 72:11,13 72:23
incomplete 27:23
incorrect 27:23

indicating 36:25 38:1
indication 46:16 81:2
indifferent 5:6
information 5:13 10:21 72:1
initial 12:6
inmate 6:23 7:1 13:7 17:19,22 36:21 49:5 65:21,23 75:3 75:13,14,15,23 78:8,10,10,12 78:15 82:13,16
inmates 29:9 70:22
inside 38:16 42:21
instance 31:20 50:11
instantaneously 57:1
instructions 7:5
intake 28:8,16 29:6 30:5 31:23 51:7
interested 90:15
Internal 3:13 10:7,10 20:14 71:3,6 74:11 87:1 88:5
interrupt 7:20 36:17
interrupted 20:10
introduction 4:16
investigation 10:24 11:11
Investigations 3:13
involved 11:12 19:2 72:13
involvement

20:20 68:5
involving 75:3
Iron 2:3
issue 37:16 43:15 48:22 51:23 63:22 64:22 78:16 80:7,13
issues 8:6 37:12

___ J ___

J 2:12
JFK 2:13
job 6:17,19
JOHN 1:9
Jon 4:17 27:13 43:19 56:5 77:3 88:16
Jonathan 1:4 2:2 4:19
Jones 12:5,11,12 12:15,24 13:10 13:18,21 14:4 14:21 15:1,6,9 15:16 18:7,7,8 18:17 20:6 25:6 53:4,16 53:17,20 55:4 56:23 57:8 58:5,12 59:13 59:21 61:7,15 61:18,19 63:20 64:2 65:9,10 65:13,14,17 67:8,9,10,10 67:25,25 73:3 85:22
Joneses 16:17
Jr 1:4 4:19
July 21:15,16 22:13
jump 61:21
June 1:16 90:7

___ K ___

KAIRYS 2:2

KAPLAN 1:23
keep 65:11 77:11
keeps 49:20
key 39:1,7
kick 56:23
kicked 64:2
KIMBALL 2:11
kind 23:13 52:4 68:15 70:6
knew 5:16 63:23
knocking 38:19
know 4:15 5:17 7:19,24 9:7,11 14:23 16:7 17:16,21 19:23 21:22 24:18 25:21 26:9 29:23 32:7 34:13,18 37:3 37:10,24,25 41:12 43:1 46:6 47:4 48:15,18 49:2 49:3,9,11,19 49:22 51:4,5 58:18 59:4 60:10,14 63:4 63:5 64:1 65:8 65:22 66:10 68:8,8,9 70:5 74:4 75:6 76:5 77:2 79:7,8,10 79:13,14 80:22 80:23 84:8,12 84:14 85:2,4 85:22,25 86:5
knowing 25:13
knowledge 36:4 41:12 44:8 45:5 53:16
known 4:23

___ L ___

L-E 13:24
lag 8:4

LALITHA 1:8
large 81:10
law 23:17
lawsuit 4:25 5:2 5:5
lawyers 8:3
laying 42:13
leads 7:11
LEAMAN 1:23
learned 8:3 81:14
leave 14:23 27:11 28:5 30:4,7 61:5
led 5:14
left 20:12 28:13 28:14 42:19 58:12 61:17
leg 31:23 33:3,4 33:15 37:20
let's 12:1 17:2 22:11,11 27:16 28:18,19 29:24 35:10 54:14 55:11 63:18 65:11,11 69:11 69:11 74:19 87:20
letting 66:23
level 23:7 30:10
Lieutenant 3:15 3:17 44:23 70:21 71:1 73:23 77:18,21 88:1,6
Lieutenants 44:8 77:22
life 45:3
light 46:4,7,7,16 46:20,22 47:13 47:21 48:24 49:14,15
lights 47:21
LIN 2:2
line 14:6,13 37:15 82:7

lips 66:13
list 69:11
LITIGATION 1:23
little 21:7 24:21 37:24 57:7,11 66:12 73:2
LLP 2:2,11
location 39:4
locked 50:3
locks 29:4
log 3:11 27:7 39:25 40:12,18 41:1 43:18 45:9 52:15 53:14 54:14,15 88:4
logged 45:9
long 6:15 9:14 12:22 21:13 24:7,11 25:11 33:16 34:13 44:15
longer 75:1
look 10:19,23 31:19 33:16 34:12 57:4,22 59:22 67:16 73:7
looked 17:13 33:3 58:21 64:6 74:22 88:6
looking 45:2,9 53:14 57:14 59:3 60:2 61:3 67:13
lookout 36:1
looks 40:7 52:25 56:25 57:8 58:6,11 64:15 68:13,15 74:15
Lori 7:9 8:9 14:11 88:9,10 90:3,18,19
lot 17:11 28:15

31:24 35:20 42:14,15 43:4 43:7,7 62:7,7 66:12,14

**M**

**ma'am** 4:7 24:21 55:21
**maintenance** 49:10,19
**Major** 3:16 77:23
**making** 7:10 11:7 53:11
**male** 61:14 65:10
**males** 85:3
**man** 60:1 61:21
**management** 32:19 83:22
**marked** 39:24 74:12 76:19 87:21
**Marshall** 74:16 76:3
**mates** 51:10
**matter** 6:20 32:13
**MATU** 1:9
**McNAMARA** 1:3 4:18,18,24 5:5 11:7
**meal** 36:22
**mean** 6:22 26:9 29:25 31:3 36:8 41:11 51:3,8 52:22 60:13 62:6 67:13 82:1 85:18
**meaning** 62:15 79:25
**means** 7:4 9:2 33:1 40:25
**Med** 29:3
**media** 11:19

**medical** 5:3,7 18:6,23,24 19:12,21,23 20:13 29:4,16 36:24 37:12,16 37:22 38:1 42:17,17 50:8 50:12,15 51:23 60:2 62:19 66:24 67:3,5 67:22 68:1,3,4 70:6,8 80:13 81:23 82:4 86:22
**medically** 69:5
**medicine** 37:10
**Medina** 3:17 77:18,21
**member** 66:24 68:14
**memo** 10:6,13 70:16,19,20,23 70:24 81:9 83:13 86:25 87:25
**memorandum** 3:14,16 73:17 74:6 88:6
**memos** 10:20
**mental** 29:17 72:11
**mention** 7:8,20 35:4 76:3,8
**mentioned** 8:9 16:17 28:3 31:1 35:20 62:2 70:14 71:2 75:24 77:13
**message** 27:7
**MESSING** 2:2
**Mill** 29:8,17
**mind** 17:12 29:5
**mini** 88:17,21
**minimum** 32:23
**minutes** 29:19

32:18,24 33:1 35:11 73:3
**misunderstood** 79:2
**moment** 4:16 17:21 31:1 37:15 39:18 56:6 59:7 61:5 61:11 74:2 75:5 77:1 81:5
**moments** 65:18
**month** 43:3
**morning** 81:5,11 83:21
**motion** 31:25
**mouth** 17:13 18:2 60:24 65:5 66:8 69:9 69:10,12
**move** 31:23 33:20 38:9
**movement** 28:15 34:6 35:11 38:14,18
**moving** 40:4 52:18

**N**

**N** 3:1,6 4:1
**naked** 17:12,23 18:2 60:21 65:1 70:2
**name** 4:8,17 17:23 60:10
**named** 4:18 5:1 5:10
**NARCAN** 37:7
**nature** 34:14
**need** 6:3 9:15 41:24 42:11 52:4 88:17
**needed** 42:16 64:7
**needs** 5:7
**neglected** 54:13 76:2,8

**neither** 90:10
**never** 69:8,8 77:13 82:4 83:2
**newly** 30:12,16 30:19
**night** 19:25 25:22 26:22 39:25
**normally** 28:9 70:22
**nose** 36:25 37:1 37:3,7
**Notary** 90:21
**note** 40:2,8 42:8 42:11 53:3
**noted** 40:22 41:9 41:11,16
**notes** 10:6 11:15 40:21 41:20,23 42:5
**notice** 12:16 37:15 60:20,23 61:1 67:4,18
**noticeable** 66:19
**noticed** 17:25 18:1 20:25 37:19 66:8
**noticing** 65:5
**notification** 47:25
**November** 90:24
**nudge** 37:24
**number** 3:10 15:7 23:22 24:19 43:7,20 46:18,20 77:4
**numbering** 73:16
**numbers** 43:22

**O**

**O** 4:1
**o'clock** 89:1
**O'CONNOR** 2:11

**oath** 6:9 7:4 8:20,25
**objecting** 16:2
**objections** 2:22
**observe** 68:7 84:24
**observed** 16:23 36:5 69:12 72:23 75:14
**observing** 68:6
**obvious** 31:18 34:1,4 70:8
**obviously** 7:9,24 15:6 18:25 21:22 22:22 37:12 43:13 63:25 64:5,21 65:23 70:2,2 86:3
**occasion** 21:1 26:2,10 43:6
**October** 22:14 22:16 74:18 76:3
**officer** 4:14,15 5:1,19 6:18,21 6:25 8:19,24 10:1 12:5,11 12:12,15,23 13:9,18,21 14:4,12,21,25 15:5,8,9,15,16 16:11,16,17 18:8,17 19:16 19:18 21:5,10 21:14 23:21 25:5,19,21 26:25 27:14,21 28:4,10,18 31:12 32:1 34:12,23 36:17 37:9 40:7 42:25 44:7 45:11,13,15,19 46:22 48:12 49:12 50:13

51:2,10,12,22
52:3,16,20,21
53:16,17,17,22
55:1,4 56:14
56:15,23 57:8
58:5,12 59:13
59:21 61:7,14
61:14,18,18
62:11,15,16,21
62:25 63:1,9
63:15,20 64:1
65:9,13,14,17
67:7,16,25,25
70:14 72:9,22
73:1,3,6,15,17
74:3 75:24
76:6,21 78:16
79:1,4,9,11,25
79:25 81:6
82:8 83:2,4
84:20 85:22,25
86:3,5,9,10,12
86:16,21 87:9
87:16 88:4
90:3
**Officer's** 45:22
51:18 80:23
**officers** 47:20
48:3 51:15
72:6,12,18
**official** 29:10
**Oh** 13:16 21:4
49:16 50:19
56:10 76:6
78:3 85:21
88:3
**okay** 15:11
16:10 17:18
18:20 20:8
24:13,23 27:18
28:23 30:2
31:20,25 32:6
33:23 38:2
39:17 41:14,14
41:14,22 42:4
42:24 44:4

47:18 51:21
52:7 54:21
55:13,16 56:10
57:14 58:23
59:2,8 60:6
65:7 67:12,16
68:10,13 79:23
80:20 82:12,17
84:18 88:19,22
**once** 6:14 28:10
28:24 32:24
33:1 40:19
42:19 44:18,20
54:6 55:3
64:25 68:1,3
76:19
**open** 37:23
59:17
**opened** 38:23
58:12 64:3
**opiate** 29:14
35:21,25 36:1
36:5 43:10
**opportunity**
5:25 67:24
**orange** 61:21
**order** 41:8,18
73:16 76:20
**orders** 88:16
**original** 2:22
**ought** 44:18
**outside** 11:12
**outta** 62:12,13
80:1 82:22
**overdose** 36:1,9
**overdosed** 36:5
36:7,8,24
**overtime** 26:5,6

———————
**P**
———————
**P** 4:1
**P-1** 3:11 39:24
88:4
**P-2** 3:12 74:12
74:13 88:4
**P-3** 3:14 73:17

**P-7** 3:16 76:19
**p.m** 1:16 32:8
74:19 89:1
**PA** 2:4,9,14
90:21
**page** 3:2 75:13
76:24 77:10
78:8
**pandemic** 8:2
**panic** 45:17
**paper** 27:8,11
58:22,25 59:1
64:17
**papers** 60:14,16
**paperwork**
60:12
**pardon** 77:6,25
**part** 16:8 26:24
41:14 76:5
81:10
**parties** 90:12,14
**partner** 17:6
18:7 20:5 25:5
**partners** 25:9,11
**party** 5:10
**passed** 36:21
71:18
**pause** 39:19
52:13 56:11
61:17 83:18
**pausing** 57:14
**pay** 65:2 67:2
**paying** 17:11
**pen** 58:22 59:4
64:17
**pencil** 58:21
64:17
**pending** 9:19
**Penn** 2:12
**Pennsylvania**
1:1,24 90:22
**people** 10:20
29:4,10 30:12
30:17 43:10
70:22
**perfect** 39:17

**period** 19:18
**person** 7:25 13:7
26:15 33:15
49:24 50:8
74:15
**personal** 11:10
11:15 15:7
**perspective** 82:8
**Philadelphia** 1:7
1:24 2:4,9,10
2:14 4:11,24
4:25 5:4 10:24
11:12 13:19
14:22 21:19,23
30:19 35:16
36:6 84:1,9,14
**phone** 15:7
**phrase** 31:3
**piece** 27:8,11
58:25
**place** 8:11 16:4
24:1 41:19
42:1,4 48:14
70:23
**Plaintiff** 1:5 2:5
**play** 36:13 56:3
57:7 59:5 61:4
61:10 63:18
66:23,23
**played** 57:15
68:20
**playing** 56:8
65:12
**Plaza** 2:12
**please** 4:8 7:13
9:15 20:11
52:12 75:2
77:1,4 88:16
88:23
**pod** 24:3,8 26:15
43:6
**pods** 24:4
**point** 9:15 18:16
18:24 19:2
29:19 34:10,24
57:17 69:1

72:23 78:4
83:10,20 85:7
86:7,10
**pointing** 52:18
55:25
**police** 84:1,9,14
85:23 86:1
**policy** 34:9,19
47:24
**popped** 39:3
**position** 23:20
**post** 11:19
**practices** 32:8
**prepare** 10:2,5
87:2
**prepared** 10:20
76:17,18 84:13
86:25
**preparing** 84:25
**presented** 37:13
**press** 45:18,23
46:1,2
**pressed** 80:17,21
80:25 86:22
**pretty** 9:14
22:18 38:12
57:1 60:1
66:18 69:21
81:17
**previous** 27:23
51:13 75:24
78:11 81:6
**prior** 80:15
**prison** 23:15,18
49:20 71:7
72:9 86:6,11
**prisoner** 31:17
33:2 47:25
49:11 51:18
52:4 82:9
**prisoners** 10:25
31:12 37:13
45:16 48:3
**Prisons** 4:11,24
5:4 10:24
11:13 13:19

| | | | | |
|---|---|---|---|---|
| 14:22 21:19,23 30:20 35:16 36:6 | **Q** | **reason** 5:15 7:2 7:20 9:23 24:20 26:4 60:17 | **related** 6:19 90:11 | **responds** 75:2 **response** 14:1 51:13 |
| **probably** 14:5 14:10 25:16 26:11 27:8,10 37:10 48:1 59:22 79:11 | **quarantine** 29:21,24 30:1 30:2,3 35:6,19 **question** 7:18 8:5,23 9:6,19 9:20 11:4 17:4 26:4 28:7 | **recall** 12:22 26:8 32:22 51:15 60:3 62:5 72:5 75:10 84:23 86:24 | **relative** 90:13 **relevant** 5:13 **relief** 52:21,22 **relieve** 52:24 **remember** 13:6 13:12 15:17,20 17:2 18:8 | **responsibilities** 24:22 25:4 30:24 64:23 **responsibility** 31:14 46:21 **responsible** 5:8 **rest** 20:14 |
| **problem** 27:15 63:24 82:23 **procedure** 34:10 **proceeding** 6:10 8:11 | 31:18 32:6 50:16 51:12,13 59:6 66:24 67:18 68:1 75:2 83:11 | **receive** 15:17 **receiver** 30:7 **receiving** 30:4,6 **recess** 27:19 **recollection** | 53:19 55:7,19 59:20,23,25 60:16 62:20 64:11,14 65:4 65:6,8,18 | **result** 5:7 **Retail** 23:16 **return** 83:10 **reversed** 8:24 **review** 10:16 |
| **proceedings** 7:11,22 90:9 **process** 29:6 30:5 35:22 65:4 66:7 67:5 69:1 | 86:9 **questions** 6:4 7:3,13 10:8 13:9 21:9 25:5 30:24 67:4 69:19 70:13 | 15:15 16:23 19:21 53:15 54:25 55:3,15 58:8 65:12 67:21 73:24 75:20 76:11 | 68:23 71:12 75:22 87:6 **repeatedly** 49:12 **reported** 58:9 **Reporter** 7:9 14:8 29:12 | **reviewed** 10:12 11:6,23 74:5 75:7 77:8,12 **right** 11:22 14:19,23 24:17 25:25 29:14 |
| **Production** 84:17 **professionals** 72:12 | 71:3 86:6 87:10,12,14 **quick** 9:14 27:13 | **record** 4:8,17 7:7,10,10,14 8:10,21 15:5 | 37:2 88:13,15 88:19,22 90:21 **Reporter-Not...** 4:4 | 30:16 33:20 34:2,3,16,23 35:3 36:13,16 38:12,20,23 |
| **proof** 33:10,10 45:3 | **R** | 39:10 40:12,18 41:19 49:20 | **REPORTING** 1:23 | 39:21 45:24 54:6 55:25 |
| **proper** 54:22 86:17 **protecting** 31:12 **provide** 19:7 **providers** 5:3 **Public** 4:4 90:21 **pulse** 19:5 | **R** 4:1 13:24 **rag** 75:17 **raised** 68:15,21 **Raising** 47:7 **rank** 44:22 **RCF** 22:7 **reach** 14:25 | 56:18 88:16 90:8 **recorded** 90:9 **recording** 8:10 8:14 **records** 10:23 60:9 | **reports** 10:25 **represent** 16:13 **represented** 5:21 **Representing** 2:5,10,15 **request** 9:16 | 56:4,12 57:15 58:3,16 59:12 59:18 60:17,20 60:23 63:10 64:3,12 66:5 68:16 75:6 78:24 |
| **purpose** 31:6 **purposes** 5:21 8:16 | **read** 7:22 10:6 60:13 74:3,4 74:25 75:5 | **refer** 4:14 **reference** 40:3 **referring** 36:18 | 15:4,8 84:16 **required** 31:2 32:11 | **rising** 33:8,16 **Riverside** 22:3 **Road** 71:8 |
| **pushed** 48:11 **pushes** 51:18 **pushing** 50:24 **put** 18:5,18,19 | 77:1,3 83:12 **reading** 2:21 34:1 77:11 **reads** 78:11 | 61:25 **reflection** 74:7 **refresh** 53:15 58:7 73:24 | **requirement** 44:7 47:23 **rescue** 70:22 **respond** 47:25 | **roles** 8:24 **roll** 20:1 31:22 **room** 5:24 30:4 30:6,7 36:12 |
| 27:3 36:24 37:6 39:11 41:3,13,15 42:11,20 52:14 | **ready** 64:16 **realize** 9:9 27:22 **really** 16:7 17:11 18:13,14 20:25 | **refreshes** 55:14 65:12 **regard** 50:15 **Regarding** | 49:12 66:1 80:8 81:2 82:10 86:21 **responded** 81:24 | 46:8 **routine** 26:24 **rover** 28:12,14 **RUDOVSKY** |
| 52:23 58:24,24 **putting** 42:23 65:20 | 24:9 26:11 61:2 65:10 66:11 70:25 71:1 | 35:19 **regular** 42:22 48:19 | 83:2 **responding** 48:4 | 2:2 |

**rule** 9:18 28:6 54:1
**rules** 32:3,4,5 35:5,7
**run** 27:14
**running** 66:15 66:23

**— S —**

**s** 1:9 4:1
**S-L-O-R-Y** 5:1
**safety** 31:12 69:2
**saw** 16:23 37:1 41:17 42:7 55:4 60:16 70:5 85:11
**saying** 5:11 16:11 21:3 62:7,9 64:11 65:18 75:16 79:3 81:6,22 82:19
**says** 34:19 40:22 41:5,6 52:20 78:8 83:6
**Scale** 29:14
**scene** 57:12
**school** 23:8,9,14
**screen** 39:11,15 52:15,15 55:18 55:21 57:15 59:12 67:14
**screens** 57:4
**scroll** 40:3
**seafood** 14:6,14 14:15
**sealing** 2:21
**seated** 5:23
**second** 7:16 8:9 34:14 41:6 52:12 77:10 80:6 83:17
**seconds** 56:19 57:19 59:9,16 61:6,14 65:15

66:22 68:14
**see** 8:15 14:18 29:4 33:8,24 36:12 38:18 39:13,21 40:4 40:8,22 41:7,8 43:20 46:13,22 48:12 50:24 52:15,25 55:14 55:18,21 56:14 56:19,20,22 57:5,16,20 59:12 60:19 61:5,11,17,21 65:1,8,11,13 66:24 68:11,21 73:17 74:19,25 76:18,24 81:9 83:19 85:12,16 87:21
**Seeing** 58:7 59:20
**seen** 5:12 14:6 20:6 36:5 42:10 60:9 69:8 76:20 77:13 84:13,16
**seizure** 51:4
**sense** 34:14 62:25 63:20
**sent** 6:23,25 10:6
**sentence** 78:11
**September** 4:21 11:4 20:19,24 21:24 22:21 23:4 24:7,16 25:12 26:14 28:19 32:21 40:1,1,7 52:11 52:19 73:20 81:5 83:14,21 86:11
**sequence** 75:3
**Sergeant** 28:25 44:23 71:1

74:16 76:3
**Sergeants** 44:8 44:24 45:1
**serious** 5:7
**served** 36:22
**set** 44:14
**shake** 31:22 33:3 33:15,15 37:20 37:20
**share** 39:15
**sheet** 58:22
**shift** 19:25 20:1 22:22,24 23:1 23:3,4 25:22 26:13,16 28:3 28:3,5,20 32:2 32:8 44:9,11 44:12,15,18,21 45:6 52:24 53:18,18,21 54:2 57:24
**shifts** 26:3
**shook** 33:3,4
**short** 12:8 13:21 27:19,21 39:19 52:13 56:11 62:2 83:18
**shot** 30:7
**show** 26:19 28:20 39:11 44:13,13,15,15 44:24 55:12 73:14 74:10 76:15,16
**showed** 53:7 83:13
**showing** 39:23
**shown** 55:20
**shows** 73:6
**shrink** 76:23
**sic** 8:19 49:8
**sick** 75:16 82:15 82:22
**side** 83:21
**sides** 66:15
**Sign-off** 52:20

**sign-on** 53:3
**significant** 64:21
**signing** 2:21
**sit** 29:1 46:3
**sitting** 33:22,25 34:18 39:13 54:19,24 60:15 72:5 74:6 84:24
**situation** 16:8 24:14 49:23 50:7,20 60:2 70:8 82:10
**situations** 51:22
**sleeping** 33:6
**Slory** 1:8 5:1 19:16,18 25:19 25:21 40:8 52:20,21 53:17 53:22 55:1 62:16 63:1,15 72:22 73:1,6 80:1,7,22 81:2 83:2,4 85:25 86:3,5
**Slory's** 80:6,17 81:1
**social** 11:19 29:9 29:15
**Solicitor** 2:7
**somebody** 42:13 48:11 51:4,4,5 51:8
**soon** 20:1 40:17 55:9 57:1 64:6 64:12 66:19
**sorry** 16:1 20:10 21:4 27:10 38:7 47:2 51:16 58:24 66:10 68:2 72:3 77:17 78:10 85:21
**sound** 25:25 29:14 31:18 54:14 60:11

69:24 88:14
**sounds** 10:12 13:8 24:10,15 24:25 34:22 38:11,17 43:14 44:17 49:2 51:14,21 60:15 63:5 76:10 79:21,24 80:5 83:1 85:11
**South** 1:24 2:3
**speak** 5:25 6:3 12:4,10,15 14:4 15:8 16:17 20:21 28:5 69:15 71:22,25
**speaker** 47:5
**speaking** 36:15 52:1 54:25 72:6
**special** 3:12 32:19
**specific** 10:18,19 34:9,19 47:23 51:2 59:25
**specificity** 43:2
**spoke** 11:24 36:23 53:17 74:15
**spoken** 19:16,18 84:21
**staff** 19:12 66:24 68:1,4,14 78:9 78:12
**Stamp** 78:8
**standing** 68:6,7
**stands** 19:20 65:17
**start** 8:4 20:2 22:12 23:1 41:15 53:21 58:2 59:10
**started** 20:9 22:14 23:15,18 35:4 53:17,18

53:23 59:11
state 4:7
statement 3:12
10:9,14 74:11
76:17 77:19
78:7 81:17
84:5,6,9,22,25
85:5,13,23
86:1 87:1 88:5
88:7
statements
10:20,25 84:13
87:4
STATES 1:1
steps 38:18 61:7
stipulated 2:20
STIPULATION
2:20
stop 20:11 56:8
stories 51:15
straight 28:24
Street 1:24 2:3,8
stretcher 41:25
42:1,12 43:1,6
43:8,9
strike 51:16
stuff 26:22 62:14
79:17
submitted 73:25
Subpoena 13:1
14:9 15:17
16:5,6
subpoenaed
12:19,19
substance 6:24
6:24
sued 5:9
suit 61:21
Suite 1:24 2:3
2:13
summoned
63:20,23
supervising
72:18
supervisor 44:18
44:22 45:12,13

48:2 71:16,23
Supervisor's
45:8
supervisors 44:8
44:13
SUPPORT 1:23
supposed 32:15
32:23 34:20
40:12,14,18
44:25 45:8,16
86:18
sure 7:3 18:13
18:14 24:9,11
24:24 25:17
26:11 27:15
28:13 29:24
31:5,6 33:2,17
34:5,21 36:9
37:4,6 43:21
48:1 49:4 56:7
60:3 61:2 63:3
65:10 70:25
71:1 77:5
85:19 88:13
surveillance
11:3
swearing 9:3
sworn 4:3 90:6
symp- 70:1
symptoms 36:1

――― T ―――

T 13:21
T- 13:24
take 9:13,20
18:24 26:12
27:13 32:3
34:5 39:16
43:18 45:23
46:10 53:7,22
64:7 70:11
74:2 75:5 77:1
taken 27:19
70:15 84:9,20
86:4 90:4,12
takes 8:11

talk 10:2 11:25
26:10 63:15
72:12,22 85:7
85:20
talked 11:22
53:20 73:15
talking 17:11
20:9 28:1
29:24 34:8
36:20 53:19
62:7
tap 37:24
taught 34:25
Taylor 2:7 5:22
5:23 6:1,4 8:19
10:4 15:11,24
16:1 27:13,18
39:14 56:5,8
56:12 64:8
73:11 77:3,7
81:18,25 83:7
84:15 87:14,24
88:8,23
TB 29:2 30:6,7,8
TE 12:12 13:21
14:4,21,25
15:16 18:7
20:5 25:5 53:4
61:18 63:20
64:1 65:14,17
67:8,10,11,25
73:3 85:22
technical 8:6
technology 8:4
tell 4:10 6:25
9:15 10:4
15:23 16:12
17:2,23 26:18
26:21 28:19
31:18 34:23
43:1 48:10,23
49:5,6 64:5
68:8,11 71:17
71:19 78:25
79:4 80:3,16
81:1,13

telling 32:11
47:24 49:15
60:4,5 75:23
79:6,15
terms 8:6 26:19
37:19
Terrelle 13:22
15:9
testified 4:4 6:6
6:9,12
testify 5:16 7:4
testifying 8:20
8:25
testimony 2:21
6:1 9:24 27:23
90:5,8
text 74:3 76:23
77:11
thank 21:5 32:6
35:3 67:12
77:7 78:3
84:18 87:13,15
87:17
thanks 44:4
thing 7:8 16:22
25:16 29:25
30:25 32:12
36:25,25 37:3
37:6 38:4 39:9
58:2 66:4
74:10 76:16
79:24 80:6
things 7:12
11:23 18:1
33:14 63:16
69:11 76:18
79:21
think 7:6 9:13
14:5,11 18:1
28:19 29:19
35:3 39:14,16
52:2 55:11
66:3 67:21
69:4,6 70:12
79:3 84:13
88:1

thinking 51:2
Thomas 2:12
3:17 60:10
61:11 63:1,6
63:16 75:13,15
75:23 76:11,18
77:19 78:9,12
78:15,21 79:21
79:24 80:3,5
80:16 81:4,5,9
81:11,17,22
83:1,6,19 84:4
84:24 85:7,17
86:22
Thomas' 88:7
three 14:5,10,10
22:8 69:21
73:7,7 74:19
87:22 88:23
throw 42:16
thrown 42:14
till 19:11
time 1:16 2:22
6:3 9:19 12:1
17:24 21:20
25:13 26:13
30:20 32:13
34:5,13 40:15
42:10,18 43:14
43:14 44:14
45:23 54:1
56:20 75:14
84:4 85:16
times 6:12 43:5
title 21:10
today 4:15 5:15
6:1 7:11 9:14
9:24 16:15,19
34:18 54:24
60:15 72:5
74:6 75:22
87:18
today's 5:22
10:2
told 15:16 17:6
17:15 21:9

Charlene Wilson

45:16 48:2
60:7 62:11,15
62:21 63:8
71:15 73:5
75:22 78:23,25
79:3,5,8,14,21
79:25 80:5
81:10 82:21
83:1
**Tom** 43:24
82:13 87:11
**top** 17:10,12,22
55:25 56:4
58:11 59:12
61:17
**topic** 35:4 43:17
45:15 85:10
86:10
**touch** 19:11
**tour** 28:12 31:19
32:12 33:14
34:11,20,25
40:11,15,17
41:14,14,15,16
41:18,22 42:4
42:6,8,22,24
44:13,25 45:2
45:8 49:7 50:3
53:23 54:2,6,9
54:10,16,16,20
54:21 63:2
64:16 86:17
**toured** 40:8 41:8
41:9
**tours** 28:10,16
29:18 31:1,2,4
32:16,23 35:10
37:19 39:10
41:2 43:17
44:9
**trained** 37:12,14
69:5
**training** 22:13
34:24
**transcribed** 2:21
90:7

**transcript** 7:21
88:11
**transition** 16:21
28:2
**treat** 84:16
**trial** 2:22
**tried** 78:15,25
80:6 81:6,23
**TRIVIKRAM**
1:9
**true** 9:3 83:6
90:8
**try** 17:3 38:18
51:18 55:12
68:2 80:17
**trying** 15:5
16:13 50:5
51:5
**turn** 28:25
**twice** 44:20,20
**two** 2:12 7:12
10:12 12:13
14:10 16:16
18:1,2 22:6
25:8 26:6
38:18 41:2,4
51:9 59:16
69:15 74:19
76:15 79:21
85:3 87:7
**type** 31:25 41:13
41:15,20,21,22
41:22,24,25
45:2 62:13
82:10,18
**typed** 42:4
**typical** 64:23
**Tyrone** 3:17
60:10 77:19

———————
**U**
———————
**um** 46:25
**understand** 5:18
7:3,22 8:12,19
9:2,6 10:18
16:12 19:10

20:23 73:9
86:15
**understanding**
23:21 25:24
26:3 32:10
44:17 59:24
69:5 72:10
79:20 81:4
83:14 87:2
**understood** 7:2
7:14 8:7,17
9:16,21 79:3
**uniform** 4:10
**unit** 3:13 20:2
28:12 29:3,6
29:21,24 30:1
30:9,12 31:5
35:6,12,15,19
35:20 36:12
37:16,22 40:8
40:11 41:8,9
46:3,17 50:17
50:17,18 51:7
56:1 57:5,17
68:1,3,4 70:15
71:6 83:22
85:19 86:4
**UNITED** 1:1
**unmanned**
28:17
**unrelated** 6:18
**unresponsive**
4:22
**update** 27:1
**upset** 82:16
**upstate** 30:18
**usage** 36:6
**use** 31:2 39:1
43:25 47:5
**usual** 24:25
**usually** 24:3
25:8

———————
**V**
———————
**verbal** 7:13
**versa** 26:5

**vice** 26:5
**video** 8:7,11
11:4 36:13
55:12,20,22
57:13 58:11
60:20 61:3
63:25 64:6
68:20 70:11
**view** 17:16 56:9
**visits** 29:10
**voice** 47:7
**vs** 1:6

———————
**W**
———————
**wait** 7:18 18:23
27:16 50:6
**waited** 19:11
**waiting** 52:21,22
52:23
**waive** 2:21
**walk** 17:8 18:15
26:18 28:21
31:4 33:19,24
38:23 58:5
61:11 64:16
65:13,14
**walked** 20:7
50:5 58:6 61:6
61:14 64:12
68:14
**walking** 33:25
47:4 56:15
57:8,20 58:6
59:10,11,13
61:18 68:8
**wanna** 7:8 10:3
38:9,10 50:5
80:13
**want** 8:15 16:22
21:8 24:24
29:5 30:25
38:4 39:9
45:22 47:9
73:14 78:11
82:10,15,24
**Warden** 78:1,4

**wasn't** 16:8
17:11 53:6
63:3 69:18
**watch** 11:3 56:4
59:6
**watching** 64:5
65:11
**way** 14:25 19:4
19:14 20:5
23:25 27:24
29:21 33:13,21
34:24,25 43:23
44:12 48:23
49:3 53:15,21
54:13 55:15
60:9 62:2
63:10 72:20
77:17,21 79:10
83:14
**we'll** 9:20 27:16
49:9,10 55:14
55:18 61:5
67:24
**we're** 7:25 8:2
9:13 16:13
17:11 18:19
21:6 29:24
34:8 36:13,20
70:12
**we've** 5:15 16:14
37:18 60:9
64:12 73:15
**Wednesday** 1:16
**weekend** 14:6
**weeks** 12:2
14:10 20:24
74:20
**welcome** 87:19
**went** 4:16 8:10
10:7 18:17
19:23 20:13
22:15 35:4
50:24 65:9
71:2 85:19
**whichever** 30:9
**white** 46:7

**Williams** 88:4
**Wilson** 1:14 3:3
  3:15 4:2,9,14
  4:15 5:19 8:24
  14:12 15:8,15
  16:11,16 21:5
  32:1,1 34:13
  51:2 53:1,4
  67:16 74:3
  84:20 87:10
  90:4,5
**Wilson's** 3:12
  88:5
**window** 38:19
  64:6
**wiping** 75:16
**withdraw** 8:23
  29:9
**withdrawal**
  29:14 35:21,25
  42:15 43:11
**withdrawing**
  31:24 38:8
  42:16
**witness** 2:21 3:2
  4:3 15:25 16:3
  64:9 73:12
  74:5 75:7 77:8
  77:12 82:1
  83:8 87:19
  90:5,8
**woke** 33:22
**WOLFE** 1:23
**woman** 4:18
**word** 41:15
**words** 20:20
  33:19 59:25
**work** 13:18 16:4
  22:8 23:13,18
  25:8 26:4,5,6
  26:19 34:25
  35:8 38:22
  44:11 49:6,17
**workday** 58:2
**worked** 5:4
  21:18 22:5

23:18 25:11,19
  29:3,7
**Worker** 29:10
  29:16
**working** 21:24
  22:2,22 23:15
  49:12
**works** 44:12
  48:16 49:4
**wouldn't** 49:14
**write** 54:15
  70:23 77:18
**writing** 15:13
  27:3 58:23
**written** 27:6
  84:25
**wrong** 5:11
  46:23 48:12
  79:8,13 80:10
  82:3,19
**wrongdoing**
  11:8
**wrote** 54:20
  70:15

**X**

**X** 3:1,6 34:20

**Y**

**Y** 34:20
**y'all** 82:21
**yeah** 6:19 13:11
  14:15,20 22:9
  22:11 24:18
  27:15 29:20
  51:14 56:10
  84:18 85:19
  87:23 88:3
**years** 6:16 21:15
  23:5 24:17
  25:17 34:16
  82:8
**yell** 47:9
**yelling** 65:21
**yellow** 55:25
**Yep** 44:5

**Z**

**Z** 34:20
**Zoom** 1:14 7:25
  8:3 56:9

**0**

**1**

**1** 17:6 48:21
  52:14 56:1,15
  58:6,13 59:10
  59:13,17 61:22
  64:19 87:24
**1-3** 29:3
**1-877-KLW-...**
  1:25
**1:00** 74:19
**1:42** 41:5,8
**10/10/18** 3:12
**10th** 74:18 76:3
**11** 6:16 25:23,24
  26:6,15 28:2,4
  32:8 44:16,16
**1100** 2:13
**12** 21:15 34:16
  82:8
**1303** 1:24
**14th** 2:8
**15** 65:15 73:3
**1515** 2:8
**15th** 2:13
**18** 59:16
**19** 44:1
**19102** 1:24 2:9
  2:14
**19106** 2:4

**2**

**2:20-cv-04570...**
  1:7
**2:24** 40:3,6 41:6
**20** 29:19 32:18
**2005** 23:12
**2009** 21:16
  22:16 34:24
**2014** 23:2

**2018** 4:21 11:4
  20:19,24 21:24
  21:24 22:21
  23:4 24:7,16
  25:12 26:14
  28:19 32:21
  40:1 52:11
  73:20 74:18
  76:4 81:5
**2019** 22:20
**2021** 1:16 90:7
**2023** 90:24
**20th** 40:1
**215** 1:25
**21st** 4:21 11:4
  20:19,24 40:1
  40:7 52:11,19
  73:20 81:5
  83:15,21 86:11
**230** 1:24
**25** 44:3
**27** 21:16 22:13
**27th** 21:15
**28** 57:19
**29** 90:24

**3**

**3** 19:25 20:1
  22:22 26:5,13
  28:3,20 32:2
  44:11,16,16
  88:5
**3:10** 1:16
**30** 1:16 32:24
  33:1 35:11
  90:7
**32** 61:6
**33** 66:22

**4**

**4** 3:3 47:9
**4:45** 89:1
**40** 56:18
**44** 56:19

**5**

**501** 2:3

**55** 61:14
**55th** 14:17
**59** 68:13

**6**

**6** 28:14
**6:30** 28:11,13,14
  54:3,4,9
**6:53** 52:19

**7**

**7** 19:25 20:1
  22:22 25:24
  26:5,6,13,15
  28:2,3,4,20
  32:2,8 44:11
  44:15,16 53:4
  54:4,9,10 73:8
  87:24 88:7
**7:10** 56:18,19
**7:12** 57:15,19
**7:13** 59:9,16
  61:6,13
**7:14** 65:13,15
**7:15** 66:22 68:13
**7:30** 54:10
**7:33** 53:6
**718** 2:3

**8**

**9**

**9/21/18** 3:14
**9/26/18** 3:16
**922-7112** 1:25