# EXHIBIT I

Terrelle Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EILEEN A. McNAMARA, as | : CIVIL ACTION NO. |
| Administrator of the | : |
| ESTATE OF JONATHAN | : 2:20-CV-04570-RBS |
| GLEAVES, JR., | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CITY OF PHILADELPHIA, | : |
| CORIZON HEALTH, GERALD | : |
| SLORY, ELIZABETH | : |
| BRADLEY, LALITHA | : |
| TRIVIKRAM, MATU GAYE, | : |
| JOHN DON(s), | : |
| Defendants. | : |

Philadelphia, Pennsylvania

December 22, 2021

Video deposition of TERRELLE JONES,
taken on behalf of the Plaintiff, at the Law
Offices of Kairys, Rudovsky, Messing, Feinberg
& Lin, LLP, 718 Arch Street, Philadelphia,
Pennsylvania, on the above date, commencing at
10:00 a.m., before Linda A. Ricciardi,
Certified Court Reporter.

KAPLAN LEAMAN & WOLFE
COURT REPORTERS
230 South Broad Street, Suite 1303
Philadelphia, Pennsylvania  19102

1-877-559-3376

Page 2

APPEARANCES:
KAIRYS, RUDOVSKY, MESSING & FEINBERG
BY: JONATHAN H. FEINBERG, ESQUIRE
   GILA GLATTSTEIN, Paralegal
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19106
215-925-4400
jfeinberg@krlawphila.com

Counsel for Plaintiff

CITY OF PHILADELPHIA
LAW DEPARTMENT
BY: BAILEY AXE, ESQUIRE
1515 Arch Street
Philadelphia, Pennsylvania 19102
215-683-5000
bailey.axe@phila.gov

Counsel for Defendant
City of Philadelphia
O'CONNOR KIMBALL LLP
BY: THOMAS J. GREGORY, ESQUIRE
Two Penn Center Plaza, Suite 1100
1500 JFK Boulevard
Philadelphia, Pennsylvania 19102
215-564-0400
tgregory@okllp.com
Counsel for Defendant
Corizon Health

Page 3

I N D E X

WITNESS                        PAGE

TERRELLE JONES

   By Mr. Feinberg              4

   By Ms. Axe                   69


EXHIBIT NO.    DESCRIPTION        MARKED

   (None marked at this time.)

Page 4

(It is stipulated and agreed by and between counsel for the respective parties that the reading, signing, sealing, certification and filing of the within deposition be waived; and that all objections, except as to the form of the question, be reserved until the time of trial.)

-----

TERRELLE JONES, after having been first duly sworn, was examined and testified as follows:

-----

EXAMINATION

-----

BY MR. FEINBERG:

Q. Ms. Jones, good morning.

A. Good morning.

Q. I introduced myself just a moment ago before we went on the record. My name is John Feinberg. I am the attorney for a woman named Eileen McNamara. Ms. McNamara is the grandmother of the children of Jonathan Gleaves, Jr., and as you may recall, Mr. Gleaves died on September 21, 2018, a few hours

Page 5

after he was found unresponsive in his cell at the Curran-Correctional Facility in the Philadelphia Department of Prisons.

Ms. McNamara has brought a lawsuit against the City of Philadelphia, a correctional officer by the name of Gerald Slory, S-L-O-R-Y, Corizon and some of Corizon's medical providers.

In the lawsuit my client, Ms. McNamara, claims that the defendants, the people who I just named, were deliberately indifferent to Mr. Gleaves' serious medical needs and as a result caused his death.

You have not been sued as a defendant in this case, no one has brought any claims against you, but based on the documents that we have seen and some of the video footage that we have seen from the prison it appears that you have relevant information about the case.

So for that reason we asked you to come here today in a deposition about what you know. Do you understand everything that I just explained?

A. Yes.

2 (Pages 2 to 5)

Terrelle Jones

Page 6

Q.   You were subpoenaed to appear for this proceeding; is that correct?
A.   Yes.
Q.   You confirmed that the person who handed you the subpoena also gave you a check for your witness fee?
A.   Yes.
Q.   Are you represented by an attorney for purposes of this deposition?
A.   No.
Q.   My understanding is that you are a former employee of the City of Philadelphia; is that correct?
A.   Yes.
Q.   But despite that former employment you are not represented by the City of Philadelphia Law Department; is that correct?
A.   No.
Q.   Okay.  Are you comfortable proceeding with this deposition today without an attorney representing you?
A.   Yes.
Q.   All right.  Have you ever testified in a deposition before?

Page 7

A.   No.
Q.   Have you ever testified in court at all under oath in any proceeding?
A.   Yes.
Q.   Okay.  What type of proceedings have you testified in?
A.   It was a domestic violence case I had.
Q.   Was that a criminal case?
A.   Yes.
Q.   So you were testifying against someone who was charged with a crime?
A.   Yes.
Q.   How long ago was that?
A.   My oldest was born in 2008, so I believe 2008.
Q.   So like 13 years ago or something?  Is that a yes?
A.   Yes.
Q.   All right.  The reason I asked you that question is just to find out whether you are familiar with the concept of testifying under oath.  Given that that was a long time ago, let me give you some instructions about what it means to testify under oath and testify in this

Page 8

proceeding, okay?
A.   Okay.
Q.   First things first.  Linda, who introduced herself a short time ago, is a court reporter who is making a transcript of everything that is said while we are formally on the record.  Do you understand that?
A.   Yes.
Q.   For that reason I am going to give you two instructions.  One, please make sure to give a verbal answer, a loud verbal answer so everyone can hear it, and that way it can be recorded in the transcript, understood?
A.   Yes.
Q.   And what I mean by that is if you want to say yes or no, you can't shake or nod your head or say uh-huh or something like that, it has to be a word that we can understand and then be recorded in the transcript, okay?
A.   Yes.
Q.   All right.  Second instruction I will give is this, in normal conversation, it happens all the time that you can predict what I am going to say with my question and you will

Page 9

be inclined to interrupt me, not to be rude, but just because that is how conversation works.  I will ask you to try to resist that temptation and let me finish my question so that our transcript that is produced after this deposition consists of questions followed by answers as opposed to the two of us interrupting each other.  Understood?
A.   Yes.
Q.   All right.  For that same reason I will ask you that if I ever interrupt any of your answers I want you to tell me so I stop talking and then you take an opportunity to finish your answer, okay?
A.   Yes.
Q.   All right.  Now, a couple of other points.  We have two folks participating by Zoom, I know they are off camera now, but Mr. Gregory and Ms. Axe are involved as counsel for some of the parties that are involved in this case.  They may have questions for you at some point during this deposition once I am finished, and you may hear from them during the testimony, so even though they are not here in

3 (Pages 6 to 9)

Terrelle Jones

Page 10

the room they are participating as if they are here, understood?

A.    Yes.

Q.    Second, other point I will make for you is that you noticed that right as I started the deposition I turned on the video camera that is to my right here, this is making a video and audio recording of the testimony.  That recording will be made available to the attorneys in the case, it is not going to be disclosed on YouTube or anything, it is just for purposes of this case.  Do you understand that?

A.    Yes.

Q.    I mentioned the phrase under oath, and you understand you are testifying under oath; is that correct?

A.    Yes.

Q.    Do you understand that this means that you are swearing that all of your answers are true and correct?

A.    Yes.

Q.    If you don't understand a question that I have asked will you let me know that?

Page 11

A.    Yes.

Q.    If you realize that an answer that you have given earlier in your testimony was incorrect or incomplete will you let me know that as well?

A.    Yes.

Q.    I don't think we are going to be here too terribly long, but if we get to a point that you need a break just let me know that.  If you do need a break though and there is a question pending I will ask you to give an answer to that question and then take a break after you give the answer.  Understood?

A.    Yes.

Q.    Is there any reason why you cannot give full and complete testimony today?

A.    No.

Q.    First off, when I mentioned the case to you at the beginning of my questioning when I told you about Mr. Gleaves and who I represent, did that name and the circumstances of his death sound familiar to you?

A.    Yes.

Q.    Did you do anything to prepare for this

Page 12

deposition, to refamiliarize yourself with the details of what happened?

A.    Everything is still in my mind.

Q.    Okay.  Now, there were a couple of documents that you prepared, which I am going to show you a little later, while you were working at the prison, one was a formal interview statement, another was a memorandum.

     Have you gone back and looked at any of those documents?

A.    No.

Q.    Do you even have them in your possession now?

A.    No.

Q.    There were a couple of other correctional officers that we've taken testimony from so far, and I will name them.  First is Officer Slory, who has been sued in this case, second is Officer Charlene Wilson, who is a witness, and third was Officer Christopher Jones, who is also a witness.

     Have you spoken to any of the three of them at any time in the past several months leading up to this deposition?

Page 13

A.    Charlene Wilson we keep in contact because we were partners for many years.

Q.    Did you speak with Ms. Wilson about her deposition?

A.    She didn't give me details.  When I found out that someone was trying to give me a subpoena from my grandmother, I asked her if it was about Jonathan, and she said yes, but she didn't give me any details.  She said really wasn't -- all she said was it really wasn't involving us, it was medical.

Q.    Okay.  So did she tell you anything about the questions that were asked or the answers that she gave?

A.    No, she didn't tell me any specifics.

Q.    So you mentioned Charlene Wilson, have you spoken to either of the other two witnesses that I mentioned --

A.    No, I haven't.

Q.    -- Slory or -- that's okay, I asked a long question.  Let me start over.  Have you spoken to Mr. Slory or Mr. Christopher Jones about the deposition?

A.    No, I haven't.

4 (Pages 10 to 13)

Terrelle Jones

Page 14

Q.    Have you spoken to anybody else besides the people that I mentioned about your testimony today?
A.    No.
Q.    Who is the last name or pardon me, when was the last time you heard the name Jonathan Gleaves?
A.    The day it happened.
Q.    I mean other than your conversation with Charlene Wilson, that is the last time that you considered Mr. Gleaves was back when it happened?
A.    Yes.
Q.    Let's talk more specifically about your memory.  My understanding is that you were one of two officers who were working in the relevant housing area, which I understand to be B, Bravo, 1 pod 3.  First, did I get the housing area correct?
A.    Yes.
Q.    And am I correct that you did find Mr. Gleaves unresponsive?
A.    Yes.
Q.    And you remember locating him in his

Page 15

cell; is that right?
A.    Yes.
Q.    Okay.  What I would like to do now at the start is have you walk through with me about what you remember about that incident.  What is it that first caught Mr. Gleaves to your attention?
A.    He was naked laying on the top bunk.
Q.    Okay.  What is the context in which you saw him, how did you come in contact with him?
A.    He was -- while I was doing the morning count we have this -- when you do the morning count you have to see a body physically moving.  So what caught my eye that he was naked, and then his cell mate got out of the bed and he was very agitated.
Q.    What did the cell mate -- well, what happened after you first noticed that?
A.    The cell mate came to the door, I told the cell mate to back up, he was agitated he said.  He had been trying to get help all night and nobody came.
Q.    By the way, we received documents which suggest that the cell mate's name was Tyrone

Page 16

Thomas.  Does that name sound familiar to you?
A.    It sounds familiar.
Q.    Do you know Mr. Thomas, can you describe him to me?
A.    No, I couldn't put a face to his name.
Q.    But bottom line, you have no reason to disagree with the fact that is the same person we are talking about; is that correct?
A.    Yes.
Q.    So let's go back to when you first -- what called Mr. Gleaves attention to -- what called your attention to Mr. Gleaves, it was the fact that he was naked; is that correct?
A.    Yes.  To be in a cell with someone undressed with another man that seemed odd to me.
Q.    Okay.  Is it fair to say that was immediately obvious to you, you saw it right away?
A.    Yes.
Q.    Okay.  Could you tell whether Mr. Gleaves had any clothing on his body at all?
A.    From what I could see was his legs exposed, which I automatically knew he didn't

Page 17

have anything because they wear jumpsuits, and the window, inmates they right -- the window is not very, you can't see clearly through, you have to like maneuver, it is not a clear visible view.
Q.    So you could tell, despite any obstruction to the view you could tell that there was no clothing basically from the waist down; is that correct?
A.    Yes.
Q.    And you knew that because the uniform was a jump suit, if his legs were bare that meant he couldn't be wearing anything; is that correct?
A.    Yes.
Q.    This may sound like an odd question, but why is it unusual to see someone completely naked laying in bed?
A.    It is unusual being in the cell with another person.  If they are alone it is not unusual because most of the inmates on that housing unit are going through withdrawal, so they may get sweaty, they may soil their jumpsuit so it is not uncommon for them to take

5 (Pages 14 to 17)

Case 2:20-cv-04570-RBS   Document 38-10   Filed 01/31/23   Page 7 of 29

Terrelle Jones

Page 18

it off, but they usually refrain from doing that when they are housed in a cell with another person.

Q. For the purpose of privacy; is that right?

A. Yes.

Q. In other words, your expectation is that if someone is going to be naked in the cell because of their concerns about privacy they won't do that when someone else is there; is that correct?

A. Yes.

Q. Okay, all right. So Mr. Thomas you said -- I am going to refer to the cell mate as Mr. Thomas given the documents that we have. You said Mr. Thomas was very agitated; is that correct?

A. Yes.

Q. Could you describe what you mean by that?

A. He was angry. He complained that Jonathan was sick during the night, and he tried to get the guard's attention and no one came and checked on him.

Page 19

Q. Did he say anything about how he tried to get the guard's attention? And let me replace the hes with names. Did Mr. Thomas tell you anything about the way in which he tried to get any guard's attention?

A. He just said he was banging on the door all night.

Q. Did Mr. Thomas describe anything about Mr. Gleaves' condition that caused him to try to get an officer's attention?

A. He didn't tell me exactly what was going on. I didn't know until I was able to see more into the cell, and that is when I saw Jonathan foaming at the mouth.

Q. Foaming at the mouth, okay. You nodded your head yes, can you just confirm?

A. Yes.

Q. Okay. And I know obviously you are not trained as a medical professional; is that correct?

A. No.

Q. Okay. Is that something that stood out to you as being of concern?

A. Yes.

Page 20

Q. I take it given that the way you are reacting that that was something very difficult for you to see; is that correct?

A. Yes.

Q. Okay. What happened next? We will get you a tissue Ms. Jones.

A. I called for a stretcher from medical, and I asked for assistance because I didn't want to open up the door and I didn't know how agitated his cell mate was, I didn't want him to attack me.

Q. So when you say him, you are referring to Mr. Thomas; is that correct?

A. Yes, Mr. Thomas.

Q. So you were concerned because Mr. Thomas was so agitated and upset you were concerned for your safety; is that correct?

A. Yes.

Q. So can you tell me how far into the cell did you go before you noticed that Mr. Gleaves was foaming at the mouth?

A. I seen it from the window.

Q. So you could tell that -- if we can review the order, you go to the window, you

Page 21

look in, you see Mr. Gleaves is naked; is that correct? Is that yes?

A. Yes.

Q. I told you I would remind you. Mr. Thomas then comes to the cell door and he complains to you about how he couldn't get attention for Mr. Gleaves; is that correct?

A. Yes.

Q. And then as you continue to look in the window you can tell that Mr. Gleaves is foaming at the mouth; is that correct?

A. Yes.

Q. Okay. Now, I am not going to ask you to quantify how much foam there was, but can you describe it for me, what it looked like, how much there was?

A. It was a lot. I could just see him gasping for air.

Q. Okay. Enough that the foam was obvious to you; is that right?

A. Yes.

Q. Okay. So you described three things about Mr. Gleaves; one, naked, two, foaming at the mouth, three, gasping for air?

6 (Pages 18 to 21)

Terrelle Jones

Page 22

A.   Yes.

Q.   Was there anything else that you noticed about him?

A.   No, that was it.

Q.   Okay.  That told you right away that this is a medical issue that needs medical attention; is that correct?

A.   Yes.

Q.   So you called for the medical unit; is that correct?

A.   Yes.

Q.   How do you refer to that, is that calling for medical emergency?

A.   On a walkie-talkie you would say a stretcher is needed and you would give the unit which I would say Bravo 1 pod 3.

Q.   Okay.  At any point in these interactions did Officer Charlene Wilson come join you?

A.   Yes, she did.

Q.   Can you tell me about when in the chronology that we have gone through she came up, as far as you recall?

A.   She came on the pod -- she came on the

Page 23

pod when I called for the stretcher for medical.

Q.   Okay.  At some point do you recall pulling Mr. Thomas out of the cell?

A.   I did, because once I saw Jonathan and how he was, he needed medical attention.

Q.   Okay.  And so can you explain to me why was it that you needed Mr. Thomas out of the cell?

A.   So that medical could get easy access to Mr. Jonathan.

Q.   Okay.  To create room?

A.   Yes.

Q.   Okay.  Did Mr. Thomas -- I am sorry, let me ask that again.  You told me so far that Mr. Thomas told you a couple of things, one is that Jonathan was very sick; and, two, that he was trying to get attention throughout the night; is that correct?

A.   Yes.

Q.   What else did Mr. Thomas tell you besides those two things that you can remember?

A.   That is the only thing that I can remember.

Page 24

Q.   Okay.  So let's go back to the timeline of events that we described.  I think we stopped as Officer Wilson came up, and you called medical at some point in that time frame.  What happens next?

A.   I can't remember exact details, but I know the supervisor responded and medical also responded.

Q.   Okay.  Did you stand there and observe any of the work that the medical unit was doing with Mr. Gleaves?

A.   I was there, I can't remember exactly what they were doing.

Q.   As far as -- can I assume that your job as a correctional officer is to get the medical people there and to let the medical people handle the medical emergency; is that correct?

A.   Yes.

Q.   Did you have any responsibility for performing CPR or anything like that?

A.   No.

Q.   So is it fair to say then at that point you stood back and let medical do its job?

A.   Yes.

Page 25

Q.   All right.  Do you remember how many medical people responded to the block?

A.   No.

Q.   Okay.

A.   It was chaotic.

Q.   I assume then at some point Mr. Gleaves was taken off the block on the stretcher; is that correct?

A.   Yes.

Q.   Did you go with him to medical or anything like that?

A.   No.

Q.   So did you stay on the unit instead and continue on with your shift?

A.   Yes, I had to stay on my unit and continue with the shift.

Q.   Okay.  At any point after that did anyone come ask you questions about what happened?

A.   Internal affairs came and spoke to me and Charlene Wilson.

Q.   Okay.  When you say internal affairs are you talking about the --

A.   OPC, for the prison.

7 (Pages 22 to 25)

Terrelle Jones

Page 26

Q. Office of professional, I don't remember what OPC stands for.

A. Compliance.

Q. Okay. So that is the investigation within the prison that investigates allegations of misconduct or rule violations by correction officers; is that correct?

A. Yes.

Q. Okay. Did they come speak to you that day or sometime later?

A. They came to the jail that day, they just wanted to know if we were okay, and we were taken down to the office at a later date to give a formal statement.

Q. Okay. I think I have a copy of that statement, which we will look at in a little bit. It looks like on October 10th, so this incident happened September 21, 2018, so October 10th, which would have been three weeks later give or take, does that sound right to you?

A. Yes.

Q. Did you speak to anybody else that day, for example, did any supervising officer come

Page 27

ask you what happened or ask you to provide any more information?

A. No.

Q. I also have in here a memorandum that you wrote to Lieutenant Albright, which again I will show you later. Do you remember how that came to be, did someone ask you to write it or did you write it on your own?

A. I believe I was asked to write it. Usually if a memorandum is wrote we were asked to write it.

Q. Okay. So someone at some point would have come to you and said Officer Jones can you write down what happened; is that correct?

A. Yes.

Q. Other than internal affairs and whoever asked you to write the memorandum do you remember anybody else coming and asking you about what happened?

A. No.

Q. Did you -- let me ask that a different way. The information that we have shows that Mr. Gleaves was taken to two different hospitals and he died later that day at

Page 28

Hahnemann Hospital sometime in the afternoon, were you aware of that?

A. Yes, my supervisor informed me.

Q. Which supervisor was that?

A. Sergeant Katrina Miles.

Q. Miles, M-I-L-E-S?

A. Yes.

Q. Do you know when Sergeant Miles advised you of that?

A. I am not sure of the time but when she told me she said that she just received word that he was deceased in the hospital.

Q. Okay. Do you remember discussing that with Officer Wilson?

A. I think she told both of us at the same time or separate time, I am not sure. I think she told both of us. I am not sure.

Q. Okay. If you don't remember that is fine, and if you remember as we go on later today you can always come back to that point, okay? Did anyone from or did you ever speak with anyone from Mr. Gleaves' family?

A. No.

Q. What did you think when you heard that

Page 29

Mr. Gleaves had died?

A. It was unfortunate. During my nine years at the prison I have seen stabbings, fights, but to see someone like that and you can't help them.

Q. It was upsetting for you?

A. Yes.

Q. And here we are more than three years later it is still upsetting to you; is that correct?

A. Yes.

MR. FEINBERG: Gail, can you pull up the video from the beginning of the shift? Let's go off the record one second.

(Whereupon a discussion was held off the record.)

BY MR. FEINBERG:

Q. Officer, what we are going to do now is show you some video surveillance from the unit on September 21, 2018. It is appearing on the screen in front of you. First of all, do you see the four small screens?

A. Yes.

Q. Okay. I will ask you to look at the

8 (Pages 26 to 29)

Terrelle Jones

Page 30

top left, and by the way, just for the record the video that we are looking at will show what is happening at 7:08 a.m.; is that correct?

MS. GLATTSTEIN: Yes.

BY MR. FEINBERG:

Q. So 7:08 would have been the beginning of your shift that day?

A. Yes.

Q. Now, I realize it is small on the screen that you are looking at, but on the top left where I am pointing do you see the main desk in the B 1 pod 3 area?

A. Yes.

Q. And do you see yourself standing behind that desk?

A. It looks like it is me.

Q. Okay. Let me ask you just to hit play. Let's watch for a couple of seconds, and I want you to see -- there is another person there, and I want you to watch that and then I will ask you a few questions after we watch what happens here.

As we are watching here can you see the other person who was with you at the desk?

Page 31

A. Can you rewind it?

Q. Just to be full disclosure here, what I want to confirm is whether this is Officer Slory, and the reason I want to confirm that is because my understanding is he worked the shift before you from 11 p.m. to 7 a.m. Okay. So let's play from there.

A. Yes.

Q. It looks like he is walking out of the unit after he finished his shift for the day; is that correct?

A. Yes.

Q. Okay. So let's -- actually let's keep playing. I just want to show you one part of when you arrive at Mr. Gleaves' cell, Ms. Jones, so if you watch, can you tell me the time now?

MS. GLATTSTEIN: 7:09:11.

BY MR. FEINBERG:

Q. So 7:09 and 11 seconds it looks like you are getting your things together behind that desk in order to start your count, does that sound right to you?

A. Yes.

Page 32

Q. Is that typically the first thing you do when you get on duty?

A. Yes.

Q. So we watch now at, I am going to turn this so we can see the time, at 7:09 and 36 seconds you are still getting your things together; is that correct?

A. Yes.

Q. At 7:10 you are walking out from behind the desk; is that correct?

A. Yes.

Q. Then you went behind the desk one more time; is that correct?

A. Yes.

Q. All right. Any idea what you were doing at that point?

A. Not sure. I was getting something for count, head count.

Q. Okay. Now, at 7:10:32 seconds you were walking down towards the cells; is that correct?

A. Yes.

Q. And we see you now on the top right walking towards cell 1; is that correct?

Page 33

A. Yes.

Q. Let's stop there. At 7:10 or I am sorry, 7:11 and 32 seconds did you see yourself kick the door of cell 1?

A. Yes.

Q. Okay.

A. To see if he would -- to see if Jonathan would move.

Q. Just to confirm what we saw right there was you walk to the window, it was obvious that there was something going on in the cell, and that is because he was naked; is that correct?

A. Yes.

Q. And your immediate reaction was to kick the door to see if he would move; is that correct?

A. Yes.

Q. Did he move?

A. No.

Q. Okay. Is that when Mr. Thomas then came to the cell window?

A. Yes.

Q. And that is when you had the interaction that you've already described to

Terrelle Jones

Page 34

me; is that correct?

A. Yes.

Q. We will keep the video up there for just one minute in case we need to go back. You obviously had a conversation with Officer Slory at the start of your shift; is that correct?

A. Yes.

Q. Is that typically what happens at the beginning of the shift, you get a report from the officer who is leaving their post?

A. Yes.

Q. What typically happens in those between shift conversations?

A. The officer will tell you the census, how many inmates are housed on the unit, if they have any problems on the shift, if locks are damaged on the cell doors, any problems in general that will be relevant to me having an issue.

Q. Okay. Did Officer Slory tell you anything about problems he had with Jonathan Gleaves?

A. No, he did not.

Page 35

Q. Did Officer Slory tell you anything about hearing from Mr. Thomas as Mr. Thomas explained to you?

A. No, he did not.

Q. When you got to the cell -- actually, I am sorry, before I get there. Did Officer Slory tell you when he had done his last tour?

A. I can't recall.

Q. Do you know what the usual practice is on his shift, the 11 p.m. to 7 a.m. shift?

A. That is where it should be done, right prior to the end of his shift.

Q. Okay. And we will get there in a little bit. My understanding is that tours are suppose to be done every half hour; is that correct?

A. Yes.

Q. Okay. So not just at the end of the shift, a half hour before that, a half hour before that and so on; is that correct?

A. Yes.

Q. So your expectation is that Officer Slory would have conducted the tour and seen Mr. Gleaves a few minutes before you did your

Page 36

tour; is that correct?

A. Yes.

Q. When you saw Mr. Gleaves in his bunk were you surprised that Officer Slory didn't mention it to you?

A. Yes.

Q. What was your reaction?

A. At that moment I didn't process the fact that Slory didn't tell me anything of the incident. I just knew I had to get him help.

Q. Okay. So your first reaction is let's get medical here; is that right?

A. Yes.

Q. Okay. Gila, you can take the video off the screen.

It sounds like from the way you just answered my question though that at some point you did start thinking to yourself, hey, what was Slory doing, am I understanding you correctly?

A. Yes.

Q. When did that come to you?

A. I am not sure but later on I did process it because I did 16 hours that day.

Page 37

For me to come in and see that at the beginning of my shift he should have seen it at the end of his shift.

Q. Did you ever discuss that with Officer Slory?

A. No, I did not.

Q. And when I say ever I am talking at any point from September 21st of 2018 through today, December 22nd of 2021, have you ever had a conversation with him?

A. No.

Q. To your recollection did any officers ever come to you, I am sorry, not officers, any supervisors, sergeants, lieutenants, whatever, come to you and say, ask you about what Officer Slory did on his shift?

A. I can't recall.

Q. Did you ever work with Officer Slory on the same shift?

A. No, I haven't.

Q. Okay. Am I correct then in assuming that any interactions you had with Officer Slory would have been him leaving his shift and you starting your shift?

10 (Pages 34 to 37)

Terrelle Jones

Page 38

A.    Yes.

Q.    Did you ever have any issues or arguments or problems with Officer Slory?

A.    No.

Q.    Did you ever have any concerns about his job performance?

A.    No, I never worked with him.

Q.    Okay.  Now, obviously you since September 21st of 2018 have developed some concern about his job performance, at least on that night; is that correct?

A.    Yes.

Q.    All right, let me just ask you some background questions, and I know we just jumped right into -- sorry, Linda, are you good to go?

COURT REPORTER:  I am okay.

MR. FEINBERG:  Yeah, okay.

BY MR. FEINBERG:

Q.    We jumped right into the facts of the case.  I want to back up now and ask more about you, just so I understand what your background was at that point.

When did you leave the Philadelphia Department of Prisons?

Page 39

A.    I went on maternity leave February of 2020.

Q.    And did you ever go back to work after your maternity leave?

A.    No, I didn't.

Q.    Okay.  What was the circumstances of you leaving, did you voluntarily leave your job, did you ask to leave?

A.    I voluntarily left.

Q.    When did you have to give notice that you were leaving?  Before you answer, let me help you with the timing.  So if you start your maternity leave February of 2020, how long of a leave did you have?

A.    Six months.

Q.    Okay.  So that would take you up to August of 2020?

A.    August I put in for an extension because my children weren't in school because of the pandemic, and after that I just decided I wasn't going to return.

Q.    So you left the job at some point -- well, before we get there, was the extension of your maternity leave granted?

Page 40

A.    No, it wasn't.

Q.    So at that point you decided to quit; is that right?

A.    Yes.

Q.    All right.  Is it a paid maternity leave by the way?

A.    No, it was unpaid.

Q.    So you worked -- so the last time you worked in the facility would have been February of 2020; is that correct?

A.    Yes.

Q.    When did you start working for the prisons?

A.    January 31, 2011.

Q.    All right.  So about eight -- no, nine years total?

A.    Yes.

Q.    What is your highest level of education?

A.    Some college.

Q.    When did you graduate from high school?

A.    2005.

Q.    What kind of jobs did you have, if any, between 2005 and when you started at the prison

Page 41

in 2011?

A.    Retail jobs.

Q.    Anything else in law enforcement?

A.    No.

Q.    Were you ever fired or terminated from any position?

A.    No.

Q.    We know from what we have seen about this case that you were on the 7 a.m. to 3 p.m. shift in September of 2018; is that correct?

A.    Yes.

Q.    How long had you been on that shift leading up to that time?

A.    I started in 2011, I want to say maybe two years or three.

Q.    So from 2015, and it is fine for you to estimate if you don't recall specifically, so two to three years on the 7 to 3 shift; is that correct?

A.    Yes.

Q.    What shift did you do before that time period?

A.    3 p.m. to 11 p.m.

Q.    Which facility?

11 (Pages 38 to 41)

Terrelle Jones

Page 42

A.   CFCF.

Q.   Were you in CFCF for the entire time at the prison?

A.   Yes.

Q.   So you started out at 3 to 11, and then shifted from 7 to 3 sometime in around 2015; is that correct?

A.   Yes.

Q.   And did you remain in that shift all the way through the start of your maternity leave in 2020?

A.   Yes.

Q.   When you were -- did you -- when you were on the day shift, the 7 to 3 shift, at CFCF were you always assigned to B 1 pod 3?

A.   Yes.

Q.   And we know you were a partner of Charlene Wilson; is that correct?

A.   Yes.

Q.   For how long were the two of you partners?

A.   Shortly after we came to 7 to 3 in 2015, maybe a couple months -- a couple months went past and then we became partners.

Page 43

Q.   Okay.  So you were partners for a good three years give or take before this incident happened; is that correct?

A.   Yes.

Q.   And I take it you had a good working relationship with Officer Wilson?

A.   Yes.

Q.   All right.  Officer Slory, we already established that you never worked with him but that he would hand off responsibilities to you at 7 a.m. when you started your shift; is that correct?

A.   Not every day.

Q.   Okay.

A.   He is on 3 to 11 so in order for him -- for me to relieve him he would have had to do overtime.

Q.   Right, okay, thank you, you reminded me, I knew that before.  His typical shift was 3 to 11, sometimes he would do overtime from 11 to 7 and then he would hand off to you; is that correct?

A.   Yes.

Q.   Can you estimate how many times that

Page 44

happened leading up to 2018?

A.   I can't remember.

Q.   To your knowledge when he was on the 3 to 11 shift was that also on B 1 pod 3?

A.   I don't remember him relieving me.

Q.   Okay, yeah, and to help you answer that question, it would be the case that if someone was on the 3 to 11 shift in that same pod you would be having a conversation with him at the end of your shift; is that correct?

A.   Yes.

Q.   Sounds like you can't recall with specificity about whether that happened with Officer Slory; is that correct?

A.   Yes.

Q.   Okay.  All right, let's talk a little more specifically about what you do on B 1 pod 3.  That is the quarantine unit; is that correct?

A.   Yes.

Q.   And you already mentioned to me that many people on that quarantine unit are just coming off the street, they may be withdrawing from whatever substance they are addicted to;

Page 45

is that correct?

A.   Yes.

Q.   So you are used to dealing with people who may have medical issues related to that withdrawal; is that correct?

A.   Yes.

Q.   So is it fair to say that because of that you are normally attuned to people's medical conditions?

A.   Yes.

Q.   Did you often have to seek medical for people that are housed on that unit?

A.   Yes.

Q.   Could you describe to me what a typical shift looks like on the 7 to 3 -- let me say that again.  What a typical day on the 7 to 3 shift looks like from the time you walk in until you finish your shift?

A.   When I first come in we do morning head count.  Once head count clears, which is usually around 8 a.m., usually a nurse will come up from medical, and they would see the inmates that are going through withdrawal.
So we would have to get the inmates up,

12 (Pages 42 to 45)

Terrelle Jones

Page 46

have them go to unit management to get their vitals checked by a nurse, sometimes inmates don't tell medical that they are going through withdrawal and we have to let them know by seeing signs of them vomiting and having fevers, chills, stuff like that.

Usually after vitals are done the breakfast comes, we set up the tables for the meal. They may sit at the table, they eat their meal.

After that another medical staff comes and checks their TB placement. After that medication, whoever is on the medication list, they will go to unit management to get their medication, until about 10:30 they are watching TV, they will go back to their cells, lay down. 10:30 we lock down the unit and we go to lunch, one officer at a time. 12:30 the unit is open back up, whoever wants to come out they can come out and they can go in the yard, watch TV. The second half of the day is usually their free time, nothing really going on.

Q.    Okay. You mentioned a while ago in response to some of my questions, this concept

Page 47

of tours. I think you confirmed for me that a correctional officer has a responsibility to tour the unit every 30 minutes; is that correct?

A.    Yes, yes.

Q.    Does that happen no matter whether the people on the block are out of their cells -- I will say that a different way. Do you have a responsibility to tour even when people have free time and can come out into the day room?

A.    Yes. We have to tour 30 minutes, no exception.

Q.    All right. And that tour means -- well, let me not put words in your mouth. Can you tell me what does it mean for you as an officer to conduct a tour on the unit?

A.    To look into the cell, to make sure if it is someone in there that they are responsive.

Q.    Okay. Can you define what that means to be responsive?

A.    Move a arm, usually like I did in the video, if I kicked the door, the inmate would know what it means and they will move -- they

Page 48

will shake their arm just to let me know they are okay.

Q.    Officer Wilson told me you essentially need proof of life from everyone; is that correct?

A.    Yes.

Q.    And that would mean shake an arm, shake a leg; is that correct?

A.    Yes.

Q.    If you don't get proof of life what do you do?

A.    I would open up the door.

Q.    Is it sometimes the case that people are just sleeping and they are sound asleep and they don't hear you?

A.    Yes.

Q.    Okay. And if that happens once you open the door you try to get their attention; is that correct?

A.    Yes. I may speak louder, usually they wake up if nothing is wrong.

Q.    Okay. If something is wrong what do you do?

A.    I would immediately call medical.

Page 49

Q.    Okay. So is it fair to say in all this that with every tour that you do, every half an hour during your shift your responsibility is to make sure that people on the unit are not having any kind of medical emergency that requires further attention?

A.    Yes.

Q.    And that is something that you are careful to do, you or your partner, every 30 minutes when you are working on the shift?

A.    Yes.

Q.    Since you and Officer Wilson were partners for a long time, did the two of you have a routine about who would do which tour, how you would take responsibility for that?

A.    We usually would alternate back and forth, sometimes one may want to walk more. It wasn't really a set routine.

Q.    Okay. So you would just communicate about it, say I will get this one, you get the next one, that kind of thing?

A.    Yes.

Q.    If it was the case that one of you was out sick or on vacation, would there typically

13 (Pages 46 to 49)

Terrelle Jones

Page 50

be a replacement so there would be two people on the block?

A.    Yes.

Q.    Is there ever a situation on that 7 to 3 shift where you would be working solo?

A.    There has been times.

Q.    Okay. When you are working solo do you still do the tours every 30 minutes?

A.    Yes.

Q.    I am assuming, and I want you to confirm for me that that is your most significant responsibility as an officer to do those tours; is that correct?

A.    Yes.

Q.    So if there is something else going on on the block no matter what, that is something that you are going to do; is that correct?

A.    Yes.

Q.    Do supervisors ever come around and check to make sure you are doing your tours?

A.    No.

Q.    Okay. Now, I know, in fact, let's take a look at your binder there, there is a black blinder here, you will see that there are --

Page 51

there are tabs. On the right side there is tab number 1, and behind that there is an exhibit marked as P-1. So turn that tab over, and do you see a print out of a log sheet here?

A.    Yes.

Q.    Can I assume that when you were back working at the prison you would see this log-on on a computer screen?

A.    Yes.

Q.    Okay. Does this look like what you would see for the housing log when you were working on the unit?

A.    Yes.

Q.    Do you record on the log every tour that you make?

A.    Yes.

Q.    In fact, if you flip over to -- let's look at the fourth page of that document. Yeah, keep going, two or three more.

       MR. GREGORY:  Jon, is there a Bates number of that --

       MR. FEINBERG:  Yeah, the Bates number is City 22.

       MR. GREGORY:  City 22?

Page 52

       MR. FEINBERG:  Yes.

BY MR. FEINBERG:

Q.    At the top right there do you see the name TE Jones?

A.    Yes.

Q.    Is that your log entry?

A.    Yes.

Q.    Okay. Can you tell me, you know, I am not talking about that specific log entry that I pointed to just now, I am just showing you that as an example. When you conduct a tour what is your practice in terms of how you record it on the log, when do you do it?

A.    It is logged into the computer that everything is fine once the tour is completed.

Q.    Okay. So you complete your tour of the entire unit, come down and sit at your computer and record it on the log; is that correct?

A.    Yes.

Q.    How long does a tour typically take?

A.    I am not sure exactly how long it should take, but if you are properly checking each cell it would take -- I don't even know how to put a time on it, but usually inmates

Page 53

are talking to you, it is not just walking around the tier and just coming to sit back down.

       COURT REPORTER:  Walking around the tier and what?

       THE WITNESS:  Just coming back to the desk. It is lengthy.

BY MR. FEINBERG:

Q.    Okay. Especially on the day shift between 7 a.m. and 3 p.m. people are awake and they are moving around and talking to you; is that correct?

A.    Yes.

Q.    Did you ever do or did you ever work overtime on the 11 p.m. to 7 a.m. shift?

A.    Yes.

Q.    Is there a difference between the tours on the overnight shift versus the day shift in terms of timing?

A.    Usually it is no inmates at the door talking to you, so that would speed it up as opposed to 7 to 3.

Q.    Okay.

A.    But other than that, you still have to

14 (Pages 50 to 53)

Terrelle Jones

Page 54

make sure the person is breathing.

Q.    Okay.  So the purpose of the tour is the same no matter the shift; is that correct?

A.    Yes.

Q.    But just as a function of 11 p.m. to 7 a.m. people tend to be asleep in their bunks, you are going to have less conversation; is that correct?

A.    Yes.

Q.    So for that reason those tours will take less time; is that correct?

A.    Yes.

Q.    Do you know, and I realize you haven't worked in the prison now for at least two years, but do you know there are any policies or directives which would outline your responsibilities to conduct the tour?

A.    Yes.

MR. AXE:  Objection, form.

BY MR. FEINBERG:

Q.    Okay.  That just means that she is objecting to the question that I asked, but you still can answer, which you already did.

So can you recall for me where this is

Page 55

outlined, what documents it is outlined in?

A.    At every desk there should be a binder with procedures in it.  They are called general orders.

Q.    Do you remember the name of the general order that would describe your responsibilities to conduct a tour?

A.    I can't recall.

Q.    Okay.  Is it fair to say that what you have been describing to me about your responsibilities to conduct a tour is something that you've understood from the day of your -- from your training back in 2011?

A.    Yes.

Q.    Obviously with regard to the log, is it accurate to say that you have to be truthful what you report on the log?

A.    Yes.

Q.    In other words, you can't say on the log that you did a tour when you, in fact, did not do a tour; is that correct?

A.    Yes.

Q.    Obviously that would be lying; is that right?

Page 56

A.    Yes.

Q.    And also the person has access as we just saw to video surveillance which shows whether you have done the tour or not; is that correct?

A.    Yes.

Q.    There has been some discussion and prior testimony in this case, including with Officer Wilson or Officer Jones about the alarm button or the call button in each cell.  Am I correct that each cell does have a button that people can press to get an officer's attention?

A.    Yes.

Q.    Okay.  In your time at the prison did you ever experience or learn that there were issues with those buttons working?

A.    Yes.  Some buttons wouldn't work in the cell.

Q.    Okay.  How was it that you came to learn about that?

A.    Just by doing tours the inmates would tell me, you know, I have been pushing the button and I would tell them, you know, it didn't go off at the console.

Page 57

Q.    Okay.  Is there -- to your knowledge is there any way that -- any responsibility that officers have to check to make sure the buttons are working in all of the cells?

A.    I don't think it is on the officer's -- I am not sure.

Q.    And I realize that I am testing your memory because we are going back almost two years, but do you recall anyone ever coming to the cell, anyone like from a maintenance department or anything to check on the call buttons in that unit?

A.    I can't recall.

Q.    Okay.  I want to show you just a couple of documents that we were talking about before.  First, if you turn to tab 4.  See tab 4 is on the right, if you flip that, behind that there is a let's see, a two page -- I am sorry, a three-page document, and for counsel's benefit this is Bates City 451 through City 453.  What I would like you to do, Officer Jones -- I am sorry, before I ask you to read it, does this document look familiar to you?

A.    Yes.

Page 58

Q.  Okay.  Let's do this, I want to ask you just to take a couple minutes, take as much time as you need, read it to yourself, and then let me know when you are finished and I will ask you a couple of questions about it, okay?
A.  Okay.
Q.  It is three pages, please read all three pages, and let me know when you are done?
A.  I am done.
Q.  All right.  So you finished reading this document, ma'am?
A.  Yes.
Q.  All right.  Is this a copy of the statement that you gave to Sergeant Marshall, the internal affairs investigator, on October 10th?
A.  Yes.
Q.  Did you see anything in this document that appeared to be inaccurate to you?
A.  No.
Q.  Okay.  Is it generally consistent with your recollection?
A.  Yes.
Q.  Okay.  Now, on the second page there is

Page 59

some discussion of your -- of your communications with Mr. Thomas, do you see that?
A.  Yes.
Q.  All right.  And it looks to me like you were just giving a brief summary of that conversation here in this interview; is that correct?
A.  Yes.
Q.  All right.  For instance, it does not mention what you told me before about Mr. Thomas having complained about trying to get the officer's attention; is that correct?
A.  Correct.
Q.  All right.  But let me show you one other thing and ask you if you have seen it before.  In fact, I will show you two things. First turn to tab 7.  Tab 7 is a memorandum from Lieutenant Medina on behalf of Tyrone Thomas, the Bates numbers are City 469 through 470.  I will ask you to read -- it is a page and a half so read that to yourself, ma'am?
A.  Okay.
Q.  You have reviewed this document, ma'am?

Page 60

A.  Yes.
Q.  First of all, do you have any idea why, this may be a shot in the dark but why Lieutenant Medina would write a memo on behalf of Tyrone Thomas?
A.  No.
Q.  Is Lieutenant Medina from internal affairs?
A.  The only one -- Lieutenant Medina I know is a female, and I've never worked with her that I can recall.
Q.  Okay.  One of the statements that is made in this memorandum, this is the middle of the first page, says, Inmate Thomas claims he hit the button to alert staff but no one came. Did you see that?
A.  Yes.
Q.  Is that consistent with what Mr. Thomas told you when you opened the cell door on the morning of October 21st?
A.  He didn't say anything about the button, but he did say he was trying to get someone's attention all night.
Q.  So same generally.

Page 61

A.  Yes.
Q.  He told you he was trying to get someone's attention, here he says the button basically communicates the same message; is that correct?
A.  Yes.
Q.  Okay.  Let's go -- one more document I am going to show you from Mr. Thomas, if you turn to tab 9.  I apologize, I gave you the wrong number, it is tab 10, and for your background, ma'am, this is a statement that Mr. Thomas gave to a Philadelphia police homicide detective after Mr. Gleaves died.  It is a long document.  I am going to show you just a portion of it.  For counsel's benefit it is Bates City 489 through 494.
If you turn to the fourth page, the bottom of it you will see the number, it is actually a little hard to see, you will look at the top you will see page 4 of 5.  You went one page too far?
A.  You said four?
Q.  Yeah, four, I am sorry.  You see that there are a series of questions and answers.

16 (Pages 58 to 61)

Terrelle Jones

Page 62

If you look down to the second question, the handwriting is a little tough to read so I am going to read it to you and ask you to read along. Do you see the question that says did you make any attempts to notify the guards prior to 6:00 a.m. Do you see that?

A. Yes.

Q. All right. Now, the answer that Mr. Thomas gave is, I pressed the button around 5:00 a.m. and it didn't beep so I don't know if it was working, then I told the guard at 6 a.m. when she was making a tour. Do you see that answer?

A. Yes.

Q. Now, we know 6 a.m. is probably wrong because you were there at 7 a.m., right?

A. Yes.

Q. But generally him pressing the button around 5:00 a.m. is that also consistent with what he told you that he was trying to get the guard's attention?

A. Yes.

Q. These two documents that I showed you from Mr. Thomas, have you ever seen them before

Page 63

I just showed them to you right now?

A. No.

Q. Okay. There is one other document that I neglected to show you, just to confirm things. Go all the way back to tab 5. This appears to be the memorandum that you prepared on September 21st of 2018; is that correct?

A. Yes.

Q. Okay. My only question was this looks like what you did then; is that correct?

A. Yes.

Q. All right. You see the name Lieutenant Albright is on there as the recipient?

A. Yes.

Q. Does that refresh your recollection about who may have asked you to prepare this memorandum?

A. She is the lieutenant in my building.

COURT REPORTER: Say it again.

THE WITNESS: She is the lieutenant for the building.

BY MR. FEINBERG:

Q. So Lieutenant Albright or someone on her behalf would have come to you and said

Page 64

please write a memorandum about what happened; is that correct?

A. Yes.

Q. Besides the two documents that I showed you from me, the memorandum and the statement that you gave to internal affairs, you don't recall preparing any other documents related to this incident?

A. No.

Q. Did you ever say anything -- are you on social media at all?

A. Yes, I am on social media.

Q. Did you post anything on social media about this experience or anything like that?

A. No.

Q. Did you ever send anyone a text about it or anything like that?

A. No.

Q. All right. Ms. Jones, at this point I don't have any further questions from you or for you. I will ask other counsel if they have questions.

MR. AXE: I actually just have a few questions, two or three, if you don't mind.

Page 65

MR. FEINBERG: Go ahead Bailey.

-----

EXAMINATION

-----

BY MS. AXE:

Q. Good morning officer, thank you for being here. Just a quick question about the alarm that Mr. Feinberg had asked you about. He asked you some hypothetical, rather general questions about the alarm in the cell, do you remember those questions?

A. Yes.

Q. Just to clarify, you didn't have that morning any information that the button was not working in that cell, did you?

A. No.

Q. No one told you that the button wasn't working?

A. No.

Q. And you didn't have any specific knowledge of maintenance relating to that button?

A. No.

Q. Okay. Thank you. And then one other

17 (Pages 62 to 65)

Terrelle Jones

Page 66

question I have, you were describing the day-to-day of your 7 to 3 shift, and you had mentioned at one point that medical staff would come, I believe it was either before or after breakfast; is that correct?

A.    As soon as count cleared.

Q.    Okay. Was medical staff -- did they come at any other point during that shift?

A.    I am not sure what you are asking.

Q.    Sorry. So medical staff came when it was cleared, on a typical day was there any other point in the day when they would also be there in that cell block?

A.    Oh, yes, everything still had to resume, the withdrawal protocol, vitals check, medication, everything still had to resume.

Q.    Okay. And that was -- you at some point mentioned you had worked other shifts, was medical staff on a typical shift there also at other points during those shifts?

A.    I've seen them do it, they do it, the withdrawal protocol they do it on every shift.

Q.    Okay, that is all the questions I have.

        MR. GREGORY:  No questions.

Page 67

        MR. FEINBERG:  I don't have any for you either so Ms. Jones that concludes your deposition.

        Since you don't have counsel let me advise you, you have the right, if you wish, to read the transcript of your deposition and make sure that it is recorded correctly.

        You wouldn't be able to change your testimony or anything, but if there are any errors in the transcript that you wanted to correct you are free to do that.  You also don't have to, but I want to mention that to you on the record.

        Would you like to read a copy of the deposition?

        THE WITNESS:  No.

        MR. FEINBERG:  Okay.  So we will note that the witness has waived reading and signing.

        And with that, that concludes the deposition, we will go off the record and you are free to go.

        COURT REPORTER:  Does everyone want a copy of the transcript?

Page 68

        MR. GREGORY:  Yes, please.
        MR. AXE:  Yes.
            -----
        (Witness excused.)
    (Deposition concluded at 11:15 a.m.)

Page 69

CERTIFICATION

        I, Linda A. Ricciardi, hereby certify that the foregoing is a true and accurate transcript of the deposition of Terrelle Jones, who was first sworn by me at the time, place and on the date herein before set forth.

        I further certify that I am neither attorney nor counsel for, not related to or employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_____
        Linda A. Ricciardi
Court Reporter and Notary Public

18 (Pages 66 to 69)

Terrelle Jones

Page 70

**A**

**a.m** 1:19 30:3 31:6 35:10 41:9 43:11 45:21 53:10,15 54:6 62:6,10 62:11,15,16,19 68:5
**able** 19:12 67:8
**access** 23:10 56:2
**accurate** 55:16 69:5
**action** 1:2 69:12 69:16
**addicted** 44:24
**Administrator** 1:3
**advise** 67:5
**advised** 28:8
**affairs** 25:20,22 27:16 58:15 60:8 64:6
**afternoon** 28:1
**agitated** 15:16 15:20 18:16 20:10,16
**ago** 4:18 7:13,16 7:22 8:4 46:23
**agreed** 4:1
**ahead** 65:1
**air** 21:18,24
**alarm** 56:9 65:8 65:10
**Albright** 27:5 63:13,23
**alert** 60:15
**allegations** 26:5
**alternate** 49:16
**angry** 18:21
**answer** 8:11,11 9:14 11:2,12 11:13 39:11 44:6 54:23 62:8,13
**answered** 36:17

**answers** 9:7,12 10:20 13:14 61:24
**anybody** 14:1 26:23 27:18
**apologize** 61:9
**appear** 6:1
**APPEARAN...** 2:1
**appeared** 58:19
**appearing** 29:20
**appears** 5:18 63:6
**Arch** 1:17 2:4,9
**area** 14:17,19 30:12
**arguments** 38:3
**arm** 47:22 48:1 48:7
**arrive** 31:15
**asked** 5:20 7:19 10:24 13:7,13 13:20 20:8 27:9,10,17 54:22 63:16 65:8,9
**asking** 27:18 66:9
**asleep** 48:14 54:6
**assigned** 42:15
**assistance** 20:8
**assume** 24:14 25:6 51:6
**assuming** 37:21 50:10
**attack** 20:11
**attempts** 62:5
**attention** 15:7 16:11,12 18:23 19:2,5,10 21:7 22:7 23:6,18 48:18 49:6 56:12 59:13 60:23 61:3 62:21
**attorney** 4:20

6:8,20 69:10 69:14
**attorneys** 10:10
**attuned** 45:8
**audio** 10:8
**August** 39:17,18
**automatically** 16:24
**available** 10:9
**awake** 53:10
**aware** 28:2
**Axe** 2:8 3:5 9:19 54:19 64:23 65:5 68:2

**B**

**B** 14:18 30:12 42:15 44:4,17
**back** 12:9 14:11 15:20 16:10 24:1,23 28:20 34:4 38:20 39:3 46:16,19 49:16 51:6 53:2,6 55:13 57:8 63:5
**background** 38:14,21 61:11
**Bailey** 2:8 65:1
**bailey.axe@p...** 2:10
**banging** 19:6
**bare** 17:12
**based** 5:16
**basically** 17:8 61:4
**Bates** 51:20,22 57:20 59:20 61:16
**bed** 15:15 17:18
**beep** 62:10
**beginning** 11:19 29:13 30:6 34:10 37:1
**behalf** 1:15 59:19 60:4 63:24

**believe** 7:15 27:9 66:4
**benefit** 57:19 61:15
**binder** 50:23 55:2
**bit** 26:17 35:14
**black** 50:23
**blinder** 50:24
**block** 25:2,7 47:7 50:2,16 66:13
**body** 15:13 16:22
**born** 7:14
**bottom** 16:6 61:18
**Boulevard** 2:14
**BRADLEY** 1:8
**Bravo** 14:18 22:16
**break** 11:9,10 11:12
**breakfast** 46:8 66:5
**breathing** 54:1
**brief** 59:6
**Broad** 1:22
**brought** 5:4,15
**building** 2:3 63:18,21
**bunk** 15:8 36:3
**bunks** 54:6
**button** 56:10,10 56:11,23 60:15 60:22 61:3 62:9,18 65:14 65:17,22
**buttons** 56:16 56:17 57:3,12

**C**

**call** 48:24 56:10 57:11
**called** 16:11,12 20:7 22:9 23:1 24:4 55:3

**calling** 22:13
**camera** 9:18 10:6
**careful** 49:9
**case** 5:15,19 7:7 7:8 9:21 10:10 10:12 11:18 12:19 34:4 38:20 41:9 44:7 48:13 49:23 56:8 69:15
**Cast** 2:3
**caught** 15:6,14
**caused** 5:13 19:9
**cell** 5:1 15:1,15 15:17,19,20,24 16:14 17:19 18:2,9,14 19:13 20:10,20 21:5 23:4,9 31:15 32:24 33:4,11,21 34:18 35:5 47:17 52:23 56:10,11,18 57:10 60:19 65:10,15 66:13
**cells** 32:20 46:16 47:7 57:4
**census** 34:15
**Center** 2:14
**certification** 4:4 69:1
**Certified** 1:20
**certify** 69:4,9
**CFCF** 42:1,2,15
**change** 67:8
**chaotic** 25:5
**charged** 7:11
**Charlene** 12:19 13:1,16 14:10 22:18 25:21 42:18
**check** 6:5 50:20 57:3,11 66:15
**checked** 18:24

Terrelle Jones

46:2
checking 52:22
checks 46:12
children 4:22
39:19
chills 46:6
Christopher
12:21 13:22
chronology
22:22
circumstances
11:21 39:6
City 1:6 2:7,12
5:5 6:12,16
51:23,24 57:20
57:20 59:20
61:16
CIVIL 1:2
claims 5:10,15
60:14
clarify 65:13
clear 17:4
cleared 66:6,11
clearly 17:3
clears 45:20
client 5:9
clothing 16:22
17:8
college 40:20
come 5:20 15:10
22:18 25:18
26:9,24 27:13
28:20 36:22
37:1,13,15
45:19,22 46:19
46:20 47:10
50:19 52:17
63:24 66:4,8
comes 21:5 46:8
46:11
comfortable
6:19
coming 27:18
44:23 53:2,6
57:9
commencing
1:18

communicate
49:19
communicates
61:4
communicatio...
59:2
complained
18:21 59:12
complains 21:6
complete 11:16
52:16
completed 52:15
completely
17:17
Compliance
26:3
computer 51:8
52:14,17
concept 7:21
46:24
concern 19:23
38:10
concerned 20:15
20:17
concerns 18:9
38:5
concluded 68:5
concludes 67:2
67:20
condition 19:9
conditions 45:9
conduct 47:16
52:11 54:17
55:7,11
conducted 35:23
confirm 19:16
31:3,4 33:9
50:11 63:4
confirmed 6:4
47:1
considered
14:11
consistent 58:21
60:18 62:19
consists 9:6
console 56:24
contact 13:1

15:10
context 15:9
continue 21:9
25:14,16
conversation
8:22 9:2 14:9
34:5 37:10
44:9 54:7 59:7
conversations
34:14
copy 26:15
58:13 67:14,24
Corizon 1:7
2:17 5:7
Corizon's 5:7
correct 6:2,13
6:17 10:17,21
14:19,21 16:8
16:13 17:9,14
18:11,17 19:20
20:3,13,17
21:2,7,11 22:7
22:10 23:19
24:17 25:8
26:7 27:14
29:10 30:3
31:11 32:7,10
32:13,21,24
33:12,16 34:1
34:7 35:16,20
36:1 37:21
38:11 40:10
41:10,19 42:7
42:18 43:3,12
43:22 44:10,14
44:19 45:1,5
47:4 48:5,8,19
50:13,17 52:18
53:12 54:3,8
54:11 55:21
56:5,11 59:8
59:13,14 61:5
63:7,10 64:2
66:5 67:11
correction 26:6
correctional 5:6
12:16 24:15

47:2
correctly 36:20
67:7
counsel 2:6,11
2:17 4:2 9:19
64:21 67:4
69:10,14
counsel's 57:19
61:15
count 15:12,13
31:22 32:18,18
45:20,20 66:6
couple 9:16 12:4
12:15 23:16
30:18 42:23,23
57:14 58:2,5
court 1:1,20,22
7:2 8:4 38:16
53:4 63:19
67:23 69:24
CPR 24:20
create 23:12
crime 7:11
criminal 7:8
Curran-Corre...
5:2

_____
          D
_____
D 3:1
damaged 34:18
dark 60:3
date 1:18 26:13
69:7
day 14:8 26:10
26:11,23 27:24
30:7 31:10
36:24 42:14
43:13 45:16
46:21 47:10
53:9,18 55:12
66:11,12
day-to-day 66:2
dealing 45:3
death 5:13 11:22
deceased 28:12
December 1:12
37:9

decided 39:20
40:2
defendant 2:11
2:17 5:14
defendants 1:9
5:10
define 47:20
deliberately
5:11
department 2:8
5:3 6:17 38:24
57:11
deposition 1:14
4:5 5:21 6:9,20
6:24 9:6,22
10:6 12:1,24
13:4,23 67:3,6
67:15,21 68:5
69:5,12
describe 16:4
18:19 19:8
21:15 45:14
55:6
described 21:22
24:2 33:24
describing
55:10 66:1
DESCRIPTI...
3:9
desk 30:12,15
30:24 31:22
32:10,12 53:7
55:2
despite 6:15
17:6
details 12:2 13:5
13:9 24:6
detective 61:13
developed 38:9
died 4:24 27:24
29:1 61:13
difference 53:17
different 27:21
27:23 47:8
difficult 20:2
directives 54:16
disagree 16:7

disclosed 10:11
disclosure 31:2
discuss 37:4
discussing 28:13
discussion 29:15
   56:7 59:1
DISTRICT 1:1
   1:1
document 51:18
   57:19,23 58:11
   58:18 59:24
   61:7,14 63:3
documents 5:16
   12:5,10 15:23
   18:15 55:1
   57:15 62:23
   64:4,7
doing 15:11 18:1
   24:10,13 32:16
   36:19 50:20
   56:21
domestic 7:7
DON(s) 1:9
door 15:19 19:6
   20:9 21:5 33:4
   33:15 47:23
   48:12,18 53:20
   60:19
doors 34:18
duly 4:10
duty 32:2

_____ E _____

E 3:1
earlier 11:3
EASTERN 1:1
easy 23:10
eat 46:9
education 40:19
eight 40:15
Eileen 1:2 4:21
either 13:17
   66:4 67:2
ELIZABETH
   1:7
emergency
   22:13 24:17

49:5
employed 69:11
   69:14
employee 6:12
   69:13
employment
   6:15
enforcement
   41:3
entire 42:2
   52:17
entry 52:6,9
errors 67:10
Especially 53:9
ESQUIRE 2:2,8
   2:13
essentially 48:3
established 43:9
ESTATE 1:3
estimate 41:17
   43:24
events 24:2
exact 24:6
exactly 19:11
   24:12 52:21
EXAMINATI...
   4:13 65:3
examined 4:10
example 26:24
   52:11
exception 47:12
excused 68:4
exhibit 3:9 51:2
expectation 18:7
   35:22
experience
   56:15 64:14
explain 23:7
explained 5:23
   35:3
exposed 16:24
extension 39:18
   39:23
eye 15:14

_____ F _____

face 16:5

facility 5:2 40:9
   41:24
fact 16:7,13 36:9
   50:22 51:17
   55:20 59:17
facts 38:19
fair 16:17 24:22
   45:7 49:1 55:9
familiar 7:21
   11:22 16:1,2
   57:23
family 28:22
far 12:17 20:19
   22:23 23:15
   24:14 61:21
February 39:1
   39:13 40:9
fee 6:6
Feinberg 1:16
   2:2,2 3:4 4:15
   4:20 29:12,17
   30:5 31:19
   38:17,18 51:22
   52:1,2 53:8
   54:20 63:22
   65:1,8 67:1,17
female 60:10
fevers 46:6
fights 29:4
filing 4:4
financially
   69:15
find 7:20 14:21
fine 28:19 41:16
   52:15
finish 9:4,13
   45:18
finished 9:23
   31:10 58:4,10
fired 41:5
first 4:10 8:3,3
   11:18 12:18
   14:18 15:6,18
   16:10 29:21
   32:1 36:11
   45:19 57:16
   59:18 60:2,14

69:6
flip 51:17 57:17
foam 21:14,19
foaming 19:14
   19:15 20:21
   21:10,23
folks 9:17
followed 9:6
follows 4:11
footage 5:17
foregoing 69:4
form 4:6 54:19
formal 12:7
   26:14
formally 8:6
former 6:12,15
forth 49:17 69:8
found 5:1 13:6
four 29:22 61:22
   61:23
fourth 51:18
   61:17
frame 24:5
free 46:22 47:10
   67:11,22
front 29:21
full 11:16 31:2
function 54:5
further 49:6
   64:20 69:9,13

_____ G _____

Gail 29:12
gasping 21:18
   21:24
GAYE 1:8
general 34:19
   55:3,5 65:9
generally 58:21
   60:24 62:18
Gerald 1:7 5:6
getting 31:21
   32:6,17
Gila 2:3 36:14
give 7:23 8:9,11
   8:22 11:11,13
   11:15 13:5,6,9

22:15 26:14,20
   39:10 43:2
given 7:22 11:3
   18:15 20:1
giving 59:6
GLATTSTEIN
   2:3 30:4 31:18
Gleaves 1:4 4:23
   4:24 11:20
   14:7,11,22
   15:6 16:11,12
   16:22 20:21
   21:1,7,10,23
   24:11 25:6
   27:23 29:1
   34:23 35:24
   36:3 61:13
Gleaves' 5:12
   19:9 28:22
   31:15
go 16:10 20:20
   20:24 24:1
   25:10 28:19
   29:14 34:4
   38:15 39:3
   46:1,14,16,17
   46:20 56:24
   61:7 63:5 65:1
   67:21,22
going 8:9,24
   10:10 11:7
   12:5 17:22
   18:8,14 19:12
   21:13 29:18
   32:4 33:11
   39:21 45:23
   46:3,22 50:15
   50:17 51:19
   54:7 57:8 61:8
   61:14 62:3
good 4:16,17
   38:15 43:1,5
   65:6
graduate 40:21
grandmother
   4:22 13:7
granted 39:24

Terrelle Jones

**Gregory** 2:13 9:19 51:20,24 66:24 68:1
**guard** 62:11
**guard's** 18:23 19:2,5 62:21
**guards** 62:5

**H**

**H** 2:2
**Hahnemann** 28:1
**half** 35:15,19,19 46:21 49:2 59:22
**hand** 43:10,21
**handed** 6:5
**handle** 24:17
**handwriting** 62:2
**happen** 47:6
**happened** 12:2 14:8,12 15:18 20:5 25:19 26:18 27:1,14 27:19 43:3 44:1,13 64:1
**happening** 30:3
**happens** 8:23 24:5 30:22 34:9,13 48:17
**hard** 61:19
**head** 8:17 19:16 32:18 45:19,20
**Health** 1:7 2:17
**hear** 8:12 9:23 48:15
**heard** 14:6 28:24
**hearing** 35:2
**held** 29:15
**help** 15:21 29:5 36:10 39:12 44:6
**hes** 19:3
**hey** 36:18
**high** 40:21

**highest** 40:18
**hit** 30:17 60:15
**homicide** 61:12
**hospital** 28:1,12
**hospitals** 27:24
**hour** 35:15,19 35:19 49:3
**hours** 4:24 36:24
**housed** 18:2 34:16 45:12
**housing** 14:17 14:19 17:22 51:11
**hypothetical** 65:9

**I**

**idea** 32:15 60:2
**immediate** 33:14
**immediately** 16:18 48:24
**inaccurate** 58:19
**incident** 15:5 26:18 36:10 43:2 64:8
**inclined** 9:1
**including** 56:8
**incomplete** 11:4
**incorrect** 11:4
**indifferent** 5:11
**information** 5:19 27:2,22 65:14
**informed** 28:3
**inmate** 47:23 60:14
**inmates** 17:2,21 34:16 45:23,24 46:2 52:24 53:20 56:21
**instance** 59:10
**instruction** 8:21
**instructions** 7:23 8:10

**interaction** 33:24
**interactions** 22:18 37:22
**interested** 69:15
**internal** 25:20 25:22 27:16 58:15 60:7 64:6
**interrupt** 9:1,11
**interrupting** 9:8
**interview** 12:8 59:7
**introduced** 4:18 8:4
**investigates** 26:5
**investigation** 26:4
**investigator** 58:15
**involved** 9:19,20
**involving** 13:11
**Iron** 2:3
**issue** 22:6 34:20
**issues** 38:2 45:4 56:16

**J**

**J** 2:13
**jail** 26:11
**January** 40:14
**jfeinberg@krl...** 2:5
**JFK** 2:14
**job** 24:14,23 38:6,10 39:8 39:22
**jobs** 40:23 41:2
**John** 1:9 4:19
**join** 22:19
**Jon** 51:20
**Jonathan** 1:3 2:2 4:22 13:8 14:6 18:22 19:14 23:5,11 23:17 33:8

34:22
**Jones** 1:14 3:3 4:9,16 12:21 13:22 20:6 27:13 31:16 52:4 56:9 57:21 64:19 67:2 69:6
**Jr** 1:4 4:23
**jump** 17:12
**jumped** 38:14 38:19
**jumpsuit** 17:24
**jumpsuits** 17:1

**K**

**Kairys** 1:16 2:2
**KAPLAN** 1:21
**Katrina** 28:5
**keep** 13:1 31:13 34:3 51:19
**kick** 33:4,14
**kicked** 47:23
**KIMBALL** 2:13
**kind** 40:23 49:5 49:21
**knew** 16:24 17:11 36:10 43:19
**know** 5:21 9:18 10:24 11:4,9 16:3 19:12,18 20:9 24:7 26:12 28:8 35:9 38:14 41:8 42:17 46:4 47:24 48:1 50:22 52:8,23 54:13 54:15 56:22,23 58:4,8 60:10 62:10,15
**knowledge** 44:3 57:1 65:21

**L**

**LALITHA** 1:8

**law** 1:15 2:8 6:17 41:3
**lawsuit** 5:4,9
**lay** 46:16
**laying** 15:8 17:18
**leading** 12:24 41:13 44:1
**LEAMAN** 1:21
**learn** 56:15,20
**leave** 38:23 39:1 39:4,7,8,13,14 39:24 40:6 42:11
**leaving** 34:11 37:23 39:7,11
**left** 30:1,11 39:9 39:22
**leg** 48:8
**legs** 16:23 17:12
**lengthy** 53:7
**let's** 14:14 16:10 24:1 29:14 30:18 31:7,13 31:13 33:2 36:11 44:16 50:22 51:17 57:18 58:1 61:7
**level** 40:18
**lieutenant** 27:5 59:19 60:4,7,9 63:12,18,20,23
**lieutenants** 37:14
**life** 48:4,10
**Lin** 1:17
**Linda** 1:19 8:3 38:15 69:3,23
**line** 16:6
**list** 46:13
**little** 12:6 26:16 35:14 44:16 61:19 62:2
**LLP** 1:17 2:13
**locating** 14:24
**lock** 46:17

locks 34:17
log 51:4,11,14
  52:6,9,13,18
  55:15,17,20
log-on 51:7
logged 52:14
long 7:13,22
  11:8 13:21
  39:13 41:12
  42:20 49:13
  52:20,21 61:13
look 21:1,9
  26:16 29:24
  47:17 50:23
  51:10,18 57:23
  61:19 62:1
looked 12:9
  21:15
looking 30:2,10
looks 26:17
  30:16 31:9,20
  45:15,17 59:5
  63:9
lot 21:17
loud 8:11
louder 48:20
lunch 46:17
lying 55:23

_____

**M**

M-I-L-E-S 28:6
ma'am 58:11
  59:22,24 61:11
main 30:11
maintenance
  57:10 65:21
making 8:5 10:7
  62:12
man 16:15
management
  46:1,14
maneuver 17:4
marked 3:9,10
  51:3
Marshall 58:14
mate 15:15,17
  15:19,20 18:14

20:10
mate's 15:24
maternity 39:1
  39:4,13,24
  40:5 42:10
matter 47:6
  50:16 54:3
MATU 1:8
McNAMARA
  1:2 4:21,21 5:4
  5:9
meal 46:9,10
mean 8:15 14:9
  18:19 47:15
  48:7
means 7:24
  10:19 47:13,20
  47:24 54:21
meant 17:13
media 64:11,12
  64:13
medical 5:8,12
  13:11 19:19
  20:7 22:6,6,9
  22:13 23:2,6
  23:10 24:4,7
  24:10,15,16,17
  24:23 25:2,10
  36:12 45:4,9
  45:11,22 46:3
  46:11 48:24
  49:5 66:3,7,10
  66:19
medication
  46:13,13,15
  66:16
Medina 59:19
  60:4,7,9
memo 60:4
memorandum
  12:8 27:4,10
  27:17 59:18
  60:13 63:6,17
  64:1,5
memory 14:15
  57:8
mention 36:5

59:11 67:12
mentioned
  10:15 11:18
  13:16,18 14:2
  44:21 46:23
  66:3,18
message 61:4
Messing 1:16
  2:2
middle 60:13
Miles 28:5,6,8
mind 12:3 64:24
minute 34:4
minutes 35:24
  47:3,11 49:10
  50:8 58:2
misconduct 26:6
moment 4:18
  36:8
months 12:23
  39:15 42:23,23
morning 4:16,17
  15:11,12 45:19
  60:20 65:6,14
mouth 19:14,15
  20:21 21:11,24
  47:14
move 33:8,15,18
  47:22,24
moving 15:13
  53:11

_____

**N**

N 3:1
naked 15:8,14
  16:13 17:18
  18:8 21:1,23
  33:12
name 4:19 5:6
  11:21 12:17
  14:5,6 15:24
  16:1,5 52:4
  55:5 63:12
named 4:20 5:11
names 19:3
need 11:9,10
  34:4 48:4 58:3

needed 22:15
  23:6,8
needs 5:12 22:6
neglected 63:4
neither 69:10
never 38:7 43:9
  60:10
night 15:21
  18:22 19:7
  23:19 38:11
  60:23
nine 29:2 40:15
nod 8:16
nodded 19:15
normal 8:22
normally 45:8
Notary 69:24
note 67:18
notice 39:10
noticed 10:5
  15:18 20:20
  22:3
notify 62:5
number 51:2,21
  51:23 61:10,18
numbers 59:20
nurse 45:21 46:2

_____

**O**

O'CONNOR
  2:13
oath 7:3,22,24
  10:15,16
objecting 54:22
Objection 54:19
objections 4:5
observe 24:9
obstruction 17:7
obvious 16:18
  21:19 33:10
obviously 19:18
  34:5 38:8
  55:15,23
October 26:17
  26:19 58:15
  60:20
odd 16:15 17:16

office 26:1,13
officer 5:6 12:18
  12:19,20 22:18
  24:3,15 26:24
  27:13 28:14
  29:18 31:3
  34:5,11,15,21
  35:1,6,22 36:4
  37:4,15,18,22
  38:3 43:6,8
  44:14 46:18
  47:2,16 48:3
  49:12 50:12
  56:9,9 57:21
  65:6
officer's 19:10
  56:12 57:5
  59:13
officers 12:16
  14:16 26:7
  37:12,13 57:3
Offices 1:16
Oh 66:14
okay 6:19 7:5
  8:1,2,19 9:14
  12:4 13:12,20
  15:3,9 16:17
  16:21 18:13
  19:15,18,22
  20:5 21:13,19
  21:22 22:5,17
  23:3,7,12,14
  24:1,9 25:4,17
  25:22 26:4,9
  26:12,15 27:12
  28:13,18,21
  29:24 30:17
  31:6,13 32:19
  33:6,20 34:21
  35:13,18 36:11
  36:14 37:21
  38:8,16,17
  39:6,16 43:1
  43:14,18 44:6
  44:16 46:23
  47:20 48:2,17
  48:22 49:1,19

50:7,22 51:10 52:8,16 53:9 53:23 54:2,21 55:9 56:14,19 57:1,14 58:1,5 58:6,21,24 59:23 60:12 61:7 63:3,9 65:24 66:7,17 66:23 67:17
**oldest** 7:14
**once** 9:22 23:5 45:20 48:17 52:15
**OPC** 25:24 26:2
**open** 20:9 46:18 48:12,18
**opened** 60:19
**opportunity** 9:13
**opposed** 9:7 53:22
**order** 20:24 31:22 43:15 55:6
**orders** 55:4
**outline** 54:16
**outlined** 55:1,1
**overnight** 53:18
**overtime** 43:17 43:20 53:15

**P**

**P-1** 51:3
**p.m** 31:6 35:10 41:9,23,23 53:10,15 54:5
**page** 3:2 51:18 57:18 58:24 59:21 60:14 61:17,20,21
**pages** 58:7,8
**paid** 40:5
**pandemic** 39:20
**Paralegal** 2:3
**pardon** 14:5
**part** 31:14

**participating** 9:17 10:1
**parties** 4:2 9:20 69:11
**partner** 42:17 49:9
**partners** 13:2 42:21,24 43:1 49:13
**pending** 11:11
**Penn** 2:14
**Pennsylvania** 1:1,11,18,23 2:4,9,15
**people** 5:10 14:2 24:16,16 25:2 44:22 45:3,12 47:7,9 48:13 49:4 50:1 53:10 54:6 56:12
**people's** 45:8
**performance** 38:6,10
**performing** 24:20
**period** 41:22
**person** 6:4 16:7 17:20 18:3 30:19,24 54:1 56:2
**Philadelphia** 1:6 1:11,17,23 2:4 2:7,9,12,15 5:3 5:5 6:12,16 38:23 61:12
**phrase** 10:15
**physically** 15:13
**place** 69:7
**placement** 46:12
**Plaintiff** 1:4,15 2:6
**play** 30:17 31:7
**playing** 31:14
**Plaza** 2:14
**please** 8:10 58:7 64:1 68:1

**pod** 14:18 22:16 22:24 23:1 30:12 42:15 44:4,8,17
**point** 9:22 10:4 11:8 22:17 23:3 24:4,22 25:6,17 27:12 28:20 32:16 36:17 37:8 38:22 39:22 40:2 64:19 66:3,8,12,18
**pointed** 52:10
**pointing** 30:11
**points** 9:17 66:20
**police** 61:12
**policies** 54:15
**portion** 61:15
**position** 41:6
**possession** 12:13
**post** 34:11 64:13
**practice** 35:9 52:12
**predict** 8:23
**prepare** 11:24 63:16
**prepared** 12:5 63:6
**preparing** 64:7
**press** 56:12
**pressed** 62:9
**pressing** 62:18
**print** 51:4
**prior** 35:12 56:8 62:6
**prison** 5:18 12:7 25:24 26:5 29:3 40:24 42:3 51:7 54:14 56:14
**prisons** 5:3 38:24 40:13
**privacy** 18:4,9
**probably** 62:15
**problems** 34:17

34:18,22 38:3
**procedures** 55:3
**proceeding** 6:2 6:19 7:3 8:1
**proceedings** 7:5
**process** 36:8,24
**produced** 9:5
**professional** 19:19 26:1
**proof** 48:4,10
**properly** 52:22
**protocol** 66:15 66:22
**provide** 27:1
**providers** 5:8
**Public** 69:24
**pull** 29:12
**pulling** 23:4
**purpose** 18:4 54:2
**purposes** 6:9 10:12
**pushing** 56:22
**put** 16:5 39:18 47:14 52:24

**Q**

**quantify** 21:14
**quarantine** 44:18,22
**question** 4:6 7:20 8:24 9:4 10:23 11:11,12 13:21 17:16 36:17 44:7 54:22 62:1,4 63:9 65:7 66:1
**questioning** 11:19
**questions** 9:6,21 13:13 25:18 30:21 38:14 46:24 58:5 61:24 64:20,22 64:24 65:10,11 66:23,24
**quick** 65:7

**quit** 40:2

**R**

**reacting** 20:2
**reaction** 33:14 36:7,11
**read** 57:22 58:3 58:7 59:21,22 62:2,3,3 67:6 67:14
**reading** 4:3 58:10 67:18
**realize** 11:2 30:9 54:13 57:7
**really** 13:9,10 46:22 49:18
**reason** 5:20 7:19 8:9 9:10 11:15 16:6 31:4 54:10
**recall** 4:23 22:23 23:3 35:8 37:17 41:17 44:12 54:24 55:8 57:9,13 60:11 64:7
**received** 15:23 28:11
**recipient** 63:13
**recollection** 37:12 58:22 63:15
**record** 4:19 8:7 29:14,16 30:1 51:14 52:13,18 67:13,21
**recorded** 8:13 8:19 67:7
**recording** 10:8,9
**refamiliarize** 12:1
**refer** 18:14 22:12
**referring** 20:12
**refrain** 18:1
**refresh** 63:15
**regard** 55:15

Terrelle Jones

Page 76

related 45:4
64:7 69:10
relating 65:21
relationship
43:6
relative 69:13
relevant 5:19
14:17 34:19
relieve 43:16
relieving 44:5
remain 42:9
remember
14:24 15:5
23:22,24 24:6
24:12 25:1
26:2 27:6,18
28:13,18,19
44:2,5 55:5
65:11
remind 21:4
reminded 43:18
replace 19:3
replacement
50:1
report 34:10
55:17
reporter 1:20
8:5 38:16 53:4
63:19 67:23
69:24
REPORTERS
1:22
represent 11:20
represented 6:8
6:16
representing
6:21
requires 49:6
reserved 4:7
resist 9:3
respective 4:2
responded 24:7
24:8 25:2
response 46:24
responsibilities
43:10 54:17
55:6,11

responsibility
24:19 47:2,9
49:3,15 50:12
57:2
responsive
47:19,21
result 5:13
resume 66:15,16
Retail 41:2
return 39:21
review 20:24
reviewed 59:24
rewind 31:1
Ricciardi 1:19
69:3,23
right 6:23 7:19
8:21 9:10,16
10:5,7 15:1
16:18 17:2
18:5,13 21:20
22:5 25:1
26:20 31:23
32:15,23 33:9
35:11 36:12
38:13,15,19
40:3,5,15 43:8
43:18 44:16
47:13 51:1
52:3 55:24
57:17 58:10,13
59:5,10,15
62:8,16 63:1
63:12 64:19
67:5
room 10:1 23:12
47:10
routine 49:14,18
rude 9:1
Rudovsky 1:16
2:2
rule 26:6

———————
S
———————
S-L-O-R-Y 5:7
safety 20:17
saw 15:10 16:18
19:13 23:5

33:9 36:3 56:3
says 60:14 61:3
62:4
school 39:19
40:21
screen 29:21
30:10 36:15
51:8
screens 29:22
sealing 4:3
second 8:21 10:4
12:19 29:14
46:21 58:24
62:1
seconds 30:18
31:20 32:6,19
33:3
see 15:13 16:23
17:3,17 19:13
20:3 21:1,17
29:4,22 30:11
30:14,19,23
32:5,23 33:3,7
33:7,15 37:1
45:22 50:24
51:4,7,11 52:3
57:16,18 58:18
59:2 60:16
61:18,19,20,23
62:4,6,12
63:12
seeing 46:5
seek 45:11
seen 5:17,18
20:22 29:3
35:23 37:2
41:8 59:16
62:24 66:21
send 64:16
separate 28:16
September 4:24
26:18 29:20
37:8 38:9
41:10 63:7
Sergeant 28:5,8
58:14
sergeants 37:14

series 61:24
serious 5:12
set 46:8 49:18
69:8
shake 8:16 48:1
48:7,7
sheet 51:4
shift 25:14,16
29:13 30:7
31:5,10 34:6
34:10,14,17
35:10,10,12,19
37:2,3,16,19
37:23,24 41:10
41:12,18,21
42:9,14,14
43:11,19 44:4
44:8,10 45:15
45:17,18 49:3
49:10 50:5
53:9,15,18,18
54:3 66:2,8,19
66:22
shifted 42:6
shifts 66:18,20
short 8:4
Shortly 42:22
shot 60:3
show 12:6 27:6
29:19 30:2
31:14 57:14
59:15,17 61:8
61:14 63:4
showed 62:23
63:1 64:4
showing 52:10
shows 27:22
56:3
sick 18:22 23:17
49:24
side 51:1
significant
50:12
signing 4:3
67:19
signs 46:5
sit 46:9 52:17

53:2
situation 50:4
Six 39:15
sleeping 48:14
Slory 1:7 5:7
12:18 13:20,22
31:4 34:6,21
35:1,7,23 36:4
36:9,19 37:5
37:16,18,23
38:3 43:8
44:14
small 29:22 30:9
social 64:11,12
64:13
soil 17:23
solo 50:5,7
someone's 60:23
61:3
soon 66:6
sorry 23:14 33:3
35:6 37:13
38:15 57:18,22
61:23 66:10
sound 11:22
16:1 17:16
26:20 31:23
48:14
sounds 16:2
36:16 44:12
South 1:22 2:4
speak 13:3 26:9
26:23 28:21
48:20
specific 52:9
65:20
specifically
14:14 41:17
44:17
specificity 44:13
specifics 13:15
speed 53:21
spoke 25:20
spoken 12:22
13:17,22 14:1
stabbings 29:3
staff 46:11 60:15

Terrelle Jones

Page 77

66:3,7,10,19
stand 24:9
standing 30:14
stands 26:2
start 13:21 15:4
  31:22 34:6
  36:18 39:12
  40:12 42:10
started 10:5
  40:24 41:14
  42:5 43:11
starting 37:24
statement 12:8
  26:14,16 58:14
  61:11 64:5
statements
  60:12
STATES 1:1
stay 25:13,15
stipulated 4:1
stood 19:22
  24:23
stop 9:12 33:2
stopped 24:3
street 1:17,22
  2:4,9 44:23
stretcher 20:7
  22:15 23:1
  25:7
stuff 46:6
subpoena 6:5
  13:7
subpoenaed 6:1
substance 44:24
sued 5:14 12:18
suggest 15:24
suit 17:12
Suite 1:22 2:4
  2:14
summary 59:6
supervising
  26:24
supervisor 24:7
  28:3,4
supervisors
  37:14 50:19
suppose 35:15

sure 8:10 28:10
  28:16,17 32:17
  36:23 47:17
  49:4 50:20
  52:21 54:1
  57:3,6 66:9
  67:7
surprised 36:4
surveillance
  29:19 56:3
swearing 10:20
sweaty 17:23
sworn 4:10 69:6

———— T ————

tab 51:1,3 57:16
  57:16 59:18,18
  61:9,10 63:5
table 46:9
tables 46:8
tabs 51:1
take 9:13 11:12
  17:24 20:1
  26:20 36:14
  39:16 43:2,5
  49:15 50:22
  52:20,22,23
  54:11 58:2,2
taken 1:15 12:16
  25:7 26:13
  27:23 69:12
talk 14:14 44:16
talking 9:12
  16:8 25:23
  37:7 52:9 53:1
  53:11,21 57:15
TB 46:12
TE 52:4
tell 9:12 13:12
  13:15 16:21
  17:6,7 19:4,11
  20:19,23 21:10
  22:21 23:21
  31:16 34:15,21
  35:1,7 36:9
  46:3 47:15
  52:8 56:22,23

temptation 9:4
tend 54:6
terminated 41:5
terms 52:12
  53:19
Terrelle 1:14
  3:3 4:9 69:6
terribly 11:8
testified 4:11
  6:23 7:2,6
testify 7:24,24
testifying 7:10
  7:21 10:16
testimony 9:24
  10:8 11:3,16
  12:17 14:3
  56:8 67:9
testing 57:7
text 64:16
tgregory@okl...
  2:16
thank 43:18
  65:6,24
thing 23:23 32:1
  49:21 59:16
things 8:3 21:22
  23:16,22 31:21
  32:6 59:17
  63:5
think 11:7 24:2
  26:15 28:15,16
  28:24 47:1
  57:5
thinking 36:18
third 12:20
Thomas 2:13
  16:1,3 18:13
  18:15,16 19:3
  19:8 20:13,14
  20:16 21:5
  23:4,8,14,16
  23:21 33:20
  35:2,2 59:2,12
  59:20 60:5,14
  60:18 61:8,12
  62:9,24
three 12:22

21:22,24 26:19
  29:8 41:15,18
  43:2 51:19
  58:7,8 64:24
three-page
  57:19
tier 53:2,5
time 3:10 4:7
  7:22 8:4,23
  12:23 14:6,10
  24:4 28:10,16
  28:16 31:17
  32:5,13 40:8
  41:13,21 42:2
  45:17 46:18,22
  47:10 49:13
  52:24 54:11
  56:14 58:3
  69:7
timeline 24:1
times 43:24 50:6
timing 39:12
  53:19
tissue 20:6
today 5:21 6:20
  11:16 14:3
  28:20 37:9
told 11:20 15:19
  21:4 22:5
  23:15,16 28:11
  28:15,17 48:3
  59:11 60:19
  61:2 62:11,20
  65:17
top 15:8 30:1,10
  32:23 52:3
  61:20
total 40:16
tough 62:2
tour 35:7,23
  36:1 47:3,9,11
  47:13,16 49:2
  49:14 51:14
  52:11,15,16,20
  54:2,17 55:7
  55:11,20,21
  56:4 62:12

tours 35:14 47:1
  50:8,13,20
  53:17 54:10
  56:21
trained 19:19
training 55:13
transcript 8:5
  8:13,19 9:5
  67:6,10,24
  69:5
trial 4:7
tried 18:23 19:1
  19:5
TRIVIKRAM
  1:8
true 10:21 69:4
truthful 55:16
try 9:3 19:9
  48:18
trying 13:6
  15:21 23:18
  59:12 60:22
  61:2 62:20
turn 32:4 51:3
  57:16 59:18
  61:9,17
turned 10:6
TV 46:16,20
two 2:14 8:10
  9:7,17 13:17
  14:16 21:23
  23:17,22 27:23
  41:15,18 42:20
  49:13 50:1
  51:19 54:14
  57:8,18 59:17
  62:23 64:4,24
type 7:5
typical 43:19
  45:14,16 66:11
  66:19
typically 32:1
  34:9,13 49:24
  52:20
Tyrone 15:24
  59:19 60:5

Terrelle Jones

Page 78

**U**

**uh-huh** 8:17
**uncommon** 17:24
**understand** 5:22 8:7,18 10:12 10:16,19,23 14:17 38:21
**understanding** 6:11 14:15 31:5 35:14 36:19
**understood** 8:13 9:8 10:2 11:13 55:12
**undressed** 16:15
**unfortunate** 29:2
**uniform** 17:11
**unit** 17:22 22:9 22:15 24:10 25:13,15 29:19 31:10 34:16 44:18,22 45:12 46:1,14,17,18 47:3,16 49:4 51:12 52:17 57:12
**UNITED** 1:1
**unpaid** 40:7
**unresponsive** 5:1 14:22
**unusual** 17:17 17:19,21
**upset** 20:16
**upsetting** 29:6,9
**usual** 35:9
**usually** 18:1 27:10 45:21,21 46:7,21 47:22 48:20 49:16 52:24 53:20

**V**

**v** 1:5
**vacation** 49:24
**verbal** 8:11,11

**versus** 53:18
**video** 1:14 5:17 10:6,7 29:13 29:19 30:2 34:3 36:14 47:23 56:3
**view** 17:5,7
**violations** 26:6
**violence** 7:7
**visible** 17:5
**vitals** 46:2,7 66:15
**voluntarily** 39:7 39:9
**vomiting** 46:5

**W**

**waist** 17:8
**waived** 4:5 67:18
**wake** 48:21
**walk** 15:4 33:10 45:17 49:17
**walkie-talkie** 22:14
**walking** 31:9 32:9,20,24 53:1,4
**want** 8:15 9:12 20:9,10 30:18 30:20 31:3,4 31:14 38:20 41:14 49:17 50:10 57:14 58:1 67:12,23
**wanted** 26:12 67:10
**wants** 46:19
**wasn't** 13:10,10 39:21 40:1 49:18 65:17
**watch** 30:18,20 30:21 31:16 32:4 46:20
**watching** 30:23 46:15
**way** 8:12 15:23

19:4 20:1 27:22 30:1 36:16 40:6 42:10 47:8 57:2 63:5
**we've** 12:16
**wear** 17:1
**wearing** 17:13
**weeks** 26:19
**went** 4:19 32:12 39:1 42:24 61:20
**weren't** 39:19
**Wilson** 12:19 13:1,3,16 14:10 22:18 24:3 25:21 28:14 42:18 43:6 48:3 49:12 56:9
**window** 17:2,2 20:22,24 21:10 33:10,21
**wish** 67:5
**withdrawal** 17:22 45:5,23 46:4 66:15,22
**withdrawing** 44:23
**witness** 3:2 6:6 12:20,21 53:6 63:20 67:16,18 68:4
**witnesses** 13:17
**WOLFE** 1:21
**woman** 4:20
**word** 8:18 28:11
**words** 18:7 47:14 55:19
**work** 24:10 37:18 39:3 53:14 56:17
**worked** 31:5 38:7 40:8,9 43:9 54:14 60:10 66:18
**working** 12:7

14:16 40:12 43:5 49:10 50:5,7 51:7,12 56:16 57:4 62:11 65:15,18
**works** 9:3
**wouldn't** 56:17 67:8
**write** 27:7,8,9 27:11,14,17 60:4 64:1
**wrong** 48:21,22 61:10 62:15
**wrote** 27:5,10

**X**

**X** 3:1

**Y**

**yard** 46:20
**yeah** 38:17 44:6 51:19,22 61:23
**years** 7:16 13:2 29:3,8 40:16 41:15,18 43:2 54:15 57:9
**YouTube** 10:11

**Z**

**Zoom** 9:18

**0**

**1**

**1** 14:18 22:16 30:12 32:24 33:4 42:15 44:4,17 51:2
**1-877-559-3376** 1:24
**10** 61:10
**10:00** 1:19
**10:30** 46:15,17
**10th** 26:17,19 58:16
**11** 31:6,20 35:10 41:23 42:5 43:15,20,20

44:4,8 53:15 54:5
**11:15** 68:5
**1100** 2:14
**12:30** 46:18
**13** 7:16
**1303** 1:22
**1500** 2:14
**1515** 2:9
**16** 36:24
**19102** 1:23 2:9 2:15
**19106** 2:4

**2**

**2:20-CV-0457...** 1:3
**2005** 40:22,24
**2008** 7:14,15
**2011** 40:14 41:1 41:14 55:13
**2015** 41:16 42:6 42:23
**2018** 4:24 26:18 29:20 37:8 38:9 41:10 44:1 63:7
**2020** 39:2,13,17 40:10 42:11
**2021** 1:12 37:9
**21** 4:24 26:18 29:20
**215-564-0400** 2:15
**215-683-5000** 2:10
**215-925-4400** 2:5
**21st** 37:8 38:9 60:20 63:7
**22** 1:12 51:23,24
**22nd** 37:9
**230** 1:22

**3**

**3** 14:18 22:16 30:12 41:9,18

Terrelle Jones

41:23 42:5,6
42:14,15,22
43:15,20 44:3
44:4,8,18
45:15,16 50:5
53:10,22 66:2
**30** 47:3,11 49:9
50:8
**31** 40:14
**32** 33:3
**36** 32:5

---

**4**

**4** 3:4 57:16,16
61:20
**451** 57:20
**453** 57:20
**469** 59:20
**470** 59:21
**489** 61:16
**494** 61:16

---

**5**

**5** 61:20 63:5
**5:00** 62:10,19
**501** 2:4

---

**6**

**6** 62:11,15
**6:00** 62:6
**69** 3:5

---

**7**

**7** 31:6 35:10
41:9,18 42:6
42:14,22 43:11
43:21 45:15,16
50:4 53:10,15
53:22 54:5
59:18,18 62:16
66:2
**7:08** 30:3,6
**7:09** 31:20 32:5
**7:09:11** 31:18
**7:10** 32:9 33:2
**7:10:32** 32:19
**7:11** 33:3

**718** 1:17 2:4

---

**8**

**8** 45:21

---

**9**

**9** 61:9