# EXHIBIT R

Christopher Jones

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EILEEN A. McNAMARA, as  :
Administrator of the     :
ESTATE OF JONATHAN       :
GLEAVES, JR.,            :
        Plaintiff  :
                         :
    vs.         : NO. 2:20-cv-04570-RBS
                         :
CITY OF PHILADELPHIA,    :
CORIZON HEALTH, GERALD   :
SLORY, ELIZABETH        :
BRADLEY, LALITHA         :
TRIVIKRAM, MATU GAYE,    :
JOHN DOE (s),           :
        Defendants  :
_____


ZOOM DEPOSITION OF CHRISTOPHER JONES

DATE AND TIME:  Tuesday, September 28, 2021
            at 10:15 a.m.


_____


KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112  1-877-KLW-DEPO
www.klwreporters.com

## Page 2

APPEARANCES:

KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN, LLP
By:  Jonathan H. Feinberg, Esquire
Cast Iron Building, Suite 501 South
718 Arch Street
Philadelphia, PA  19106
    Representing the Plaintiff


Anne B. Taylor, Esquire
Chief Deputy City Solicitor
1515 Arch Street
14th Floor
Philadelphia, PA  19102
    Representing the City of Philadelphia Defendants

O'CONNOR KIMBALL, LLP
By:  Thomas J. Gregory, Esquire
Two Penn Center Plaza
15th and JFK Blvd.
Suite 1100
Philadelphia, PA  19102

    Representing Corizon Health Defendants


ALSO PRESENT:

Gila Glattstein


_____

STIPULATION:  It has been stipulated by and between
counsel that they waive the reading, signing and sealing
of the transcribed testimony by the witness and the
filing of the original with the Court, and all
objections, except as to form, until the time of trial.

## Page 3

INDEX

WITNESS          EXAMINED BY          PAGE

Christopher Jones    Mr. Feinberg          4
                 Ms. Taylor          54

EXHIBITS


EXHIBITS USED IN DEPOSITION

NUMBER          DESCRIPTION
P-6      Christopher Jones Statement      44
P-7      Tyrone Thomas Statement       50
P-9      Christopher Jones Memorandum    43
P-10     Tyrone Thomas Police Statement    52
P-11     Gerald Slory Statement        --

## Page 4

PROCEEDINGS

CHRISTOPHER JONES

was called as a witness and, having been first duly sworn by the Reporter-Notary Public through Zoom, was examined and testified as follows:

BY MR. FEINBERG:

    Q.   Mr. Jones, you can put your hand down there, sir.

    A.   (Witness complies.)

    Q.   First things first, are you still employed with the Philadelphia Department of Prisons?

    A.   Yes, sir.

    Q.   So I'll refer to you as Officer Jones. And as I just mentioned to you a moment ago, before we went on the record, my name is Jon Feinberg.  I'm the attorney for Eileen McNamara.  Ms. McNamara is the grandmother of the children of Jonathan Gleaves, Jr., and she's been appointed by the Court to serve as the Administrator for Mr. Gleaves' Estate, which means that she has the authority to bring legal action related to Mr. Gleaves' death.

        As you are likely aware, Mr. Gleaves died on September 21st of 2018, a few hours after he was found unresponsive in his cell at the Curran-Fromhold Correctional Facility in the Philadelphia Department of

1 (Pages 1 to 4)

Christopher Jones

Page 5

Prisons.

Ms. McNamara has brought a lawsuit against the City of Philadelphia, a Correctional Officer by the name of Gerald Slory and some Corizon medical providers. And in the lawsuit Ms. McNamara claims that the Defendants who've been sued were deliberately indifferent to Mr. Gleaves' serious medical needs and, as a result, caused his death.

You are not named as a Defendant in this case, so no one has brought a lawsuit against you in this particular case. But based on the documents we've seen and also some video surveillance footage, it appears that you may have relevant information about the case. For that reason, we've asked you to come here today to testify in a deposition about what you know.

Do you understand all that, sir?

A. Yes, sir.

Q. You're represented, for purposes of this deposition, by Counsel for the City; that's Anne Taylor, who's seated to your left. Have you had an opportunity to speak with Ms. Taylor about your testimony today?

A. Yes, sir.

Q. Do you need any more time to speak with Ms. Taylor before we begin?

A. No, sir.

Page 6

Q. Have you ever testified in a deposition before?

A. No, sir.

Q. Have you ever testified in court before?

A. Yes, sir.

Q. How many times have you testified in court?

A. Numerous times. I've been in the prison system for almost 20 years, so I've been to court several times.

Q. And were those criminal matters that arose out of issues that popped up in the prison?

A. Yeah, yes, sir, but sometimes there have been issues where I've just been a witness. Other times I've had to actually just go and basically sit and wait for my turn to be called. Sometimes I've gone as like an extra witness but not -- not needed, just like a standby or whatever.

Q. Mr. Jones, the reason I asked you all those questions is to make sure that you're aware of what it means to testify under oath. And let me note that even though today in this deposition we're not in front of a Judge or a jury, the oath that you took at the beginning of this deposition is the same as if you were testifying in court. Do you understand all that, sir?

Page 7

A. Yes, sir.

Q. Let me give you two instructions. These may be obvious to you, but it's worth noting. First, because we're making a transcript of today's proceedings -- Lori, our Court Reporter, is preparing the transcript -- I'll ask you to keep your voice up and make sure that you give verbal answers to all of the questions that I ask. Understood?

A. Yes, sir.

Q. Secondly, and relatedly because we're making a transcript and because Lori can't hear two people talking at the same time, I'll ask you to try to do your best to wait until I complete my question before you start your answer even if it's obvious what the question is going to be. So please try to be conscious about that. Understood, sir?

A. Yes, sir.

Q. By the same token, I'm going to do my best not to interrupt your answer by starting another question. And if I do that, if I interrupt you, I want you to tell me so that we make sure that you have the opportunity to finish your answer. Is that acceptable to you, sir?

A. Absolutely.

Q. So, obviously, we're conducting this

Page 8

deposition by Zoom. We have all dealt with, over the past year and a half, there is technical issues with Zoom. If you have trouble hearing us or seeing us if the connection goes out, please just make sure that you let us know so we make sure that we have an appropriate record of today's proceedings. Understood?

A. Yes, sir.

Q. Also, one other point about Zoom. As you may have heard me mention right as we began, we are recording this Zoom so there'll be a video and audio recording. That recording will be used only for purposes of this case. Understood?

A. Yes, sir.

Q. And just to confirm, so you understand that you are testifying under oath. Is that correct?

A. Yes, sir.

Q. If you don't understand a question that I've asked at any point, will you let me know that?

A. Yes, sir.

Q. If you realize that an answer that you gave earlier in the deposition was not correct or complete, will you let me know that, as well?

A. Yes, sir.

Q. I don't think we're going to be here all that long today, but if we get to a point where you need

2 (Pages 5 to 8)

Christopher Jones

Page 9

a break to use the restroom, stand up, stretch your legs, just let me know that, with the one qualification being that if there's a question pending at the time, you'll have to answer that question before we take the break. Understood?

A. Yes, sir.

Q. Is there any reason why you cannot give full and complete testimony today?

A. No, sir.

Q. I want to ask you about the preparation that you did for today's deposition, and I assume that you met with Ms. Taylor. I'm not going to ask you about what you discussed, but I would like to know whether you reviewed any documents or other materials. Can you tell me?

A. Yes. I believe my memos, the information that I -- that I had furnished for the -- excuse me -- for the prison system after the time of the incident.

Q. We'll look at these a little bit later. I have seen a memorandum that you wrote within -- either on the same day or, perhaps, the next day after the incident with Mr. Gleaves. Is that what you're referring to, sir?

A. Yes, sir.

Page 10

Q. There also was, I believe, a statement that you gave to Internal Affairs maybe a couple of months after the incident. Did you review that, as well?

A. Yes, sir.

Q. Was there anything else besides those two documents that I just described?

A. No, sir.

Q. Did you review any of the video surveillance footage from the time at which Mr. Gleaves was found in his cell?

A. No, sir.

Q. Did you speak to any other employees or former employees of the Philadelphia Department of Prisons at any time over the past three or four months about this case?

A. No, sir.

Q. And just by way of example, we took the testimony of Officer Charlene Wilson back on June 30th. Have you spoken with Officer Wilson about this case since June 30th?

A. I haven't spoken to her, no.

Q. There's two other witnesses who we know were present at or near the time that you were there. One is Officer Terrelle Jones. Have you spoken with Officer Terrelle Jones about this case?

Page 11

A. No, sir.

Q. How about Officer Gerald Slory?

A. No, sir.

Q. And I asked you broadly before, but whether you've spoken to anyone, I take it that that's your answer; right? You haven't spoken to anybody about this deposition before coming in today. Is that correct?

A. That's correct.

Q. Sir, my understanding is that you responded to the housing area where Mr. Gleaves was found at B-1, Pod 3, when Mr. Gleaves was found unresponsive, and that you went into his cell. Is that correct?

A. Yes, sir.

Q. Do you remember -- sitting here today, do you remember walking into the cell and seeing Mr. Gleaves?

A. I don't remember all the details, but I do remember assisting Mr. Gleaves.

Q. Well, let's do this because I want to try to differentiate between what's in the documents and what you recall. Can you tell me -- and let's start with this. What first brought your attention to Mr. Gleaves? In other words, why did you go to his cell?

A. Officers Washington and Jones -- I mean Wilson and Jones called for my assistance. There was

Page 12

another inmate in the cell that was -- that I guess alerted them that Mr. Gleaves wasn't responsive or acting -- acting right. I can't remember the other inmate's name, but he was -- he was hostile with -- with the -- with my co-workers, so that's why they called me, to remove him from the cell so I could assist Mr. Gleaves.

Q. What happened when you got there?

A. Like I said, the one inmate was standing in the doorway and he was unruly, so I removed him from the cell. And if I'm not mistaken, when I went in, Mr. Gleaves was laying on his back on the top bunk. He had like a frothy, white substance coming from his mouth and his nose.

He was still breathing, so I couldn't do CPR. So I was thinking I'll put him in the recovery position while Medical was alerted, and I just stayed with him until Medical got there.

When Medical got there, I had to actually assist the nurses in getting him off the top bunk and putting him onto the stretcher.

Q. Do you remember anything else about Mr. Gleaves' appearance besides the foam -- foamy substance that you described, coming from his mouth and nose?

A. His eyes were rolling.

3 (Pages 9 to 12)

Christopher Jones

Page 13

Q. I'm sorry, I didn't hear that. Could you say that again, sir?

A. His eyes were rolling, like rolling.

(Court Reporter clarification.)

Yes, ma'am.

Q. So it sounds like what you're describing is his eyes were not focused and appeared to be moving in different directions. Is that correct?

A. Absolutely.

Q. I believe Officer Wilson described Mr. Gleaves as being completely naked on his bunk. Do you remember that, as well?

A. Yes. I covered him with a sheet before I assisted him out of his cell.

Q. Do you remember --

A. And --

Q. I'm sorry, I interrupted you. Go ahead.

A. He had like an orange jumpsuit, but it was rolled down, like past his crotch.

Q. And is that --

A. It was --

(Court Reporter clarification.)

Yes, ma'am.

It was -- he was hard to move, to like pull the jumper up over his privates, so I just covered

Page 14

him with the sheet. And while he was covered with the sheet, once the nurses came, that's when I assisted them in taking him off the top bunk and putting him onto the stretcher.

Q. So is the jumpsuit the type that you would -- if you were putting it on, you would put your legs through the -- in and then wrap it up around the back of your body?

A. Yes, sir.

Q. And what you're describing is it sounds like he had removed it from the top of his body and rolled down the pant legs so they were somewhere below his crotch. Is that correct?

A. Yes, sir.

Q. Did Mr. Gleaves speak to you?

A. No, sir.

Q. Now -- and when I ask you these questions, I know that you are not -- or I'm assuming that you're not a trained medical provider. Did you get -- just based on your experience, did you have the impression that he was able to understand you when you were speaking to him?

A. No, sir.

Q. And by the way, I actually made an assumption. Did you say anything to him?

Page 15

A. Yes, I did ask him could I help him, and I did ask him to say his name.

Q. And he did not respond. Is that correct?

A. That's correct.

Q. Where were -- were Officer Wilson and Officer Jones present while this was all happening?

A. Yes, sir, but they were, I guess, standing behind me with the other inmate.

Q. And by the way, the records we have show that the other inmate had the name Tyrone Thomas. Does that name sound familiar to you?

A. No, sir. I really don't remember much about the other inmate. More focus was on Mr. Gleaves.

Q. Was anybody else in the cell with you besides Mr. Gleaves?

A. I don't remember.

Q. Was it immediately apparent to you, when you walked in, that Mr. Gleaves was having a medical emergency?

A. No, sir.

Q. When did it become apparent to you?

A. As I approached him, once I got closer to him and seen that he had this substance coming from his mouth and nose, it appeared that he definitely needed some type of help.

Page 16

Q. Got it. Okay. Is the fact -- are there prison rules about whether a prisoner may sleep naked?

A. No, sir.

Q. Okay. If you were walking by his cell and looked in and saw someone, you know, naked, with their clothes down around their knees, is that something that would cause your -- that would attract your attention?

A. Unfortunately not. Again, I've been in the prison system -- my anniversary's in a couple months -- for 20 years, and I've worked with males and females, juvenile male and females, and sometimes to get attention some of them have been naked. Also, to be disrespectful to the opposite gender officer, they've also stood in their cells naked to be a distraction for count or whatever.

(Court Reporter clarification.)

To be a distraction for count.

Q. If you walk by a cell and see someone naked, do you tell the person to put their clothing on?

A. Yes, sir.

Q. And that's really what I was getting at when I asked if it would attract your attention. It's not like you would just walk by the cell and just let that go and say, okay, well, there's another guy who's

4 (Pages 13 to 16)

Christopher Jones

Page 17

naked. You would stop and do something about that. Is that correct?

A. Yes, sir.

Q. Do you remember anything about what Mr. -- and I know -- I've identified him as Mr. Thomas. You said you don't know his name. Why don't we refer to him as the other inmate who was removed from the cell. Okay?

A. Okay.

Q. Do you remember anything about what he said during this time period?

A. He just said that he knew Mr. Gleaves, that he sold drugs to Mr. Gleaves or that he -- he knew him. And he was more, I guess, interested in what was going on with my co-workers as far as giving him help.

Q. You mean -- when you say he, are you referring to the other inmate?

A. Yes, the other inmate was -- I guess he was trying to get their attention, but he wouldn't allow them to give Mr. Gleaves any help without someone else being present.

Q. Well, let me summarize my understanding of what Officer Wilson testified to about her encounters with this other inmate. She told me two things. I'm just going to represent this to you, and I'll ask if either of these things sound familiar.

Page 18

She recalled that this other inmate had wanted the previous officer to take Mr. Gleaves out of his cell, but the previous officer did not do that. Do you remember hearing anything about that?

A. No, sir.

MS. TAYLOR: Form.

(Court Reporter clarification.)

Just objection to form, but you can go ahead.

BY MR. FEINBERG:

Q. Officer Wilson also reported that this other inmate had said that he hit the button, meaning the call button in the cell, and no one responded. Do you remember hearing anything about that?

MS. TAYLOR: Objection. You can answer.

THE WITNESS: No, sir.

BY MR. FEINBERG:

Q. Now, is it fair to say that, to your understanding, there was a period of time where Mr. -- where this other inmate was having a conversation with Officer Wilson and Officer Terrelle Jones before you arrived?

A. Yes, sir.

Q. Did -- when you arrived, do you remember, did you have any conversation with either Wilson or Jones

Page 19

where they said to you something to the effect of this other inmate keeps saying this or he says that? Did anything like that happen?

A. Yes, sir, that he was hostile with them and that he wouldn't allow them to help until some more people came.

Q. Officer Wilson also told me that because she observed that Mr. Gleaves was naked, she did not feel comfortable going into the cell to assess his medical condition. Do you remember hearing her or anyone else say that?

MS. TAYLOR: Objection.

THE WITNESS: No, sir.

BY MR. FEINBERG:

Q. What I'm getting at with that question is in response to your recollection that the other inmate prevented someone from going into the cell, did you ever hear anything to the contrary, that it was the officers who decided not to go in?

A. No, sir.

Q. If another inmate says to an officer, I don't want you coming into the cell, does the officer have the authority to go into the cell?

A. Yes, sir.

Q. You mentioned that you assisted the

Page 20

Medical responders by putting Mr. Gleaves onto a stretcher. Is that correct?

A. Yes, sir.

Q. Were you involved in anything related to his care after that, for example, CPR or any medical monitoring?

A. No, sir.

Q. Was Mr. Gleaves then taken to the Medical Unit from that point?

A. Yes, sir.

Q. Did you have any further contact with Mr. Gleaves after he was removed from the block?

A. No, sir.

Q. Did you learn later that day that Mr. Gleaves had died while in the hospital?

A. I didn't find out till the next day 'cause I was -- I believe I was off.

Q. What was your normal shift at that time period?

A. 7:00 to 3:00.

Q. So you were -- rather than making a suggestion, let me ask you. What do you remember about the circumstances of you hearing about Mr. Gleaves' death?

A. I was told that he was airlifted.

5 (Pages 17 to 20)

Page 21

That's one of the -- one thing I do remember, that he was airlifted. I don't know from which hospital to which, but he was -- he was airlifted. And then while I was off, the next day I was called to come in to give my memo as to what I did to assist the nurses.

Q. Did you have any discussions with any of the officers who accompanied Mr. Gleaves to the hospital?

A. No, sir.

Q. Other than that memorandum that you prepared and the interview that was completed later, did you ever create any formal -- any other written statement?

A. No, sir.

Q. Did you ever make any notes or write anything in a personal diary or anything like that?

A. No, sir.

Q. Did you ever post anything on social media about what happened with Mr. Gleaves?

A. No, sir.

Q. Let me ask you some background questions, sir. We started the deposition confirming that you are still employed as a Correctional Officer. Is that correct?

A. Yes, sir.

Q. How long have you been employed as a

Page 22

Correctional Officer in the Philadelphia Department of Prisons?

A. 19 years.

Q. So you started in 2002?

A. No, I started November 26, 2001.

Q. Got it. Okay. About to hit your 20th anniversary. Is that correct?

A. Yes, sir.

Q. Have you had any breaks of employment where you left the Department of Prisons and went somewhere else, other than normal vacation leave?

A. No, sir.

Q. What's your highest level of education?

A. High school.

Q. When did you graduate from high school?

A. '93.

Q. What kind of work did you do before you started working for the Philadelphia Department of Prisons?

A. I worked for UPS, and before that I served in the U.S. Army.

Q. How long were you in the U.S. Army?

A. Five years.

Q. Did you receive an honorable discharge?

A. Yes, sir.

Page 23

Q. Were you ever fired from any job or asked to leave any job?

A. No, sir.

Q. So you were working the 7:00 to 3:00 shift back in 2018. Are you still on the 7:00 to 3:00 shift?

A. Yes, sir.

Q. When did you start on the 7:00 to 3:00 shift?

A. I don't remember exactly.

Q. So I know there are a number of different facilities -- are you still thinking, sir?

A. Yes, sir.

Q. All right. And you can give me an estimate. It's -- I don't mean --

A. 2006.

Q. So for the better part of your -- of your career in the Philadelphia Department of Prisons, you've been working as -- on the 7:00 to 3:00 shift. Is that correct?

A. Yes, sir.

Q. Have you ever applied for a promotion above the rank of Correctional Officer?

A. I've taken the test.

Q. When was the last time you took the test?

Page 24

A. 2017.

Q. How many of the different facilities on State Road have you worked at?

A. Five.

Q. Which sounds like all of them. Is that right?

A. Almost.

Q. So you were at CFCF back in 2018. Are you still there?

A. No, sir.

Q. When did -- where are you now?

A. The Detention Center.

Q. When did you move from CFCF to the -- let me try that again. When did you move from the -- from CFCF to the Detention Center?

A. 2019.

Q. And how long had you been at CFCF before that move?

A. 12 years.

Q. So it sounds like from roughly 2007 through 2019 you were at CFCF on the 7:00 to 3:00 shift. Is that correct?

A. Yes, sir.

Q. Now, I'm aware that when you show up as an officer at CFCF at the beginning of your shift, there

Christopher Jones

Page 25

are a number of different assignments that you can be given for the day.

What was your assignment on September 21st of 2018 when you had occasion to have this encounter with Mr. Gleaves?

A. I was assigned to B Building, just B-1, as the rover. Sometimes it's called an escort, which is, I guess, semantics, but it's the same job. I had been working in B Building for about three years. And B --

Q. What was --

A. -- Building is the intake.

(Court Reporter clarification.)

Yes, ma'am.

B-1 is intake. It's quarantine. So from the receiving room from -- for intake to B-1 for quarantine.

Q. What was your -- did you have a typical assignment where you tended to work that more than other -- other assignments?

A. Yes, sir.

Q. And what was that?

A. Majority of the time was assisting the inmates brand-new to the facility from the intake process, which is in the receiving room, to quarantine,

Page 26

which is all in B-1.

Q. And is that the rover position that you're describing, or is rover something else?

A. Yes, sir.

Q. So the B-1 rover was typically where you -- your work assignment for your shift. Is that correct?

A. Yes, sir.

Q. And what your duties consisted of were escorting people from the intake facility to their housing areas in the B Building. Is that correct?

A. Yes, sir.

Q. What other responsibilities did you have besides that main responsibility?

A. Medication and, also, at that time we also had withdrawal protocol. So if the nurse comes, and she has a list of inmates that may have had opioid or drug abuse history, those inmates had to be escorted from their cells, if they didn't want to be seen, to make sure they're seen by the nurse to assess them before they're allowed to go back to their cell.

Q. Bear with me for just a moment there, Officer. Sir, in that job that you tended to do back in September of 2018, did you ever have responsibility for conducting a tour in a housing area?

A. Yes, sir.

Page 27

Q. And would that be part of your responsibility as to B-1 rover? Would you -- would you be tasked with giving -- with making a tour?

A. Yes, sir, to assist all of the housing areas. There's four separate housing areas. And depending on how many rovers or escorts are available, we are supposed to at least periodically check on the officers in each housing area.

Q. So I want to make sure we're talking about the same thing. When I talk about a tour, and I've questioned Officer Wilson about this at length, my understanding from Officer Wilson is that tours would have to happen at a regular interval, which we'll discuss in just a second, where Officer Wilson would go around and look in every cell on the unit and then record her findings on a -- on a computerized log. Is that what you're talking about when you use the phrase tour?

A. No, sir. Housing officers would make those tours every half an hour as time permitted. As a rover, there's four separate housing units. It's not possible for me to make a tour on every housing unit every half an hour.

Q. So when you describe yourself conducting a tour, what that means is you're going into each unit to ask whether those officers need anything from you, any

Page 28

assistance. Is that -- is that correct?

A. Yes, sir.

Q. How frequently are you supposed to do that?

A. As often as available. Sometimes, like I said, if you have a task removing someone from a cell that needs assistance or is sick, I may be with that particular inmate for the duration.

Q. Is there ever an occasion where when you conduct a tour through the various units that you have responsibility for, where an officer says to you, I have not been able to conduct a tour of my unit, can you please do it for me?

A. Yes, sir.

Q. When you do that, walk me through what you do to conduct that tour.

A. I would take the officer's keys and go cell to cell, check the cell, check the inmates if they're in the cell, maybe wake them up if they haven't moved for some period of time just to make sure that they're alive.

Q. So in that case, it sounds like although you did not work as a housing officer, you have a general familiarity with what the housing officer's responsibilities are for conducting a tour. Is that

7 (Pages 25 to 28)

Christopher Jones

Page 29

correct?

A.    Yes, sir.  Everyone is a housing officer when they start.

Q.    Got it.  Okay, so that's -- that's -- and that was your - your first job once you started at the Philadelphia Department of Prisons.  Is that correct?

A.    Yes, sir.

Q.    For how long were you a housing officer?

A.    For the first eight years.

Q.    And would that have been in the B-1 Building?

A.    No.  I started at House of Correction, the oldest prison in the --

(Court Reporter clarification.)

House of Correction.

Q.    House of Correction, Lori.

A.    Yes, ma'am, House of Correction, HOC.

Q.    Got it.  And were you ever a housing officer at CFCF?

A.    Yes, sir.

Q.    And which -- which unit did you work on as a housing officer as CFCF?

A.    When I first got to CFCF in 2007, I worked all of the housing areas in B-1.

Q.    Including B-1, Pod 3 where this incident

Page 30

took place; right?

A.    Yes, sir.

Q.    Let me summarize for you my understanding of what Officer Wilson told me, and I'll see if you agree.  If I get anything wrong on this, tell me.  And when I talk -- when I talk about summarize, I'm summarizing her explanation of how an officer is supposed to conduct a tour.

First, she told me that a tour is supposed to happen every half hour.  Is that your understanding, as well?

A.    Yes, sir.

Q.    And that that applies no matter the time of day, so 24 hours a day every half hour.  Is that correct?

A.    Yes, sir.

Q.    She told me that the purpose of a tour is to ensure that prisoners who are in the unit are alive and in -- and -- well, yeah, really, she's looking for proof of life.  Does that sound correct to you, sir?

A.    Yes, sir, and that they're there.

Q.    Yeah, right, that's part of -- part of your function is to ensure their presence; right?

A.    Yes, sir.

Q.    And if they're present, then you are also

Page 31

required, when conducting a tour, to ensure that they are alive.  Is that correct?

A.    Yes, sir.

Q.    And that could include seeing breathing, seeing a chest rising and falling.  Is that correct?

A.    Yes, sir.

Q.    And if you can't tell from when you're looking in the cell whether the person is alive, Officer Wilson told me that you should get the person's attention and direct them to shake a leg or shake an arm.  Is that correct?

A.    Yes, sir.

Q.    And is it fair to say that when you conduct the tour, you can't move on from that cell where you're looking in unless you have proof of life?

A.    Yes, sir.

Q.    If you don't have proof of life, would it be correct to say that you've got to take some action to ensure that you get proof of life?

A.    Yes, sir.

Q.    Officer Wilson described to me that she goes through two steps.  First, she would knock on the cell door either by kicking it or maybe wrapping a key against the window to see whether that would get someone's attention.  Is that something that you've done

Page 32

before, sir?

A.    Yes, sir.

Q.    And if you can't get proof of life after trying to get the person's attention, then she told me that you have to go into the cell.  Is that your understanding, as well?

A.    Yes, sir.

Q.    And, finally, when you conduct a tour of a housing area, you're required to log the tour on the Housing Log.  Is that correct?

A.    Yes, sir.

Q.    And we -- we won't have to -- we won't do it now, but I've reviewed the Housing Log with Officer Wilson, and there's a reference which says, Toured unit -- let me -- let me find the specific reference -- toured unit, appears in order.

That's something that you would note if you saw no issues on your tour.  Is that correct?

A.    Yes, sir.

Q.    And I assume that if you put that entry onto the log, you've got to be telling the truth.  You can't lie about it and say you did a tour if the tour didn't actually happen.  Is that correct?

A.    That's correct.

Q.    And I take it all of what we've just

8 (Pages 29 to 32)

Christopher Jones

Page 33

reviewed over the past couple of minutes, those are concepts that you've been familiar with throughout the course of your career in the Philadelphia Department of Prisons. Is that correct?

A. Yes, sir.

Q. Now, I mentioned before that Officer Wilson testified about an encounter with the other inmate in the cell where he mentioned the -- pressing the call button. And I know you don't remember hearing anything about that, but let me ask you about your understanding of how that call button works.

Can I assume that you -- when you've been on a housing area, you've seen some indication that -- that a prisoner had pushed the call button?

A. The call button, I guess depending on the housing area, most of the call buttons do work. There's a -- there's a strobe light. Sometimes the strobe light isn't on, but then there's also a buzzer that rings on the console, I think, at the officer's desk.

Q. So if you're a housing officer sitting at the desk, you'll get some indication that someone has pressed the call button. Is that correct?

A. Yes, sir.

Q. You mentioned a strobe light. Is that a

Page 34

strobe light that's high up in the dayroom area?

A. Yes, sir.

Q. So that way you would see an indication of it no matter where you were in the housing unit. Is that correct?

A. And also outside on the rotunda --

(Court Reporter clarification.)

On the rotunda where the escort or rovers would be, we can see that strobe light on each housing area as long as it works.

Q. You said as long as it works. Are there times when that strobe light is not working?

A. Yes, sir.

Q. Do you have any idea who is responsible for ensuring that the strobe light is working?

A. U.S. Facilities.

Q. Is that a contract organization -- a private contractor that -- that monitors the maintenance?

A. Yes, sir.

Q. If you are an officer in a housing area and noticed the strobe light is not working, what obligation, if any, do you have to alert someone else about that?

A. You would contact Maintenance.

Q. And are there -- when you -- and I

Page 35

understand you were not a housing officer at the time. Is there -- is that part of your daily routine, to check whether certain equipment and facilities are in working order?

A. Yes, sir.

Q. So when you arrive on the cell block at the beginning of the shift, is there a responsibility to check whether --

(Court Reporter clarification.)

Let me start that question over then, Lori.

When you arrive on the cell block at the beginning of your shift, do you have that responsibility to check some paperwork that the strobe light is working?

A. Yes, sir.

Q. All right. What's that paper called?

A. That's your Sanitation and Security.

Q. So that -- and is it in a paper log or a computerized log?

A. That's an actual check-off sheet, so it's a piece of paper.

Q. And what happens to that piece of paper at the end of the shift?

A. It goes to the Shift Commander.

(Court Reporter clarification.)

Page 36

Shift Commander. The Shift Commander.

Q. And do you have to physically take that document to a Shift Commander at the end of the shift?

A. Yes, sir.

Q. Where do you take it?

A. Well, the Shift Commander's office is normally located outside the facility in front of the jail. I, being the escort or a rover, normally take that type of paperwork up to him from each of the housing units.

Q. So you would collect it from all of the housing officers in the B Building where you serve as the rover. Is that correct?

A. Yes, sir.

Q. Do you have any memory from September 21st of 2018 as to whether the strobe light was working?

A. No, sir.

Q. Can we assume that there would be some documentation about that?

MS. TAYLOR: Objection.

THE WITNESS: I -- I guess so. It's part of the sanitation.

BY MR. FEINBERG:

Q. Sure, and that's -- really, that's the

9 (Pages 33 to 36)

Christopher Jones

Page 37

question. You're answering the question that I should have asked, which is under normal practice, if the strobe light was working or not working, it would have been documented under standard practice on the sanitation paperwork for that day. Is that correct?

A. Yes, sir.

Q. Now, I've been asking you about the strobe light that is connected to the call button. You also mentioned that at the console where the housing officer sits, where there's a desk, there's some indication about a call button going off. Is that correct?

A. Yes. There's a -- a buzzer. I can't remember if there's a light on the console or not, but you hear -- like the two -- the two correspond with each other, either the strobe light will blink and you'll hear like the buzzer noise or vice versa, you would hear the buzzer noise. If the strobe light doesn't work at all, you still should hear the buzzer noise.

Q. Officer Wilson -- and I'm going from recollection here, so I want to be clear that I'm not quoting her -- described that the console would have some indication as to which cell the call button had come from. So, for example, Mr. Gleaves is in Cell 1; right? If someone presses the cell -- the call button in Cell 1,

Page 38

there will be some indication on the console that someone in Cell 1 needs assistance.

A. Yep.

Q. Is that your --

A. Yes. Also on the console there are lights, red and green. The light will blink for the call button. There's also a red light, if I'm not mistaken, if the door is -- is ajar. So once the door's -- it's, again, part of your tour, you check the door. When you check the console, then everything should be green and everything is functional. And just red, then that means that door is unlocked.

Q. Going through those lights to make sure that they are working, is that part of your daily responsibility while working as a housing officer? Is that part of the same sanitation process you described before?

A. Yes, sir, because there are times when those lights don't work at all.

Q. So presumably -- same question I asked you before -- you would expect that there would be some record kept from whether those lights were working on September 21st of 2018. Is that correct?

A. Yes.

MS. TAYLOR: Objection.

Page 39

BY MR. FEINBERG:

Q. When a person in a cell presses the call button, and assuming everything is working, what are your responsibilities as an officer?

A. If you're able to assist them, you'll -- you will assist them immediately.

Q. How do you find out what they are -- what kind of assistance is needed? Are you supposed to go to the cell side immediately, or is there some other way to find out?

A. The only way you would find out is going to the cell.

Q. Are there situations where prisoners abuse the use of the call button?

A. All the time.

Q. And if you, as a housing officer, are concerned that the call button may be -- is being abused by a prisoner, what are you supposed to do about it?

A. There's really nothing you can do about it.

Q. Let me ask you --

A. Just ignore it, I guess.

Q. Well, is that -- and that was exactly my next question. Are you permitted to -- if a call button is pressed, to just ignore it?

Page 40

A. No.

Q. So you've got to give it some attention. Is that correct?

A. Yes, sir.

Q. By the way, I neglected to ask you before, we went through all of the procedures that apply to giving -- conducting tours in housing areas. Are you aware of any policy or directive, any written guidance that spells out that you're supposed to conduct a tour every half hour, and you're supposed to obtain proof of life, all that kind of thing?

A. Post orders.

Q. Can you identify a specific post order, off the top of your head, that applies to tours?

A. No, sir.

Q. Can you identify a specific post order that applies to the call button that we've just been discussing?

A. No, sir.

Q. One other general point, sir. Can I assume that if you see evidence of a prisoner experiencing a medical emergency, your job is to contact the Medical Unit immediately? Is that correct?

A. Yes, sir.

MR. FEINBERG: Let's go off the record

10 (Pages 37 to 40)

Christopher Jones

Page 41

for one second.

(Discussion was held off the record.)

BY MR. FEINBERG:

Q. Officer Jones, we're -- we're now back on the record. Did you realize during the short break that we just took that any of your previous testimony was incorrect or incomplete?

A. No, sir.

Q. Okay, thanks. Let me ask you just a couple of questions about Officer Slory. I take it you know Officer Slory?

A. I know Officer Slory is an officer. I don't really know him.

Q. And as far as you can recall, has he ever worked on the same shift as you?

A. No, sir.

Q. Do you remember having any encounter with him in connection with Jonathan Gleaves at all?

A. No, sir.

Q. And by -- by way of reference, so you understand why I'm asking these questions, is Officer Slory was on the overnight shift in B-1, Pod 3 from 11:00 p.m. to 7:00 a.m. and then left, as far as we can tell, right before Officer Terrelle Jones and Officer Charlene Wilson came onto the unit and found Mr. Gleaves

Page 42

in the midst of a medical emergency.

With that as background my question is, do you recall any conversations with Officer Slory about what he observed concerning Mr. Gleaves before that medical emergency?

MS. TAYLOR: Objection.

THE WITNESS: No, sir. But I did know that Officer Slory -- my understanding, he was on 3:00 to 11:00. So if he was on the overnight shift, 11:00 to 7:00, he was probably doing overtime.

BY MR. FEINBERG:

Q. Do you know who the usual 11:00 p.m. to 7:00 a.m. officers were?

A. No, sir.

Q. In your position as a B-1 rover, would you normally have a conversation with officers who are leaving the shift at or around 7:00 a.m. before you start?

A. Sometimes, yes.

Q. For example, my understanding is from the housing officers, that when they start their shift at 7:00 a.m., they may have a short conversation with the officers who are leaving about anything of note that happened the night before, what the count is, that kind of thing. Do you have a similar conversation?

Page 43

A. Yes, sir.

Q. Do you remember anything being brought to your attention about Mr. Gleaves during the course of that conversation?

A. No, sir.

Q. And after the fact, in the days and weeks that followed the incident with Mr. Gleaves, do you remember participating or overhearing any conversation with Officer Slory about his observations from that night?

A. No, sir.

Q. Did you ever hear from anyone else about conversations with Officer Slory about what happened that night?

A. No, sir.

Q. Let me show you, sir, some -- the documents that we talked about at the beginning of the deposition. I'm going to put them on your screen or I'll share my screen and, hopefully, you'll be able to see them.

The first -- we'll label this as Exhibit P-9. Lori, I don't have a stamp, so I'm going to ask you -- I'll email after we conclude the deposition, and I'll ask you if you could stamp them at that point and attach them to the transcript, for any of the exhibits that I

Page 44

use here.

COURT REPORTER: Okay.

(Document shown.)

BY MR. FEINBERG:

Q. So this is Exhibit P-9. Sir, do you see that document in front of you?

A. Yes, sir.

Q. Is this the memorandum that you reviewed in preparation for today's deposition?

A. Yes, sir.

Q. Is this memorandum consistent with your recollection as to what happened on that night?

A. Yes, sir.

Q. Now, I noticed that the date here is May 19th of 2018, which obviously precedes this incident by about six months. Is that just an error, sir?

A. Absolutely.

Q. I'm going to show you another document, sir. This will be marked as Exhibit P-6.

(Document shown.)

We're numbering out of order, but do you see this document in front of you, sir, with your name on it?

A. Yes, sir.

Q. Now, this appears to be an interview that

11 (Pages 41 to 44)

Page 45

you gave to the Special Investigations Unit on December 10th of 2018. Did you review this document in preparation for today's deposition?

A. No, sir.

Q. Was this -- no, you did not?

A. No, sir.

Q. I thought you told me that you reviewed two documents. Do you remember what the other document was?

A. I -- I guess this was it. I don't -- didn't remember.

Q. Did you give a statement to the Philadelphia Police Department, sir?

A. I don't --

(Court Reporter clarification.)

I don't remember if it was for this incident or not.

Q. You don't remember one way or the other whether you spoke to the Philadelphia Police Department. Is that correct?

A. That's correct.

Q. Why don't you take a minute, because my question will be whether this statement is consistent with your recollection. Are you able to read the text on the screen that you're using, sir?

Page 46

A. Yes, sir.

Q. I can enlarge it if you need me to. Let's do this. Take a moment to read -- it -- it goes onto a second page, so read the first page to yourself. Let me know when you're finished, and I'll ask you another question.

A. (Witness reviewed document.)

Okay.

Q. Go to the second page.

A. (Witness reviewed document.)

Okay.

Q. Is that statement consistent with what you -- with your recollection of this incident, sir?

A. Yes, sir.

Q. Now, this interview appears to have taken place, as I mentioned, on December 10th of 2018 with Sergeant I., that's the first initial, Marshall. Do you recall participating in that interview, sir?

A. Yes, sir.

Q. Do you have -- what was it that -- if you know, why was the reason that you were contacted in December of 2018, some two to two and a half months after the incident?

A. I don't know why it took so long.

Q. Do -- do you remember -- first, where did

Page 47

this interview take place?

A. This interview took place at Internal Affairs which -- well, OPC.

Q. How was it that you were alerted to the fact that you were wanted for an interview?

A. I was told after our morning roll call.

Q. Was anybody else in the room when you -- when you participated in this interview?

A. No, sir.

Q. All right, let me take that down.

Do you -- do you ever learn about the findings of any Internal Affairs investigation?

A. No, sir.

Q. Let's do this now. Gila, I'd like to show the video that we reviewed.

Officer, I'm going to put in front of you what -- Gila's going to share a screen which will show some of the video surveillance from that night.

(Video shown.)

So, sir, if you see -- you should see that -- the time stamps. This is September 21st of 2018, 7:13 and 54 seconds. Do you see that?

A. Yes, sir.

Q. Top right screen, do you see Cell 1 with the door open?

Page 48

MS. TAYLOR: Jon, I'm just gonna -- if you pause for a minute, I need to move the strip where you guys are --

MR. FEINBERG: Sure.

MS. TAYLOR: -- because it's blocking that particular camera. Okay, yeah, we -- we can't see your face, but we can see the screen.

BY MR. FEINBERG:

Q. Okay. So, Officer, you can see -- do you see Cell 1 with the door open?

A. Yes, sir.

Q. And do you see two officers standing outside of Cell 1?

A. Yes, sir.

Q. From context and what you know about that case, does that appear to be Officer Jones and Officer Wilson?

A. Yes, sir.

Q. On the bottom right screen do you see what -- do you see yourself?

A. Yes, sir.

Q. And am I understanding -- we're not going to show you all of the video. It appears that you've been summoned or someone has requested assistance, and now you have entered B-1, Pod 3. Is that -- is that a

12 (Pages 45 to 48)

Christopher Jones

Page 49

fair description of what we're looking at, sir?

A. Yes, sir.

Q. I'm going to -- Gila, I want you to hit play, and I'll let you know when to pause.

I'll just ask you to watch the video, sir.

(Video shown.)

A. (Witness complies.)

Q. As we're watching, do you see yourself on the top left screen walking back towards Cell 1? Is that correct?

A. Yes.

Q. Did you see a man in an orange jumpsuit come out of the cell?

A. Yes, sir.

Q. And now we're at 7:14 and 11 seconds, and you are at the cell side with Officer Wilson and Officer Jones. Is that correct?

A. Yes, sir.

Q. Gila, can you play for just another little bit? I'll let you know when to pause.

(Video shown.)

Now, as we're watching here, at 7:14 and 25 seconds, we can't really see what you were doing. I saw some hand motions. Would you have been putting on

Page 50

rubber gloves, sir?

A. Yes, sir.

Q. All right, Gila, you can pause from there.

So my first question, sir, is, just to review my -- your previous testimony, from your recollection, was that you had to order the other inmate out of the cell. Did I -- am I remembering that correctly?

A. Yes, sir.

Q. It looks from this video as Mr. -- that -- that this other inmate exited the cell before you got to the cell side. Does that refresh your recollection about the sequence of events?

A. Yes, sir.

Q. And does it appear that that other inmate actually left the cell before you arrived there?

A. Yes, sir.

Q. We can take the video down, Gila, thank you.

I also asked you some questions about things that Mr. Thomas said or didn't say. What I want to do now is show you Exhibit P-8 -- actually, pardon me one second. I'm going to show you Exhibit P-7.

(Document shown.)

Page 51

Do you see a document marked P-7 in front of you, sir?

A. Yes, sir.

Q. Now, this appears to be a memorandum that was written by Lieutenant Medina on behalf of Tyrone Thomas dated September 26th of 2018. Mr. Thomas, from the background information we have, that's the name of the other inmate who left the cell. Do you understand that, sir?

A. Yes, sir.

Q. First of all, have you ever seen this document before?

A. No, sir.

Q. All right. I'm going to show you text here. Do you see where my cursor is?

A. Yes, sir.

Q. I'll just read along with -- with what appears in this memorandum. Inmate Thomas claims when he hit the button, he looked out and didn't see any staff. Note, Inmate Thomas claims during the night he -- that's referring to Mr. Gleaves -- was moaning all night.

I'll stop there and ask, having seen this memorandum, do you recall hearing from Mr. Thomas or anybody that there was an effort to get an officer's attention by hitting the call button?

Page 52

A. No, sir.

Q. I'll show you one more document from Mr. Thomas. This was a -- this will be marked as Exhibit P-10. Once again, Lori, this one is not stamped, so I'll ask you to stamp this one.

(Document shown.)

Do you see in front of you, sir, an Investigation Interview Record from the Philadelphia Police Department with Tyrone Thomas's name?

A. Yes, sir.

Q. Now, my understanding is that this is a statement that Mr. Thomas gave to Philadelphia police in connection with an investigation into Mr. Gleaves' death. Do you understand that, sir?

A. Yes, sir.

Q. I'm not going to show you this entire document because I don't think it's relevant, but if at any point -- I'll just ask you a couple of brief questions, but if you feel like you need to see more of the document, you should let me know.

I'm going to the fourth page of the document, which is Bates stamped City 492. There's a question that's the second question on the page. I've read this a couple of times, so I'll read it to you, and I'll read the answer, and I'll ask you just to follow

13 (Pages 49 to 52)

Christopher Jones

Page 53

along with me.

The officer who's conducting this interview asks: Did you make any attempts to notify the guards prior to 6:00 a.m.?

And the answer is: I pressed the button around 5:00 a.m. and it didn't beep, so I didn't know if it was working. Then I told the guard at 6:00 a.m. when she was making a tour.

Once again I'll ask you, just in an effort to refresh your recollection, did you ever hear about any effort on the part of Mr. Thomas, the other inmate, to press the call button at around 5:00 a.m.?

A.   No, sir.

Q.   And sitting here today, sir, I take it you can't tell me one way or the other whether the call button was working in Cell 1?

A.   No, sir.

Q.   At any point, sir, in the -- in connection with you preparing your memorandum for the Shift Commander, in the interview that you conducted with the Internal Affairs Unit, did you ever hear anyone say that someone in the prison didn't do their job properly with regard to Mr. Gleaves?

MS. TAYLOR:  Objection.

THE WITNESS:  No.  No, sir.

Page 54

BY MR. FEINBERG:

Q.   Sir, I've heard, in connection with other cases that I've handled, that there's something called a Critical Incident Debriefing, where after a death or a serious medical emergency comes up that Supervisors or Mental Health Caseworkers will speak with staff involved.

Did anything like that happen in this case, sir?

A.   I wasn't involved.  I believe it did.

Q.   And on -- on what basis do you say you believe it did?  What did you hear about it?

A.   If I'm not mistaken, the -- the Warden has those type of briefings with Medical staff and maybe the housing officers, whoever, in the Warden's conference room.

Q.   So that's -- your answer is based on your understanding of what happens in other cases.  Is that correct?

A.   Yes, sir.

Q.   And you do not recall anything like that -- well, first, you do not recall participating in anything like that.  Is that correct?

A.   That's correct.

MR. FEINBERG:  Officer Jones, with that, I don't have any further questions for you.

Page 55

BY MS. TAYLOR:

Q.   If I can just do a couple quick follow-ups, just for record clarification.

So one thing, Officer Jones, you had been asked and responded about the existence of post orders. Could you just explain to us what a post order is?

A.   Post orders are on all housing areas, including the inside of the booths.  There's -- normally, it's in a binder of some kind that would have the City regulations and also the prison regulations as -- as to how to operate that specific post.  That's a post order.

Q.   And then there was -- you were asked about call buttons and call button use, and I believe you testified that you said you learned to ignore it.  What did you mean by that?

A.   If you're busy and someone is inside their cell trying to get your attention, it's not humanly possible to stop what you're doing and go and rush to them, so you have to --

(Court Reporter clarification.)

And rush to their aid immediately if you're already assisting someone.

Q.   And what do you do when you're finished assisting a person who you were involved with?  Do you

Page 56

follow up with that person --

A.   You still have to follow up.  Regardless of what's going on, you still have to follow up with whoever it is that pushed the call button, as far as banging on the door for your assistance.

Q.   And that sounds -- is this paraphrased correct, that you prioritize what you're currently doing and then follow up with the subsequent calls?  Is that right?

A.   Yes, ma'am.

Q.   When you were speaking about during the tours -- or testifying about banging on the window or rattling your key to wake someone up, is that something you do during the day shift, so the 7:00 to 3:00 shift?

A.   That's a common practice on all shifts.

Q.   And then could you just -- and we haven't had testimony about this yet.  Could you describe the internal structure of the cell?  So by way of example, Mr. Gleaves was housed in Cell 1.  How is that cell laid out?

A.   All right.  It's the cell, straight ahead are the bunks, one top bunk, one bottom.  Off to the right of the cell is a table.  Right as you go into the cell, immediate right there is a sink and a toilet.

Q.   Okay.  And when you look into the cell

14 (Pages 53 to 56)

Christopher Jones

Page 57

through the cell window, what is it that you look in on when you look in straight ahead?

A. You look directly at the bunks.

Q. And is there any requirement about where the heads have to be on the bunks, how someone sleeps?

A. There is now, but there wasn't then.

Q. Do you have any recollection what orientation Mr. Gleaves was, if his head was closer to the door or further away from it?

(Court Reporter clarification.)

A. No, ma'am.

MS. TAYLOR: Those are all the questions I have. Thank you.

MR. FEINBERG: Tom, any questions?

MR. GREGORY: No questions. Thank you.

MR. FEINBERG: And I don't have any follow-up. So with that, Officer, your deposition's concluded.

MS. TAYLOR: Thanks, everyone.

COURT REPORTER: Counsel, before we leave, Mr. Feinberg, orders, please?

MR. FEINBERG: Just a PDF mini.

COURT REPORTER: And Ms. Taylor?

MS. TAYLOR: Same, PDF mini, please.

COURT REPORTER: And Mr. Gregory?

Page 58

MR. GREGORY: Same for me, please.

(Whereupon, the deposition concluded at 11:30 o'clock a.m.)

Page 59

CERTIFICATE

I, Lori A. Dilks, the officer before whom the deposition of CHRISTOPHER JONES was taken, do hereby certify that CHRISTOPHER JONES, the witness whose testimony appears in the foregoing deposition, was duly sworn by me, through Zoom, on September 28, 2021, and that the transcribed deposition of said witness is a true record of the testimony given by him; that the proceedings are herein recorded fully and accurately to the best of my ability; that I am neither attorney nor counsel for, nor related to any of the parties to the action in which this deposition was taken; and, further, that I am not a relative of any attorney or counsel employed by the parties hereto or financially interested in this action.

Lori Dilks_____
Lori A. Dilks

PA Court Reporter
Notary Public in and for the
Commonwealth of Pennsylvania

My Commission expires
November 29, 2023

15 (Pages 57 to 59)

Christopher Jones

Page 60

**A**

**a.m** 1:16 41:23 42:13,17,22 53:4,6,7,12 58:3
**ability** 59:11
**able** 14:21 28:12 39:5 43:19 45:24
**Absolutely** 7:24 13:9 44:17
**abuse** 26:17 39:14
**abused** 39:17
**acceptable** 7:22
**accompanied** 21:7
**accurately** 59:10
**acting** 12:3,3
**action** 4:20 31:18 59:13,16
**actual** 35:20
**Administrator** 1:3 4:19
**Affairs** 10:2 47:3,12 53:21
**ago** 4:14
**agree** 30:5
**ahead** 13:17 18:9 56:22 57:2
**aid** 55:22
**airlifted** 20:25 21:2,3
**ajar** 38:8
**alert** 34:22
**alerted** 12:2,17 47:4
**alive** 28:21 30:18 31:2,8
**allow** 17:18 19:5
**allowed** 26:20
**Anne** 2:7 5:19
**anniversary** 22:7
**anniversary's**

16:10
**answer** 7:14,19 7:22 8:20 9:4 11:6 18:15 52:25 53:5 54:16
**answering** 37:1
**answers** 7:7
**anybody** 11:6 15:14 47:7 51:24
**apparent** 15:17 15:21
**appear** 48:16 50:16
**appearance** 12:23
**APPEARAN...** 2:1
**appeared** 13:7 15:24
**appears** 5:12 32:16 44:25 46:15 48:23 51:4,18 59:6
**applied** 23:22
**applies** 30:13 40:14,17
**apply** 40:6
**appointed** 4:18
**approached** 15:22
**appropriate** 8:5
**Arch** 2:3,8
**area** 11:10 26:24 27:8 32:9 33:13,16 34:1 34:10,20
**areas** 26:10 27:5 27:5 29:24 40:7 55:7
**arm** 31:10
**Army** 22:21,22
**arose** 6:12
**arrive** 35:6,12
**arrived** 18:22,24

50:17
**asked** 5:14 6:19 8:18 11:4 16:23 23:1 37:2 38:20 50:21 55:5,13
**asking** 37:7 41:21
**asks** 53:3
**assess** 19:9 26:19
**assigned** 25:6
**assignment** 25:3 25:19 26:6
**assignments** 25:1,20
**assist** 12:6,20 21:5 27:4 39:5 39:6
**assistance** 11:25 28:1,7 38:2 39:8 48:24 56:5
**assisted** 13:14 14:2 19:25
**assisting** 11:18 25:23 55:23,25
**assume** 9:11 32:20 33:12 36:19 40:21
**assuming** 14:18 39:3
**assumption** 14:25
**attach** 43:24
**attempts** 53:3
**attention** 11:22 16:8,13,23 17:18 31:9,25 32:4 40:2 43:3 51:25 55:18
**attorney** 4:16 59:11,14
**attract** 16:7,23
**audio** 8:10
**authority** 4:20

19:23
**available** 27:6 28:5
**aware** 4:22 6:20 24:24 40:8

**B**

**B** 2:7 25:6,9,9 26:10 36:12
**B-1** 11:11 25:6 25:15,16 26:1 26:5 27:2 29:10,24,25 41:22 42:15 48:25
**back** 10:18 12:12 14:8 23:5 24:8 26:20,22 41:4 49:10
**background** 21:20 42:2 51:7
**banging** 56:5,12
**based** 5:11 14:20 54:16
**basically** 6:15
**basis** 54:10
**Bates** 52:22
**Bear** 26:21
**beep** 53:6
**began** 8:9
**beginning** 6:24 24:25 35:7,13 43:17
**behalf** 51:5
**believe** 9:16 10:1 13:10 20:17 54:9,11 55:14
**best** 7:13,19 59:11
**better** 23:17
**binder** 55:9
**bit** 9:20 49:21
**blink** 37:16 38:6

**block** 20:12 35:6 35:12
**blocking** 48:5
**Blvd** 2:13
**body** 14:8,11
**booths** 55:8
**bottom** 48:19 56:22
**BRADLEY** 1:8
**brand-new** 25:24
**break** 9:1,4 41:5
**breaks** 22:9
**breathing** 12:15 31:4
**brief** 52:18
**briefings** 54:13
**bring** 4:20
**BROAD** 1:23
**broadly** 11:4
**brought** 5:2,10 11:22 43:2
**Building** 2:3 25:6,9,12 26:10 29:11 36:12
**bunk** 12:12,20 13:11 14:3 56:22
**bunks** 56:22 57:3,5
**busy** 55:17
**button** 18:12,13 33:9,11,14,15 33:23 37:8,11 37:23,25 38:7 39:3,14,17,24 40:17 51:19,25 53:5,12,16 55:14 56:4
**buttons** 33:16 55:14
**buzzer** 33:18 37:13,17,18,19

**C**

Christopher Jones

Page 61

**C** 4:1
**call** 18:13 33:8
  33:11,14,15,16
  33:23 37:8,11
  37:23,25 38:7
  39:2,14,17,24
  40:17 47:6
  51:25 53:12,15
  55:14,14 56:4
**called** 4:3 6:16
  11:25 12:5
  21:4 25:7
  35:16 54:3
**calls** 56:8
**camera** 48:6
**care** 20:5
**career** 23:18
  33:3
**case** 5:10,11,13
  8:12 10:15,19
  10:25 28:22
  48:16 54:8
**cases** 54:3,17
**Caseworkers**
  54:6
**Cast** 2:3
**cause** 16:7 20:17
**caused** 5:8
**cell** 4:24 10:10
  11:12,15,23
  12:1,6,11
  13:14 15:14
  16:4,19,24
  17:7 18:3,13
  19:9,17,22,23
  26:20 27:15
  28:6,18,18,18
  28:19 31:8,14
  31:23 32:5
  33:8 35:6,12
  37:23,24,25,25
  38:2 39:2,9,12
  47:24 48:10,13
  49:10,14,17
  50:8,12,13,17
  51:8 53:16

  55:18 56:18,19
  56:19,21,23,24
  56:25 57:1
**cells** 16:15 26:18
**Center** 2:13
  24:12,15
**certain** 35:3
**CERTIFICA...**
  59:1
**certify** 59:5
**CFCF** 24:8,13
  24:15,17,21,25
  29:19,22,23
**Charlene** 10:18
  41:25
**check** 27:7
  28:18,18 35:2
  35:8,14 38:9
  38:10
**check-off** 35:20
**chest** 31:5
**Chief** 2:7
**children** 4:17
**Christopher**
  1:14 3:3,13,15
  4:2 59:4,5
**circumstances**
  20:23
**City** 1:7 2:7,10
  5:3,19 52:22
  55:10
**claims** 5:5 51:18
  51:20
**clarification**
  13:4,22 16:17
  18:7 25:13
  29:14 34:7
  35:9,25 45:15
  55:3,21 57:10
**clear** 37:21
**closer** 15:22
  57:8
**clothes** 16:6
**clothing** 16:20
**co-workers** 12:5
  17:14

**collect** 36:11
**come** 5:14 21:4
  37:23 49:14
**comes** 26:15
  54:5
**comfortable**
  19:9
**coming** 11:7
  12:13,24 15:23
  19:22
**Commander**
  35:24 36:1,1,3
  53:20
**Commander's**
  36:6
**Commission**
  59:24
**common** 56:15
**Commonwealth**
  59:22
**complete** 7:13
  8:22 9:8
**completed** 21:10
**completely**
  13:11
**complies** 4:9
  49:8
**computerized**
  27:16 35:19
**concepts** 33:2
**concerned** 39:17
**concerning** 42:4
**conclude** 43:23
**concluded** 57:18
  58:2
**condition** 19:10
**conduct** 28:10
  28:12,16 30:8
  31:14 32:8
  40:9
**conducted** 53:20
**conducting** 7:25
  26:24 27:23
  28:25 31:1
  40:7 53:2
**conference**

  54:15
**confirm** 8:14
**confirming**
  21:21
**connected** 37:8
**connection** 8:4
  41:18 52:13
  53:19 54:2
**conscious** 7:15
**consisted** 26:8
**consistent** 44:11
  45:23 46:12
**console** 33:19
  37:9,14,22
  38:1,5,10
**contact** 20:11
  34:24 40:22
**contacted** 46:21
**context** 48:15
**contract** 34:17
**contractor**
  34:18
**contrary** 19:18
**conversation**
  18:20,25 42:16
  42:22,25 43:4
  43:8
**conversations**
  42:3 43:13
**Corizon** 1:7
  2:15 5:4
**correct** 8:15,21
  11:7,8,12 13:8
  14:13 15:3,4
  17:2 20:2
  21:23 22:7
  23:20 24:22
  26:6,10 28:1
  29:1,6 30:15
  30:20 31:2,5
  31:11,18 32:10
  32:18,23,24
  33:4,23 34:5
  36:13 37:5,12
  38:23 40:3,23
  45:20,21 49:11

  49:18 54:18,22
  54:23 56:7
**Correction**
  29:12,15,16,17
**Correctional**
  4:25 5:3 21:22
  22:1 23:23
**correctly** 50:9
**correspond**
  37:15
**counsel** 2:23
  5:19 57:20
  59:12,14
**count** 16:16,18
  42:24
**couple** 10:2
  16:10 33:1
  41:10 52:18,24
  55:2
**course** 33:3 43:3
**court** 1:1,23
  2:24 4:18 6:4,7
  6:9,25 7:5 13:4
  13:22 16:17
  18:7 25:13
  29:14 34:7
  35:9,25 44:2
  45:15 55:21
  57:10,20,23,25
  59:21
**covered** 13:13
  13:25 14:1
**CPR** 12:16 20:5
**create** 21:11
**criminal** 6:11
**Critical** 54:4
**crotch** 13:19
  14:13
**Curran-From...**
  4:24
**currently** 56:7
**cursor** 51:15

————————
**D**
————————
**D** 3:1 4:1
**daily** 35:2 38:14

Christopher Jones

Page 62

| | | | | |
|---|---|---|---|---|
| **date** 1:16 44:14 | 14:10 26:3 | **DOE** 1:9 | **ensure** 30:18,23 | **F** |
| **dated** 51:6 | **description** 3:12 | **doing** 42:10 | 31:1,19 | **face** 48:7 |
| **day** 9:22,22 | 49:1 | 49:24 55:19 | **ensuring** 34:15 | **facilities** 23:12 |
| 20:14,16 21:4 | **desk** 33:20,22 | 56:7 | **entered** 48:25 | 24:2 34:16 |
| 25:2 30:14,14 | 37:10 | **door** 31:23 38:8 | **entire** 52:16 | 35:3 |
| 37:5 56:14 | **details** 11:17 | 38:10,12 47:25 | **entry** 32:20 | **facility** 4:25 |
| **dayroom** 34:1 | **Detention** 24:12 | 48:10 56:5 | **equipment** 35:3 | 25:24 26:9 |
| **days** 43:6 | 24:15 | 57:9 | **error** 44:16 | 36:7 |
| **dealt** 8:1 | **diary** 21:15 | **door's** 38:9 | **escort** 25:7 34:8 | **fact** 16:1 43:6 |
| **death** 4:21 5:8 | **died** 4:22 20:15 | **doorway** 12:10 | 36:8 | 47:5 |
| 20:24 52:13 | **different** 13:8 | **drug** 26:17 | **escorted** 26:17 | **fair** 18:18 31:13 |
| 54:4 | 23:11 24:2 | **drugs** 17:12 | **escorting** 26:9 | 49:1 |
| **Debriefing** 54:4 | 25:1 | **duly** 4:3 59:6 | **escorts** 27:6 | **falling** 31:5 |
| **December** 45:1 | **differentiate** | **duration** 28:8 | **Esquire** 2:2,7,12 | **familiar** 15:11 |
| 46:16,22 | 11:20 | **duties** 26:8 | **Estate** 1:4 4:19 | 17:25 33:2 |
| **decided** 19:19 | **Dilks** 59:3,19,20 | | **estimate** 23:15 | **familiarity** |
| **Defendant** 5:9 | **direct** 31:10 | **E** | **events** 50:14 | 28:24 |
| **Defendants** 1:10 | **directions** 13:8 | **E** 3:1 4:1,1 | **evidence** 40:21 | **far** 17:14 41:14 |
| 2:10,15 5:6 | **directive** 40:8 | **earlier** 8:21 | **exactly** 23:10 | 41:23 56:4 |
| **definitely** 15:24 | **directly** 57:3 | **EASTERN** 1:1 | 39:23 | **feel** 19:8 52:19 |
| **deliberately** 5:6 | **discharge** 22:24 | **education** 22:13 | **examined** 3:2 | **Feinberg** 2:2,2 |
| **Department** | **discuss** 27:13 | **effect** 19:1 | 4:4 | 3:3 4:6,15 |
| 4:11,25 10:13 | **discussed** 9:13 | **effort** 51:24 | **example** 10:17 | 18:10,17 19:14 |
| 22:1,10,18 | **discussing** 40:18 | 53:10,11 | 20:5 37:24 | 36:24 39:1 |
| 23:18 29:6 | **Discussion** 41:2 | **eight** 29:9 | 42:20 56:18 | 40:25 41:3 |
| 33:3 45:13,19 | **discussions** 21:6 | **Eileen** 1:3 4:16 | **excuse** 9:18 | 42:11 44:4 |
| 52:9 | **disrespectful** | **either** 9:21 | **Exhibit** 43:21 | 48:4,8 54:1,24 |
| **depending** 27:6 | 16:14 | 17:25 18:25 | 44:5,19 50:23 | 57:14,16,21,22 |
| 33:15 | **distraction** | 31:23 37:16 | 50:24 52:3 | **females** 16:12 |
| **deposition** 1:14 | 16:15,18 | **ELIZABETH** | **exhibits** 3:6,10 | 16:12 |
| 3:10 5:15,19 | **DISTRICT** 1:1 | 1:8 | 43:25 | **filing** 2:24 |
| 6:1,22,24 8:1 | 1:1 | **email** 43:23 | **existence** 55:5 | **finally** 32:8 |
| 8:21 9:11 11:7 | **document** 36:3 | **emergency** | **exited** 50:12 | **financially** |
| 21:21 43:18,23 | 44:3,6,18,20 | 15:19 40:22 | **expect** 38:21 | 59:15 |
| 44:9 45:3 58:2 | 44:22 45:2,8 | 42:1,5 54:5 | **experience** | **find** 20:16 32:15 |
| 59:4,6,8,13 | 46:7,10 50:25 | **employed** 4:11 | 14:20 | 39:7,10,11 |
| **deposition's** | 51:1,12 52:2,6 | 21:22,25 59:15 | **experiencing** | **findings** 27:16 |
| 57:17 | 52:17,20,22 | **employees** 10:12 | 40:22 | 47:12 |
| **Deputy** 2:7 | **documentation** | 10:13 | **expires** 59:24 | **finish** 7:22 |
| **describe** 27:23 | 36:20 | **employment** | **explain** 55:6 | **finished** 46:5 |
| 56:17 | **documented** | 22:9 | **explanation** | 55:24 |
| **described** 10:6 | 37:4 | **encounter** 25:5 | 30:7 | **fired** 23:1 |
| 12:24 13:10 | **documents** 5:11 | 33:7 41:17 | **extra** 6:17 | **first** 4:3,10,10 |
| 31:21 37:22 | 9:14 10:6 | **encounters** | **eyes** 12:25 13:3 | 7:3 11:22 29:5 |
| 38:16 | 11:20 43:17 | 17:22 | 13:7 | 29:9,23 30:9 |
| **describing** 13:6 | 45:8 | **enlarge** 46:2 | | 31:22 43:21 |

46:4,17,25
50:5 51:11
54:21
**Five** 22:23 24:4
**Floor** 2:8
**foam** 12:23
**foamy** 12:23
**focus** 15:13
**focused** 13:7
**follow** 52:25
56:1,2,3,8
**follow-up** 57:17
**follow-ups** 55:3
**followed** 43:7
**follows** 4:5
**footage** 5:12
10:9
**foregoing** 59:6
**form** 2:24 18:6,8
**formal** 21:11
**former** 10:13
**found** 4:23
10:10 11:10,11
41:25
**four** 10:14 27:5
27:20
**fourth** 52:21
**frequently** 28:3
**front** 6:22 36:7
44:6,22 47:16
51:1 52:7
**frothy** 12:13
**full** 9:8
**fully** 59:10
**function** 30:23
**functional** 38:11
**furnished** 9:17
**further** 20:11
54:25 57:9
59:13

**G**

**G** 4:1
**GAYE** 1:9
**gender** 16:14
**general** 28:23

40:20
**Gerald** 1:7 3:17
5:4 11:2
**getting** 12:20
16:22 19:15
**Gila** 2:18 47:14
49:3,20 50:3
50:19
**Gila's** 47:17
**give** 7:2,7 9:7
17:19 21:4
23:14 40:2
45:12
**given** 25:2 59:9
**giving** 17:14
27:3 40:7
**Glattstein** 2:18
**Gleaves** 1:4 4:17
4:22 9:23 10:9
11:10,11,16,18
11:22 12:2,7
12:12 13:11
14:15 15:13,15
15:18 17:11,12
17:19 18:2
19:8 20:1,8,12
20:15 21:7,18
25:5 37:24
41:18,25 42:4
43:3,7 51:21
53:23 56:19
57:8
**Gleaves'** 4:19,21
5:7 12:23
20:23 52:13
**gloves** 50:1
**go** 6:15 11:23
13:17 16:25
18:8 19:19,23
26:20 27:14
28:17 32:5
39:8 40:25
46:9 55:19
56:23
**goes** 8:4 31:22
35:24 46:3

**going** 7:15,18
8:24 9:12
17:14,24 19:9
19:17 27:24
37:11,20 38:13
39:11 43:18,22
44:18 47:16,17
48:22 49:3
50:24 51:14
52:16,21 56:3
**gonna** 48:1
**graduate** 22:15
**grandmother**
4:17
**green** 38:6,11
**Gregory** 2:12
57:15,25 58:1
**guard** 53:7
**guards** 53:4
**guess** 12:1 15:7
17:13,17 25:8
33:15 36:22
39:22 45:10
**guidance** 40:8
**guy** 16:25
**guys** 48:3

**H**

**H** 2:2
**half** 8:2 27:19
27:22 30:10,14
40:10 46:22
**hand** 4:7 49:25
**handled** 54:3
**happen** 19:3
27:13 30:10
32:23 54:7
**happened** 12:8
21:18 42:24
43:13 44:12
**happening** 15:6
**happens** 35:22
54:17
**hard** 13:24
**head** 40:14 57:8
**heads** 57:5

**Health** 1:7 2:15
54:6
**hear** 7:11 13:1
19:18 37:15,17
37:17,19 43:12
53:10,21 54:11
**heard** 8:9 54:2
**hearing** 8:3 18:4
18:14 19:10
20:23 33:9
51:23
**held** 41:2
**help** 15:1,25
17:14,19 19:5
**hereto** 59:15
**high** 22:14,15
34:1
**highest** 22:13
**history** 26:17
**hit** 18:12 22:6
49:3 51:19
**hitting** 51:25
**HOC** 29:17
**honorable** 22:24
**hopefully** 43:19
**hospital** 20:15
21:2,7
**hostile** 12:4 19:4
**hour** 27:19,22
30:10,14 40:10
**hours** 4:23
30:14
**House** 29:12,15
29:16,17
**housed** 56:19
**housing** 11:10
26:10,24 27:4
27:5,8,18,20
27:21 28:23,24
29:2,8,18,22
29:24 32:9,10
32:13 33:13,16
33:21 34:4,9
34:20 35:1
36:10,12 37:9
38:15 39:16

40:7 42:21
54:14 55:7
**humanly** 55:19

**I**

**idea** 34:14
**identified** 17:5
**identify** 40:13
40:16
**ignore** 39:22,25
55:15
**immediate**
56:24
**immediately**
15:17 39:6,9
40:23 55:22
**impression**
14:21
**incident** 9:19,23
10:3 29:25
43:7 44:15
45:17 46:13,23
54:4
**include** 31:4
**including** 29:25
55:8
**incomplete** 41:7
**incorrect** 41:7
**indication** 33:13
33:22 34:3
37:11,23 38:1
**indifferent** 5:7
**information**
5:13 9:17 51:7
**initial** 46:17
**inmate** 12:1,9
15:8,10,13
17:7,16,17,23
18:1,12,20
19:2,16,21
28:8 33:7 50:7
50:12,16 51:8
51:18,20 53:12
**inmate's** 12:4
**inmates** 25:24
26:16,17 28:18

**inside** 55:8,17
**instructions** 7:2
**intake** 25:12,15
  25:16,24 26:9
**interested** 17:13
  59:15
**internal** 10:2
  47:2,12 53:21
  56:18
**interrupt** 7:19
  7:20
**interrupted**
  13:17
**interval** 27:13
**interview** 21:10
  44:25 46:15,18
  47:1,2,5,8 52:8
  53:3,20
**investigation**
  47:12 52:8,13
**Investigations**
  45:1
**involved** 20:4
  54:6,9 55:25
**Iron** 2:3
**issues** 6:12,14
  8:2 32:18

**J**

**J** 2:12
**jail** 36:8
**JFK** 2:13
**job** 23:1,2 25:8
  26:22 29:5
  40:22 53:22
**JOHN** 1:9
**Jon** 4:15 48:1
**Jonathan** 1:4
  2:2 4:17 41:18
**Jones** 1:14 3:3
  3:13,15 4:2,7
  4:13 6:19
  10:24,25 11:24
  11:25 15:6
  18:21,25 41:4
  41:24 48:16

49:18 54:24
  55:4 59:4,5
**Jr** 1:4 4:17
**Judge** 6:23
**jumper** 13:25
**jumpsuit** 13:18
  14:5 49:13
**June** 10:18,20
**jury** 6:23
**juvenile** 16:12

**K**

**KAIRYS** 2:2
**KAPLAN** 1:22
**keep** 7:6
**keeps** 19:2
**kept** 38:22
**key** 31:23 56:13
**keys** 28:17
**kicking** 31:23
**KIMBALL** 2:12
**kind** 22:17 39:8
  40:11 42:24
  55:9
**knees** 16:6
**knew** 17:11,12
**knock** 31:22
**know** 5:15 8:5
  8:18,22 9:2,13
  10:22 14:18
  16:5 17:5,6
  21:2 23:11
  33:9 41:11,12
  41:13 42:7,12
  46:5,21,24
  48:15 49:4,21
  52:20 53:6

**L**

**label** 43:21
**laid** 56:19
**LALITHA** 1:8
**lawsuit** 5:2,5,10
**laying** 12:12
**LEAMAN** 1:22
**learn** 20:14

47:11
**learned** 55:15
**leave** 22:11 23:2
  57:21
**leaving** 42:17,23
**left** 5:20 22:10
  41:23 49:10
  50:17 51:8
**leg** 31:10
**legal** 4:20
**legs** 9:1 14:7,12
**length** 27:11
**let's** 11:19,21
  40:25 46:3
  47:14
**level** 22:13
**lie** 32:22
**Lieutenant** 51:5
**life** 30:20 31:15
  31:17,19 32:3
  40:11
**light** 33:17,18,25
  34:1,9,12,15
  34:21 35:14
  36:16 37:3,8
  37:14,16,18
  38:6,7
**lights** 38:6,13,19
  38:22
**LIN** 2:2
**list** 26:16
**LITIGATION**
  1:23
**little** 9:20 49:21
**LLP** 2:2,12
**located** 36:7
**log** 27:16 32:9
  32:10,13,21
  35:18,19
**long** 8:25 21:25
  22:22 24:17
  29:8 34:10,11
  46:24
**look** 9:20 27:15
  56:25 57:1,2,3
**looked** 16:5

51:19
**looking** 30:19
  31:8,15 49:1
**looks** 50:11
**Lori** 7:5,11
  29:16 35:11
  43:22 52:4
  59:3,19,20

**M**

**ma'am** 13:5,23
  25:14 29:17
  56:10 57:11
**main** 26:13
**maintenance**
  34:18,24
**Majority** 25:23
**making** 7:4,11
  20:21 27:3
  53:8
**male** 16:12
**males** 16:11
**man** 49:13
**marked** 44:19
  51:1 52:3
**Marshall** 46:17
**materials** 9:14
**matter** 30:13
  34:4
**matters** 6:11
**MATU** 1:9
**McNAMARA**
  1:3 4:16,16 5:2
  5:5
**mean** 11:24
  17:15 23:15
  55:16
**meaning** 18:12
**means** 4:19 6:21
  27:24 38:12
**media** 21:18
**medical** 5:4,7
  12:17,18,19
  14:19 15:18
  19:9 20:1,5,8
  40:22,23 42:1

42:5 54:5,13
**Medication**
  26:14
**Medina** 51:5
**memo** 21:5
**memorandum**
  3:15 9:21 21:9
  44:8,11 51:4
  51:18,23 53:19
**memory** 36:15
**memos** 9:16
**Mental** 54:6
**mention** 8:9
**mentioned** 4:14
  19:25 33:6,8
  33:25 37:9
  46:16
**MESSING** 2:2
**met** 9:12
**midst** 42:1
**mini** 57:22,24
**minute** 45:22
  48:2
**minutes** 33:1
**mistaken** 12:11
  38:8 54:12
**moaning** 51:21
**moment** 4:14
  26:21 46:3
**monitoring** 20:6
**monitors** 34:18
**months** 10:3,14
  16:11 44:16
  46:22
**morning** 47:6
**motions** 49:25
**mouth** 12:13,24
  15:24
**move** 13:24
  24:13,14,18
  31:14 48:2
**moved** 28:20
**moving** 13:7

**N**

**N** 3:1 4:1

naked 13:11 16:2,5,13,15 16:20 17:1 19:8
name 4:15 5:4 12:4 15:2,10 15:11 17:6 44:22 51:7 52:9
named 5:9
near 10:23
need 5:23 8:25 27:25 46:2 48:2 52:19
needed 6:17 15:25 39:8
needs 5:7 28:7 38:2
neglected 40:5
neither 59:11
night 42:24 43:10,14 44:12 47:18 51:20,21
noise 37:17,18 37:19
normal 20:18 22:11 37:2
normally 36:7,8 42:16 55:9
nose 12:14,24 15:24
Notary 59:22
note 6:21 32:17 42:23 51:20
notes 21:14
noticed 34:21 44:14
notify 53:3
noting 7:3
November 22:5 59:24
number 3:12 23:11 25:1
numbering 44:21
Numerous 6:8

nurse 26:15,19
nurses 12:20 14:2 21:5

— O —

O 4:1
o'clock 58:3
O'CONNOR 2:12
oath 6:21,23 8:15
objection 18:8 18:15 19:12 36:21 38:25 42:6 53:24
objections 2:24
obligation 34:22
observations 43:9
observed 19:8 42:4
obtain 40:10
obvious 7:3,14
obviously 7:25 44:15
occasion 25:4 28:9
office 36:6
officer 4:13 5:3 10:18,19,24,25 11:2 13:10 15:5,6 16:14 17:22 18:2,3 18:11,21,21 19:7,21,22 21:22 22:1 23:23 24:25 26:22 27:11,12 27:14 28:11,23 29:2,8,19,22 30:4,7 31:8,21 32:13 33:6,21 34:20 35:1 37:10,20 38:15 39:4,16 41:4 41:10,11,12,12

41:21,24,24 42:3,8 43:9,13 47:16 48:9,16 48:16 49:17,17 53:2 54:24 55:4 57:17 59:3
officer's 28:17 28:24 33:19 51:24
officers 11:24 19:18 21:7 27:8,18,25 36:12 42:13,16 42:21,23 48:12 54:14
okay 16:1,4,25 17:7,8 22:6 29:4 41:9 44:2 46:8,11 48:6,9 56:25
oldest 29:13
once 14:2 15:22 29:5 38:8 52:4 53:9
OPC 47:3
open 47:25 48:10
operate 55:11
opioid 26:16
opportunity 5:20 7:22
opposite 16:14
orange 13:18 49:13
order 32:16 35:4 40:13,16 44:21 50:7 55:6,12
orders 40:12 55:5,7 57:21
organization 34:17
orientation 57:8
original 2:24
outside 34:6 36:7 48:13

overhearing 43:8
overnight 41:22 42:9
overtime 42:10

— P —

P 4:1
P-10 3:16 52:4
P-11 3:17
P-6 3:13 44:19
P-7 3:14 50:24 51:1
P-8 50:23
P-9 3:15 43:22 44:5
p.m 41:23 42:12
PA 2:4,9,14 59:21
page 3:2 46:4,4 46:9 52:21,23
pant 14:12
paper 35:16,18 35:21,22
paperwork 35:14 36:9 37:5
paraphrased 56:6
pardon 50:23
part 23:17 27:1 30:22,22 35:2 36:22 38:9,14 38:16 53:11
participated 47:8
participating 43:8 46:18 54:21
particular 5:11 28:8 48:6
parties 59:12,15
pause 48:2 49:4 49:21 50:3
PDF 57:22,24
pending 9:3

Penn 2:13
Pennsylvania 1:1,24 59:22
people 7:12 19:6 26:9
period 17:10 18:19 20:19 28:20
periodically 27:7
permitted 27:19 39:24
person 16:20 31:8 39:2 55:25 56:1
person's 31:9 32:4
personal 21:15
Philadelphia 1:7 1:24 2:4,9,10 2:14 4:11,25 5:3 10:13 22:1 22:18 23:18 29:6 33:3 45:13,19 52:8 52:12
phrase 27:17
physically 36:2
piece 35:21,22
place 30:1 46:16 47:1,2
Plaintiff 1:5 2:5
play 49:4,20
Plaza 2:13
please 7:15 8:4 28:13 57:21,24 58:1
Pod 11:11 29:25 41:22 48:25
point 8:8,18,25 20:9 40:20 43:24 52:18 53:18
police 3:16 45:13,19 52:9 52:12

policy 40:8
popped 6:12
position 12:17
    26:2 42:15
possible 27:21
    55:19
post 21:17 40:12
    40:13,16 55:5
    55:6,7,11,12
practice 37:2,4
    56:15
precedes 44:15
preparation
    9:10 44:9 45:3
prepared 21:10
preparing 7:5
    53:19
presence 30:23
present 2:17
    10:23 15:6
    17:20 30:25
press 53:12
pressed 33:23
    39:25 53:5
presses 37:25
    39:2
pressing 33:8
presumably
    38:20
prevented 19:17
previous 18:2,3
    41:6 50:6
prior 53:4
prioritize 56:7
prison 6:8,12
    9:18 16:2,10
    29:13 53:22
    55:10
prisoner 16:2
    33:14 39:18
    40:21
prisoners 30:18
    39:13
Prisons 4:11 5:1
    10:14 22:2,10
    22:19 23:18

29:6 33:4
private 34:18
privates 13:25
probably 42:10
procedures 40:6
proceedings 7:5
    8:6 59:10
process 25:25
    38:16
promotion
    23:22
proof 30:20
    31:15,17,19
    32:3 40:10
properly 53:22
protocol 26:15
provider 14:19
providers 5:5
Public 4:4 59:22
pull 13:25
purpose 30:17
purposes 5:18
    8:11
pushed 33:14
    56:4
put 4:7 12:16
    14:6 16:20
    32:20 43:18
    47:16
putting 12:21
    14:3,6 20:1
    49:25

    Q

qualification 9:2
quarantine
    25:15,17,25
question 7:13,15
    7:20 8:17 9:3,4
    19:15 35:10
    37:1,1 38:20
    39:24 42:2
    45:23 46:6
    50:5 52:23,23
questioned
    27:11

questions 6:20
    7:7 14:18
    21:20 41:10,21
    50:21 52:19
    54:25 57:12,14
    57:15
quick 55:2
quoting 37:22

    R

R 4:1
rank 23:23
rattling 56:13
read 45:24 46:3
    46:4 51:17
    52:24,24,25
reading 2:23
realize 8:20 41:5
really 15:12
    16:22 30:19
    36:25 39:19
    41:13 49:24
reason 5:14 6:19
    9:7 46:21
recall 11:21
    41:14 42:3
    46:18 51:23
    54:20,21
recalled 18:1
receive 22:24
receiving 25:16
    25:25
recollection
    19:16 37:21
    44:12 45:24
    46:13 50:7,13
    53:10 57:7
record 4:15 8:6
    27:15 38:22
    40:25 41:2,5
    52:8 55:3 59:9
recorded 59:10
recording 8:10
    8:11,11
records 15:9
recovery 12:16

red 38:6,7,12
refer 4:13 17:6
reference 32:14
    32:15 41:20
referring 9:23
    17:16 51:21
refresh 50:13
    53:10
regard 53:23
Regardless 56:2
regular 27:13
regulations
    55:10,10
related 4:20
    20:4 59:12
relatedly 7:10
relative 59:14
relevant 5:13
    52:17
remember 11:14
    11:15,17,18
    12:3,22 13:12
    13:15 15:12,16
    17:4,9 18:4,14
    18:24 19:10
    20:22 21:1
    23:10 33:9
    37:14 41:17
    43:2,8 45:8,11
    45:16,18 46:25
remembering
    50:8
remove 12:6
removed 12:10
    14:11 17:7
    20:12
removing 28:6
reported 18:11
Reporter 7:5
    13:4,22 16:17
    18:7 25:13
    29:14 34:7
    35:9,25 44:2
    45:15 55:21
    57:10,20,23,25
    59:21

Reporter-Not...
    4:4
REPORTING
    1:23
represent 17:24
represented
    5:18
Representing
    2:5,10,15
requested 48:24
required 31:1
    32:9
requirement
    57:4
respond 15:3
responded 11:10
    18:13 55:5
responders 20:1
response 19:16
responsibilities
    26:12 28:25
    39:4
responsibility
    26:13,23 27:2
    28:11 35:7,13
    38:15
responsible
    34:14
responsive 12:2
restroom 9:1
result 5:8
review 10:3,8
    45:2 50:6
reviewed 9:14
    32:13 33:1
    44:8 45:7 46:7
    46:10 47:15
right 8:9 11:6
    12:3 23:14
    24:6 30:1,22
    30:23 35:16
    37:24 41:24
    47:10,24 48:19
    50:3 51:14
    56:9,21,23,23
    56:24

rings 33:19
rising 31:5
Road 24:3
roll 47:6
rolled 13:19
  14:12
rolling 12:25
  13:3,3
room 25:16,25
  47:7 54:15
rotunda 34:6,8
roughly 24:20
routine 35:2
rover 25:7 26:2
  26:3,5 27:2,20
  36:8,13 42:15
rovers 27:6 34:8
rubber 50:1
RUDOVSKY
  2:2
rules 16:2
rush 55:20,22

—————————
S
—————————
s 1:9 4:1
sanitation 35:17
  36:23 37:4
  38:16
saw 16:5 32:18
  49:25
saying 19:2
says 19:2,21
  28:11 32:14
school 22:14,15
screen 43:18,19
  45:25 47:17,24
  48:7,19 49:10
sealing 2:23
seated 5:20
second 27:14
  41:1 46:4,9
  50:24 52:23
Secondly 7:10
seconds 47:22
  49:16,24
Security 35:17

see 16:19 30:4
  31:24 34:3,9
  40:21 43:19
  44:5,22 47:20
  47:20,22,24
  48:6,7,9,10,12
  48:19,20 49:9
  49:13,24 51:1
  51:15,19 52:7
  52:19
seeing 8:3 11:15
  31:4,5
seen 5:11 9:21
  15:23 26:18,19
  33:13 51:11,22
semantics 25:8
separate 27:5,20
September 1:16
  4:23 25:4
  26:23 36:16
  38:23 47:21
  51:6 59:7
sequence 50:14
Sergeant 46:17
serious 5:7 54:5
serve 4:18 36:12
served 22:21
shake 31:10,10
share 43:19
  47:17
sheet 13:13 14:1
  14:2 35:20
shift 20:18 23:5
  23:6,9,19
  24:21,25 26:6
  35:7,13,23,24
  36:1,1,3,3,6
  41:15,22 42:9
  42:17,21 53:20
  56:14,14
shifts 56:15
short 41:5 42:22
show 15:9 24:24
  43:16 44:18
  47:15,17 48:23
  50:23,24 51:14

52:2,16
shown 44:3,20
  47:19 49:7,22
  50:25 52:6
sick 28:7
side 39:9 49:17
  50:13
signing 2:23
similar 42:25
sink 56:24
sir 4:8,12 5:16
  5:17,22,25 6:3
  6:5,13,25 7:1,9
  7:16,17,23 8:7
  8:13,16,19,23
  9:6,9,24,25
  10:4,7,11,16
  11:1,3,9,13
  13:2 14:9,14
  14:16,23 15:7
  15:12,20 16:3
  16:21 17:3
  18:5,16,23
  19:4,13,20,24
  20:3,7,10,13
  21:8,13,16,19
  21:21,24 22:8
  22:12,25 23:3
  23:7,12,13,21
  24:10,23 25:21
  26:4,7,11,22
  26:25 27:4,18
  28:2,14 29:2,7
  29:20 30:2,12
  30:16,20,21,24
  31:3,6,12,16
  31:20 32:1,2,7
  32:11,19 33:5
  33:24 34:2,13
  34:19 35:5,15
  36:4,14,18
  37:6 38:18
  40:4,15,19,20
  40:24 41:8,16
  41:19 42:7,14
  43:1,5,11,15

43:16 44:5,7
  44:10,13,16,19
  44:22,24 45:4
  45:6,13,25
  46:1,13,14,18
  46:19 47:9,13
  47:20,23 48:11
  48:14,18,21
  49:1,2,6,15,19
  50:1,2,5,10,15
  50:18 51:2,3,9
  51:10,13,16
  52:1,7,10,14
  52:15 53:13,14
  53:17,18,25
  54:2,8,19
sit 6:15
sits 37:10
sitting 11:14
  33:21 53:14
situations 39:13
six 44:16
sleep 16:2
sleeps 57:5
Slory 1:8 3:17
  5:4 11:2 41:10
  41:11,12,22
  42:3,8 43:9,13
social 21:17
sold 17:12
Solicitor 2:7
someone's 31:25
sorry 13:1,17
sound 15:11
  17:25 30:20
sounds 13:6
  14:10 24:5,20
  28:22 56:6
South 1:23 2:3
speak 5:21,23
  10:12 14:15
  54:6
speaking 14:22
  56:11
Special 45:1
specific 32:15

40:13,16 55:11
spells 40:9
spoke 45:19
spoken 10:19,21
  10:24 11:5,6
staff 51:19 54:6
  54:13
stamp 43:22,24
  52:5
stamped 52:4,22
stamps 47:21
stand 9:1
standard 37:4
standby 6:18
standing 12:9
  15:8 48:12
start 7:14 11:21
  23:8 29:3
  35:10 42:18,21
started 21:21
  22:4,5,18 29:5
  29:12
starting 7:19
State 24:3
statement 3:13
  3:14,16,17
  10:1 21:12
  45:12,23 46:12
  52:12
STATES 1:1
stayed 12:17
steps 31:22
stipulated 2:22
STIPULATION
  2:22
stood 16:15
stop 17:1 51:22
  55:19
straight 56:21
  57:2
Street 1:23 2:3,8
stretch 9:1
stretcher 12:21
  14:4 20:2
strip 48:2
strobe 33:17,18

33:25 34:1,9 34:12,15,21 35:14 36:16 37:2,8,16,18
structure 56:18
subsequent 56:8
substance 12:13 12:23 15:23
sued 5:6
suggestion 20:22
Suite 1:23 2:3,14
summarize 17:21 30:3,6
summarizing 30:7
summoned 48:24
Supervisors 54:5
SUPPORT 1:23
supposed 27:7 28:3 30:7,10 39:8,18 40:9 40:10
sure 6:20 7:7,21 8:4,5 26:19 27:9 28:20 36:25 38:13 48:4
surveillance 5:12 10:9 47:18
sworn 4:3 59:7
system 6:9 9:18 16:10

**T**

table 56:23
take 9:4 11:5 18:2 28:17 31:18 32:25 36:2,5,8 41:10 45:22 46:3 47:1,10 50:19 53:14
taken 20:8 23:24

46:15 59:4,13
talk 27:10 30:6,6
talked 43:17
talking 7:12 27:9,17
task 28:6
tasked 27:3
Taylor 2:7 3:4 5:19,21,24 9:12 18:6,15 19:12 36:21 38:25 42:6 48:1,5 53:24 55:1 57:12,19 57:23,24
technical 8:2
tell 7:21 9:14 11:21 16:20 30:5 31:7 41:24 53:15
telling 32:21
tended 25:19 26:22
Terrelle 10:24 10:25 18:21 41:24
test 23:24,25
testified 4:5 6:1 6:4,6 17:22 33:7 55:15
testify 5:15 6:21
testifying 6:25 8:15 56:12
testimony 2:23 5:21 9:8 10:18 41:6 50:6 56:17 59:6,9
text 45:24 51:14
thank 50:19 57:13,15
thanks 41:9 57:19
thing 21:1 27:10 40:11 42:25 55:4
things 4:10

17:23,25 50:22
think 8:24 33:19 52:17
thinking 12:16 23:12
Thomas 2:12 3:14,16 15:10 17:5 50:22 51:6,6,18,20 51:23 52:3,12 53:11
Thomas's 52:9
thought 45:7
three 10:14 25:9
till 20:16
time 1:16 2:24 5:23 7:12 9:3 9:18 10:9,14 10:23 17:10 18:19 20:18 23:25 25:23 26:14 27:19 28:20 30:13 35:1 39:15 47:21
times 6:6,8,10 6:14 34:12 38:18 52:24
today 5:14,21 6:22 8:25 9:8 11:7,14 53:14
today's 7:4 8:6 9:11 44:9 45:3
toilet 56:24
token 7:18
told 17:23 19:7 20:25 30:4,9 30:17 31:9 32:4 45:7 47:6 53:7
Tom 57:14
top 12:12,20 14:3,11 40:14 47:24 49:10 56:22
tour 26:24 27:3

27:10,17,21,24 28:10,12,16,25 30:8,9,17 31:1 31:14 32:8,9 32:18,22,22 38:9 40:9 53:8
toured 32:14,15
tours 27:12,19 40:7,14 56:12
trained 14:19
transcribed 2:23 59:8
transcript 7:4,6 7:11 43:25
trial 2:24
TRIVIKRAM 1:9
trouble 8:3
true 59:8
truth 32:21
try 7:12,15 11:19 24:14
trying 17:18 32:4 55:18
Tuesday 1:16
turn 6:16
two 2:13 7:2,11 10:5,22 17:23 31:22 37:15,15 45:8 46:22,22 48:12
type 14:5 15:25 36:9 54:13
typical 25:18
typically 26:5
Tyrone 3:14,16 15:10 51:5 52:9

**U**

U.S 22:21,22 34:16
understand 5:16 6:25 8:14,17 14:21 35:1 41:21 51:8

52:14
understanding 11:9 17:21 18:19 27:12 30:3,11 32:6 33:10 42:8,20 48:22 52:11 54:17
Understood 7:8 7:16 8:6,12 9:5
Unfortunately 16:9
unit 20:9 27:15 27:21,24 28:12 29:21 30:18 32:14,16 34:4 40:23 41:25 45:1 53:21
UNITED 1:1
units 27:20 28:10 36:10
unlocked 38:12
unresponsive 4:24 11:11
unruly 12:10
UPS 22:20
use 9:1 27:17 39:14 44:1 55:14
usual 42:12

**V**

vacation 22:11
various 28:10
verbal 7:7
versa 37:17
vice 37:17
video 5:12 8:10 10:8 47:15,18 47:19 48:23 49:5,7,22 50:11,19
voice 7:6
vs 1:6

**W**

Christopher Jones

Page 69

wait 6:15 7:13
waive 2:23
wake 28:19
    56:13
walk 16:19,24
    28:15
walked 15:18
walking 11:15
    16:4 49:10
want 7:20 9:10
    11:19 19:22
    26:18 27:9
    37:21 49:3
    50:22
wanted 18:2
    47:5
Warden 54:12
Warden's 54:14
Washington
    11:24
wasn't 12:2 54:9
    57:6
watch 49:5
watching 49:9
    49:23
way 10:17 14:24
    15:9 34:3 39:9
    39:11 40:5
    41:20 45:18
    53:15 56:18
we'll 9:20 27:13
    43:21
we're 6:22 7:4
    7:10,25 8:24
    27:9 41:4,4
    44:21 48:22
    49:1,9,16,23
we've 5:11,14
    32:25 40:17
weeks 43:6
went 4:15 11:12
    12:11 22:10
    40:6
white 12:13
who've 5:6
Wilson 10:18,19

11:25 13:10
15:5 17:22
18:11,21,25
19:7 27:11,12
27:14 30:4
31:9,21 32:14
33:7 37:20
41:25 48:17
49:17
window 31:24
    56:12 57:1
withdrawal
    26:15
witness 2:23 3:2
    4:3,9 6:14,17
    18:16 19:13
    36:22 42:7
    46:7,10 49:8
    53:25 59:5,8
witnesses 10:22
WOLFE 1:22
words 11:23
work 22:17
    25:19 26:6
    28:23 29:21
    33:16 37:18
    38:19
worked 16:11
    22:20 24:3
    29:24 41:15
working 22:18
    23:4,19 25:9
    34:12,15,21
    35:3,14 36:17
    37:3,3 38:14
    38:15,22 39:3
    53:7,16
works 33:11
    34:10,11
worth 7:3
wouldn't 17:18
    19:5
wrap 14:7
wrapping 31:23
write 21:14
written 21:11

40:8 51:5
wrong 30:5
wrote 9:21
www.klwrepo...
    1:25

**X**

X 3:1

**Y**

yeah 6:13 30:19
    30:22 48:6
year 8:2
years 6:9 16:11
    22:3,23 24:19
    25:9 29:9
Yep 38:3

**Z**

Zoom 1:14 4:4
    8:1,3,8,10 59:7

**0**

**1**

1 37:24,25 38:2
    47:24 48:10,13
    49:10 53:16
    56:19
1-877-KLW-D...
    1:24
10:15 1:16
10th 45:2 46:16
11 49:16
11:00 41:23 42:9
    42:9,12
11:30 58:3
1100 2:14
12 24:19
1303 1:23
14th 2:8
1515 2:8
15th 2:13
19 22:3
19102 1:24 2:9
    2:14
19106 2:4

19th 44:15

**2**

2:20-cv-04570...
    1:6
20 6:9 16:11
2001 22:5
2002 22:4
2006 23:16
2007 24:20
    29:23
2017 24:1
2018 4:23 23:5
    24:8 25:4
    26:23 36:16
    38:23 44:15
    45:2 46:16,22
    47:21 51:6
2019 24:16,21
2021 1:16 59:7
2023 59:24
20th 22:6
215 1:24
21st 4:23 25:4
    36:16 38:23
    47:21
230 1:23
24 30:14
25 49:24
26 22:5
26th 51:6
28 1:16 59:7
29 59:24

**3**

3 11:11 29:25
    41:22 48:25
3:00 20:20 23:4
    23:5,8,19
    24:21 42:8
    56:14
30th 10:18,20

**4**

4 3:3
43 3:15
44 3:13

492 52:22

**5**

5:00 53:6,12
50 3:14
501 2:3
52 3:16
54 3:4 47:22

**6**

6:00 53:4,7

**7**

7:00 20:20 23:4
    23:5,8,19
    24:21 41:23
    42:10,13,17,22
    56:14
7:13 47:22
7:14 49:16,23
718 2:3

**8**

**9**

922-7112 1:24
93 22:16