**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EILEEN A. MCNAMARA, as** | : | |
| **Administrator of the ESTATE OF** | : | |
| **JONATHAN GLEAVES, JR.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No. 2:20-cv-04570-RBS |
| | : | |
| **CITY OF PHILADELPHIA; CORIZON** | : | |
| **HEALTH; GERALD SLORY;** | : | |
| **ELIZABETH BRADLEY; LALITHA** | : | |
| **TRIVIKRAM; MATU GAYE; JOHN** | : | |
| **DOE(S),** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Plaintiff's Opposition to Defendant Slory's**
**Motion for Summary Judgment**

## I.    Introduction

In September 2018, defendant Gerald Slory was an experienced correctional officer in the

Philadelphia Department of Prisons (PDP). He knew of his responsibility to protect the health

and safety of incarcerated persons assigned to the housing area he supervised. He knew he was

required to conduct regular tours of his housing area to ensure the immediate provision of

medical assistance for anyone experiencing a health emergency. He knew that persons just

admitted to PDP and housed in quarantine areas were at heightened risk for serious medical

issues due to withdrawal from controlled substances, and, as such, that he had an enhanced

responsibility to monitor the well-being of persons housed in those areas.

In the early morning hours of September 21, 2018, Slory violated these responsibilities

and caused the death of 33-year-old Jonathan Gleaves, Jr., who had just been admitted to PDP

the previous evening. Gleaves was assigned to a housing area where Slory was the sole

correctional officer on duty. During Slory's overnight shift, Gleaves experienced progressively worsening symptoms due to withdrawal from controlled substances, including excessive diarrhea and vomiting. Throughout that time, Tyrone Thomas, Gleaves's cellmate, struggled to get attention for Gleaves. Thomas banged on the door, yelled, and pressed a call button used to alert officers to emergencies. Slory, however, did nothing to address Gleaves's medical emergency.

At 6:56 am, Slory walked by Gleaves's cell, shone his flashlight in the window, and kept walking. He then finished his shift and left the facility. Less than 15 minutes later, Officer Terrelle Jones started her shift in the same housing area and walked by Gleaves's cell. She saw immediately that something was wrong. Gleaves was lying in his bed completely naked. Within seconds, Jones noticed that Gleaves was foaming at the mouth and struggling to breathe. She summoned medical staff, who removed Gleaves from his cell and transported him to a nearby hospital. Shortly after 1:00 pm, Gleaves died. Medical evidence showed that he died due to a stroke—likely caused by his extreme withdrawal symptoms—that would have been treatable with earlier intervention.

Plaintiff Eileen McNamara, the grandmother of Gleaves's three children and the administrator of his estate, has brought this civil rights wrongful death and survival action under 42 U.S.C. § 1983 asserting claims that, as relevant to this motion, Officer Slory was deliberately indifferent to Gleaves's serious medical needs, and, as such, violated his Fourteenth Amendment rights. During discovery, Slory denied at his deposition that he had any knowledge of Gleaves's medical needs, and he claimed that Gleaves's death was a complete surprise. He has moved for summary judgment on that basis, arguing that he cannot be held accountable for deliberate indifference to Gleaves's serious medical needs if he did not, in fact, know of Gleaves's medical condition.

As demonstrated below, however, Slory's reliance on his self-serving denials are not sufficient to support summary judgment given contradicting evidence that Slory's motion ignores. Contrary to Slory's contentions, when the facts are viewed in the proper context—that is, in the light most favorable to plaintiff—the combined evidence from Gleaves's cellmate, Tyrone Thomas, and the officers who found Gleaves in obvious medical distress moments after Slory saw him are more than sufficient to support an inference that Slory knew of Gleaves's serious medical needs and ignored them. Slory's motion should be denied.[1]

## II.   Facts

Ms. McNamara has submitted with this memorandum Plaintiff's Statement of Facts in Support of Opposition to Defendant Slory's Motion for Summary Judgment. The statement is cited throughout this memorandum with references to "PS," followed by the relevant paragraph number.[2]  A summary of the facts relevant to the motion is as follows:

### A.   Officers' Responsibilities to Protect the Health, Safety, and Well-Being of Persons Incarcerated in PDP Facilities

Correctional officers employed by the City of Philadelphia to work in PDP facilities have a duty and responsibility to protect the health, safety, and well-being of persons incarcerated in those facilities. PS 1. Officers who are assigned to supervise housing areas in PDP facilities fulfill this duty by conducting regular tours of their assigned unit. PS 2. They must conduct those

---

[1] Ms. McNamara's Complaint also asserted claims against the City of Philadelphia, Corizon Health, and three Corizon employees. The instant motion seeks summary judgment on behalf of both Slory and the City, and Ms. McNamara does not oppose dismissal of her claims against the City. The Corizon defendants have not filed any dispositive motion, but, instead, have filed a suggestion of bankruptcy seeking to stay proceedings against them. ECF 41. Ms. McNamara requests an opportunity to address the status of her claims against Corizon once the Court resolves the instant motion.

[2] Ms. McNamara has also filed a response to Slory's statement of facts in support of motion for summary judgment (ECF 38-1).

tours at intervals that do not exceed 30 minutes—at least twice per hour—and, during a tour, must look in every cell in the unit. PS 3-4. When doing so, officers must ensure that they see "proof of life" to confirm that people in each cell are alive and well. PS 4. If an officer cannot immediately tell if a person is alive and well, then the officer must direct the person to "shake a leg" or move an arm. PS 5. If the officer receives no response, they must enter the cell the ensure the person's well-being. PS 6. If at any point an officer sees evidence of a medical emergency, the officer must immediately seek assistance from the medical professionals assigned to work in each PDP facility. PS 7. Once officers complete a tour, they are required to contemporaneously document the tour in a computerized record system, and that documentation must be truthful and accurate. PS 8-9. All requirements for tours are outlined for officers from the beginning of their work in the PDP and are spelled out in orders posted at each officer's workstation. PS 10.

Beyond their responsibility to conduct regular tours, officers have an additional duty to respond to requests for assistance made by persons residing in their housing area. PS 12-13. Incarcerated people can seek assistance by pressing a call button in their cell, which then alerts the officer by causing a light to flash in the housing area and a light or buzzer to activate at the officer's workstation. PS 12. When the officer receives such an alert, the officer is required to investigate the reasons why someone is seeking assistance. PS 13.

Fulfillment of these responsibilities for PDP officers is significantly enhanced for officers working in the quarantine unit at the Curran-Fromhold Correctional Facility, the main PDP intake facility for males. PS 14-15. People in the quarantine unit are "just off the street," and, as a result, large percentages of them experience withdrawal from controlled substances, especially opiates. PS 16. Officers working in quarantine units know that withdrawal frequently requires the emergent provision of medical assistance through a "stretcher call," and, for this reason,

officers assigned to such units know that they must carefully monitor people housed there. PS 17-18.

      **B.**     **Jonathan Gleaves's Medical Deterioration After Admission to PDP and Defendant Slory's Failure to Address His Serious Medical Needs**

On the evening of September 19, 2018, Philadelphia police encountered Jonathan Gleaves, Jr. at his sister's home and placed him under arrest based on warrants related to an alleged violation of probation. PS 19. Gleaves was held in police custody until the next day and was admitted to PDP in the late afternoon of September 20. PS 20. Shortly after that admission, Gleaves had medical encounters with two Corizon employees who documented his extensive history of drug usage. PS 21. They recorded Gleaves's daily usage of 10 bags of heroin, 100 milligrams of Fentanyl, and four to six tablets of Xanax (a benzodiazepine), with his last usage that day. *Id.* Based on this history, the Corizon employees determined that Gleaves was at substantial risk for withdrawal. PS 22. Withdrawal is particularly dangerous early in the process—in the days immediately following admission to PDP—and especially so for users of benzodiazepines like Gleaves. PS 23-24. In view of this danger and Gleaves's reported usage, the Corizon employees who saw Gleaves placed him on a withdrawal protocol requiring medical assessments three times per day. PS 22.[3]

Following his medical assessments, Gleaves was assigned to the B1 Pod 3 housing area in the CFCF quarantine unit. PS 25. He arrived in that unit shortly before 1:00 am on September 21. PS 26. Defendant Gerald Slory, who had been a PDP correctional officer for more than two

---

[3] The record establishes that an assessment that was required to occur between 11:00 pm on September 20 and 7:00 am on September 21 did not, in fact, take place. The failure to conduct that assessment is central to Ms. McNamara's claims against the Corizon defendants. Those claims are not at issue in the instant motion.

years, was assigned to work as the B1 Pod 3 housing officer on the 11:00 pm to 7:00 am shift. PS 28. Slory placed Gleaves in Cell 1 with a man named Tyrone Thomas. PS 27, 30.

Slory was fully aware of his responsibilities to protect the health and safety of people assigned to his housing unit, to conduct tours every 30 minutes, and to accurately document those tours. PS 31. Slory conducted, and documented, four tours between 1:11 am and 3:22 am. PS 32. Thereafter, and in violation of PDP rules for correctional officers, Slory conducted no tours until shortly before 7:00 am. PS 33. Slory compounded his violation of PDP rules by falsely reporting in the computerized record system that he had conducted four separate tours during this time frame when he had not, in fact, done so. PS 34.

During this time, Gleaves was experiencing worsening symptoms related to drug withdrawal; as reported by his cellmate, Tyrone Thomas, Gleaves appeared to be "dope sick" in that he was repeatedly defecating in the cell toilet to the point that he needed to use a rag to clean his buttocks. PS 35. Thomas believed that Gleaves needed urgent medical assistance and at approximately 5:00 am pressed the call button in his cell. PS 36. He also yelled for assistance. PS 37.[4] Slory, however, did not respond to the call button.[5] PS 38. Nor did Slory respond to Thomas's yelled requests for assistance. *Id.* According to Slory, there never was a reason to respond because, as he claimed in his deposition, no one pressed the call button or asked that Gleaves be removed from his cell to receive medical attention. PS 39.

---

[4] Slory's statement of facts and memorandum of law omits any reference to Thomas's statements on the purported ground that they are inadmissible hearsay. As explained below, however, all of Thomas's statements outlined in this statement of facts fall within exceptions to the hearsay rule and may be considered on summary judgment. *See infra* § IV.A.2.

[5] Slory acknowledged that the call button system was working and operable during his shift. PS 29.

At 6:56 am, as his shift was ending, Slory conducted a tour of the housing area. PS 40. As he walked by Cell 1, he shone his flashlight in the cell and observed Gleaves. PS 41. According to Slory, Gleaves was alive and well and sleeping comfortably. *Id*.

### C.   Gleaves is Discovered in Severe Medical Distress and Tyrone Thomas Confirms Slory's Failure to Respond to Gleaves's Serious Medical Needs

At 7:00 am, Slory's shift ended, and he was replaced in the B1 Pod 3 area by Officer Terrelle Jones who was joined shortly thereafter by her partner Officer Charlene Wilson. PS 42. At 7:10 am, Jones began the first tour of her shift. PS 43. She went to Cell 1 and immediately observed that Gleaves was lying on the top bunk fully naked. *Id.* Concerned that this was a sign of a serious problem, she kicked the cell door, trying to get Gleaves's attention. *Id.* Gleaves did not respond. PS 44.

Moments after kicking the door, Jones' concern was heightened when she noticed that Gleaves was foaming at the mouth; as described by Officer Wilson, who joined Jones at the Cell 1 door shortly after Jones' initial observations, the foaming was obvious as there were large quantities running down both sides of Gleaves's face. PS 45-46. Jones and Wilson were then joined by a third officer, Christopher Jones. PS 47. All the officers observed Gleaves's need for emergency medical attention as, in addition to the foaming at the mouth, Gleaves was breathing heavily and gasping for air, was unable to speak, and his eyes were unfocused and moving in different directions. *Id.*

In addition to making these observations, the officers learned about Gleaves's medical symptoms from his cellmate, Tyrone Thomas, who, from the moment Terrelle Jones kicked the door, vigorously complained to her about what had happened during defendant Slory's shift. PS 48. Thomas was, as Jones observed, "agitated" when making his complaints, so much so that Jones was concerned he would attack her, which caused her to delay opening the cell door until

7

she was joined by her partner, Officer Wilson. *Id.* Wilson echoed those observations, describing Thomas as "hyperactive" when describing the events of the early morning hours. *Id.* While he was in this agitated and hyperactive state, Thomas told Jones that Gleaves had been very sick, that he had tried to summon help for Gleaves by banging on the door all night, and that he pressed the call button in his cell. PS 50-51. Despite these efforts, Thomas reported, Slory never responded. PS 51.

Slory, in addition to denying that he ever heard anyone seeking attention for Gleaves or pressing the call button, PS 39, claimed that when he conducted his 6:56 am tour, Gleaves was neither naked nor foaming at the mouth. PS 52. According to Slory, those circumstances could only have developed in the 14 minutes between his 6:56 am tour and Jones' immediate observation upon arriving at Gleaves's cell door. PS 52. Jones contradicted this assertion, stating that, based on what she saw, there was no way in which Slory could have determined that Gleaves was healthy and safe. PS 53.

**D.    Gleaves's Death and Medical Confirmation that the Stroke He Suffered Would Have Been Treatable with Earlier Intervention**

After their observations of Gleaves, Officers Terrelle Jones and Wilson immediately called for medical attention. PS 54. Gleaves was removed from his cell and taken to the CFCF medical unit, and then transported to Nazareth Hospital. PS 55. After doctors at Nazareth determined that Gleaves needed more intensive care, he was transported to Hahnemann University Hospital. PS 56. Gleaves was pronounced dead that afternoon at 1:05 pm. PS 57.

According to plaintiff's medical expert in the field of neurology, Dr. Joseph Caleb McCall, the precipitating cause of Gleaves's death was a stroke that began in the overnight hours, with the stroke likely due to worsening withdrawal symptoms that led to a change in heart rhythms and blood flow. PS 58. As Dr. McCall explained, Gleaves's stroke was of the type that

could have been treated with earlier intervention. PS 59. Had medical intervention been provided when Gleaves's cellmate was seeking assistance from Slory, Gleaves would have had a significantly increased chance of surviving the stroke. PS 59-60.

## III.   Standard of Review

Summary judgment should only be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute bars summary judgment when it "might affect the outcome of the suit under governing law." *Id.* In deciding a summary judgment motion, the Court must "view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland Cty.,* 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted).

## IV.   Argument

Defendant Slory argues that the facts do not support Ms. McNamara's claims of deliberate indifference to serious medical needs, and, in any event, he is entitled to qualified immunity. Neither argument has merit. The motion should be denied, and Ms. McNamara should be permitted to proceed to trial on her claim against Slory.

### A.   The Record Establishes Defendant Slory's Deliberate Indifference to Jonathan Gleaves's Serious Medical Needs in Violation of Gleaves's Constitutional Rights.

Under long-established Supreme Court precedent, Ms. McNamara's § 1983 claim against defendant Slory that he unconstitutionally denied medical care to Jonathan Gleaves while he was

a pretrial detainee in the PDP requires a showing that (1) Mr. Gleaves had a serious medical need and (2) Slory was deliberately indifferent to that serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This standard applies to medical professionals and non-medically trained law enforcement officers alike. *Id.* at 104-05. The standard effectuates the constitutional requirement that pretrial detainees and prisoners be afforded, at a minimum, "adequate" medical care. *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citing *Estelle*, 429 U.S. at 105).

The legal inquiry includes both an objective prong and a subjective prong. First, the Court looks to whether there is "objective evidence that [a] plaintiff had serious need for medical care." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citation omitted). Second, the Court considers whether "prison officials ignored that evidence." *Id.* This "subjective" prong is "consistent with recklessness as that term is defined in criminal law." *Id.* (citation omitted).[6]  Importantly, the recklessness standard does not require intentional or

---

[6] Because Gleaves was a pretrial detainee, Ms. McNamara's claim arises under the Fourteenth Amendment. *Natale*, 318 F.3d at 581-82. Although the legal analysis described above references a subjective deliberate indifference standard, claims like those in this case should, in light of developing case law, be evaluated on an objective standard. This follows from *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015), in which the Supreme Court ruled that a pretrial detainee's excessive force claims against jail officers are measured for objective reasonableness. Since *Kingsley*, several courts have applied that same reasoning to other constitutional claims brought by or on behalf of pretrial detainees. *See Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (quoting *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)) ("[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard."); *Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017) (holding that the "subjective prong" of a claim of deliberate indifference to conditions of confinement under the Fourteenth Amendment must be "defined objectively" in light of *Kingsley*); *see also Richmond v. Huq*, 885 F.3d 928, 937-38 & n.3 (6th Cir. 2018) (recognizing that "shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether [plaintiff] need even show that the individual defendant-officials were

knowing action. *See Farmer v. Brennan,* 511 U.S. 825, 835 (1994) (noting that plaintiff need not prove defendants acted with the "very purpose of causing harm or with knowledge that harm will result"). Ms. McNamara has produced sufficient evidence at the summary judgment stage in support of both prongs.

### 1.    Jonathan Gleaves Had Objectively Serious Medical Needs.

The combined evidence from Tyrone Thomas, Officer Terrelle Jones, Officer Charlene Wilson, and Officer Christopher Jones establishes that through the morning hours of September 21, 2018, Jonathan Gleaves had symptoms that were more than sufficient to establish a serious medical need. His condition started with excessive bowel movements and discomfort that, as a jury could find, led Gleaves to strip away all his clothing. He was foaming at the mouth and unresponsive, such that he could not answer officers' questions, and his eyes were unfocused and moving in different directions.

Courts have found medical needs objectively serious in situations much less grave than that presented here. *See, e.g.*, *Gonzalez v. Feinerman*, 663 F.3d 311, 313-14 (7th Cir. 2011)

---

subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them").

The Third Circuit has not, since *Kingsley*, revisited its 2003 holding in *Natale* that a subjective deliberate indifference standard applies to pretrial detainees. *Moore v. Luffey*, 767 F. App'x 335, 340 (3d Cir. 2019). However, in view of the clear shift in analysis present in the circuit authorities cited above, this Court would be well justified in applying an objective standard. *See Moyer v. Lebanon Cty.*, No. 3:16-cv-01424, 2017 WL 6989168, at *4 (M.D. Pa. Dec. 28, 2017), *report and recommendation adopted,* 2018 WL 472444 (M.D. Pa. Jan. 18, 2018) (noting that deliberate indifference "standard is lessened in cases falling under the Fourteenth Amendment for pretrial detainees" and, in such cases, is "considered a willingness to ignore a foreseeable danger or risk"). Thus, if the Court were to determine that the evidence in this case does not support a finding of Slory's subjective deliberate indifference, the Court could still deny summary judgment. While Ms. McNamara expressly preserves this argument, the Court need not decide the issue given that the facts, viewed in the light most favorable to Ms. McNamara as the non-moving party, provide sufficient evidence of Slory's subjective deliberate indifference.

(inguinal hernia and chronic hernia-related pain); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (tooth decay requiring root canal); *Jett v. Penner*, 439 F.3d 1091, 1096-98 (9th Cir. 2006) (fractured thumb requiring orthopedic intervention); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (need for prescription eyeglasses to avoid double vision and loss of depth perception).

As relevant to cases like this one, where the condition at issue led to death, the Third Circuit has made clear that the ultimate outcome of the condition—or even the potential outcome of the condition—is highly probative of its objective seriousness. *See Montgomery v. Pinchak*, 294 F.3d 492, 499-500 (3d Cir. 2002) (plaintiff's HIV and heart conditions constituted serious medical needs "because both conditions can be life threatening if not properly treated"); *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347 (noting that "seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment" and that "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious").

Slory's contention that medical personnel observed only mild symptoms of withdrawal and allowed Gleaves to be placed in a cell is a *non sequitur*. ECF 38 at 5-6. Ms. McNamara's claim does not center on observations made at the time of his medical evaluation during the evening of September 20.[7] To the contrary, her claim focuses on what became apparent throughout the early morning hours of September 21. In view of the fact that Gleaves *died* just

---

[7] If Ms. McNamara were offering such an argument, Gleaves's withdrawal symptoms would still be sufficient to qualify as an objectively serious medical need. *See Adami v. Cty. of Bucks*, No. 19-cv-2187, 2022 WL 1073072, at *4 (E.D. Pa. April 8, 2022) (noting defendants' concession that decedent suffering opiate withdrawal symptoms had a serious medical need).

hours after his symptoms were apparent to Slory,[8] there is sufficient record evidence to establish that Gleaves had objectively serious medical needs at the time Slory was supervising his housing area.

### 2. Slory was Aware of Gleaves's Serious Medical Needs and Ignored Them.

Slory's argument as to his purported lack of subjective knowledge regarding Gleaves's medical needs and his contention that he did not ignore any such needs is based on two faulty premises. First, Slory relies exclusively on his own testimony denying that he saw Gleaves's medical distress. ECF 38 at 8. Second, Slory writes critical evidence from Tyrone Thomas's statements out of the case, contending that they are hearsay, not properly considered on summary judgment. *Id.* at 9. Both points are based on fundamental legal error.

As to the first point, the Third Circuit has made clear that in cases where a defendant's conduct has led to a person's death, the defendant's denials of misconduct must be viewed with skepticism. *See Lamont v. New Jersey*, 637 F.3d 177, 181-82 (3d Cir. 2011) ("Because the victim of deadly force is unable to testify…we have recognized that a court ruling on summary judgment in a deadly-force case should be cautious…to ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify.") (citations and quotations omitted). For this reason, courts should be cautious in accepting "what may be a selfserving account by the officer," and, instead, consider whether circumstantial evidence would convince a rational finder of fact to disbelieve the officer's account. *Id.* at 182.

---

[8] To the extent Slory contends that some or all of these symptoms were apparent only after he saw Gleaves, such self-serving denials must be rejected in favor of other record evidence undermining the credibility of this assertion. *See infra* § IV.A.2.

As to the second point, Thomas's statements fit within an exception to the hearsay rule as they constitute excited utterances under Fed. R. Evid. 803(2). The statements meet all the requirements of this provision in that (1) Thomas experienced a startling occasion, (2) the statements concern the circumstances of that startling occasion, (3) Thomas appeared to have personally observed the events, and (4) Thomas's statements were made before he had time to reflect and fabricate. *United States v. Brown,* 254 F.3d 454, 458 (3d Cir. 2001) (citing *United States v. Mitchell,* 145 F.3d 572, 576 (3d Cir. 1998); *Miller v. Keating,* 754 F.2d 507 (3d Cir. 1985)). The rule requires that a statement be made when the declarant "was under the stress of excitement," a test that is met when declarants are "visibly in an excited state." *Id.* at 459-61; *see also United States v. Waters*, 428 F. App'x 155, 166-67 (3d Cir. 2011) (emphasizing "evidence regarding the state of the declarant").

Based on the testimony of Officers Terrelle Jones and Wilson that Thomas was "agitated" and "hyperactive" at the time he made his statements—to the point that Jones feared for her personal safety—Thomas presented with all the hallmarks of having observed a startling event, that is, Gleaves's serious medical deterioration. His statements concern the circumstances of that deterioration and his efforts to obtain assistance, he observed that deterioration, and his statements were communicated immediately after Jones arrived at the cell door. Because the statements qualify as excited utterances and are admissible under Fed. R. Evid. 803(2), the statements must be considered in the Court's evaluation of the summary judgment record. *See Doe ex rel. Doe v. Darien Bd. of Educ.*, 110 F. Supp. 3d 386, 398 (D. Conn. 2015) (considering on summary judgment parents' testimony regarding child's statements about alleged abuse as excited utterances); *Boucher v. Grant*, 74 F. Supp. 2d 444, 450-52 (D.N.J. 1999) (finding

deposition testimony and interrogatory answers about statements made after automobile accident appropriate part of summary judgment record based on excited utterance rule).[9]

In view of these principles, the full "factual context" and inferences drawn from that context, when evaluated in the light most favorable to Ms. McNamara, *Tolan v. Cotton*, 572 U.S. 650, 651 (2014), establishes the following:

- Gleaves was gravely ill hours before Jones discovered him in his cell;

- His symptoms caused Thomas to seek emergency attention at approximately 5:00 am;

- Thomas banged on the cell door and yelled for help;

- Thomas pressed the call bell in the cell;

- Slory was aware of Thomas's efforts to seek assistance, but ignored them;

- When Slory toured the unit, Gleaves was seriously ill and Slory was able to observe that fact;

- Despite his observations, Slory took no action, causing a critical delay in provision of care to Gleaves; and

- Even the slightest day in care was reasonably likely to have increased Gleaves's risk of death.

---

[9] The statements may also be considered under the present-sense impression exception to the hearsay rule, which allows for the admission of "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1). The exception requires that the statement describe an event personally witnessed by the declarant and that the declaration is made "essentially contemporaneous" to the witnessing of the event. *United States v. Green*, 556 F.3d 151, 155 (3d Cir. 2009) (citing *United States v. Mitchell,* 145 F.3d 572, 576 (3d Cir. 1998)). Thomas's statements to the officers demonstrate on their face that he was describing his experiences immediately prior to the officers' approach to his cell and thus meet the rule's requirement of "substantial contemporaneity." *Id.* at 156.

To be sure, in his motion Slory denies each of these points, emphasizing, in particular, his claims (1) that he did not become aware of anyone pressing the call button and (2) that he did not observe Gleaves's symptoms during his 6:56 am tour. But those denials are countered by evidence Slory ignores—with the first contradicted by Thomas's admissible statements and the second contradicted by Jones's assertion that Gleaves was so obviously ill that his symptoms had to have been apparent 14 minutes earlier.

These facts contradicting Slory's denials are even more compelling given the substantial evidence in the record demonstrating Slory's lack of credibility. Slory admits that he violated a critical prison policy requiring tours at 30-minute intervals, all while knowing that this policy was aimed at protecting the health and safety of incarcerated people in his care and knowing that the unit where he was working housed the most vulnerable people in the PDP. Such violations of policy have been held to establish deliberate indifference in and of themselves. *See Phillips v. Roane Cty.*, 534 F.3d 531, 541, 543-44 (6th Cir. 2008) ("[W]e find persuasive the correctional officers' disregard of prison protocols, which describe the actions that officers should take when an inmate makes certain medical complaints or exhibits certain medical symptoms."); *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005) (noting that violation of protocols "certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm"). While Ms. McNamara does not contend that Slory's failure to conduct tours was independently sufficient to establish his deliberate indifference,[10] a rational jury could find that his cavalier attitude regarding his core duties provides ample reason to question the truthfulness of his testimony.

---

[10] For this reason, the cases Slory cites regarding policy violations are not relevant here. ECF 38 at 7-8.

There is an even more substantial basis to disbelieve Slory's testimony in light of his admitted false reports asserting that he had conducted *four* separate tours when, in fact, he had not done so. A jury could reasonably determine that an officer who failed to do his job and then lied *four times* about that failure was motivated by fear of adverse consequences for his employment. Such a determination forges a clear path to finding that Slory also lied about not receiving notification, or making observations, regarding Gleaves's rapid medical deterioration. *See Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 147 (2000) (noting that "the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt"); *United States v. Berrios*, 443 F. Supp. 408, 410 (E.D. Pa. 1978) (Cahn, J.) (quoting *United States v. Lacey*, 459 F. 2d 86, 89 (2d Cir. 1972)) ("[E]xculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.").

Ultimately, if a jury disbelieves Slory and believes the testimony of Officer Terrelle Jones and testimony regarding the statements of Tyrone Thomas, that evidence will be more than sufficient to establish a claim of deliberate indifference to serious medical needs. Indeed, the legal basis for this claim finds significant support in the recent factually analogous decision issued by Chief Judge Sánchez in *Adami v. Cty. of Bucks*, No. 19-cv-2187, 2022 WL 1073072 (E.D. Pa. April 8, 2022), denying summary judgment on claims regarding the decedent's death in prison custody due to untreated opiate withdrawal. In *Adami*, the decedent had been placed on a watch status requiring officers to check his cell every 30 minutes. *Id.* at *1-2. One of the officers performed twelve checks of the decedent's cell but failed to do so every 30 minutes and, in some instances, only walked quickly past the cell, not spending any time visualizing the decedent. *Id.* at *2. Evidence from the decedent's cellmate established that during this time the decedent's

worsening withdrawal symptoms resulted in him vomiting or defecating every 15 to 20 minutes. *Id.* at *3. The cellmate explicitly stated that he did not alert any officer to the decedent's condition but "believe[d] anyone coming to the window to check on [the decedent] every 15 minutes would have at some point overlapped" with the decedent's vomiting and defecation. *Id.* at *3. Based on the cellmate's expectations, Judge Sánchez concluded that a jury could find that the officer defendants must have known that the decedent "was alarmingly sick, was on medical watch, and ignored a serious medical need" such that the plaintiff's deliberate indifference claim was established. *Id.* at *6.[11]

None of the cases Slory cites to support his argument justify a grant of summary judgment. The principal case he cites, *Fox v. Horn*, No. 98-5279, 2000 WL 49374, at *4 (E.D. Pa. Jan. 21, 2000), is distinguishable on the ground that the undisputed evidence showed that none of the defendant officers "made the inference that [the decedent] faced substantial risk of serious harm and then deliberately ignored helping" him. In this case, as outlined above, the evidence is in conflict, with one side supporting, at a minimum, an inference that Slory knew Gleaves was experiencing a medical emergency but ignored that emergency. The decision in *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001), is, likewise, distinguishable, as in that case the decedent died after swallowing drugs, he repeatedly denied having done so, and the defendant officers monitored him. Ultimately, the court concluded, the defendant officers could not be found deliberately indifferent for not forcing medical treatment on the decedent when he denied any need for medical intervention. *Id. Hinneburg v. Miron*, 676 F. App'x 483,

---

[11] Judge Sánchez's reliance on the *expectations* of the decedent's cellmate that an officer had to have known of the decedent's symptoms precisely mirrors Ms. McNamara's claim regarding Officer Terrelle Jones's *expectations* that defendant Slory could not have observed Gleaves sleeping comfortably at 6:56 am, but, instead, had to have seen evidence of Gleaves's medical deterioration.

484-85 (6th Cir. 2017), is similarly inapplicable, as in that case, an officer closely monitored the decedent while she was sleeping and sought attention as soon as he observed she was unresponsive.

In this case, by contrast, the evidence is sufficient at the summary judgment stage to establish that Slory was alerted to Gleaves's medical condition by Thomas's yelling, banging on the cell door, and activation of the call button and, further, that Slory personally observed Gleaves at a time when he was naked, foaming at the mouth, and unable to breathe. As in *Adami,* such evidence supports a finding that Slory was deliberately indifferent to Gleaves's serious medical needs and, therefore, that he violated Gleaves's rights under the Fourteenth Amendment.

### B.    Slory is Not Entitled to Qualified Immunity.

Slory's second contention, that qualified immunity protects him from suit, likewise fails. In the first instance, his assertion of the defense suffers from the same flaws as his argument that the facts do not support a finding of deliberate indifference as he operates from the premise that he had no knowledge of Gleaves's medical distress. ECF 38 at 10. As demonstrated above, there is sufficient record evidence to cause a jury to reach a contrary conclusion. On those facts, qualified immunity cannot apply.

The question for purposes of the qualified immunity analysis is whether Gleaves's right to medical care under the factual circumstances of this case was "sufficiently clear that 'a reasonable officer would understand that what he is doing violates that right.'" *Kedra v. Schroeter*, 876 F.3d 424, 449-50 (3d Cir. 2017) (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 200 (3d Cir. 2004)). In answering this question, it is not relevant that there is no directly analogous precedent to have addressed the specific facts at issue in this case. Instead, the "salient question" is whether the law at the time Slory encountered Gleaves gave him "fair warning" his

19

actions were unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Thus, "officials can still

be on notice that their conduct violates established law even in novel factual circumstances." *Id.*

A long line of Third Circuit cases illustrates the broad scope of situations in which a

defendant law enforcement officer can be found to have had "fair warning," such that a qualified

immunity defense fails. *See Halsey v. Pfeiffer*, 750 F.3d 273, 295-96 (3d Cir. 2014) (plaintiff

could pursue due-process based fabrication of evidence claim despite lack of precedent

establishing such cause of action on ground that "[t]he established-right prong of a qualified

immunity defense does not demand that there had been a precise preview of the applicable legal

analysis underlying the defense; rather, what is required is that government officials have fair

and clear warning that their conduct is unlawful") (internal quotations omitted); *Schneyder v.

Smith*, 653 F.3d 313, 329-31 (3d Cir. 2011) (holding that despite lack of any prior similar

decision, prosecutor could be held liable under § 1983 due to "self-evident wrongfulness" of her

conduct); *Rivas*, 365 F.3d at 200 (3d Cir. 2004) (quoting *Hope*, 536 U.S. at 741) ("[I]n some

cases 'a general constitutional rule already identified in the decisional law may apply with

obvious clarity to the specific conduct in question, even though the very action in question has

[not] previously been held unlawful.'"); *Sterling v. Borough of Minersville*, 232 F.3d 190, 198

(3d Cir. 2000) (citing *Gruenke v. Seip*, 225 F.3d 290, 299 (3d Cir. 2000)) (holding that

"constitutional violation was apparent" and officer was not entitled to qualified immunity despite

"the fact that the very action in question had not previously been held to be unlawful").

While there may be no Third Circuit decision directly covering the facts of this case,

there is little question that a reasonable officer in the place of defendant Slory would know that

the constitutional duty to provide "adequate" medical care, *Monmouth Cty. Corr. Inst. Inmates*,

834 F.2d at 347, required seeking intervention for a person exhibiting Gleaves's symptoms. *See*

*Adami*, 2022 WL 1073072, at *6 (defining constitutional right at issue as whether decedent "had a clearly established right to adequate medical treatment for his withdrawal symptoms—a serious medical need"). On that issue, it has been clear in the Third Circuit for decades that an officer may not ignore evidence of a serious need for medical care, *Natale*, 318 F.3d at 582 (citing *Nicini v. Morra*, 212 F.3d 798, 815 n.14 (3d Cir. 2000)), or delay care for "non-medical reasons." *Id.* (citing *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347).

Indeed, the Third Circuit has held that if the summary judgment record includes sufficient evidence of deliberate indifference, then it would be virtually impossible for a defendant to credibly claim qualified immunity. *See Beers-Capitol v. Whetzel,* 256 F.3d 120, 142 n.15 (3d Cir. 2001) ("Because deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent."); *see also Carter v. City of Philadelphia,* 181 F.3d 339, 356 (3d Cir.1999) (holding at motion to dismiss stage that if plaintiff succeeds in establishing defendants acted with deliberate indifference to plaintiff's constitutional rights, then defendant's conduct was not objectively reasonable and qualified immunity is not available); *Adami*, 2022 WL 1073072, at *7 (citing *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003)) ("For more than forty years under *Estelle*, it has been clear that a prison official violates the constitutional rights of an inmate by showing deliberate indifference to the inmate's existing serious medical need."); *Nealman v. Laughlin*, No. 15-cv-1579, 2016 WL 4539203, at *7 (M.D. Pa. Aug. 31, 2016) (rejecting qualified immunity defense for correctional officer defendants on ground that "[t]here is no debate…that the suicide of a pretrial detainee may support a Fourteenth Amendment claim against custodial officers who are aware of and act with reckless indifference to a detainee's 'particularized vulnerability' to suicide"); *Gioffre v. Cty. of Bucks*, No. 08-cv-4232, 2009 WL

3617742, at *6 (E.D. Pa. Nov. 2, 2009) (Pratter, J.) (denying motion to dismiss on qualified immunity grounds based on adequate pleading of deliberate indifference to decedent's medical needs).

As in these authorities, because the record includes sufficient evidence to demonstrate Slory's deliberate indifference to Gleaves's serious medical needs, Slory is not protected by qualified immunity.

## V.    Conclusion

For the foregoing reasons, defendant Slory's motion for summary judgment should be denied, and Ms. McNamara should be permitted to proceed to trial on her claim that Slory violated the constitutional rights of decedent Jonathan Gleaves.

Respectfully submitted,

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
KAIRYS, RUDOVSKY, MESSING
 FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
jfeinberg@krlawphila.com

*Counsel for Plaintiff Eileen McNamara*