| | | |
|---|---|---|
| **EILEEN A. MCNAMARA, as** | : | |
| **Administrator of the ESTATE OF** | : | |
| **JONATHAN GLEAVES, JR.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 2:20-cv-04570-RBS** |
| | : | |
| **CITY OF PHILADELPHIA; CORIZON** | : | |
| **HEALTH; GERALD SLORY;** | : | |
| **ELIZABETH BRADLEY; LALITHA** | : | |
| **TRIVIKRAM; MATU GAYE; JOHN** | : | |
| **DOE(S),** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

### Plaintiff's Statement of Facts in Support of Opposition to Defendant Slory's Motion for Summary Judgment

Plaintiff Eileen McNamara, through the undersigned counsel, submits this Statement of Facts in support of her opposition to the motion for summary judgment filed on behalf of defendant Gerald Slory.[1] In support of the below factual assertions, Ms. McNamara cites to one of two sources: (1) the exhibits filed with defendants' motion, labeled A through R and (2) two supplemental exhibits filed with this submission, labeled 1 and 2.

Ms. McNamara respectfully submits that, when viewing the record and all reasonable inferences drawn therefrom in the light most favorable to her as the non-moving party, the material facts established in this case are as follows:

---

[1] The motion also seeks summary judgment for defendant City of Philadelphia. Because Ms. McNamara does not oppose dismissal of her claims against the City, this Statement of Facts addresses only the record support for her claims against defendant Slory.

**I.** **The Responsibility of Philadelphia Department of Prisons Correctional Officers to Protect the Health and Safety of the Incarcerated Population through Regular Tours**

1. Correctional officers employed by the City of Philadelphia to work in the Philadelphia Department of Prisons (PDP) have a duty and responsibility to protect the health, safety, and well-being of persons incarcerated in PDP facilities. Ex. G, Slory Dep. at 58:14-18, 59:14-19; Ex. H, Wilson Dep. at 31:11-15.

2. When correctional officers are assigned to supervise housing units in PDP facilities, they fulfill this duty by conducting regular tours of their assigned unit. Ex. G, Slory Dep. at 56:25-57:3, 60:19-61:12; Ex. I, T. Jones Dep. at 49:1-11, 50:10-18.

3. Officers are required to tour their assigned unit at intervals not to exceed 30 minutes, that is, a minimum of two times per hour throughout their entire working shift. Ex. G, Slory Dep. at 63:14-18; Ex. H, Wilson Dep. at 32:15-33:5; Ex. I, T. Jones Dep. at 35:14-21, 46:23-47:12, 49:1-11; Ex. R, C. Jones Dep. at 30:9-16.

4. When conducting tours, officers are required to look into every cell in their assigned housing unit and ensure that they see "proof of life," that is, confirmation that the persons in each cell are alive and well. Ex. G, Slory Dep. at 65:8-25, 66:11-20; Ex. H, Wilson Dep. at 31:4-10, 33:6-18; Ex. R, C. Jones Dep. at 28:17-29:3.

5. When an officer looking into a cell cannot immediately tell whether a person is alive and well, the officer is required to seek a response from the occupants of the cell by directing the occupants to, for example, "shake a leg" or move an arm. Ex. G, Slory Dep. at 68:4-69:10; Ex. H, Wilson Dep. at 31:16-25; Ex. I, T. Jones Dep. at 15:13, 47:13-48:9; Ex. R, C. Jones Dep. at 30:17-32:11.

6. If the occupant of a cell does not respond to the officer's directive, the officer is required to enter the cell and investigate the person's well-being. Ex. H, Wilson Dep. at 37:18-38:1, 38:14-24; Ex. I, T. Jones Dep. at 48:10-24; Ex. R, C. Jones Dep. at 30:17-32:11.

7. If the officer observes any signs of a potential medical issue, the officer is required to immediately call for assistance from trained medical professionals assigned to work in the facility. Ex. G, Slory Dep. at 79:17-25; Ex. I, T. Jones Dep. at 48:10-24; Ex. R, C. Jones Dep. at 40:20-24.

8. After officers conduct a tour of their assigned housing area, they are required to contemporaneously document that tour in a computerized record system. Ex. H, Wilson Dep. at 40:11-20.

9. Officers' documentation of a tour must be truthful, and officers are not permitted to state that they have completed a tour when they have not in fact done so. Ex. G, Slory Dep. at 69:11-70:15; Ex. H, Wilson Dep. at 54:13-23; Ex. I, T. Jones Dep. at 55:15-56:1; Ex. R, C. Jones Dep. at 32:20-24.

10. Each of these requirements related to officers' touring responsibilities are reviewed from the first stages of an officer's education in the training academy and are spelled out in orders posted at correctional officers' workstations, and, accordingly, all officers are familiar with these requirements. Ex. G, Slory Dep. at 64:6-22; Ex. H, Wilson Dep. at 34:22-35:2; Ex. I, T. Jones Dep. at 54:13-55:4, 55:9-14.

11. In addition to conducting tours at specified intervals, officers are required to respond to requests for assistance made by incarcerated persons via a call button in each cell. Ex. H, Wilson Dep. at 45:15-21.

12. If an incarcerated person needs assistance, they can press the call button, which activates both a flashing light on the ceiling of the housing area and a light or buzzer on a console at the officer's workstation. Ex. G, Slory Dep. at 73:3-74:1; Ex. H, Wilson Dep. at 45:22-46:23; Ex. R, C. Jones Dep. at 33:12-34:10, 37:7-38:12.

13. When the officer observes the alert, the officer is required to investigate the reasons why the cell occupant is seeking assistance. Ex. G, Slory Dep. at 77:4-9.

14. Responsibilities to ensure the health and well-being of incarcerated people are enhanced for officers working in the quarantine unit in the Curran-Fromhold Correctional Facility (CFCF). Ex. G, Slory Dep. at 70:23-71:2, 121:3-8; Ex. I, T. Jones Dep. at 44:21-45:13.

15. CFCF is the main intake facility for males in the PDP, and the quarantine unit is the first housing area where newly admitted males are sent. Ex. H, Wilson Dep. at 30:11-22.

16. Persons residing in the quarantine unit are "just off the street," and large percentages of those persons experience withdrawal from controlled substances, especially opiates. Ex. G, Slory Dep. at 51:16-52:12, 71:8-23; Ex. H, Wilson Dep. at 31:16-25.

17. Given the medical consequences of opiate withdrawal, officers assigned to the quarantine unit frequently are required to seek emergency medical assistance through "stretcher calls." Ex. G, Slory Dep. at 53:16-20, 70:16-22; Ex. H, Wilson Dep. at 42:25-43:16; Ex. I, T. Jones Dep. at 44:21-45:13.

18. Because of the increased likelihood of medical emergencies in the quarantine unit, officers are aware of the need to carefully monitor persons housed in that unit. Ex. G, Slory Dep. at 53:21-24.

**II.** **Jonathan Gleaves's Medical Deterioration After Admission to PDP and Defendant Slory's Failure to Address Gleaves's Serious Medical Needs**

19. On the evening of September 19, 2018, Philadelphia police encountered 33-year-old Jonathan Gleaves, Jr. (Gleaves) at his sister's home and placed him under arrest based on warrants related to an alleged violation of probation. Ex. A.

20. Gleaves was held in police custody until the next day and was then admitted to the Philadelphia Department of Prisons at 4:25 pm on September 20, 2018. Ex. B.

21. Shortly after his admission, Gleaves was examined by medical staff members, including defendants Nurse Matu Gaye and Dr. Elizabeth Bradley. In these encounters, Gleaves reported an extensive history of drug usage, including ingestion of 10 bags of heroin daily, 100 milligrams of Fentanyl daily, and four to six tablets of Xanax daily, with his last usage of these substances occurring that same day, September 20, 2018. Ex. C at City 0184.

22. Based on his report and symptoms and the likelihood that he would experience withdrawal, Gleaves was placed on a withdrawal protocol requiring medical assessments three times per day. Ex. D; Ex. 1, Trivikram Dep. at 52:8-13.[2]

23. Withdrawal is particularly dangerous early in the process, that is, in the days immediately after a person is admitted to PDP, and a person in the beginning stages of withdrawal must be monitored with regularity. Ex. F, Jeoboham Dep. at 35:20-36:5.

24. This is especially true for persons experiencing withdrawal from benzodiazepines, as was Gleaves, a regular user of Xanax. Ex. 1, Trivikram Dep. at 43:9-17.

---

[2] The record establishes that an assessment was required to take place between 11:00 pm on September 20 and 7:00 am on September 21, but that this assessment did not, in fact, take place. The failure to conduct that assessment is central to Ms. McNamara's claims against the Corizon defendants. Because those defendants have not filed a motion for summary judgment, this Statement of Facts does not further address the omitted assessment.

25. After initial medical assessments, Gleaves was assigned to a housing area at CFCF known as B1 Pod 3, an area within the quarantine unit. Ex. G, Slory Dep. at 82:14-16, 85:2-13; Ex. H, Wilson Dep. at 29:21-30:10; Ex. J at City 0019.

26. Gleaves arrived in that unit shortly before 1:00 am on September 21, 2018. Ex. G, Slory Dep. at 25:12-19; Ex. J at City 0019.

27. Gleaves was placed in that cell with Tyrone Thomas. Ex. G, Slory Dep. at 99:18-100:2.

28. Defendant Officer Gerald Slory, who had been employed at PDP for more than two years, was assigned to work as the sole housing officer in B1 Pod 3 for a shift starting at 11:00 pm on September 20 through 7:00 am on September 21. Ex. G, Slory Dep. at 44:7-13, 57:7-13, 58:5-10.

29. When Slory started his shift, he confirmed that all equipment in the housing area, including the call button system, was working. Ex. G, Slory Dep. at 74:22-76:6, 76:13-77:1, 83:4-18.

30. Slory assigned Gleaves to Cell 1 and placed him in that cell at 12:58 am. Ex. G, Slory Dep. at 25:12-19; Ex. J at City 0019.

31. As of September 21, 2018, Slory was aware of his responsibilities to conduct tours every 30 minutes, to ensure the health and well-being of all persons assigned to the unit, and to accurately document his tours with entries on a computerized log sheet. Ex. G, Slory Dep. at 63:14-18, 65:8-25, 66:11-20; 69:11-70:15.

32. Slory conducted tours of the unit at 1:11 am, 1:42 am, 2:24 am, and 3:22 am. He documented those tours in the computerized record system. Ex. G, Slory Dep. at 87:22-88:13, 92:21-93:11, 93:24-94:20, 94:21-95:9; Defendants' Statement of Facts (ECF 38-1) at ¶ 21.

33. Slory did not conduct any further tours until shortly before 7:00 am. Defendants' Statement of Facts (ECF 38-1) at ¶¶ 20-21.

34. Despite his failure to conduct tours in this time, Slory falsely reported in the computerized record system that he conducted tours at 3:49 am, 4:29 am, 5:19 am, and 6:12 am. Ex. G, Slory Dep. at 100:22-104:15; Defendants' Statement of Facts (ECF 38-1) at ¶¶ 20-21.

35. During this time, Gleaves was experiencing concerning symptoms of a serious medical condition related to drug withdrawal. Gleaves's cellmate, Tyrone Thomas, believed Gleaves was "dope sick," as he was repeatedly defecating in the cell toilet to the point that he needed to clean his buttocks with a rag. Ex. H, Wilson Dep. at 75:12-21; Ex. I, T. Jones Dep. at 18:21-24.

36. Thomas believed that Gleaves required medical assistance and, accordingly, at around 5:00 am, pressed the call button in his cell. Ex. H, Wilson Dep. at 78:7-79:1; Ex. I, T. Jones Dep. at 62:8-22.

37. Additionally, Thomas yelled for assistance. Ex. H, Wilson Dep. at 62:10-24; Ex. I, T. Jones Dep. at 18:16-24.

38. Slory did not respond to the call button after Thomas pressed it, nor did he respond to Thomas's yelled requests for assistance. Ex. I, T. Jones Dep. at 18:16-24.

39. Slory denies that anyone ever pressed the call button for Cell 1 or asked that Gleaves be removed from the cell for medical attention. Ex. G, Slory Dep. at 120:6-10, 120:14-19.

40. At 6:56 am, as his shift was ending, Slory conducted a tour of the housing area. Ex. I, Slory Dep. at 108:13-110:6.

41.     Slory shone his flashlight into Cell 1 and claims that Gleaves appeared to be alive and well and sleeping comfortably. Ex. G, Slory Dep. at 81:9-12, 95:10-19, 108:21-109:2, 110:1-6, 110:21-111:3, 112:10-17.

**III.     Officer Terrelle Jones Discovers Gleaves in Severe Medical Distress and Learns of Tyrone Thomas's Unsuccessful Efforts to Obtain Assistance from Defendant Slory**

42.     At 7:00 am, Slory's shift ended, and he was replaced in the B1 Pod 3 area by Officer Terrelle Jones. Shortly thereafter, she was joined by her partner, Officer Charlene Wilson. Ex. I, T. Jones Dep. at 22:17-23:2, 30:6-31:12.

43.     At 7:10 am, Jones began the first tour of her shift. She went to Cell 1 and immediately observed that Gleaves was lying on the top bunk fully naked. As soon as she saw this concerning fact, Jones tried to get Gleaves's attention by kicking the cell door. Ex. H, Wilson Dep. at 56:22-57:3, 64:5-9; Ex. I, T. Jones Dep. at 15:8, 17:6-15, 33:2-19.

44.     Gleaves did not respond. Ex. I, T. Jones Dep. at 33:2-19.

45.     Jones then noticed that Gleaves was foaming at the mouth. Ex. I, T. Jones Dep. at 19:13-24, 20:19-21:12.

46.     The foaming was obvious. There was a large quantity of it, and, as described by Officer Wilson, who arrived on the scene as Officer Jones was at the cell door, foam was running down both sides of Gleaves's face. Ex. H, Wilson Dep. at 17:9-17, 17:25-18:4, 66:10-21; Ex. I, Jones Dep. 21:13-21.

47.     The officers were joined by a third officer, Christopher Jones. All the officers could immediately observe signs of a medical emergency: Gleaves was breathing heavily and gasping for air; he was unable to speak; and his eyes were "rolling," that is, unfocused and moving in different directions. Ex. H, Wilson Dep. at 17:6-8, 59:9-19, 69:15-25; Ex. I, T. Jones Dep. at 20:23-22:4; Ex. R, C. Jones Dep. at 12:22-13:9, 14:24-15:4.

48. When Jones was first at the cell door, Gleaves's cellmate, Tyrone Thomas, complained to Jones about what happened on the previous shift. According to Jones, Thomas was "agitated" when making his complaints, so much so that Jones was concerned Thomas would attack her. For that reason, she did not want to open the cell door until she was joined by her partner. Ex. I, T. Jones Dep. at 15:15-22, 18:16-24, 20:7-18; *see also* Ex. H, Wilson Dep. at 60:3-8, 62:2-8 (describing Thomas as "hyperactive").

49. Thomas yelled at Jones that he had been trying to get help for Gleaves "all night," but that nobody came. Ex. I, T. Jones Dep. at 18:16-19:7; *See also* Ex. H, Wilson Dep. at 62:10-24 (stating that Thomas informed officers that "he told the Officer before us to come get [Gleaves] outta his cell").

50. Thomas told Jones that Gleaves was very sick and that he had been banging on the door throughout the night. Ex. I, T. Jones Dep. at 19:1-7, 23:14-24.

51. Thomas told the officers that he had pressed the call button in his cell to get an officer's attention, but that no one responded. Ex. H, Wilson Dep. at 78:7-79:10, 80:21-81:8.

52. Slory denied that he observed Gleaves to have any medical issues and claimed that if Gleaves was naked and foaming at the mouth when Officer Terrelle Jones made her first observation less than 15 minutes after his 6:56 am tour, then these were circumstances that developed over that less-than-15-minute period. Ex. G, Slory Dep. at 81:9-12, 114:1-23, 122:19-123:7, 126:22-127:7.

53. Officer Terrelle Jones was surprised defendant Slory did not tell her anything about Gleaves's condition or Thomas's efforts to get medical attention. Based on her observations, Slory had to have seen Gleaves's condition at the end of his shift. Ex. I, T. Jones Dep. at 34:21-35:4, 35:22-36:6, 36:23-37:5.

**IV. Gleaves Dies and Medical Testimony Confirms that the Stroke that Caused His Symptoms Would Have Been Treatable with Earlier Intervention.**

54. Following their observations of Gleaves, Officers Terrelle Jones and Wilson immediately called for medical attention. Ex. H, Wilson Dep. at 67:2-11; Ex. I, T. Jones Dep. at 24:1-8.

55. Gleaves was removed from his cell, taken to the medical unit, and then transported to Nazareth Hospital. Ex. K; Ex. 2, McCall Report at McNamara 001240-41.

56. Thereafter, following a determination that Gleaves needed more intensive care, he was transferred to Hahnemann University Hospital. Ex. 2, McCall Report at McNamara 001241-42.

57. Gleaves was pronounced dead at 1:05 pm on September 21, 2018. Ex. 2, McCall Report at McNamara 001242.

58. According to plaintiff's medical expert in the field of neurology, Dr. Joseph Caleb McCall, the precipitating cause of Gleaves's death was a stroke that began sometime in the overnight hours of September 20-September 21, 2018, with the stroke likely due to Gleaves's worsening withdrawal syndrome that changed his heart rhythms and blood flow. Ex. 2, McCall Report at McNamara 001243-44.

59. The condition would have been treatable with earlier intervention. According to Dr. McCall, Gleaves would have had a significantly increased chance of surviving the stroke if medical care had been initiated when his cellmate was attempting to notify correctional staff that Gleaves's condition was worsening. Ex. 2, McCall Report at McNamara 001244-45; *see also* Ex. E, McCall Dep. at 20:11-14 ("[A] tenet of stroke care is…time is brain. So even minutes can be precious in diagnosing and seeking appropriate care for a stroke.").

60.     As a result, had Gleaves been taken out of his cell when his cellmate alerted Officer Slory, it is more likely than not that Gleaves would have survived. Ex. 2, McCall Report at McNamara 001245.

Respectfully submitted,

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
KAIRYS, RUDOVSKY, MESSING
 FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
jfeinberg@krlawphila.com

*Counsel for Plaintiff Eileen McNamara*