# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EILEEN A. MCNAMARA, as Administrator of the ESTATE OF JONATHAN GLEAVES, JR., | : : : : | |
| Plaintiff, | : : | |
| v. | : : : | No. 2:20-cv-04570-RBS |
| CITY OF PHILADELPHIA; CORIZON HEALTH; GERALD SLORY; ELIZABETH BRADLEY; LALITHA TRIVIKRAM; MATU GAYE; JOHN DOE(S), | : : : : : : : | |
| Defendants. | : : | |

### Plaintiff's Response to Defendant Slory's Statement of Facts in Support of Motion for Summary Judgment

Plaintiff Eileen McNamara, through counsel, responds to the statement of facts proffered by defendant Gerald Slory in support of his motion for summary judgment (ECF 38-1). Unless otherwise specified, all citations below are to Plaintiff's Statement of Facts in Support of Opposition to Defendant Slory's Motion for Summary Judgment, abbreviated as "PS" and followed by the relevant paragraph number.

1. On the evening of September 19, 2018, Jonathan Gleaves, Jr. was taken into custody on a warrant related to drug possession charges. Ex. A, CITY0001-04.

    **Response:** Admitted.

2. The next afternoon, September 20, 2018, Gleaves was admitted to Curran-Frumhold Correctional Facility ("CFCF"), an intake facility in the Philadelphia Department of Prisons ("PDP"). Ex. B, CITY0177.

    **Response:** Admitted.

3. That same evening, Gleaves was seen by Dr. Elizabeth Bradley, MD and Matu Gaye, RN for his intake and screening assessment while being admitted to CFCF. *Id.*

**Response:** Admitted.

4. Gleaves' vital signs were recorded, and he was asked for any prior medical problems and current complaints. Medical staff also performed a physical examination, and Gleaves completed an extensive questionnaire. Ex. C, CITY0184-189.

**Response:** Admitted.

5. Gleaves reported recent drug use including "heroin 10 bags daily, Xanax 2mg bar 4-6 tablet daily, Fentanyl 100 mg daily…" Ex. C, CITY0184.

**Response:** Admitted.

6. Gleaves indicated his most recent drug use was September 19, 2018, the day before the intake assessment. *Id.*

**Response:** Denied as stated. The cited record reports that Gleaves's last usage was on September 20, 2018.

7. He also reported a history of asthma and Hepatitis C Virus infection. *Id.*

**Response:** Admitted.

8. According to the assessment, Gleaves reported "running nose, dizziness, leg cramps, anxiety, bone aches, nausea/vomiting [and] stomach cramps[.]" *Id.*

**Response:** Admitted.

9. Medical staff also included the BWS-C (Benzodiazepine Withdrawal Syndrome) screening tool, which scored six, and the COWS (Clinical Opiate Withdrawal Scale) tool, which scored ten. These scores were noted to be consistent with signs of mild benzodiazepine and opiate withdrawal. Ex. C, CITY0186-88.

**Response:** Admitted that the cited source states as such. Denied to the extent defendant contends that the reported medical symptoms remained consistent throughout the early morning hours of September 21, 2018, as contrary evidence indicates that Gleaves's condition deteriorated substantially, and, further, that defendant Slory was aware of, and recklessly disregarded, that deterioration. PS 35-37, 48-53, 58-60.

10. With regard to the physical assessment, Gleaves' pupils were noted to be equal in size and normally reactive to light, his skin was warm, and there were no signs of visible injury. Ex. C, CITY0186.

**Response:** Admitted that the cited source states as such. Denied to the extent defendant contends that the reported medical symptoms remained consistent throughout the early morning hours of September 21, 2018, as contrary evidence indicates that Gleaves's condition deteriorated substantially, and, further, that defendant Slory was aware of, and recklessly disregarded, that deterioration. PS 35-37, 48-53, 58-60.

11. Gleaves' assessment demonstrated a Glasgow Coma Scale of 15, consistent with normal eye, motor, and verbal responses. *Id.*

**Response:** Admitted that the cited source states as such. Denied to the extent defendant contends that the reported medical symptoms remained consistent throughout the early morning hours of September 21, 2018, as contrary evidence indicates that Gleaves's condition deteriorated substantially, and, further, that defendant Slory was aware of, and recklessly disregarded, that deterioration. PS 35-37, 48-53, 58-60.

12. Overall, medical staff concluded Gleaves was awake, alert, and oriented and found his testing results to be consistent with "withdrawal protocol medication…" and he was informed to contact medical at any time if his condition worsened. Ex. D, CITY0044.

**Response:** Admitted that the cited source states as such. Denied to the extent defendant contends that the reported medical symptoms remained consistent throughout the early morning hours of September 21, 2018, as contrary evidence indicates that Gleaves's condition deteriorated substantially, and, further, that defendant Slory was aware of, and recklessly disregarded, that deterioration. PS 35-37, 48-53, 58-60.

13. Plaintiff's own medical expert, Dr. Joseph Caleb McCall, agreed that Gleaves presented with "mild" possibly bordering on "moderate" withdrawal symptoms (Ex. E, McCall Dep. Tr. 59:6) and demonstrated no signs of stroke at intake (*Id.* 22:6-24).

**Response:** Admitted that the cited source states as such. Denied to the extent defendant contends that the reported medical symptoms remained consistent throughout the early morning hours of September 21, 2018, as contrary evidence indicates that Gleaves's condition deteriorated substantially, and, further, that defendant Slory was aware of, and recklessly disregarded, that deterioration. PS 35-37, 48-53, 58-60.

14. Gleaves was placed on withdrawal assessment for five days. *Id.*

**Response:** Admitted.

15. There were no medical records of a withdrawal assessment for the shift following his assessment, between September 20 at 11:00 pm and September 21 at 7:00 am. Ex. F, Jeoboham Dep. Tr. 41:20-42:1.

**Response:** Admitted.

16. On September 20, 2018, Defendant Correctional Officer Gerald Slory was working the 11:00 pm to 7:00 am shift in the B Building, also known as the Quarantine Unit of CFCF. Ex. G, Slory Dep. Tr. 49:20-24, 51:1-4.

**Response:** Admitted.

17.     Defendant Slory worked this shift solo. *Id.* 58:5-10.

**Response:** Admitted.

18.     Around 1:00 am, Defendant Slory saw Gleaves first arrive on the housing unit with five other inmates. *Id.* 80:1-17.

**Response:** Admitted.

19.     Corrections officers are trained to perform "tours" of the unit they are monitoring every thirty minutes. Ex. G, Slory Dep. Tr. 64:6-10; Ex. H, Wilson Dep. Tr. 32:23-25, 34:22-25, 35:1-2; Ex. I, T. Jones Dep. 55:9-22.

**Response:** Admitted.

20.     Defendant Slory's logbook states that during the approximate six hours that Gleaves was on the housing unit, he conducted tours at 1:11 am, 1:42 am, 2:24 am, 2:58 am, 3:49 am, 4:29 am, 5:19 am, 6:12 am, and 6:43 am. Ex. J, CITY0019-0025.

**Response:** Admitted.

21.     For purposes of summary judgment, however, Defendants concede that Defendant Slory only conducted four of the nine tours logged (at 1:11 am, 1:42 am, 2:24 am, 3:22 am.). Ex. G, Slory Dep. Tr. 85-87, 98-101.

**Response:** Admitted that Slory conducted four tours between 1:11 am and 3:22 am, and falsely reported that he conducted four additional tours. By way of further response, Slory made observations of Gleaves in his cell at 6:56 am during which time, as circumstantial evidence confirms, he observed Gleaves's serious medical needs. PS 40-41, 52-53.

22.     Shortly after 7:00 am on September 21, 2018, Corrections Officer Terrelle Jones relieved Defendant Slory from his shift and conducted the first tour of next shift. Ex. I, T. Jones Dep. Tr. 31-33.

**Response:** Admitted.

23. Officer Jones' partner that shift was Corrections Officer Charlene Wilson. Ex. H, Wilson Dep. Tr. 18:7.

**Response:** Admitted.

24. Officer Jones noted that Gleaves was motionless on his bunk and found secretions around his mouth. Ex. I, T. Jones Dep. Tr. 20:19-22.

**Response:** Admitted. By way of further response, Jones noticed that Gleaves was fully naked and foaming at the mouth. PS 43-45.

25. Officer Jones called for Officer Wilson to come to Cell 1 where Gleaves was housed. Ex. H, Wilson Dep. Tr. 17:6-7.

**Response:** Admitted.

26. When Officer Wilson arrived, Gleaves' cellmate was agitated and "talking a lot" and Officer Wilson noticed Gleaves was naked and "foaming at the mouth." *Id.* 17:9-14.

**Response:** Admitted.

27. Officer Jones called for medical assistance who found Gleaves to be "awake [with his] eyes open" but "non-verbal." Ex. K, CITY0034-35.

**Response:** Admitted.

28. At approximately 7:15 am, staff called for an ambulance and moved Gleaves from his cell to the medical unit for assessment by Dr. Lalitha Trivikram. *Id.*

**Response:** Admitted.

29. Dr. Trivikram's team administered suctioning of the mouth and naloxone to treat or reserve opiate intoxication as well as lorazepam to treat seizures before Emergency Medical Services ("EMS") arrived, took over care, and then transported Gleaves to Nazareth

Hospital's Emergency Department. *Id.*

**Response:** Admitted.

30. During the hospital course at Nazareth, providers again treated Gleaves with naloxone for possible opiate overdose, but he did not respond and was intubated. Ex. L, McNamara000447-454.

**Response:** Admitted.

31. A CT scan of Gleaves' brain was performed and interpreted to demonstrate a developing edema within the cerebellum. *Id.*

**Response:** Admitted.

32. An x-ray of the chest revealed "bilateral patchy infiltrates left lung greater than right which suggests the possibility of aspiration given the history." *Id*.

**Response:** Admitted.

33. Gleaves was subsequently transferred to Hahnemann University Hospital and admitted to a critical care unit in care of the neurosurgery team and further assessed by the pulmonary/critical care team. Ex. M, McNamara000385.

**Response:** Admitted.

34. Medical staff at Hahnemann Hospital unsuccessfully attempted ventilator changes and other measures to improve Gleaves' oxygenation. Gleaves eventually suffered several cardiac arrests and was pronounced deceased on September 21, 2018, at 1:09 pm. Ex. N, McNamara000404.

**Response:** Admitted.

35. The autopsy report lists the cause of death as drug intoxication (Cocaine, Fentanyl, Xylazine). Ex. O, McNamara000519.

**Response:** Admitted that the cited source states as such. By way of further response, plaintiff's medical expert opines that the precipitating cause of death was a stroke caused by extreme withdrawal symptoms. PS 58.

36. At the time of the above-described incident, the Philadelphia Department of Prisons had policies and procedures in place regarding the health of inmates. For example, the Prisons Policies and Procedures direct that it is the policy of the PDP to screen all inmates at intake to obtain and physical and behavioral health-related information. Ex. P, CITY0358-365.

**Response:** Admitted.

37. Per the policy, this information "is essential for making initial housing assignments and managing immediate and routine inmate health issues." *Id.*

**Response:** Admitted.

38. The policy further details the purpose and requirements of the intake health screening as well as medical staffing by shift. *See id.*

**Response:** Admitted.

39. The Philadelphia Department of Prisons further had in place a policy regarding the obligation to provide inmates with physical and behavioral health care. *See* Ex. Q, CITY0393-403.

**Response:** Admitted.

40. The policy further directs that each inmate is to be provided "access to a Qualified Health Care Professional (QHCP) who will screen, provide treatment, and/or refer inmates for ongoing or emerging health care problems as appropriate, normally on a scheduled basis." Ex. Q, CITY0393.

**Response:** Admitted.

41. The Philadelphia Department of Prisons also trains corrections officers with regard to safety of inmates; specifically, officers are trained on when and how to conduct guard tours. Ex. G, Slory Dep. Tr. 64:6-10; Ex. H, Wilson Dep. Tr. 32:23-25, 34:22-25, 35:1-2; Ex. I, T. Jones Dep. 55:9-22.

**Response:** Admitted.

42. Officers are informed of the withdrawal protocol which informs officers when certain inmates with opioid or other drug abuse history are to be escorted from their cells to ensure they are seen by medical professionals. Ex. R, C. Jones Dep. Tr. 26:14-20.

**Response:** Admitted.

43. Officers are also trained that all inmates must go through the intake process, which includes an assessment by medical professionals. Ex. H, Wilson Dep. Tr. 29:2-22.

**Response:** Admitted.

Respectfully submitted,

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
KAIRYS, RUDOVSKY, MESSING
 FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
jfeinberg@krlawphila.com

*Counsel for Plaintiff Eileen McNamara*