# EXHIBIT 1

## Page 1

IN THE UNITED DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
- - -
EILEEN A. MCNAMARA,            :
as Administrator of            :
the ESTATE OF JONATHAN:
GLEAVES, JR.          :
                               :
   Plaintiff (s)   :
                               :
   vs.          :
                               :
CITY OF PHILADELPHIA; :
CORIZON HEALTH; GERALD:
SLORY; ELIZABETH      :
BRADLEY; LALITHA      :
TRIVIKRAM; MATU GAYE; :
JOHN DOES (S)      :
                               :
   Defendant (s)   :
- - -

Zoom deposition of LALITHA TRIVIKRAM, M.D., was taken pursuant to notice, held on March 9, 2022, beginning at or about 12:33 p.m. before Michelle Palys, Court Reporter and Notary Public, there being present.
- - -
Any reproduction of this transcript is prohibited without authorization by the certifying agency.
- - -

## Page 2

APPEARANCES:
KAIRYS, RUDOVSKY, MESSING & FEINBERG
VIA ZOOM:
BY: JONATHAN H. FEINBERG, ESQUIRE
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19106
Phone: (215) 925-4400
Representing the Plaintiff
jfeinberg@krlawphila.com
O'CONNOR KIMBALL
VIA ZOOM:
BY: THOMAS J. GREGORY, ESQUIRE
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1100
Philadelphia, Pennsylvania 19102
Phone: (215) 564-0400
Representing the Defendant, Corizon
tgregory@okllp.com
CITY OF PHILADELPHIA LAW DEPARTMENT
VIA ZOOM:
BY: ANNE TAYLOR, ESQUIRE
1515 Arch Street, Suite 15
Philadelphia, Pennsylvania 19102
Phone: (215) 683-5381
Representing the City of Philadelphia
anne.taylor@phila.gov

## Page 3

- - -
I N D E X
- - -
LALITHA TRIVIKRAM, M.D.          PAGE
BY MR. FEINBERG:          5

- - -
E X H I B I T S
- - -
NUMBER     DESCRIPTION          PAGE
P-12     Medical Chart     10
P-14     Education Report     34

## Page 4

Before I swear in the witness, I will ask Counsel to stipulate on the record that due to the current national emergency pandemic, the court reporter, myself, may swear in the deponent even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.
- - -
MR. GREGORY: No objection.

MR. FEINBERG: That's agreed for Plaintiff.

MS. TAYLOR: And no objection from the City defendants.
- - -
LALITHA TRIVIKRAM, M.D., after having been first duly sworn, was examined and testified as follows:
- - -
THE COURT REPORTER: Any stipulations?

MR. GREGORY: Usual is fine with me.

MR. FEINBERG: That's fine for me as well.

MS. TAYLOR: That's fine.

1 (Pages 1 to 4)

Dr. Lalitha Trivikram

Page 5

--- 

(It is hereby stipulated and agreed by and between Counsel for respective parties that sealing, certification and filing are waived and that all objections as to the form of the questions be reserved until the time of trial.)

---

EXAMINATION

---

BY MR. FEINBERG:

Q.     Doctor, good afternoon.  We were introduced just a moment ago off the record.  My name is Jon Feinberg.  I'm the attorney for a woman named Eileen McNamara.  Ms. McNamara is the grandmother of the children of Jonathan Gleaves, Jr., and has been appointed by the Court as the Administrator of Mr. Gleaves' Estate.  As you're likely aware, Mr. Gleaves died on September 21st, 2018 a few hours after he was found unresponsive in his cell at the Curran Fromhold Correctional Facility in the Philadelphia Department of Prisons.  Ms. McNamara has brought a lawsuit against Corizon, three medical providers including yourself, the City of Philadelphia and a City of Philadelphia correctional officer.  In the lawsuit she's claiming

Page 6

that the defendants were deliberately indifferent to Mr. Gleaves' serious medical needs and as a result were a causal factor in his death.

Do you understand everything that I just outlined for you, Doctor?

A.     I do.

Q.     Okay.

You're represented for purposes of this deposition and for purposes of this case by Mr. Gregory who is also here on the Zoom.  Have you had a chance to speak with Mr. Gregory before today's deposition?

A.     I have.

Q.     Do you need any more time to speak with Mr. Gregory before I ask you questions about this case?

A.     No, I do not.

Q.     Have you ever testified in a deposition before?

A.     I have.

Q.     How many times?

A.     Once.

Q.     When was that deposition?

A.     That was back in maybe 2004.

Q.     Okay.

Have you ever testified in a live Court

Page 7

proceeding in front of a Judge or Jury?

A.     No.

Q.     Okay.

Back in 2004 did that deposition take place while you were working for Corizon?

A.     No.

Q.     Did the deposition concern a suit related to your work as a medical provider?

A.     It did.

Q.     Was it a civil case brought against you as a defendant?

A.     Yes, it was.

Q.     How was that case resolved in terms of -- if you are aware?

A.     The case against me was dropped.

Q.     Okay.

Now, those questions were just a prelude to my question about whether you understand the rules of a deposition, and I assume that Mr. Gregory has informed you about some of these, but let me just note on the record that we have a court reporter, Michelle, who swore you in at the beginning who is making a transcript of everything that is said during the course of today's deposition; do you understand

Page 8

that?

A.     Yes.

Q.     Okay.

For that reason I'm going to give you two instructions.  The first would be please be sure to give verbal answers to all of my questions so they can be recorded in the transcript, agreed?

A.     Yes.

Q.     All right.

The second is at some point it's very likely that you'll anticipate the question that I'm going to ask and you might be inclined just to interrupt me because you have an idea of what I'm going to say.  I'll ask you to try to resist that temptation so that we have a transcript that it's questions followed by answers rather than the two of us speaking over one another, agreed?

A.     Yes.

Q.     All right.

We are conducting this deposition by Zoom and as we learned earlier this morning or had confirmation of earlier today there sometimes are issues with the technology in terms of the video or audio lag.  If that happens at any point, please tell

2 (Pages 5 to 8)

Dr. Lalitha Trivikram

Page 9

me. I want to be sure that you can hear me, that you can see me and you can see any documents I show you. And if you have any difficulties just let us know and we'll do our best to accommodate any technological issues, agreed?

A.    Understood.

Q.    Okay.

Now, typically or at least prior to the pandemic depositions would be conducted with everyone in the same room and we would see who is with you and see what documents you had. But since we're not that leads to this question is anybody in the room with you today?

A.    No.

Q.    If someone were to enter the room and join you during the course of this deposition would you please tell me so we're aware of that?

A.    Yes.

Q.    Okay.

Relatively, are there any documents that you have in front of you related to this case or anything else for that matter?

A.    Papers on my desk but I do have some papers relevant to the case.

Page 10

Q.    Which papers do you have related to the case?

A.    I have the autopsy report and I have my review of the case that happened at the time of the mortality.

Q.    Okay.

Now, I've seen -- in fact, let me show you a document that I have and see if we're talking about the same thing. Throughout the course of this deposition, Doctor, I'll likely be putting documents on the screen. And the first document I'll put on the screen is Exhibit P-12 which is the medical chart for Mr. Gleaves during the relevant time period to this case and also during earlier periods of time. The specific document I'll show you now is at Pages 0007 to 0008. We have here a progress note entered by you on September 21st, 2018 and then signed off on at 8:20 -- I'm sorry, that's -- actually, we don't see the time when you signed off. Well, my question is this, is this the document that you're referring to?

A.    Yes.

Q.    Okay.

Are there any other documents that you have related to Mr. Gleaves besides the autopsy and the two pages that we're looking at right now?

A.    No.

Page 11

Q.    Okay.

A couple of other just preliminary questions for you, Doctor. You understand that you're testifying under oath, correct?

A.    Yes.

Q.    And you understand that this mean that you're swearing that all of your answers are true and correct?

A.    Yes.

Q.    If you don't understand a question that I've asked will you let me know that so I can clarify?

A.    Yes.

Q.    If you realize that an answer you've given earlier in your testimony was incorrect or incomplete will you let me know that so we can allow you to correct your previous answer?

A.    Yes.

Q.    Okay.

I don't think we're going to be here all that long today but if we get to a point where you need a break for any reason, please feel free to let me know with just the instruction that if there's a question pending at the time you ask for the break you'll have to answer that question before we take the break, understood?

Page 12

A.    Yes.

Q.    Is there any reason why you cannot give full and complete testimony today?

A.    No.

Q.    What did you do to prepare for today's deposition?

A.    I reviewed the chart and I reviewed the autopsy report.

Q.    When did you review those documents?

A.    I reviewed them on Thursday when I was notified of this deposition.

Q.    So that would be Thursday last week like six days ago; is that correct?

A.    Correct.

Q.    Prior to that point were you aware that a lawsuit had been filed naming you as a party in the case?

A.    I was not.

Q.    Okay.

And Mr. Gleaves was in the facility -- taken out at the time of his death on September 21st of 2018. Did you have any occasion to consider anything about to discuss his case, discuss his care with anybody between September 21st of 2018 and when you

Dr. Lalitha Trivikram

Page 13

first learned about this deposition last week?

A.    Other than the mortality review we had as an organization, no.

Q.    Okay, I'll come back to that.

By the way, since you mentioned it, have you reviewed any documents that were prepared as a result of the mortality review concerning Mr. Gleaves?

A.    I have not.

Q.    Have you -- I assume you spoke to Mr. Gregory in preparation for the deposition.  I will not ask you what you discussed because that's attorney/client privilege material.  But can you tell me when you spoke to Mr. Gregory?

A.    I spoke to him on Thursday and I spoke with him yesterday evening.

Q.    For how long in total did you speak to Mr. Gregory about this deposition?

A.    Let's see, maybe 30 minutes total.

Q.    In terms of other documents that are out there about this case there would have been a Federal Civil Rights Complaint that was filed, a document which outlines allegations that was filed back in September of 2020.  Since you first learned about the case just last week I assume if you didn't look at it back then

Page 14

but now over the past six days or so have you looked at that Complaint?

A.    I have not seen that, no.

Q.    Have you reviewed transcripts of any of the other depositions that have taken place in this case?

A.    I have not.

Q.    Did you watch any of the surveillance video that was recorded from the block where Mr. Gleaves was housed?

A.    I did not.

Q.    And while I'm thinking about it I know that you were involved in the response or the assessment of Mr. Gleaves when he was found unresponsive in his cell on September 21st, 2018.  Did you ever go to the block where Mr. Gleaves was housed?

A.    I did not go to the block at that time, no.

Q.    Okay, now, I assume you've been to that block on other occasions.  I'm talking about that day.  So do I understand correctly then that your encounters with Mr. Gleaves all would have taken place within the medical unit at the facility?

A.    Correct.

Q.    Okay, thank you.

Just back to the topic of preparation,

Page 15

did you look into any other documents about Mr. Gleaves, any social media posts, any online research, anything like that?

A.    No.

Q.    Do you have any personal notes regarding Mr. Gleaves or your involvement in his case?

A.    No.

Q.    Okay.

Do I understand correctly then that the only encounter you had with Mr. Gleaves was on the morning of September 21st when he was found unresponsive in his cell?

A.    Yes.

Q.    Okay.

Do you remember sitting here today participating in that event?

A.    I do.

Q.    Okay.

Could you walk me through and we'll go back and look at the documents but could you walk me through what happened as far as you recall?

A.    So I believe from what I remember a stretcher was called for Mr. Gleaves and per our protocol nursing staff responds initially.  And when they assessed the

Page 16

patient they felt additional help was needed and so they called for additional help.  I remember speaking to the nurse who saw the patient initially and she described that he was on the bunk and that there was a white milky substance that was coming from him that was in his mouth or on his face.  So when she came down after getting additional help to transport him she got everything ready to suction him.  So by the time I saw him he was -- he had vital signs, they were stable, but he was not responding.  He was not responsive.  So we suctioned and I remember getting some of the white milky substance from him.  And in terms of trying to figure out can we reverse the state that he's in we did give him a dose of Narcan.  That did not actually improve his mental status.  There was thought that perhaps he was seizing so we did give him a dose of Ativan.  And given that he had this decrease level of consciousness I had asked that they placed AED on him prophylactically.  There was no indication he was unstable cardiovascularly but I did not want to take a chance on given how obtunded he was.  And this is what I remember of the case.

Q.    Okay.

When you first encountered him I think

Dr. Lalitha Trivikram

Page 17

you already confirmed this, this was in the medical unit; is that correct?

A.    Correct.

Q.    And that's -- I've already discussed this with Doctor Bradley a short time ago.  I understand the medical unit is close to or next to the admission area of the facility; is that correct?

A.    It is, correct, yes.

Q.    Mr. Gleaves was housed I believe at B1 Pod 3; does that sound right to you from the documents you reviewed?

A.    Yes, B1-3.

Q.    Can you tell me how long would it take to walk -- I've done the walk before but I don't remember from B1 Pod 3 to the medical unit?

A.    It would take a couple of minutes.  B1-3 is on the first floor so you don't even have to take the elevator.  It would take a couple of minutes to walk from there to medical triage.

Q.    Where were you in the facility when you first heard the stretcher call?

A.    I don't know that I remember that.

Q.    Okay.

Do you remember being in the medical

Page 18

unit and staying there or do you remember being somewhere else when you had to come back to the medical unit to address the patient?

A.    I'm not entirely sure.

Q.    Okay.

Who else was present with you in the medical unit when you had the interactions that you described with Mr. Gleaves?

A.    The only one I specifically remember is the nurse who initially assessed the patient who is Ms. Seeger.

Q.    Seeger, S-E-E-G-E-R?

A.    Correct.

Q.    Okay.

And you're not saying there weren't others there but you just don't remember any others besides Nurse Seeger; is that correct?

A.    That's correct.

Q.    Okay.

Now, I want to make sure I understand what your medical assessment was when you first saw Mr. Gleaves.  It sounds like the first thing you thought is that there might be an opiate overdose which led you to provide Narcan; is that correct?

Page 19

A.    Correct.

Q.    The second thing was the seizure which is what led you to provide the Ativan; is that correct?

A.    Correct.

Q.    And the third thing that you thought although it sounds like you were less certain that there could have been a cardiac issue which is why you placed the AED; is that correct?

A.    Because of his obtunded state not knowing what the status of his respiratory condition was should he decompensate I wanted to be prepared.  I didn't have a specific concern of anything cardiovascular at that time.  Blood pressure was a little elevated but it was fine.  His pulse was elevated but it was fine.  He had a pulse.  It was more in case things were to get worse we would be prepared.

Q.    Okay.

Now, we know that Emergency Medical Services was eventually summoned; is that correct?

A.    Correct.

Q.    When within that process that you described the provision of the Narcan, the Ativan and the AED was the decision made to seek out Emergency Medical assistance?

Page 20

A.    I don't know for sure.  Typically, as soon as a patient is assessed when we see their condition that's usually when the call goes out even before they come to medical.  Because it's pretty clear he'll need further care.  You know, our job is to stabilize him, correct whatever we can correct and then get him to the hospital for further treatment.

Q.    Can you say sitting here today whether the call to Emergency Medical Services was made before he got to the medical unit?

A.    I don't recall.

Q.    And my next question I know what your answer will be but I'll ask anyway.  Can you estimate for me how -- you told me you have no idea when the call was made; is that correct?

A.    I'm sorry, I didn't hear you.

Q.    Sure, I'll wait until that speaker stops.

A.    Yeah, it's done.

Q.    Okay, thank you.

You can't say one way or the other whether it was made before you got there, whether it was made during this process of the assessment or sometime after; is that correct?

A.    Yes, I don't recall that.

5 (Pages 17 to 20)

Dr. Lalitha Trivikram

Page 21

Q.   Do you know who made the call to Emergency Medical Services?

A.   Usually one of the nurses would. I think in the note it said Ms. McGettigan had called.

Q.   Okay.

Do you know how long it took for the Emergency Medical Services to get there?

A.   I do not.

Q.   While you were waiting for Emergency Medical Services what, if anything, were you doing with Mr. Gleaves?

A.   We would have been monitoring him again just making sure his vital signs remain stable and that there wasn't any change in his condition.

Q.   Okay.

Did you draw any conclusions about what his specific medical condition was at that time other than what we've already discussed?

A.   I couldn't draw any specific conclusions. It seemed less likely to be opiate related since the Narcan didn't reverse him like I would have expected. It's hard to say if there was any seizure component because he never really came through for us to see a postictal phase to assess him in that way. And as I

Page 22

said, and his blood pressure and pulse were fine. He was breathing. There was concern that he may have aspirated. There might be some pneumonia that's starting but there's no way to know that for sure. That would be suspected but I wouldn't conclude that that's what happened.

Q.   Okay.

Now, you just explained to me that you reviewed the autopsy report. Before I ask you more questions about that, did you look at any documents from either of the two hospitals that Mr. Gleaves was taken to Nazareth and Hahnemann?

A.   I did not.

Q.   Do you recall now sitting here today -- well, first, just as a first principle. My understanding is that when a patient is taken from the Philadelphia Department of Prisons to an outside hospital there are regular communications that occur between the medical unit and the hospital; is that true?

A.   Regular communications as in?

Q.   Periodic updates from the hospital if someone is going to be admitted or a report back from the hospital about what happened in the emergency department, anything like that?

Page 23

A.   There can be, yes.

Q.   Do you recall participating or having any phone conversations or any other communications for that matter with anyone at either Nazareth Hospital or Hahnemann Hospital?

A.   I don't recall having any conversation with anybody at the hospital.

Q.   Do you recall hearing from any of your colleagues in the medical unit whether they be doctors, nurses, what have you, about their communications with anyone in the hospital?

A.   Not that I can recall.

Q.   Do you recall -- well, obviously, sitting here today you're aware that Mr. Gleaves died after going to the hospital; is that correct?

A.   Correct.

Q.   All right.

Let's go back into September of 2018, when did you learn about his death?

A.   I probably would have learned about it the same day likely, yeah.

Q.   Do you remember what you learned at that point about the cause of death?

A.   I don't know that I knew anything specific

Page 24

about the cause of death at that point.

Q.   Okay.

So obviously you've been more educated on that now given what you've seen in the autopsy report; is that right?

A.   That's correct.

Q.   Okay.

Now, that everyone involved in this case has seen the autopsy report but let me just ask you what's your understanding as to the cause of death based on what you saw in the autopsy?

A.   So what I saw and what I understand is that it was acute drug intoxication. The substances that were found in his system were cocaine, Fentanyl and Xylidine. There was also evidence of acute cerebellar infarction and pulmonary congestion that was found.

Q.   Okay.

When you say -- let's focus specifically on acute cerebellar infarction. That's essentially a stroke that takes place in the cerebellum; is that correct?

A.   Correct.

Q.   Have you -- we don't need to go into more discussion of this but have you seen or heard reporting

6 (Pages 21 to 24)

Dr. Lalitha Trivikram

Page 25

on how that type of event can be sometimes related to drug intoxication?

A.    Yes.

Q.    Okay.

At any point do you recall reading -- or strike that.

You've already told me that you prepared a note on September 21st concerning your encounter with Mr. Gleaves; is that correct?

A.    Correct.

Q.    At any point back in September of 2018, or now for that matter, did you go back and look at the rest of the medical chart to see what happened in the encounters leading up to the morning of the 21st?

A.    Yes.

Q.    Okay.

So any my question then is did you see any evidence from this prior encounter that he was experiencing that cerebellar infarction at that point any time prior to the morning of the 121st?

A.    No.

Q.    Okay.

You mentioned that you expect that you would have heard about the death at some point on the

Page 26

21st after it happened.  After that death did you participate in any conversations, any discussions of Mr. Gleaves of his care or anything like that in the days and weeks that followed?

A.    There would have been a discussion as far as a mortality review but that would have been the extent of it.

Q.    Okay.

At that point were you the site medical director at CFCF?

A.    I was.

Q.    Is that still your title today?

A.    It is.

Q.    Okay.

My understanding from a previous deposition is that the site medical director will as a matter of course participate in the mortality review; is that a correct understanding?

A.    Yes.

Q.    Who else tends to participate in the mortality review?

A.    It will be the quality assurance people for Corizon.  PDP is involved.  Detectives that investigate the case are involved.  Behavioral Health is involved.

Page 27

And the administrator for CFCF will be involved.

Q.    How long after the death does the mortality review typically occur?

A.    I would say probably two to three weeks.

Q.    Okay.

And do you recall -- sitting here today do you recall participating in that mortality review for Mr. Gleaves; is that correct?

A.    I don't specifically remember but I would have been, yes.

Q.    Okay.

As a matter of course you would have participated; is that correct?

A.    Correct.

Q.    And that's not because you had an encounter but because of your title as the site medical director you would have; is that correct?

A.    That's correct.

Q.    All right.

Forget Mr. Gleaves for a moment, in a mortality review in just a typical case, walk me through the process of what happens during those reviews?

A.    So I generally will report on the details of

Page 28

the case and I will provide any information I have from AED or from the autopsy report.  And then I'll generally in hindsight seen what the cause of death may have been and discuss areas of improvement that we might need to address.  After I finish my section people ask questions, clarifications will be made.  Then Behavioral Health will be asked to weigh in on whatever their review of the chart revealed.  Then PDP there's a nurse who reviews the chart as well and looks for areas of improvement and we discuss those and then finally the detectives will provide any information they have so that we can get a whole picture of the case.

Q.    As a result of that process are there documents prepared?

A.    Yes, there are documents prepared.

Q.    What types of documents are prepared as a result of that review process?

A.    It's my review.  I suppose there are other documents that QI makes.  I don't necessarily see those.  I'm not exactly sure what the nature of those are.

Q.    And if there are any remedial measures that -- or let me ask that a different way.

7 (Pages 25 to 28)

Dr. Lalitha Trivikram

Page 29

If as a result of this process you determine that there should be some remedial measures in place whether it's training for an employee or a change in practice or discipline for an employee, I take it that would be reported somewhere in the process; is that correct?

A.    Correct.

Q.    All right.

And just to confirm, leading up to this deposition have you gone back and looked at any of the documents produced for or as a result of the mortality review in this case?

A.    Other than my review, nothing else.

Q.    Okay.

Well, so your review -- did you go back and look at notes that you made for purposes of the mortality review?

A.    The review itself, yes.

Q.    Okay.

And that was different from the document that we looked at earlier today?

A.    Correct.

Q.    Okay.

Do you have that document with you

Page 30

today?

A.    I don't have it in front of me right now, no.

Q.    Okay, all right.

MR. FEINBERG:  Tom, in light of the fact that our witness reviewed this document in preparation for the deposition I think I'm entitled to see it.  And I'd ask that it be produced before we go on with the deposition.

MR. GREGORY:  My position is that this is a document prepared --

- - -

(Whereupon, a brief discussion was held off the record.)

- - -

(Whereupon, a brief break was taken at this time.)

- - -

MR. GREGORY:  Well, we disagree.  I think the documents are protected by the Act.  They were prepared in conjunction with the requisites of the Act or the purposes behind the Act.  And if the Judge says we have to turn them over we'll turn them over but until that happens we respectfully decline.

MR. FEINBERG:  Okay, fair enough,

Page 31

understood.  We'll continue with the deposition but let me just note that if those documents are produced I'll reserve the right to reopen the deposition for the purpose of furthering questioning on this document.

MR. GREGORY:  If the Judge says she has to come back, she'll come back.

MR. FEINBERG:  Okay.

BY MR. FEINBERG:

Q.    All right, Doctor, let me ask --

MR. FEINBERG:  Well, Tom, I know you're going to object from the previous discussion but let me note the question for the record.

BY MR. FEINBERG:

Q.    Were there any conclusions reached in the mortality review process whether it was the meeting or any documents produced that there were errors made or violations of any procedure in the care provided to Mr. Gleaves?

MR. GREGORY:  Objection, do not answer.

BY MR. FEINBERG:

Q.    All right, to your knowledge, Doctor, similar question, was there any directive for the institution of discipline in connection with the care regarding Mr. Gleaves?

Page 32

MR. GREGORY:  Objection, do not answer.

BY MR. FEINBERG:

Q.    Doctor, did you ever hear -- forget the mortality review process for a moment.  Did you ever hear anyone say that Mr. Gleaves' death could have been prevented?

A.    No.

Q.    Did you ever reach that conclusion yourself that Mr. Gleaves' death could have been prevented?

A.    It could not have been prevented.  My conclusion was that it could not have been prevented.

Q.    All right.

Let me show you -- and actually, as I ask that, let me ask you to explain.  Why is it that you reached the conclusion that Mr. Gleaves' death was not preventable?

A.    Because based on what the medical examiner found it seemed like it was an acute event.  And he received the attention to try to stabilize him when he was found.  He was sent to the hospital in a timely manner.  And you know, we weren't able to reverse the course.  So I don't feel like there is something that we could have done differently.  He was given the emergency care that he needed.  I do not feel like

Dr. Lalitha Trivikram

Page 33

there is something we could have done differently.

Q. Did you ever hear any indication that Mr. Gleaves' cellmate had sought assistance from a correctional officer at some point during the early morning hours of September 21st before you saw Mr. Gleaves?

A. I did not.

Q. Okay.

Did you ever hear or see any documents concerning whether -- actually, I'm sorry.

Do you have any understanding given the position about what correctional officers responsibilities are for conducting tours in the housing areas where they're assigned?

A. I'm sorry, can you repeat that question, please.

Q. Sure, and let me state I know you work for Corizon and you're not a correctional officer and literally I'm just asking you for what you've heard. But have you ever heard what a correctional officer's responsibility is in terms of frequency for conducting a tour of the unit where they're assigned?

A. I don't think I can really comment on that since my role is medical.

Page 34

Q. Understood.

Have you -- do you know a nurse by the name of Matu Gaye?

A. I do.

Q. And did I pronounce that name correctly?

A. Yes.

Q. Is Nurse Gaye still employed by Corizon?

A. She is.

Q. Working at CFCF?

A. Correct.

Q. Okay.

I'm going to show you a document which I had previously marked as Exhibit P-14. It's a document called Employee Education Report. And it appears -- I can't interpret the signature of the supervisor. Do you have any idea whose signature that is?

A. I'm not for sure whose that might be. It might be Ms. Jeobohan just looking at the letters.

Q. Could you spell that name for me?

A. Yes, J-E-O-B-O-H-A-N.

Q. Thank you.

The Employee Education Report notes as follows under the supervisor's statement. Mrs. Gaye

Page 35

failed to create the same day withdrawal encounters for an inmate on 9/20/18. First off, have you seen this document before?

A. I have not, no.

Q. Do you have any idea what this means under the supervisor's statement?

A. Yes, I do.

Q. Can you tell me or explain it to me, please?

A. Yes, so the system that we have when a patient comes in through intake and reports a history of drug use the system -- the computer system triggers assessments to be scheduled each shift for I believe seven days so that they can be monitored for their withdrawal symptoms and treated accordingly. The system for whatever reason doesn't generate appointments starting on the same as the intake encounter occurs and this is what that is referring to. Those appointments need to be generated manually.

Q. Okay.

And how -- tell me what you mean by a manual appointment or manual creation of an appointment?

A. That means that somebody would have to go in and specifically create the appointment for the same

Page 36

day -- withdrawal appointment for the same day as the intake encounter occurs.

Q. Understood. And then if -- and by the way, you don't have to repeat -- well, I know you weren't present for Doctor Bradley's deposition but with Doctor Bradley we went through at length when withdrawal assessments are supposed to take place. And she informed me -- I'm just giving you my recollection. That typically there's one withdrawal assessment per shift; is that correct to your understanding?

A. That is correct.

Q. So if Mr. Gleaves came in and was seen in the intake area sometime between 3:00 p.m. and 11:00 p.m. on September 20th, 2018 you would expect that he would have another withdrawal assessment between 11:00 p.m. on the 20th and 7:00 a.m. on the 21st; is that correct?

A. Correct.

Q. And in order for that appointment to be created you would have to go through this manual process as opposed to the system which automatically creates it; is that correct?

A. Correct.

Q. All right.

How long has the -- and by the way, the

9 (Pages 33 to 36)

Page 37

system we're talking about that's the electronic medical record; is that correct?

A. Correct.

Q. And how do you at the prison like what do you call that record just EMR?

A. Technically, the name is ECW Eclinicalworks.

Q. How long has ECW been in place at the Philadelphia Department of Prisons?

A. For as long as I've been here but I think it was instated earlier than that so I'm not sure.

Q. I haven't asked you your background questions yet which I'll do in just a moment but when did you start with the Philadelphia Department of Prisons?

A. February of 2018.

Q. Okay.

And to your knowledge has this situation been in place throughout that time where you have to manually schedule an appointment on the same day?

A. I believe so.

Q. And by the way, we're using the phrase same day. We're talking about the next shift 11:00 p.m. to 7:00 p.m. as the next shift after the 3:00 p.m. to 11:00 p.m. shift. Is that timeframe 11:00 p.m. to

Page 38

7:00 a.m. after a 3:00 p.m. to 11:00 p.m. encounter considered the same day?

A. Yes, it would.

Q. Okay.

And since that issue has been in place -- well, strike that.

Do you have any understanding as to what training nurses receive regarding the scheduling of these same day assessments?

A. I don't think I can speak to the training the nurses receive.

Q. Okay.

But from your perspective and your understanding this is a known issue EWC does not automatically create that appointment so you have to manually create them; is that correct?

A. Yes.

Q. And you, yourself, Doctor Trivikram have known that since you started working for the Philadelphia Department of Prisons; is that correct?

A. At some point I would have learned that, yes.

Q. Okay.

At any point since your encounter with Mr. Gleaves on September 21st did you ever learn

Page 39

anything about the failure to schedule a same day assessment for Mr. Gleaves?

A. Could you repeat the question?

Q. Sure, now, I just showed you a document which reported that there was a failure to manually create that same day assessment. My question is before I showed you that document at any time from September 21st of 2018 through today were you involved in any conversation where this topic was discussed in connection with Mr. Gleaves?

A. It would have been related to identifying -- the -- yes, if Ms. Gaye received the education that it would have been triggered by discussion or review of the case.

Q. In the mortality review?

A. Yes.

Q. Do you remember participating in any discussions with other Corizon professionals about what Nurse Gaye did or didn't do in this case?

A. No, not specifically, no.

Q. Okay.

Outside of the context of this case do you recall seeing other instances where there had been failures on the part of nurses to manually schedule

Page 40

same day assessments?

A. I have not, no.

Q. And by the way, I neglected to ask you this before, the phrase same day does that mean within 24 hours?

A. I guess, yes -- no, not -- 24 hours of when?

Q. Yeah, let me do this. I think it would be easier to answer the question this way. The records that we have show that Mr. Gleaves saw Nurse Gaye and that Doctor Bradley reviewed those notes between 7:00 p.m. and 10:00 p.m. on September 20th of 2018, understood?

A. Yes.

Q. All right.

And as part of that process there was on order issued by Nurse Gaye and signed off on by Doctor Bradley for one withdrawal assessment per shift, understood?

A. Yes.

Q. Okay.

Now, for what appointments given that timeframe would Nurse Gaye have needed to manually schedule as we discussed?

A. It would have been the 11:00 to 7:00 shift

10 (Pages 37 to 40)

Page 41

that would have needed to be manually scheduled.

Q.  Okay.

Because the system would have generated scheduling for the 7:00 a.m. to 3:00 p.m. shift?

A.  Yes.

Q.  So you would expect to see then if there's an appointment scheduled between 7:00 a.m. or for the 7:00 to 3:00 shift on the morning of the 21st but without the manual scheduled there's nothing there -- there would be nothing there between 11:00 and 7:00 a.m.; is that correct?

A.  Correct.

Q.  So essentially it's the next shift following the initial assessment; is that correct?

A.  For that day, yes.

Q.  Okay.

So is it accurate to say that the manual assessment -- well, strike that.

Would you agree that when patients come into the facility and they're going through withdrawal the most dangerous time in terms of their medical situation is usually in that period right after they get there?

A.  It is not necessarily the most dangerous

Page 42

because withdrawal by itself is not lethal.  It is something that they can get very sick from and they should be treated for relief of their symptoms.  But withdrawal itself is not a lethal condition.

Q.  Okay, and I understand that.  And are you speaking just with regard to opiate withdrawal or all forms of withdrawal including Benzodiazepine and alcohol withdrawal?

A.  I'm speaking mostly to opiates.  With Benzo's and alcohol it is a different situation.

Q.  Okay.

Opiate withdrawal the risks that are associated with it usually include dehydration from persistent vomiting and diarrhea; is that correct?

A.  Correct.

Q.  Okay.

By treating the symptoms you can treat the or you can try to prevent those dangerous conditions from arising; is that correct?

A.  Correct.

Q.  Okay.

Benzo withdrawal and alcohol withdrawal do have potentially medical consequences; is that correct?

Page 43

A.  That is correct.

Q.  For example, let's take Benzodiazepine withdrawal that can lead to seizures; is that correct?

A.  Correct.

Q.  And seizures if left untreated can be extremely dangerous if not fatal; is that correct?

A.  Seizures by themselves it depends on the severity of the seizure.

Q.  Okay, but bottom line it seems like you're in agreement though that there are dangers associated with both Benzo withdrawal and alcohol withdrawal.  And getting back to my previous question would you agree that that early time period when the person first arrives off the street and is withdrawing from the substances they've been using that's the most dangerous period?

A.  If there's Benzo's and alcohol, yes.

Q.  Have you -- are you aware of any conversations between Corizon or anyone associated with Corizon and the vendor who provided ECW to the facility about changing the setup which requires manual creation of the same day assessments?

A.  I do not know of any.  I'm not aware.

Q.  Who is the vendor, by the way, if you know?

Page 44

MR. GREGORY:  ECW.  She's testified ECW.

MR. FEINBERG:  Got it, all right.  I understand that.  I understood ECW to be the name of the system.  But if you're saying ECW is the company that provides it then that answers that.

MR. GREGORY:  It is the company.  It stands for Eclinicalworks.

MR. FEINBERG:  Understood, okay.

BY MR. FEINBERG:

Q.  And to be clear then, Doctor, what you're saying is that you're not aware of any conversations between anyone with Corizon and Eclinicalworks about this issue that we've been discussing concerning same day assessments; is that correct?

A.  That's correct.

Q.  Okay.

Let me ask you just some background questions, Doctor.  You first arrived at Corizon you said in 2018; is that correct?

A.  Correct.

Q.  You have an M.D.; is that right?

A.  Correct.

Q.  Where did you obtain your M.D.?

11 (Pages 41 to 44)

Dr. Lalitha Trivikram

Page 45

A.    At Penn State College of Medicine.

Q.    And what year?

A.    That would have been '94 to '98.

Q.    Okay.

Where did you go to college before you went to medical school?

A.    State University of Buffalo.

Q.    Did you graduate right around 1994?

A.    Correct.

Q.    Okay.

How many different jobs did you have between your completion of medical school and when you started at Corizon?

A.    Let's see, four, four jobs.

Q.    Could you just list them for me?

A.    Sure, initially out of residency I worked in a multispecialty practice outpatient/inpatient nursing home care.  Subsequent to that I went to another multispecialty group.  Subsequent to that I went to a nursing home and I worked in a nursing home full-time and then I took a couple of years off when we moved to Pennsylvania and then I joined an outpatient practice prior to starting with Corizon.

Q.    Is your specialty family medicine?

Page 46

A.    Internal medicine.

Q.    Internal medicine, got it, okay.

Well, what was the outpatient practice in Pennsylvania called?

A.    Christian Meyer & Associates.

Q.    In Chester County, right?

A.    Yes.

Q.    Any of those previous jobs were you fired or asked to leave the position?

A.    No.

Q.    Why did you make the shift to correctional medicine?

A.    I was looking for -- I was looking for some workplace balance but I wanted work where I felt -- that would be gratifying.  I've always been drawn to working with marginalized population.  I enjoyed my work in the nursing home and I thought correctional medicine might be something that I would enjoy doing and I would find fulfilling.

Q.    And you've stayed with Corizon doing that work since 2018; is that correct?

A.    Correct.

Q.    At any point have you left Corizon for any time period other than vacation?

Page 47

A.    No.

Q.    Okay.

Could you walk me through the different assignments that you've had while working -- and I'm sorry, before I ask that.  Do I understand correctly that while working for Corizon you have always been stationed at the Philadelphia Department of Prisons?

A.    Yes.

Q.    Okay.

And can you -- there are obviously different facilities.  Have you been at CFCF the entire time?

A.    I have.

Q.    When did you become the site medical director?

A.    It was the role I came into.

Q.    Okay.

So you've been the site medical director consistently from 2018 through the present; is that correct?

A.    Correct.

Q.    Who do you report to?

A.    I report to Doctor Kalu, the Regional Medical Director.

Q.    Okay.

Page 48

And are you the lead clinical supervisor at CFCF?

A.    Yes.

Q.    Do I understand that all of the physicians who are assigned there would report to you?

A.    Yes.

Q.    And how about nurses do they report to you as well or is that to the HSA?

A.    That's to the HSA.

Q.    Okay.

At any given time how many physicians are assigned to be working -- let me say that differently.

On any shift how many physicians are working at CFCF?

A.    We have physicians and midlevels that cover the shifts.

Q.    And how many -- let's say on the 7:00 to 3:00 shift how many are there?

A.    On dayshift we have five physicians that are covered.  They may be all midlevels.  Currently, we have all midlevels that are covering the dayshift other than myself.

Q.    Okay.

WWW.KLWREPORTERS.COM

Dr. Lalitha Trivikram

Page 49

Now, Doctor Bradley told me during her deposition that her assignment was as the triage provider. How many different assignments are there for physicians who are stationed at the facility?
A. For the positions would either be working in chronic care or they would be working in the triage role.
Q. And chronic care there are a number of different clinicians where patients are assigned to come at some level of interval; is that correct?
A. Yes.
Q. Let me ask you just a few more questions about the intake process. Once a person walks in the door of CFCF because they've been ordered by a Judge to serve time or they're taken there by the police, how much time typically passes before they first encounter a medical professional?
A. They are screened as soon as they come in by a medical professional to quickly identify any issues that would preclude them from actually coming into CFCF. If someone is sick enough and needed to go then they'll be sent to the hospital immediately.
Q. So that takes place immediately after arrival at the facility?

Page 50

A. Correct.
Q. After that takes place what's the next step in the intake process?
A. So then I believe after they've been cleared by medical then corrections takes over and does whatever they need to do as part of their intake process.
Q. Okay.
I reviewed and in fact, let me put this up on the screen now. Exhibit P-12 is the medical record for Mr. Gleaves or the pdf of those medical records. I will refer you to Page Corizon 0013. It's a seven page document from Corizon 0013 through Corizon 0019. This is all part of what I believe to be the intake assessment. Is this the assessment that you were referring to just a moment ago which happens basically instantaneously once the person arrives at the facility?
A. No.
Q. Okay.
When does this take place, when I say this meaning the document that I just put up on the screen?
A. This occurs after corrections does what they

Page 51

need to do with a new intake then they're brought to medical to be assessed.
Q. Okay.
So if I understand correctly there's an initial assessment done by medical then corrections does whatever intake they need to do regarding the person whose been admitted and then after that there is this more comprehensive intake assessment that is the record for which we have in front of us; is that correct?
A. Correct.
Q. And I take it that this process the intake assessment a standard part of that is assessing what symptoms the person is experiencing from withdrawal from controlled substances; is that correct?
A. That would be part of it, yes.
Q. Okay.
I understand a whole medical history would be taken but withdrawal from controlled substances is certainly part of the process, correct?
A. Correct.
Q. Okay.
And if a person is going to be placed on withdrawal assessments that is also done during this

Page 52

process; is that correct?
A. Correct.
Q. In fact, we're now down at Page Corizon 0018 under assessment. Do you see the highlighted text there that I'm pointing to?
A. I do.
Q. Okay.
It notes he, meaning, Mr. Gleaves, will be on withdrawal assessments Q shift for five days. Is it correct to state that that's an order indicating that Mr. Gleaves should be seen once per shift for the next five days; is that correct?
A. Correct.
Q. And as a result of that, in fact, let me go to a different location. There would be orders placed -- let me start over. I am now at Page Corizon 0011. And we see here that these are orders issued by Doctor Bradley on the same date September 20th regarding Mr. Gleaves and there's a note that -- bear with me. Well, actually, let me ask you, do I have the right location where the withdrawal assessments are ordered?
A. No, they are triggered by the nurse's note.
Q. I see, which we were looking at previously; is that correct?

13 (Pages 49 to 52)

Dr. Lalitha Trivikram

Page 53

A.    Correct.

Q.    All right.

So if we go back to Page 0001 this is a scheduled appointment for Mr. Gleaves to be seen for withdrawal for the COWS assessment and the BWS or Benzodiazepine assessment; is that correct?

A.    Correct.

Q.    And you expect that this would be generated as a result of the nurse's note that we looked at just a moment ago at Pages 0013 through 0019; is that correct?

A.    Yes, because this is the day of the 21st, yes.

Q.    Okay.

And we know from other documents and also from your experience that Mr. Gleaves was not in the facility later on the 21st because he was taken out shortly after 7:00 a.m.; is that correct?

A.    Correct.

Q.    Okay.

So the appointment -- you see the appointment here on Page 0001, another appointment here on Page 0002 and then another appointment here on Page 0003. These all would have been generated as a result of what the nurse did; is that correct?

A.    Correct.

Page 54

Q.    And if I understand your testimony from before correctly, in order to create an appointment for the 11:00 p.m. to 7:00 a.m. shift then there would have had to have been a manual order placed by the nurse; is that correct?

A.    Correct.

Q.    Okay, thank you.

One other thing I'll show you back on the -- well, let's go backwards. Let's go to Page 0011. No, I'm sorry, let me go back to Page 0018. I'm sorry, I keep taking you to the wrong record. Here it is, Page 011. These notes these are entered by the physician; is that correct?

A.    Yes.

Q.    In this case it's Doctor Bradley. Will have Clonidine available with COWS meds for now. Does that indicate that Clonidine will be available for Mr. Gleaves if needed when the assessment is done on the next shift?

A.    Yes.

Q.    Do you have any knowledge of nursing practices regarding when they conduct assessments versus when they provide medication, for example, is it done at the same time or does the nurse do assessments and come

Page 55

back and get the medication later?

A.    It's usually given at the same time.

Q.    Okay.

So if a nurse is going to do a withdrawal assessment then assesses the patient, assesses the patient's presentation and has a discussion with the patient the nurse makes the determination that medication will be helpful the nurse then hands the medication over at that time; is that correct?

A.    Correct.

Q.    And to your knowledge does the nurse conduct that assessment and provide the medication in the housing area?

A.    Yes.

Q.    Okay.

So in other words, let's say a manual order was issued for Mr. Gleaves for the 11:00 p.m. to 7:00 a.m. shift on the 20th/21st of September, 2018, you would expect that a nurse would have gone out to the housing area and assessed Mr. Gleaves; is that correct?

A.    Correct.

Q.    Okay.

Page 56

Let's go back to the document we looked at at the beginning of the deposition which is your note from your encounter with Mr. Gleaves which is at Page 0007 -- Corizon 0007 and 0008. I want to ask you a few questions about the narrative that you reported here. Do you need time to review the document one more time before I ask you questions or are you prepared for me to ask questions now?

A.    You can ask the questions.

Q.    Okay.

If you need time to review the document when I ask you the question just let me know.

A.    Yes.

Q.    Okay.

My first question is reading this note can you tell where you were when you first learned about Mr. Gleaves' medical situation?

A.    This note that's in front of us on the screen right now is entered by Nurse Seeger. My documentation is an addendum to this note.

Q.    I see, okay, thank you for that clarification. So the note that you entered is on the -- under addendum or on Page Corizon 0008; is that correct?

A.    Correct.

14 (Pages 53 to 56)

Dr. Lalitha Trivikram

Page 57

Q.    Okay.

And I assume from this text does that refresh your recollection in anyway as to where you were when you learned about Mr. Gleaves' medical situation?

A.    Yeah, my notes state that I saw the patient when he came to medical.

Q.    Okay.

Right, you saw him in medical but my question which is an in-artful question, you can't tell whether you had to come there from somewhere else or anything like that; is that correct?

A.    Correct.

Q.    Okay.

The note here he was ordered comfort meds and serial assessments. I take it that you were able to determine that from going back and looking at the record including some of the documents that we just reviewed; is that correct?

A.    Correct.

Q.    Serial assessment means the withdrawal assessments that are supposed to occur once per shift; is that correct?

A.    Correct.

Page 58

Q.    Okay.

Your note that mental status improved as noted above. I take it the noted above is referring to the nurse's note on Page Corizon 0007; is that correct?

A.    Correct.

Q.    The phrase -- and I understand you didn't write this note but your were present which is why I want to ask you about it. EMS arrived simultaneously to continue care. Can you tell when during this process the EMS arrived?

A.    I cannot tell from this documentation when EMS actually arrived.

Q.    Have you seen any record anywhere about when -- exactly what time Mr. Gleaves was transported to the emergency room after the arrival of EMS?

A.    I do not know what time he was transported.

Q.    Okay.

In other words, we know that you obviously were with him from some time after 7:04 a.m. through 7:27 a.m. but beyond that you don't have a record of the timing at which he was taken out of the facility; is that correct?

A.    Correct.

Page 59

Q.    Have you seen any records from the Emergency Medical Services provider about when the transport took place?

A.    I have not.

MR. FEINBERG:  Doctor, I think I'm about finished with the questions I have. Let's go off the record. I want to review my notes for just a minute or two and then I'll be back and we'll finish up, okay?

THE WITNESS:  Okay.

- - -

(Whereupon, a brief break was taken at this time.)

- - -

BY MR. FEINBERG:

Q.    Doctor, we took just a short break and did you realize during the break that any of your previous testimony was incorrect or incomplete?

A.    I'm sorry, repeat the question.

Q.    Sure, did you realize that any of your previous testimony was incorrect or incomplete in anyway?

A.    I do not think so, no.

Q.    Okay, all right.

Page 60

MR. FEINBERG:  With that let me -- yeah, I don't have any further questions. So that's it, I'm done. I'll turn it over to Ms. Taylor to see if she has any questions.

MS. TAYLOR:  No questions, thank you.

MR. GREGORY:  None from me either, thank you.

MR. FEINBERG:  Okay, Doctor, your deposition is concluded. You're free to go. Thanks for your time.

THE WITNESS:  Thank you.

THE COURT REPORTER:  Mr. Gregory, a copy of the transcript?

MR. GREGORY:  Yes, same as before.

MS. TAYLOR:  Same for me, too, please, electronic only and mini only.

MR. FEINBERG:  Same, that's correct.

- - -

(Whereupon, the deposition was concluded at 1:50 p.m.)

- - -

15 (Pages 57 to 60)

Page 61

CERTIFICATE

- - -

I, Michelle Palys, Court Reporter and Notary Public and for Philadelphia, Pennsylvania, do hereby certify that the foregoing testimony of LALITHA TRIVIKRAM, M.D., was taken before me remotely on Wednesday, March 9, 2022, that the foregoing testimony was taken by me in shorthand by myself and reduced to typing under my direction and control, that the foregoing pages contain a true and correct transcription of all of the testimony of said witness.

.............
MICHELLE PALYS
Notary Public
My commission expires
June 22, 2025

Page 62

I have read the foregoing deposition and the answers given by me are true and correct, to the best of my knowledge and belief.

...........................
LALITHA TRIVIKRAM, M.D.

Witness to signature

Address

My Commission expires
.............

Page 63

ERRATA SHEET

PAGE  LINE #  CHANGE  REASON THEREFORE

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____