# EXHIBIT 2

Joseph Caleb McCall, MD, HEC-C
3535 W School House Lane
Philadelphia, PA 19129

October 27, 2022

Dear Mr. Feinberg,

I was asked by your office to conduct a review of various medical records of Jonathan Gleaves, along with depositions taken from numerous parties in this case, and provide my opinion regarding whether Mr. Gleaves' death could have been prevented and any deviations from standards of care as it relates to Jonathan Gleaves' neurological status throughout his course at Curran-Fromhold Correctional Facility.

**Materials Reviewed**
Records from Curran-Fromhold Correctional Facility (CFCF)'s Corizon Record System
Records from Nazareth Hospital
Records from Hahnemann University Hospital (HUH)
Deposition of Matu Gaye, R.N.
Deposition of Kungchiha Jeoboham, R.N., M.S.N.
Deposition of Terrelle Jones
Deposition of Lalitha Trivikram, M.D.

**Medical Course at CFCF**
During the dates in question, 9/20/2018 – 9/21/2018, Jonathan Gleaves was a 33 year-old man with a medical history that included asthma, irritable bowel syndrome, Hepatitis C Virus infection, and substance use disorders (the patient's reporting included use of heroin, fentanyl, and alprazolam ("Xanax")). On 9/20/2018, Mr. Gleaves was seen by Dr. Elizabeth Bradley, MD, and Matu Gaye, RN, during his intake and screening assessment while being admitted to CFCF. During his assessment, his vital signs were recorded, a history of prior medical problems and current complaints was elicited, a physical exam was performed, and numerous questionnaire-style screening tools were used by Dr. Bradley and Nurse Gaye.

In their history of present illness (HPI), they note the patient reported a history of asthma but with difficult-to-remember and likely remote exacerbations as well as recent drug use including "heroin 10 bags daily, Xanax 2mg bar 4-6 tablet daily, Fentanyl 100mg daily…." They also noted the patient reported a history of Hepatitis C Virus infection, but no history of treatment. They elicited that the most recent use of these drugs was 9/19/2018, the day before their assessment. The patient did report complaints during his assessment, including

McNamara001239

"running nose, dizziness, leg cramps, anxiety, bone aches, nausea/vomiting [and] stomach cramps," noting onset of these symptoms on 9/19/2018. There was a note that the patient had previously experienced substance withdrawal symptoms and identification that several symptoms were indicative of withdrawal at the time of the assessment (diarrhea, headache, anxiety/agitation, bone aches, nausea/vomiting, runny nose). Their assessment included the BWS-C screening tool, as well as the COWS tool, which scored 6 and 10 respectively. The assessments were completed on 9/20/2018 at 1900, and were noted to be consistent with signs of mild benzodiazepine and opiate withdrawal.

During their physical examination, in addition to assessing those features required for completion of the BWS-C and COWS screening tools, they noted the patient's pupils were equal in size and normally reactive to light, his oral mucosa was moist, his skin was warm, and with regards to general appearance, there were no signs of "visible injury." They also performed the Glasgow Coma Scale, which is scored between 3 and 15 and assesses consciousness through observations of responses of the eyes, extremity movements, and verbal responses to an interviewer. Lower scores are often indicative of some alteration of consciousness. At the time of his assessment (approximately 1900), his score was the highest possible score, 15, consistent with normal eye, motor, and verbal responses.

In their Assessment and Plan, they noted completion of the intake assessment and routine general medical examination. They again summarized the patient's history, that he was currently awake, alert, and oriented, the scores of the BWS-C and COWS and based on their results treatment with "withdrawal protocol medication…" which elsewhere in the chart were detailed to have included Vistaril, Pepto-Bismol, Dicyclomine HCl, Loperamide HCl, Clonidine HCl, and Promethazine HCl, and acetaminophen, each for as-needed use to manage various symptoms. They also provided as-needed use of albuterol inhalers for asthma. They noted the patient was "educated to feel free to contact medical at any time if condition worsens and that he will be on withdrawal assessment q shift for 5 days…." They noted the patient was "Oriented to sick call process." There were no medical records of a withdrawal assessment for the shift following his assessment, between 9/20/2018 2300 and 9/21/2018 0700.

The following morning, on 9/21/2018, the patient was discovered shortly after 0700 by guard Terrelle Jones, who was starting the daytime shift and making the first patrol and count on the unit. In Ms. Jones' deposition, Ms. Jones noted that Mr. Gleaves was undressed and motionless on his bunk and appeared to have copious secretions around his mouth. Mr. Gleaves was unresponsive to calls by Ms. Jones, and Ms. Jones reported in her deposition that the other prisoner sharing his cell, Mr. Thomas, was agitated. Ms. Jones explained in greater detail in her deposition that the other prisoner reported that Mr. Gleaves had been sick throughout the night and that nobody had responded to numerous calls for assistance. Ms. Jones called for medical assistance, and medical records indicate that at the beginning of the medical assessment, 0704, Mr. Gleaves was "awake (eyes open but non-verbal)." They also noted presence of white viscous substance in and around his mouth, and that there was evidence he had aspirated or inhaled these secretions when they listened to his lungs. At

McNamara001240

approximately 0715, they called an ambulance. At some point around this time, he was moved from his cell into the medical unit and assessed by Dr. Lalitha Trivikram. Dr. Trivikram and her team administered suctioning of the mouth and naloxone 0.4mg at 0721, to treat or reverse possible opiate intoxication. They also gave lorazepam 2mg at 0727 to treat seizures (judged in their notes and in her deposition to possibly be occurring due to very fine movements of the extremities and the patient's unresponsive state). At approximately this time, Emergency Medical Services arrived and assumed Mr. Gleaves' care.

Records from the Philadelphia Fire Department's EMS Staff indicate they assessed Mr. Gleaves at 0727, found an elevated respiratory rate of 38, an elevated blood pressure of 140/110, and an elevated pulse of 158. Glasgow Coma Scale was performed and scored 7, which indicated diminished motor and verbal responses and an overall decreased level of consciousness. Of note, EMS staff did document that the patient was responding to stimulation by withdrawing his extremities. A nasopharyngeal airway was placed and supplemental oxygen was administered through this device. The patient was transported to Nazareth Hospital's Emergency Department.

**Hospital Course at Nazareth Hospital**
The patient was assessed by medical providers in Nazareth's Emergency Department at 0755. Mr. Gleaves' history was obtained primarily through report from EMS, as Mr. Gleaves was unable to respond verbally and so unable to provide his own history. His vital signs were noted to include a pulse of 165, a respiratory rate of 49, and hypoxia with oxygen saturation levels of 92%. The providers assessing him noted no response to noxious stimulation, which was a change from a short time before during EMS examination. The patient was again treated with naloxone for possible opiate overdose, but when there was no response, he was intubated at 0805. Blood was collected for serum lab testing and a CT scan of the head was ordered, as was an X-ray scan of the chest.

A CT scan of the brain performed 9/21/2018, at 0852, was interpreted by the radiologist at Nazareth Hospital to demonstrate "developing edema within the cerebellum, right greater than left, may be related to an underlying infarct given history of overdose. There is corresponding effacement of the adjacent cisterns, crowding of foramen magnum and tonsillar herniation…There is enlargement of the ventricles out of proportion of the sulci, suggestive of developing obstructive hydrocephalus." An X-ray of the chest performed at 0856 demonstrated "bilateral patchy infiltrates left lung greater than right which suggests the possibility of aspiration given the history." Serum lab testing demonstrated significant abnormalities, including an elevated white blood cell count, an elevated hemoglobin level, elevated creatinine and blood urea levels, as well as an acidosis and signs of elevation in the levels of liver enzymes and cardiac enzymes.

Physicians noted during his hospital course diagnoses of sepsis due to suspected aspiration pneumonia, respiratory failure, possible seizures, possible upper gastrointestinal bleeding, a stroke and brain herniation. Shortly after the findings of the CT scan of the head were noted and relayed to them (recorded at 0853), the Emergency Medicine team contacted Dr.

McNamara001241

Liebman, a neurosurgeon, to assume the patient's care and planned for a transition to Hahnemann University Hospital. Prior to transfer, he was treated with antibiotics

for suspected aspiration pneumonia, as well as an antiepileptic drug, levetiracetam, for possible seizures.

**Hospital Course at Hahnemann University Hospital (HUH)**

The patient arrived at HUH on 9/21/2018, at 0949. He was admitted to a critical care unit and his care assumed by the neurosurgery team. His records were reviewed, and  some tests performed earlier that morning were repeated. His vital signs were notable for pulse of 150, respiratory rate of 39, blood pressure of 116/80 mm Hg, and oxygen saturation of 90%. His neurological examination was notable for sluggishly reactive pupils, no eye movements during passive head turning, intact gag and cough reflexes, and absence of withdrawal from noxious stimuli in any of his extremities. It was noted that this exam occurred in the absence of sedation, while the patient was intubated. A chest X-ray was reportedly reviewed by the critical care team and concerning for changes consistent with Acute Respiratory Distress Syndrome (ARDS), and with the presence of hypoxia, the team urgently consulted with the Pulmonary/Critical Care Team.

Because Mr. Gleaves' condition was critical and it seems documentation often occurred retrospective to provision of care by minutes or hours, it is difficult to ascertain exactly when the Pulmonary/Critical Care Team assessed Mr. Gleaves and when other events occurred. The Pulmonary/Critical Care Team noted "during our initial encounter, the patient was being bagged with no improvements in his saturations. We attempted different ventilator changes/paralytics/flolan to improve his oxygenation but were unsuccessful. He suffered a cardiac arrest but ROSC was achieved after one round of epinephrine...patient was ultimately pronounced dead." Documentation from the neurosurgery team in the critical care unit similarly noted "His sat's were in the low 90's however he began to quickly desaturate. He was started on abx on arrival. Pulmonary was consulted to optimize ventilation. Pt required manual bagging to maintain O2 sats over 80%...After almost 3 hours of attempting to improve O2 sats patient went into respiratory arrest and PEA arrest with ROS being achieved after 1 round of epi. However, patient soon coded again and could not be revived."

Mr. Gleaves experienced a cardiac arrest and was briefly resuscitated before experiencing another cardiac arrest and after failed attempts to resuscitate him, he was pronounced deceased on 9/21/2018, at 1305.

**Opinions**

Cerebral infarcts, or strokes, have a wide range of consequences for those who experience them. While they can be life threatening, with access to timely and appropriate medical care it is more common for patients to survive a stroke than it is for them to die, even if they suffer long-term disability. Most strokes are caused by a blockage of blood flow to an area of the brain. In cases of an acute stroke, the goal of emergency treatment is to restore blood flow to an area of brain tissue that has not yet suffered permanent damage but is at risk, as well as, to

McNamara001242

provide supportive care, monitor for complications, manage complications, and take measures to prevent more strokes from occurring. One of the universal tenets of stroke care is the need to *quickly* recognize signs of stroke and *quickly* seek appropriate care, since treatments aimed at restoring blood flow and preserving at-risk but still viable brain tissue become less effective as time passes and the risk of complications from a stroke increase as time goes on. Time to provide treatment for these patients in clinical settings is usually measured in minutes or hours, again underscoring the critical nature of prompt treatment.

It is my opinion, to a reasonable degree of medical certainty, that Mr. Gleaves suffered a stroke while in the care of CFCF staff on the dates of 9/20/2018 and 9/21/2018 and that this stroke caused his death. It is also my opinion, to a reasonable degree of medical certainty, that he would have had a significantly increased chance of surviving the stroke he experienced had his status been more closely monitored and timely medical care been provided during the periods when he and/or his cellmate attempted to notify CFCF staff that his condition was worsening (9/20/2018 2300 to 9/21/2018 0700).

First, there is no evidence that Mr. Gleaves was already suffering a stroke during his intake assessment. He complained of no symptoms of motor dysfunction with regards to speech, ambulation or movements of his extremities, which would have been very likely to manifest in the case of a stroke in the cerebellum that would later go on to cause severe cerebral edema. Staff did not note observations of such symptoms in the medical record or recall these in their depositions. There was unlikely to be any cerebral edema, compression of the brainstem, or obstructive hydrocephalus (findings later seen on CT scan of the head) at the time of his intake assessment, since these findings would have almost certainly caused alteration of consciousness, and his Glasgow Coma Scale (GCS) was reportedly normal. The reports of imaging studies from the time Mr. Gleaves arrived at Nazareth Hospital, particularly the CT scan of the head performed 9/21/2018 at 0852, indicate the presence of cerebral edema in the cerebellum as well as compression of other brain structures by this swollen tissue. Cerebral edema is a complication of stroke. It normally occurs within 24 to 48 hours after a stroke, and peaks in its severity within 3 to 5 days after a stroke. Mr. Gleaves' case is exceptional, however, in that he was relatively young and so had not likely experienced the significant brain atrophy—or loss of brain volume—that occurs over the course of an individual's life and is usually evident in advanced age. This lack of significant atrophy in younger individuals means that the skull is essentially more full and specifically more full of brain tissue, and so the brain is more sensitive to the swelling and increased pressure that cerebral edema causes. His case is also exceptional because his stroke occurred in cerebellum, a part of the brain located in an anatomic space known as the posterior fossa. This space is bordered by a thick, inflexible layer of connective tissue above it and the rigid, bony base of the skull below it. In front of it is the brainstem—a structure that connects the brain and the spinal cord and conducts signals responsible for regulation of breathing and heart rate, in addition to other critical body functions—and the cerebral aqueduct—a narrow passage for the flow of fluid from within and around the brain.

This anatomic context is important because a stroke in this area of the brain and in a young

McNamara001243

patient can result in edema that becomes symptomatic, severe and potentially life-threatening through compression of the brainstem and obstruction of spinal fluid flow through the cerebral aqueduct much earlier than would be expected in many patients. Again, the stroke itself likely would have caused significant neurological symptoms not noted during the intake assessment and so was not likely present at that time. The presence of cerebral edema—which likely required at least several hours to develop—when he was assessed with a CT scan of the head, leads me to conclude that the stroke happened several hours before this CT scan and so was likely in the hours after Mr. Gleaves intake assessment ended on 9/20/2018.

While the exact mechanism of Mr. Gleaves' stroke is difficult to ascertain through my retrospective chart review and because testing was limited by the rapidity with which his condition grew unstable, my opinion from reviewing his records and my experience in similar cases is that his stroke related to either elevation of blood pressures during the worsening withdrawal syndrome he experienced while under the care of staff at CFCF, changes in heart rhythms and blood flow that occurred during this same withdrawal syndrome, or, less likely, as a result of a tear in the lining of the blood vessels leading to the brain sustained during periods of intense vomiting and coughing that were reported to have occurred. These mechanisms also seem more likely in the absence of other chronic conditions that would have predisposed Mr. Gleaves to having a stroke in this setting (although essential hypertension, a significant risk factor for stroke, was noted in his record, the CFCF medical staff commented that he previously had normal blood pressures documented in their records from a prior encounter and that they would only treat his blood pressure elevations during a suspected withdrawal syndrome with as-needed medications). It is therefore also my opinion, to a reasonable degree of medical certainty, that if his withdrawal syndrome had been adequately monitored and treated he may not have suffered a stroke at all, and perhaps been spared the other risks of significant complications of untreated withdrawal from benzodiazepines and opiates.

In their initial assessment, Dr. Bradley and Nurse Gaye properly elicited a history of Mr. Gleaves having recently used multiple drugs, a history of daily use of these substances, a history of withdrawal and in fact signs of current, mild withdrawal syndrome already having begun. They recommended and ordered a withdrawal protocol that would include symptomatic treatments, an assessment by medical staff during each shift for the following five days, and a directive that the patient notify staff if his symptoms or condition worsened, with his medical record indicating that he had been, "oriented to sick call process." In Ms. Jones' deposition, she notes that many of the inmates housed in the area where Mr. Gleaves was staying are also suffering from withdrawal. Ms. Jones also noted that guards working in that area have a responsibility to patrol the unit every 30 minutes, during which time they were expected to assess each prisoner for signs of responsiveness. Even if this were not detailed inspections of each cell, Ms. Jones recounts that Mr. Gleaves' cellmate complained that nobody had responded to their calls for help, casting doubt on whether someone was patrolling or relaying the request for medical assistance as would have been expected and as would have offered the possibility to rescue Mr. Gleaves. Review of depositions from Mrs.

McNamara001244

Jeoboham and Mrs. Gaye also indicate that an assessment by a nurse was not performed after Mr. Gleaves' intake assessment, during the  shift between 9/20/2018 2300 and 9/21/2018 0700. While there is dispute between their depositions as to whether such an assessment should have been manually scheduled, automatically scheduled through the electronic health record system, or was not necessary, leaving such a large gap in medical assessment of a patient experiencing mild withdrawal and at risk for worsening withdrawal would be a deviation from standards of care for such patients.

It is routine for the most complex types of stroke care to occur at a few, centralized Comprehensive Stroke Centers. Review of the records after Mr. Gleaves was discovered in his cell to the time that he died shows a prompt assessment and ordering of head imaging, almost immediate consultation with a neurosurgeon at an associated referral hospital once the  imaging was noted to show abnormalities concerning for his stroke, and transfer. It seems that shortly after arrival at Hahnemann University Hospital, Mr. Gleaves was found to have developed acute respiratory distress syndrome (ARDS). This condition resulted in worsening hypoxia that could not be corrected despite numerous interventions detailed in the medical record and summarized above. The CT scan performed at Nazareth Hospital demonstrated that Mr. Gleaves' cerebral edema was already causing compression of the brainstem, herniation of brain tissue through the base of the skull, and blockage of spinal fluid, with signs of obstructive hydrocephalus. These conditions are often treated with a combination of medical and sometimes surgical therapies, although a patient with hypoxia and already advanced imaging findings as in this case would make these interventions riskier or contraindicate them. It is again my opinion that he would have been a better candidate for potentially life-saving stroke care and could have had an improved outcome had his symptoms been assessed and appropriately triaged during the time in which he and his cellmate were requesting help and were not monitored by nursing or guard staff members.

Joseph Caleb McCall, MD, HEC-C

10/27/2022

# JOSEPH CALEB MCCALL, MD

Phone: (337) 802-9708                                                3535 W School House Lane
calebmccall@gmail.com                                            Philadelphia, PA 19129

## PROFESSIONAL EXPERIENCE

**2016-Present**    Thomas Jefferson University                              Philadelphia, PA
**Clinical Assistant Professor in Department of Neurology**
**Neurohospitalist and Neurohospitalist Division Chief**

- Appointed one of the first dedicated hospital-based neurologists at TJUH.
- Improved reimbursement in our patient cohort by reducing length of stay and improving clinical documentation to reflect higher clinical complexity.
- Appointed Division Chief; lead other Neurohospitalists in Academic Development and Clinical Process Improvement efforts and complete administrative tasks for our Division.
- Received multiple awards for teaching and embodiment of humanism in medicine from Medical College's Dean, student body and neurology residents.
- Serve and lead various committees, including Neurology Dept. Faculty Affairs Committee, Hospital Delirium Committee.
- Represent the Neurology Department on the Hospital Medicine Leadership Council.

**2012-2016**    Thomas Jefferson University Hospital                      Philadelphia, PA
**Internal Medicine Intern and Neurology Resident**

- Worked as a resident physician, caring for patients and teaching medical students.
- Inducted into Alpha Omega Alpha Honor Society for a commitment to scholarship and excellent patient care.
- Acted as Chief Resident in the Neurology Residency, helping launch a well-received "boot camp" for new residents, teaching high-yield clinical neurology and clinical skills.

## EDUCATION

**2022-2024**    Executive MBA (Candidate)                                    Philadelphia, PA
The Wharton School of the University of Pennsylvania
Accepted January 2022; Planned Matriculation May 2022

**2008-2012**    Doctor of Medicine (MD)                                          Shreveport, LA
Louisiana State University Health Sciences Center

**2004-2008**    Bachelor of Science, Biology                                    Lake Charles, LA
Bachelor of Science, Psychology
McNeese State University
Graduated Magna Cum Laude

McNamara001246

## VOLUNTEER EXPERIENCE

**2017-Present**    Thomas Jefferson University Hospital; Methodist Hospital                Philadelphia, PA
            **Hospital Ethics Consultant**

- o    Act as one of three volunteer ethics consults, advising patients, families, staff and hospital administration regarding ethical dilemmas with ramifications for patient care and hospital services at TJUH and Methodist Hospital.
- o    Assist with education of staff regarding topical ethical issues and contribute to a more formalized educational and peer-review process for ethics consultation at Hospital Ethics Committee meetings.

## PROFESSIONAL LICENSURE AND CERTIFICATION

American Board of Psychiatry and Neurology **-** Board Certified in Neurology
Medical License (MD/DO) - State of Pennsylvania
Hospital Ethics Consultation Certification (HECC) - American Society for Bioethics and the Humanities

## PROFESSIONAL AFFILIATIONS

Pennsylvania State Medical Society – Active Member
American Academy of Neurology – Active Member
Neurohospitalist Society – Active Member

## PROFESSIONAL SERVICE

Advisor to Neurohospitalist Fellowship Education Consortium
Peer-reviewer for the Practical Neurology publication

McNamara001247

Joseph Caleb McCall, MD
3535 W School House Lane
Philadelphia, PA 19129
337-802-9708
Joseph.mccall@jefferson.edu


Neurology and Medical Ethics Legal Consultation
Fee Schedule

**Medical Record Review or Document Creation:**
(Includes medical record review, case analysis, telephone communications, meeting time, case preparation time and preparation of report (if needed))
$500.00 per hour

**Deposition and Trial Appearance (Local to Philadelphia Region)*:**
$2000.00 for first four hours (minimum); $500.00 for each additional hour

**Deposition and Trial Appearance (Outside of Philadelphia Region)*:**
$2000.00 for first four hours (minimum); $500.00 for each additional hour; plus travel and accommodation expenses (if needed)


*Cancellation Fees:
If planned service is not required, fee may still be requested based on amount of notice given.
Three or more business days' notice: No fee.
Two business days' notice: 50% fee.
Less than two business days' notice: 100% fee.

McNamara001248